RICHARD J. NELSON (State Bar No. 141658)
E-Mail: *rnelson@sideman.com*
IAN K. BOYD (State Bar No. 191434)
E-Mail: *iboyd@sideman.com*
ANGELA M. HE (State Bar No. 319351)
E-Mail: *ahe@sideman.com*
SIDEMAN & BANCROFT LLP
One Embarcadero Center, Twenty-Second Floor
San Francisco, California 94111-3711
Telephone: (415) 392-1960
Facsimile: (415) 392-0827

Attorneys for Cisco Systems, Inc. and Cisco Technology, Inc.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

CISCO SYSTEMS, INC., a California corporation, et al.,

Plaintiffs,

v.

ZAHID "DONNY" HASSAN SHEIKH, an individual, et al.,

Defendants.

---

ADVANCED DIGITAL SOLUTIONS INTERNATIONAL, INC., a California corporation,

Third-Party Plaintiff,

v.

RAHI SYSTEMS, INC., a California corporation, et al.,

Third-Party Defendants.

Case No. 4:18-cv-07602 YGR

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY/REPORTS OF DR. DANIEL LEVY AND GREG REGAN**

Judge: Honorable Yvonne Gonzalez Rogers
Date: July 31, 2020
Time: 2:00 p.m.
Crtrm.: 1, 4th Floor

**PUBLIC VERSION**

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

**TABLE OF CONTENTS**

**Page**

INTRODUCTION .......... 1

A. Cisco's Allegations and Evidence of Defendants' Wrongdoing .......... 3

B. Defendants' Attempts to Cover Up Evidence of Their Wrongdoing .......... 4

C. Despite Being the Sole Source of Information to Rebut This Evidence, Defendants Refused to Answer Questions and Asserted the Fifth Amendment .......... 5

D. Cisco's Risk-Scoring Model .......... 6

E. Cisco's Expert Disclosures .......... 8

1. Dr. Levy's Expert Report .......... 8

2. Mr. Regan's Expert Report Complies With the Requirements of *Daubert* .......... 10

a. Missing Data that Defendants Failed to Provide .......... 10

b. Evidence of Defendants' Sales of Non-Genuine Cisco Products .......... 11

c. Evidence Favoring Pricing Inelasticity for Cisco Customers .......... 11

d. Portion of Defendants' Sales Were Not Accounted for in Damages Analysis .......... 12

e. Mr. Regan's Lost Profits Analysis .......... 13

I. THE COURT SHOULD ALLOW THE EXPERT TESTIMONY OF DR. LEVY AND MR. REGAN BECAUSE THEY EACH APPLIED ACCEPTED PRINCIPLES AND METHODOLOGY IN THEIR ANALYSIS .......... 13

A. Dr. Levy's Testing of the Cisco Risk Scoring Model Is Reliable .......... 14

B. Defendants' Arguments Concerning the Underlying Cisco Risk Scoring Model Are Both Incorrect and Inappropriate For a *Daubert Motion* .......... 16

1. Dr. Levy's Methods Have Been Peer Reviewed, and Defendants' Assertion That the Cisco Risk Scoring Model Has Not is Irrelevant .......... 16

2. Revisions To the Underlying Risk Scoring Model To Increase Efficiency Does not Invalidate Dr. Levy's Analysis .......... 17

3. The Sale of Used or Surplus Cisco Products Does Not Invalidate Dr. Levy's Analysis ..... 18

4. The False Positive Rate Associated With the Small Sample of Transceivers Does Not Justify Exclusion of Dr. Levy's Report. ..... 18

C. Mr. Regan's Lost Profits Analysis is Reliable ..... 19

1. Mr. Regan Is Well Qualified To Opine On Forensic Accounting Matters ..... 19

2. Mr. Regan's Expert Opinion Calculating Damages Related to Transceivers Of Unknown Origin Is Fully Justified. ..... 19

3. Mr. Regan's Lost Profits Analysis is Based On Sound Methodology and Is Not Impermissibly Speculative ..... 20

a. Mr. Regan's Report Satisfies Plaintiffs' Burden re Lost Profits ..... 20

b. Mr. Regan's Report Does Not Assert Perfectly Inelastic Demand ..... 23

4. Mr. Regan May Extrapolate Cisco's Damages, Especially Where Defendants Have Concealed Evidence of Their Wrongdoing ..... 24

CONCLUSION ..... 25

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
738 F. 3d 960 (9th Cir. 2013)....................14

*Albergo v. Immunosyn Corp.*,
No. 09CV2653 DMS (MDD), 2012 WL 12953736 (S.D. Cal. June 19, 2012)....................20

*Apple Inc. v. Samsung Elecs. Co.*,
No. 11-01846, 2018 WL 1586276 (N.D. Cal. Apr. 2, 2018)....................14

*City of Pomona v. SOM N. Am. Corp.*,
750 F.3d 1036 (9th Cir. 2014)....................17

*Daubert v. Merrell Dow Pharms., Inc.*,
*509 U.S. 579 (1993)* .................... *passim*

*Dial Corp. v. News Corp.*,
No. 13CV6802, 2016 WL 690868 (S.D.N.Y. 2016)....................16

*Ford Motor Co. v. Kuan Tong Indus. Co.*,
697 F. Supp. 1108 (N.D. Cal. 1987)....................24

*General Electric Co. v. Joiner*,
*522 U.S. 136 (1997)*....................14

*Grace v. Apple*,
328 F.R.D. 320 (N.D. Cal. 2018)....................16

*Intel Corp. v. Terabyte Int'l, Inc.*,
6 F.3d 614 (9th Cir. 1993)....................25

*Kumho Tire Co. v. Carmichael*,
*526 U.S. 137 (1999)*....................14

*Lucent Techs., Inc. v. Microsoft Corp.*,
837 F. Supp. 2d 1107 (S.D. Cal. 2011)....................18

*McCurley v. Royal Seas Cruises, Inc.*,
331 F.R.D. 142 (S.D. Cal. 2019)....................16

*Microsoft Corp. v. Buy Cheap Software*,
2016 WL 7444627 (C.D. Cal. 2016)....................24

*Microsoft Corp. v. Compusource Distributors, Inc.*, 115 F.Supp.2d 800 (E.D. Mich. 2000) ........ 25

*Moroccanoil, Inc. v. Groupon, Inc.*, 278 F. Supp. 3d 1157, 1162 (C.D. Cal. 2017) ........ 24

*Obrey v. Johnson*, 400 F.3d 691 (9th Cir. 2005) ........ 16

*In re Packaged Seafood Prod. Antitrust Litig.*, No. 15-MD-2670 JLS (MDD), 2019 WL 3429174 (S.D. Cal. July 30, 2019) ........ 16

*Primiano v. Cook*, 598 F.3d 558 (9th Cir. 2010) ........ 14

*Regents of Univ. of California v. Affymetrix, Inc.*, No. 17-01394, 2019 WL 1298094 (S.D. Cal. Mar. 21, 2019) ........ 14

*Square D Co. v. Breakers Unlimited, Inc.*, No. 1:07-CV-806-WTL-JMS, at *2–3 (S.D. Ind. May 21, 2009) ........ 21, 22, 23

*Wang v. Chinese Daily News, Inc.*, No. 04-1498, 2007 WL 4355187 (C.D. Cal. Aug. 3, 2007) ........ 16

*Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227 (9th Cir. 2017) ........ 17

**Statutes**

Lanham Act ........ 21, 22

**Other Authorities**

*Alan Agresti*, CATEGORICAL DATA ANALYSIS, 2ND EDITION (Wiley & Sons, 2002) ........ 8, 15

Fifth Amendment ........ 2, 4, 5, 20

F.R.C.P. 26(a)(2)(B) ........ 8

Federal Rule of Evidence 702 ........ 13, 14, 16

*Jeffrey Woolridge*, INTRODUCTION TO ECONOMETRICS, 5th Edition, (South-Western), 2009 ........ 8, 15

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

## INTRODUCTION

The expert reports and opinions offered by Dr. Daniel Levy and Greg Regan are more than sufficiently reliable for a finder of fact to consider in assessing the extent of Defendants' liability and the resulting damages arising from Defendants' counterfeiting scheme. The crux of Defendants' Motion to Exclude Expert Testimony of Dr. Daniel Levy and Greg Regan ("Motion" or "Mot."), is to create a straw man and try to distract the Court by focusing on the false argument that the underlying risk model must comply with the requirements of *Daubert*, when in fact it is the expert reports and respective methodologies applied by the experts which are at issue, and they both readily clear the bar of admissibility.

The critique and validation of a risk scoring model, the subject of Dr. Levy's report and opinion, is a standard and appropriate basis for expert testimony. Dr. Levy's statistical analysis applies both out-of-sample testing and an independent logit regression to assess the validity of the Cisco risk scoring model. Both of these validation approaches are widely accepted methods of statistical examination. Recognizing this, Defendants spend a great deal of their motion conflating Dr. Levy's analysis with their complaints about the underlying Cisco risk model itself – not the methodology applied by Dr. Levy. Indeed, Defendants even cite Dr. Levy's own findings with approval to criticize the Cisco risk scoring model, belying their contention that his analysis is not reliable.

Defendants use the remainder of their motion to make the customary defense argument that the calculated lost profits are too high as determined by Plaintiffs' damages and forensic accounting expert, Greg Regan. Defendants wrongly contend that for his lost profits analysis,[1] Mr. Regan assumed inelastic demand and that every sale of Defendants' counterfeit Cisco product would have otherwise gone to Cisco. Yet Defendants, who fail to provide their own lost profits analysis, fail to acknowledge that Mr. Regan's findings do not take into account Defendants' sales

---

[1] Defendants' Motion does not expressly address Mr. Regan's opinion regarding the amount of Defendants' unjust enrichment arising from their counterfeiting enterprise.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

of approximately [redacted] of "Cisco" goods (roughly 18% of Defendants' net sales) for which Defendants have successfully concealed the necessary data. Thus, because Mr. Regan does not factor in 18% of Defendants' sales, by definition he does not assert inelastic demand nor that every sale of counterfeit goods by Defendants would have otherwise gone to Cisco.

Defendants also contend that Mr. Regan makes improper assumptions that certain sales were 100% counterfeit in the absence of actually inspecting each one. However, Mr. Regan did not make this forensic determination in a vacuum. Notably, with respect to these sales:

- A former ADSI employee testified that Defendants were trafficking in counterfeit Cisco products and observed Defendants' personnel applying counterfeit labels on such "Cisco" products.
- U.S. Customs seized counterfeit Cisco labels being imported by Defendants.
- U.S. Customs also seized hundreds of counterfeit "Cisco" products imported by Defendants to Fremont, and Defendants then arranged to have counterfeit products shipped from China to Reno and Portland, Oregon (Defendants did not maintain offices at either location and U.S. Customs subsequently seized counterfeit Cisco products destined for the Reno location).
- Every transceiver sold by ADSI and tested by Cisco was counterfeit (in excess of 60 transceivers).
- Defendants failed to provide serial numbers and vendor information for numerous transactions.
- Multiple Defendants asserted the Fifth Amendment and refused to testify regarding these topics and Defendants' financial documentation (or lack thereof), and Cisco is entitled to the appropriate inference by law.

Mr. Regan, a CPA-certified forensic accountant and Certified Fraud Examiner, thus opined on these transactions accordingly.

Defendants are free to cross-examine Dr. Levy about his validation of the Cisco risk scoring model, or Mr. Regan to try to mitigate his lost profits calculations, and the jury may take it all into account in determining damages. However, Defendants' arguments about the underlying risk scoring model and the experts' conclusions go to the weight of the testimony -- they do not justify the exclusion of Dr. Levy or Mr. Regan as they applied sound and reliable methodologies in preparing their reports. The Court should deny Defendants' Motion.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

## FACTS RELEVANT TO MOTION

### A. Cisco's Allegations and Evidence of Defendants' Wrongdoing

Plaintiffs Cisco Systems, Inc., and Cisco Technology, Inc. (collectively, "Cisco" or "Plaintiffs") filed the Second Amended Complaint in this action on December 4, 2019 (Docket No. 79), against Advanced Digital Solutions International, Inc. ("ADSI"), individuals related to that company, and companies controlled by them. (For purposes of this Opposition, defendants ADSI, PureFutureTech, LLC, K & F Associates, LLC, Shahid Sheikh, Kamran Sheikh, and

Defendants have engaged in a large and sophisticated scheme to sell counterfeit Cisco products. By way of just a few examples:

- A former employee, Nabia Uddin, who worked at ADSI until November 2017 testified that she observed co-Defendants Jessica Little and Husain applying counterfeit labels on "Cisco" transceivers.[2]

- US Customs seized counterfeit Cisco transceiver labels imported by Defendants. Ms. Uddin testified that ADSI was trafficking in counterfeit Cisco products and ADSI's CEO, Shahid Sheikh, and co-Defendant Little, instructed her to order "Cisco" transceivers from China, and they arrived separate from the Cisco labels.[3]

- Every transceiver sold by ADSI that Cisco tested was counterfeit. This includes 39 transceivers sold to a broker in Florida from April 2015 to April 2017; 10 transceivers sold to the [REDACTED] in August 2018; and 12 transceivers sold to the [REDACTED] in October 2017.[4]

---

[2] Declaration of Ian K. Boyd ISO Plaintiffs' Opposition to Defendants' Motion to Exclude Expert Testimony ("Boyd Decl.), Exh. A at 134:2-135:6; 136:21-137:20; 208:16-210:12; 215:21-216:14. *See also* Expert Report of Greg Regan ("Regan Report"), at 12-13 (attached as Exhibit E to the Declaration of Andrew Parkhurst in Support of Defendants' Motion to Exclude Expert Testimony of Daniel Levy and Greg Regan, and Motion to Strike Expert Reports, Docket No. 134-1 ("Parkhurst Decl., Docket No. 134-1").

[3] Boyd Decl., Exh. A at 122:8-125:9; Regan Report, at 13.

[4] Boyd Decl., ¶ 28; Regan Report, at 10.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

- After U.S. Customs seized hundreds of counterfeit transceivers being imported by Defendants to Fremont, Defendants arranged for a UPS box in Reno, Nevada to receive Cisco products from China.[5] When U.S. Customs seized counterfeit Cisco products going to the Reno box, Defendants arranged for a UPS box in Portland, Oregon. There were no ADSI employees or customers in Reno or Portland, and Shahid Sheikh in his deposition provided no innocent explanation for arranging for far-flung locations to receive Cisco products.[6]

**B. Defendants' Attempts to Cover Up Evidence of Their Wrongdoing**

Defendants have attempted during discovery to cover up evidence of their counterfeiting activity. By way of a few examples:

- Defendant ADSI's transaction data does not contain the serial numbers for the Cisco equipment sold by Defendants.[7]
- ADSI and Defendant K & F Associates, LLC failed to provide vendor information for approximately 75% of their Cisco sales, despite ADSI's assertion that it is company policy to retain such information.[8]
- 100% of ADSI's sales to fellow co-defendant K&F Associates did not contain vendor information.[9]

Defendants produced intentionally incomplete financial records that preclude Mr. Regan from including over [redacted] in his lost profits analysis.[10] Namely, Defendants reported sales of [redacted] where the Cisco product number (also known as a Product ID, or "PID") cannot be matched to Cisco's list price (also known as Global List Price, or "GLP"). When viewed in the

---

[5] Boyd Decl., ¶ 29; Regan Report at 12-13.

[6] Boyd Decl., Exh. B at 29:18-31:22; 200:13-201:25.

[7] Regan Report, at 14; Boyd Decl., Exhs. M, O-Y.

[8] Regan Report, at 11; Boyd Decl., Exhs. M, O-Y.

[9] Regan Report, at 11.

[10] Declaration of Greg Regan in Support of Plaintiffs' Opposition to Defendants' Motion to Exclude Expert Testimony/Reports of Dr. Daniel Levy and Greg Regan ("Regan Decl."), ¶17.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

overall context, these products are almost certainly counterfeit, but Mr. Regan did not have enough information from these transactions to formulate the associated lost profits and thus excluded them from that calculation.[11]

In addition, there is <u>at least</u> [REDACTED] in Defendants' sales surrounding missing transactions that are not accounted for in Mr. Regan's lost profits analysis.[12] For example, Defendants appear to have sold:

- Eight switches to the [REDACTED] in November 2017 related to a product referred to only in Defendants' data as CISCO-WS-C3850.[13]
- [REDACTED] worth of Cisco goods where the Defendants produced numerous hard copies of customer invoices but omitted the related electronic sales data.[14]

**C. Despite Being the Sole Source of Information to Rebut This Evidence, Defendants Refused to Answer Questions and Asserted the Fifth Amendment**

Cisco sought to question Defendants about these facts and related documentation, but:

- Kamran Sheikh, who owns and operates Defendant PureFutureTech, asserted his Fifth Amendment right at his deposition on February 20, 2020.
- Farhaad Sheikh, the C.E.O. of ADSI, asserted his Fifth Amendment right at his deposition on February 21, 2020.
- Shahid Sheikh, an owner of ADSI and father of Kamran Sheikh and Farhaad Sheikh, asserted his Fifth Amendment right at his resumed deposition on February 28, 2020.[15]

In sum, Defendants have had plentiful opportunities to produce full and complete documentation of their business records, such as to provide serial numbers and complete vendor

---

[11] Regan Decl. ¶¶ 5-7 and Schedule 10c of Regan Report.

[12] Regan Decl, ¶ 15 and Exhibit 1 attached thereto.

[13] Regan Decl., ¶ 14; Boyd Decl., Exhs. C, D.

[14] Regan Decl., ¶13; *see* Boyd Decl., Exhs. C, E.

[15] Declaration of Richard J. Nelson in Support of Plaintiffs' Opposition to Motion by Defendants to Stay Civil Proceedings Until Expiration of Statute of Limitations, Docket No. 122-1, at ¶ 8.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

information, and other missing electronic data, to verify that the additional goods are not counterfeit and to address Defendants' allegations about the alleged elasticity of customer demand. Instead, Defendants have not only remained silent, they have affirmatively thwarted the development of the very evidence that they fault Plaintiffs for not having.

### D. Cisco's Risk-Scoring Model

Cisco's Brand Protection team is tasked with identifying and stemming the flow of counterfeit Cisco products. In light of the inherent pragmatic challenges in inspecting and/or obtaining sufficient information for each and every such product sold by unauthorized sources (as evidenced by Defendants' surreptitious activity), and in order to create a model that would assist in identifying whether a product might be counterfeit when the actual product is unavailable for inspection, Cisco created a methodology, based on a traditional risk scoring model,[16] to assist in predicting whether certain products have a high risk of being counterfeit based on certain available data.[17]

Initially created in 2016, Cisco has refined the model over time in an attempt to even further increase its predictive reliability. The risk scoring model currently assesses the following factors concerning the product: [REDACTED]

---

[16] Risk scoring models are well known and commonly accepted by economists for a wide variety of purposes. Declaration of Daniel S. Levy, Ph.D., ISO Plaintiff's Opposition to Defendants' Motion to Exclude Expert Testimony/Reports of Dr. Daniel Levy and Greg Regan ("Levy Decl."), ¶¶ 2-3. One example of a risk scoring model is a credit score, which "employs statistical techniques and historical data to produce a score that financial institutions can use to evaluate credit applicants in terms of risk." *See Yingxu Yang*, Adaptive Credit Scoring with Kernel Learning Methods, p. 1 (attached as Exhibit 1 to Levy Decl.). In fact, Defendants' own expert, Dr. Russell Mangum, has built risk models and used techniques similar to those used by Dr. Levy dozens of times to assess risk models. Boyd Decl., Ex. F.

[17] Expert Report of Daniel Levy ("Levy Report"), at 5-6 (attached as Exhibit B to the Parkhurst Decl., Docket No. 134-1); *see* "Memorandum on the Risk Scoring History and Evolution" authored by Mr. Tim Casto (attached as Exhibit A to the Parkhurst Decl., Docket No. 134-1).

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

[REDACTED] Cisco applied different weights to each of these factors based on Cisco's experience as to their predictive nature, providing higher scores to criteria it believed to be associated with a greater risk of counterfeiting.[18]

By definition no risk scoring model is perfect. However, in the absence of the ability to physically examine each and every one of the thousands of products at issue in this litigation, especially considering Defendants' surreptitious conduct, Cisco turned to outside experts to first determine if the risk scoring model was deemed valid and statistically sound for trial, and if so, for a damages expert to then utilize the available information provided by Defendants and third-party sources to reasonably attempt to estimate damages where particular products were "High Risk," "Medium Risk," or "Low Risk" of being counterfeit.

While Defendants take issue with the conclusions reached by these experts, the appropriate question for their motion, as shown below, is whether these experts applied a sound and reliable methodology in coming to their opinions, not whether Defendants agree with their ultimate conclusions. Both Dr. Levy and Mr. Regan fully pass this test.[19]

---

[18] Levy Report, at 5-6; Parkhurst Decl., Docket No. 134-1, Exh. A.

[19] This is not the first time Cisco's risk scoring model has been in dispute before a Northern District Court. Cisco presented its risk scoring model to Magistrate Judge van Kuelen seeking the ability to contact customers of High Risk product in *Cisco Systems, Inc. et al. v. Beccela's Etc, et al.*, Case 5:18-cv-00477-BLF. The Court's Order Re The Parties' June 24, 2019 Joint Discovery Letter (Dkt. 102) found that Cisco's use of the risk scoring method "to assess counterfeit risk demonstrates that Cisco has attempted to narrow its discovery to the most relevant transactions and products."

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

**E. Cisco's Expert Disclosures**

Pursuant to F.R.C.P. 26(a)(2)(B), Cisco disclosed Dr. Daniel Levy and Mr. Greg Regan as experts and served their respective expert reports on Defendants.

**1. Dr. Levy's Expert Report**

Cisco retained Dr. Daniel Levy to review the performance and validity of the risk scoring system that Cisco developed "to distinguish between new, genuine Cisco products and counterfeit products sold by various resellers." Dr. Levy is widely recognized for his work in econometrics.[20]

To briefly summarize the findings and process of Dr. Levy as contained more fully in his expert report, Dr. Levy examined how the Cisco risk scoring model performed "in distinguishing the new, genuine products from counterfeit products" which Defendants "sold as new, genuine products." He assessed the risk scoring model by performing a standard "out-of-sample" analysis[21] (utilizing data distinct from the in sample analysis) to determine if he could validate the model. This proved successful.[22]

Dr. Levy then applied a logit regression[23] to independently test how well the risk scoring model performed compared to a statistical model where the weights for each factor are constructed

---

[20] Levy Report, Appendix 1 (Dr. Levy's curriculum vitae).

[21] *See Jeffrey Woolridge*, INTRODUCTION TO ECONOMETRICS, 5th Edition, (South-Western), 2009, p. 659 ("For forecasting, it is better to use out-of-sample criteria, as forecasting is essentially an amount-of-sample problem. … An out-of-sample comparison involves using the first part of a sample to estimate the parameters of the model and saving the latter part of the sample to gauge its forecasting capability.") (Attached as Exhibit 1 to Levy Decl.)

[22] Levy Decl., ¶¶ 10-11.

[23] *See Alan Agresti*, CATEGORICAL DATA ANALYSIS, 2ND EDITION (Wiley & Sons, 2002), p. 165 ("This [Logit] is the most important model for categorical response data. It is used increasingly in a wide variety of applications. Early uses were in biomedical studies but in the past 20 years have also seen much use in social science research and marketing.") This text also confirms that logit models have been used to assess and predict a wide range of binary outcomes, including probability of promotions, patient responses to treatments, graduate school acceptance, and the occurrence of heart disease, among others. (Attached as Exhibit 1 to Levy Decl.)

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

by the statistical process that fits the "in sample" data best. The logit regression independently confirmed the validity and reliability of the Cisco risk-scoring model.[24]

Applying a 95% confidence interval concept, Dr. Levy concluded that the risk scoring model "has a high likelihood of identifying verified counterfeit units as High Risk and a low probability of identifying verified genuine units as High Risk particularly for switches and transceivers … The Cisco risk-score metrics perform well on the measures, risk-levels and data sets I analyzed."[25]

It is generally understood that it is the out-of-sample fit, not the in-sample fit, that is the measure of how well the model works and the relevant measure. The performance of the model in fitting the in-sample data used to develop the model is generally not considered the measure of the performance of the metric. Because a model is built with the use of the training (in-sample) set of data, the fit of this model may not be a reflection of how well the model may fit other data on which it was not constructed (i.e. out-of-sample data). The test of how well the model works is how well it fits the out-of-sample data not used in the model's development.[26]

Applying the out-of-sample fit, Dr. Levy concluded that the risk scoring model correctly estimated that:

- For switches, the out-of-sample false positive rate was 5.3% (upper and lower confidence intervals of 0.1% and 26.0%).
- For transceivers, the out-of-sample false positive rate was 0% (upper and lower confidence intervals of 0.0% and 2.8%).[27]

Defendants take issue with the fact that Dr. Levy found that the <u>in-sample</u> fit estimated for one subset that 38% of the transceivers designated as High Risk of counterfeit were in fact

---

[24] Levy Decl., ¶ 13.

[25] Levy Report., at 19.

[26] Levy Decl., ¶ 10 and citing Jeffrey Wooldridge, *Introduction to Econometrics*, 5th Edition, (South-Western) 2009, p. 659. (attached as Exhibit 1 to Levy Decl.).

[27] Levy Decl., ¶ 11

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

genuine. Although this result occurred in part because of the very limited sample size of the transceiver set,[28] as noted above, it is the out-of-sample fit that is the better determinant here. Tellingly, in arguing that this one instance of a false positive arising from the in-sample analysis of a transceivers subset is cause to throw out Dr. Levy's report, Defendants in fact rely on (and validate) Dr. Levy's analysis concerning the 38% estimate to try to substantiate their own argument.[29] As shown below, that Defendants quibble with the underlying statistics may be cause for cross-examination, but it does not provide grounds to exclude Dr. Levy's report where he applied standard and reliable methodologies and principles to assess and confirm the validity of the underlying risk scoring model.[30]

### 2. Mr. Regan's Expert Report Complies With the Requirements of *Daubert*

Greg Regan provided an expert report measuring economic recoveries available to and damages suffered by Cisco related to the actions alleged against Defendants. Mr. Regan calculated both 1) Cisco's lost profits and 2) Defendants' unjust enrichment.[31]

#### a. Missing Data that Defendants Failed to Provide

Mr. Regan's forensic analysis should not be performed in a vacuum and he began by noting ADSI's missing transaction data, as noted above. ADSI's failure to produce serial numbers of sold products, and ADSI and K&F's failure to produce vendor information for purchased

---

[28] Boyd Decl., Exh. G at 150:20 – 152:22.

[29] Defendants' Mot., 18:19-27.

[30] Moreover, as shown below and out of an excess abundance of caution, Mr. Regan adjusted his findings downward to provide Defendants the benefit of the doubt with respect to his damages calculations for the limited set of transceivers to which this probability applied.

[31] As confirmed in his c.v., Mr. Regan is not only a Certified Public Accountant but he also holds the Certified in Financial Forensics (CFF) certification from the AICPA. He currently serves as the Chair of California Society of Certified Public Accountants (CalCPA) statewide Forensic Services Section and is a Certified Fraud Examiner. Regan Report, Appendix A (Mr. Regan's curriculum vitae).

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

products, led a to reasonable conclusion that Defendants sought to hide evidence of such transactions, particularly where the C.E.O. (Shahid Sheikh) testified that ADSI keeps that data in its system. Mr. Regan correctly noted that Defendants, such as Farhaad Sheikh, refused to answer questions regarding the completeness of the sales data produced for ADSI, nor would they answer questions confirming that the provided financial documents were reliable, despite being the only individuals who could reasonably confirm this information.[32] Mr. Regan confirmed that in his experience as a forensic accountant, the absence of this data substantially increases the risk that the product was non-genuine.[33]

**b. Evidence of Defendants' Sales of Non-Genuine Cisco Products**

Mr. Regan's analysis also took into account the evidence that in many instances, Defendants did not have the "Cisco" product delivered directly to the Defendants' Fremont business, but to UPS boxes in Reno and Portland, Oregon, and he referenced the testimony of Defendants' former employee that she was instructed to schedule delivery to a UPS box when the "Cisco" product was ordered from Hong Kong or China. He also took into account the evidence of Defendants' use of "Cisco labels" shipped to Defendants from a third party notwithstanding that genuine Cisco products come with the labels pre-affixed on the product.[34]

**c. Evidence Favoring Pricing Inelasticity for Cisco Customers**

Mr. Regan was aware that many Cisco customers would be willing to pay a higher price to obtain a genuine Cisco product, due in part to the evidence concerning the assurance of increased security risk, the benefits of Cisco support and service, and because many customers' computer networks were already comprised of a Cisco products network.[35] For example, Marc Parker of Valley Network Technologies, who consulted with ADSI customer [redacted] (which unknowingly purchased counterfeit "Cisco" switches from Defendants), testified that "99

[32] Regan Decl., ¶ 19.

[33] Regan Decl., ¶ 20; Regan Report, at 11, ¶ 40.

[34] Regan Decl., ¶ 19.

[35] Regan Decl., ¶ 20.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

percent/100 percent" of his company's products were Cisco branded because he believed that Cisco equipment had "been proven to be the most effective solution that I've been able to put out for my customers."[36] Other ADSI customers testified similarly, underscoring that their networks were predominantly using Cisco products and that they purchased Cisco products to supplement existing networks.[37]

Mr. Regan confirmed that the median price of Defendants' sales of Cisco-branded products was less than ████, indicating that these customers bought these products to supplement an existing Cisco network and that Cisco would not deviate from its discounting practices for sales of this amount.[38] In addition, Mr. Regan observed that approximately 62% of Defendant ADSI's sales of suspect products were to ████████, which were sales made pursuant to ████████ ████ specifying that Cisco products be procured.[39] All of these facts support the contention that such sales would have gone to Cisco but for Defendants' counterfeit scheme.

**d. Portion of Defendants' Sales Were Not Accounted for in Damages Analysis**

Mr. Regan's analysis found evidence that Defendants provided incomplete financial sales records.[40] He estimates the amount of missing transactions to be at least ████.[41] Mr. Regan's excluded these sales from his lost profits analysis. In addition, Defendants have sales of ████ where the PID cannot be matched to Cisco's GLP. Those sales of Cisco products are also not captured by Mr. Regan's damage calculations. Accordingly, there is an approximate combined total in excess of ████ in sales by Defendants that cannot be properly traced. Instead of

---

[36] Boyd Decl., Exh. H at 36:6 – 37:2.

[37] Boyd Decl., Exh. I at 45:5 – 47:15, Exh. J at 11:21 – 13-17, Exh. K at 30:24 – 32:9 .

[38] Regan Decl., ¶ 20; Boyd Decl., Exh. L at 113:23 – 114:18 (Deposition of Greg S. Regan, "Regan Depo.").

[39] Regan Decl., ¶ 20; Regan Report, at 7, ¶ 23

[40] Regan Decl., ¶¶ 8-15; Regan Depo., 84:11 – 85:14

[41] Regan Decl., ¶ 16

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

including this amount in his damage analysis, which he would have been entitled to do, Mr. Regan took the conservative—and Defendants-friendly—approach of excluding this [REDACTED] from lost profits. For Mr. Regan, this conservative exclusion omitting 18% of Defendants' sales of "Cisco" goods offsets the potential that some percentage of Defendants' customers would not have purchased a genuine Cisco product if Defendants had not sold them a counterfeit product.[42]

**e. Mr. Regan's Lost Profits Analysis**

Mr. Regan calculated Plaintiffs' lost profits from five different categories: 1) lost profits arising from Defendants' purchase of non-authentic Cisco products from US reseller Link US; 2) lost profits arising from Defendants' purchase of non-authentic Cisco products from US reseller Vodanet; 3) lost profits arising from products sold by Defendants and later tested by Cisco and confirmed to be non-genuine; 4) lost profits arising from apparent non-genuine transceiver products sold by Defendants; and 5) lost profits arising from non-transceiver products sold by Defendants for which Defendants withheld vendor information. He calculated these lost profits by computing revenues as they "would have been earned but-for the unlawful act(s), less avoided costs."[43] Utilizing the methodology detailed in his report, Mr. Regan calculated Cisco's total lost profits to be [REDACTED].[44]

## ARGUMENT

### I. THE COURT SHOULD ALLOW THE EXPERT TESTIMONY OF DR. LEVY AND MR. REGAN BECAUSE THEY EACH APPLIED ACCEPTED PRINCIPLES AND METHODOLOGY IN THEIR ANALYSIS

Federal Rule of Evidence 702 ("Rule 702") incorporates the Supreme Court's reasoning from the "Daubert Trilogy" of cases, which established the gatekeeper role of the federal judiciary with respect to expert testimony. *See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993);*

---

[42] Regan Decl., ¶ 18

[43] Regan Report, at 18 ¶ 68.

[44] Regan Report, Schedule 1.

*General Electric Co. v. Joiner*, 522 U.S. 136 (1997); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). The rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

As a result, "the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F. 3d 960, 969 (9th Cir. 2013). "Further, the Ninth Circuit has explained that Rule 702 should be applied with a liberal thrust favoring admission." *Regents of Univ. of California v. Affymetrix, Inc.*, No. 17-01394, 2019 WL 1298094, at •2 (S.D. Cal. Mar. 21, 2019). Therefore, "the test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010), as amended (Apr. 27, 2010). "When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony." *Apple Inc. v. Samsung Elecs. Co.*, No. 11-01846, 2018 WL 1586276, at •3 (N.D. Cal. Apr. 2, 2018).

**A. Dr. Levy's Testing of the Cisco Risk Scoring Model Is Reliable**

Defendants do not contend that Dr. Levy is either unqualified to opine on Cisco's risk scoring model, or that his methods applying standard out-of-sample testing and logit regression analysis were unscientific and unreliable, nor can they. Instead, Defendants seek to confuse the issue by attacking the Cisco risk scoring model itself, even going so far as to actually apply Dr.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

Levy's own findings in doing so, further confirming the validity of his approach.[45]

Dr. Levy first utilized out-of-sample testing to validate the Cisco risk-scoring model. This approach is appropriate and often recommended.[46] Under this test, the data set that is included in the testing may be from the same set as the group of interest, although distinct from the in-sample set (as was done with the ADSI data). "This procedure of splitting the data into two parts – one for estimation and the other for prediction – is called cross validation."[47]

Dr. Levy also utilized a logit regression to test how well the Cisco risk-scoring model, based on Cisco's determination of the effect of each risk factor, performs compared to a statistical model where the weights for each factor are constructed by the statistical process that fits the in-sample data best. Dr. Levy's use of the logit regression was also an appropriate and standard approach, which has been in use since at least the 1950's.[48] In fact, Defendants' expert, Dr. Mangum, uses logit regression as part of his work as an economist and his Ph.D. dissertation centered on a logit regression model.[49]

Defendants' actual complaints about Dr. Levy's report do not involve the <u>methodology</u> he applied but rather the <u>conclusions</u> he arrived at in assessing the risk scoring model. These arguments are not the proper subject of a *Daubert* motion. *Daubert* only requires the Court's

---

[45] Defendants' Mot., at 21.

[46] *See Jeffrey Woolridge*, INTRODUCTION TO ECONOMETRICS, 5th Edition, (South-Western), 2009, p. 659 ("For forecasting, it is better to use out-of-sample criteria, as forecasting is essentially an amount-of-sample problem. … An out-of-sample comparison involves using the first part of a sample to estimate the parameters of the model and saving the latter part of the sample to gauge its forecasting capability.") (Attached as Exhibit 1 to Levy Decl.)

[47] *See G.S. Maddala*, Introduction to Econometrics, 2nd Edition (MacMillan Publishing, NY) (1992), p. 505-06 (attached as Exhibit 1 to Levy Decl.)

[48] *See Alan Agresti*, CATEGORICAL DATA ANALYSIS, 2ND EDITION (Wiley & Sons, 2002), p. 165 ("This [Logit] is the most important model for categorical response data. It is used increasingly in a wide variety of applications. Early uses were in biomedical studies but in the past 20 years have also seen much use in social science research and marketing.") This text also confirms that logit models have been used to assess and predict a wide range of binary outcomes. (attached as Exhibit 1 to Levy Decl.).

[49] Boyd Decl., Exh. F at 185:12-187:5.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

gatekeeping function to assess the reliability and methodology of Dr. Levy's analysis. Thus, "[t]here is no need to evaluate an expert's underlying data or factual assumptions so long as there is a basis in the record supporting the expert's factual assumptions." *McCurley v. Royal Seas Cruises, Inc.*, 331 F.R.D. 142, 159 (S.D. Cal. 2019). Claims "that models are flawed owing to their failure to include this or that variable are prototypical concerns that go to weight, not admissibility." *Grace v. Apple*, 328 F.R.D. 320, 341 (N.D. Cal. 2018).[50] *See also Wang v. Chinese Daily News, Inc.*, No. 04-1498, 2007 WL 4355187, at *1 (C.D. Cal. Aug. 3, 2007) ("Generally, questions relating to the bases and sources of an expert's opinion affect the weight of the expert's opinion and not its admissibility").

In *Obrey v. Johnson*, 400 F.3d 691, 696 (9th Cir. 2005), the Ninth Circuit stated that "[a]s a general matter, so long as the evidence is relevant and the methods employed are sound, neither the usefulness nor the strength of statistical proof determines admissibility under Rule 702" (finding defendant's claim of "unreliability of the statistics," in arguing that plaintiff's expert report was "incomplete" because the statistician failed to account for the relative qualifications of the applicants being studied, did not warrant exclusion of the report).

Ultimately, Defendants' Motion "does not show flaws in the methodology, but merely disagreements among the experts about what data should be." *In re Packaged Seafood Prod. Antitrust Litig.*, No. 15-MD-2670 JLS (MDD), 2019 WL 3429174, at *21 (S.D. Cal. July 30, 2019). Plaintiffs' burden is to show that Dr. Levy's methodology was reliable and relevant. It has done so here.

### B. Defendants' Arguments Concerning the Underlying Cisco Risk Scoring Model Are Both Incorrect and Inappropriate For a *Daubert Motion*

#### 1. Dr. Levy's Methods Have Been Peer Reviewed, and Defendants' Assertion That the Cisco Risk Scoring Model Has Not is Irrelevant

---

[50] *See also Dial Corp. v. News Corp.*, No. 13CV6802, 2016 WL 690868, at •4 (S.D.N.Y. 2016) (Asserted "errors" in an expert's analysis or factual information are not valid grounds for exclusion but rather are "fair ground for cross-examination … a jury can assess the reliability of [the expert's] theories behind his calculations, and [defendant] may inquire into those theories on cross-examination.")

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

The Cisco risk scoring model has of course not been peer reviewed in academic journals,[51] but that is irrelevant. What matters is that both the out-of-sample and independent logit regressions testing for the accuracy of the binary model have repeatedly been approved in peer review journals and other studies. Dr. Levy utilized statistically valid and accepted methods which he documented to perform the tests and analysis of the risk scoring model and Defendants do not establish otherwise.

**2. Revisions To the Underlying Risk Scoring Model To Increase Efficiency Does not Invalidate Dr. Levy's Analysis**

Still conflating the Cisco risk scoring model with Dr. Levy's methodologies, Defendants argue that his report should be excluded because the model has undergone modest revisions over the past few years in an effort to improve predictive accuracy. Again, the question here is the methodology utilized by Dr. Levy to assess the Cisco risk scoring model, which has not deviated, and he applied widely accepted statistical approaches to validate the model.[52]

Moreover, most models that are designed to monitor a process evolve over time.[53] The validity of the model here comes from how well it predicts out-of-sample tests. Dr. Levy

---

[51] A model with the specific parameters found in the Cisco risk scoring model would not be found in a peer journal in part because peer reviewed journals would have no interest in it due to its specific purpose and because it is based on standard economic and statistical methods that have already been in peer reviewed journals. Moreover, even if it was the risk scoring model, and not Dr. Levy's opinion that was at issue, peer review is not a requirement under *Daubert* and its progeny. *See Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1235 (9th Cir. 2017) ("[E]xpert testimony may still be reliable and admissible without peer review and publication.").

[52] Even if it was the Cisco risk scoring model itself that was at issue, the Ninth Circuit has confirmed that "scientific methods that are subject to 'further testing and refinement' may be generally accepted and sufficiently reliable. . . . The existence of ongoing research . . . does not necessarily invalidate the reliability of expert testimony." *City of Pomona v. SOM N. Am. Corp.*, 750 F.3d 1036, 1044-46 (9th Cir. 2014) (reversing District Court decision to exclude expert testimony).

[53]A risk scoring model based upon continuous reassessment of the factors and weights applied is both customary and appropriate. *See Adaptive Credit Scoring with Kernal Learning Methods, Yingxu Yang*, p.5 "Ideally, a dynamic decision model should be created which is able to continuously adapt to changes both in the environment and the system, and in real time." Thus, (footnote continued)

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

validated the Cisco risk scoring model with out-of-sample prediction and with a separate model that independently demonstrated that Cisco's model applied factors that served as good predictors.[54] Accordingly, the fact that Cisco refined its model over time is not relevant; Dr. Levy's assessment of the model using widely-accepted methodologies is the relevant inquiry, and Dr. Levy's analysis is well-grounded.

**3. The Sale of Used or Surplus Cisco Products Does Not Invalidate Dr. Levy's Analysis**

Defendants again attack the risk scoring model by asserting that it does not work on used or surplus products. However, as Dr. Levy confirmed, Cisco uses the model for products that are advertised as new and genuine, which is what is germane to this action. There is no evidence that Defendants have ever advertised "Cisco" products as used. Defendants' own spreadsheets do not indicate the purchase of any "used" goods and they have failed to otherwise identify any.

**4. The False Positive Rate Associated With the Small Sample of Transceivers Does Not Justify Exclusion of Dr. Levy's Report.**

The one-time occurrence of a 38% false positive rate for a subset of transceivers is not grounds for excluding Dr. Levy's report, especially given the overall soundness of the methodology applied by both Dr. Levy and Mr. Regan. *See Lucent Techs., Inc. v. Microsoft Corp.*, 837 F. Supp. 2d 1107, 1123–24 (S.D. Cal. 2011) (concluding that plaintiff's expert adequately explained the applicable error rate of his probability survey, and correlated it to the data to show that it did not invalidate the survey results). Moreover, as explained below, this calculation only applies to transceivers sold by [redacted] and [redacted] (as they have serial

---

"[R]ather than using only the first n observations to estimate the parameters of the model, we can reestimate the models each time we add a new observation and the use new model to forecast the next time period." *Introductory Econometrics – A Modern Approach,* 5th Ed., Jeffrey M. Wooldridge, p. 659.

[54] Defendants contend that his analysis was "untested" (Defendants' Mot., at 7:17), but Dr. Levy tested the model with out-of-sample testing and with a completely independent statistical test.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

numbers). For the vast majority of the transceivers at issue in this case (received from China and to which Defendants affixed their own "Cisco" labels), Mr. Regan did not utilize the Cisco risk scoring model to assess damages.

**C. Mr. Regan's Lost Profits Analysis is Reliable**

**1. Mr. Regan Is Well Qualified To Opine On Forensic Accounting Matters**

Mr. Regan's standing as a C.P.A. and a Certified Fraud Examiner confirms that he is well qualified to offer opinions on forensic accounting matters. Defendants protest when Mr. Regan states that in his "opinion, the absence of complete and accurate information regarding vendor purchase data, as well as other purchase data such as serial numbers, increases the risk that the product is non-genuine." They similarly complain about Mr. Regan's opinion that Defendants' shipment of suspect product to locations other than ADSI's business in Fremont, and their sale of allegedly genuine "Cisco" products at prices significantly below Cisco's standard pricing, all made it more likely that Defendants' sales of these products were counterfeit goods. Yet such opinions are squarely within his areas of expertise as a forensic and fraud examiner.

**2. Mr. Regan's Expert Opinion Calculating Damages Related to Transceivers Of Unknown Origin Is Fully Justified.**

Defendants assert that Regan provides unsupported testimony that certain groups of products—namely, transceivers that are not identified with a vendor—are all counterfeit, that he "assumed" the percentage counterfeit, that this conclusion was contrary to Cisco's risk model, and thus, according the Defendants, "his methodology and conclusions are unsound."[55] On the contrary, Regan grounded his opinion in the evidence in this case, which is appropriate for a damages expert. Regan properly considered the applicable facts from documents and depositions in this case for his conclusion, including 1) eyewitness testimony of use of counterfeit labels; 2) repeated seizures by U.S. Customs of Defendants' counterfeit products; 3) that every transceiver

[55] Defendants' Mot., at 12:12, 21:17-24, 22:5.

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

sold by ADSI and tested by Cisco (over 60 total) was counterfeit; and 4) Defendants' principals assertions of the Fifth Amendment.[56]

The evidence cited by Mr. Regan demonstrates that he provided reliable testimony well within the subject matter of his expertise.[57] Defendants' argument that Mr. Regan erred in basing damages from transceivers of unknown origin fails,[58] because he correctly took into account the facts and evidence in this case (and Defendants are free to question his conclusions at trial).

**3. Mr. Regan's Lost Profits Analysis is Based On Sound Methodology and Is Not Impermissibly Speculative**

**a. Mr. Regan's Report Satisfies Plaintiffs' Burden re Lost Profits**

Defendants incorrectly contend that Mr. Regan's analysis is too speculative, and that he improperly assumes that every sale by Defendants would have otherwise gone to Plaintiffs. Defendants fail to understand that Mr. Regan's lost profits calculation does not take into account almost 1/5 of Defendants' sales and they further fail to understand the respective burdens here in light of the evidence.

In *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1223 (9th Cir. 2010), the Ninth Circuit found in a trademark infringement action that "precision in the calculation of damages is neither necessary nor possible. [Defendant]'s wrong made it impossible to know with any precision what [plaintiff]'s sales would have been had he not committed his wrong. Requiring more precision

---

[56] *See Albergo v. Immunosyn Corp.*, No. 09CV2653 DMS (MDD), 2012 WL 12953736, at •3 (S.D. Cal. June 19, 2012) ("Where, as here, a question is asked in discovery in a civil case, the responding party invokes the Fifth Amendment, and the requesting party presents independent corroborating evidence of the fact in question, an adverse inference may be drawn from the responding party's invocation of the Fifth Amendment.").

[57] Mr. Regan testified at deposition that he looked for evidence of genuine transceiver sales here. He couldn't find any. *See* Regan Depo., 145:14 – 146:7.

[58] Even Defendants' expert, Mr. Mangum, who has now submitted two reports, hasn't identified information indicating that transceiver products were secured from legitimate vendors, or that the transceiver products had known serial numbers that would allow for those products to be tested in such a way to demonstrate their genuineness or not. Defendants' own silence is consistent with the methodology applied by Mr. Regan.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

than can be attained, especially where the impossibility of more precise ascertainment was the fault of the wrongdoer, would be inequitable and is not required." *See also Marquis v. Chrysler Corp.*, 577 F.2d 624, 638–639 (9th Cir. 1978) (damages "are not rendered speculative or conjectural merely because they cannot be calculated with mathematical exactness. It is sufficient if a reasonable basis of computation is afforded, even though the result may be only an approximation. . . . Ordinarily, it is the exclusive function of the jury to fix the amount of damages."). In *Marquis*, the court approved of the fact that plaintiff's expert, just as Mr. Regan has done here, (1) explained the assumptions upon which his lost profit projections were based, and (2) described the data and documentation upon which his computations were based. He presented "data from which the amount of probable loss could be ascertained as a matter of reasonable inference…. [Plaintiff expert's] assumptions and estimates were not demonstrably false or unreasonable." *Id.*

In line with the authority noted above, the court in *Square D Co. v. Breakers Unlimited, Inc.*, No. 1:07-CV-806-WTL-JMS, at *2–3 (S.D. Ind. May 21, 2009), denied defendants' motion to exclude the testimony of plaintiff's damages expert, where defendant argued that (1) plaintiff's expert did not adjust his analysis to take into account the law of demand, and (2) plaintiff had no proof to support plaintiff expert's assumption that all of the counterfeit products would have been replaced in the market by products purchased from plaintiff or its authorized dealers. The court found that a plaintiff who has suffered from a Lanham Act violation is not subject to an exacting burden of proof, and while the proof of the *fact* of damages must be certain, "proof of the amount can be an estimate, uncertain or inexact." *Id.* at 3. The court found that plaintiff expert's testimony regarding lost profits constituted admissible evidence. The court also noted that, as is the case here with Defendants, defendant's expert did not offer any calculation of his own taking into account the law of demand, but rather only criticized plaintiff's expert for failing to do so.

Moreover, Mr. Regan's analysis does not assume that end customers would always pay a higher price for purposes of his lost profits calculation. Instead, as Mr. Regan explained at his

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

deposition, his lost profits calculation results in some end customers that pay lower prices, which offsets other instances in which end customers pay higher prices. [59] As just one example of a customer paying a lower price, the Defendants sold four WS-C3750X-48P-L switches to a GSA entity at a unit price of [REDACTED] in March 2015.[60] For purposes of calculating lost profits, Mr. Regan estimated a per unit price to Cisco for this product of [REDACTED], which is demonstrably lower.[61] The Defendants ignore such critical details and consequently make inaccurate assertions about Mr. Regan's analysis.

The *Square D* court concluded: "[T]he fact that [plaintiff expert]'s methodology involves some speculation regarding exactly how many circuit breakers [plaintiff] would have sold but for the alleged counterfeit sales does not render his testimony insufficient to support an award for lost profits." *Id.* The court stated "it is impossible to determine with certainty the number of [defendants'] customers who would have purchased circuit breakers from other 'gray market' sources rather than from [plaintiff] or its authorized dealers. A plaintiff who has suffered injury from a Lanham Act violation is not subject to such an exacting burden of proof, however." *Id.* at 3. Citing to the leading treatise on the issue of lost profits, the court noted:

> "[T]he [reasonable certainty] rule applies only to the fact of damages, not to the amount of damages. Proof of the fact of damages in a lost profits case means proof that there would have been some profits. If plaintiff's proof leaves uncertain whether plaintiff would have made any profits at all, there can be no recovery. But once this level of causation has been established for the fact of damages, less certainty (perhaps none at all) is required in proof of the amount of damages. While the proof of the fact of damages must be certain, proof of the amount can be an estimate, uncertain or inexact. Robert L. Dunn, *Recovery of Damages for Lost Profits* § 1.3 at 11." *Id.*

The court found that plaintiff expert's testimony constituted admissible evidence given this standard of proof, stating that '[i]t is particularly in the area of quantifying the amount of lost profits that courts impose the risk of uncertainty on the breaching party whose breach gave rise to

---

[59] Regan Depo., 123:17-124:1.
[60] Boyd Decl., Exh. M (Invoice No. 1073113).
[61] Regan Report, Schedule 3b.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

the uncertainty.'" *Id.* (citing *Mid-America Tablewares, Inc. v. Mogi Trading Co., Ltd.*, 100 F.3d 1353, 1367 (7th Cir. 1996).

Plaintiffs here do not profess to have provided an exact calculation of damages to the nearest penny. But they have established the fact of damage and provided a rational and reliable basis for their accounting. They also establish that further precision (in Plaintiffs' favor) is precluded because of Defendants' willful misconduct in withholding financial documentation. Mr. Regan's report is more than sufficiently precise and not unfairly speculative.

**b. Mr. Regan's Report Does Not Assert Perfectly Inelastic Demand**

Defendants further contend that Mr. Regan's lost profits calculation assumes perfectly inelastic demand. They are wrong.

The parties disagree as to the degree of pricing elasticity among Plaintiffs' customers. Cisco has put forth both a factual and logical basis as to why its customers would seek to purchase genuine Cisco products instead of an alternative. These facts include that over 60% of Defendants' ADSI sales of suspect products were to [REDACTED] (which were sales made pursuant to [REDACTED] specifying that Cisco products be procured);[62] the median price of Defendants' sales of Cisco-branded products was less than [REDACTED], indicating that these customers bought these products to supplement an existing Cisco network;[63] networks tend to operate most efficiently when they utilize equipment from a single manufacturer;[64] and genuine Cisco products come with enhanced security, service and warranty features, and elevated security protection, all of which in Cisco's experience are material in customers' purchasing decisions.[65]

However, Mr. Regan does <u>not</u> assert perfect inelasticity regarding his lost profits calculation. As noted above, there is approximately [REDACTED] of sales by Defendants that Mr. Regan elected—conservatively—to exclude from his lost profits analysis because of Defendants'

---

[62] Regan Report, at 7, ¶ 23.

[63] Regan Depo., 113:23 – 114:18.

[64] Boyd Decl., Exh. N at 142:22 – 145:10; Regan Depo., 113:23 – 114:18.

[65] Boyd Decl., Exh. H at 39:11 – 40:23, Exh. N. at 133:7-16.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

tactics. Thus approximately **18%** of Defendants' Cisco sales is not accounted for in the lost profits model, belying an assertion that Cisco seeks a perfectly inelastic "1:1" lost profits claim.[66] As Mr. Regan testified:

> "I'm using the economic data available to me and the facts relevant to this case, including how the witnesses have testified on this topic; and moreover, *your question assumes that it's a hundred percent of the transactions, and that's not the case.· Because the defendants' data clearly omits transactions involving transceiver sales*, for which I am not able to include all of that information here or did not include all that information here."[67]

**4. Mr. Regan May Extrapolate Cisco's Damages, Especially Where Defendants Have Concealed Evidence of Their Wrongdoing**

It is not possible for Cisco to inspect every piece of suspect equipment here, that numbers in the thousands, in order to be eligible for damages. That is especially true where there is overwhelming evidence of Defendants' efforts to cover up their wrongdoing. The extrapolation provided by Mr. Regan is thus in line with what courts deem acceptable.

In *Moroccanoil, Inc. v. Groupon, Inc.*, 278 F. Supp. 3d 1157, 1162 (C.D. Cal. 2017), the Court granted plaintiff's motion for summary adjudication as to liability on its counterfeiting theory and found that defendant's sole argument—that because plaintiff purchased and tested only three of the defendant's treatments, it could establish counterfeiting only as to those three items—was meritless. The court stated: *"Taken to its logical conclusion, it would require trademark owners to purchase all (or at least a large quantity) of an infringer's infringing goods to establish its claim. [Defendant] points to no cases so holding, and in fact, many cases have found that a sampling of infringing goods is sufficient to establish liability." Id.* (*emphasis added*). *See also Microsoft Corp. v. Buy Cheap Software*, 2016 WL 7444627 at •2 (C.D. Cal. 2016) (rejecting a

---

[66] Yet s*ee Ford Motor Co. v. Kuan Tong Indus. Co.*, 697 F. Supp. 1108, 1109 (N.D. Cal. 1987) (finding that "where… a party *knowingly* sells goods bearing counterfeit copies of the plaintiff's trademarks, there is a presumption that the commercial success of the infringing party's goods is directly attributable to the counterfeit trademarks, and, therefore, a sale made by the infringing party is presumed to be a sale lost to the trademark owner.").

[67] Regan Depo., 94:4-13.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

defense that "would require [plaintiff] Microsoft to buy and test every [defendant] product…"); *Microsoft Corp. v. Compusource Distributors, Inc.*, 115 F.Supp.2d 800, 812 (E.D. Mich. 2000) (courts "can extrapolate the degree to which Defendant distributed counterfeit and infringing [plaintiff] Microsoft software and hardware[,]" where plaintiff had proven the sale of numerous counterfeit units by defendant).[68]

Mr. Regan's methodology to extrapolate Plaintiffs' damages is sound, reliable, practical and accepted by courts.

## CONCLUSION

Dr. Levy and Mr. Regan comfortably exceed the threshold laid down by *Daubert*. Dr. Levy's application of the out-of-sample test and logit regression are reliable and widely accepted methodologies for risk model assessment. Mr. Regan applied proper forensic accounting methods with the sufficient degree of specificity in calculating Plaintiffs' lost profits, based on the available evidence actually provided by Defendants.

Plaintiffs respectfully submit that the Court deny Defendants' motion.

DATED: June 12, 2020

SIDEMAN & BANCROFT LLP

By: /s/ *Ian K. Boyd*
Ian K. Boyd
Attorneys for Cisco Systems, Inc.
and Cisco Technology, Inc.

---

[68] *See also Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 621 (9th Cir. 1993) (affirming District Court finding that 95% of defendant's total sales were infringing due to an inference in Intel's favor extrapolating the total number of infringing products as the great majority of coprocessors that Intel purchased from defendant over a six-month period were counterfeit, and noting that "[m]uch legal reasoning depends on that very kind of extrapolation from limited data.").