# EXHIBIT 1

## REDACTED, PUBLIC VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

RICHARD J. NELSON (State Bar No. 141658)
E-Mail:        *rnelson@sideman.com*
IAN K. BOYD (State Bar No. 191434)
E-Mail:        *iboyd@sideman.com*
ANGELA M. HE (State Bar No. 319351)
E-Mail:        *ahe@sideman.com*
SIDEMAN & BANCROFT LLP
One Embarcadero Center, Twenty-Second Floor
San Francisco, California 94111-3711
Telephone:     (415) 392-1960
Facsimile:     (415) 392-0827


Attorneys for Cisco Systems, Inc. and Cisco Technology, Inc.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| CISCO SYSTEMS, INC., a California corporation, et al.,<br><br>　　　　　Plaintiffs,<br><br>　　　v.<br><br>ZAHID "DONNY" HASSAN SHEIKH, an individual, et al.,<br><br>　　　　　Defendants.<br><br>ADVANCED DIGITAL SOLUTIONS INTERNATIONAL, INC., a California corporation,<br><br>　　　　　Third-Party Plaintiff,<br><br>　　　v.<br><br>RAHI SYSTEMS, INC., a California corporation, et al.,<br><br>　　　　　Third-Party Defendants. | Case No. 4:18-cv-07602 YGR<br><br>**EXHIBIT 1 TO STIPULATION TO UNSEAL PORTIONS OF DOCUMENTS ATTACHED TO DECLARATIONS OF ANDREW PARKHURST AND IAN BOYD CONCERNING DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF DANIEL LEVY AND GREG REGAN, AND MOTION TO STRIKE EXPERT REPORTS (DOCKET NOS. 134-1, 141-2); AND PROPOSED ORDER**<br><br><span style="color:red">**REDACTED, PUBLIC VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL**</span> |

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

JAMES McMANIS (40958)
TYLER ATKINSON (257997)
ANDREW PARKHURST (324173)
McMANIS FAULKNER
A Professional Corporation
50 West San Fernando Street, 10th Floor
San Jose, California 95113
Telephone:    (408) 279-8700
Facsimile:    (408) 279-3244
Email:        aparkhurst@mcmanislaw.com

Attorneys for Defendant and Third Party Plaintiff
Advanced Digital Solutions International, Inc., and
Defendants PureFutureTech, LLC, K&F Associates, LLC,
Shahid Sheikh, Kamran Sheikh and Farhaad Sheikh

## UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| CISCO SYSTEMS, INC., a California corporation, and CISCO TECHNOLOGY, INC., a California corporation,<br><br>       Plaintiffs,<br><br>    v.<br><br>ZAHID "DONNY" HASSAN SHEIKH, an individual; et al.,<br><br>       Defendants.<br>_____<br>ADVANCED DIGITAL SOLUTIONS INTERNATIONAL, INC., a California corporation,<br><br>       Third-Party Plaintiff,<br><br>    v.<br><br>RAHI SYSTEMS, INC., a California corporation; et al.,<br><br>       Third-Party Defendants. | Case No. 4:18-CV-07602-YGR<br><br>**DECLARATION OF ANDREW PARKHURST IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF DANIEL LEVY AND GREG REGAN, AND MOTION TO STRIKE EXPERT REPORTS**<br>_____<br><br>Date:    July 31, 2020<br>Time:   2:00 p.m.<br>Court:  Courtroom 1, 4th Floor<br>Judge:  The Hon. Yvonne Gonzalez Rogers |

# REDACTED VERSION OF DOCUMENT
# SOUGHT TO BE SEALED

I, Andrew Parkhurst, declare:

1.      I am an attorney at law duly licensed to practice before the United States District Court for the Northern District of California and in all courts of the State of California.  I am an attorney with McManis Faulkner, counsel of record for Defendants, Advanced Digital Solutions International, Inc., PureFutureTech, LLC, K&F Associates, LLC, Shahid Sheikh, Farhaad Sheikh, and Kamran Sheikh (together "defendants"), in the above-captioned matter.  I make this declaration in support of Defendants' Motion to Exclude Expert Testimony of Daniel Levy and Greg Regan, and Motion to Strike Expert Reports; Memorandum of Points and Authorities.  I have personal knowledge of the facts stated herein and, if called as a witness, I could and would competently testify thereto.

2.      Attached hereto as **Exhibit A** is a true and correct copy of a document titled "Memorandum on the Risk Scoring History and Evolution" authored by Mr. Tim Casto.

3.      Attached hereto as **Exhibit B** is a true and correct copy of the expert report authored by Dr. Daniel Levy.

4.      Attached hereto as **Exhibit C** is a true and correct copy of the relevant portions of the transcript from the deposition of Charles Williams on May 8, 2020.

5.      Attached hereto as **Exhibit D** is a true and correct copy of the relevant portions of the transcript from the deposition of Dr. Daniel Levy on May 6, 2020.

6.      Attached hereto as **Exhibit E** is a true and correct copy of the expert report authored by Mr. Greg Regan.

7.      Attached hereto as **Exhibit F** is a true and correct copy of the relevant portions of the transcript from the deposition of Mr. Sam Gupta on May 11, 2020.

8.      Attached hereto as **Exhibit G** is a true and correct copy of the expert rebuttal report authored by Dr. Russell Mangum III.

9.      Attached hereto as **Exhibit H** is a true and correct copy of the relevant portions of the transcript from the deposition of Mr. Greg Regan on May 7, 2020.

10.      Attached hereto as **Exhibit I** is a true and correct copy a document marked Bates Nos. CISCO00000758-763 and marked as Exhibit 4 in the deposition of Mr. Kenny Carter on

DECL. OF PARKHURST ISO DEF. MOTION TO EXCLUDE EXPERT TESTIMONY OF LEVY AND REGAN, AND MOTION TO STRIKE EXPERT REPORTS; Case No. 4:18-CV-07602-YGR

1   January 23, 2020.

2        11.     Attached hereto as **Exhibit J** is a true and correct copy of the relevant portions of

3   the transcript from the deposition of Acer America Corporation (Ms. Anita Smith) on May 12,

4   2020.

5        12.     Attached hereto as **Exhibit K** is a true and correct copy of the relevant portions of

6   the rough transcript from the deposition of E.W. Scripps Company (Mr. Paul Riccobene) on May

7   20, 2020.

8        13.     Based on statements made by Sam Gupta, Cisco's expert deposed on May 11,

9   2020, defendants are aware that at least two reports prepared for Cisco found that products

10  associated with defendants were genuine.  At Gupta's deposition, counsel for plaintiffs agreed to

11  produce those reports.  As of the date of this motion, plaintiffs have not produced the documents.

12       I declare under penalty of perjury that the foregoing is true and correct.

13

14  DATED:  May 29, 2020

15

16

McMANIS FAULKNER

/s/ Andrew Parkhurst
ANDREW PARKHURST

17

18

19

20

21

22

23

24

25

26

27

28

3

DECL. OF PARKHURST ISO DEF. MOTION TO EXCLUDE EXPERT TESTIMONY OF LEVY AND REGAN,
AND MOTION TO STRIKE EXPERT REPORTS; Case No. 4:18-CV-07602-YGR

# EXHIBIT A



Cisco Systems, Inc.
170 West Tasman Drive
San Jose, CA 95134-1706
Phone: 408 526-4000
Fax: 408 526-4100
http://www.cisco.com

April 14, 2020

**From: Tim Casto**
**Re:    Memorandum on the Risk Scoring History and Evolution**

## I.      <u>Background</u>

One of the main responsibilities for Cisco Brand Protection is to identify and stem the flow of counterfeit Cisco products. To make an authenticity determination on Cisco-branded products sold through non-authorized channels,[1] Brand Protection engineers must analyze specific attributes of the products through one of the following means: physical analysis, console readout analysis, or photographic analysis. Depending upon the product type under test, different attributes will need to be analyzed.

Given the challenges associated with getting information on products to conduct analysis (e.g., products sold to third-parties not connected with Cisco, products installed in active networks, the number of products may be too high to be administratively feasible, etc.), Brand Protection endeavored to create a methodology that helps identify products that have a higher risk of being counterfeit just based on the known data.

The risk analysis is done for the purpose of: 1) identifying products that have a higher likelihood of being counterfeit, so that investigative resources can focus on the products that are most likely to be counterfeit in customers' networks; 2) helping Cisco engineering focus resources on higher risk products, and 3) streamlining damages calculations for purposes of reducing litigation costs and improving the prospect of early settlement.

## II.     <u>Rudimentary Risk Analysis related to Broker 1 in 2016</u>

In 2016, Brand Protection applied a rudimentary test with a broker ("Broker 1") to calculate damages related to sales of counterfeit products that occurred in the three years prior. The factors considered were the following:

---

[1] When Cisco products are procured through Cisco authorized distribution channels, Cisco has a chain of sale that can be traced back to Cisco manufacturing.



The test was intended to facilitate discussion about what calculations are appropriate, and reduce the burden on both Cisco and Broker 1 because it is not practical to access and inspect thousands of Cisco products located among numerous customers.

**III.** **Applied to Broker 2 Case - Early 2018**

In 2018, Brand Protection further refined its risk factor analysis with another broker ("Broker 2"). for short.

In this 2018 case, the returned a "yes" or "no" result which was calculated using a formula in an Excel spreadsheet.  At this stage, the results were not quantified or weighted because they were not tallied to create an overall risk score.  In order to refine the scoring, Brand Protection considered other factors in combination with the to determine the overall "risk" of the product being counterfeit:

-

-

-

Thus, Brand Protection reviewed four factors as part of our analysis in the case of Broker 2: (1)

---

[2] Cisco maintains detailed manufacturing records of every product it produces. These products were excluded from the analysis as a precaution.

[3] The date difference was filtered, and a high risk was attached to lower date differences, with the idea that it is reasonable to expect a genuine used part would decline in value over time and that a longer time period between Cisco's original sale date and the broker's sale date is more likely to predict a genuine but used product.

To illustrate the interplay of these factors, if a serial number associated with a known counterfeit product type is flagged in the ████ but the time indicates several years have passed from Cisco's original sale date, it is reasonable to expect a decrease in value and a decrease in the sale price. This provides a possible rational explanation for the ████ flag and therefore makes the item somewhat less likely to be counterfeit.

Conversely, if a serial number associated with a known counterfeit product type is flagged in the ████ and only a few weeks or months have passed from Cisco's original sale date, it further strengthens that it is not commercially reasonable for the broker to have purchased a genuine product for less than the price Cisco sold that serial number in that short period of time.

As with Broker 1, the use of the risk analysis assisted in streamlining the counterfeit analysis of a large number of products without the need to physically or virtually inspect those products, thereby facilitating predictive determinations that could be used by Cisco and the broker in early settlement discussions.

## IV.   Formalizing Risk Scoring Process – December 2018

In December 2018, Brand Protection created a standard risk scoring analysis methodology that could be used consistently across multiple cases. The first use of the standardized risk score was a case with Broker 3, wherein the formalized analysis weighted different factors based on the likelihood of each factor predicting counterfeit. We combined factors from the previous two cases, and added several new ones to make the analysis more precise. In total, Brand Protection assigned eight "risk factors" in the first version of the standardized Risk Scoring. In creating the various formulas and deciding upon the factors, Brand Protection took great care not to maximize the number of high-risk categorizations, but rather, tailored the factors to predict, as accurately as possible, the authenticity of the Unit Under Test.

These factors are listed and discussed below.







## V.    First Modification of Risk Scoring Based on More Data and Actual Product Testing – May 2019

As Cisco received and analyzed more data from Broker 3, it discovered further anomalies in the rudimentary formulas that caused some products confirmed to be genuine (through photographic analysis) to result in "high-risk" risk scores. The anomalies primarily appeared to stem from formalistic discrepancies in how Cisco captures data in one-tier (from its Distributors) and two-tier (from its Resellers) transactions.  Cisco collects data from each level of its authorized distribution chain, and is reflected in its internal databases as it is captured by the respective entity.   Each tier contains specific information related to pricing and the parties involved but sometimes would overlap depending on the deal type and the way the products were sold.

For example, in a one-tier transaction, Cisco may sell products directly to an authorized partner or reseller who then sells directly to the end user. The sales data associated with that transaction is called Enterprise Resource Planning ("ERP") data. This is the first layer of data.

However, the majority of Cisco products are sold through two-tier transactions, wherein Cisco first sells the products to Cisco authorized distributors, who then sell to authorized resellers, who eventually sell to an end customer.   Cisco's authorized distributors maintain warehouses and can stock products directly.  The sales data associated with the partner to end user in a two-tier transaction is called Point of Sale ("POS") data.

Some data associated with serial numbers that were sold in a two-tier transaction may overlap. 

While this logic or order of precedence generally worked, there were instances where the POS data was incomplete.

As an initial measure to account for these discrepancies,

This change was instituted in an effort to be more conservative in risk scoring and to minimize the chances of a genuine product being placed in medium or high-risk category.

As another precaution to avoid false positive returns in the          Brand Protection added a "buffer zone" to

it would not automatically trigger a positive result, but rather be given zero risks points. We made this modification with the belief that it is possible that such a product

## VI.  Second Modification of Risk Scoring – January 2020

In January 2020, Cisco again made modifications to the Risk Scoring algorithm based upon further analysis of data received from other Brokers.  The primary change was to simplify the ▮▮▮▮▮▮▮▮▮▮▮▮▮ in a way that continued to minimize the chance of the test returning a "false positive."   Brand Protection also made some slight changes to the wording of some of the risk factors.

One change applied across all risk factors and the Risk Scoring document in general was to clarify that "Product ID" would be more consistently referred to as "PID".

For ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Brand Protection clarified that the test used fuzzy logic  to  compare  whether ▮▮▮▮▮▮▮▮▮▮▮  To do so, Brand Protection clarified the formula as follows:



Brand Protection implemented this clarification to make the description consistent with the  formula  used,  which  already  used  fuzzy  logic  to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Thus,  this  change  was  merely  to  reflect  what  we  were already doing in the analysis.

Brand  Protection  also  instituted  a  second  substantive  change  to ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  The new test was reflected as follows:

This change further reduced the risk of false positive results as taking ▮▮▮▮▮▮▮ ▮▮▮▮▮▮  would shift the risk of false data to Cisco, rather than the Broker, and further simplify the logic formula, which was resulting in other Excel errors. Subsection (b) of ▮▮▮▮▮▮ was not amended.

In ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Brand Protection added language to clarify the that the analysis applies to the same product, as reflected below:



**VII.** **Acknowledgment of Specific Anomalies that Cause an Overstatement or Understatement of Counterfeit Risk**

Brand Protection acknowledges that this standardized risk scoring algorithm may still result in specific anomalies in the results depending upon variations in data input from Cisco and/or the brokers, but it continues to strive to refine and account for those anomalies.

Some of the instances in which Cisco has identified specific issues where risk scoring is not effective, or needs further analysis, are as follows:





Conversely, there are instances where the risk algorithm understates the risk that a particular product is counterfeit:



# EXHIBIT  B

<u>EXPERT REPORT OF DANIEL S. LEVY, Ph.D.</u>
April 17, 2020
(Revised May 1, 2020)
Privileged and Confidential

# Contents

1. Executive Summary ............................................................................................................ 2

2. Qualifications .................................................................................................................... 4

3. Information Considered .................................................................................................... 4

4. Cisco's Counterfeit Detection Metric .............................................................................. 5

5. Validation of Cisco's Risk-Scoring Metric ....................................................................... 6

    a. Check of Measure Construction .................................................................................. 6

    b. Check of Cisco's Risk-Score to Separate Counterfeit from Genuine ........................... 7

    c. Cisco's Risk-Measure for Switches and Transceivers .................................................. 8

    d. Evaluation of Cisco's Risk-Metric Based on Statistical Models ................................. 10

    e. Test of Cisco's Risk-scoring Metric in "Out of Sample" Datasets ............................. 17

6. Conclusion ...................................................................................................................... 19

Appendix 1- Curriculum Vitae DANIEL S. LEVY, PhD .......................................................... 20

Appendix 2- Additional Results ............................................................................................ 24

## 1.     Executive Summary

I have been retained by counsel for Cisco Systems, Inc. (CISCO) in the matter of *Cisco Systems, Inc v. Zahid"Donny" Hassan Sheikh et al* to review the performance and validity of a scoring system (risk-metric) that Cisco developed to distinguish between new, genuine Cisco products and counterfeit Cisco products sold by various resellers. Of particular interest is how the Cisco scoring system performs in distinguishing the new, genuine products from counterfeit products, which ADSI sold as new, genuine products.

I reviewed the performance of the Cisco risk-scoring metrics on these products sold by various resellers. The Cisco risk-metric scores products as "High Risk," "Medium Risk," or "Low Risk" of being counterfeit. I did so first by reviewing the logic and the accuracy of the criteria and weights that Cisco developed to determine whether an individual device had a high, medium, or low risk of being counterfeit. On various measures of internal consistency, discussed below, the Cisco calculations of the High, Medium, and Low risk were consistent and logical.

2

Within the Broker dataset, Cisco found that 81.4% of the devices predicted to be counterfeit based on Cisco's eight counterfeit detection metrics were counterfeit, based on photographic evidence. This 81.4% identification is estimated with a "95% confidence interval" between 76.0% at the low end and 86.0% at the upper end.[1] This means that there is about a 95% chance that the true counterfeit rate from this population sampled is between 76.0% and 86.0%. Of the products that Cisco verified to be genuine by physical inspection of the units, Cisco's risk-scoring metric classified 4.0%[2] as High Risk in this set of records.[3]

Second, I conducted a separate statistical analysis, a logit regression, based on the underlying criteria developed by Cisco and found that for switches determined by photographic inspection to be counterfeit, 80.4% were predicted to be more likely to be counterfeit.[4] For switches determined by photographic inspection to be genuine, 1.5%[5] were predicted to be more likely to be counterfeit by the logit analysis based on the underlying risk criteria developed by Cisco. This shows that the Cisco counterfeit detection metrics performs comparably to statistical methods used in similar statistically based categorical predictions within the sample on which the metrics were developed. Although overall, only 39% of those 555 switches in the population were counterfeit, Cisco's counterfeit detection metrics[6] and method was good at identifying which of these units were counterfeit, yielding counterfeits more than 91% of the time when the Cisco counterfeit detection metrics show a high risk of counterfeit.[7] I performed a similar statistical analysis for transceivers, as discussed further below.

Third, I reviewed Cisco's analysis of products that Cisco obtained from additional sources which were *not* used to develop Cisco's counterfeit risk scoring system. My review shows that the Cisco scoring system is reliable in detecting counterfeit switches, and identifies

---

[1] Cochran defines a confidence interval as follows: "The '99% confidence' figure implies that if the same sampling plan were used many times in a population, a confidence statement being made from each sample, about 99% of these statements would be correct and 1% wrong." William G. Cochran, *Sampling Techniques*, Third Edition (New York: Wiley & Sons, 1977), P.12.

[2] 95% confidence interval is 2.6% to 6.0%.

[3] From "Combined Risk Score Results for Expert (4.15.20).xlsx", containing data originally from "2019 Broker Analysis 2020-04-13.xlsx".

[4] 95% confidence interval is 74.4% to 85.5%.

[5] 95% confidence interval is 0.5% to 3.4%.

[6] In evaluating Cisco's risk scoring metric, units with missing data in the Cisco Net Price (POS) field were excluded. 37% of the switches with non-missing data were counterfeit.

[7] 95% confidence interval is 85.5% to 95.5%.

3

few genuine switches as counterfeit, based on a sample of Cisco product on which the Cisco risk-scoring metric were *not* developed, which is often referred to as an "out of sample" test. I also used the alternative statistical model, logit, again to test how well the underlying components of the Cisco risk-scoring model identify the counterfeit switches and found that 75.5% of the products that were determined to be counterfeit were predicted to be the most likely to be counterfeit by the statistical model.[8] Of the switches that were determined to be genuine only 2.9% were identified as among the more likely units to be counterfeit by the statistical model based on the components of Cisco's risk-scoring metric in out of sample testing. I also performed similar statistical tests for transceivers, discussed below. Cisco's counterfeit detection metrics and method was good at identifying which of the 37%[9] of the switches were counterfeit, yielding counterfeits 94.1%[10] of the time when the Cisco counterfeit detection metrics show a high risk of counterfeit.

## 2.      Qualifications

I am the National Managing Director and a founder of Advanced Analytical Consulting Group, Inc. ("AACG"). I have a Ph.D. in Economics from The University of Chicago. I have published scholarly research, performed research for government agencies and provided testimony to Federal Commissions, State courts and Federal Courts. My curriculum vitae attached in Appendix 1.

My billing rate for this case is $700 per hour. The rates of my staff assigned to this project, which worked at my direction and under my supervision, range from $220 to $550. Compensation for AACG is not contingent on the outcome of the proceedings.

## 3.      Information Considered

My opinions are based upon the review and analysis of various documents and data provided to me in this matter (which are cited in the body of this report), academic references in footnotes, and my education and experience in research and consulting.

---

[8] 95% confidence interval is 65.6% to 83.8%.

[9] 37%, or 140 out of 383, of the switches with non-missing data were counterfeit when observations with a missing Cisco Net Price (POS) are excluded.

[10] In the Broker dataset for switches with non-missing values of Cisco Net Price (POS), there are 136 units classified as "High Risk". 128 of these, or 94.1%, were determined as counterfeit.

####  4. **Cisco's Counterfeit Detection Metric**

I evaluated Cisco's construction of eight measures that Cisco believes are predictive of counterfeit products and Cisco's total risk score developed form them. I received a file from Cisco that that contained information about individual products which Cisco evaluated to determine whether they were genuine or counterfeit.[11] These records came from what I understand to be a "broker" of Cisco products. Some of the products evaluated were genuine, and some were counterfeit. The products obtained from this "Broker" data were used during Cisco's development of the Cisco risk-metric.[12]

Cisco developed a set of criteria to predict the likelihood that a given device, labeled as a Cisco product, is a genuine Cisco product. Early versions of the Cisco risk-metric were very similar to the one most recently developed based on some refinements implemented during the review of results on the Broker data. Since the time those refinements were made on the Broker data, the Cisco risk-metric has been stable. It is my understanding that Cisco risk-scored an additional sets of products based on the Cisco risk-scoring metric without further refinement to the risk-scoring metric. The additional set of data are contained in the same data file I received from Cisco and are indicated by the terms "Observed", "Warehouse", and "ADSI".[13] It is my understanding that the additional data was not used in the development of the Cisco risk-metric.

Therefore, the performance of the Cisco risk-score on these three additional datasets are what economists and statisticians call an "out-of-sample" test because it was developed based on one set of data and tested and verified against the second set of data that is outside the original set.

Cisco developed the risk-score criteria based on Cisco's understanding of their products, the market for their products, and characteristics that indicate a counterfeited device.[14] Cisco assigned numerical values to eight pieces of information about the device and it sale, producing a scale of the likelihood of counterfeit for an individual device.[15] For instance, one of the eight criteria is the █████████████████████████████████████████████████████

---

[11] From "Combined Risk Score Results for Expert (4.15.20).xlsx. The risk model is performed on and applied to only new products. Other products were not used in the Cisco risk-score development.

[12] "Combined Risk Score Results for Expert (4.15.20).xlsx".

[13] "Combined Risk Score Results for Expert (4.15.20).xlsx".

[14] Tim Casto, *Memorandum on the Risk Scoring History and Evolution*, April 14, 2020.

██████████
████████████████████████████████████████████████████████

Cisco gave higher scores to criteria that Cisco believed to be associated with greater risk of counterfeiting. Each component risk metric has only two values. However, those values differ across the risk metrics. ████████████████████████████████████ Cisco summed the scores for the eight individual criteria to create a total score for each individual device. Devices with a total score over 15 points, were classified as "High Risk" of being counterfeit. Devices that had a total score between 6 and 15 were classified as "Medium Risk". Products with a total score of five or below were classified as "Low Risk".

5.    **Validation of Cisco's Risk-Scoring Metric**

I analyzed Cisco's risk-scoring metric in three ways. First, I test for calculation errors which would alter the values from intended. These errors could alter the construction of the eight underlying measures and the overall Cisco risk-scoring measure. Second, I test the probability that Cisco's risk-scoring metric identifies photographically or physically determined counterfeits as High Risk ("True Positives"), and the probability it identifies photographically or physically determined genuines as High Risk ("False Positives"). It is my understanding that Cisco's emphasis is to minimize the number of False Positives. Third, I use a standard statistical model regularly used to classify items into two groups, a "logit regression" as a check on how well Cisco's risk-scoring metric separated units based on their authenticity (genuine versus counterfeit).

I used all of the three methods above on the out of sample dataset, containing observations which were not used in the development of the Cisco risk-scoring metric, performing what is known as out-of-sample tests of the Cisco risk-scoring metric and the logit model.

a.    **Check of Measure Construction**

To the extent I can, I tested for calculation errors in the construction of the underlying test scores which contribute to the overall Cisco risk-scoring measure. Of the eight underlying

---

[16] Tim Casto, *Memorandum on the Risk Scoring History and Evolution*, April 14, 2020. See Formalizing Risk Scoring Process – December 2018.

tests, I was able to check five of them.[17] I also verified that the overall risk-score was the sum of the underlying eight measures and the risk category assigned accordingly was correct.

### b.    Check of Cisco's Risk-Score to Separate Counterfeit from Genuine

To determine the ability of Cisco's risk-scoring metric to detect counterfeit devices, I compared the results of the risk-scoring metric against verified determination of authenticity for individual units sold as new Cisco authentic products. I understand that Cisco obtained photographs of Cisco units from an unauthorized reseller (Broker dataset), physical evidence from authorized resellers in other matters, and from the customers of the reseller in this matter (ADSI), from which Cisco determined authenticity. The photographic determinations of authenticity of the units in the Broker data were used in fine-tuning the Cisco risk-scoring metric. The evidence for the units from the other dataset is used to evaluate the Cisco risk-scoring metric. Cisco evaluated evidence only for new products. It is my understanding that Cisco plans to use the risk-scoring metric only on new products. It is my understanding that, although Cisco was not granted access for every product Cisco requested to inspect, Cisco did not determine which individual devices to analyze and therefore compare to their risk-score metric.

Based on the data for two sets of units evaluated, Broker and Out-of-Sample datasets, I constructed correspondence tables to determine the probability that verified counterfeit products were categorized as High Risk by Cisco's risk-scoring metric. I also calculated the probability of false determinations of genuine products, when Cisco's risk-scoring metric identified photographically determined genuine products as High Risk. Table 1 lists the number photographically determined counterfeit and genuine products that the Cisco's risk-scoring metric categorized as High Risk for the Broker data.

---

[17] The tests are described in "Risk Scoring for Secondary Market product.docx" received from Counsel. I cannot verify Test 3 and Test 6 because they rely on lists of ▮▮▮▮▮▮▮▮▮▮▮ that I do not have. I cannot check Test 2 because this requires knowledge of whether ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ For Test 7, I used fuzzy matching technique and then manually looked through ▮▮▮▮▮▮▮ Similarly, for Test 8, I used fuzzy matching technique and then manually looked through a total of ▮▮▮▮▮▮▮

Table I: Percentage of Total Products that are High Risk Using Cisco Detection Matrix: All Product Families
Only Analyze Records That Have a Non-Missing Cisco Net Price POS

| PhotoDetermination | Source | High Risk | Total | Percentage High Risk | Lower Bound 95% | Upper Bound 95% |
|---|---|---|---|---|---|---|
| Counterfeit | Broker | 201 | 247 | 81.4% | 76.0% | 86.0% |
| Genuine | Broker | 24 | 593 | 4.0% | 2.6% | 6.0% |

Sources:
Combined Risk Score Results for Expert (4.15.20).xlsx.

The top row lists information about the units that Cisco determined to be counterfeit based on photographic evidence. The second row is for units photographically determined to be genuine. The first row shows that the Cisco risk metric categorized 201 out of 247 (81%)[18] photographically determined counterfeit products as High Risk. The second row shows that the Cisco risk metric scored 24 out of 593 (4%)[19] photographically determined genuine products as High Risk. This means that the Cisco risk-scoring metric has a relatively high power of identifying counterfeit products as counterfeit (81%),[20] a low probability of falsely identifying genuine products as counterfeit (4%).[21]

### c.   Cisco's Risk-Measure for Switches and Transceivers

The Broker data contains more than a dozen different types of products. Switches and transceivers are two groups with the larger number of units in the Broker data. It is my understanding that the units at issue in the ADSI data fall largely in the area of switches and transceivers as well. Table II below list the same type of correspondence table listed above for switches found in the Broker data.

---

[18] 95% confidence interval is 76.0% to 86.0%.

[19] 95% confidence interval is 2.6% to 6.0%.

[20] 95% confidence interval is 76.0% to 86.0%.

[21] 95% confidence interval is 2.6% to 6.0%.

Table II: Percentage of Total Products that are High Risk Using Cisco Detection Matrix: Switch Product Family
Only Analyze Records That Have a Non-Missing Cisco Net Price POS

| PhotoDetermination | Source | High Risk | Total | Percentage High Risk | Lower Bound 95% | Upper Bound 95% |
|---|---|---|---|---|---|---|
| Counterfeit | Broker | 128 | 140 | 91.4% | 85.5% | 95.5% |
| Genuine | Broker | 8 | 243 | 3.3% | 1.4% | 6.4% |

Sources:
Combined Risk Score Results for Expert (4.15.20).xlsx.

Table II shows that for switches in the Broker dataset, Cisco risk-scoring metric identified 128 of the 140 (91.4%)[22] photographically determined counterfeit switches as counterfeit (True Positives), and 8 out of 243 (3.3%)[23] genuine switches as counterfeit (False Positives).

Table III below lists the same type of correspondence table listed above for transceivers found in the Broker data.

Table III: Percentage of Total Products that are High Risk Using Cisco Detection Matrix: Transceiver Product Family
Only Analyze Records That Have a Non-Missing Cisco Net Price POS

| PhotoDetermination | Source | High Risk | Total | Percentage High Risk | Lower Bound 95% | Upper Bound 95% |
|---|---|---|---|---|---|---|
| Counterfeit | Broker | 34 | 36 | 94.4% | 81.3% | 99.3% |
| Genuine | Broker | 7 | 18 | 38.9% | 17.3% | 64.3% |

Sources:
Combined Risk Score Results for Expert (4.15.20).xlsx.

Table III shows that for transceivers in the Broker dataset, Cisco risk-scoring metric identified 34 of the 36 (94.4%)[24] photographically determined counterfeit switches as counterfeit (True Positives), and 7 out of 18 (38.9%)[25] genuine transceivers as counterfeit (False Positives).

---

[22] 95% confidence interval is 85.5% to 95.5%.

[23] 95% confidence interval is 1.4% to 6.4%.

[24] 95% confidence interval is 81.3% to 99.3%.

[25] 95% confidence interval is 17.3% to 64.3%.

### d.     Evaluation of Cisco's Risk-Metric Based on Statistical Models

Another independent method of evaluating of the Cisco counterfeit detection is to test how well an econometric model, such as a logit, can predict the counterfeit devices. A logit regression is statistical methodology commonly used when the variable of interest is a binary outcome.[26] In this matter, the binary outcome evaluated is whether a product is counterfeit or genuine. In the logit analysis, I assign a value of 1 if a device is identified as counterfeit and 0 if it is genuine. I then estimate a logit model using the eight criteria calculated by Cisco. In this logit analysis, I use the cardinal scoring assigned by Cisco in their counterfeit detection metric. However the magnitude of the scores on individual metrics has no impact on the risk-scores obtained from the logit model due to the binary nature of the scores on the component measures of Cisco's risk-scoring metric. The logit regression determines which of these eight characteristics are predictive of counterfeit devices and the strength (added probability) each characteristic provides to the prediction.

#### i.     Statistical Model of Switches from Broker Data

Table IV lists the results of the counterfeit prediction logit for switches in the Broker dataset.

---

[26] G. S. Maddala, *Limited-Dependent and Qualitative Variables in Econometrics*, (Cambridge University Press, Cambridge)1983, P. 22.

**Table IV: Logit Regression for Switches in Broker Dataset**

```
Logistic regression                          Number of obs   =        555
                                             LR chi2(7)      =     539.91
                                             Prob > chi2     =     0.0000
Log likelihood = -100.07953                  Pseudo R2       =     0.7295
```

| Counterfeit | Coef. | Std. Err. | z | P>\|z\| | [95% Conf. Interval] | |
|---|---|---|---|---|---|---|
| | -.3280833 | .4968017 | -0.66 | 0.509 | -1.301797 | .6456302 |
| | 0 | (omitted) | | | | |
| | -.0023389 | .2528052 | -0.01 | 0.993 | -.4978279 | .4931501 |
| | .3788172 | .1282795 | 2.95 | 0.003 | .1273941 | .6302403 |
| | .2397411 | .0386835 | 6.20 | 0.000 | .1639229 | .3155593 |
| | .2942444 | .1064056 | 2.77 | 0.006 | .0856933 | .5027955 |
| | .6234028 | .0799299 | 7.80 | 0.000 | .4667431 | .7800625 |
| | 0 | (omitted) | | | | |
| | .3858693 | .1879357 | 2.05 | 0.040 | .0175221 | .7542165 |
| | -3.578684 | .4480541 | -7.99 | 0.000 | -4.456854 | -2.700515 |

The column labeled "Coef." reflects how each of the eight criteria impact the likelihood that a device was counterfeit. If the coefficient is positive then an increase in that factor increases the likelihood that a device is counterfeit holding other factors constant. Alternatively, if the coefficient is negative, an increase in a factor reduces the likelihood that a device is counterfeit (increases the likelihood that it is genuine) holding all other factors constant. For instance, the



After conducting the logit analysis, I predict for each device whether it is likely to be counterfeit. The prediction from a logit regression calculates a value between 0 and 1. A value



closer to 1 indicates that a product is more likely to be counterfeit, while a value closer to 0 indicates that a product is more likely to be genuine. The table below reports, on each row, the "Total" number of devices that had the predicted value, derived from the logit regression, and the number of switches with a given logit value that were photographically determined to be genuine or counterfeit:

Table V: Predicted Counterfeit Switches from Broker Dataset

|         | Counterfeit | Genuine | Total |
|---------|------------|---------|-------|
| 0.00475 | 2 | 102 | 104 |
| 0.01466 | 1 | 31 | 32 |
| 0.01497 | 2 | 30 | 32 |
| 0.02679 | 0 | 1 | 1 |
| 0.02715 | 1 | 61 | 62 |
| 0.04521 | 1 | 24 | 25 |
| 0.08001 | 1 | 40 | 41 |
| 0.08158 | 1 | 8 | 9 |
| 0.16746 | 0 | 2 | 2 |
| 0.21676 | 0 | 1 | 1 |
| 0.30913 | 0 | 1 | 1 |
| 0.31214 | 3 | 13 | 16 |
| 0.38526 | 0 | 6 | 6 |
| 0.38650 | 2 | 7 | 9 |
| 0.39028 | 0 | 2 | 2 |
| 0.54035 | 5 | 0 | 5 |
| 0.58572 | 9 | 3 | 12 |
| 0.66249 | 14 | 4 | 18 |
| 0.66408 | 1 | 0 | 1 |
| 0.66720 | 1 | 2 | 3 |
| 0.78553 | 3 | 0 | 3 |
| 0.81816 | 1 | 1 | 2 |
| 0.86200 | 4 | 0 | 4 |
| 0.95028 | 4 | 0 | 4 |
| 0.96368 | 13 | 0 | 13 |
| 0.98348 | 45 | 0 | 45 |
| 0.98805 | 80 | 2 | 82 |
| 0.98830 | 1 | 0 | 1 |
| 0.99475 | 5 | 0 | 5 |
| 0.99621 | 14 | 0 | 14 |
|         | 214 | 341 | 555 |

Sources:
Combined Risk Score Results for Expert (4.15.20).xlsx

12

The last row of the table, above the "Total" row, lists 14 devices had a logit score of .99621, which means they were scored to be the most likely to be counterfeit. Cisco's analysis determined that those 14 were counterfeit. As another example, 5 units received a logit score of .99475. All 5 were determined to be counterfeit. Another 82 (80 in the counterfeit column and 2 in the genuine column) received a logit score of .98805, meaning that all of these units are predicted to be among the most likely to be counterfeit. Analogously, at the top of the table, the logit model scored 104 units at .00475, which means they are the least likely to be counterfeit. Looking down the table as the logit model's predicted value increases, the corresponding number of devices that were determined to be counterfeit increases. Looking at the counterfeit column we can determine that 172 out of 214 true counterfeit items (80%) have a logit score of above .664. There are only 5 out of 341 of the true genuine switches (1.5%) that have a logit score that high. This means that the logit score confirms that the measures developed by Cisco serve to separate counterfeit units from genuine products.

Academic researchers developed tests to determine whether classification methods, as used here, are effective.[28] Many of these tests are based on whether the classification models can concentrate the feature if interest (in our case, counterfeit status) into an identifiable group in greater proportion than it exists in the general population. To understand the concept, consider a population that has 10% of people who like baseball. A model might be used to identify a group of people who like baseball based on various characteristics, such as age, city of residence, and income. If the group it identifies as baseball fans only has 10% of people who are actually baseball fans the model has added nothing. On the other hand, if the model identifies a group composed of 40% baseball fans, then the model has had some degree of success in grouping people in a way that concentrates the baseball fans into an identifiable group. An even better model would produce a higher percentage of actual baseball fans in the group the model identified as baseball fans.

Similarly, in the task Cisco has performed, the general population of 555 switches is about 39% counterfeit. The Cisco counterfeit detection method has grouped switches, making it possible to turn to a single high-risk group that is 80% counterfeit, and only about 2% genuine.

---

[28] Peter Kennedy, *A Guide to Econometrics* 4th Edition, MIT Press, Cambridge, 1998, P. 239.

The model has been successful at sorting the devices into groups so that one group has a much higher concentration of counterfeit devices, improving the efficiency of searching for, and evaluating potentially counterfeit devices, with little chance of falsely identifying a genuine product as counterfeit.

In addition, other works using logit models suggests that even when the underlying group being predicted makes up 50% of the population, a model that can group individuals so that 75% of a group has the characteristic of interest (counterfeits, in this matter) is of value.[29] Cisco's counterfeit detection metric creates a high risk group where 94%[30] has the characteristic of interest (counterfeit) and it is out of a population with an overall rate of 37%.[31] This means that Cisco's counterfeit detection method is performing better than the example of valuable performance in sorting binary outcomes from a text specializing in these sorts of categorical data analysis.

Table VI below provides the predictions obtained from the logit analysis based on Cisco's risk-scoring metric.

Table VI: Percentage of Total Products that are High Risk Using Logit: Switch Product Family

| PhotoDetermination | Source | Probability Using Logit | Total | Percentage | Lower Bound 95% | Upper Bound 95% |
|---|---|---|---|---|---|---|
| Counterfeit | Broker | 172 | 214 | 80.4% | 74.4% | 85.5% |
| Genuine | Broker | 5 | 341 | 1.5% | 0.5% | 3.4% |

Sources:
Combined Risk Score Results for Expert (4.15.20).xlsx.

The above table shows that the methodology using a logit regression provides similar outcomes as did Cisco risk-scoring metric, described in Table II. This statistical method also produces a low rate of false positive findings of counterfeit units. The Cisco risk-scoring metric, in Table II, finds a little over 3.3% of the genuine products were falsely identified as

---

[29] Jeffrey S. Simonoff, *Analyzing Categorical Data*, Springer, 2003, Chapters 4 and 9.

[30] In the Broker dataset for switches with non-missing values of Cisco Net Price (POS), there are 136 units classified as "High Risk". 128 of these, or 94.1%, were determined as counterfeit.

[31] In the Broker dataset for switches with non-missing values of Cisco Net Price (POS), there are 383 total units. 140 of these, or 36.6%, were determined as counterfeit.

counterfeit.[32] The logit analysis derived from the components of the Cisco risk-score identified 1.5% of genuine switches as counterfeit.[33] It also produces a high rate of true positives 80.4%.[34]

### ii.   *Statistical Model of Transceivers from Broker Data*

I perform the same logit model for transceivers from the Broker data. The results are presented in Table VII.

**Table VII: Logit Regression for Switches in Transceiver Dataset**

```
Logistic regression                          Number of obs    =        166
                                             LR chi2(5)       =      95.77
                                             Prob > chi2      =     0.0000
Log likelihood = -63.668788                  Pseudo R2        =     0.4293
```

| Counterfeit | Coef. | Std. Err. | z | P>|z| | [95% Conf. Interval] | |
|---|---|---|---|---|---|---|
| | −1.59097 | .534449 | −2.98 | 0.003 | −2.638471 | −.5434696 |
| | 0 | (omitted) | | | | |
| | 0 | (omitted) | | | | |
| | 0 | (omitted) | | | | |
| | .1894242 | .0705377 | 2.69 | 0.007 | .0511728 | .3276756 |
| | .6562911 | .2847648 | 2.30 | 0.021 | .0981622 | 1.21442 |
| | .7715691 | .1734093 | 4.45 | 0.000 | .4316932 | 1.111445 |
| | 0 | (omitted) | | | | |
| | .473444 | .2340837 | 2.02 | 0.043 | .0146483 | .9322397 |
| | −1.803128 | .8085685 | −2.23 | 0.026 | −3.387894 | −.2183634 |

These results are based on the Broker data, which was used to develop the metric. The test of how well the metric performs in samples used in its development is listed in Table VII. The logit scores determining which transceivers are more or less likely to be counterfeit are listed in Table VIII.

---

[32] 95% confidence interval is 1.4% to 6.4%.

[33] 95% confidence interval is 0.5% to 3.4%.

[34] 95% confidence interval is 74.4.% to 85.5%.

15

Table VIII: Predicted Counterfeit Transceivers from Broker Dataset

|  | Counterfeit | Genuine | Total |
|---|---|---|---|
| 0.00320 | 0 | 3 | 3 |
| 0.14147 | 2 | 7 | 9 |
| 0.24760 | 1 | 3 | 4 |
| 0.28260 | 16 | 41 | 57 |
| 0.40545 | 0 | 2 | 2 |
| 0.61981 | 4 | 2 | 6 |
| 0.65912 | 12 | 7 | 19 |
| 0.88892 | 4 | 0 | 4 |
| 0.94408 | 1 | 0 | 1 |
| 0.97582 | 31 | 1 | 32 |
| 0.98589 | 2 | 0 | 2 |
| 0.99405 | 9 | 0 | 9 |
| 0.99498 | 15 | 0 | 15 |
| 0.99878 | 3 | 0 | 3 |
|  | 100 | 66 | 166 |

Sources:
Combined Risk Score Results for Expert (4.15.20).xlsx

Table VIII, again shows that the logit model based on the Broker data effectively separates genuine from counterfeit transceivers. Only 10 of the 66 (15.2%)[35] genuine transceivers in the broker data have a logit score above .61.  81% of the 100 counterfeit transceivers have a logit score above .61. Again, this statistical model based on the underlying components of the Cisco risk-scoring metric separates counterfeit transceivers from genuine transceivers with high probability. Table IX shows this analysis.

.

Table IX: Percentage of Total Products that are High Risk Using Logit: Transceiver Product Family

| PhotoDetermination | Source | Probability Using Logit | Total | Percentage | Lower Bound 95% | Upper Bound 95% |
|---|---|---|---|---|---|---|
| Counterfeit | Broker | 81 | 100 | 81.0% | 71.9% | 88.2% |
| Genuine | Broker | 10 | 66 | 15.2% | 7.5% | 26.1% |

Sources:
Combined Risk Score Results for Expert (4.15.20).xlsx.

---

[35] 95% confidence interval is 7.5% to 26.1%.

### e.    Test of Cisco's Risk-scoring Metric in "Out of Sample" Datasets

The analysis above is based on the performance of the Cisco risk-scoring metric and logit analysis on the Broker data. In this section I describe the performance of the Cisco risk-scoring metric in separating counterfeit units from genuine in another dataset.  This type of analysis is called out-of-sample testing.

### iii.    Out-of-Sample Test of Cisco Risk-Score for Switches

Table X lists the results of the Cisco risk-scoring metric for switches in the out-of-sample dataset.

Table X: Percentage of Total Products that are High Risk Using Cisco Detection Matrix: Switch Product Family
Only Analyze Records That Have a Non-Missing Cisco Net Price POS

| PhotoDetermination | Source | High Risk | Total | Percentage High Risk | Lower Bound 95% | Upper Bound 95% |
|---|---|---|---|---|---|---|
| Counterfeit | Broker | 128 | 140 | 91.4% | 85.5% | 95.5% |
| Genuine | Broker | 8 | 243 | 3.3% | 1.4% | 6.4% |
| Counterfeit | Out-of-Sample | 28 | 38 | 73.7% | 56.9% | 86.6% |
| Genuine | Out-of-Sample | 1 | 19 | 5.3% | 0.1% | 26.0% |

Sources:
Combined Risk Score Results for Expert (4.15.20).xlsx.

For the out-of-sample data, the Cisco risk-scoring metric identified 73.7% of the true counterfeit switches as High Risk.[36] It identified 5.3% of the true genuine switches as counterfeit[37].

### iv.    Out-of-Sample Test of Logit Based on Cisco's Risk Measures for Switches

Table XI lists the results for the logit model based on the components of the Cisco risk-score metric for switches. The predicted values are based on the logit regression performed on switches in the Broker dataset and the characteristics of each of the switches the out-of-sample data.

---

[36] 95% confidence interval is 56.9% to 86.6%.

[37] 95% confidence interval is 0.1% to 26.0%.

Table XI: Percentage of Total Products that are High Risk Using Logit: Switch Product Family

| PhotoDetermination | Source | Probability Using Logit | Total | Percentage | Lower Bound 95% | Upper Bound 95% |
|---|---|---|---|---|---|---|
| Counterfeit | Broker | 172 | 214 | 80.4% | 74.4% | 85.5% |
| Genuine | Broker | 5 | 341 | 1.5% | 0.5% | 3.4% |
| Counterfeit | Out-of-Sample | 71 | 94 | 75.5% | 65.6% | 83.8% |
| Genuine | Out-of-Sample | 1 | 34 | 2.9% | 0.1% | 15.3% |

Sources:
Combined Risk Score Results for Expert (4.15.20).xlsx.

For the out-of-sample data the logit model identified 71 switches as likely counterfeits out of 94 determined counterfeits (75.5%).[38] The logit identified one genuine switch as counterfeit out of 34 (2.9%).[39]

### v.    Out-of-Sample Test of Cisco Risk-Score for Transceivers

Table XII lists the results of the Cisco risk-scoring metric for the out-of-sample data..

Table XII: Percentage of Total Products that are High Risk Using Cisco Detection Matrix: Transceiver Product Family
Only Analyze Records That Have a Non-Missing Cisco Net Price POS

| PhotoDetermination | Source | High Risk | Total | Percentage High Risk | Lower Bound 95% | Upper Bound 95% |
|---|---|---|---|---|---|---|
| Counterfeit | Broker | 34 | 36 | 94.4% | 81.3% | 99.3% |
| Genuine | Broker | 7 | 18 | 38.9% | 17.3% | 64.3% |
| Counterfeit | Out-of-Sample | 44 | 81 | 54.3% | 42.9% | 65.4% |
| Genuine | Out-of-Sample | 0 | 131 | 0.0% | 0.0% | 2.8% |

Sources:
Combined Risk Score Results for Expert (4.15.20).xlsx.

The Cisco risk-scoring metric categorized 44 of the 81 determined counterfeit transceivers as counterfeit (54.3%).[40] Cisco's risk-scoring metric identified 0 of the 131 determined genuine transceivers as counterfeit.[41]

---

[38] 95% confidence interval is 65.6% to 83.8%.

[39] 95% confidence interval is 0.1% to 15.3%.

[40] 95% confidence interval is 42.9% to 65.4%.

[41] 95% confidence interval is 0.0% to 2.8%.

### vi.    Out of Sample Test of Logit Based on Cisco's Risk Measures for Transceivers

Table XIII lists the results for the logit model based on the components of the Cisco risk-score metric for transceivers. The predicted values are based on the logit regression performed on switches in the Broker dataset and the characteristics of each of the transceivers the out-of-sample data.

| | | Probability | | | Lower Bound | Upper Bound |
|---|---|---|---|---|---|---|
| PhotoDetermination | Source | Using Logit | Total | Percentage | 95% | 95% |
| Counterfeit | Broker | 81 | 100 | 81.0% | 71.9% | 88.2% |
| Genuine | Broker | 10 | 66 | 15.2% | 7.5% | 26.1% |
| Counterfeit | Out-of-Sample | 95 | 98 | 96.9% | 91.3% | 99.4% |
| Genuine | Out-of-Sample | 0 | 142 | 0.0% | 0.0% | 2.6% |

Table XIII: Percentage of Total Products that are High Risk Using Logit: Transceiver Product Family

Sources:
Combined Risk Score Results for Expert (4.15.20).xlsx.

For the out-of-sample data, the logit model identified 95 transceivers as likely counterfeits out of 98 photographically determined counterfeits (96.9%).[42] The logit model based on the component measures of the Cisco risk-scoring metric none of the 142 identified genuine transceivers as counterfeit.[43]

### 6.    Conclusion

Cisco's counterfeit detection metric has a high likelihood of identifying verified counterfeit units as High Risk and a low probability of identifying verified genuine units as High Risk particularly for switches and transceivers that I understand to be at issue in this case. The Cisco risk-score metrics perform well on the measures, risk-levels, and data sets I analyzed.

_____

Daniel S. Levy
April 17, 2020

_____

[42] 95% confidence interval is 91.3% to 99.4%.

[43] 95% confidence interval is 0.0% to 2.6%.

19

### Appendix 1- Curriculum Vitae DANIEL S. LEVY, PhD

Daniel S. Levy specializes in applications of economics and statistics in the study of corporate structures related to industrial organization/antitrust, intellectual property infringement and damages issues. His work includes detailed analyses and valuations of corporate functions, risks, and assets for international corporations in a wide range of industries. He has served as an expert witness in high technology industries for copyright litigation, patent disputes and associated antitrust allegations. He has designed and performed sampling protocols to review the composition of alleged copyrighted material. He has also designed consumer surveys to determine the consumers' value of products and services. As part of his business consulting, Dr. Levy has worked Fortune 500 companies developing economic, statistical and computing solutions for optimizing prices. He has analyzed lost profits in various business related situations. He has testified in Federal Court, presented statistical issues to Government Agencies and served as an Expert Arbitrator.

Prior to Advanced Analytical Consulting Group, Inc., Dr. Levy was the National Leader of the Economic and Statistical Consulting Group at Deloitte Financial Advisory Services and Global Leader of Economic Consulting at Arthur Andersen's Business Consulting Group. He also held research and consulting positions at Charles River Associates, The RAND Corporation, Needham-Harper Worldwide Advertising, SPSS Inc. and The University of Chicago Computation Center.

Dr. Levy and his team of economists and engineers design, build and implement pricing models and applications that help their clients optimize prices to improve revenues/profits.

Ph.D., Economics, The University of Chicago

### EXPERT REPORTS, TESTIMONY/AFFIDAVITS

- The State of Washington v Jersey Mike's Franchise Systems, Inc. 2019.
- Infodeli, LLC. et al v Western Robidoux, Inc. et al, Case No. 4:15-cv-00364-BCW, United States District Court for the Western District of Missouri, Western Division, 2019, *Expert Report*.

- Zuniga v Alexandria Care Center, Case No. BC529776, Superior Court of California, Los Angeles, 2018, *Declaration.*

- Rimini Street, Inc. v. Oracle International Corporation, Case No. 2:14-cv-01699, United States District Court for the District of Nevada, 2018, Expert Report.

- Olvera v. El Pollo Loco, Inc., JCCP Case No. 4957, Superior Court of California, Orange County, 2018, Expert Report and Deposition

- In Re: Wholesale Grocer Products Antitrust Litigation, Civil Action No. 09-md-02090, United States District Court for the District of Minnesota, 2017, Expert Report and Deposition.

- Crescent City Surgical Center v. Louisiana Health Services and Indemnity Company, 24th Judicial District Court for the Parish of Jefferson, Stat of Louisiana, No.: 765-705, 2017, Expert Report and Deposition.

- Lucy Truitt, et al., v Atlanta Independent School System, Civil Action File No. 1:15-CV-04295-SCJ-WEJ,US District Court, Northern District of Georgia, Atlanta Division, 2017, Expert Reports and Deposition.

- US Department of Labor v Analogic, CASE NO. 2017-OFC-00001, United States Department of Labor Office of Administrative Law Judges, 2017, Expert Report and Testimony

- Susan Mojica et al v Securus Technologies , Civil Action No. 14-5258, US Federal Court, Western District, 2017, Expert Report.

- Ex rel Duffy v Lawrence Memorial Hospital, Civil Action Case No. 2:14-cv-02256-SAG-JPO, US Federal Court, District of Kansas, 2017 Expert Report.

- Miller v. The Port Authority of New York & New Jersey, Case No. 2:15-CV-06370-KM-MAH, US District Court for District of New Jersey, 2017.

- Omega Hospital, LLC v Louisiana Health Services & Indemnity Company, State of Louisiana, Civil Proceeding No. 16-c-4, 2016, Expert Report and Deposition

- University of Virginia Patent Foundation v Dynavox Systems, LLC, American Arbitration Association, Case No. 01-14-0000-7598, 2015, Expert Report.

- Veronica Becerra et al v the McClatchy Company, Case No. 8CECG 04411KCK, 2014.

- E. Aguilera, et al. v. Waukesha Memorial Hospital, Inc. U.S. District Court, Eastern District of Wisconsin, Case No. 13-CV-1245, 2015, Labor, Expert Report.

- Sirko et al v International Business Machine Corporation, Case no. CV13-3192 DMG, 2014, Expert Report and Deposition.

- Sawin et al. v. The McClatchy Company et al., SCSC Case No. 34-2009-00033950-CU-OE-GDS, 2014, Expert Report and Deposition.

- Oracle USA, Inc. v Rimini Street Inc. and Seth Ravin, Case No. 2-10-cv-0106 LRH-VCF, 2012, Expert Report.

- Stephen Markson v. MBNA Canada Bank, Ontario Superior Court of Justice, Court File 03-CV254970CP, 2012, Expert Report and Deposition.

- Disney Enterprises, Inc. et al.v. Hotfile Corp et al, U.S. District Court, Southern District of Florida, Case no. 11-20427-Williams-Turnoff, 2012, Expert Report and Deposition.

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2009 – Present | National Managing Director, Advance Analytical Consulting Group, Inc. |
| 2002 - 2009 LLP | National Leader of Economic and Statistical Consulting, Deloitte FAS |
| 2001 - 2002 | Global Director of Economic and Statistical Consulting, Arthur Andersen: Value Solutions |
| 1998 - 2001 | National Director of Economic and Statistical Consulting, Arthur Andersen: Business Consulting |
| 1996 - 1998 | Regional Director of Economics, Arthur Andersen: CRCO |
| 1995 - 1996 | Economist, Arthur Andersen |
| 1991 - 1995 | Senior Associate, Charles River Associates |
| 1988 - 1991 | Associate Economist, The RAND Corporation |
| 1985 - 1988 | Computer Advisor, The University of Chicago Computation Center |
| 1982 - 1985 | Research and Teaching Consultant, SPSS Inc. |
| 1981 - 1982 | Research Consultant, Needham, Harper Worldwide Advertising |

## PROFESSIONAL HONORS and ACTIVITIES

- Earhart Fellowship for graduate research in economics, 1981 - 1982
- Hewlett Grant for research in developing countries, 1985 - 1986; renewed, 1986 - 1987
- CBS Bicentennial Scholarship for research on events leading to the American Revolution, 1986 - 1987
- Homer and Alice Jones Fellowship, University of Chicago, 1987 - 1988
- American Economics Association, 1988- Present
- Population Association of America, 1988-1991

## PAPERS, PRESENTATIONS, AND PUBLICATIONS

- Levy, Daniel and Tardiff, Timothy J. and Zhang, Yiyuan and Yamron, Alex, No-Poaching Clauses, Job Concentration and Wages: A Natural Experiment Generated by a State Attorney General (January 23, 2020). Available at http://aacg.com/wp-content/uploads/Effect-of-No-poaching-Clauses-on-Wages-2020-01-23-1900.pdf

- Levy, Daniel and Tardiff, Timothy J., Measurement of Market Concentration Faced by Labor Pools: Theory and Evidence from Fast Food Chains in Rhode Island with No-Poaching Clauses (September 14, 2018). Available at SSRN: https://ssrn.com/abstract=3247932 or http://dx.doi.org/10.2139/ssrn.3247932

- Levy, Daniel *et al.*," Is LIBOR Still Being Manipulated?: Identifying Colluders with Methods of Detecting LIBOR Tampering," December 27, 2016. Available at SSRN: https://ssrn.com/abstract=2884953 or http://dx.doi.org/10.2139/ssrn.2884953

- Daniel S. Levy and Timothy J. Tardiff "Pricing and Maximizing Profits within Corporations: Applications of Lester Taylor's Insights," Demand for Communications Services – Insights and Perspectives, Springer, New York, 2014.

- Timothy Tardiff, Daniel Levy, Audrius Girnius, and Karthik Padmanabhan, "Antitrust and Community Impact Report," Montana Commissioner of Securities, January 29, 2013.

- Daniel S. Levy and Timothy J. Tardiff "Pricing and Maximizing Profits within Corporations: Applications of Lester Taylor's Insights," Presented at Telecommunications Demand and Investment: The Road Ahead, Conference in Honor of Emeritus Professor Lester D. Taylor, Jackson Hole, Wyoming, October 10, 2011.

- Daniel S. Levy. "Foundations of Pricing," Presented at the Professional Pricing Society Meetings, Oct 2010.

**Appendix 2- Additional Results**

Suppose we know the following information, as shown in the table below:

- Percentage of high risk in Counterfeits: A
- Percentage of high risk in Genuine: B
- Total observations in High Risk: C
- Total observations: D

|             | High Risk | Total | Percentage |
|-------------|-----------|-------|------------|
| Counterfeit | X1        | X2    | A          |
| Genuine     | X3        | X4    | B          |
| Total       | C         | D     |            |

This table forms four simultaneous equations with four unknowns, as follows:

$$\frac{X1}{X2} = A$$

$$\frac{X3}{X4} = B$$

$$X1 + X3 = C$$

$$X2 + X4 = D$$

This can be further reduced to 2 simultaneous equations with 2 unknowns.

$$X1 + X3 = C$$

$$\frac{X1}{A} + \frac{X3}{B} = D$$

Therefore, we can solve for X1:

$$X1 = \frac{ABD - AC}{B - A}$$

Hence, the percentage of high-risk products that are counterfeits is:

$$\frac{X1}{C} = \frac{ABD - AC}{(B - A)C}$$

# EXHIBIT  C

Page 1

 1              UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA
 2                   OAKLAND DIVISION

 3  CISCO SYSTEMS, INC., a California :
    corporation, and CISCO TECHNOLOGY,:
 4  INC., a California corporation,    :
                                       :
 5          Plaintiffs,                :
                                       :
 6          vs.                        : Case No.
                                       : 4:18-CV-07602-YGR
 7  ZAHID "DONNY" HASSAN SHEIKH, an    :
    individual; et al.,                :
 8                                     :
            Defendants.                :
 9  _____:
                                       :
10  ADVANCED DIGITAL SOLUTIONS         :
    INTERNATIONAL, INC.; a California  :
11  corporation,                       :
                                       :
12          Third-Party Plaintiff,     :
                                       :
13          vs.                        :
                                       :
14  RAHI SYSTEMS, INC., a California   :
    corporation; et al.,               :
15                                     :
            Third-Party Defendants.    :
16
                        - - -
17
        CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
18
        REMOTE VIDEOCONFERENCE DEPOSITION OF
19
                  F. CHARLES WILLIAMS
20
                        - - -
21
                  Friday, May 8, 2020
22                Raleigh, North Carolina, Wake County

23

24  Job No. 179849

25  Reported by Ann Ford, RPR

1    developed is to help us identify counterfeit that may

2    have been sold by somebody.  And the reason for that

3    is counterfeit often requires us to get a hands-on

4    determination to make an analysis that it's a

5    counterfeit.

6              And if you had an instance where you had a

7    seller who may have sold thousands or hundreds of

8    thousands of pieces, individual pieces, of equipment,

9    it's really -- to get to the end result of that is a

10   very difficult task, time-consuming, with customers,

11   other parties involved in the case.

12             So the risk-scoring model was a way to

13   allow us to get to a way of identifying counterfeit

14   and maybe, in the marketplace, to then conduct

15   further analysis or requests for recall of that -- of

16   those products.

17   Q.        So what inputs did you supply towards

18   developing that model?

19   A.        Well, the reason to have it, the purpose

20   for having it, using the data that we are aware of,

21   whether that be our financial data, sales systems,

22   the data supplied by the brokerage, leveraging known

23   counterfeit product I.D.s within our system to help

24   with the weight scoring, and then the refinement of

25   the process.

1   determined to be counterfeit that would be added to

2   the model.  And then there's just the

3   counter-weighting of, hey, are you always being

4   conservative enough in your information to get to the

5   accurate results on it?

6           We don't want to be in a position where

7   we're overstating something.  So we prefer to be on

8   the conservative side of that.

9   Q.        So is part of your job responsibilities

10  the ongoing management of the risk-scoring model?

11  A.        I have -- you know, Tim Casto you've

12  referenced, he's on my team, but it's a group we

13  bring into this.  So I mentioned the collaborative

14  work.  You've got people that are on my engineering

15  team.  So I get results from them, as far as

16  confirmation of test results or confirmation that a

17  new product has been counterfeit to add to the model.

18  Q.        Okay.  So since the model was first

19  started, and even to this day, it sounds like it's

20  constantly being monitored and adjusted as new

21  information becomes available.

22           Would that be correct to say?

23           MR. NELSON:  Objection.  Vague and

24      ambiguous.

25  A.        Yes.

1    the risk involved with it.  So they never desire to

2    go out and find counterfeit from anybody.  The best

3    way to do that is through a secure source of supply,

4    which would be the Cisco partner distribution model.

5              In a conversation like that, if a

6    customer -- you know, a typical customer who wants to

7    buy a product, they're determining who they want to

8    purchase from.  If they determine that they want to

9    purchase a Cisco product, then they can go out and

10   shop for it.  The consumer is making a decision on

11   what they want to purchase, what networking equipment

12   provider they want to purchase from.  If they choose

13   Cisco -- and hopefully they do -- they would then

14   choose what product fits their needs and purchase it

15   from their supplier.

16              Ideally, from our stake, it's an

17   authorized supplier, such as a partner of ours.  If a

18   consumer wants to buy it in the open marketplace,

19   they're permitted to do so.

20   Q.        So it's your belief that consumers in this

21   marketplace make a decision about the brand that they

22   want to buy before they go shopping, as opposed to

23   deciding the piece of technology they want to buy and

24   then shopping around?

25   A.        Yeah.  I think the consumer has a

1   networking need and desire, and they choose from the

2   well-known vendors from that.  If a consumer has a

3   product within its network that's already Cisco -- if

4   they've established or settled on Cisco, they're

5   typically going to get another Cisco through their

6   network.

7           It may work in our favor; it may work

8   against us, because if they settle on a competitor of

9   ours, they're most likely to go after that

10  competitor's device as well.

11  Q.       Who are Cisco's competitors?

12  A.       HP, Juniper -- there's a whole bunch of

13  them -- are two known networking competitors of ours.

14  Q.       Are those kind of the biggest hardware

15  competitors?

16  A.       Hardware, yes.

17  Q.       Are there any others, kind of, in the top

18  five, off the top of your head?

19  A.       You get into different product categories,

20  so you might be talking Cloud services.  You could be

21  talking, like, this videoconferencing.  Cisco has a

22  well-known and robust and secure platform called

23  Webex.  That system is used, and I would recommend

24  that for future use for you guys.

25              There's also services, so there's many

1    different product categories that our products fall

2    into.  Each one of those sets comes with different

3    competitors.

4    Q.        Okay.  Do HP and Juniper make Internet

5    switches?

6    A.        Yes.  Networking switches.  And there's

7    switches and routers.  And they make those and resell

8    those.

9    Q.        And HP and Juniper make transceivers as

10   well?

11   A.        Yes.

12   Q.        Would it be fair to say that those

13   products are competing in the same marketplace?

14   A.        That's correct.

15   Q.        So if I was shopping around for a

16   transceiver, I could get comparable transceiver

17   devices from HP and from Cisco?

18   A.        If you were shopping around for a

19   transceiver, you would want a transceiver that fit

20   the networking devices you had and was compatible

21   with them.  If you had a Juniper product, you would

22   want to purchase a transceiver that was compatible

23   with a Juniper product.

24   Q.        Okay.  So I can't stick a Cisco

25   transceiver into a Juniper network?

1    A.          They function -- functionality-wise,

2    they're the same concept and idea for transmission of

3    information, but each one, like Cisco's, are designed

4    to function effectively with our products, the most

5    efficient way to do it.

6    Q.          When you say "effectively" and

7    "efficient," what do you mean by that?

8    A.          The design needs to be compatible with the

9    products that we develop.

10   Q.          Okay.  So if I'm a customer, and I have an

11   entirely Juniper built-out network system, I could go

12   buy a Cisco transceiver to replace a transceiver;

13   that's correct to say?

14   A.          You could place Juniper-compatible

15   transceivers in there.  There may be different

16   competitor brands in there.  Whether or not a Cisco

17   transceiver works, you know, well with a Juniper

18   product, I can't comment on that.

19   Q.          Are there any other companies besides HP

20   and Juniper that make transceivers that you can think

21   of?

22   A.          Yes.  There's a lot out there.  You could

23   do a quick search and find many different

24   manufacturers that develop that product specifically.

25   Q.          So getting back to Mr. Regan, is that the

1   where the numbers detail come in, I don't recall off

2   the top of my head.

3   Q.        Okay.  So did you have any involvement in

4   deciding these point levels, the 16 -- for example,

5   the 16 points?

6   A.        Yes.  I was involved in the scoring of

7   those.

8   Q.        So if we go down to Number 2, ███████

███████████████

10            Do you see that?

11  A.        Yes.

12  Q.        Do you know what that factor looks at?

13  A.        ██████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████████████

████████

20  Q.        Okay.  We're going to Number 3 -- sorry,

21  Number 4.  I guess this is the third item but the

22  fourth page of this document.

23            Do you recognize this page of the

24  document?

25  A.        Yes.

Confidential

1   A.          It's not a used price.  It's defining a

2   used product.

3   Q.          I'm sorry.  Yeah.  How does Cisco define a

4   used product?

5   A.          A product that's owned by somebody else or

6   sold to another end customer.

7   Q.          Okay.  So would this -- if I bought a

8   product from a Cisco channel partner and never opened

9   it but resold it to someone else, would that be

10  considered a used Cisco product?

11  A.          Yeah.  The end customer wouldn't match up,

12  so it would.  And the reason it would, in Cisco's

13  eyes, is because the warranty and the licensing

14  wouldn't transfer.  So it would be considered used,

15  because the warranty and the licensing were only

16  provided to the individual end user.

17  Q.          So would Cisco consider any product not

18  bought either directly from Cisco or through a

19  channel partner to be a used product?

20             MR. NELSON:  Objection.  Vague and

21      ambiguous.

22  A.          Do you mind restating that for me?

23  Q.          Yeah.

24             So would Cisco consider any product not

25  bought through Cisco directly or from a Cisco channel

1   partner to be a used product?

2   A.          Any product -- any product sourced outside

3   of Cisco's authorized channel would fit into that

4   model.  So it may have started inside our authorized

5   channel; it changed hands multiple times -- would

6   then fall into that category.  Once it's out of our

7   authorized channel, we just can't offer guarantees as

8   to the quality and condition of a product.

9   Q.          So what's defined as a Cisco authorized

10  channel?

11  A.          That's our -- the partner model we

12  discussed at the beginning, where we -- our primary

13  route to market is through our partner, our partners.

14  And so we have manufacturing, distribution, and then

15  resellers are partners that sell for us.  That's our

16  two-tier distribution model.  And they all have

17  contract terms of where they buy and where they can

18  sell.

19          So purchasing terms for the partners are

20  required to purchase through distribution within

21  their country, and those same partners that are

22  purchasing from distribution are required to sell to

23  end customers within their -- within their territory.

24  Q.          If I bought a product from a Cisco channel

25  partner, never took it out of the box, and turned

1              Do you recall that conversation?

2    A.        Yes.

3    Q.        And we talked about if a customer has

4    installed their network with Cisco products, it was

5    your belief that they would be more likely to

6    purchase Cisco products in the future for that

7    network.

8              Do you recall that?  Is that an accurate

9    statement?

10   A.        Yes.  I recall saying that if a customer

11   has decided on a specific networking manufacturer,

12   that they're more likely to stick with them for

13   future purchases if they have a good experience.

14   Q.        And so in that scenario, for somebody

15   who's installed a Cisco networking system, it would

16   be -- they could get a Juniper product that would be

17   compatible with that Cisco network system; is that

18   correct?

19   A.        They could install different manufacturers

20   within their network, would be an accurate statement,

21   if they chose to.

22   Q.        So if the customer had built out a Juniper

23   network system, they could buy Cisco transceivers

24   that would work in that system?  That's something

25   that they could do; correct?

 1                    MR. NELSON:  Objection.  Asked and

 2          answered.

 3   A.          You're jumping around on the technology

 4   aspect of it.  But if you want to mix and match a

 5   network with different providers, you could.

 6                    But what I would like to point out is once

 7   you have -- you know, network, again, can be complex.

 8   And so you hire experts, IT department staff, CIOs

 9   for large organizations to manage your network.  And

10   they want to standardize on something and have a

11   consistent experience.

12                    So there's a lot of training and expertise

13   in certain cases that go into these technologies to

14   really understand how to make them work efficiently

15   and effectively.

16                    And so once you invest all that time and

17   resources and training for your staff to standardize,

18   it's difficult to shift around.  It's one of these

19   things that cuts both ways for all vendors.  But if

20   you have a good user experience, you're more likely

21   to stick with the same products.

22   Q.          So when Cisco manufactures a transceiver,

23   it manufacturers it with the intent that that

24   transceiver can be used across different competitor's

25   platforms.

1                    CERTIFICATE
State of North Carolina :
2                          SS:
County of Hoke        :
3              I, Ann Ford, Notary Public in and for the

4   State of North Carolina, duly commissioned and

5   qualified, certify that the within named witness was

6   by me remotely duly sworn to testify to the whole

7   truth in the cause aforesaid; that the testimony was

8   taken down by me in stenotypy via remote

9   videoconference, afterwards transcribed upon a

10   computer; that the foregoing is a true and correct

11   transcript of the testimony given by said witness

12   taken at the time and place in the foregoing caption

13   specified.

14              I certify that I am not a relative,

15   employee, or attorney of any of the parties hereto,

16   or of any attorney or counsel employed by the

17   parties, or financially interested in the action.

18              IN WITNESS WHEREOF, I have set my hand and

19   affixed my seal of office at Raeford, North Carolina,

20   on this 20th day of May, 2020.

21

22                    *Ann Ford*
                 ANN FORD, Notary Public in and
23                 for the State of North Carolina
                 Registered Professional Reporter
24

25   My Commission expires:  October 10, 2021.

# EXHIBIT  D

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1

2      IN THE UNITED STATES DISTRICT COURT

3         NORTHERN DISTRICT OF CALIFORNIA

4              OAKLAND DIVISION

5   -------------------------------x

6   CISCO SYSTEMS, INC., a
    California corporation, et al.,
7           Plaintiffs,          Case No.
        v.                    4:18-cv-07602-YGR
8
    ZAHID "DONNY" HASSAN
9   SHEIKH, an individual, et al.,
            Defendants.
10  _____

11  ADVANCED DIGITAL SOLUTIONS,
    INTERNATIONAL, INC., a California
12  corporation,
            Third-Party Plaintiff,
13      v.

14  RAHI SYSTEMS, INC., a California
    corporation et al.,
15          Third-Party Defendants.

16  -------------------------------x

17  CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

18

19     REMOTE VIDEOCONFERENCE DEPOSITION OF

20            DANIEL S. LEVY, Ph.D.

21            Boston, Massachusetts

22

23

24  Reporter: MaryJo O'Connor, RDR, RMR

25  Job No: 179815

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 30

1        issue.

2                 MR. NELSON:  I agree.  Move on.

3                 MR. ATKINSON:  Okay.

4    BY MR. ATKINSON:

5            Q.  So my question is, Dr. Levy -- and

6    I apologize if I ever slip and call you

7    Mr. Levy -- but, Dr. Levy, is it correct that

8    there are no writings that you obtained

9    before April 14 that discuss the factors in

10   the Cisco model?

11           A.  Yes.  I believe that's true.

12           Q.  Okay.

13           A.  There are no other writings.

14           Q.  Okay.  What was your understanding

15   of your assignment in this case as an expert?

16           A.  To evaluate the metrics and

17   measures that were used in the Cisco model to

18   determine how well they distinguish between

19   counterfeit and genuine products.

20           Q.  And to perform this evaluation,

21   who have you spoken with?

22           A.  Mr. Nelson and Ms. He I think.

23   There is another name that I am forgetting.

24           Q.  Is that a Sideman --

25           A.  Yes, I believe it's a Sideman

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 46

1    determined to be actually manufactured and

2    branded by Cisco, as determined in my work in

3    the dataset that I was provided.

4         Q.  And is it your understanding that

5    Cisco actually manufactures these products,

6    or is that beyond the scope?

7         A.  That's -- I wasn't asked to

8    evaluate that.

9         Q.  Okay.  Your report has a sentence,

10   "Of particular interest is how the Cisco

11   scoring system performs in distinguishing the

12   new, genuine products from counterfeit

13   products, which ADSI sold as new, genuine

14   products."

15        Do you see that in your report?

16        A.  I do see that.

17        Q.  Did you form an opinion that ADSI

18   actually sold counterfeit products?

19        A.  I wasn't asked to evaluate that as

20   separate from the metric scoring system that

21   I was evaluating.

22        Q.  And do I understand correctly,

23   then, because you weren't asked to look at

24   that, you didn't form an opinion on that

25   subject, correct?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 47

 1          A.  Could you define the subject

 2    specifically again?

 3          Q.  Whether or not you formed an

 4    opinion that ADSI sold counterfeit products.

 5          A.  I wasn't asked to evaluate that

 6    separate from the measure of counterfeit that

 7    I received in the file to validate the metric

 8    system, and underlying --

 9          Q.  Doctor, first of all, I'm not

10    asking -- this is a question about whether or

11    not you formed an opinion.

12             Am I correct to understand you did

13    not form an opinion that ADSI sold

14    counterfeit products?  That's not one of the

15    opinions you have, correct?

16          A.  I don't have that opinion as -- I

17    wasn't asked to form an opinion on that for

18    this report, and I don't provide an opinion

19    specifically on that topic in this report

20    separate from the metrics that I received in

21    the dataset that I have.

22          Q.  Okay.  And, thank you.  I'll move

23    on.  At the top of Page 3, you begin "Within

24    the Broker dataset."

25             Do you see that sentence?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 53

1          A.  I understood it well enough to

2   understand that based on the model-based

3   analysis that I'm doing here, that I had

4   enough information in the dataset to do what

5   needed to be done.

6          Q.  Can you approximate for me the

7   number of brokers whose information was not

8   provided in connection with the counterfeit

9   investigation or litigation?

10          MR. NELSON:  This is Nelson.

11      Object to the extent that he's asking for

12      communications with counsel that were not

13      considered in forming the opinions or

14      relied upon in forming the opinions.

15          A.  That information is not necessary

16   to do the analysis correctly.

17          Q.  Okay.  So to do the analysis

18   correctly, it's your position all of the

19   Broker dataset can come from brokers accused

20   by Cisco of counterfeiting; is that correct?

21          A.  Given that there are the variables

22   that are in the model, yes, it can be.  Yes.

23          Q.  Okay.  Still on top of Page 3, you

24   say, "Within the Broker dataset, Cisco found

25   that 81.4 percent of the devices predicted to

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 54

1    be counterfeit based on Cisco's eight

2    counterfeit detection metrics were

3    counterfeit."

4              Do you see that part of your

5    report?

6         A.  81 percent.  Yes.

7         Q.  When you say "Cisco found," who at

8    Cisco found the 81.4 percent of the devices

9    predicted to be counterfeit were counterfeit?

10        A.  It's in the dataset that I

11   received.

12        Q.  Okay.  So you don't know who at

13   Cisco made that determination?

14        A.  It's not important for the

15   analysis that I'm doing.

16             When I say "Cisco found," I'm

17   saying in the dataset that I received.  And

18   to the extent that my analysis relies on the

19   counterfeit determination, that's where I'm

20   referring to as a Cisco found.

21        Q.  Does it matter to you who at Cisco

22   put the dataset together?

23        A.  Not for what I'm doing in

24   validating the model.  So, no, it doesn't

25   matter for validating the model.  If there is

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 55

1   some issue with whether or not some of those

2   values are correct or not, someone at Cisco

3   can -- I believe there is an expert on that

4   topic that's going to cover that.

5          Q.  And you never picked up the phone

6   and called the person at Cisco who actually

7   put the dataset together, correct?

8          A.  I didn't, because I don't need to

9   to validate the model, as was presented in

10  the data that they provided.

11         Q.  And no questions came up in your

12  mind, as you looked through the dataset, for

13  which you wanted a clarification?  Or is that

14  not right?

15         A.  So I'm not sure if that is -- I'm

16  not sure if I'm supposed to be answering that

17  or not.

18         Q.  I'll put it this way.  I'll

19  rephrase it.

20             Did you have questions in your

21  mind when you looked at the dataset that was

22  provided, the one you refer to "Cisco found

23  81.4 percent," et cetera?  Did you have

24  questions in your mind?

25         A.  There was one that I did when I

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 57

1   record is pretty clear you did not talk to

2   that person, correct?

3          A.  I didn't.  Again, I investigated

4   the quality of the dataset by analyzing the

5   dataset and going to other sources to

6   validate and check the dataset.

7          Q.  Was there a reason why you didn't

8   talk to somebody at Cisco?

9          A.  I didn't need to for the task that

10  I was given.

11         Q.  Okay.  When you talk about the

12  idea that there were devices that were

13  counterfeit based on photographic evidence --

14  I'm still at the top of Page 3 -- have you

15  seen photographic evidence of counterfeiting

16  in this case?

17         A.  I hadn't seen the photographic

18  evidence.  It's both listed in the file as

19  photographic evidence and, as I understand

20  it, is photographic and other physical

21  inspection as well.  But the dataset lists it

22  as photographic evidence as a title.

23         Q.  So when the dataset says

24  photographic evidence, sometimes it's

25  photographic, sometimes it's physical; is

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 59

1          A.  Not without learning more about it

2    at this moment.  I probably could if you gave

3    me, you know, enough examples of them.  I

4    probably could.  But I don't have -- I

5    haven't looked at physical -- that many

6    physical Cisco products to do that.

7          Q.  Have you looked at any physical --

8          A.  I'm sorry.  And I don't need to in

9    order to do what I was asked to do.

10          Q.  Right.  And have you looked at any

11   physical Cisco products in this case for

12   purposes of your report and opinion?

13          A.  Not for the purposes of this

14   report and opinion.  I have looked at

15   physical Cisco product.

16          Q.  Okay.  Then so you were not

17   involved in any determination of the

18   authenticity or genuineness of Cisco products

19   in this case, right?

20          A.  That's correct.  That's the

21   information that I received in the data, and

22   I was validating the measurements and the

23   performance of the metric and identifying

24   those as defined in the dataset.

25          Q.  And Cisco determined if a product

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 60

1   was counterfeit or not, right?

2          A.  That's my understanding.  And I

3   understand there is a Cisco witness involved

4   in this case to discuss those issues.

5          Q.  And what's the name of that

6   witness?

7          A.  I'm going to forget his last name.

8   Sam.  I don't remember his last name.

9          Q.  That's okay.  So you are relying

10  on Cisco to tell you when a product is

11  counterfeit or not, correct?  For the

12  purposes of your analysis.

13         A.  For the purposes of determining

14  whether the measurement system works, yes.

15  That's what I was asked to do.

16         Q.  In your report, you talk about --

17  actually, strike that.

18             Do you know what Cisco is looking

19  for when it does photographic inspection for

20  counterfeiting?

21         A.  No.  And, again, I don't need to

22  know that.  The other expert in this case

23  from Cisco will deal with that issue I

24  understand.

25         Q.  Okay.  And do you know what Cisco

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 61

1    is looking for for physical inspection to

2    determine counterfeiting?

3             A.   In a general way, but not that I

4    relied on for this work.

5             Q.   Okay.  Is there an error rate for

6    Cisco's inspection of product to determine if

7    it's genuine or counterfeit?

8                  MR. NELSON:   Objection.  Beyond

9         the scope.

10            A.   I'm a little confused by the

11   question.  I apologize.

12            Q.   Does your opinion assume that

13   Cisco's determinations were perfect?

14            A.   No, in that it determines whether

15   or not the metric is predicting the

16   counterfeits as determined in that field in

17   the dataset.

18            Q.   So we talked about that Cisco

19   determined if a product is counterfeit or

20   not, right?

21            A.   Correct.

22            Q.   Okay.  And we talked a little bit

23   about the fact that you're not involved in

24   it, but your understanding is there were

25   photographic inspections, physical

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 67

1    nothing wrong with the report itself, what

2    was stated.  This model is valid for the data

3    that's being used.

4            Q.  And do you consider it material

5    whether or not the Cisco determinations of

6    authenticity have an error rate?  Do you

7    consider that relevant to your analysis?

8               MR. NELSON:  Objection.  Vague and

9          ambiguous.  Using terms that are

10         undefined.

11           A.  Could you rephrase that?

12           Q.  Is it relevant to your inquiry

13   whether or not Cisco is accurate in

14   determining whether a product is counterfeit;

15   is that relevant to your inquiry?

16           A.  For developing the model and

17   observing how it performs, it's based on the

18   data that I received.  So to the extent that

19   that data were to change, as with all

20   analyses and all statistical models and all

21   economic analysis, if the underlying data

22   were to change, that could change -- had the

23   potential to change the model.  If there are

24   small numbers of them that change, it will

25   probably have -- would have very little

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 68

1    impact on whether the model -- the numbers in

2    a report like this would change.

3                But the numbers in this report are

4    for the dataset that I received.  So it's

5    relevant only in that sense; that if someone

6    has an update to the data, the same model

7    could be run -- the same analysis that I

8    performed here could be run to evaluate the

9    model.

10          Q.  In forming your opinion, did you

11   investigate or look into whether Cisco is

12   correctly identifying counterfeit and genuine

13   products?  Is that something you look into?

14                MR. NELSON:  Objection.  Asked and

15         answered.  You can answer again, though.

16          A.  Okay.  So, as I said, the model --

17   the task I was asked -- the research I was

18   asked to do and the tasks I performed to

19   answer it were related to the data that I

20   received.  And so based on that, I can use

21   the data that they provided me.  And as with

22   any other economic or statistical model or

23   analysis, it's based on the data that you

24   receive -- one receives or uses.

25                If there is some change to that

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 69

 1   data, which I believe Cisco's expert is going

 2   to discuss, or you could ask him about it,

 3   then this analysis that I performed could be

 4   run again on that changed data.

 5             MR. NELSON:  Hey, Tyler, we've

 6        been going for about two-and-a-half

 7        hours, a little off and on of course.

 8        But when you come to a breaking point, if

 9        we could just take a ten-minute break.

10        That would be great.

11             MR. ATKINSON:  Absolutely.  I'll

12        reach that point in a moment.

13   BY MR. ATKINSON:

14        Q.  Dr. Levy, this is a line of

15   questions I'm not going to go very much

16   further down, but the accuracy of the Cisco

17   determinations is not something you yourself

18   looked into, correct?

19             And just to be clear, those

20   determinations, we're still talking about the

21   determinations of whether or not something

22   was actually genuine or actually counterfeit?

23        A.  I did not investigate that aspect

24   of the dataset and verify it from photographs

25   or physical analysis of the products.  That's

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 70

1  something I believe Cisco -- you'd have to

2  address with Cisco.

3          Q.  Okay.  Why don't we go ahead and

4  take that ten-minute break.

5          A.  Okay.  Great.

6          MR. ATKINSON:  So we'll see you in

7      ten.  Thanks everyone.

8          (Proceedings recessed at

9      3:44 p.m., and reconvened at 3:58 p.m.)

10 BY MR. ATKINSON:

11         Q.  Dr. Levy, just to close the loop

12 on that line of questions I had before the

13 break, is Cisco's determination of whether a

14 product is counterfeit versus authentic, I

15 understand your methodology may not change,

16 but would your results change?

17         A.  So if they gave additional --

18 provided additional underlying data that was

19 different, then with the new data there could

20 be some change in the result.  It would

21 depend on how much and which direction things

22 go in it, but there could be a change.  If

23 the underlying data in any analysis is

24 altered, it could change the results, have

25 the potential to change the results.  It

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 73

1    conclusion about the model; isn't that

2    correct?

3              MR. NELSON:  This is Nelson.

4         Objection.  Incomplete hypothetical.

5         Vague and ambiguous.

6         A.  You know, it would depend how much

7    the change is.

8              Q.  And you didn't determine whether

9    or not the determinations of authentic versus

10   counterfeit are accurate determinations,

11   right?

12             A.  I wasn't asked to do that.  I was

13   asked to evaluate the model based on the data

14   that I received.  And, again, if there are

15   small changes in that, it probably would have

16   very little impact on the underlying, you

17   know, results that came from it.  And if

18   there were to be changes that should be made,

19   the analysis that I did could be run through

20   on the new data.

21             Q.  Okay.  And when you say you

22   weren't asked to do that, it's not just you

23   weren't asked to do something, you didn't do

24   it, right?

25             A.  It was outside of the scope of

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 74

1    what I needed to do for my analysis, and I

2    wasn't asked to analyze that portion of this

3    issue.

4              Q.  And, therefore, you did not do it,

5    right?

6              A.  And I did not do that.  Because it

7    wasn't --

8              Q.  Okay.  Just --

9              A.  Because it wasn't needed to do

10   what I was asked to do.

11             Q.  You didn't believe that it was

12   needed on your part to determine whether or

13   not Cisco is doing an accurate job when it

14   comes to deciding if something is counterfeit

15   or not.  You didn't believe you needed to do

16   that, right?

17             A.  Not to perform the task that I was

18   asked to do, which is to verify the

19   performance of the model.

20             Q.  Okay.

21             A.  Not to --

22             (Court reporter requests

23        clarification due to overlapping

24        speakers)

25             A.  I didn't need to do that in order

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    scoring system."

2              Do you see that?

3         A.  Yes.  I do.  I do see that.

4         Q.  Okay.  And can you identify for

5    me, please, who those additional sources are?

6         A.  Well, I describe them in here as

7    the Warehouse data and -- I'm looking for the

8    names of them -- and the -- the Observed data

9    and the Warehouse data and also ADSI.

10        Q.  And is Warehouse a place?

11        A.  It's the name of a dataset.  It's

12   a set of data that they received and named it

13   as the Warehouse data.

14        Q.  And where did that data come from?

15        A.  A source that was obtained after

16   they made the model.  And that's the critical

17   piece.

18        Q.  And I'm not -- this isn't a gotcha

19   question.  I'm just asking what was the

20   source.

21        A.  It came in the same dataset.

22        Q.  What is the --

23        A.  The Warehouse set.

24             MR. NELSON:  This is Nelson.  Hey,

25        Tyler, I'm sorry, are you asking him who

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

 1          gave him the data or who the Warehouse

 2          is?

 3                    MR. ATKINSON:  Who the Warehouse

 4          is.

 5                    MR. NELSON:  Oh, okay.

 6              A.  I don't know the exact entity of

 7     the Warehouse.  I'm not sure that it is

 8     something that's supposed to be described at

 9     this moment.  It's not relevant for what I

10     did, where the source of it, though.  It's

11     not something I relied on, what the exact

12     source is, in where that data -- in where,

13     quote, the Warehouse is.

14              Q.  So you didn't care where that data

15     came from in terms of where the source of the

16     Warehouse data came from?  What is the

17     Warehouse, that didn't matter to you?

18              A.  It's not important for doing the

19     out-of-sample testing and verifying the

20     performance of the model.

21              Q.  And that's not something you

22     looked into in terms of what is Warehouse.

23     Is it -- you didn't look into that, right?

24              A.  So, as I said before, I'm not sure

25     that that's -- I don't know if that

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 78

1   information is public or not, but I don't

2   know whether I'm supposed to be describing

3   that.  But its source is not relevant for the

4   analysis that I did.  Other than that it

5   involves, you know, Cisco products and they

6   collected the relevant data for that.

7        Q.  Is Warehouse a reseller?

8        A.  So the dataset has the entire

9   stream of the product prices.  So it's prices

10   to the end-user.  That's what's relevant.

11   Either --

12        Q.  Can I just ask you what --

13        A.  It's either the ERP or the point

14   of sale is where the data is coming from.

15   And those are the --

16        Q.  Is it your understanding Warehouse

17   is a reseller?

18        A.  It doesn't -- it's not relevant to

19   me whether it's a reseller or not, because I

20   have the prices for the product listed in the

21   dataset at either -- at two points in the

22   stream there.  So it matters that I have

23   those prices for the products.

24        Q.  Regionally, what region was

25   Warehouse selling these products?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 79

```
 1          A.  Again, that's not relevant for me

 2   to know.  It's not relevant to the testing

 3   outside of the development sample, so that I

 4   -- that information isn't relevant to the

 5   model.  Not needed to validate the system.

 6          Q.  And when I ask for the identity of

 7   the Warehouse, are you withholding any

 8   information on grounds of privilege?

 9          A.  Well, I'm not sure whether I'm

10   supposed to be talking about that or not.  If

11   someone can instruct me, that might be

12   helpful.

13               MR. NELSON:  This is Nelson.  So I

14          think one question is that Mr. Atkinson

15          is trying to get at is whether you know

16          the identity of the Warehouse.  I think

17          you can answer that yes or no.  And then,

18          depending upon that answer, then we could

19          deal with whether or not -- whether or

20          not a privilege applies.

21          A.  Okay.  I believe I did know the

22   identity.  I don't remember the name, as I

23   sit here right now.

24          Q.  Do you have any documents that

25   identify what Warehouse is?
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 80

1          A.  No.  I didn't find that it was

2    relevant for my analysis.  So I believe I had

3    an understanding of who they were, who that

4    was, and how it was collected.  But it's,

5    again, it's not relevant to the analysis.

6    It's not important for validating the

7    performance of the metric.  That's why I

8    don't have it in the report and partly why I

9    don't remember it right now.

10         Q.  And I had the same question for,

11   quote-unquote, "Observed."  Do you know the

12   source of the data that's identified as,

13   quote-unquote, "Observed"?

14         A.  All right.  So I believe I did

15   know it.  I don't think it's relevant for the

16   report.  I don't remember it at this moment.

17         Q.  Are you aware of whether

18   Observed -- what market Observed sold in to

19   regionally?

20         A.  I don't recall.  I think I did

21   know it at one point, but I wouldn't need to

22   know it in order to do this analysis.  That

23   is, not only did I not use it, but it

24   wouldn't be relevant as a part of testing the

25   out-of-sample performance of this metric, of

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 81

1   this risk scoring system and the underlying

2   metrics.

3            (Court reporter requests

4        clarification)

5            A.  It wouldn't be relevant for

6   validating the model, the Cisco model, and

7   the underlying metrics.

8            Q.  And, Dr. Levy, is it your

9   understanding that the Warehouse dataset is

10  based on products that were held out as new,

11  genuine products?

12           A.  The model that I'm developing here

13  is for new, genuine products.  So it could

14  be -- if the model is -- if there are not

15  new, not genuine products in it, it would

16  probably fit less well.  That is, the model

17  wouldn't fit those data points as well.

18           So applying the model to some

19  other type of location, different structure,

20  if it's not fitting, it would fit less well

21  in places that are decidedly -- you know, you

22  would see that in a lower performance of the

23  model.

24           Q.  Okay.  We'll get back to that.

25  Sorry, did you want to say something?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 92

1   to see how well it predicts.  So you want to

2   make sure that the variables that are in the

3   dataset, or we want to check whether the

4   variables in the dataset are handled the same

5   way for the different observations, make sure

6   that that logic of the way it is put together

7   is there.  And then after that, the real

8   issue is what model does the -- what comes

9   out of it, and how well does it predict

10  out-of-sample.

11          Q.  I'd like to turn to Page 5.

12          A.  Okay.  I'm on 5.

13          Q.  Okay.  Yeah.  It says, "Cisco's

14  Counterfeit Detection Metric" at the top.

15          A.  Yes.

16          Q.  Are you aware of whether Cisco's

17  counterfeit detection metric has been

18  peer reviewed?

19          A.  I'm not aware of whether it has or

20  not.  A peer review I understand to mean --

21  my understanding of it is for academic

22  research.

23              I don't think they tried to

24  publish this.  I don't think they made any

25  attempt to do that, because I -- it's not my

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1   understanding that they wished to attempt to

2   publish this.

3           Q.  And it's not your understanding

4   it's been published, right?

5           A.  This is outside of what I know

6   about, but I can say it would be quite

7   surprising.

8               Peer review is for academic

9   research like professors do.  I don't -- so

10  I'm unaware of whether it was peer reviewed

11  in the term that you're using.  I'm not aware

12  of research that people are doing inside

13  companies that isn't done for publication it

14  gets peer reviewed.

15              I am reviewing it, and I think

16  that's the idea behind it.  But to get

17  something peer reviewed, as I understand the

18  term, would mean that they would then -- it

19  would have to have been submitted for

20  publication.  A journal will only peer review

21  something if you agree to have it published.

22          Q.  And this model hasn't been

23  published, right?

24          A.  I am not aware of that issue.  I

25  am not aware of that topic.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 94

1          Q.  Okay.

2          A.  It would be irrelevant to me

3    whether it was or wasn't.

4          Q.  Okay.  And the Cisco detection

5    metric, is it used by anyone other than Cisco

6    to your knowledge?

7          A.  I don't -- so I'm having a little

8    trouble with this.  I think it's -- it can't

9    be, because it's based on Cisco's specific

10   data.  So there may as well be some --

11         Q.  Okay.

12         A.  There may be something that's very

13   similar at another company, and I think there

14   are things that are conceptually similar.

15   But unless you have Cisco data, you can't use

16   this exact same model.

17         Q.  Right.  You mentioned you've

18   reviewed the Cisco model.  Are you aware of

19   other people outside of Cisco who've reviewed

20   the model that you looked at?

21         A.  Other than myself and people who

22   were working with me, other people from

23   Sideman, no.

24         Q.  Okay.

25         A.  And you're including also outside

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 99

1    it and that's why it's dated that.  I have no

2    knowledge of that.

3           Q.  When did you start writing this

4    report?

5           A.  Well, in some ways, probably weeks

6    prior to this.  But that could well have been

7    just, you know, the section at the top laying

8    out an outline, you know, what my task was,

9    what I was asked to analyze.  So I would

10   often write that down at the beginning of the

11   project.

12              So the writing is sort of ongoing.

13   But I might have started writing that quite a

14   long time before this was filed.  Sometime

15   this year, but I don't recall when I first

16   started laying, you know, laying out what the

17   tasks were and maybe even collecting up some

18   of the, you know, the appendix material.

19           Q.  So I don't want to know about the

20   content of any draft reports that you wrote.

21   But approximately how many drafts did you

22   send to the Sideman firm?

23           A.  Well --

24              MR. NELSON:  Actually, belated

25         objection.  So I guess any kind of draft

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 148

1          Q.  Sure.  Is it correct that 36 out

2     of 54 transceivers that Cisco looked at it

3     deemed as counterfeit?

4          A.  Yes, I believe that's true.

5          Q.  Okay.

6          A.  In the set you just described.

7          Q.  Right.  This is the set from the

8     Broker of transceivers only analyzing records

9     that have non-missing Cisco net price POS,

10    correct?

11         A.  Correct.

12         Q.  Okay.  And so is it your

13    understanding that as to this pool of 54

14    transceivers, someone with Cisco looked at

15    some form of evidence and determined

16    two-thirds of the time that what they had

17    there was a counterfeit; isn't that correct?

18         A.  For this product, the transceivers

19    in the Broker dataset, yes.

20         Q.  Okay.  And is Table III limited to

21    high risk only?  Does it exclude low and

22    medium risk?

23         A.  Well, it has all of the ones that

24    were counterfeit and/or genuine, and it's how

25    many were categorized as high risk.  So

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    BY MR. ATKINSON:

2            Q.   Dr. Levy, if you could go back a

3    couple pages to Page 9 Table III.  I just

4    wanted to ask you a question about Table III.

5            Do you see it?

6            A.   I'm there.  All set.  Thank you.

7            Q.   Okay.  Do I understand correctly

8    that 38.9 percent of the time, the Cisco

9    metric predicted that product was high risk

10   when in fact it was genuine?  And I'm talking

11   about transceivers.

12           A.   So I wouldn't say it's predicted.

13   This is the in-sample part.  So within the

14   sample, which is not the measure of how well

15   the metric is performing, within the dataset

16   in which it was created, that's what it's

17   predicting; that genuines -- of 18 genuines,

18   7 of them were listed as calculated as high

19   risk.

20           Q.   Right.  So nearly 40 percent of

21   the -- strike that.

22               Of this sample, the model

23   says/predicts that nearly 40 percent were

24   high risk when in fact they were genuine,

25   correct?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1          A.  Well, it's not, in a sense,

2   predicting.  I mean, this is where they're

3   constructing the metric.  So it's a different

4   concept a little bit.

5          So to find out how well the metric

6   is performing, you have to take how that

7   metric is constructed because it was built,

8   in part, on this dataset.  So you have to

9   take it to another dataset to see how well it

10  performs out-of-sample.

11          In the dataset -- in this dataset,

12  somewhere between, that's not -- because of

13  the small numbers, it's not very precise in

14  this because there aren't very many in the

15  transceivers.  So you could see that the

16  confidence intervals on that, the upper and

17  lower bound, are very broad.  And this is the

18  in-sample part.  So it's not a measure on how

19  well the metric is performing out-of-sample,

20  which is what is the relevant part.

21          Q.  So in-sample, the upper bound is

22  64 percent.  It was predicting in-sample that

23  more than 64 percent were high risk when, in

24  fact, they were genuine.

25          A.  All that's really saying is that

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 152

 1   there aren't very many observations in this

 2   in-sample part.

 3          Q.  Okay.

 4          A.  That this is not precise.

 5          Q.  Not many --

 6               (Court reporter requests

 7          clarification due to overlap)

 8          A.  So there aren't many observations

 9   here.  So here in looking at those numbers,

10   it is not a very precise estimate.  But also

11   on top of it, this is the in-sample part; and

12   to evaluate how well it's performing, you

13   need to look out-of-sample.

14               So the percents that you're

15   talking about are pretty broad.  And on top

16   of it, you need to look out-of-sample to see

17   how well the metric actually worked.

18          Q.  And is it the case that there are

19   not many in-sample observations of

20   transceivers?

21          A.  Yeah.  I think that's true.  It's

22   the relatively smaller population.

23          Q.  Okay.  Turning to Page 11,

24   Table IV, the "Logit Regression for Switches

25   in Broker Dataset," when it says "Number of

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 182

1          Q.  It's not relevant?  The 38.9

2    percent is not relevant to you?

3          A.  Well, what it's saying is

4    out-of-sample is where the test is done.

5    Out-of-sample testing means that you're

6    testing it on a fresh dataset in which you

7    did not use the data to construct the model.

8    And in that said, it's predicting genuines as

9    not high risk.

10         Q.  You said -- you used the word

11   "relevant," and I just want to be clear, do

12   you think the 38.9 percent in-sample rate is

13   relevant to your analysis?

14         A.  It's relevant in that I'm using it

15   to construct the out-of-sample test.  But the

16   point of this is, as I say in the paper, the

17   out-of-sample testing is the test of the

18   measure.

19         Q.  Do you think that it's significant

20   that your in-sample, high risk rate for

21   genuine was 38.9 percent but your

22   out-of-sample drops to zero?  I mean, I

23   understand you think that it's good that it's

24   zero, but that's a pretty significant swing,

25   is it not?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 214

 1   this case.

 2          Q.  Okay.  And so you were retained

 3   March 25, 2020; is that correct?  That's when

 4   you signed the letter?

 5          A.  That's when I signed the letter,

 6   yes.

 7          Q.  And just I'll move the screen over

 8   to that page.  Okay.  Just a moment.

 9          A.  Yup.

10          (Pause.)

11          A.  Oh, there it is.  Okay.  I see it.

12          MR. ATKINSON:  I'd like to take a

13      two-minute break.  We're very close to

14      the end.

15          (Proceedings recessed at

16      8:42 p.m., and reconvened at 8:46 p.m.)

17   BY MR. ATKINSON:

18          Q.  Okay.  Dr. Levy, I wanted to ask

19   you just a question that came up.  When we

20   look at your expert report, if you could

21   please refer back to your revised expert

22   report.  In particular I'm looking at I

23   believe it's Page 13.  And I'll give you a

24   moment to pull it up.  Actually, it's

25   Page 12, and I'm looking at Table V.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1                C E R T I F I C A T E

2

3    COMMONWEALTH OF MASSACHUSETTS )

4                                ) ss.:

5    COUNTY OF SUFFOLK            )

6

7            I, MaryJo O'Connor, a Notary Public

8    within and for the Commonwealth of

9    Massachusetts, do hereby certify:

10           That DANIEL S. LEVY, Ph.D., the

11   witness whose deposition is hereinbefore set

12   forth, was duly sworn by me and that such

13   deposition is a true record of the testimony

14   given by such witness.

15           I further certify that I am not

16   related to any of the parties to this action

17   by blood or marriage; and that I am in no way

18   interested in the outcome of this matter.

19           IN WITNESS WHEREOF, I have

20   hereunto set my hand this 18th day of May,

21   2020.

22                *Mary Jo O'Connor*

23           _____

24           MaryJo O'Connor, RDR/RMR

25

# EXHIBIT  E

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**EXPERT REPORT**

**of**

**Greg J. Regan, CPA/CFF, CFE**

*CISCO SYSTEMS, INC., and CISCO TECHNOLOGY, INC.*

*v.*

*ADSI, et al*

Case No. 4:18-cv-07602 YGR

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Table of Contents**

1. Introduction ..................................................................................................................... 1

   a.   Nature of Assignment and Summary of Opinions ................................................. 1

   b.   Qualifications ........................................................................................................ 2

   c.   Evidence Considered ............................................................................................. 3

2. Overview and Background ............................................................................................... 4

   a.   Cisco ..................................................................................................................... 4

   b.   Cisco's Product Sales Cycle .................................................................................. 4

   c.   Defendants ............................................................................................................. 5

   d.   Allegations Regarding Non-Genuine Cisco Products ........................................... 7

3. Sales of "Cisco" Product by the Defendants ................................................................... 7

   a.   Summary of Transaction Data Provided by ADSI-affiliated Entities ................... 7

        i.   ADSI ............................................................................................................ 7

        ii.   K&F   8

        iii.   PureFutureTech .......................................................................................... 9

        iv.   Other ADSI-Related Entities ..................................................................... 9

   b.   Identified Instances of Non-Genuine Product Sales ........................................... 10

   c.   Indications that Defendants Sold Other Non-Genuine Products ......................... 10

        i.   Purchases of Product from Vendors in China and Hong Kong ............... 11

        ii.   Products Delivered to Non-Standard Addresses ...................................... 12

        iii.   The Defendants Used Unauthorized Product Labeling ............................ 13

        iv.   The Defendants Did Not Produce Data Identifying Product Serial Numbers ... 14

        v.   The Available Data Indicates that the Transceiver Products Sold by the Defendants Are Non-Genuine ................................................................... 14

        vi.   Commercial terms ................................................................................... 15

   d.   Implications of the Sale of Non-Genuine Cisco Products .................................. 16

        i.   Overall Impact ........................................................................................ 16

        ii.   Cisco Lost Sales and Related Lost Profits .............................................. 16

        iii.   Defendants' Unjust Enrichment .............................................................. 19

4. Damages Related to Apparent Non-Genuine Product Purchased by Defendants from Link-US .......................................................................................................................... 20

   a.   The Link US Sales Data ...................................................................................... 20

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

b.   Cisco's Lost Profits ................................................................................21

c.   Defendants' Unjust Enrichment .............................................................22

5.   Damages Related to Apparent Non-Genuine Product Purchased by Defendants from Vodanet ..................................................................................22

a.   Lost Profits ...........................................................................................22

b.   Unjust Enrichment ...............................................................................23

6.   Damages Related to Products Sold by Defendants Later Tested by Cisco and Identified as Non-Genuine ..........................................................................23

a.   Lost Profits ...........................................................................................23

b.   Unjust Enrichment ...............................................................................23

7.   Damages Related to Apparent Non-Genuine Transceiver Products Sold by Defendants23

a.   Lost Profits ...........................................................................................23

b.   Unjust Enrichment ...............................................................................24

8.   Damages Related to Other Products Sold By Defendants Without Electronic Data Regarding the Vendor That Supplied the Product ............................................24

a.   Lost Profits ...........................................................................................24

b.   Unjust Enrichment ...............................................................................24

9.   Prejudgment Interest ....................................................................................24

10.  Statutory Damages.......................................................................................25

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## 1. Introduction

1.      The opinions expressed in this report and information presented in the accompanying schedules are my present opinions. Amendments or supplements to this report may be required because of developments prior to or at the trial, including the testimony of witnesses in this matter. I anticipate using documents reviewed in connection with preparing this report, and additional graphics illustrating concepts described herein, at trial.

### a.  Nature of Assignment and Summary of Opinions

2.      Sideman & Bancroft LLP has retained me on behalf of Cisco Systems, Inc., and Cisco Technology, Inc. (Cisco), through my employer, Hemming Morse LLP. I was asked to measure economic recoveries available to and damages suffered by Cisco related to the actions of the defendants.[1] In addition, I expect to analyze any findings of and, if necessary, respond to defendants' damages expert.

3.      I have reviewed Cisco's claims for relief.[2] These claims relate to the defendants' alleged actions to distribute and sell non-genuine "Cisco"[3] products or products that otherwise infringed Cisco's trademarks.[4] Based on Cisco's claims, I have calculated 1) Cisco's lost profits and 2) the defendants' unjust enrichment.[5]

---

[1] I have assumed that Cisco establishes liability for purposes of my analysis. Defendants include Zahid "Donny" Hassan Sheikh ("Donny"), IT Devices Online, Inc. ("IT Devices"), Advanced Digital Solutions International ("ADSI"), PureFutureTech LLC ("PureFutureTech"), K & F Associates, LLC ("K & F"), Shahid Sheikh ("Shahid"), Kamran Sheikh ("Kamran"), Farhaad Sheikh ("Farhaad"), Imran Husain ("Husain"), and Jessica Little aka Jessica McIntosh personally and dba McIntosh Networks ("Little").

[2] Second Amended Complaint for Damages and Injunctive Relief (SAC), pp.18-23.

[3] For purposes of this report, I have attempted to identify sales of non-genuine Cisco products using the phrase "Cisco" products.

[4] I am not offering an opinion on how such non-genuine Cisco products should be classified (*e.g.*, counterfeit or otherwise). For purposes of this report, I refer to these products as non-genuine.

[5] Cisco may only be able to recover defendants' profits to the extent they are not duplicative of Cisco's lost profits. *See* AICPA Practice Aid, *Calculating Intellectual Property Infringement Damages*, pp.93.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Recovery or Damages related to:[6]<br>*$s in millions* | Cisco Lost Profits[7] | Defendants' Profits[8] |
|---|---|---|
| Apparent non-genuine product purchased by defendants from Link-US. *See* § 4. | $0.144 | $0.034 |
| Apparent non-genuine product purchased by defendants from Vodanet. *See* § 5. | $0.063 | $0.027 |
| Products sold by defendants later tested by Cisco and identified as non-genuine. *See* § 6. | $0.038 | $0.019 |
| Apparent non-genuine transceiver products sold by defendants. *See* § 7. | $4.776 | $0.798 |
| Other products sold by defendants without data regarding the vendor that supplied the product. *See* § 8. | $1.629 | $0.921 |
| Total[9] | $6.649 | $1.800 |

4.      I also understand that statutory and punitive damages may apply and I additionally understand that treble of damages and attorneys fees may apply. If I am asked to calculate these amounts, I am able to do so.

5.      My present opinions are described throughout this expert report. I am performing this expert witness engagement in accordance with the American Institute of Certified Public Accountants' (AICPA) *Statement on Standards for Forensic Services*. These standards require me to be impartial, intellectually honest, and free of conflicts of interest.

b.   Qualifications

6.      I am a Certified Public Accountant (CPA), licensed in California and New York. I hold the Certified in Financial Forensics (CFF) certification from the AICPA. I obtained my undergraduate degree from Georgetown University and Master in Business Administration with an emphasis in Corporate Finance from the University of San Francisco.

---

[6] These measures of recovery are available for trademark infringement as described in AICPA Practice Aid, *Calculating Intellectual Property Infringement Damages*, p.20. *See also*, § 35 of the Lanham Act, 15 U.S.C. §1117, (a) Profits; Damages and Costs; Attorney Fees: "When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125(a) or (d) of this title, or a willful violation under section 1125(c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action…" https://www.law.cornell.edu/uscode/text/15/1117

[7] These amounts do not include prejudgment interest. The methodology to calculate prejudgment interest is presented in § 9 and the related amounts are presented in the schedules hereto.

[8] The amounts by defendant are separately presented for each category of damages in the schedules attached hereto.

[9] *See* Schedule 1.0 for the calculation of these amounts and references to underlying schedules.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

7.     My work in the accounting profession includes experience as an auditor at Ernst & Young LLP, as the Controller of a publicly traded company, and as a consultant. I have worked on many complex litigation matters. My work has involved analysis of lost business value, lost profits, and other forms of economic damage involving entities across a diverse range of industries, such as high technology, retail, health care, and real estate.

8.     I am a member of the California Society of Certified Public Accountants (CalCPA) and currently serve as the Chair of its statewide Forensic Services Section.

9.     I am also a member of the AICPA. I recently completed a three-year term on the AICPA's Forensic & Valuation Services Executive Committee. This nine-member committee establishes professional standards and guidance for practitioners performing consulting services that require the application of forensic accounting or valuation-related methodologies. I was the Chair of the AICPA's Economic Damages Task Force from 2010-2013 and continue to serve as a member of this task force. In 2012, I received the AICPA's Forensic Services Volunteer of the Year.

10.     I am also a Certified Fraud Examiner (CFE), which is a designation of the Association of Certified Fraud Examiners (ACFE). CFEs are frequently called upon to investigate matters involving counterfeit products, including alleged intellectual property theft.[10]

11.     My expert qualifications, including testimony in the last four years and publications authored, are described in Appendix A. These publications include materials relevant to this matter such as AICPA practice aids entitled "Calculating Lost Profits" and "Attaining Reasonable Certainty in Economic Damages Calculations."

12.     My firm is being compensated for my review and analysis in this matter at my standard hourly rate, which is currently $530 per hour. My compensation is not contingent on the outcome of this matter.

       c.   Evidence Considered

13.     I have studied and evaluated documents that were provided to me by counsel, as well as documents obtained from the public domain. I have also reviewed the transcripts of depositions of various people from this matter. Appendix B to this report summarizes these sources of evidence.[11] This evidence is of the type that would ordinarily be relied on by a damages expert.

---

[10] *See, e.g.*, The Fraud Examiner, Buyer Beware: Intellectual Property Theft Can Lead To Counterfeiting (https://www.acfe.com/fraud-examiner.aspx?id=4294985057, accessed April 13, 2020).

[11] For purposes of clarity, I have relied on all the documents cited in this report and the accompanying schedules.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### 2. Overview and Background

   a. <u>Cisco</u>

14.      Cisco is a worldwide leader in developing and providing information technology products.[12] Cisco's customers include governments, public institutions, businesses, and service providers.[13]

15.      Cisco maintains numerous trademarks.[14] Cisco alleges that the defendants made unauthorized uses of Cisco's trademarks in connection with the sale of non-genuine Cisco products.

   b. <u>Cisco's Product Sales Cycle</u>

16.      Cisco sells products to customers directly, as well as through third-party vendors and channel partners.[15] Cisco's "Authorized Channel Partners" or "Partners" interface with customers for Cisco products and services.[16] These Partners identify sales opportunities, assist customers in selecting products, conduct the sales, supply the products and provide support.[17]

17.      Cisco's distributors purchase and hold product inventory from which sales are made to other resellers.[18] Distributors purchase products from Cisco at a discount from Cisco's Global List Price (GLP).[19] Distributors are permitted to sell Cisco products to Partners at a discount negotiated between the distributor and Partner(considered standard discounts).

18.      In the United States, Partners purchase Cisco products from distributors, on-average, at approximately 58%-62% of GLP (*i.e.*, a 38-42% discount from Cisco's GLP).[20]

---

[12] *See, e.g.*, Cisco 2018 Annual Report "About Cisco."

[13] Cisco 2018 Annual Report, p.1.

[14] *See, e.g.*, https://www.cisco.com/c/en/us/about/legal/trademarks.html (accessed March 25, 2020).

[15] Cisco 2015 Annual Report, p.10, "A substantial portion of our products and services is sold through our channel partners, and the remainder is sold through direct sales. Our channel partners include systems integrators, service providers, other resellers, and distributors." *See also*, Cisco 2018 Annual Report, p.5.

[16] Discussion with Charles Williams on April 17, 2020.

[17] *Id.*

[18] Cisco 2015 Annual Report, p.10. *See also*, Cisco Worldwide Partner Organization, Partnership Integrity (accessed at https://www.cisco.com/c/dam/en_us/partners/program/documents/partnership-integrity-initiatives.pdf on April 13, 2020).

[19] Discussion with Charles Williams on April 17, 2020.

[20] *Id.*

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Cisco's distributors typically purchase products from Cisco at discounts, however, I understand the maximum discount is typically 42%.

19.     Cisco relies on contract manufacturers for its manufacturing needs.[21] Cisco has developed sophisticated inventory management processes related to products held by its distributors.[22] From 2015 onwards, Cisco has maintained an inventory turnover of approximately 12.[23] This metric means that Cisco cycles its entire inventory balance 12 times or, on-average, monthly. This turnover rate is demonstrably higher than Cisco's peer companies.[24] Generally, a higher turnover rate indicates a tightly managed purchasing function.[25]

c.   Defendants

20.     The table below summarizes my understanding of the defendants and the businesses operated by the defendants:

| Entity | Nature of Business | Owned and/or Operated By[26] |
|---|---|---|
| IT Devices Online[27] | Operated at least in part in Fremont, California. Imported non-genuine Cisco products.[28] | Donny Sheikh |
| ADSI[29] | Reseller of technology products based in Fremont, California. Imported and sold non-genuine Cisco products.[30] | Shahid Sheikh Farhadd Sheikh |

---

[21] See, e.g., Cisco 2018 Annual Report, p.8.

[22] See, e.g., Cisco 2015 Annual Report, pp.21, 41.

[23] Schedule 12.1.

[24] Schedule 12.2.

[25] Inventory Turnover Formula, https://www.accountingtools.com/articles/2017/5/16/inventory-turnover-formula (accessed April 13, 2020).

[26] SAC ¶¶ 11-13.

[27] SAC ¶ 7.

[28] SAC ¶¶ 37-40.

[29] Defendants ADSI, Purefuturetech, Kamran Sheikh, and Farhaad Sheikh's Answer to Plaintiffs' SAC ¶ 13 (indicating Farhaad Sheikh was the CEO of ADSI). See also, https://www.adsii.com/shop/aboutus (accessed March 25, 2020). The California Secretary of State's data indicates that Agent for Service of Process for ADSI is Shahid Sheikh.

[30] SAC ¶ 41.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Entity | Nature of Business | Owned and/or Operated By[26] |
|---|---|---|
| K&F Associates LLC[31] | Reseller of technology products based in Fremont, California. Imported and sold non-genuine Cisco products.[32] | Shahid Sheikh[33] |
| PureFutureTech LLC[34] | Reseller of technology products based in Pleasanton, California. Imported and sold non-genuine Cisco products.[35] | Kamran Sheikh[36] Shahid Sheikh[37] |
| McIntosh Networks[38] | Importer for products seized by U.S. Customs and reported to Cisco.[39] | Kamran Sheikh[40] Jessica Little[41] |
| Uddin Networks[42] | Imported non-genuine Cisco products.[43] | Nabia Uddin Shahid Sheikh[44] |

---

[31] SAC ¶ 10. *See also*, http://kandfassociates.com/#about-us.php (accessed March 25, 2020). This entity also was referred to as tapeforbackup.com and The Network Hardware.

[32] SAC ¶ 71.

[33] Ex. 7 (Sadaghiani).

[34] SAC ¶ 9. *See also*, http://purefuturetechnology.com/ (accessed March 25, 2020).

[35] SAC ¶ 70.

[36] *See, e.g.*, Exs. 3 and 4 (Sadaghiani) (indicating Karman Sheikh was the agent for service of process and Manager).

[37] According to Shahid Sheikh, he has no involvement with this entity (Sheikh Tr. 230:9-15), which is contradicted by the testimony of Kamran Sheikh.

Note: All references to the Sheikh Tr. are to Shahid. Sheikh's deposition on September 10, 2019 unless otherwise noted.

[38] SAC ¶¶ 49-51. 53-61.

[39] *See, e.g.*, Exs. 22, 25 (Little).

[40] Ex. 21 (Little) (indicating 1) Ms. Little expected Kamran Sheikh to pay for the UPS Box in Reno, Nevada, 2) the address for McIntosh Networks was 4255 Business Center Drive, Fremont, CA, which was ADSI's business address, and 3) that the business phone number was Kamran Sheikh's mobile phone number).

[41] Ex. 21 (Little) (indicating Jessica Little registered for a UPS Box at The UPS Store in Reno, Nevada for McIntosh Networks). Ms. Little testified, however, that she had not heard of a company named McIntosh Networks. (Little Tr. 53:12-14.)

[42] SAC ¶ 45-49. Ms. Uddin testified that she was instructed to form Uddin Networks by Shahid Sheikh (Uddin Tr. 112:21-113:17.

[43] Uddin Tr. 118:5-10 and 121:5-7.

[44] Uddin Tr. 266:14-24 (indicating that Mr. Sheikh reimbursed Ms. Uddin for the fees incurred to establish the entity).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

21.     These entities are not affiliated with Cisco or authorized sellers of products using Cisco's trademarks.[45] Such entities that do not have an agreement with Cisco to sell product are referred to as brokers.[46]

### d.   Allegations Regarding Non-Genuine Cisco Products

22.     Cisco alleges that the defendants used the entities above for the unauthorized importation, distribution and sale of non-genuine products.[47] I further understand that ADSI made sales of non-genuine "Cisco" product through ADSI's General Services Administration (GSA) contract.[48] GSA Schedule Contracts are subject to the Trade Agreements Act (TAA) that requires products available for purchase to have been manufactured or "substantially transformed" in the United States or a TAA "designated country."[49]

### 3.   Sales of "Cisco" Product by the Defendants

#### a.   Summary of Transaction Data Provided by ADSI-affiliated Entities

23.     I understand that the Defendant entities have not produced relevant and complete accounting records including, inventory purchasing data such as the supplier name, and sales data such as end customer names. In certain circumstances, as described herein, the missing information requires assumptions to be made. I understand that additional information may be produced that may allow me to verify these assumptions. In that event, I reserve the right to supplement my report.

##### i.   ADSI

24.     The data produced by ADSI reported approximately $4.1 million of sales during the years 2015 to 2018.[50] Approximately 50% of these sales were to K&F, a related party, at little-to-no profit. Netting obvious related party sales, ADSI's sales to third parties total $2.1 million. Of this amount, ADSI's data indicates that approximately $1.3 million was sold pursuant to GSA contracts.[51]

---

[45] SAC ¶¶ 36 (IT Devices), 43-45 (ADSI – terminated by Cisco in May 2015).

[46] Carter Tr. 28:4-12.

[47] SAC ¶ 34.

[48] SAC ¶¶ 41, 49. *See also*, Sheikh Tr. 252:16-25 (indicating that ADSI had a segment of its business that sold to the GSA), Exs. 17, 81-92 (Sheikh) referencing contracts for the sale of products to the U.S. Government, including contract numbers GS-35F-0032Y and GS-02F-0032R.

[49] Ex. 13 (Sheikh).

[50] Schedule 10a.

[51] These sales were identified as GSA Contract GS-35F-0032Y (70) and GSA Contract GS-02F-0032R (75).

25.     ADSI's transaction data is missing useful information. For example, ADSI has not produced information regarding the serial numbers of sold products. Similarly, while ADSI's data has a field entitled "our_vend" that purports to identify the vendor from which ADSI acquired the product, this field is not populated for the vast majority of sales.

26.     As illustrated in the table below, ADSI's sales data exhibits inconsistent patterns, which may indicate that the data is incomplete. Defendants, for example, Kamran Sheikh, would not answer questions regarding the completeness of the sales data produced for ADSI.[52] I reserve the right to update my analysis if additional sales data is identified:



  *ii.   K&F*

27.     The data produced by K&F reported approximately $3.5 million of sales during the years 2015 to 2018.[53] Approximately $0.2 million of these sales were to ADSI. K&F's transaction details do not contain data related to the acquisition price of these products.

28.     The defendants' data does include information to identify the customer for approximately $1.2 million of these sales. Moreover, K&F's transaction data does not identify the vendor that supplied the products other than the limited instances in which K&F acquired product from ADSI.[54]

---

[52] Kamran Sheikh Tr. 130:6-17.

[53] Schedule 10a.

[54] Sheikh Tr. 215:18-216:24 (indicating K&F purchases Cisco product from ADSI).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

29.     In addition, it appears that the defendants' also used an entity, The Network Hardware to make certain additional sales. Based upon my analysis to date, it appears that The Network Hardware sales are included in the K&F transaction data.

30.     Defendants, for example, Farhaad Sheikh, would not answer questions regarding the completeness of the sales data produced for ADSI.[55] Moreover, Defendants would not answer questions regarding whether the financial documents it provided were reliable.[56] I reserve the right to update my analysis if additional or corrected sales data is identified.

31.     K&F may also have sold products to other affiliated entities for which data is not presently available. For example, approximately $87,000 of K&F's sales of Cisco products were made to "Esilience Technologies, LLC."[57] It appears that the address for Esilience may have been established by an ADSI-related individual.[58]

### iii.   PureFutureTech

32.     I am not aware of electronic transaction data produced by PureFutureTech regarding sales of Cisco products, including information that would allow an identification of products as either genuine or non-genuine. There are, however, certain documents identifying approximately $0.1 million of sales by PureFutureTech of "Cisco" products.[59]

33.     I am also not aware of any data from the defendants that enables PureFutureTech's sales to be identifiable within other defendant sales (*e.g.*, K&F data that identifies the vendor that supplied the product). At this time, I have treated K&F's sales as related party sales (*i.e.*, I have not included these sales as to third party customers). To the extent additional information becomes known, I reserve the right to update my analysis.

### iv.   Other ADSI-Related Entities

34.     Based on the evidence I reviewed, the Defendants operated other business entities (*e.g.*, F. Sheikh Group, Watchtower Systems, LLC, and K&F Builders). It is possible that the Defendants used such other affiliated entities to make additional sales of non-genuine Cisco products. At this time, I am not aware of data to quantify such sales. If additional information becomes available, I reserve the right to update my analysis.

---

[55] *See, e.g.*, Farhaad Sheikh Tr. 71:19-72:3 and 74:.14-25.

[56] *See, e.g.*, Farhaad Sheikh Tr. 78:6-24.

[57] KFA00002.

[58] Exs. 94 and 95 (Sheikh). The individual that registered the address for this entity was Mahmood Shaikh, who provided an address in Lahore, Pakistan. ADSI has employees based in Lahore, Pakistan. The billing information reflected that the address for Esilience was ADSI's address in Fremont, CA.

[59] *See, e.g.*, Ex. 15.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

    b.  <u>Identified Instances of Non-Genuine Product Sales</u>

35.    U.S. Customs has seized products with the Cisco trademarks intended for delivery to the defendants.[60] I am not aware of any evidence indicating that the defendants contested the seizures by U.S. Customs.

36.    In addition, Cisco has identified numerous instances of the sale of non-genuine products by the defendants.[61] In those instances when the defendants' data allows these transactions to be identified, I have separately analyzed these transactions.[62]

    c.  <u>Indications that Defendants Sold Other Non-Genuine Products</u>

37.    I am familiar with "red flags" or indicators that products are non-genuine. For example, indicators may include: [63]

- High priced products replaced with lower priced alternatives, and

- Discrepancies between a product's description or normal appearance and actual appearance.

38.    Similarly, Cisco makes available Brand Protection-related information.[64] For example, Cisco identifies warning signs of non-genuine product sales, including:

- Products offered a much greater discount than genuine products,

- Products with labels, including Cisco trademarks, that are inconsistent with those found on genuine products, and

- Products without labels.

39.    The sub-sections below describe factors relevant to the defendants' sales that I considered for purposes of my analysis of damages.

---

[60] Schedule 11.

[61] *See, e.g.*, Ex. 66 (F. Sheikh). *See also*, Cisco Systems, Inc. and Cisco Technology, Inc.'s Response to First Set of Interrogatories Propounded by Defendant [ADSI] (Cisco Rogs), No.2.

[62] I was provided with a file entitled "List of Defendant Sales that were Analyzed 04-16-2020 CONFIDENTIAL" that contained the results of Cisco's testing. I have assumed that the conclusions expressed in this analysis were reliable. *See, e.g.*, Ex. 65.

[63] *See, e.g.*, ACFE 2014 U.S. Fraud Examiners Manual at 1.1423 "Non-Conforming Goods or Services." *See also, Id.* at 3.221, "Counterfeit Printed Documents."

[64] *See*, https://www.cisco.com/c/en/us/partners/partner-with-cisco/partnership-integrity.html#~tab-protect (accessed March 25, 2020.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

*i.  Purchases of Product from Vendors in China and Hong Kong*

40.     ADSI's data reports purchases from distributors such as Ingram and Synnex.[65] I understand that these companies are authorized Cisco distributors.[66] At times, ADSI generated documents that appeared to indicate products had been acquired from such entities.[67]

41.     The vendor information for ADSI's sales of "Cisco" products, however, is missing for more than 60% of ADSI's sales, including for 100% of the sales to K&F.[68] Across all defendants' sales, the vendor information is missing for approximately 73% of sales.[69] The absence of this data occurred despite the fact that the vendor information was available for majority of transactions.[70] In my experience, the absence of this data increases the risk that the product was non-genuine.

42.     Ms. Uddin testified that ADSI purchased "Cisco" products from Chinese vendors, as well as Vodanet and Atlantix.[71] The determination regarding where to purchase "Cisco" products was an instruction from Ms. Little or Shahid Sheikh.[72]

43.     I have reviewed ADSI records that identify the "Cisco" products purchased from an entity in Wuhan, China. ADSI's records further indicate that the same products were then sold to K&F at, or about, the same price (*i.e.*, without a markup).[73] Mr. Sheikh described such sales as an "intraoffice company transfer."[74] Mr. Sheikh did not take measures such as visiting vendors (*e.g.*, Wuhan Etopcom Technology) or receiving visitors from vendors to mitigate the risk that "Cisco" products purchased from Chinese vendors were non-genuine.[75]

---

[65] In some instances, ADSI's data includes information in the field "our_vend" [Our Vendor]. This information includes entries such as ING100, and SYN100 that appear to indicate entities such as Ingram and Synnex, respectively.

[66] *See, e.g.*, https://usa.ingrammicro.com/c/communities-smb-mfr-cisco.aspx (accessed April 16, 2020).

[67] *See, e.g.*, Ex. 42 at ADSI01455-456 indicating that "Cisco" products had been acquired from Ingram Micro prior to the sale of the products to the U.S. Government.

[68] Schedule 8.

[69] As described above, the transaction data produced by non-ADSI defendants did not include information to identify the vendor that supplied the product except in instances when the materials were acquired from ADSI.

[70] Uddin Tr. 65:19-66:2.

[71] Uddin Tr. 72:13-23.

[72] Uddin Tr. 75:6-11.

[73] *See, e.g.*, Ex. 12 (Sheikh).

[74] Sheikh Tr. 182:7-23.

[75] Sheikh Tr. 202:11-203:9.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

44.     The table below summarizes the ADSI data where the relevant field, "our_vendor", appears to be associated with vendors located in Hong Kong or mainland China for all purchases of "Cisco" product:[76]

| our_vendor | Expected Vendor | Total Sales |
|------------|-----------------|-------------|
| SHE101 | Shenzen | $11,543 |
| WUH100 | Wuhan | $5,890 |
| Total | | $17,433 |

45.     ADSI's documents also indicate purchases of "Cisco" products from another China-based entity, Pretty Technologies.[77] Pretty Technologies appears to be the same entity as Wuhan Etopcom.[78] In numerous instances when ADSI purchased product from Wuhan Etopcom/Pretty Technologies the "our_vend[or]" field was not populated with data. For example, ADSI ordered 36 "Cisco" products with Item Number "SFP-10G-LRM=" from Wuhan Etopcom Technonology (Pretty) in June 2016.[79] All of the transactions involving the sale of this product are missing an entry in the "our_vend" field (i.e., ADSI's records do not reflect a purchase of this Item Number from this vendor).[80]

46.     In my opinion, the absence of complete and accurate information regarding vendor purchase data, as well as other purchase data such as serial number, increases the risk that the related product is non-genuine.

*ii.   Products Delivered to Non-Standard Addresses*

47.     ADSI's general practice was for purchased product to be delivered to its business address in Fremont, California.[81] In many instances, however, the "Cisco" product was not delivered directly to the defendants' business address.

48.     Specifically, the defendants established delivery addresses in Reno, Nevada and later Portland, Oregon.[82] Mr. Sheik could not think of a reason why the UPS Box in

---

[76] Schedule 8.

[77] ASDI00099A.

[78] Wuhan Etopcom Technology and Pretty Technology are either the same or affiliated entities. *See, e.g.,* Ex. 12 (Sheikh) *(i.e.,* compare ADSI-00001 and ADSI-00061 where the vendor number, contact person, and business address were identical for the two companies). *See also,* Uddin Tr. 196:11-197:8 (regarding Ex. 12).

[79] Ex. 12 (Sheikh) at ADSI-00003.

[80]

[81] Uddin Tr. 219:5-14.

[82] *See, e.g.,* Ex. 28 (Lau) (indicating that Kamran Sheikh's credit card was used to pay for the mail box). Ms. Lau testified that Kamran Sheikh asked her to find the UPS box, opened the account, signed the agreement and used his business credit card. (Lau Tr. 101:10-106:13.)

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Reno, Nevada was obtained other than to avoid U.S. Customs.[83] Similarly, Mr. Sheik could not think of a legitimate business reason for the defendants' UPS Box in Portland, Oregon.[84] In fact, Ms. Uddin testified that she was instructed to schedule delivery to a UPS Box when the "Cisco" product was ordered from Hong Kong or China.[85]

49.     An ADSI employee received notification when product was delivered to the addresses in Reno or Portland. Thereafter, the product was moved to the UPS Store in Fremont, California.[86] Ms. Uddin testified that the "Cisco" products were the only products purchased by ADSI delivered to the UPS Store in Fremont.[87]

50.     ADSI used other alternative delivery addresses for "Cisco" products. For example, ADSI specified delivery to Prime Solutions, Inc., which had an address adjacent to ADSI in Fremont, California.[88]

51.     The electronic transaction data produced by the defendants did not identify the address that product was specified for delivery. Thus, at this time, I have not systematically quantified the extent of this issue. In my opinion, however, the delivery of product to locations other than ADSI's business location in Fremont, California increased the risk the product was non-genuine.

### iii.   The Defendants Used Unauthorized Product Labeling

52.     ADSI employees also affixed labels onto "Cisco" product.[89] These labels were shipped to ADSI separately from the related product purchases, however, both the labels and product were shipped to one of the defendants' UPS Boxes rather than directly to ADSI.[90] I understand that genuine Cisco product is shipped with a label pre-fixed on the product.[91]

---

[83] Sheikh Tr. 86:6-21.

[84] Sheikh Tr. 70:4-10..

[85] Uddin Tr. 108:19-109:1.

[86] Lau Tr. 112:25-133:5.

[87] Uddin Tr. 219:15-220:1.

[88] *See, e.g.*, Ex. 96 (Sheikh).

[89] Uddin Tr. 134:2-139:4.

[90] *See, e.g.*, Ex. 7 (Uddin). ADSI personnel also ordered "Cisco" product labels from Pretty Technology. (*see, e.g.*, Uddin Tr. 216:8-17.)

[91] *See, e.g.*, Uddin Tr. 243:16-24.

#### iv. The Defendants Did Not Produce Data Identifying Product Serial Numbers

53.     A product serial number provides information useful to an assessment of whether a product is genuine. For example, Cisco personnel have the ability to identify the customer that purchased a product based on the product's serial number.[92]

54.     Mr. Sheikh testified that ADSI's policy was to record the serial numbers of products purchased.[93] The policy existed to enable ADSI to return purchases if necessary.[94]

55.     I am not aware of any data produced by the defendants that identifies the serial number of any "Cisco" product sold by the defendants. In my opinion, the absence of serial numbers in the data supplied during this case, when Mr. Sheikh testified that the data exists, increases the risk the product was non-genuine.

#### v. The Available Data Indicates that the Transceiver Products Sold by the Defendants Are Non-Genuine

56.     According to Ms. Uddin, several of the defendants (Ms. Little, Kamran Sheikh and Shahid Sheikh) <u>each</u> instructed her to purchase "Cisco" products from Hong Kong Ltd, Hong Kong Sellsi Technology, or other vendors in China, more than 100 times.[95] For example, Ms. Uddin testified that ADSI purchased transceivers with Cisco part numbers such as GLC-LH-SMD, GLC-SX-MMD, GLC-T, and SFP-10G-SR from Pretty Technology.[96]

57.     As described above, the defendants' records frequently failed to identify the vendor that supplied the product. The absence of such information was particularly frequent for transceiver products. For example, the following table summarizes the defendants' sales to third parties for the "Cisco" parts addressed by Ms. Uddin:[97]

| Item No. | Total Sales (Defendants' Price to Customer) | No Vendor Identified |
|---|---|---|
| GLC-LH-SMD | $176,327 | 99% |
| GLC-SX-MMD | $196,804 | 96% |
| GLC-T | $231,068 | 96% |
| SFP-10G-SR | $285,788 | 95% |
| SFP-10G-LR | $193,826 | 100% |

---

[92] Carter Tr. 50:1-10.

[93] Sheikh Tr. 142:25-143:24.

[94] *Id.*

[95] Uddin Tr. 80:10-23, 197:15-198:16.

[96] Uddin Tr. 199:5-18 regarding Ex. 7 (Uddin).

[97] Schedule 5d.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Item No. | Total Sales (Defendants' Price to Customer) | No Vendor Identified |
|---|---|---|
| Total | $1,083,813 | 97% |

58.    Further, the four largest vendors supplying transceiver products that are identified by name in the defendants' data are unusual. Specifically, the largest vendor was Vodanet, which ADSI identified as having supplied approximately 194 transceivers. This data is contradicted by the data acquired directly from Vodanet, which indicates that only 19 transceiver products were sold to ADSI.[98] This data indicates that the defendants inaccurately attributed product purchases to a different vendor (or no vendor at all). The defendants' second largest transceiver supplier was Link-US, however, Cisco's analysis found that a significant percentage of products supplied by Link-US represent a high risk of non-genuine product.[99] Defendants' third and fourth largest purported transceiver vendors were K&F and SHE101, which I understand to represent a Shenzhen, China supplier. Thus, even when the defendants' data does identify the source for a transceiver, the product appears to have a high risk of being non-genuine.

59.    Finally, "Cisco" transceiver products were amongst the most frequent products seized by U.S. Customs.[100]

### vi.   Commercial terms

60.    The defendants' data indicates sales transacting at prices significantly less than Cisco's comparable prices. For example, in March 2018, PureFutureTech made a sale involving "Cisco" products to peopleNComm, Inc.[101] At that time, a PureFutureTech representative sent the customer an email containing pictures of boxes with labels that appear to reflect Cisco trademarks.[102] Cisco Brand Protection personnel tested the information represented on the labels in these pictures and concluded that the labels were non-genuine.[103] The table below summarizes attributes of this transaction:[104]

| Product | PFT Price | Cisco GLP |
|---|---|---|
| 3850-24S-S | $3,391 | $24,518 |
| WS-C2960X-48TS-L | $938 | $4,578 |

---

[98] Schedule 3d.

[99] Schedule 2b.

[100] Schedule 11.

[101] Ex. 67 (Farhaad Sheikh) at CISCO_PNC000001.

[102] Ex. 67 (Farhaad Sheikh) at CISCO_PNC000005.

[103] Ex. 68 (Farhaad Sheikh) at CISCO00002597-2601.

[104] Data for the table is derived from Exs. 67 and 68.

61.      The defendants' sale of "Cisco" products at prices significantly below the list price the product was available to Cisco's distributors indicates an increased risk the product was non-genuine. I understand that Cisco incorporates this consideration into its risk scoring analysis, based on Cisco's records for how much it sold the particular serial-numbered product.[105] Cisco's use of this risk factor is consistent with my experience.

### d.   Implications of the Sale of Non-Genuine Cisco Products

#### i.   Overall Impact

62.      Cisco undertakes efforts to block the manufacture and sale of non-genuine products.[106] Non-genuine product sales harm relationships with authorized sellers, increase the risk of brand reputation, and reduce revenue and profits for manufacturers such as Cisco.[107]

#### ii.   Cisco Lost Sales and Related Lost Profits

63.      As described in § 2 above, the defendants' actions culminated in the sale of "Cisco" products to customers through a distribution channel. The defendants sold "Cisco" products concurrent to Cisco's active efforts to sell the same products. In other words, the defendants' sales of non-genuine "Cisco" products displaced sales otherwise available to Cisco through its authorized distribution network.[108]

64.      In fact, Cisco's contemporaneous documents indicate that the defendants' efforts to sell apparent non-genuine "Cisco" products at low prices interfered with efforts to sell genuine Cisco products. For example, in October 2016, Cisco personnel encountered

---

[105] *See, e.g.*, CONFIDENTIAL Risk Score Results ADSI Link US Sales Data (4.15.20).

[106] *See, e.g.*, Cisco 2018 Annual Report, p.24.

[107] *See e.g.*, "Gray markets: an evolving concern, Unauthorized sales continue to raise costs and damage brand reputation," KPMG, February 25, 2016, p.1, "This unauthorized activity has long been a problem for OEMs, which can lose significant revenue and margin from price erosion, as well as improper sales and marketing discounts and potential brand reputation risk. Further costs include handling end-customer issues caused by inadequate customer service, product handling and installation, and a lack of warranty coverage (which manufacturers often provide, at no cost, to maintain customer relationships)." *See also, Id.* at p.2, "Whenever an unauthorized sourced product enters a market, it competes with the authorized regional source by driving deeper discounting and poses a risk to the OEM's brand reputation. OEMs generally have no visibility into unauthorized sales and cannot ensure that products sold are authentic or undamaged, and are installed and supported properly. Regardless of the cause, however, gray market activity can affect everyone in the supply and value chain negatively."

[108] Actual damages suffered by plaintiff is an available remedy under Section 35 of the Lanham Act, 15 U.S.C. § 1117. Lost profits are a typical measure of actual damages in trademark infringement cases. *See* AICPA Practice Aid, Calculating Intellectual Property Infringement Damages, pp.44. "In copyright, trademark, trade secret, and trade dress cases, lost profits represent those profits that the intellectual property owner failed to earn as a result of the infringement. The lost sales measure attempts to equate the intellectual property owner's damages with the profits that would have been earned from each lost sale due to the infringer's misconduct."

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

an attempt by IT Devices to sell product to a customer.[109] I am not aware of any production of data by the defendants of sales by IT Devices.

65.     In some instances, a customer that purchases a non-genuine product transacts at a lower price as compared to if the customer had purchased a genuine product. There are valid reasons, however, why a customer would be willing to pay a higher price for genuine Cisco product as compared to a non-genuine "Cisco" product.[110] For example, a customer purchasing a genuine Cisco product is assured that the product has not been modified, particularly in a way that would increase security risk.[111] Similarly, genuine Cisco product includes licensed software and is accompanied by Cisco guarantees, support and service.[112] Critically, a customer that purchases a Cisco product frequently does so because the customer already has Cisco equipment embedded within its network. Thus, the customer has an increased likelihood of purchasing incremental Cisco products due to, for example, known reliability and institutional product knowledge of its staff that enables operational efficiencies.[113]

66.     I have reviewed testimony from entities that purchased products sold by the defendants' indicating that the customer intended to purchase genuine Cisco product.[114] For example, Richard Love, managed the procurement team for the National Ground Intelligence Center (NGIC).[115] Mr. Love testified that Cisco products comprised the majority of NGIC's network.[116] Mr. Love further testified that the products NGIC purchased from ADSI through the GSA were specified by the personnel who were deploying the products based on the determination that Cisco products were required. Mr. Love's testimony is consistent with my understanding that Cisco products are primary products used in mission critical infrastructure in the United States.[117]

67.     Consequently, I have assumed that, but-for the defendants' sales, Cisco would have been able to manufacture and sell more product. Indeed, there is significant evidence that Cisco is able to sell products at prevailing prices (*i.e.*, Cisco's net price to

---

[109] *See e.g.*, Ex. 4 (Carter) at CISCO00000763.

[110] Cisco Rogs Nos. 6-7.

[111] *See, e.g.*, https://www.cisco.com/c/dam/m/sl_si/events/2017/cisco-connect/pdf/ConnectSLO_presentation_Brand-Protection.pdf (accessed (March 25, 2020).

[112] *Id. See also*, Carter Tr. 35:2-7, 112:2-9 and Ex. 4 (Carter) at CISCO00000760-761.

[113] Discussion with Charles Williams on April 17, 2020.

[114] *See,e.g.,* Tesfaye Tr. 26:8-21 (TJR), MacDougall Tr. (Abaram).

[115] Love Tr. 9:16:23.

[116] Love Tr. 45:11-19.

[117] Discussion with Charles Williams on April 17, 2020.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

distributors).[118] Furthermore, the evidence I have seen indicates that the defendants' customers expected to purchase genuine Cisco products and were not driven by pricing considerations. Finally, I have reviewed no evidence that the defendants' customers knew that they were purchasing non-genuine Cisco products and accepted those products because the price was lower than the price for genuine products.

68.     A damage analysis is an estimate of the detriment suffered (in this case, by Cisco) because of an unlawful act (in this case, by defendants). Lost profits are a type of economic damage. Generally, lost profits are computed as the revenues that would have been earned but-for the unlawful act(s), less avoided costs.[119] Avoided costs are incremental (variable) costs that were not incurred because the revenue was lost.[120] Lost profits are measured as lost revenues less avoided/incremental costs.

69.     I have performed my analyses of Cisco's lost profits assuming that Cisco establishes liability. If Cisco fails to establish liability, its damages are zero. I have also employed the following assumptions.[121]

| Assumptions and Data Provided | Supporting Data |
|---|---|
| Cisco List Prices | The file entitled "Cisco GLP" was provided by Cisco to represent applicable product list prices.[122] |
| Cisco Product Families | The file entitled "PIDS for product families 041620"[123] was provided by Cisco to identify the applicable product family for each unique product type sold by the defendants. |
| Standard Discount Levels for Cisco Products Sold to Cisco Distributors | Discussion with Chuck Williams. |
| Risk Scored vendor transactions data | I was provided with the results of risk scored transaction data from two vendors that defendants indicated supplied "Cisco" products.[124] |

---

[118] Discussion with Charles Williams on April 17, 2020.

[119] AICPA, Calculating Lost Profits, p.23.

[120] AICPA, Calculating Lost Profits, p.42.

[121] In certain instances, further assumptions were employed develop certain calculations herein. These assumptions are identified in the relevant sections below.

[122] The defendants' electronic transaction data does not appear to have used Cisco's PIDs consistently. As a result, at this time, I have not been able to match approximately $0.7 million of defendants' sales with a corresponding PID on Cisco's GLP (*see* Schedule 10a). To the extent that the GLP amount for additional products sold by defendants is identified, I reserve the right to supplement my analysis.

[123] PID is a term used for product identification number.

[124] See files entitled "CONFIDENTIAL Risk Score Results ADSI Link US Sales Data (4.15.20)" and "Vodanet 2020-04-16 CONFIDENTIAL."

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

70.     The final assumption described in the table above relates to Cisco's transaction risk scoring. I obtained data summarizing Cisco's testing of approximately 1,800 transactions involving possible non-genuine product sales.[125] Cisco's testing applies a risk scoring algorithm based on eight separate factors. These factors include attributes of each product sale, ███████████████████████████████████████████

████████████████████████████████████[126]

ct sale is High Risk, Medium Risk, or Low Risk for being non-genuine. In this way, Cisco determines how likely a product matches a particular risk score. For example, if 100 switches are risk scored as "High Risk," and 95 are determined to be non-genuine after testing, Cisco concludes that a "High Risk" switch is 95% likely to be counterfeit. As described in § 3, in my opinion, Cisco applies reasonable factors for such an analysis and Cisco's conclusions appear to be reasonable.[127]

### iii.   Defendants' Unjust Enrichment

71.     An alternative measure of Cisco's damages is the defendants' alleged unjust enrichment.[128] That is, to what extent did the defendants' profit from the alleged harmful act? The identified amount may be disgorged from the defendants to compensate Cisco.[129] This measure of damages is frequently used in litigation involving trademark issues such as this dispute.[130]

72.     Generally, I calculated the revenues earned by sales of the products through documents and, where applicable and supported, reduced such revenues by costs incurred by Defendants because of the sales.[131] Consequently, in the sections below, I analyze the

---

[125] Schedule 2f, which analyzes the Cisco data in the file entitled "Combined Risk Score Results for Expert (4.15.20)." The products involved in this matter primarily involve three product families (switches, transceivers, and modules). Thus, the number of relevant purchases in Cisco's analysis is less than 1,800.

[126] *See, e.g.*, "CONFIDENTIAL Risk Score Results ADSI Link US Sales Data (4.15.20)."

[127] I understand that Cisco has retained Dr. Daniel Levy to examine Cisco's risk scoring approach. I further understand that Dr. Levy is expected to opine that Cisco's methodology results in a reliable methodology of predicting whether a product is likely to be non-genuine. Dr. Levy's report will be issued concurrent with the issuance of my report. I intend to review Dr. Levy's report to ensure that his opinions are consistent with my application of Cisco's risk-scoring data.

[128] AICPA Practice Aid, *Calculating Intellectual Property Infringement Damages*, pp.20 and 78, including "Unjust enrichment is an alternative damages measure to compensatory damages. Compensatory damages seek to restore the plaintiff to the financial position in which it would have been but for the defendant's wrongful act."

[129] *Id.*, p.78, "In contrast, unjust enrichment seeks to deprive the defendant of whatever gain or benefit it obtained from the wrongful act. In essence, unjust enrichment compels the defendant to disgorge all ill-gotten gains to the owner of the infringed intellectual property."

[130] *Id.*, p.78, "The unjust enrichment remedy is frequently employed by the courts in copyright, trademark, and trade secret litigation and is incorporated in the federal statutes governing intellectual property."

[131] Although Defendants generally are responsible for proving costs that should be deducted from sales in an unjust enrichment claims, I have identified and deducted certain applicable costs in my analysis. *See* AICPA

defendants' sales of non-genuine "Cisco" products and the related profits obtained by the defendants.

### 4. Damages Related to Apparent Non-Genuine Product Purchased by Defendants from Link-US

#### a. The Link US Sales Data

73.    Link US produced data identifying "Cisco" products it has sold to ADSI. As described above, this data was analyzed by Cisco. Cisco risk scored each of the products sold by Link US to gauge the likelihood as to whether the product acquired by the defendants was non-genuine. Also as described above, Cisco's risk scoring classified the "Cisco" products sold to ADSI based on the likelihood the product was non-genuine (*i.e.*, High Risk, Medium Risk, or Low Risk). The Link US transaction data identified 1,100 "Cisco" products sold to ADSI. Based on the Cisco risk scoring, approximately 1,050 (95%) of these products had a "High Risk" of being non-genuine.

74.    Next, I used the data from Cisco's risk scoring analysis to calculate the likelihood that the defendants' product sales in each category were non-genuine based on the product's relevant Cisco product family. For example, the vast majority of Link US's sales to ADSI were in the Transceiver product family and had a "High Risk" of being non-genuine.[132] Therefore, I applied the rate identifiable from Cisco's related testing, approximately 74%, as the rate of non-genuine product sales.[133]

75.    I observed that Link US's data identified significantly more "Cisco" products sold to ADSI than the transaction data produced by ADSI identified as purchased from Link US.[134] Specifically, the defendants' data identifies 158 products acquired from LIN105,[135] which compares to the 1,100 products identified by Link US as sold to ADSI. The defendants have not explained this anomaly. To account for this discrepancy, I attributed the incremental product purchases by ADSI without an existing entry in the "our_vend" to Link US using the product item number data (*i.e.*, reducing the number of transactions where the "our vend" was otherwise missing).[136]

---

Practice Aid, Calculating Intellectual Property Infringement Damages, pp.94. *See also* Section 35 of the Lanham Act, 15 U.S.C. § 1117, (a) Profits; Damages and Costs; Attorney Fees: . . . "In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed…" https://www.law.cornell.edu/uscode/text/15/1117

[132] Schedule 2d.

[133] Schedule 2f.

[134] *See* Schedule 2d comparing Link US's data to ADSI's transaction data where "our_vend" field was equal to "LIN105."

[135] Schedule 2d.

[136] Schedule 2d.

b. Cisco's Lost Profits

76.     The defendants' transaction data indicates, when Link US is the identified vendor, the U.S. Government or other governmental entities were the largest customers.[137]

77.     For the reasons set forth above, I have assumed that Cisco would have originated the Link US sales but-for the defendants' sales. I estimated that Cisco's sales price for these transactions would have been consistent with its standard discounting for similar transactions.[138] That is, I estimated that Cisco would have sold the underlying products to a distributor at a discount of 42% of GLP.[139] Next, I used Cisco's transaction risk scoring assessment in combination with the percentage likelihood that the product sold by the defendants was non-genuine to estimate total lost sales for each PID. I performed this calculation for each PID sold by the defendants.[140]

78.     After estimating Cisco's lost sales, I next estimated Cisco's costs associated with the lost sales. First, I estimated the cost to Cisco to manufacture the related product (*i.e.*, cost of goods sold (COGS)). Specifically, I calculated Cisco's weighted-average product-related COGS in the applicable year in which the sale occurred.[141] Cisco also would have incurred selling, general, and administrative costs (SG&A) associated with the sales. To calculate this cost, I used Cisco's total SG&A costs. The data I employed, however, includes both fixed and variable expenses.[142] A lost profits calculation normally deducts only variable costs. Thus, this calculation of Cisco's SG&A costs results in a conservative calculation.

79.     Cisco's lost profits calculated in the manner described above are presented in Schedule 2a hereto.

---

[137] Schedule 2e.

[138] The defendants' largest transaction had a total invoice value of approximately $75,000 and the median invoice amount was $646. Based on my discussion with Charles Williams, I understand that the defendants' transactions are not the types of transactions that typically are considered for non-standard discounting.

[139] This discount is the maximum typically offered to Cisco's distributors.

[140] Schedule 2b.

[141] Schedule 9.

[142] Schedule 9.

c.  Defendants' Unjust Enrichment

80.     As described above, I estimated the defendants' total sales of products acquired from Link US. These sales included the adjustments I made to account for the quantity differences in sales to ADSI based upon reporting provided by the vendor.[143]

81.     Next, I deducted the defendants' COGS for these purchases. In those instances when the defendant's electronic data did not identify the cost to acquire the product, I estimated the cost based on other defendant data.[144] I then deducted an estimate for the commission expense that the defendants might have paid related to these sales. The defendants, however, have not produced any data to indicate this expense was actually incurred.

82.     Finally, I estimated the percentage of the defendants' sales that involved non-genuine product. To make this calculation, I determined the weighted-average rate at which the defendants' sales involved non-genuine product.[145] I then used this rate to estimate defendants' profits.

83.     Defendants' profits calculated in the manner described above are presented in schedule 2c hereto.

5. **Damages Related to Apparent Non-Genuine Product Purchased by Defendants from Vodanet**

a.  Lost Profits

84.     Data from Vodanet was obtained that identified each product sale to ADSI. I compared this data to the defendants' electronic data. I made certain adjustments to conform defendants' data to the data from Vodanet. For example, I reduced the number of transceivers that the defendants attributed to Vodanet because the defendants' data overstated that quantity. For other products, I increased the quantity that the defendants purchased from Vodanet (*i.e.*, by populating the vendor field).[146]

85.     I used the data from Cisco's risk scoring to estimate the likelihood that the Vodanet products were non-genuine. I then used the same data to estimate Cisco's lost sales associated with the defendants' sales of Vodanet-supplied product.[147] This method was similar to the process described in § 4.b.

---

[143] Schedule 2d.

[144] Schedule 10b.

[145] Schedule 2b.

[146] Schedule 3d.

[147] Schedule 3b.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

86.     I also used the process described in § 4.b to estimate Cisco's costs associated with the lost sales. Cisco's lost profits are presented in Schedule 3a.

### b.   Unjust Enrichment

87.     I used the process described in § 4.c to estimate defendants' profits associated with sales of Vodanet-supplied product. My analysis of defendants' profits is presented in Schedule 3c.

## 6. Damages Related to Products Sold by Defendants Later Tested by Cisco and Identified as Non-Genuine

### a.   Lost Profits

88.     As described above, Cisco has tested certain products that were sold by the defendants.[148] In certain instances, Cisco could determine that the product sold was genuine. In other instances, however, Cisco's testing concluded that the product sold was non-genuine. In these instances, I have assumed that but-for the defendants' sales, the product would have been sold by Cisco.

89.     I used the process described in § 4.b to estimate Cisco's lost sales and related lost profits.[149] Cisco's related lost profits are presented in Schedule 4a.

### b.   Unjust Enrichment

90.     I used the process described in § 4.c to estimate defendants' profits associated with sales of transceiver products. My analysis of defendants' profits is presented in Schedule 4c.

## 7. Damages Related to Apparent Non-Genuine Transceiver Products Sold by Defendants

### a.   Lost Profits

91.     As described in § 3.c, I have reviewed significant evidence that indicates the defendants' sales of "Cisco" transceiver products were non-genuine. Accordingly, I have assumed that Cisco would have originated the transceiver sales made by the defendants but-for the defendants' sales.

92.     I used the process described in § 4.b to estimate Cisco's lost sales and related lost profits.[150] Cisco's related lost profits are presented in Schedule 5a.

---

[148] *See* file entitled "List of Defendant Sales that were Analyzed 04-16-2020 CONFIDENTIAL."

[149] This analysis is independent of the analyses of lost sales related to Link US and Vodanet.

[150] This analysis is independent of the analyses of lost sales in other categories.

b.   Unjust Enrichment

93.     I used the process described in § 4.c to estimate defendants' profits associated with sales of transceiver products. My analysis of defendants' profits is presented in Schedule 5c.

**8.   Damages Related to Other Products Sold By Defendants Without Electronic Data Regarding the Vendor That Supplied the Product**

a.   Lost Profits

94.     As described in § 3.c, the defendants' sales that do not include information sufficient to identify the vendor that supplied the product have a higher risk that non-genuine was involved. For example, K&F did not provide electronic data to identify the supplying vendor for a significant percentage of its sales. I have reviewed documents, however, that K&F obtained products from vendors in China such as Hong Kong Sellsi.[151]

95.     Accordingly, where the vendor that supplied the product is missing from the defendants' data, I have assumed that the sale involved non-genuine product.[152] Further, I have assumed that Cisco would have originated these sales but-for the defendants' sales.

96.     I used the process described in § 4.b to estimate Cisco's lost sales and related lost profits.[153] Cisco's related lost profits are presented in Schedule 6a.

b.   Unjust Enrichment

97.     I used the process described in § 4.c to estimate defendants' profits associated with sales of transceiver products. My analysis of defendants' profits is presented in Schedule 6c.

**9.   Prejudgment Interest**

98.     I understand that Cisco may be awarded prejudgment interest. Accordingly, I have calculated prejudgment interest using a mid-year convention at an annual rate of 7%, which I understand to be the statutory rate.[154] These calculations are presented within each schedule where Cisco's lost profits are presented.

---

[151] *See, e.g.*, Exs. 12, 15, and 92.

[152] I reserve the right to update my analysis if I am able to identify vendor data indicating genuine products were supplied to the defendants for purposes of these sales.

[153] This analysis is independent of the analyses of other categories of lost sales.

[154] *See* https://www.justia.com/trials-litigation/docs/caci/3900/3935/ (accessed April 17, 2020).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### 10. Statutory Damages

99.     Cisco may elect statutory damages if it establishes liability for its trademark claims. The statutory damage amount varies depending on whether the alleged act was willful or not.

100.     I understand that the statutory damage framework may be summarized as follows:

| Court Finding | Trademark (per mark) |
|---|---|
| Not willful | Not less than $1,000, or more than $200,000 |
| Willful | Not more than $2,000,000 |

101.     Cisco's claims that 1) consumer goodwill has been lost, 2) its distribution chain has been disrupted, and 3) ancillary sales may have been (or will be) lost.

102.     If Cisco is determined to be entitled to statutory damages, I am able to implement a calculation of such damages using the framework above.

Greg J. Regan, CPA/CFF
April 17, 2020



CURRICULUM VITAE

SAN FRANCISCO OFFICE
201 Spear Street | Suite 1100
San Francisco, CA 94105
T: 415.836.4000
F: 415.777.2062

SAN MATEO OFFICE
177 Bovet Road | Suite 525
San Mateo, CA 94402
T: 415.836.4000
F: 415.777.2062

# GREG REGAN, CPA/CFF, MBA

HEMMING.COM

## Profile

Greg Regan is a Partner in the Forensic and Financial Consulting Services Group in the San Francisco office of Hemming Morse, LLP. In 2018, Greg became the Chair of California Society of CPAs Forensic Services Section. In 2013, Greg was appointed to the American Institute of CPA's ("AICPA") Forensic and Valuation Services Executive Committee. This 9-member committee establishes professional standards for practitioners performing consulting services that require the application of forensic or valuation-related methodologies. From 2010 to 2013, he served on the AICPA's Forensic and Litigation Services ("FLS") Committee. This 11-member committee provides professional guidance to CPA practitioners who perform accounting investigations, economic damage analyses such as lost profits calculations, and a variety of other services. Greg was the Chair of the AICPA's Damages Task Force from 2010 to 2013 and continues to be an active member. Greg received the AICPA's 2012 Award for the FLS Volunteer of the Year.

Greg has testified in federal and state courts as well as in arbitrations regarding these types of forensic analyses. Greg is a Certified Public Accountant (CPA), a Certified Financial Forensic (CFF), and a Certified Fraud Examiner (CFE). Greg serves as an Officer of the California Society of Certified Public Accountants (CalCPA) statewide Forensic Services Committee.

Greg received his B.S. degree in Accounting from Georgetown University, Washington, D.C., and his Masters in Business Administration with an Emphasis in Finance from the University of San Francisco. When he's not working, he enjoys spending time with his wife and coaching the sports teams of his two boys.



**SAN FRANCISCO OFFICE**
201 Spear Street | Suite 1100
San Francisco, CA 94105
T: 415.836.4000
F: 415.777.2062

**SAN MATEO OFFICE**
177 Bovet Road | Suite 525
San Mateo, CA 94402
T: 415.836.4000
F: 415.777.2062

## GREG REGAN, CPA/CFF, MBA

HEMMING.COM

### Employment & Education

| | |
|---|---|
| 2012 – Present | **Hemming Morse, LLP**<br>**Certified Public Accountants,**<br>**Forensic and Financial Consultants**<br>Partner |
| 2003 – 2011 | **Hemming Morse, Inc.**<br>Director, 2007-2011<br>Manager, October 2003-2006 |
| 2009 – Present | **Golden Gate University**<br>Adjunct Professor<br>Introduction to Financial Forensic Accounting, Spring 2009-2016<br>An In-Depth Analysis of Economic Damages, Fall 2010 |
| 1993 – 2003 | **SupportSoft, Inc. (Nasdaq: SPRT)**<br>Controller, February 2001- October 2003<br>Accounting Manager, April 1999- February 2001 |
| 1995 – 1999 | **Ernst & Young, LLP**<br>Senior Auditor, October 1997- April 1999<br>Staff Auditor, October 1995-September 1997 |
| 2004 – 2007 | **University of San Francisco**<br>Masters in Business Administration with emphasis in Finance<br>Beta Gamma Sigma Honor Society |
| 1995 | **Georgetown University, Washington, D.C.**<br>B.S. Accounting, Minor in Theology |



**HEMMING | MORSE**
FORENSIC & FINANCIAL CONSULTANTS

| SAN FRANCISCO OFFICE | SAN MATEO OFFICE |
|---|---|
| 201 Spear Street | Suite 1100 | 177 Bovet Road | Suite 525 |
| San Francisco, CA 94105 | San Mateo, CA 94402 |
| T: 415.836.4000 | T: 415.836.4000 |
| F: 415.777.2062 | F: 415.777.2062 |

# GREG REGAN, CPA/CFF, MBA

HEMMING.COM

## Professional & Service Affiliations

- **Certified Public Accountant,** State of California, 1998

- **Certified Public Accountant,** State of New York, 2010

- **Certified Fraud Examiner**

- **Certified in Financial Forensics,** 2008

- **American Institute of Certified Public Accountants**
  - Forensic & Valuation Services Executive Committee, 2013-2016
  - Forensic & Litigation Services Committee, 2010-2013
  - Chair, Damages Task Force
  - National Forensic & Valuation Conference
  - Co-Chair, 2014-2015
  - Planning Committee, 2011-present
  - CPA Ambassador, January 2006-present
  - Board of Examiners, Uniform CPA Examination Contributor

- **California Society of Certified Public Accountants**
  - Co-chair, San Francisco Chapter Litigation Consulting Services Committee, 2006-2011
  - State Steering Committee, 2007-present
  - Officer, 2012-present
  - Economic Damages Section Member, 2004-present
  - Officer, 2008-2012
  - State Accounting Principles and Auditing Standards Committee, Member, 2005-2010
  - CalCPA Leadership Institute, Spring 2006
  - Leadership Identification and Development Committee, 2007-present

- **CAMICO, Risk Management Committee,** 2014-present

- **California CPA Education Foundation**
  - Accounting & Auditing Curriculum Advisory Committee, 2007-2010

- **Association of Certified Fraud Examiners**

- **Georgetown University,** Alumni Admissions Committee

- **Advisory Board to Golden Gate University Forensic Accounting Program,** August 2008-present

- **Legal Aid of San Mateo County**
  - Board of Directors, Treasurer

- **Board of Regents,** Junipero Serra High School



**SAN FRANCISCO OFFICE**
201 Spear Street | Suite 1100
San Francisco, CA 94105
T: 415.836.4000
F: 415.777.2062

**SAN MATEO OFFICE**
177 Bovet Road | Suite 525
San Mateo, CA 94402
T: 415.836.4000
F: 415.777.2062

## GREG REGAN, CPA/CFF, MBA

HEMMING.COM

### Publications

- "Calculating Lost Profits", AICPA Practice Aid, 2019

- Unblurring the Line(s) Between Accounting and Legal Opinions", The Witness Chair, Winter 2017

- "Big Data's Day in Court", Plaintiff Magazine, January 2017

- "Attaining Reasonable Certainty in Economic Damages, Calculations", AICPA Practice Aid, 2015

- "How CPAs can benefi t from Colin Powell's Rule", AICPA "FVS Insider" Article, August 2013

- "Options for Consumers in Crisis - An Economic Analysis of the Debt Settlement Industry", December 31, 2012

- "Discount Rates, Risk, and Uncertainty in Economic Damage Calculations", AICPA Practice Aid, 2012

- "Causation Scenarios for the Damages Expert", Dunn on Damages, Winter 2011

- "2010 Federal Rules of Civil Procedure Changes", AICPA.org, November 2010

- "Selecting the Right Investigative Resource", (Co-author) Journal of Accountancy, December 2009

- "Discount Rates and Lost Profits... Where's The Risk?", (Co-author) CPA Expert, Summer 2009

- "Discount Rates and Lost Profi ts: A Review of Case Law", The Witness Chair, Winter 2009

- "CFFs: CPAs Looking Behind Closed Doors", CalCPA Magazine, September 2008

- "Discount Rates and Lost Profits ... Where's The Risk", The Witness Chair, Summer 2008

- "Software Revenue Recognition on the Rise", (Co-author) Journal of Accountancy, December 2007

- "FAS 123R: Accounting for Stock Options, Tips for an Increasingly Complex Task", CalCPA Magazine, March 2007

- "Forensic Accounting: Is It Right For You?", CalCPA.org, February 2005

- "Talk it Over", CalCPA Magazine, December 2004



**SAN FRANCISCO OFFICE**
201 Spear Street | Suite 1100
San Francisco, CA 94105
T: 415.836.4000
F: 415.777.2062

**SAN MATEO OFFICE**
177 Bovet Road | Suite 525
San Mateo, CA 94402
T: 415.836.4000
F: 415.777.2062

# GREG REGAN, CPA/CFF, MBA

HEMMING.COM

## Awards

- AICPA, Forensic & Litigation Services Volunteer of the Year, 2012

- Georgetown University, Dean's Citation, 1995

## Presentations

- "Damages - When are they Foreseeable?", AICPA National Forensic & Valuation Services Conference, 2018

- "Linking Causation to Damages", AICPA National Forensic & Valuation Services Conference, 2017

- "Un-blurring the Lines Between Legal and Expert Opinions", AICPA National Forensic & Valuation Services Conference, 2017

- "Un-blurring the Lines Between Accounting and Legal Opinions", CalCPA Forensic Services Steering Committee, June 2016

- "Examining Cross-Examination", AICPA National Forensic & Valuation Conference, 2015

- "Experts on Offense, Experts on Defense", ABA National Securities Fraud Conference, 2014

- "Attaining Reasonable Certainty in a Damages Calculation", AICPA National Forensic & Valuation Conference, 2012 Texas Society of CPAs, 2013

- "Emerging Financial Forensic Accounting", AICPA National Forensic Accounting Conference September 2011

- "Review of Notable Recent Cases – Economic Damages", AICPA National Forensic Accounting Conference September 2011

- "Forensic Accounting: Bridging the Gap between Theory and Practice", AAA, National Conference, August 2011

- "Causation Scenarios and the Damages Expert", CalCPA Economic Damages and Fraud Committees August 2011

- "Ethics and the Expert", AAA, Forensic and Investigative Accounting Section Research Conference, March 2011

- "Bridging the Gap - The Road to the CFF", AAA, Forensic and Investigative Accounting Section Research Conference, March 2011

- "Educating Legally Aware Accountants", AAA, Forensic and Investigative Accounting Section Research Conference, March 2011

- "Revenue Recognition", Licensing Executives Society, October 2009



CURRICULUM VITAE

| SAN FRANCISCO OFFICE | SAN MATEO OFFICE |
|---|---|
| 201 Spear Street | Suite 1100 | 177 Bovet Road | Suite 525 |
| San Francisco, CA 94105 | San Mateo, CA 94402 |
| T: 415.836.4000 | T: 415.836.4000 |
| F: 415.777.2062 | F: 415.777.2062 |

## GREG REGAN, CPA/CFF, MBA                    HEMMING.COM

### Presentations continued

- "Accounting for Devices With Embedded Software", Revenue Recognition for MedTech Companies June 2009

- "Recessionary Implications for CPAs", Cal Society of CPAs, Economic Damages Section May 2009

- "Analyzing Earnings Releases", San Jose Mercury News, October 2008, January 2010

- "The Subprime Debacle & Debate About Fair Value Accounting", San Francisco, Barristers Club, August 2008

- "IPOs: Promises and Pitfalls", Guest Lecturer, Golden Gate University Law School March 2008, March 2009

- "The Foreign Corrupt Practices Act: An Independent Monitor's Perspective", Cal Society of CPAs, San Francisco Chapter Litigation Section, January 2008

- "Options Backdating: What you need to know", (Panel member) CalCPA Litigation Society October 2006

- "I've Sold Software: How and When Do I Recognize Revenue?", Hemming Morse Training, November 2005

- "Facts about Fraud", Cal Society of CPAs, CPE Extravaganza, June 2005, June 2006

- "Fraud/Corporate Investigations" JHI Members Conference, 2004

### AICPA CFF Education, Spring 2010-Present

- Fundamentals of the Legal System & Engagement Administration

- Reporting, Expert Reports, and the Provision of Testimony

- Financial Statement Investigations



# HEMMING | MORSE
### FORENSIC & FINANCIAL CONSULTANTS

**SAN FRANCISCO OFFICE**
201 Spear Street | Suite 1100
San Francisco, CA 94105
T: 415.836.4000
F: 415.777.2062

**SAN MATEO OFFICE**
177 Bovet Road | Suite 525
San Mateo, CA 94402
T: 415.836.4000
F: 415.777.2062

## GREG REGAN, CPA/CFF, MBA                    HEMMING.COM

### Testimony

#### Trial

- **Sumotext Corp. v. Zoove, Inc., et al. (2020)**
  U.S. District Court, Northern District of California,
  San Jose Division, Case No. 5:16-cv-01370-BLF

- **PPFA, Inc. v. Center For Medical Progress, et al.
  (2019),** U.S. District Court Northern District San
  Francisco, Case No. 3:16-Cv-00236-Who

- **ASML US, Inc, v. XTAL (2018),**
  Superior Court of California, County of Santa Clara,
  Case No. 16-CV-295051

- **State of Colorado v. Center for Excellence in Higher
  Education, Inc., et al. (2017),** District Court, Denver
  City and State of Colorado, Case No. 2014cv34530

- **Arata Equipment Company v. Recology, Inc., et al.
  (2015),** Superior Court of California, County of San
  Mateo, Case No. CIV 497024

- **Riverbed, et al. v. Scottish Equity Partners LLP
  (2015),** Superior Court of California, City and County
  of San Francisco, Case No. CGC-12-525496

- **Patrick S. Ryan v. NextG Networks, Inc., et al. (2014)**
  Superior Court of California, County of Santa Clara
  Case No. 1-12-CV-218713

- **Hinn v. Yellow Cab, et al. (2014)** Superior Court of
  California, City and County of San Francisco Case
  No. CGC-12-525420

- **Robin Stearns, et al. v. R&H Investments, et al.
  (2014),** Superior Court of California, County of
  San Mateo, Southern Branch
  Case No. CIV503511

- **Richardson Bay Sanitary District v. City of Mill
  Valley (2013),** Superior Court of California, County
  of Marin, Case No. CIV 1103684

- **Boris Kriman, et al. v. Victor Mayorkis, et al.
  (2012)** Superior Court of California, County of San
  Mateo, Case No. CIV 491312

- **First National v. Federal Realty Investment
  Trust (2008) (2009),** U.S. District Court, Northern
  District of California, San Jose Division
  Case No. C-03-02013 RMW



**SAN FRANCISCO OFFICE**
201 Spear Street | Suite 1100
San Francisco, CA 94105
T: 415.836.4000
F: 415.777.2062

**SAN MATEO OFFICE**
177 Bovet Road | Suite 525
San Mateo, CA 94402
T: 415.836.4000
F: 415.777.2062

# GREG REGAN, CPA/CFF, MBA

HEMMING.COM

**Testimony** continued

### Arbitration

- **Sutter Health and Sutter Health Plan v. Optum Insight, Inc. (2017),** American Arbitration Association
  Case No. 011500034226

- **Cloud Cruiser, Inc. v. Cisco Systems, Inc. (2017)**
  JAMS Reference No. 1100085560

- **Tristan Broussard v. First Tower Loan, LLC, et al. (2016)**

- **Far Niente v. Jeremy J. Nickel (2015),** JAMS

- **Steve Brull v. James Preimesberger, et al. (2015)** JAMS

- **Lee v. Oakhollow Group, L.P., et al. (2014)**
  JAMS Reference No. 1100076156

- **[Redacted] v. Panoche Energy Center, LLC (2013)\***
  *Parties' names and case number have been redacted due to a Stipulated Protective Order Regarding Confidentiality

- **Curriculum Associates, LLC v. Let's Go Learn, Inc. (2011),** American Arbitration Association
  No. 74-117-Y-00247-11

- **Craig W. Story, Seller Representative of PHSI v. U.S. Water LLC (2011)**
  JAMS Reference No. 1100063613

### Deposition

- **Administrator v. Marlette Funding, LLC et al. (2020),** District Court, Denver City and State of Colorado, Case No. 17CV30376

- **In Re: Restasis Antitrust Litigation (2020),** United States District Court, Eastern District of New York, Case No. MDL No. 2819 18-MD-2819 (NG) (LB)

- **Wetlands Preservation Foundation v. Department of Water Resources, The Nature Conservancy (2019)** Superior Court of California, San Joaquin County Case No. STK-CV-UWM-2018-8957

- **Healthnet v. American International Specialty Lines Insurance Company, et al. (2019),** Superior Court of California Los Angeles County, Case No. Bc357436



**SAN FRANCISCO OFFICE**
201 Spear Street | Suite 1100
San Francisco, CA 94105
T: 415.836.4000
F: 415.777.2062

**SAN MATEO OFFICE**
177 Bovet Road | Suite 525
San Mateo, CA 94402
T: 415.836.4000
F: 415.777.2062

# GREG REGAN, CPA/CFF, MBA

HEMMING.COM

## Testimony continued

### Deposition continued

- **PPFA, Inc. v. Center For Medical Progress, et al. (2019),** U.S. District Court Northern District San Francisco, Case No. 3:16-Cv-00236-Who

- **Sumotext Corp. v. Zoove, Inc., et al. (2019)** U.S. District Court, Northern District of California, San Jose Division, Case No. 5:16-cv-01370-BLF

- **Fred Sahadi v. Liberty Mutual Insurance. et al (2019),** U.S. District Court Northern District of California, Case No. 5:18-CV-04061-LHIK

- **Justice Laub v. Drone Racing League, Inc. et al. (2019),** U.S. District Court, Central District of California, Western Division, Case No. 2:17-CV-06210-JAK (KSX)

- **United States Of America v. County Of Clark And Nevada Links, Inc. (2019),** U. S. District Court District Of Nevada, Case No. 2:17-Cv-02303

- **Fuse Chicken, LLC v. Amazon.com, Inc. (2019)** U.S. District Court Northern District of Ohio, Eastern Division, Case No. 5:17-cv-01538-SL

- **Golden Gateway Center v. San Francisco Waterfront Partners II, LLC (2018),** Superior Court of California, City and County of San Francisco, Case No. CGC 15-548437

- **ASML US, Inc, v. XTAL (2018),** Superior Court of California, County of Santa Clara, Case No. 16-CV-295051

- **The Barrel Cellar v. Quince Pacific Avenue (2018),** Superior Court of California, City and County of San Francisco, Case No. CGC-17-561363

- **Just Games Interactive Entertainment, LLC v. Scopely, Inc. (2018),** JAMS Arbitration

- **Mark de Bibo Company v. Ryan & Ryan Construction, Inc. (2017),** Superior Court of California, County of San Mateo, Case No. CIV534040

- **State of Colorado v. Center for Excellence in Higher Education, Inc., et al. (2017),**  District Court, Denver City and State of Colorado, Case No. 2014cv34530

- **Sutter Health and Sutter Health Plan v. Optum Insight, Inc. (2017),** American Arbitration Association Case No. 011500034226

- **Amedee Geothermal Venture I v. Lassen Municipal Utility District (2017),** Superior Court of California, County of Lassen, Case No. 59485

- **Hooked Media Group, Inc. v. Apple, Inc., et al. (2016),** Superior Court of California, County of Santa Clara, Case No. 114CV265819



HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

SAN FRANCISCO OFFICE
201 Spear Street | Suite 1100
San Francisco, CA 94105
T: 415.836.4000
F: 415.777.2062

SAN MATEO OFFICE
177 Bovet Road | Suite 525
San Mateo, CA 94402
T: 415.836.4000
F: 415.777.2062

## GREG REGAN, CPA/CFF, MBA

HEMMING.COM

### Testimony continued

#### Deposition continued

- **BackFlip Software, Inc. v. Cisco Systems, Inc., et al. (2016),** Superior Court of California, County of Santa Clara, Case No. 1-13-CV-242234

- **Blankenchip v. CitiMortgage, Inc., et al. (2016),** U.S. District Court, Eastern District of California Case No. 2:14-cv-02309-WSB-AC

- **Rheumatology Diagnostics Laboratory, Inc., et al. v. Aetna, Inc., et al. (2015),** U.S. District Court, Northern District of California, Case No. 3:12-cv-05847-WHO

- **SwissCanto Asset Management AG v. BlackBerry Limited (2015),** Ontario Superior Court of Justice, Canada, Case No. CV-13-49541300CP

- **Riverbed, et al. v. Scottish Equity Partners LLP (2015),** Superior Court of California, City and County of San Francisco, Case No. CGC-12-525496

- **Arata Equipment Company v. Recology, Inc., et al. (2014),** Superior Court of California, County of San Mateo, Case No. CIV 497024

- **Newman Flange & Fitting Company v. Fred Hawley, et al. (2014),** California Superior Court, Stanislaus, Case No. 684731

- **Nextdoor.com, Inc. v. Abhyanker (2014)** U.S. District Court, Northern District of California Case No. 4:2012cv05667

- **William Wardlaw; Feinstein for Senate Committee; and Fund for the Majority Committee v. First California Bank, et al. (2014),** Superior Court of California, County of Los Angeles, Case No. SC114232

- **Patrick S. Ryan v. NextG Networks, Inc., et al. (2014)** Superior Court of California, County of Santa Clara, Case No. 1-12-CV-218713

- **Hinn v. Yellow Cab, et al. (2014),** Superior Court of California, City and County of San Francisco, Case No. CGC-12-525420

- **Robin Stearns, et al. v. R&H Investments, et al. (2014),** Superior Court of California, County of San Mateo, Southern Branch, Case No. CIV503511

- **In re: Celestica Inc. Securities Litigation (2013)** U.S. District Court, Southern District of New York Civ A. No. 07-CV-00312-GB

- **AMC Technology, LLC v. Cisco Systems, Inc. (2013),** U.S. District Court, Northern District of California, Case No. 5:11-cv-03403-PSG



**SAN FRANCISCO OFFICE**
201 Spear Street | Suite 1100
San Francisco, CA 94105
T: 415.836.4000
F: 415.777.2062

**SAN MATEO OFFICE**
177 Bovet Road | Suite 525
San Mateo, CA 94402
T: 415.836.4000
F: 415.777.2062

# GREG REGAN, CPA/CFF, MBA

HEMMING.COM

**Testimony** continued

**Deposition** continued

- [Redacted] v. Panoche Energy Center, LLC
  (2013)*
  *Parties' names and case number have been
  redacted due to a Stipulated Protective Order
  Regarding Confidentiality

- Michael Karas v. George S. Karas (2013)
  American Arbitration Association
  Case No. 74 115 Y 00144 12 HIIB

- Boris Kriman, et al. v. Victor Mayorkis, et al. (2011),
  Superior Court of California, County of San Mateo,
  Case No. CIV 491312

- Underground Solutions, Inc. v. P&F Distributors, et
  al. (2011), Superior Court of California, County of San
  Mateo, Case No. CIV 470876

- Graco, Inc. v. PMC Global, Inc., et al. (2011)
  U.S. District Court, District of New Jersey
  Case No. 08-CIV-1304 (FLW) (JJH)

- Paul A. DiMartini and Britt T. Johnson v. Purcell Tire &
  Rubber Company, et al. (2010)
  U.S. District Court, State of Nevada
  Case No. 3:09-cv-00279-HDM (VPC)

- First National v. Federal Realty Investment Trust
  (2008), U.S. District Court, Northern District of
  California, San Jose Division, Case No. C-03-02013
  RMW

**Cisco v. ADSI et al**
**Appendix B - Documents Relied Upon**
**Expert Report of Greg J. Regan, CPA/CFF, CFE**

| Category | File |
|---|---|
| **Pleadings** | Second Amended Complaint |
| **Cisco Data Files** | Cisco GLPs |
| | CONFIDENTIAL Risk Score Results ADSI Link US Sales Data (4.15.20) |
| | List of Defendant Sales that were Analyzed 04-16-2020 CONFIDENTIAL |
| | PIDS for product families 041620 |
| | Vodanet 2020-04-16 CONFIDENTIAL |
| | Combined Risk Score Results for Expert (4.15.20) |
| **Defendant Data Files** | 2017CiscoSalesADSI_KF - Bates No. ADSI00338 - CONFIDENTIAL |
| | 2018CiscoSalesADSI_KF - Bates No. ADSI00339 - CONFIDENTIAL |
| | ADSI00099A - CONFIDENTIAL |
| | Cisco 2015 - Bates No. ADSI00334 - CONFIDENTIAL |
| | Cisco 2016 - Bates No. ADSI00335 - CONFIDENTIAL |
| | Cisco 2017 - Bates No. ADSI00336 - CONFIDENTIAL |
| | Cisco 2018 - Bates No. ADSI00337 - CONFIDENTIAL |
| | K&F Sales to Customers [2015] - [KFA00003] CONFIDENTIAL |
| | K&F Sales to Customers [2016] - [KFA00004] CONFIDENTIAL |
| | K&F Sales to Customers [2017] - [KFA00005] CONFIDENTIAL |
| | K&F Sales to Customers [2018] - [KFA00006] CONFIDENTIAL |
| | KF - Cisco purchases from ADSI - Bates No. KFA00001 - CONFIDENTIAL (01315799xBDAE4) |
| | KF - Cisco Sales 12-01-2015 to 07-24-2019 - Bates No. KFA00002 - CONFIDENTIAL (01315575xBDAE4) |
| **Depositions & Exhibits** | Carter Tr. |
| | F. Sheikh Tr. |
| | K. Sheikh Tr. |
| | Lau Tr. |
| | Little Tr. |
| | Love Tr. |
| | MacDougall Tr. |
| | S. Sheihk Tr. (2/28/20) |
| | S. Sheihk Tr. (910/19) |
| | Sadaghiani Tr. |
| | Tesfaye Tr. |
| | Uddin Tr. |
| **Research** | 2015 Cisco Annual Report |
| | 2016 Cisco Annual Report |
| | 2017 Cisco Annual Report |
| | 2018 Cisco Annual Report |
| | 2019 Cisco Annual Report |
| | ACFE 2014 U.S. Fraud Examiners Manual |
| | ADSI Corp SI _ California Secretary of State _ California Secretary of State |
| | AICPA Practice Aid, Calculating Intellectual Property Infringement Damages |
| | AICPA Practice Aid, Calculating Lost Profits |
| | Gray markets: an evolving concern (KPMG) |
| | Litigation Services Handbook, 5th Edition |
| | S&P Capital IQ - Cisco Financial Data |
| **Websites** | accountingtools.com |
| | adsii.com |
| | cisco.com |
| | justia.com |
| | kandfassociates.com |
| | purefuturetechnology.com |

**Cisco v. ADSI et al**
**Schedule 1 - Summary of Damage Calculations**[1]
**Expert Report of Greg J. Regan, CPA/CFF, CFE**

| Category[2] | Sch | Cisco Lost Profits | Sch | Defendants' Unjust Enrichment[3] |
|---|---|---|---|---|
| LINK-US | 2a | $143,526 | 2c | $33,661 |
| Vodanet | 3a | $62,999 | 3c | $27,284 |
| Dexon[4] | | n/a | | n/a |
| Cisco Tested Products | 4a | $37,513 | 4c | $19,418 |
| Transceivers | 5a | $4,775,968 | 5c | $798,141 |
| No Vendor Identified | 6a | $1,628,538 | 6c | $921,493 |
| Total | | $6,648,544 | | $1,799,996 |

Notes:
1 - See referenced schedules for calculation of prejudgment interest.
2 - Each "Category" is independent (*i.e.*, uses only the subset of relevant sales by Defendants).
3 - Amounts attributable to each defendant are calculated at the referenced schedule.
4 - I understand Dexon is expected to produce information relevant to my analysis after the issuance of this report.

**Cisco v. ADSI et al**
**Schedule 2a - Cisco Lost Profits (LINK-US)**
**Expert Report of Greg J. Regan, CPA/CFF, CFE**

| | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|
| Cisco Sales at Net Distributor Price (Sch. 2b) | | $0 | $139,156 | $239,840 | $0 | $0 | $378,996 |
| Incremental COGS | | $0 | ($53,972) | ($93,491) | $0 | $0 | ($147,463) |
| *COGS %* (Sch. 9) | | *41.2%* | *38.8%* | *39.0%* | *39.6%* | *38.7%* | *38.9%* |
| Gross Profit: | | $0 | $85,184 | $146,349 | $0 | $0 | $231,534 |
| Selling, General & Administrative Expense | | $0 | ($32,216) | ($55,792) | $0 | $0 | ($88,008) |
| SG&A Expense Rate (Sch. 9) | | *24.1%* | *23.2%* | *23.3%* | *23.0%* | *22.7%* | *23.2%* |
| Lost Profits | | **$0** | **$52,969** | **$90,557** | **$0** | **$0** | **$143,526** |
| Assumed Award Date | 9/30/2020 | | | | | | |
| Number of Years (Mid-point) | | 5.3 | 4.3 | 3.3 | 2.3 | 1.3 | |
| Prejudgment Interest | *7.0%* | $0 | $15,776 | $20,632 | $0 | $0 | $36,408 |

Cisco v. ADSI et al
**Schedule 2b - Value of Cisco Sales (Link-US Sales to ADSI)**
Expert Report of Greg J. Regan, CPA/CFF, CFE

| | | | | | | | | | *Discount* | | 42.0% | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**LINK-US Reported Sales to ADSI**

| Count of Harmonized Serial No. | | | HM_Year | | | | | | Likelihood | HM_Year | | | | | | | | Total Sales |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Product Family | PID | Risk Designation | 2016 | 2017 | Grand Total | HM_Adj_PID | Cisco GLP | Cisco Price, net | Non-Genuine (Sch. 2f) | 2015 | 2016 | 2017 | 2018 | Other | Adjusted Sales | | Total Sales Value |
| Transceiver | GLC-LH-SMD= | HIGH RISK | 22 | 261 | 283 | | $ 1,026 | $ 595 | 73.7% | $ - | $ 9,653 | $ 114,519 | $ - | $ (0) | $ 124,172 | $ | 168,408 |
| | GLC-SX-MMD= | HIGH RISK | 17 | 194 | 211 | | $ 518 | $ 300 | 73.7% | $ - | $ 3,766 | $ 42,975 | $ - | $ - | $ 46,741 | $ | 63,393 |
| | GLC-SX-MMD= | MEDIUM RISK | 1 | 5 | 6 | | $ 518 | $ 300 | 73.7% | $ - | $ 222 | $ 1,108 | $ - | $ 0 | $ 1,329 | $ | 1,803 |
| | GLC-SX-MMD= | LOW RISK | | 13 | 13 | | $ 518 | $ 300 | 1.8% | $ - | $ - | $ 71 | $ - | $ - | $ 71 | $ | 3,906 |
| | SFP-10G-SR= | HIGH RISK | 134 | 77 | 211 | | $ 1,032 | $ 599 | 73.7% | $ - | $ 59,139 | $ 33,983 | $ - | $ 0 | $ 93,122 | $ | 126,256 |
| | SFP-10G-SR= | MEDIUM RISK | | 2 | 2 | | $ 1,032 | $ 599 | 73.7% | $ - | $ - | $ 883 | $ - | $ - | $ 883 | $ | 1,197 |
| | SFP-10G-SR= | LOW RISK | | 1 | 1 | | $ 1,032 | $ 599 | 1.8% | $ - | $ - | $ 11 | $ - | $ - | $ 11 | $ | 599 |
| | GLC-T= | HIGH RISK | 34 | 150 | 184 | | $ 270 | $ 157 | 73.7% | $ - | $ 3,926 | $ 17,320 | $ - | $ 0 | $ 21,246 | $ | 28,814 |
| | GLC-T= | MEDIUM RISK | 1 | | 1 | | $ 270 | $ 157 | 73.7% | $ - | $ 115 | $ - | $ - | $ - | $ 115 | $ | 157 |
| | GLC-T= | LOW RISK | | 3 | 3 | | $ 270 | $ 157 | 1.8% | $ - | $ - | $ 9 | $ - | $ - | $ 9 | $ | 470 |
| | GLC-LH-SMD | HIGH RISK | 2 | 28 | 30 | | $ 1,026 | $ 595 | 73.7% | $ - | $ 878 | $ 12,286 | $ - | $ - | $ 13,163 | $ | 17,852 |
| | GLC-LH-SMD | MEDIUM RISK | 1 | | 1 | | $ 1,026 | $ 595 | 73.7% | $ - | $ 439 | $ - | $ - | $ - | $ 439 | $ | 595 |
| | SFP-10G-LR= | HIGH RISK | 30 | | 30 | | $ 4,128 | $ 2,394 | 73.7% | $ - | $ 52,960 | $ - | $ - | $ - | $ 52,960 | $ | 71,827 |
| | SFP-10G-SR | HIGH RISK | 15 | | 15 | | $ 1,032 | $ 599 | 73.7% | $ - | $ 6,620 | $ - | $ - | $ - | $ 6,620 | $ | 8,978 |
| | SFP-10G-SR | MEDIUM RISK | 3 | | 3 | | $ 1,032 | $ 599 | 73.7% | $ - | $ 1,324 | $ - | $ - | $ - | $ 1,324 | $ | 1,796 |
| | SFP-10G-SR-X= | HIGH RISK | | 14 | 14 | SFP-10G-SR-X | $ 1,575 | $ 914 | 73.7% | $ - | $ - | $ 9,430 | $ - | $ - | $ 9,430 | $ | 12,789 |
| | SFP-10G-SR-S= | HIGH RISK | | 10 | 10 | SFP-10G-SR-S | $ 728 | $ 422 | 73.7% | $ - | $ - | $ 3,113 | $ - | $ - | $ 3,113 | $ | 4,222 |
| | GLC-T | HIGH RISK | 1 | 8 | 9 | | $ 270 | $ 157 | 73.7% | $ - | $ 115 | $ 924 | $ - | $ 0 | $ 1,039 | $ | 1,409 |
| | SFP-GE-T= | HIGH RISK | | 6 | 6 | | $ - | $ - | 73.7% | $ - | $ - | $ - | $ - | $ - | $ - | $ | - |
| | SFP-GE-T= | MEDIUM RISK | | 1 | 1 | | $ - | $ - | 73.7% | $ - | $ - | $ - | $ - | $ - | $ - | $ | - |
| | GLC-SX-MMD | HIGH RISK | | 6 | 6 | | $ 518 | $ 300 | 73.7% | $ - | $ - | $ 1,329 | $ - | $ - | $ 1,329 | $ | 1,803 |
| | SFP-GE-T | MEDIUM RISK | | 1 | 1 | | $ 270 | $ 157 | 73.7% | $ - | $ - | $ 115 | $ - | $ - | $ 115 | $ | 157 |
| | DS-SFP-FC8G-LW= | HIGH RISK | | 1 | 1 | | $ - | $ - | 73.7% | $ - | $ - | $ - | $ - | $ - | $ - | $ | - |
| | SFP-10G-LR | HIGH RISK | | 1 | 1 | | $ 4,128 | $ 2,394 | 73.7% | $ - | $ - | $ 1,765 | $ - | $ - | $ 1,765 | $ | 2,394 |
| **Transceiver Total** | | | 261 | 782 | 1,043 | | $ - | $ - | | $ - | $ - | $ - | $ - | $ - | $ - | $ | - |
| Unknown | #N/A | HIGH RISK | 14 | 21 | 35 | | $ - | $ - | | $ - | $ - | $ - | $ - | $ - | $ - | $ | - |
| **Unknown Total** | | | 14 | 21 | 35 | | $ - | $ - | | $ - | $ - | $ - | $ - | $ - | $ - | $ | - |
| Phone | CP-7942G= | MEDIUM RISK | 16 | | 16 | | $ - | $ - | | $ - | $ - | $ - | $ - | $ - | $ - | $ | - |
| **Phone Total** | | | 16 | | 16 | | $ - | $ - | | $ - | $ - | $ - | $ - | $ - | $ - | $ | - |
| Module | WS-X4448-GB-RJ45= | MEDIUM RISK | 5 | | 5 | | $ - | $ - | | $ - | $ - | $ - | $ - | $ - | $ - | $ | - |
| **Module Total** | | | 5 | | 5 | | $ - | $ - | | $ - | $ - | $ - | $ - | $ - | $ - | $ | - |
| Wireless Access Point | AIR-CAP3702I-A-K9 | MEDIUM RISK | | 1 | 1 | | $ - | $ - | | $ - | $ - | $ - | $ - | $ - | $ - | $ | - |
| **Wireless Access Point Total** | | | | 1 | 1 | | $ - | $ - | | $ - | $ - | $ - | $ - | $ - | $ - | $ | - |
| **Grand Total** | | | 296 | 804 | 1,100 | | | | | $ - | $ 139,156 | $ 239,840 | $ - | $ 0 | $ 378,996 | $ | 518,865 |

Source: CONFIDENTIAL Risk Score Results ADSI Link US Sales Data (4.15.20)                                                    *Estimated non-genuine sales as a percent of total sales*   73%

**Cisco v. ADSI et al**
**Schedule 2c - Defendants Unjust Enrichment (LINK-US)**
**Expert Report of Greg J. Regan, CPA/CFF, CFE**

| HM_Intercompany_Sale | No |
|---|---|
| HM_Final_Vend | LIN105 |

| Defendants Total Sales | Column Labels | | | | | |
|---|---|---|---|---|---|---|
| Row Labels | 2015 | 2016 | 2017 | 2018 | 2019 | Grand Total |
| K&F | $4,951 | $1,051 | $2,798 | $14,167 | $3,462 | $26,429 |
| ADSI | $15,944 | $13,343 | $27,772 | $8,205 | | $65,264 |
| **Grand Total** | **$20,895** | **$14,394** | **$30,570** | **$22,372** | **$3,462** | **$91,693** |

| HM_Intercompany_Sale | No |
|---|---|
| HM_Final_Vend | LIN105 |

| Defendants COGS | Column Labels | | | | | |
|---|---|---|---|---|---|---|
| Row Labels | 2015 | 2016 | 2017 | 2018 | 2019 | Grand Total |
| K&F | $2,117 | $449 | $1,196 | $6,058 | $1,480 | $11,301 |
| ADSI | $5,277 | $6,221 | $11,068 | $3,610 | | $26,176 |
| **Grand Total** | **$7,394** | **$6,671** | **$12,265** | **$9,668** | **$1,480** | **$37,477** |

| Defendants Gross Profits | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|
| K&F | $2,834 | $602 | $1,601 | $8,109 | $1,982 | $15,128 |
| ADSI | $10,667 | $7,122 | $16,704 | $4,595 | $0 | $39,088 |
| Total Gross Profits | $13,501 | $7,723 | $18,305 | $12,705 | $1,982 | $54,216 |

| Est. Commission Expense | *15%* | | | | | |
|---|---|---|---|---|---|---|
| K&F | ($425) | ($90) | ($240) | ($1,216) | ($297) | ($2,269) |
| ADSI | ($1,600) | ($1,068) | ($2,506) | ($689) | $0 | ($5,863) |
| Total Gross Profits | ($2,025) | ($1,159) | ($2,746) | ($1,906) | ($297) | ($8,132) |

| Estimated Net Profits | *73%* | *Sch 2b* | | | | |
|---|---|---|---|---|---|---|
| K&F | $1,760 | $373 | $994 | $5,035 | $1,230 | $9,392 |
| ADSI | $6,623 | $4,422 | $10,371 | $2,853 | $0 | $24,268 |
| Total Net Profits | $8,382 | $4,795 | $11,365 | $7,888 | $1,230 | $33,661 |

Notes:
Source data is ADSI00334-337, KFA00002-006, and Ex. 15.
1 - See Uddin Tr. 21:1-2 estimating the middle tier for sales commission of 15% of gross profit.

Cisco v. ADSI et al
Schedule 2d - Value of Cisco Sales (Link-US Sales to ADSI)
Expert Report of Greg J. Regan, CPA/CFF, CFE

| HM_Intercompany_Sale | No |
| HM_Sale_Made_By: | (All) |
| our_vend | LIN105 |

**LINK-US Reported Sales to ADSI**

Count of Harmonized Serial No.

| Product Family | PID | Total |
|---|---|---|
| Transceiver | GLC-LH-SMD= | 283 |
| | GLC-SX-MMD= | 230 |
| | SFP-10G-SR= | 214 |
| | GLC-T= | 188 |
| | GLC-LH-SMD | 31 |
| | SFP-10G-LR= | 30 |
| | SFP-10G-SR | 18 |
| | SFP-10G-SR-X= | 14 |
| | SFP-10G-SR-S= | 10 |
| | GLC-T | 9 |
| | SFP-GE-T= | 7 |
| | GLC-SX-MMD | 6 |
| | SFP-GE-T | 1 |
| | DS-SFP-FC8G-LW= | 1 |
| | SFP-10G-LR | 1 |
| Unknown | #N/A | 35 |
| Phone | CP-7942G= | 16 |
| Module | WS-X4448-GB-RJ45= | 5 |
| Wireless Access Point | AIR-CAP3702I-A-K9 | 1 |
| **Grand Total** | | **1,100** |

| HM_Product_Family | item | Values Defendants Total Sales | Sum of qtyshp |
|---|---|---|---|
| Transceiver | SFP-10G-SR-X | $5,300 | 20 |
| | GLC-SX-MMD | $4,572 | 64 |
| | SFP-10G-SR | $2,880 | 32 |
| | SFP-10G-SR-S | $1,490 | 10 |
| | GLC-LH-SMD | $1,250 | 10 |
| Phone | CP-7942G | $1,800 | 20 |
| Wireless | AIR-CAP3702I-A- | $1,390 | 2 |
| **Grand Total** | | **$18,682** | **158** |

**Adj to Unidentified Vendor**

| Sales | LINK | ADSI | Net | Cisco Sales Value | Available Defs Sales Qty | Adj. PID Required | Adj. PID | Adj. Qty |
|---|---|---|---|---|---|---|---|---|
| GLC-LH-SMD= | (283) | - | (283) | $ 124,172 | 287 | | GLC-LH-SMD | 2,476 |
| GLC-SX-MMD= | (230) | - | (230) | $ 48,142 | 10 | yes | GLC-SX-MMD | 3,378 |
| SFP-10G-SR= | (214) | - | (214) | $ 94,015 | 26 | yes | SFP-10G-SR | 3,440 |
| GLC-T= | (188) | - | (188) | $ 21,370 | 7 | yes | GLC-T | 3,798 |
| GLC-LH-SMD | (31) | 10 | (21) | $ 13,602 | 2,476 | | | - |
| SFP-10G-LR= | (30) | - | (30) | $ 52,960 | - | yes | SFP-10G-LR | 1,521 |
| SFP-10G-SR | (18) | 32 | 14 | $ 7,944 | 3,440 | | | - |
| SFP-10G-SR-X= | (14) | - | (14) | $ 9,430 | - | yes | | - |
| SFP-10G-SR-S= | (10) | - | (10) | $ 3,113 | - | yes | | - |
| GLC-T | (9) | - | (9) | $ 1,039 | 3,798 | | | - |
| SFP-GE-T= | (7) | - | (7) | $ - | (30) | | | - |
| GLC-SX-MMD | (6) | 64 | 58 | $ 1,329 | 3,378 | | | - |
| SFP-GE-T | (1) | - | (1) | $ 115 | 291 | | | - |
| DS-SFP-FC8G-LW= | (1) | - | (1) | $ - | - | | | - |
| SFP-10G-LR | (1) | - | (1) | $ 1,765 | 1,521 | | | - |
| #N/A | (35) | - | (35) | $ - | - | | | - |
| CP-7942G= | (16) | - | (16) | $ - | - | | | - |
| WS-X4448-GB-RJ45= | (5) | - | (5) | $ - | - | | | - |
| AIR-CAP3702I-A-K9 | (1) | - | (1) | $ - | - | | | - |
| SFP-10G-SR-X | - | 20 | 20 | $ - | 449 | | | - |
| SFP-10G-SR-S | - | 10 | 10 | $ - | 449 | | | - |
| CP-7942G | - | 20 | 20 | $ - | - | | | - |
| AIR-CAP3702I-A- | - | 2 | 2 | $ - | (30) | | | - |
| Total | (1,100) | 158 | (942) | $ 378,996 | | | | |

**Adj to Unidentified Vendor Sales**

| | Adjustment | rental | Total | |
|---|---|---|---|---|
| GLC-LH-SMD= | (283) | | (283) | |
| GLC-SX-MMD= | (10) | | (10) | |
| SFP-10G-SR= | (26) | | (26) | |
| GLC-LH-SMD | (21) | | (21) | |
| SFP-10G-SR | 14 | (188) | (174) | Incremental SFP-10G-SR= products (188) |
| GLC-T | (9) | (181) | (190) | Incremental GLC-T= products (181) |
| GLC-SX-MMD | 58 | (220) | (162) | Incremental GLC-SX-MMD= products (220) |
| SFP-GE-T | (1) | | (1) | |
| SFP-10G-LR | (1) | (30) | (31) | Incremental SFP-10G-LR= products (30) |
| SFP-10G-SR-X= | (6) | | (6) | Includes SFP-10G-SR-X |
| SFP-10G-SR-S= | - | | - | |
| Other Items | (43) | | (43) | |
| Total | (328) | (619) | (947) | |

**Cisco v. ADSI et al**
**Schedule 2e - Defendants Sales Where Link US is the Vendor**
**Expert Report of Greg J. Regan, CPA/CFF, CFE**

| HM_Intercompany_Sale | No |
|---|---|
| HM_Final_Vend | LIN105 |

| Row Labels | Defendants Total Sales | Sum of qtyshp |
|---|---|---|
| GSA Contract GS-35F-0032Y (70) | $21,510 | 260 |
| VTA | $16,748 | 128 |
| ACC INC | $12,724 | 269 |
| HMS Business Services | $8,505 | 30 |
| ISONIC | $7,824 | 83 |
| n/a | $4,081 | 61 |
| Golden Gate University | $2,656 | 16 |
| DEXON Computer, Inc. 3230 | $2,205 | 45 |
| GSA CONRACT # GS-02-0032R (75) | $1,800 | 20 |
| Bellingham School District 6515 | $1,610 | 15 |
| FireEye Inc. | $1,490 | 10 |
| Vigilant 4040 | $1,395 | 15 |
| Globetouch, Inc. | $1,172 | 4 |
| RB Data Systems Inc. | $1,120 | 20 |
| Atlantis Casino Resort Spa | $1,009 | 6 |
| BLOOM ENERGY CORPORATION | $825 | 2 |
| Dell Financial Services L.L.C. | $744 | 8 |
| Computer Matrix | $598 | 13 |
| Online Digital Solutions Limited | $582 | 9 |
| OSI Hardware | $492 | 8 |
| PAUL'S CUSTOMER | $400 | 4 |
| IMRF | $396 | 4 |
| ARCAS TECHNOLOGY INC, 9999 | $375 | 5 |
| NETWORK SUPPLY, LLC, 2680 | $318 | 6 |
| Esilience Technologies, LLC | $235 | 6 |
| Gallant, Michael 3820 | $201 | 2 |
| GlaserWeil | $198 | 2 |
| New Advantage Corp. | $148 | 2 |
| ABARAM / ABACUS NETWORK SOLUTIONS | $144 | 2 |
| AT&T  (San Ramon CA) | $99 | 1 |
| F1 Consultancy Ltd | $90 | 1 |
| **Grand Total** | **$91,693** | **1057** |

Notes:
Source data is ADSI00334-337, KFA00002-006, and Ex. 15.

**Cisco v. ADSI et al**
**Schedule 2f - Cisco Risk Scoring Matrix Summary**
**Expert Report of Greg J. Regan, CPA/CFF, CFE**

| Count of Harmonized Serial No. HM_Product_Family | Risk Category | Cisco Testing Photo Determination | | Applied Non-Genuine Rate |
|---|---|---|---|---|
| | | Counterfeit | Genuine | |
| **Switch** | HIGH RISK | 94.4% | 5.6% | 94.4% |
| | MEDIUM RISK | 71.6% | 28.4% | 71.6% |
| | LOW RISK | 3.9% | 96.1% | 3.9% |
| **Transceiver** | HIGH RISK | 73.7% | 26.3% | 73.7% |
| | MEDIUM RISK | 95.3% | 4.7% | 73.7% |
| | LOW RISK | 1.8% | 98.2% | 1.8% |
| **Module** | HIGH RISK | 85.1% | 14.9% | 85.1% |
| | MEDIUM RISK | 46.2% | 53.8% | 46.2% |
| | LOW RISK | 6.1% | 93.9% | 6.1% |

Notes:
Source data is Combined Risk Score Results for Expert (4.15.20).

**Cisco v. ADSI et al**
**Schedule 3a - Cisco Lost Profits (Vodanet)**
**Expert Report of Greg J. Regan, CPA/CFF, CFE**

| | | 2015 | 2016 | 2017 | 2018 | Total |
|---|---|---|---|---|---|---|
| Cisco Sales at Net Distributor Price (Sch. 3b) | | $0 | $66,995 | $65,750 | $33,858 | $166,603 |
| | | | | | | |
| Incremental COGS | | $0 | ($25,984) | ($25,630) | ($13,399) | ($65,013) |
| *COGS %* (Sch. 9) | | *41.2%* | *38.8%* | *39.0%* | *39.6%* | *39.0%* |
| Gross Profit: | | $0 | $41,011 | $40,120 | $20,459 | $101,591 |
| | | | | | | |
| Selling, General & Administrative Expense | | $0 | ($15,510) | ($15,295) | ($7,787) | ($38,591) |
| SG&A Expense Rate (Sch. 9) | | *24.1%* | *23.2%* | *23.3%* | *23.0%* | *23.2%* |
| | | | | | | |
| Lost Profits | | **$0** | **$25,501** | **$24,825** | **$12,672** | **$62,999** |
| | | | | | | |
| Assumed Award Date | 9/30/2020 | | | | | |
| Number of Years (Mid-point) | | 5.3 | 4.3 | 3.3 | 2.3 | |
| Prejudgment Interest | *7%* | $0 | $7,595 | $5,656 | $2,000 | $15,251 |

Cisco v. ADSI et al
Schedule 3b - Value of Cisco Sales (Vodanet Sales to ADSI)
Expert Report of Greg J. Regan, CPA/CFF, CFE

*Discount* 42.0%

| Family | PID | Risk Category | 2016 | 2017 | 2018 | Grand Total | HM_Adj_PID | Cisco GLP | Cisco Price, net | Non-Genuine (Sch. 2f) | 2015 | 2016 | 2017 | 2018 | Total Sales | Total Sales Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Switch | C1-WS3650-48TD/K9 | LOW RISK | 13 | 1 | | 14 | | $ - | $ - | | $ - | $ - | $ - | $ - | | $ - |
| | IE-4000-4S8P4G-E | LOW RISK | | | 12 | 12 | | $ 5,427 | $ 3,148 | 3.9% | $ - | $ - | $ - | $ 1,481 | 1,481 | $ 37,772 |
| | IE-4010-16S12P | HIGH RISK | | | 1 | 1 | | $ - | $ - | 94.4% | $ - | $ - | $ - | $ - | | $ - |
| | N3K-C3064TQ-10GT | LOW RISK | 1 | | | 1 | | $ - | $ - | 3.9% | $ - | $ - | $ - | $ - | | $ - |
| | WS-C2960S-24PS-L | LOW RISK | 1 | | | 1 | | $ 2,109 | $ 1,223 | 71.6% | $ - | $ 876 | $ - | $ - | 876 | $ 1,223 |
| | WS-C2960X-24PD-L | LOW RISK | | 1 | | 1 | | $ 4,041 | $ 2,344 | 3.9% | $ - | $ - | $ 92 | $ - | 92 | $ 2,344 |
| | WS-C2960X-24PS-L | MEDIUM RISK | 6 | 2 | 2 | 10 | | $ - | $ - | 3.9% | $ - | $ - | $ - | $ - | | $ - |
| | WS-C2960X-48FPD-L | LOW RISK | | 1 | | 1 | | $ - | $ - | 71.6% | $ - | $ - | $ - | $ - | | $ - |
| | WS-C2960X-48FPS-L | HIGH RISK | 3 | | | 3 | | $ 8,726 | $ 5,061 | 94.4% | $ - | $ 14,329 | $ - | $ - | 14,329 | $ 15,182 |
| | WS-C2960X-48FPS-L | LOW RISK | 3 | | | 3 | | $ - | $ - | 3.9% | $ - | $ - | $ - | $ - | | $ - |
| | WS-C3560C-8PC-S | LOW RISK | | 10 | | 10 | | $ 7,193 | $ 4,172 | 3.9% | $ - | $ 164 | $ 164 | $ - | 327 | $ 8,343 |
| | WS-C3560CX-12PC-S | LOW RISK | 5 | | 1 | 6 | | $ 960 | $ 557 | 3.9% | $ - | $ 218 | $ - | $ - | 218 | $ 5,568 |
| | WS-C3560CX-8PC-S | LOW RISK | 2 | 1 | 3 | 6 | | $ 2,432 | $ 1,411 | 3.9% | $ - | $ 277 | $ - | $ 55 | 332 | $ 8,463 |
| | WS-C3560CX-8PC-S | LOW RISK | | 1 | | 1 | | $ - | $ - | 71.6% | $ - | $ - | $ - | $ - | | $ - |
| | WS-C3560X-24P-L | LOW RISK | 1 | | | 1 | | $ 2,880 | $ 1,670 | 94.4% | $ - | $ 1,576 | $ - | $ - | 1,576 | $ 1,670 |
| | WS-C3560X-24P-L | HIGH RISK | 2 | | | 2 | | $ - | $ - | 71.6% | $ - | $ - | $ - | $ - | | $ - |
| | WS-C3560X-24T-L | LOW RISK | 1 | | | 1 | | $ 2,340 | $ 1,357 | 94.4% | $ - | $ 1,281 | $ - | $ - | 1,281 | $ 1,357 |
| | WS-C3560X-24T-L | MEDIUM RISK | 1 | | | 1 | | $ - | $ - | 71.6% | $ - | $ - | $ - | $ - | | $ - |
| | WS-C3650-24TD-L | LOW RISK | 4 | | | 4 | | $ 5,640 | $ 3,271 | 94.4% | $ - | $ 12,349 | $ - | $ - | 12,349 | $ 13,085 |
| | WS-C3650-48FD-S | LOW RISK | | | 4 | 4 | | $ 13,970 | $ 8,103 | 94.4% | $ - | $ - | $ - | $ 30,588 | 30,588 | $ 32,410 |
| | WS-C3650-48PS-L | LOW RISK | 7 | | | 7 | | $ 9,154 | $ 5,309 | 3.9% | $ - | $ 1,457 | $ - | $ - | 1,457 | $ 37,165 |
| | WS-C3650-48PS-S | LOW RISK | | 19 | | 19 | | $ 11,456 | $ 6,644 | 3.9% | $ - | $ - | $ 4,951 | $ - | 4,951 | $ 126,240 |
| | WS-C3650-48TS-L | LOW RISK | | 2 | | 2 | | $ 7,020 | $ 4,072 | 3.9% | $ - | $ - | $ 319 | $ - | 319 | $ 8,143 |
| | WS-C3750X-24S-S | LOW RISK | 1 | | | 1 | | $ - | $ - | 94.4% | $ - | $ - | $ - | $ - | | $ - |
| | WS-C3750X-48P-L | HIGH RISK | 1 | | | 1 | | $ 7,200 | $ 4,176 | 94.4% | $ - | $ 3,941 | $ - | $ - | 3,941 | $ 4,176 |
| | WS-C3750X-48T-S | HIGH RISK | 1 | | | 1 | | $ 7,920 | $ 4,594 | 94.4% | $ - | $ 4,335 | $ - | $ - | 4,335 | $ 4,594 |
| | WS-C3850-12S-S | LOW RISK | 9 | 1 | 1 | 11 | | $ - | $ - | 3.9% | $ - | $ - | $ - | $ - | | $ - |
| | WS-C3850-12XS-S | LOW RISK | 1 | | | 1 | | $ 19,487 | $ 11,302 | 3.9% | $ - | $ 443 | $ - | $ - | 443 | $ 11,302 |
| | WS-C3850-24P-E | LOW RISK | | 6 | | 6 | | $ - | $ - | 94.4% | $ - | $ - | $ - | $ - | | $ - |
| | WS-C3850-24P-L | LOW RISK | | | 2 | 2 | | $ 8,924 | $ 5,176 | 3.9% | $ - | $ - | $ - | $ 406 | 406 | $ 10,351 |
| | WS-C3850-24P-S | LOW RISK | | 10 | | 10 | | $ 10,277 | $ 5,961 | 94.4% | $ - | $ - | $ 56,255 | $ - | 56,255 | $ 59,606 |
| | WS-C3850-24S-S | LOW RISK | 1 | | | 1 | | $ - | $ - | 3.9% | $ - | $ - | $ - | $ - | | $ - |
| | WS-C3850-24S-S | LOW RISK | 1 | | 2 | 3 | | $ 24,518 | $ 14,220 | 3.9% | $ - | $ 558 | $ - | $ 1,115 | 1,673 | $ 42,661 |
| | WS-C3850-24S-S | MEDIUM RISK | | | 1 | 1 | | $ - | $ - | 71.6% | $ - | $ - | $ - | $ - | | $ - |
| | WS-C3850-24T-L | LOW RISK | | 3 | | 3 | | $ 7,711 | $ 4,472 | 3.9% | $ - | $ - | $ 526 | $ - | 526 | $ 13,417 |
| | WS-C3850-24T-S | LOW RISK | 2 | | 2 | | | $ 9,118 | $ 5,288 | 94.4% | $ - | $ 9,982 | $ - | $ - | 9,982 | $ 10,577 |
| | WS-C3850-24T-S | LOW RISK | 1 | | | 1 | | $ - | $ - | 3.9% | $ - | $ - | $ - | $ - | | $ - |
| | WS-C3850-24XS-S | LOW RISK | | 2 | | 2 | | $ 28,099 | $ 16,762 | 3.9% | $ - | $ - | $ 1,315 | $ - | 1,315 | $ 33,523 |
| | WS-C3850-48F-L | LOW RISK | 2 | | 2 | | | $ 16,901 | $ 9,803 | 3.9% | $ - | $ 769 | $ - | $ - | 769 | $ 19,605 |
| | WS-C3850-48F-S | MEDIUM RISK | 13 | | | 13 | | $ - | $ - | 71.6% | $ - | $ - | $ - | $ - | | $ - |
| | WS-C3850-48F-S | LOW RISK | | 1 | | 1 | | $ 16,901 | $ 9,803 | 3.9% | $ - | $ - | $ 384 | $ - | 384 | $ 9,803 |
| | WS-C3850-48P-L | LOW RISK | 4 | | 4 | | | $ 16,901 | $ 9,803 | 94.4% | $ - | $ 1,538 | $ - | $ - | 1,538 | $ 39,210 |
| | WS-C3850-48P-S | LOW RISK | 2 | 1 | | 3 | | $ 16,901 | $ 9,803 | 3.9% | $ - | $ 769 | $ 384 | $ - | 1,153 | $ 29,408 |
| | WS-C4506-E | MEDIUM RISK | | 1 | | 1 | | $ - | $ - | 71.6% | $ - | $ - | $ - | $ - | | $ - |
| **Switch Total** | | | **92** | **64** | **38** | **106** | | | | | | | | | | |
| Network Module | C3850-NM-2-10G | LOW RISK | 10 | | | 10 | | $ - | $ - | 6.1% | $ - | $ - | $ - | $ - | | $ - |
| | C3850-NM-4-10G | LOW RISK | 1 | | | 1 | | $ - | $ - | 6.1% | $ - | $ - | $ - | $ - | | $ - |
| | | MEDIUM RISK | 3 | | | 3 | | $ - | $ - | 46.2% | $ - | $ - | $ - | $ - | | $ - |
| | C3850-NM-4-1G | LOW RISK | 41 | 11 | 2 | 54 | | $ 680 | $ 394 | 6.1% | $ - | $ 986 | $ 265 | $ 48 | 1,299 | $ 21,298 |
| | | MEDIUM RISK | 7 | | 1 | 8 | | $ - | $ - | 46.2% | $ - | $ - | $ - | $ - | | $ - |
| | C3850-NM-4-1G= | LOW RISK | 3 | | | 3 | | $ - | $ - | 6.1% | $ - | $ - | $ - | $ - | | $ - |
| **Network Module Total** | | | **65** | **11** | **3** | **79** | | | | | | | | | | |
| Power Supply | PWR-C1-1100WAC= | LOW RISK | 1 | | | 1 | | $ - | $ - | 3.9% | $ - | $ - | $ - | $ - | | $ - |
| | PWR-C1-350WAC= | LOW RISK | 10 | | | 10 | | $ - | $ - | 3.9% | $ - | $ - | $ - | $ - | | $ - |
| | PWR-C1-350WAC= | LOW RISK | 1 | | | 1 | | $ - | $ - | 3.9% | $ - | $ - | $ - | $ - | | $ - |
| | PWR-C1-715WAC= | LOW RISK | 1 | 4 | | 5 | | $ - | $ - | 3.9% | $ - | $ - | $ - | $ - | | $ - |
| | PWR-C2-250WAC= | MEDIUM RISK | 3 | | | 3 | | $ - | $ - | 46.2% | $ - | $ - | $ - | $ - | | $ - |
| | PWR-C2-640WAC= | LOW RISK | 1 | | | 1 | | $ - | $ - | 3.9% | $ - | $ - | $ - | $ - | | $ - |
| | PWR-C2-640WAC= | LOW RISK | | 21 | | 21 | | $ - | $ - | 3.9% | $ - | $ - | $ - | $ - | | $ - |
| | PWR-IE170W-PC-AC= | LOW RISK | | | 10 | 10 | | $ - | $ - | 3.9% | $ - | $ - | $ - | $ - | | $ - |
| | | MEDIUM RISK | | | | | | $ - | $ - | 46.2% | $ - | $ - | $ - | $ - | | $ - |
| **Power Supply Total** | | | **19** | **25** | **11** | **55** | | | | | | | | | | |
| Wireless Access Point | AIR-AP3802I-B-K9 | LOW RISK | | | 13 | 13 | | $ - | $ - | | $ - | $ - | $ - | $ - | | $ - |
| | AIR-CAP3702I-A-K9 | LOW RISK | 29 | | | 29 | | $ - | $ - | | $ - | $ - | $ - | $ - | | $ - |
| **Wireless Access Point Total** | | | **29** | | **13** | **42** | | | | | | | | | | |
| Module | WS-X4712-SFP+E= | LOW RISK | 10 | | | 10 | | $ 32,600 | $ 18,908 | 6.1% | $ - | $ 11,529 | $ - | $ - | 11,529 | $ 189,080 |
| | WS-X4748-RJ45-E= | HIGH RISK | | 2 | | 2 | | $ - | $ - | 85.1% | $ - | $ - | $ - | $ - | | $ - |
| | | MEDIUM RISK | | 1 | | 1 | | $ - | $ - | 46.2% | $ - | $ - | $ - | $ - | | $ - |
| **Module Total** | | | **10** | **3** | | **13** | | | | | | | | | | |
| Router | CISCO2911/K9 | LOW RISK | 2 | | | 2 | | $ - | $ - | n/a | $ - | $ - | $ - | $ - | | $ - |
| | CISCO2951/K9 | LOW RISK | 2 | | | 2 | | $ - | $ - | | $ - | $ - | $ - | $ - | | $ - |
| | ISR4351-V/K9 | LOW RISK | | 1 | | 1 | | $ - | $ - | | $ - | $ - | $ - | $ - | | $ - |
| | | LOW RISK | | 1 | | 1 | | $ - | $ - | | $ - | $ - | $ - | $ - | | $ - |
| | | MEDIUM RISK | | 1 | | 1 | | $ - | $ - | | $ - | $ - | $ - | $ - | | $ - |
| | ISR4431/K9 | LOW RISK | | | 1 | 1 | | $ - | $ - | | $ - | $ - | $ - | $ - | | $ - |
| | | LOW RISK | 2 | 1 | 1 | 4 | | $ - | $ - | | $ - | $ - | $ - | $ - | | $ - |
| **Router Total** | | | **6** | **4** | **2** | **12** | | | | | | | | | | |
| Transceiver | GLC-GE-100FX= | LOW RISK | 1 | | | 1 | | $ - | $ - | 1.8% | $ - | $ - | $ - | $ - | | $ - |
| | GLC-LH-SMD= | HIGH RISK | 1 | | | 1 | | $ 1,026 | $ 595 | 73.7% | $ - | $ - | $ 878 | $ - | 878 | $ 1,190 |
| | SFP-10G-SR-S= | LOW RISK | 8 | | | 8 | | $ - | $ - | 1.8% | $ - | $ - | $ - | $ - | | $ - |
| **Transceiver Total** | | | **9** | | **2** | **11** | | | | | | | | | | |
| Cable | STACK-T1-1M= | LOW RISK | 1 | | | 1 | | $ - | $ - | | $ - | $ - | $ - | $ - | | $ - |
| | | MEDIUM RISK | 3 | | | 3 | | $ - | $ - | | $ - | $ - | $ - | $ - | | $ - |
| **Cable Total** | | | **4** | | | **4** | | | | | | | | | | |
| Unknown SN | #N/A | HIGH RISK | | | 3 | 3 | | $ - | $ - | | $ - | $ - | $ - | $ - | | $ - |
| **Unknown SN Total** | | | | | **3** | **3** | | | | | | | | | | |
| Telepresence | CTS-EX90-K9 | LOW RISK | 2 | | | 2 | | $ - | $ - | n/a | $ - | $ - | $ - | $ - | | $ - |
| | | MEDIUM RISK | 1 | | | 1 | | $ - | $ - | | $ - | $ - | $ - | $ - | | $ - |
| **Telepresence Total** | | | **3** | | | **3** | | | | | | | | | | |
| Firewall | ASA5525 | LOW RISK | 1 | | | 1 | | $ - | $ - | | $ - | $ - | $ - | $ - | | $ - |
| **Firewall Total** | | | **1** | | | **1** | | | | | | | | | | |
| Small Business Switch | SG300-28MP-K9-EU | MEDIUM RISK | | 1 | | 1 | | $ - | $ - | | $ - | $ - | $ - | $ - | | $ - |
| **Small Business Switch Total** | | | | **1** | | **1** | | | | | | | | | | |
| **Grand Total** | | | **238** | **109** | **63** | **410** | | $ - | $ - | | $ - | $ 66,995 | $ 65,750 | $ 33,858 | $ 166,603 | **$798,769** |

*Estimated non-genuine sales as a percent of total sales* **21%**

Source: Vodanet 2020-04-16 CONFIDENTIAL

**Cisco v. ADSI et al**
**Schedule 3c - Defendants Unjust Enrichment (Vodanet)**
**Expert Report of Greg J. Regan, CPA/CFF, CFE**

| HM_Intercompany_Sale | No |
|---|---|
| HM_Final_Vend | VOD_HM |

| Defendants Total Sales | Column Labels | | | | |
|---|---|---|---|---|---|
| Row Labels | 2016 | 2017 | 2018 | 2019 | Grand Total |
| K&F | $14,035 | $66,559 | $101,482 | $688 | $182,764 |
| ADSI | $180,360 | $46,307 | $18,458 | | $245,125 |
| **Grand Total** | **$194,395** | **$112,866** | **$119,940** | **$688** | **$427,889** |

| HM_Intercompany_Sale | No |
|---|---|
| HM_Final_Vend | VOD_HM |

| Defendants COGS | Column Labels | | | | |
|---|---|---|---|---|---|
| Row Labels | 2016 | 2017 | 2018 | 2019 | Grand Total |
| K&F | $6,001 | $28,460 | $43,393 | $294 | $78,149 |
| ADSI | $141,008 | $36,410 | $18,425 | | $195,843 |
| **Grand Total** | **$147,009** | **$64,870** | **$61,818** | **$294** | **$273,992** |

| Defendants Gross Profits | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|
| K&F | $8,034 | $38,099 | $58,089 | $394 | $0 | $104,615 |
| ADSI | $39,352 | $9,897 | $33 | $0 | $0 | $49,282 |
| Total Gross Profits | $47,386 | $47,995 | $58,122 | $394 | $0 | $153,897 |

| Est. Commission Expense | 15% | | | | | |
|---|---|---|---|---|---|---|
| K&F | ($1,205) | ($5,715) | ($8,713) | ($59) | $0 | ($15,692) |
| ADSI | ($5,903) | ($1,485) | ($5) | $0 | $0 | ($7,392) |
| Total Gross Profits | ($7,108) | ($7,199) | ($8,718) | ($59) | $0 | ($23,085) |

| Estimated Net Profits | 21% | Sch 3b | | | | |
|---|---|---|---|---|---|---|
| K&F | $1,424 | $6,754 | $10,298 | $70 | $0 | $18,547 |
| ADSI | $6,977 | $1,755 | $6 | $0 | $0 | $8,737 |
| Total Net Profits | $8,401 | $8,509 | $10,304 | $70 | $0 | $27,284 |

Notes:
Source data is ADSI00334-337, KFA00002-006, and Ex. 15.
1 - See Uddin Tr. 21:1-2 estimating the middle tier for sales commission of 15% of gross profit.

Cisco v. ADSI et al
Schedule 3d - Reconciliation of Vendor Data to Defendants Data (Vodanet)
Expert Report of Greg J. Regan, CPA/CFF, CFE

Risk Category     (All)

| HM_Intercompany_Sale | No |
| HM_Sale_Made_By: | (All) |
| our_vend | VOD100 |

**Count of Harmonized Serial No.**

| Family / PID | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|
| **Transceiver** | | | | |
| SFP-10G-SR-S= | 8 | | | 8 |
| SFP-10G-SR= | 2 | 2 | | 4 |
| GLC-SX-MMD= | | 4 | | 4 |
| GLC-LH-SMD= | | 2 | | 2 |
| GLC-GE-100FX= | 1 | | | 1 |
| **Transceiver Total** | **11** | **8** | | **19** |
| **Switch** | | | | |
| WS-C3650-48PS-S | | 19 | | 19 |
| WS-C3850-48F-L | 15 | | | 15 |
| C1-WS3650-48TD/K9 | 13 | 1 | | 14 |
| IE-4000-4S8P4G-E | | | 12 | 12 |
| WS-C2960X-24PS-L | 7 | 3 | 2 | 12 |
| WS-C3850-24P-S | 1 | 10 | | 11 |
| WS-C3850-12S-S | 9 | 1 | 1 | 10 |
| WS-C3560C-8PC-S | | 10 | | 10 |
| WS-C3850-48P-S | 2 | 6 | | 8 |
| WS-C3560CX-8PC-S | 2 | 2 | 3 | 7 |
| CISCO-WS-C3850- | 7 | | | 7 |
| WS-C3850-24T-S | | 6 | | 6 |
| WS-C2960X-48FPD-L | 6 | | | 6 |
| WS-C3850-24P-E | | 6 | | 6 |
| WS-C2960S48LPD-L | 5 | | 1 | 6 |
| WS-C3850-48F-L | 4 | | | 4 |
| WS-C3850-24S-S | 1 | 3 | | 4 |
| WS-C3650-24TD4-L | 4 | | | 4 |
| WS-C3650-48FD-S | | | 4 | 4 |
| WS-C4948-10GE | | 4 | | 4 |
| WS-C2960X-24P-L | 3 | | | 3 |
| WS-C3750X-48T-S | 3 | | | 3 |
| WS-C3850-24T-L | | 3 | | 3 |
| WS-C3650-48TS-L | 2 | | | 2 |
| WS-C3850-24XS-S | | 2 | | 2 |
| WS-C3750X-24T-L | 2 | | | 2 |
| WS-C2960X-48FPS-L | | 1 | 1 | 2 |
| WS-C3850-24S-E | 2 | | | 2 |
| WS-C3650-48TS-L | | 2 | | 2 |
| WS-C3850-24P-L | 2 | | | 2 |
| WS-C3850-24P-S | | | 2 | 2 |
| WS-C3850-8PC-S | | | 1 | 1 |
| WS-C3850-48T-S | 1 | | | 1 |
| WS-C3650-12XS-S | 1 | | | 1 |
| WS-C3850-48P-S | | 1 | | 1 |
| WS-C4900M | | 1 | | 1 |
| WS-C2960X-24PD-L | | 1 | | 1 |
| WS-C2960S-24TS-L | 1 | | | 1 |
| N3K-C3064TQ-10GT | 1 | | | 1 |
| WS-C3064-TD-10GT | | | 1 | 1 |
| WS-C3750X-24S-S | 1 | | | 1 |
| IE-4010-16S12P | | 1 | | 1 |
| WS-C3750X-12S-E | 1 | | | 1 |
| **Switch Total** | **104** | **74** | **31** | **209** |
| **Network Module** | | | | |
| C3850-NM-4-1G | 48 | 11 | 3 | 62 |
| C3850-NM-2-10G | 10 | | | 10 |
| C3850-NM-4-10G | 4 | | | 4 |
| C3850-NM-4-1G= | | | 3 | 3 |
| **Network Module Total** | **62** | **11** | **6** | **79** |
| **Router** | | | | |
| ISR4331/K9 | 20 | | | 20 |
| ISR4431/K9 | 2 | 1 | 2 | 5 |
| CISCO2945-CHASSIS | 2 | | | 2 |
| ISR4351/C/K9 | | 3 | | 3 |
| CISCO2951/K9 | 2 | | | 2 |
| ASR1001-X= | | 1 | | 1 |
| **Router Total** | **26** | **5** | **2** | **33** |
| **Grand Total** | **206** | **99** | **36** | **341** |

**Sum of qtyshp**

| HM_Product_Family / item | Total | Adj to Unidentified Vendor Sales | Vodanet | ADSI | Net | Cisco Sales Value | Where sales > $1K |
|---|---|---|---|---|---|---|---|
| **Transceiver** | | | | | | | |
| GLC-LH-SMD | 2 | (8) | (8) | | $ - | | |
| GLC-SX-MM | 100 | | 2 | 2 | $ - | | |
| GLC-SX-MMD | 50 | | 3 | 3 | $ - | | |
| GLC-SX-MMD++ | 50 | | 4 | 4 | $ - | | |
| GLC-SX-MMD= | 1 | | 3560CX-8PC-S | | | | |
| SFP-10G-SR= | 8 | ASR1001-X | | | $ - | | |
| SFP-10G-SR-S= | 8 | ASR1001-X= | (1) | | (1) $ - | | |
| SFP-H10G8-CU-3M | 24 | C1PPCAT36502K9 | | 13 | 13 $ - | | |
| SFP-H10G8CU1M1M | 1 | C1-WS3650-48TD/ | | 13 | 13 $ - | | |
| X2-10GB-LR | 1 | C1-WS3650-48TD/K9 | (14) | | (14) $ - | | |
| **Transceiver Total** | **194** | C2960S-STACK= | | | $ - | | |
| **Switch** | | C2960X-24PS-L | | 2 | 2 $ - | | |
| 2960X-24PS-L | 2 | C3850-NM-2-10G | (10) | | (10) $ - | | |
| 2960X-48FPD-L | 3 | C3850-NM-4-10G | (4) | | (4) $ - | | |
| 3560CX-8PC-S | 4 | C3850-NM-4-10G= | | 4 | 4 $ 1,299 | Matched 6.1 |
| C1PPCAT3650ZK9 | 13 | C3850-NM-4-1G | (62) | 23 | (39) $ - | | |
| C1-WS3650-48TD/ | 13 | C3850-NM-4-1G= | (3) | | (3) $ - | | |
| CISCO-WS-C3850- | 8 | C36X-NM-10G | | 1 | 1 $ - | | |
| EDU-C3850-48F-L | 1 | CISCO2911/K9 | (20) | 14 | (6) $ - | | |
| WS-C2960S-48TD-L | 2 | CISCO2951/K9 | (2) | | (2) $ - | | |
| WS-C2960S48FPDL | 1 | CISCO2951SEC/K9 | | | $ - | | |
| WSC2960S48LPDL | 1 | CISCO2951/K9 | | 1 | 1 $ - | | |
| WS-C2960S-24PS- | 3 | CISCO3945/K9 | | 2 | 2 $ - | | |
| WS-C2960X-48FPD | 3 | CISCO3945-CHASSIS | (3) | | (3) $ - | | |
| WS-C2960X-48FPS | 3 | CISCO3945/K9 | | 1 | 1 $ - | | |
| WS-C3560CX-8TC- | 7 | CISCO-7960S | | 48 | 48 $ - | | |
| WS-C3560CX-12PC | 1 | CISCO-ISR4321/ | | 6 | 6 $ - | | |
| WSC3560X8XPCS | 3 | CISCO-WS-C3850- | | 8 | 8 $ - | | |
| WS-C3650-24TD-L | 4 | EDU-C3850-48F-L | | 1 | 1 $ - | | |
| WS-C3650-48TS-L | 2 | EDU-C3850-48F-L | | | $ - | | |
| WS-C3650-48TS-L | 2 | GLC-LH-SMD | (1) | | (1) $ - | | |
| WS-C3750S-12S-S | 5 | GLC-LH-SMD= | (2) | | (2) $ 878 | GLC-LH-SMD |
| WS-C3750X-24T-L | 0 | GLC-SX-MM | | 100 | 100 $ - | | |
| WS-C3750X-48P-L | 3 | GLC-SX-MMD | | 50 | 50 $ - | | |
| WS-C3850-12S-S | 9 | GLC-SX-MMD++ | (4) | 1 | (3) $ - | | |
| WS-C3850-24S-E | 2 | HWIC-1DSU-T1 | 1 | 97 | 97 $ - | | |
| WS-C3850-24S-S | 4 | IE-4000-4S8P4G-E | | | (12) $ 1,481 | Used 13 |
| WS-C3850-24T-L | 3 | IE-4010-16S12P | (1) | 3 | 3 $ - | | |
| WS-C3850-24XS-S | 2 | ISR4331/K9 | (3) | | (3) $ - | | |
| WS3048P4E-L | 10 | ISR4351-V/K9 | (3) | | (3) $ - | | |
| WS-C3850-48P-L | 4 | ISR4431/K9 | (5) | 2 | (3) $ - | Only 2 transactions in Defs data |
| WS-C3850-24P-S | 11 | N3K-C3064TQ-10GT | (1) | | (1) $ - | | |
| WS-C3850-48T-S | 7 | NIM-ES2 | | 4 | 4 $ - | | |
| WS-C500X-24X-E | 0 | SFP-10G-SR= | (4) | 4 | - $ - | | |
| WS-C4900M | 4 | SFP-H10G8-CU-3M | | 24 | 24 $ - | | |
| WS-X4712-SFP+E= | 10 | SFP-H10G8CU1M1M | | 1 | 1 $ - | | |
| WS-X4908-10GE | 4 | STACK-T1-1M= | | 1 | 1 $ - | | |
| WS-X4920GB-RJ45 | 4 | STACK-T1-1M= | | 2 | 2 $ - | | |
| **Switch Total** | **143** | WS-C2960S-48TD-L | (1) | | (1) $ 876 | |
| **Module** | | WS-C2960S-24TS-L | (1) | | (1) $ - | | |
| C2960S-STACK | 2 | WS-C2960S48FPDL | | 1 | 1 $ - | | |
| C2960X-STACK= | 2 | WSC2960S48LPDL | | | $ - | | |
| C3850-NM-4-10G= | 4 | WSC2960S48LPDL | | 1 | 1 $ - | | |
| C3850-NM-4-1G | 23 | WS-C2960S-24PS-L | (2) | | (2) $ - | | |
| C3KX-NM-10G | 1 | WS-C2960S-24PD-L | (1) | | (1) $ 92 | |
| HWIC-1DSU-T1 | 97 | WS-C2960X-24PS- | - | 1 | 1 $ - | | |
| NIM-ES2 | 4 | WS-C2960X-24PS-L | (12) | | (12) $ - | | |
| STACK-T1-1M= | 1 | WS-C2960X-24PS-L | | 3 | 3 $ - | | |
| **Module Total** | **132** | WS-C2960X-48FPD-L | (6) | | (6) $ 14,329 | WS-C2960X-48FPD-L |
| **Router** | | WS-C2960X-48FPS | (2) | 2 | - $ - | | |
| ASR1001-X | 0 | WS-C2960X-48FPS-L | (2) | | (2) $ 327 | Matched |
| CISCO2911/K9 | 14 | WS-C3560-8PC-S | (1) | | (1) $ - | | |
| CISCO2951SEC/K9 | 0 | WS-C3560C-8PC-S | (10) | | (10) $ 218 | |
| CISCO2925/K9 | 1 | WS-C3560C-8TC- | | 7 | 7 $ - | | |
| CISCO2945/K9 | 2 | WS-C3560C-8PC-S | | 3 | 3 $ - | | |
| CISCO-7960S | 48 | WS-C3560CX-12PC-S | (6) | | (6) $ 332 | |
| CISCO-ISR-4321/ | 6 | WS-C3560CX8XPCS | - | 3 | 3 $ - | | |
| ISR4331-SEC/K9 | 3 | WS-C3560CX-8PC-S | (7) | | (7) $ - | | |
| ISR4431/K9 | 2 | WS-C3560X-24PC-L | (3) | | (3) $ 1,576 | Match (Changed K&F) |
| **Router Total** | **77** | WS-C3560X-24T-L | (2) | | (2) $ 1,281 | Match (Changed K&F) |
| **Grand Total** | **546** | WS-C3650-24TD-L | (4) | 4 | - $ 12,349 | Match |
| | | WS-C3650-48FD-S | (4) | | (4) $ 30,588 | VOD JIM |
| | | WS-C3650-48TS-L | (7) | | (7) $ 1,457 | Unable to locate |
| | | WS-C3650-48PS-S | (19) | | (19) $ 4,951 | Match to WS-C3650-48 |
| | | WS-C3650-48TS-L | (2) | 2 | - $ 319 | Match |
| | | WS-C3650-48TS-S | (1) | 1 | - $ - | Match |
| | | WS-C3750S-12S-E | - | 5 | 5 $ - | |
| | | WS-C3750X-12S-S | (1) | | (1) $ - | |
| | | WS-C3750X-24S-S | (1) | | (1) $ - | |
| | | WS-C3750X-24T-L | | 2 | 2 $ - | |
| | | WS-C3750X-48P-L | (2) | 2 | - $ 3,941 | Match |
| | | WS-C3750X-48T-S | (3) | | (3) $ 4,335 | Only 1 match |
| | | WS-C3850-12S-S | (11) | 9 | (2) $ - | Match |
| | | WS-C3850-24P-E | (6) | | (6) $ 443 | No match |
| | | WS-C3850-24P-L | (2) | | (2) $ 406 | Match |
| | | WS-C3850-24P-S | (11) | | (11) $ 56,255 | WS-C3850-24P-S & WS-C3850-24P-S |
| | | WS-C3850-24S-E | (2) | | (2) $ - | Match |
| | | WS-C3850-24S-S | (4) | 4 | - $ 1,673 | WS-C3850-24P-S |
| | | WS-C3850-24T-L | (3) | 3 | - $ 526 | Match |
| | | WS-C3850-24T-S | (6) | 3 | (3) $ 9,982 | Matched 3 |
| | | WS-C3850-24XS-S | (2) | 2 | - $ 1,315 | Match |
| | | WS-C3850-48F-L | - | 10 | 10 $ - | Matched 17 to WS-C3850-48; remaining 12 to other similar Item No.s |
| | | WS-C3850-48F-L | (1) | | (1) $ 769 | Matched 17 to WS-C3850-48 |
| | | WS-C3850-48F-S | (1) | | (1) $ 384 | Matched 17 to WS-C3850-48 |
| | | WS-C3850-48P-L | (4) | 1 | - $ 1,538 | Matched 17 to WS-C3850-48 |
| | | WS-C3850-48P-S | (1) | 7 | 6 $ 1,153 | Matched 17 to WS-C3850-48 |
| | | ASR1001-X-X | (1) | | (1) $ - | |
| | | WS-C4o5s-E | (1) | | (1) $ - | |
| | | WS-C4900M | (1) | 4 | 3 $ - | |
| | | WS-C4948-10GE | (4) | | (4) $ - | |
| | | WS-X4712-SFP+E= | - | 10 | 10 $ 11,529 | |
| | | WS-X4908-10GE | | 4 | 4 $ - | |
| | | WS-X4920GB-RJ45 | | 4 | 4 $ - | |
| | | X2-10GB-LR | | 1 | 1 $ - | |
| | | | **(341)** | **546** | **205** $ **166,603** | |

**Cisco v. ADSI et al**
**Schedule 4a - Cisco Lost Profits (Cisco Tested Products)**
**Expert Report of Greg J. Regan, CPA/CFF, CFE**

|                                              | Total      |
|----------------------------------------------|------------|
| Cisco Sales at Net Distributor Price (Sch. 4b) | $102,190   |
|                                              |            |
| Incremental COGS                             | ($40,948)  |
| *COGS %* (Sch. 9)                            | *40.1%*    |
|   Gross Profit:                    | $61,243    |
|                                              |            |
| Selling, General & Administrative Expense    | ($23,730)  |
| SG&A Expense Rate (Sch. 9)                   | *23.2%*    |
|                                              |            |
| Lost Profits                                 | **$37,513** |

**Cisco v. ADSI et al**
**Schedule 4b - Estimated Cisco Sales (Cisco Tested Products)**
**Expert Report of Greg J. Regan, CPA/CFF, CFE**

| Sum of HM_Cisco_Sales_Net | | Years | | | |
|---|---|---|---|---|---|
| HM_Final_Vend | HM_Sale_Made_By: | 2016 | 2017 | 2018 | Grand Total |
| **Non_Genuine_Cisco_Tested** | K&F | $8,259 | $26,371 | $45,711 | $80,341 |
| | ADSI | | $6,032 | | $6,032 |
| **Tested_By_Cisco_80%_Non_Genuine** | K&F | | | $25,304 | $25,304 |
| **Tested_By_Cisco_50%_Non_Genuine** | K&F | $3,212 | | | $3,212 |
| **Cisco_Tested_Genuine** | K&F | $0 | $15,272 | | $15,272 |
| | ADSI | | $1,946 | $0 | $1,946 |
| **Grand Total** | | **$11,471** | **$49,621** | **$71,015** | **$132,107** |

| | | |
|---|---|---|
| Non-Genuine Sales | $ | 80,341 |
| 80% of Non-Genuine Sales | $ | 20,243 |
| 50% of Non-Genuine Sales | $ | 1,606 |
| Total | $ | 102,190 |

Source data:
Defendant transactions is ADSI00334-337, KFA00002-006, Ex. 15.
Cisco files entitled "PIDS for product families 041620", "Cisco GLPs", and "List of Defendant Sales

**Cisco v. ADSI et al**
**Schedule 4c - Defendants Unjust Enrichment (Cisco Tested Products)**
**Expert Report of Greg J. Regan, CPA/CFF, CFE**

| HM_Intercompany_Sale | No |
|---|---|

| Defendants Total Sales | Column Labels | | | |
|---|---|---|---|---|
| Row Labels | Non_Genuine_Cisco_Tested | Tested_By_Cisco_80%_Non_Genuine | Tested_By_Cisco_50%_Non_Genuine | Grand Total |
| K&F | $25,780 | $7,700 | $3,090 | $36,570 |
| ADSI | $2,260 | | | $2,260 |
| **Grand Total** | **$28,040** | **$7,700** | **$3,090** | **$38,830** |

| HM_Intercompany_Sale | No | *0* |
|---|---|---|

| Defendants COGS | Column Labels | | | |
|---|---|---|---|---|
| Row Labels | Non_Genuine_Cisco_Tested | Tested_By_Cisco_80%_Non_Genuine | Tested_By_Cisco_50%_Non_Genuine | Grand Total |
| K&F | $11,023 | $3,293 | $1,321 | $15,637 |
| ADSI | $348 | | | $348 |
| **Grand Total** | **$11,371** | **$3,293** | **$1,321** | **$15,985** |

| Defendants Gross Profits | Non-Genuine | 80% Non-Genuine | 50% Non-Genuine | Total |
|---|---|---|---|---|
| K&F | $14,757 | $3,526 | $884 | $20,933 |
| PureFutureTech | $1,912 | $0 | $0 | $1,912 |
| Total Gross Profits | $16,669 | $3,526 | $884 | $22,845 |

| Est. Commission Expense | *15%* | | | |
|---|---|---|---|---|
| K&F | ($2,213) | ($529) | ($133) | ($3,140) |
| PureFutureTech | ($287) | $0 | $0 | ($287) |
| Total Gross Profits | ($2,500) | ($529) | ($133) | ($3,427) |

| Estimated Net Profits | | | | |
|---|---|---|---|---|
| K&F | $12,543 | $2,997 | $752 | $17,793 |
| PureFutureTech | $1,625 | $0 | $0 | $1,625 |
| Total Net Profits | $14,168 | $2,997 | $752 | $19,418 |

Notes:
Source data is ADSI00334-337, KFA00002-006, and Ex. 15.
1 - See Uddin Tr. 21:1-2 estimating the middle tier for sales commission of 15% of gross profit.

**Cisco v. ADSI et al**
**Schedule 5a - Cisco Lost Profits (Transceivers)**
**Expert Report of Greg J. Regan, CPA/CFF, CFE**

| | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|
| Cisco Sales at Net Distributor Price (Sch. 5b) | | $3,582,717 | $3,070,740 | $2,112,024 | $4,186,365 | $0 | $12,951,846 |
| | | | | | | | |
| Incremental COGS | | ($1,476,269) | ($1,190,990) | ($823,278) | ($1,656,687) | $0 | ($5,147,224) |
| *COGS %* (Sch. 9) | | *41.2%* | *38.8%* | *39.0%* | *39.6%* | *38.7%* | *39.7%* |
| Gross Profit: | | $2,106,448 | $1,879,751 | $1,288,746 | $2,529,678 | $0 | $7,804,622 |
| | | | | | | | |
| Selling, General & Administrative Expense | | ($863,668) | ($710,896) | ($491,302) | ($962,787) | $0 | ($3,028,654) |
| SG&A Expense Rate (Sch. 9) | | *24.1%* | *23.2%* | *23.3%* | *23.0%* | *22.7%* | *23.4%* |
| | | | | | | | |
| Lost Profits | | **$1,242,780** | **$1,168,854** | **$797,443** | **$1,566,890** | **$0** | **$4,775,968** |
| | | | | | | | |
| Assumed Award Date | 9/30/2020 | | | | | | |
| Number of Years (Mid-point) | | 5.3 | 4.3 | 3.3 | 2.3 | 1.3 | |
| Prejudgment Interest | *10%* | $653,396 | $497,324 | $259,551 | $353,302 | $0 | $1,763,572 |

**Cisco v. ADSI et al**
**Schedule 5b - Estimated Cisco Sales (Transceivers)**
**Expert Report of Greg J. Regan, CPA/CFF, CFE**

| | | |
|---|---|---|
| HM_Intercompany_Sale | No | |
| HM_Product_Family | Transceiver | |
| HM_Final_Vend | (Multiple Items) | *Does not equal "LIN105" or "VOD_HM" or Cisco Tested* |

| Sum of HM_Cisco_Sales_Net | Column Labels | | | | | |
|---|---|---|---|---|---|---|
| **Row Labels** | **2015** | **2016** | **2017** | **2018** | **2019** | **Grand Total** |
| K&F | $3,529,937 | $2,900,674 | $2,066,187 | $4,083,089 | $0 | $12,579,888 |
| ADSI | $52,779 | $170,066 | $45,837 | $103,275 | | $371,958 |
| **Grand Total** | **$3,582,717** | **$3,070,740** | **$2,112,024** | **$4,186,365** | **$0** | **$12,951,846** |

| |
|---|
| Source data: |
| Defendant transactions is ADSI00334-337, KFA00002-006, Ex. 15. |
| Cisco files entitled "PIDS for product families 041620" and "Cisco GLPs." |

**Cisco v. ADSI et al**
**Schedule 5c - Defendants Unjust Enrichment (Transeivers)**
**Expert Report of Greg J. Regan, CPA/CFF, CFE**

| HM_Intercompany_Sale | No | |
|---|---|---|
| HM_Product_Family | Transceiver | |
| HM_Final_Vend | (Multiple Items) | *Does not equal "LIN105" or "VOD_HM"* |

| Defendants Total Sales | Column Labels | | | | | |
|---|---|---|---|---|---|---|
| Row Labels | 2015 | 2016 | 2017 | 2018 | 2019 | Grand Total |
| K&F | $710,203 | $448,633 | $243,396 | $189,914 | $9,476 | $1,601,622 |
| ADSI | $18,430 | $59,823 | $20,736 | $40,807 | | $139,797 |
| Grand Total | $728,633 | $508,456 | $264,132 | $230,722 | $9,476 | $1,741,418 |

| HM_Intercompany_Sale | No | |
|---|---|---|
| HM_Product_Family | Transceiver | |
| HM_Final_Vend | (All) | *Does not equal "LIN105" or "VOD_HM"* |

| Defendants COGS | Column Labels | | | | | |
|---|---|---|---|---|---|---|
| Row Labels | 2015 | 2016 | 2017 | 2018 | 2019 | Grand Total |
| K&F | $305,798 | $192,882 | $105,368 | $87,365 | $5,532 | $696,945 |
| ADSI | $14,962 | $39,925 | $23,681 | $26,917 | | $105,485 |
| Grand Total | $320,760 | $232,807 | $129,049 | $114,282 | $5,532 | $802,429 |

| Defendants Gross Profits | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|
| K&F | $404,405 | $255,751 | $138,028 | $102,549 | $3,944 | $904,677 |
| ADSI | $3,468 | $19,898 | ($2,945) | $13,890 | $0 | $34,312 |
| Total Gross Profits | $407,873 | $275,649 | $135,083 | $116,440 | $3,944 | $938,989 |

| Est. Commission Expense | 15% | | | | | |
|---|---|---|---|---|---|---|
| K&F | ($60,661) | ($38,363) | ($20,704) | ($15,382) | ($592) | ($135,702) |
| ADSI | ($520) | ($2,985) | $442 | ($2,084) | $0 | ($5,147) |
| Total Gross Profits | ($61,181) | ($41,347) | ($20,262) | ($17,466) | ($592) | ($140,848) |

| Estimated Net Profits | | | | | | |
|---|---|---|---|---|---|---|
| K&F | $343,744 | $217,389 | $117,324 | $87,167 | $3,352 | $768,976 |
| ADSI | $2,948 | $16,913 | ($2,503) | $11,807 | $0 | $29,165 |
| Total Net Profits | $346,692 | $234,302 | $114,821 | $98,974 | $3,352 | $798,141 |

> Notes:
> Source data is ADSI00334-337, KFA00002-006, and Ex. 15.
> 1 - See Uddin Tr. 21:1-2 estimating the middle tier for sales commission of 15% of gross profit.

**Cisco v. ADSI et al**
**Schedule 5d - Defendants Transceiver Purchase Data**
**Expert Report of Greg J. Regan, CPA/CFF, CFE**

| HM_Intercompany_Sale | No |
|---|---|
| HM_Product_Family | Transceiver |

| Row Labels | Sum of extprice | |
|---|---|---|
| (blank) | $1,717,896 | 93% |
| VOD100 | $24,071 | |
| LIN105 | $15,492 | |
| K&F100 | $13,460 | |
| ING100 | $13,154 | |
| SHE101 | $11,543 | |
| MJ100 | $7,600 | |
| SER106 | $7,400 | |
| AMA103 | $6,494 | |
| WUH100 | $5,890 | |
| PFT101 | $3,729 | |
| ENE100 | $2,650 | |
| ME100 | $2,250 | |
| HON102 | $1,916 | |
| ICI100 | $1,750 | |
| FIB105 | $1,590 | |
| STI101 | $890 | |
| ODS100 | $730 | |
| NEWEGG | $575 | |
| ODSII | $232 | |
| CHI102 | $0 | |
| **Grand Total** | **$1,839,311** | |

| HM_Intercompany_Sale | No |
|---|---|
| HM_Product_Family | Transceiver |

| Sum of extprice | Column Labels | | | | | |
|---|---|---|---|---|---|---|
| Row Labels | SFP-10G-SR | GLC-T | GLC-SX-MMD | SFP-10G-LR | GLC-LH-SMD | Grand Total |
| (blank) | $269,761 | $222,776 | $185,206 | $178,526 | $174,671 | $1,030,940 |
| LIN105 | $2,880 | | $4,572 | | $1,250 | $8,702 |
| K&F100 | $8,000 | | | | | $8,000 |
| AMA103 | $2,147 | $3,162 | $90 | | | $5,399 |
| SHE101 | | $800 | $3,850 | | | $4,650 |
| ME100 | | $2,250 | | | | $2,250 |
| ICI100 | | $1,750 | | | | $1,750 |
| ENE100 | | $330 | | | | $330 |
| VOD100 | | | $0 | | $300 | $300 |
| PFT101 | | | | | $106 | $106 |
| CHI102 | | | $0 | | | $0 |
| **Grand Total** | **$282,788** | **$231,068** | **$193,718** | **$178,526** | **$176,327** | **$1,062,427** |
| % Blank | 95% | 96% | 96% | 100% | 99% | 97% |

**Cisco v. ADSI et al**
**Schedule 6a - Cisco Lost Profits (No Vendor Identified)**
**Expert Report of Greg J. Regan, CPA/CFF, CFE**

| | | **2015** | **2016** | **2017** | **2018** | **2019** | **Total** |
|---|---|---|---|---|---|---|---|
| Cisco Sales at Net Distributor Price (Sch. 6b) | | $508,964 | $749,781 | $1,619,272 | $1,483,353 | $0 | $4,361,370 |
| Incremental COGS | | ($209,720) | ($290,803) | ($631,201) | ($587,013) | $0 | ($1,718,738) |
| *COGS %* (Sch. 9) | | *41.2%* | *38.8%* | *39.0%* | *39.6%* | *38.7%* | *39.4%* |
| Gross Profit: | | $299,244 | $458,977 | $988,071 | $896,340 | $0 | $2,642,633 |
| Selling, General & Administrative Expense | | ($122,694) | ($173,579) | ($376,678) | ($341,144) | $0 | ($1,014,094) |
| SG&A Expense Rate (Sch. 9) | | *24.1%* | *23.2%* | *23.3%* | *23.0%* | *22.7%* | *23.3%* |
| Lost Profits | | **$176,551** | **$285,398** | **$611,393** | **$555,196** | **$0** | **$1,628,538** |
| Assumed Award Date | 9/30/2020 | | | | | | |
| Number of Years (Mid-point) | | 5.3 | 4.3 | 3.3 | 2.3 | 1.3 | |
| Prejudgment Interest | *7%* | $64,975 | $85,002 | $139,297 | $87,630 | $0 | $376,904 |

**Cisco v. ADSI et al**
**Schedule 6b - Estimated Cisco Sales (No Vendor Identified)**
**Expert Report of Greg J. Regan, CPA/CFF, CFE**

| HM_Intercompany_Sale | No | |
|---|---|---|
| HM_Product_Family | (Multiple Items) | *Excludes Transceiver* |
| HM_Final_Vend | 0 | *Blank vendors* |

| Sum of HM_Cisco_Sales_Net | Column Labels | | | | | |
|---|---|---|---|---|---|---|
| **Row Labels** | **2015** | **2016** | **2017** | **2018** | **2019** | **Grand Total** |
| K&F | $490,440 | $213,099 | $1,395,094 | $1,483,353 | $0 | $3,581,986 |
| ADSI | $18,525 | $536,682 | $224,178 | $0 | | $779,385 |
| **Grand Total** | **$508,964** | **$749,781** | **$1,619,272** | **$1,483,353** | **$0** | **$4,361,370** |

Source data:
Defendant transactions is ADSI00334-337, KFA00002-006, Ex. 15.
Cisco files entitled "PIDS for product families 041620", and"Cisco
GLPs".

**Cisco v. ADSI et al**
**Schedule 6c - Defendants Unjust Enrichment (No Vendor Identified)**
**Expert Report of Greg J. Regan, CPA/CFF, CFE**

| HM_Intercompany_Sale | No | |
|---|---|---|
| HM_Product_Family | (Multiple Items) | *Excluding Transceivers* |
| HM_Final_Vend | 0 | *Only blank vendors* |

| Defendants Total Sales | Column Labels | | | | | |
|---|---|---|---|---|---|---|
| Row Labels | 2015 | 2016 | 2017 | 2018 | 2019 | Grand Total |
| K&F | $402,124 | $139,821 | $495,070 | $485,124 | $39,822 | $1,561,962 |
| ADSI | $66,298 | $316,949 | $117,204 | -$21,962 | | $478,489 |
| **Grand Total** | **$468,422** | **$456,771** | **$612,274** | **$463,162** | **$39,822** | **$2,040,451** |

| HM_Intercompany_Sale | No | |
|---|---|---|
| HM_Product_Family | (Multiple Items) | *Excluding Transceivers* |
| HM_Final_Vend | 0 | *Only blank vendors* |

| Defendants COGS | Column Labels | | | | | |
|---|---|---|---|---|---|---|
| Row Labels | 2015 | 2016 | 2017 | 2018 | 2019 | Grand Total |
| K&F | $171,947 | $59,787 | $211,691 | $210,318 | $17,028 | $670,772 |
| ADSI | $62,379 | $179,650 | $60,562 | -$17,021 | | $285,571 |
| **Grand Total** | **$234,326** | **$239,438** | **$272,253** | **$193,297** | **$17,028** | **$956,342** |

| Defendants Gross Profit | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|
| K&F | $230,177 | $80,034 | $283,379 | $274,806 | $22,794 | $891,190 |
| ADSI | $3,919 | $137,299 | $56,642 | ($4,941) | $0 | $192,919 |
| Total Gross Profits | $234,096 | $217,333 | $340,021 | $269,865 | $22,794 | $1,084,109 |

| Est. Commission Expense | 15% | | | | | |
|---|---|---|---|---|---|---|
| K&F | ($34,526) | ($12,005) | ($42,507) | ($41,221) | ($3,419) | ($133,678) |
| ADSI | ($588) | ($20,595) | ($8,496) | $741 | $0 | ($28,938) |
| Total Gross Profits | ($35,114) | ($32,600) | ($51,003) | ($40,480) | ($3,419) | ($162,616) |

| Estimated Net Profits | | | | | | |
|---|---|---|---|---|---|---|
| K&F | $195,650 | $68,029 | $240,872 | $233,585 | $19,375 | $757,511 |
| ADSI | $3,331 | $116,704 | $48,146 | ($4,200) | $0 | $163,981 |
| Total Net Profits | $198,982 | $184,733 | $289,018 | $229,385 | $19,375 | $921,493 |

Notes:
Source data is ADSI00334-337, KFA00002-006, and Ex. 15.
1 - See Uddin Tr. 21:1-2 estimating the middle tier for sales commission of 15% of

Cisco v. ADSI et al
**Schedule 7 - Summary of Defendants Sales by Customer**
**Expert Report of Greg J. Regan, CPA/CFF, CFE**

| Sum of extprice | Column Labels | | | |
|---|---|---|---|---|
| Row Labels | ADSI | K&F | PureFutureTech | Grand Total |
| K&F ASSOC.(TAPE4BACKUP.COM) | $1,995,887 | | | $1,995,887 |
| GSA Contract GS-35F-0032Y (70) | $1,219,010 | | | $1,219,010 |
| n/a | | $1,128,850 | | $1,128,850 |
| DEXON Computer, Inc. 3230 | | $765,449 | | $765,449 |
| PAYPAL | $363,600 | | | $363,600 |
| ADSII GSA | | $174,530 | | $174,530 |
| ACC INC | | $164,881 | | $164,881 |
| Federal Transaction Services, Inc | | $159,672 | | $159,672 |
| Lightning Technology, Inc. | | $117,016 | | $117,016 |
| OSI Hardware | | $98,969 | | $98,969 |
| Esilience Technologies, LLC | | $86,789 | | $86,789 |
| Golden Gate University | $74,512 | | | $74,512 |
| VTA | $70,422 | | | $70,422 |
| Parallel Technologies, Inc. | | $57,395 | | $57,395 |
| MSSI, LTD | | $54,073 | | $54,073 |
| Globetouch, Inc. | $48,554 | | | $48,554 |
| GSA CONTRACT GS-02F-0032R (75) | $46,356 | | | $46,356 |
| Solutek LA LLC | | $40,385 | | $40,385 |
| Data Q Direct | | $40,044 | | $40,044 |
| Abacus Technologies Inc | | $34,738 | | $34,738 |
| DEXON Computer | | | $33,800 | $33,800 |
| C Plus Electronics, Inc. | | $31,098 | | $31,098 |
| Allarea Contractors, Inc | | $30,404 | | $30,404 |
| West USA Realty | | $19,340 | $10,790 | $30,130 |
| Mohawk Network Solutions, 3534 | | $25,485 | | $25,485 |
| ITECH Devices, Inc | $25,070 | | | $25,070 |
| Vigilant 4040 | | $25,047 | | $25,047 |
| GM CRUISE LLC | $23,908 | | | $23,908 |
| Atlantis Casino Resort Spa | $23,809 | | | $23,809 |
| ASSURED TECHNOLOGY | $22,916 | | | $22,916 |
| TRILOGY INNOVATIONS, 0335 | | $22,859 | | $22,859 |
| PeopleNcomm Inc | | $21,213 | | $21,213 |
| Murtala, Abdul Muhammed 3800 | | $19,962 | | $19,962 |
| KomKonsult L.L.C | | $19,150 | | $19,150 |
| ABARAM / ABACUS NETWORK SOLUTIONS | | $18,309 | | $18,309 |
| 9201 East Bloomington | | | $16,220 | $16,220 |
| Alfa Electronics Supply, Inc. | | $13,316 | | $13,316 |
| NCR | | | $13,266 | $13,266 |
| Bellingham School District 6515 | | $13,243 | | $13,243 |
| ALAMEDA ALLIANCE FOR HEALTH | $13,226 | | | $13,226 |
| QCH, Inc., a Nevada Corporation | $12,543 | | | $12,543 |
| IP Technology - UK | | $12,151 | | $12,151 |
| American Networks LLC | | $11,982 | | $11,982 |
| TEVET LLC | | $11,400 | | $11,400 |
| GLOBAL CASH ACCESS, INC. | $11,310 | | | $11,310 |
| Dell Financial Services L.L.C. | $11,244 | | | $11,244 |
| STSS 3656 | | $11,200 | | $11,200 |
| Worldwide Supply | | $11,200 | | $11,200 |
| HILMAR CHEESE COMPANY | $10,903 | | | $10,903 |
| HMS Business Services | $10,724 | | | $10,724 |
| DATA SALES CO. | $10,549 | | | $10,549 |
| Comtek Network Systems | | $10,200 | | $10,200 |
| LATINEX TARDING CORPORATION | | $10,090 | | $10,090 |
| Quettawala Inc | | $9,956 | | $9,956 |
| Wave 2 Wave | $9,870 | | | $9,870 |
| FirsTech Inc. | | $9,765 | | $9,765 |
| QUANTA MFG NASHVILLE LLC | $9,670 | | | $9,670 |
| ISONIC | $9,296 | | | $9,296 |
| BLOOM ENERGY CORPORATION | $8,973 | | | $8,973 |
| TEL-CONN | | $8,800 | | $8,800 |
| SAMSUNG SEMICONDUCTOR, INC. | $8,753 | | | $8,753 |
| Ricoh Innovations Corp. | $8,396 | | | $8,396 |
| EeZee Solutions Inc | $8,385 | | | $8,385 |
| Tech Data Reseller, 2939 | | $8,310 | | $8,310 |
| HARDWARE NATION, 5847 | | $7,740 | | $7,740 |
| Tech for Solutions, LLC 0034 | | $7,661 | | $7,661 |
| New Advantage Corp. | | $7,452 | | $7,452 |
| Primus solutions Inc. | | $7,301 | | $7,301 |
| PICS Telecom International | | $7,300 | | $7,300 |
| Teksavers | | $7,000 | | $7,000 |
| GLOBECOM | | $6,560 | | $6,560 |
| xel [usa] inc. | | $6,240 | | $6,240 |
| Marshall Farms Group, Ltd | | $6,196 | | $6,196 |
| ENVIVIO INC. | $6,163 | | | $6,163 |
| Minncom Companies, Inc. | | $5,772 | | $5,772 |
| Pantera Communications LLC | | $5,650 | | $5,650 |
| AK7-IT | | $5,600 | | $5,600 |
| FS24 SRL | | $5,546 | | $5,546 |
| Knowledge Computers Ltd. | | $5,534 | | $5,534 |
| US ARMY Public Works | | $5,528 | | $5,528 |
| Link-US | | | $5,525 | $5,525 |
| Cloud share | $5,370 | | | $5,370 |
| 4700 Warm Spring Blvd | | | $5,250 | $5,250 |
| High Performance IT Consulting 0829 | | $5,241 | | $5,241 |
| Easy Hardware Trading | $5,100 | | | $5,100 |
| RR Media Inc | $5,100 | | | $5,100 |
| Saba Software, Inc | $4,852 | | | $4,852 |
| Internet Communications, Inc | | $4,780 | | $4,780 |
| M&M Trading Company of Miami INC | | $4,598 | | $4,598 |
| ADSI | | | $4,470 | $4,470 |
| Megnet Ltd. | | $4,430 | | $4,430 |
| LINK-US LLC | | $4,430 | | $4,430 |
| Technology & Finance Int'l (SA) Pty Ltd | | $4,340 | | $4,340 |
| M&M Trading Company of Miami | | | $4,200 | $4,200 |
| Philip Morris USA-Park 500 | $4,100 | | | $4,100 |
| Philip Morris USA | $4,050 | | | $4,050 |
| Acceller Technologies /Tech for Solutions | | $3,723 | | $3,723 |

Cisco v. ADSI et al
Schedule 7 - Summary of Defendants Sales by Customer
Expert Report of Greg J. Regan, CPA/CFF, CFE

| Sum of extprice | Column Labels | | | |
|---|---|---|---|---|
| Row Labels | ADSI | K&F | PureFutureTech | Grand Total |
| Attn: Theresa, 1819 SW 5th Ave | | | $3,650 | $3,650 |
| Flex Int'l USA Inc | $3,489 | | | $3,489 |
| Office of Justice Programs | | $3,404 | | $3,404 |
| QUANTA COMPUTER USA, INC. | $3,393 | | | $3,393 |
| MIB Sigurnoshi Infomaticki Sustavi D.O.O | | $3,360 | | $3,360 |
| New Orleans Convention Center | | $3,300 | | $3,300 |
| QuadGen Wireless Solutions Inc. | | $3,250 | | $3,250 |
| Via Information Technology, 2737 | | $3,182 | | $3,182 |
| Centrex Electrical Supply Corp. | | $3,156 | | $3,156 |
| U.S. Department of Justice | | $3,102 | | $3,102 |
| USDA, ARS, ERRC | | $3,090 | | $3,090 |
| NetXperts | | $3,070 | | $3,070 |
| Gnutti Carlo USA | | $3,064 | | $3,064 |
| Gigster Products Inc | | $3,040 | | $3,040 |
| Emerald Resource | | $3,036 | | $3,036 |
| FBI Academy | | $2,985 | | $2,985 |
| ARCAS TECHNOLOGY INC, 9999 | | $2,959 | | $2,959 |
| Nokia Corporation | | $2,943 | | $2,943 |
| GSA CONRACT # GS-02-0032R (75) | $2,884 | | | $2,884 |
| MultiSol Inc | | $2,784 | | $2,784 |
| ALLIANCE NETWORK RESOLUTIONS | | $2,686 | | $2,686 |
| NETWORK SUPPLY, LLC, 2680 | | $2,672 | | $2,672 |
| A&L Aircraft Products, Inc. | | $2,400 | | $2,400 |
| US Airforce / 262 Operations Squadron | | $2,350 | | $2,350 |
| Calithera Biosciences, Inc | $2,350 | | | $2,350 |
| RB Data Systems Inc. | | $2,275 | | $2,275 |
| MODERN ENTERPRISE | | $2,159 | | $2,159 |
| M GLOBAL SERVICES | | $2,002 | | $2,002 |
| Vology | | $2,000 | | $2,000 |
| Bloomberg LP 6686 | | $1,950 | | $1,950 |
| Wiesner, Linda | | $1,784 | | $1,784 |
| A1 Teletronics Inc. | | $1,770 | | $1,770 |
| Into Netwroks | | $1,684 | | $1,684 |
| Ohio Dept of Transportation | | $1,677 | | $1,677 |
| OLMOS Technologies GmbH | | $1,675 | | $1,675 |
| Redeploy Technologies | | $1,656 | | $1,656 |
| GOLDBELT FALCON, LLC | | $1,656 | | $1,656 |
| Group Services COVI, S.A. | | $1,640 | | $1,640 |
| Arrowhead Global LLC | | $1,607 | | $1,607 |
| NETCOM G6 | | $1,600 | | $1,600 |
| Solutions Guam LLC | | $1,590 | | $1,590 |
| Hujaya Supply LLC | | $1,582 | | $1,582 |
| FireEye Inc. | $1,490 | | | $1,490 |
| DIGITS GmbH | | $1,444 | | $1,444 |
| Revention | | $1,411 | | $1,411 |
| Computer Matrix | | $1,380 | | $1,380 |
| Cherokee County Water & Sewerage | | $1,361 | | $1,361 |
| 1 Click Tech | | $1,314 | | $1,314 |
| Lincoln County School District | | $1,298 | | $1,298 |
| Hunt, Aaron 0228 | | $1,207 | | $1,207 |
| Evco Sound & Electronics, Inc. | $1,192 | | | $1,192 |
| ODSI, 0910 | | $1,170 | | $1,170 |
| TIR Global 2200 | | $1,140 | | $1,140 |
| TEXAS GULF SUPPLY | | $1,100 | | $1,100 |
| CTrends | | $1,080 | | $1,080 |
| PQ Corporation 3020 | | $1,068 | | $1,068 |
| Online Digital Solutions Limited | $1,052 | | | $1,052 |
| DISCOUNTMICROSALES (DMS) | | $1,010 | | $1,010 |
| TECH-MICRO 9992 | | $984 | | $984 |
| (BVSTV) BROADCAST VIDEO SOLUTIONS | | $980 | | $980 |
| All Area Contractors | | | $960 | $960 |
| National Radio Astronomy Observatory | | $925 | | $925 |
| TRIVAD | | $913 | | $913 |
| VMsources | | $870 | | $870 |
| Link-US, LLC | $840 | | | $840 |
| City of Michigan City | | $822 | | $822 |
| J.I.M.P. International Guam | | $819 | | $819 |
| Watchdog Security | | $792 | | $792 |
| Continental Data Graphics | | $768 | | $768 |
| Hautelook | | $764 | | $764 |
| BIYTC, LLC | | $714 | | $714 |
| A.E.R.T. | | $696 | | $696 |
| Harris | | $696 | | $696 |
| Exelis Inc, Information Systems Division | | $690 | | $690 |
| Telecommken | | $664 | | $664 |
| Worldcom Exchange, Inc. | | $656 | | $656 |
| Server Tech Supply | | $650 | | $650 |
| Leprino Foods | | $631 | | $631 |
| NAVARRO, Antonio | | $603 | | $603 |
| PEMICA INC. | | $603 | | $603 |
| OLIN | | $603 | | $603 |
| TBI Telecomm Brokers Intl. Inc. | | $597 | | $597 |
| Bureau of Indian Affairs | | $594 | | $594 |
| Level4 Solutions | | $560 | | $560 |
| NetApp | | $558 | | $558 |
| Onecall Telecom | | $552 | | $552 |
| Solano First Federal Credit Union | | $550 | | $550 |
| Fleetcor Technologies, LLC | | $548 | | $548 |
| SelectTech Services Corp | | $540 | | $540 |
| Business Computer Resources, Inc. | | $532 | | $532 |
| Universal Electronic Alarms | | $528 | | $528 |
| World Tech Solutions | | $525 | | $525 |
| Waco Electronics | | $485 | | $485 |
| Te, Steve 0755 | | $480 | | $480 |
| Emerald Performance Materials | | $440 | | $440 |
| DIGI DEVICES ONLINE | | $420 | | $420 |
| JQ AMERICAN CORP | | $402 | | $402 |

Cisco v. ADSI et al
Schedule 7 - Summary of Defendants Sales by Customer
Expert Report of Greg J. Regan, CPA/CFF, CFE

| Sum of extprice | Column Labels | | | |
|---|---|---|---|---|
| Row Labels | ADSI | K&F | PureFutureTech | Grand Total |
| PAUL'S CUSTOMER | $400 | | | $400 |
| RUCKUS WIRELESS | $400 | | | $400 |
| Preferred Homecare | | $400 | | $400 |
| Fox Network Group | | $396 | | $396 |
| IMRF | | $396 | | $396 |
| Cybertek | | $396 | | $396 |
| DO NOT USE. USE ARR103 | $390 | | | $390 |
| Rave Networx  (A div. of Link US) | | $390 | | $390 |
| Worldwide Fiber Optics, Inc | | $388 | | $388 |
| Bogen, Matthew 0355 | | $388 | | $388 |
| Advanced Networks of Texas | | $375 | | $375 |
| City of Knoxville | | $368 | | $368 |
| Pillar of Fire | | $368 | | $368 |
| AVPS, Inc. | | $356 | | $356 |
| CSC | | $356 | | $356 |
| Layer 4 Telecom | | $353 | | $353 |
| Blue Earth Services & Technology | | $352 | | $352 |
| Wired Tech Group | | $348 | | $348 |
| ULTRA CLEAN TECHNOLOGY | $340 | | | $340 |
| LAKE HAVASU UNIFIED SCHOOL DISTRIT NO. 1 | | $332 | | $332 |
| Value Pay Services | | $327 | | $327 |
| ViON Corporation | | $301 | | $301 |
| TransFirst LLC | | $301 | | $301 |
| CINTEK SYSTEM INC | | $297 | | $297 |
| Kemper Corporate Services, Inc | | $297 | | $297 |
| Walker and Associates, Inc. | | $294 | | $294 |
| Providence place | | $273 | | $273 |
| Greenville County | | $270 | | $270 |
| George P. Johnson | | $270 | | $270 |
| Video Security Specialists | | $270 | | $270 |
| CITY OF SALEM, 4034 | | $265 | | $265 |
| Applied Control Technologies, Inc. | | $262 | | $262 |
| MOY, BILLY 3284 | | $256 | | $256 |
| MICROPEER SOLUTIONS INC | | $235 | | $235 |
| Kobre & Kim LLP | | $220 | | $220 |
| L-3 KEO | | $220 | | $220 |
| Milspec Services | | $206 | | $206 |
| Warner Truck Center | | $201 | | $201 |
| Gallant, Michael 3820 | | $201 | | $201 |
| GKN Aerospace | | $201 | | $201 |
| Peak10 | | $201 | | $201 |
| IPFone | | $201 | | $201 |
| Manhattan Associates | | $201 | | $201 |
| Expresstronics | | $201 | | $201 |
| RML Automotive Group, Care of Supernap | | $201 | | $201 |
| Recommind, Inc 7899 | | $201 | | $201 |
| Federal Signal Corp | | $200 | | $200 |
| Aerotek Software Solutions Inc. | | $200 | | $200 |
| Tektronix | | $198 | | $198 |
| Verotek | | $198 | | $198 |
| JT3 | | $198 | | $198 |
| CED  Consolidated Electrical Distributors | | $198 | | $198 |
| GlaserWeil | | $198 | | $198 |
| Dynamic Manufacturing | | $198 | | $198 |
| Summit Racing Equipment | | $189 | | $189 |
| NetWolves | | $189 | | $189 |
| Cherry Stone IT 0505 | | $188 | | $188 |
| CSRA | | $184 | | $184 |
| Equinox Payments | | $184 | | $184 |
| Cayuga Centers | | $178 | | $178 |
| GEO GROUP INC. | | $178 | | $178 |
| Kratos PSS | | $178 | | $178 |
| AML RIVERSIDE | | $178 | | $178 |
| NetCentra, Inc. | | $176 | | $176 |
| KAET/Eight | | $176 | | $176 |
| IT Parts Express | | $166 | | $166 |
| Bosch, Timothy 2939 | | $156 | | $156 |
| MOBILEUM, INC. | $153 | | | $153 |
| Peninsula Innovation Partners, LLC | $139 | | | $139 |
| Comcast | | $130 | | $130 |
| Apcela | | $129 | | $129 |
| Premiere Communications | | $112 | | $112 |
| RAJ & ASSOCIATES | | $110 | | $110 |
| Salem Electric, VA | | $110 | | $110 |
| Adelcomm | | $101 | | $101 |
| ENERFAB | | $100 | | $100 |
| Harbor Freight Tools | | $100 | | $100 |
| WESTAT | | $100 | | $100 |
| Griess, Gordon | | $99 | | $99 |
| AT&T  (San Ramon CA) | | $99 | | $99 |
| Folger Shakespeare Library | | $97 | | $97 |
| GOOGLE, INC. | $95 | | | $95 |
| HCentive | | $92 | | $92 |
| F1 Consultancy Ltd | | $90 | | $90 |
| Wausau Tile Inc | | $90 | | $90 |
| University of Texas at Austin | | $89 | | $89 |
| Hampton Roads Transit | | $89 | | $89 |
| Allegis Group | | $88 | | $88 |
| BERNAL, MANUEL 2101 | | $70 | | $70 |
| Visit Baltimore | | $66 | | $66 |
| IP Supply Pty. Ltd | | $0 | | $0 |
| SOLATURE, LLC | | $0 | | $0 |
| Communications Data Group | | $0 | | $0 |
| SAFARI MICRO INCORPORATED | | $0 | | $0 |
| Sheikh, Kamran 9225 | | $0 | | $0 |
| Innovative Technologies (VA) | | $0 | | $0 |
| Beatitudes Campus | | $0 | | $0 |

Cisco v. ADSI et al
**Schedule 7 - Summary of Defendants Sales by Customer**
**Expert Report of Greg J. Regan, CPA/CFF, CFE**

| Sum of extprice | Column Labels | | | |
|---|---|---|---|---|
| Row Labels | ADSI | K&F | PureFutureTech | Grand Total |
| KLA - TENCOR | $0 | | | $0 |
| **Grand Total** | **$4,087,505** | **$3,598,091** | **$98,131** | **$7,783,727** |

Notes:
Source data is ADSI00334-337, KFA00002-006, and Ex. 15.

**Cisco v. ADSI et al**
**Schedule 8 - Summary of Defendants Sales by Vendor**
**Expert Report of Greg J. Regan, CPA/CFF, CFE**

| Sum of extprice | HM_Intercompany_Sale | | | |
|---|---|---|---|---|
| our_vend | ADSI to K&F | K&F to ADSI | No | Grand Total |
| (blank) | $1,995,747 | $174,530 | $4,098,560 | $6,268,837 |
| VOD100 | | | $804,000 | $804,000 |
| K&F100 | | | $180,207 | $180,207 |
| MEM102 | | | $105,218 | $105,218 |
| AMA103 | | | $59,184 | $59,184 |
| ING100 | | | $48,232 | $48,232 |
| TTG100 | | | $31,316 | $31,316 |
| SER106 | | | $29,000 | $29,000 |
| ARD100 | | | $26,367 | $26,367 |
| MIC119 | | | $23,888 | $23,888 |
| SYN100 | | | $21,580 | $21,580 |
| GLO107 | | | $20,800 | $20,800 |
| LIN105 | $140 | | $18,682 | $18,822 |
| CAL111 | | | $18,239 | $18,239 |
| ORI101 | | | $12,385 | $12,385 |
| ENH100 | | | $12,250 | $12,250 |
| SHE101 | | | $11,543 | $11,543 |
| DAT114 | | | $10,832 | $10,832 |
| TEK104 | | | $9,675 | $9,675 |
| ARB100 | | | $9,371 | $9,371 |
| MJ100 | | | $8,591 | $8,591 |
| HUL100 | | | $5,900 | $5,900 |
| WUH100 | | | $5,890 | $5,890 |
| PFT101 | | | $4,569 | $4,569 |
| TDO100 | | | $3,697 | $3,697 |
| ATEC | | | $3,419 | $3,419 |
| NEWEGG | | | $2,987 | $2,987 |
| ENE100 | | | $2,650 | $2,650 |
| STI101 | | | $2,528 | $2,528 |
| ME100 | | | $2,250 | $2,250 |
| C&C100 | | | $2,070 | $2,070 |
| HON102 | | | $1,916 | $1,916 |
| GET100 | | | $1,840 | $1,840 |
| ICI100 | | | $1,750 | $1,750 |
| FIB105 | | | $1,590 | $1,590 |
| CDW100 | | | $1,445 | $1,445 |
| SOT100 | | | $1,275 | $1,275 |
| PA100 | | | $1,240 | $1,240 |
| PCH100 | | | $947 | $947 |
| CEN105 | | | $890 | $890 |
| ATL105 | | | $805 | $805 |
| ACC104 | | | $750 | $750 |
| ODS100 | | | $730 | $730 |
| TEC100 | | | $564 | $564 |
| CAB108 | | | $420 | $420 |
| DOT100 | | | $415 | $415 |
| DIA102 | | | $400 | $400 |
| ODSII | | | $232 | $232 |
| SOL107 | | | $153 | $153 |
| HUM102 | | | $70 | $70 |
| BON100 | | | $0 | $0 |
| ABA100 | | | $0 | $0 |
| CHI102 | | | $0 | $0 |
| Grand Total | $1,995,887 | $174,530 | $5,613,310 / 73% | $7,783,727 |

HM_Sale_Made_By:   ADSI

| Sum of extprice | HM_Intercompany_Sale | | |
|---|---|---|---|
| our_vend | ADSI to K&F | No | Grand Total |
| (blank) | $1,995,747 | $576,868 | $2,572,615  63% |
| VOD100 | | $804,000 | $804,000 |
| K&F100 | | $180,207 | $180,207 |
| MEM102 | | $105,218 | $105,218 |
| AMA103 | | $59,184 | $59,184 |
| ING100 | | $48,232 | $48,232 |
| TTG100 | | $31,316 | $31,316 |
| SER106 | | $29,000 | $29,000 |
| ARD100 | | $26,367 | $26,367 |
| MIC119 | | $23,888 | $23,888 |
| SYN100 | | $21,580 | $21,580 |
| GLO107 | | $20,800 | $20,800 |
| LIN105 | $140 | $18,682 | $18,822 |
| CAL111 | | $18,239 | $18,239 |
| ORI101 | | $12,385 | $12,385 |
| ENH100 | | $12,250 | $12,250 |
| SHE101 | | $11,543 | $11,543 |
| DAT114 | | $10,832 | $10,832 |
| TEK104 | | $9,675 | $9,675 |
| ARB100 | | $9,371 | $9,371 |
| MJ100 | | $8,591 | $8,591 |
| HUL100 | | $5,900 | $5,900 |
| WUH100 | | $5,890 | $5,890 |
| PFT101 | | $4,569 | $4,569 |
| TDO100 | | $3,697 | $3,697 |
| ATEC | | $3,419 | $3,419 |
| NEWEGG | | $2,987 | $2,987 |
| ENE100 | | $2,650 | $2,650 |
| STI101 | | $2,528 | $2,528 |
| ME100 | | $2,250 | $2,250 |
| C&C100 | | $2,070 | $2,070 |
| HON102 | | $1,916 | $1,916 |
| GET100 | | $1,840 | $1,840 |
| ICI100 | | $1,750 | $1,750 |
| FIB105 | | $1,590 | $1,590 |
| CDW100 | | $1,445 | $1,445 |
| SOT100 | | $1,275 | $1,275 |
| PA100 | | $1,240 | $1,240 |
| PCH100 | | $947 | $947 |
| CEN105 | | $890 | $890 |
| ATL105 | | $805 | $805 |
| ACC104 | | $750 | $750 |
| ODS100 | | $730 | $730 |
| TEC100 | | $564 | $564 |
| CAB108 | | $420 | $420 |
| DOT100 | | $415 | $415 |
| DIA102 | | $400 | $400 |
| ODSII | | $232 | $232 |
| SOL107 | | $153 | $153 |
| HUM102 | | $70 | $70 |
| BON100 | | $0 | $0 |
| ABA100 | | $0 | $0 |
| CHI102 | | $0 | $0 |
| Grand Total | $1,995,887 | $2,091,618 | $4,087,505 |

**Cisco v. ADSI et al**
**Schedule 9 - Cisco Historical Cost Analyses**
**Expert Report of Greg J. Regan, CPA/CFF, CFE**

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|---|
| **Gross Profit Calculation** | | | | | | | | |
| Product Sales, net | $38,029 | $36,172 | $37,750 | $37,254 | $35,705 | $36,709 | $39,005 | $260,624 |
| Product Cost of Goods Sold | ($15,719) | ($15,181) | ($15,555) | ($14,449) | ($13,918) | ($14,527) | ($15,083) | ($104,432) |
| Product Gross Profit | $22,310 | $20,991 | $22,195 | $22,805 | $21,787 | $22,182 | $23,922 | $156,192 |
| Cost of Goods Sold % | 41.3% | 42.0% | 41.2% | 38.8% | 39.0% | 39.6% | 38.7% | 40.1% |
| | | | | | | | | |
| **Operating Expense Calculation**[1] | | | | | | | | |
| Total Sales | $48,607 | $47,142 | $49,161 | $49,247 | $48,005 | $49,330 | $51,904 | $343,396 |
| Selling General & Admin Exp. | $11,761 | $11,430 | $11,851 | $11,401 | $11,167 | $11,345 | $11,777 | $80,732 |
| Operating Expense % | 24.2% | 24.2% | 24.1% | 23.2% | 23.3% | 23.0% | 22.7% | 23.5% |

---

Notes:
Data obtained from S&P Capital IQ, which is included in the native version of these schedules (*see* schedules 12.3 and 12.4).
1 - The calculation of lost profits deducts variable costs. These figures include both fixed and variable costs, which reduces lost profits.

**Cisco v. ADSI et al**
**Schedule 10a - Reconciliation of Defendant Data Files**
**Expert Report of Greg J. Regan, CPA/CFF, CFE**

| Seller | Total Sales | | Intercompany Sales | | Net Sales |
|---|---|---|---|---|---|
| ADSI | $ | 4,087,505 | $ | (1,995,887) | $ 2,091,618 |
| K&F | $ | 3,535,873 | $ | (174,530) | $ 3,361,343 |
| K&F - Appended Data | $ | 62,218 | | | $ 62,218 |
| PureFutureTech | $ | 98,131 | $ | (98,131) | $ - |
| Total | $ | 7,783,727 | $ | (2,268,548) | $ 5,515,179 |

| Amount Addressed in: | | Net Sales |
|---|---|---|
| LINK-US | $ | 91,693 |
| Vodanet | $ | 427,889 |
| Transceivers | $ | 1,741,418 |
| Specifically Tested Sales | $ | 38,830 |
| No Vendor Identified | $ | 2,040,451 |
| | | |
| Subtotal | $ | 4,340,281 |
| Amount Excluded | $ | 1,174,898 |
| Total | $ | 5,515,179 |
| Difference | $ | - |

**Cisco v. ADSI et al**
**Schedule 10b - Estimated Defendants Cost of Goods Sold**
**Expert Report of Greg J. Regan, CPA/CFF, CFE**

**K&F Cost of Purchases from ADSI[1]**

| Sum of Amount | |
| --- | --- |
| Years | Total |
| 2017 | $569,227 |
| 2018 | $362,108 |
| Grand Total | $931,334 |
| *K&F Cost/ADSI Sales Price* | *95%* |

**ADSI Sales to Customers**

| Sum of extcost | | |
| --- | --- | --- |
| HM_K&F_Flag | Years | Total |
| K&F | 2017 | $564,148 |
| | 2018 | $415,271 |
| Grand Total | | $979,419 |

**K&F Sales to Customers**

| Sum of Total Sales price | |
| --- | --- |
| Years | Total |
| 2017 | $824,314 |
| 2018 | $802,748 |
| Grand Total | $1,627,062 |

| K&F Gross Profit | $ 695,728 |
| --- | --- |
| **K&F Gross Profit %** | **43%** |

---

Notes:
1 - The sales data produced by non-ADSI defendants did not include product acquisition cost. This analysis estimates COGS based on K&F purchases of products from ADSI. The data regarding K&F's purchase of products from ADSI, however, was only produced for 2017 and 2018.

**Cisco v. ADSI et al**
**Schedule 10c - Defendant Sales Not Matched to Cisco GLP**
**Expert Report of Greg J. Regan, CPA/CFF, CFE**

| HM_Intercompany_Sale | No |
|---|---|
| Cisco GLP | (Multiple Items) |

| Sum of extprice | |
|---|---|
| **HM_Product_Family** | **Total** |
| Switch | $390,965 |
| Transceiver | $102,395 |
| SMARTnet | $55,298 |
| N/A | $37,909 |
| Module | $35,549 |
| Wireless | $24,480 |
| Phone | $23,631 |
| other | $21,633 |
| Power | $20,148 |
| Router | $18,253 |
| License | $16,726 |
| Firewall | $7,972 |
| Small Business Switch | $4,828 |
| Not Cisco | $77 |
| Telepresence | $0 |
| **Grand Total** | **$759,862** |

Cisco v. ADSI et al
**Schedule 11 - Partial List of Product Seizes by U.S. Customs**
Expert Report of Greg J. Regan, CPA/CFF, CFE

| Ref | Source | Importation Date | Description | Quantity | Exporter | Exporter Country | Importer | Importer Location |
|-----|--------|------------------|-------------|----------|----------|------------------|----------|-------------------|
| 1 | [1] | 5/3/2016 | Transceivers | 100 | FD Dispenser Co. Ltd | China | Uddin Networks | Fremont, CA |
| 2 | [1] | 5/4/2016 | Transceivers | 64 | FD Dispenser Co. Ltd | China | McIntosh Networks | Berkeley, CA |
| 3 | [1] | 5/4/2016 | Transceivers | 100 | FD Dispenser Co. Ltd | China | Uddin Networks | Fremont, CA |
| 4 | [1] | 5/5/2016 | Transceivers | 103 | FD Dispenser Co. Ltd | China | Uddin Networks | Fremont, CA |
| 5 | [2] | 2/9/2018 | Transceivers | 56 | Black Cat Trading | Hong Kong, China | McIntosh Networks | Reno, NV |
| 6 | [2] | 3/10/2018 | Networking Equipment | 9 | Dora.HE | China | McIntosh Networks | Reno, NV |
| 7 | [2] | 3/24/2018 | Transceivers | 80 | SZ Yifu Co Ltd | Hong Kong, China | Jessica McIntosh | Reno, NV |
| 8 | [3] | 6/6/2017 | GLC-SX-MM-RGD | 9 | Dongguan Na Cheng | China | McIntosh Networks | Reno, NV |
| 9 | [3] | 9/2/2017 | Transceivers | 54 | FD Dispenser Co. Ltd | China | McIntosh Networks | Reno, NV |
| 10 | [3] | 12/2/2017 | Transceivers | 7 | Shenzen Jelly Int'l Co Ltd | Hong Kong, China | McIntosh Networks | Reno, NV |
| 11 | [3] | 5/8/2018 | Transceivers | 150 | SZ Jelly Inter Trade Co | Hong Kong, China | McIntosh Networks | Reno, NV |
| 12 | [4] | 10/29/2018 | Switches | 5 | Rainbow Beijing Technology Co. | China | ASDII | Portland, OR |
| 13 | [5] | 5/12/2016 | Switches | 2 | Susan Sun | Hong Kong, China | Uddin Networks | Fremont, CA |
| 14 | [6] | 10/6/2017 | Transceivers | 54 | FD Dispenser Co. Ltd | China | McIntosh Networks | Reno, NV |
| 15 | [7] | 5/12/2016 | Switches | 2 | Susan Sun | Hong Kong, China | Uddin Networks | Fremont, CA |

Source:
1. EX. 22 (Little).
2. Ex. 25 (Little).
3. Ex. 26 (Little). McIntosh Networks appears to have been misspelled in certain instances.
4. Ex. 32 (Lau).
5. Ex. 4 (Uddin).
6. Ex. 72.
7. Ex. 3 (Carter).

Cisco v. ADSI et al
**Schedule 12.1 - Cisco Comparable Company Data (Inventory)**
**Expert Report of Greg J. Regan, CPA/CFF, CFE**

**S&P**
**Capital IQ**

## Cisco Systems, Inc. (NasdaqGS:CSCO) > Financials > Ratios

| | | |
|---|---|---|
| Restatement: | Latest Filings | |
| Order: | Latest on Right | |
| Source: | Capital IQ & Proprie | |

| | | |
|---|---|---|
| Period Type: | Annual | |
| Decimals: | Capital IQ (Default) | |

| Ratios | | | | | | LTM |
|---|---|---|---|---|---|---|
| For the Fiscal Period Ending | 12 months Jul-25-2015 | 12 months Jul-30-2016 | 12 months Jul-29-2017 | 12 months Jul-28-2018 | 12 months Jul-27-2019 | 12 months Jan-25-2020 |
| **Profitability** | | | | | | |
| Return on Assets % | 6.5% | 6.9% | 6.3% | 6.7% | 8.6% | 9.4% |
| Return on Capital % | 8.7% | 9.1% | 8.3% | 9.5% | 13.9% | 15.2% |
| Return on Equity % | 15.4% | 17.4% | 14.8% | 0.2% | 30.3% | 29.0% |
| Return on Common Equity % | 15.4% | 17.4% | 14.8% | 0.2% | 30.3% | 29.0% |
| | | | | | | |
| **Margin Analysis** | | | | | | |
| Gross Margin % | 60.4% | 62.7% | 63.0% | 62.3% | 62.9% | 64.0% |
| SG&A Margin % | 24.1% | 23.2% | 23.3% | 23.0% | 22.7% | 22.7% |
| EBITDA Margin % | 27.6% | 30.0% | 30.5% | 30.0% | 30.7% | 31.4% |
| EBITA Margin % | 25.4% | 27.9% | 28.2% | 27.8% | 28.8% | 29.6% |
| EBIT Margin % | 23.0% | 26.2% | 26.5% | 26.0% | 27.3% | 28.1% |
| Earnings from Cont. Ops Margin % | 18.3% | 21.8% | 20.0% | 0.2% | 22.4% | 21.4% |
| Net Income Margin % | 18.3% | 21.8% | 20.0% | 0.2% | 22.4% | 21.4% |
| Net Income Avail. for Common Margin % | 18.3% | 21.8% | 20.0% | 0.2% | 22.4% | 21.4% |
| Normalized Net Income Margin % | 14.6% | 16.7% | 17.2% | 16.8% | 17.5% | 17.9% |
| Levered Free Cash Flow Margin % | 23.4% | 22.4% | 17.7% | 20.8% | 22.1% | 21.9% |
| Unlevered Free Cash Flow Margin % | 24.1% | 23.3% | 18.8% | 22.0% | 23.1% | 22.8% |
| | | | | | | |
| **Asset Turnover** | | | | | | |
| Total Asset Turnover | 0.5x | 0.4x | 0.4x | 0.4x | 0.5x | 0.5x |
| Fixed Asset Turnover | 14.9x | 14.4x | 14.1x | 15.6x | 17.9x | 15.3x |
| Accounts Receivable Turnover | 5.1x | 4.9x | 4.8x | 4.8x | 4.8x | 5.7x |
| Inventory Turnover | 12.1x | 12.9x | 12.6x | 10.7x | 11.9x | 12.2x |
| | | | | | | |
| **Short Term Liquidity** | | | | | | |
| Current Ratio | 3.1x | 3.2x | 3.0x | 2.3x | 1.5x | 1.8x |
| Quick Ratio | 3.0x | 3.0x | 2.9x | 2.2x | 1.4x | 1.6x |
| Cash from Ops. to Curr. Liab. | 0.5x | 0.5x | 0.5x | 0.5x | 0.5x | 0.7x |
| Avg. Days Sales Out. | 70.9 | 75.2 | 76.3 | 75.7 | 75.3 | 64.3 |
| Avg. Days Inventory Out. | 30.1 | 28.7 | 29.0 | 33.9 | 30.5 | 29.9 |
| Avg. Days Payable Out. | 22.9 | 25.6 | 27.7 | 34.9 | 41.2 | 38.6 |
| Avg. Cash Conversion Cycle | 78.1 | 78.3 | 77.6 | 74.6 | 64.6 | 55.6 |
| | | | | | | |
| **Long Term Solvency** | | | | | | |
| Total Debt/Equity | 42.5% | 45.0% | 51.0% | 59.3% | 73.5% | 48.0% |
| Total Debt/Capital | 29.8% | 31.1% | 33.8% | 37.2% | 42.4% | 32.5% |
| LT Debt/Equity | 35.9% | 38.5% | 38.9% | 47.2% | 43.1% | 42.8% |
| LT Debt/Capital | 25.2% | 26.5% | 25.8% | 29.6% | 24.9% | 28.9% |
| Total Liabilities/Total Assets | 47.3% | 47.7% | 49.1% | 60.3% | 65.7% | 60.7% |
| | | | | | | |
| EBIT / Interest Exp. | 20.0x | 19.1x | 14.8x | 13.6x | 16.5x | 19.3x |
| EBITDA / Interest Exp. | 24.0x | 21.8x | 17.0x | 15.7x | 18.6x | 22.0x |
| (EBITDA-CAPEX) / Interest Exp. | 21.8x | 20.1x | 15.9x | 14.8x | 17.5x | 20.9x |
| Total Debt/EBITDA | 1.9x | 1.9x | 2.3x | 1.7x | 1.5x | 1.0x |
| Net Debt/EBITDA | NM | NM | NM | NM | NM | NM |
| Total Debt/(EBITDA-CAPEX) | 2.1x | 2.1x | 2.5x | 1.8x | 1.6x | 1.1x |
| Net Debt/(EBITDA-CAPEX) | NM | NM | NM | NM | NM | NM |
| | | | | | | |
| Altman Z Score | 3.04 | 2.93 | 2.93 | 2.99 | 3.19 | 3.67 |
| | | | | | | |
| **Growth Over Prior Year** | | | | | | |
| Total Revenue | 4.3% | 0.2% | (2.5%) | 2.8% | 5.2% | 1.4% |
| Gross Profit | 4.5% | 4.0% | (2.1%) | 1.7% | 6.3% | 4.4% |
| EBITDA | 7.3% | 8.8% | (0.7%) | 1.0% | 7.7% | 5.9% |
| EBITA | 8.9% | 10.4% | (1.5%) | 1.0% | 9.1% | 6.7% |
| EBIT | 8.3% | 14.1% | (1.1%) | 0.8% | 10.3% | 7.1% |
| Earnings from Cont. Ops. | 14.4% | 19.6% | (10.5%) | (98.9%) | 10,464.5% | (14.1%) |
| Net Income | 14.4% | 19.6% | (10.5%) | (98.9%) | 10,464.5% | (14.1%) |
| Normalized Net Income | 8.8% | 14.8% | 0.0% | 0.6% | 9.5% | 6.5% |
| Diluted EPS before Extra | 17.4% | 20.6% | (10.0%) | (98.9%) | 12,950.0% | (6.5%) |
| | | | | | | |
| Accounts Receivable | 5.6% | 2.9% | (1.2%) | 5.0% | 4.4% | 1.3% |
| Inventory | 2.3% | (25.2%) | 32.8% | 14.2% | (25.1%) | (20.5%) |
| Net PP&E | 2.5% | 5.2% | (5.2%) | (9.5%) | (7.2%) | 30.4% |
| Total Assets | 7.9% | 7.3% | 6.7% | (16.2%) | (10.1%) | (11.7%) |
| | | | | | | |
| Tangible Book Value | 12.8% | 4.9% | (1.8%) | (73.6%) | NM | (99.7%) |
| Common Equity | 5.4% | 6.5% | 4.0% | (34.7%) | (22.3%) | (12.9%) |
| Cash from Ops. | 1.8% | 8.1% | 2.3% | (1.5%) | 15.8% | 11.2% |
| Capital Expenditures | (3.8%) | (6.6%) | (15.9%) | (13.5%) | 9.0% | (10.9%) |
| Levered Free Cash Flow | 29.2% | (4.2%) | (23.1%) | 21.1% | 11.4% | 39.4% |
| Unlevered Free Cash Flow | 28.1% | (3.5%) | (21.3%) | 20.4% | 10.3% | 35.7% |
| Dividend per Share | 11.1% | 17.5% | 17.0% | 12.7% | 9.7% | 6.1% |

**Cisco v. ADSI et al**
**Schedule 12.2 - Cisco Comparable Company Data (Inventory)**
**Expert Report of Greg J. Regan, CPA/CFF, CFE**

# S&P
# Capital IQ

## Cisco Systems, Inc. (NasdaqGS:CSCO) >  Quick Comparable Analysis > Financial Data

| Details | |
|---|---|
| Template: | My Capital IQ Default Comps |
| Currency: | US Dollar |
| As-Of Date: | Apr-13-2020 |

| Company Comp Set | | | | |
|---|---|---|---|---|
| Company Name | Day Close Price Latest | LTM Total Revenue | LTM EBITDA | FY-5 Inventory Turnover |
| Arista Networks, Inc. (NYSE:ANET) | 202.08 | 2,410.7 | 838.6 | 2.65x |
| Juniper Networks, Inc. (NYSE:JNPR) | 21.84 | 4,445.4 | 712.8 | 37.55x |
| Ciena Corporation (NYSE:CIEN) | 44.43 | 3,626.5 | 534.8 | 5.32x |
| CommScope Holding Company, Inc. (NasdaqGS:COMM) | 10.13 | 8,345.1 | 1,140.0 | 6.58x |
| Motorola Solutions, Inc. (NYSE:MSI) | 146.24 | 7,887.0 | 2,122.0 | 8.79x |
| Nokia Corporation (HLSE:NOKIA) | 3.25 | 25,425.3 | 2,717.6 | 6.52x |
| Plantronics, Inc. (NYSE:PLT) | 12.37 | 1,762.4 | 246.6 | 6.29x |
| CalAmp Corp. (NasdaqGS:CAMP) | 5.08 | 363.3 | 32.3 | 10.95x |
| ADTRAN, Inc. (NasdaqGS:ADTN) | 8.95 | 530.1 | (13.6) | 3.62x |
| Digi International Inc. (NasdaqGS:DGII) | 9.93 | 254.2 | 21.8 | 3.23x |
| | | | | |
| Cisco Systems, Inc. (NasdaqGS:CSCO) | 41.21 | 51,550.0 | 16,205.0 | 12.21x |

| Summary Statistics | Day Close Price Latest | LTM Total Revenue | LTM EBITDA | FY-5 Inventory Turnover |
|---|---|---|---|---|
| High | 202.08 | 25,425.3 | 2,717.6 | 37.55x |
| Low | 3.25 | 254.2 | (13.6) | 2.65x |
| Mean | 46.43 | 5,505.0 | 835.3 | 9.15x |
| Median | 11.25 | 3,018.6 | 623.8 | 6.41x |

Displaying 11 Companies.

Values converted at today's spot rate.
Companies by default are sorted by S&P Capital IQ's proprietary relevancy score.

Historical Equity Pricing Data supplied by Interactive Data Pricing and Reference Data LLC

**Cisco v. ADSI et al**
**Schedule 12.3 - Cisco P&L Data**
**Expert Report of Greg J. Regan, CPA/CFF, CFE**

**S&P**
**Capital IQ**

# Cisco Systems, Inc. (NasdaqGS:CSCO) > Financials > Income Statement

*In Millions of the reported currency, except per share items.*

| | | |
|---|---|---|
| **Template:** | Standard | **Restatement:** | Latest Filings |
| **Period Type:** | Annual | **Order:** | Latest on Right |
| **Currency:** | Reported Currency | **Conversion:** | Historical |
| **Units:** | S&P Capital IQ (Defa | **Decimals:** | Capital IQ (Default) |
| **Source:** | Capital IQ & Propriet | | |

| Income Statement | Reclassified 12 months | Reclassified 12 months | Reclassified 12 months | Reclassified 12 months | Reclassified 12 months | Reclassified 12 months | 12 months | LTM 12 months |
|---|---|---|---|---|---|---|---|---|
| For the Fiscal Period Ending | Jul-27-2013 | Jul-26-2014 | Jul-25-2015 | Jul-30-2016 | Jul-29-2017 | Jul-28-2018 | Jul-27-2019 | Jan-25-2020 |
| Currency | USD | USD | USD | USD | USD | USD | USD | USD |
| Revenue | 48,607.0 | 47,142.0 | 49,161.0 | 49,247.0 | 48,005.0 | 49,330.0 | 51,904.0 | 51,550.0 |
| Other Revenue | - | - | - | - | - | - | - | - |
| **Total Revenue** | **48,607.0** | **47,142.0** | **49,161.0** | **49,247.0** | **48,005.0** | **49,330.0** | **51,904.0** | **51,550.0** |
| Cost Of Goods Sold | 19,167.0 | 18,718.0 | 19,451.0 | 18,363.0 | 17,781.0 | 18,597.0 | 19,238.0 | 18,575.0 |
| **Gross Profit** | **29,440.0** | **28,424.0** | **29,710.0** | **30,884.0** | **30,224.0** | **30,733.0** | **32,666.0** | **32,975.0** |
| Selling General & Admin Exp. | 11,761.0 | 11,430.0 | 11,851.0 | 11,401.0 | 11,167.0 | 11,345.0 | 11,777.0 | 11,711.0 |
| R & D Exp. | 5,942.0 | 6,294.0 | 6,207.0 | 6,296.0 | 6,059.0 | 6,332.0 | 6,577.0 | 6,648.0 |
| Depreciation & Amort. | - | - | - | - | - | - | - | - |
| Amort. of Goodwill and Intangibles | 395.0 | 275.0 | 359.0 | 303.0 | 259.0 | 221.0 | 150.0 | 151.0 |
| Other Operating Expense/(Income) | - | - | - | - | - | - | - | - |
| **Other Operating Exp., Total** | **18,098.0** | **17,999.0** | **18,417.0** | **18,000.0** | **17,485.0** | **17,898.0** | **18,504.0** | **18,510.0** |
| **Operating Income** | **11,342.0** | **10,425.0** | **11,293.0** | **12,884.0** | **12,739.0** | **12,835.0** | **14,162.0** | **14,465.0** |
| Interest Expense | (583.0) | (564.0) | (566.0) | (676.0) | (861.0) | (943.0) | (859.0) | (751.0) |
| Interest and Invest. Income | 654.0 | 691.0 | 769.0 | 1,005.0 | 1,338.0 | 1,508.0 | 1,308.0 | 1,151.0 |
| **Net Interest Exp.** | **71.0** | **127.0** | **203.0** | **329.0** | **477.0** | **565.0** | **449.0** | **400.0** |
| Income/(Loss) from Affiliates | (183.0) | - | - | - | - | - | - | - |
| Currency Exchange Gains (Loss) | (74.0) | 23.0 | (173.0) | (19.0) | 13.0 | (24.0) | (62.0) | (42.0) |
| Other Non-Operating Inc. (Exp.) | 43.0 | (20.0) | 162.0 | (14.0) | (43.0) | (109.0) | (25.0) | (36.0) |
| **EBT Excl. Unusual Items** | **11,199.0** | **10,555.0** | **11,485.0** | **13,180.0** | **13,186.0** | **13,267.0** | **14,524.0** | **14,787.0** |
| Restructuring Charges | (105.0) | (418.0) | (489.0) | (266.0) | (756.0) | (358.0) | (322.0) | (284.0) |
| Merger & Related Restruct. Charges | (40.0) | (7.0) | (10.0) | (32.0) | (10.0) | (41.0) | (21.0) | (19.0) |
| Impairment of Goodwill | - | - | - | - | - | - | - | - |
| Gain (Loss) On Sale Of Invest. | 174.0 | 240.0 | 239.0 | (36.0) | (133.0) | 298.0 | (10.0) | 55.0 |
| Asset Writedown | (1.0) | - | - | - | - | - | - | - |
| Legal Settlements | - | - | (188.0) | - | - | (127.0) | 400.0 | 0 |
| Other Unusual Items | - | (655.0) | 164.0 | 74.0 | - | - | - | - |
| **EBT Incl. Unusual Items** | **11,227.0** | **9,715.0** | **11,201.0** | **12,920.0** | **12,287.0** | **13,039.0** | **14,571.0** | **14,539.0** |
| Income Tax Expense | 1,244.0 | 1,862.0 | 2,220.0 | 2,181.0 | 2,678.0 | 12,929.0 | 2,950.0 | 3,485.0 |
| **Earnings from Cont. Ops.** | **9,983.0** | **7,853.0** | **8,981.0** | **10,739.0** | **9,609.0** | **110.0** | **11,621.0** | **11,054.0** |
| Earnings of Discontinued Ops. | - | - | - | - | - | - | - | - |
| Extraord. Item & Account. Change | - | - | - | - | - | - | - | - |
| **Net Income to Company** | **9,983.0** | **7,853.0** | **8,981.0** | **10,739.0** | **9,609.0** | **110.0** | **11,621.0** | **11,054.0** |
| Minority Int. in Earnings | - | - | - | - | - | - | - | - |
| **Net Income** | **9,983.0** | **7,853.0** | **8,981.0** | **10,739.0** | **9,609.0** | **110.0** | **11,621.0** | **11,054.0** |

**Cisco v. ADSI et al**
**Schedule 12.4 - Cisco P&L Data**
**Expert Report of Greg J. Regan, CPA/CFF, CFE**

**S&P**
**Capital IQ**

## Cisco Systems, Inc. (NasdaqGS:CSCO) > Financials > Income Statement

*In Millions of the reported currency, except per share items.*

| | | |
|---|---|---|
| **Template:** | Standard | |
| **Period Type:** | Annual | |
| **Currency:** | Reported Currency | |
| **Units:** | S&P Capital IQ (Def… | |
| **Source:** | Capital IQ & Propriet | |

| | | |
|---|---|---|
| **Restatement:** | Latest Filings |
| **Order:** | Latest on Right |
| **Conversion:** | Historical |
| **Decimals:** | Capital IQ (Default) |

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|
| **Income Statement** | | | | | | | |
| **For the Fiscal Period Ending** | Reclassified 12 months Jul-27-2013 | Reclassified 12 months Jul-26-2014 | Reclassified 12 months Jul-25-2015 | Reclassified 12 months Jul-30-2016 | Reclassified 12 months Jul-29-2017 | Reclassified 12 months Jul-28-2018 | Reclassified 12 months Jul-27-2019 |
| **Currency** | USD | USD | USD | USD | USD | USD | USD |
| Revenue | 48,607.0 | 47,142.0 | 49,161.0 | 49,247.0 | 48,005.0 | 49,330.0 | 51,904.0 |
| = Net Sale service | 10,578.0 | 10,970.0 | 11,411.0 | 11,993.0 | 12,300.0 | 12,621.0 | 12,899.0 |
| + Net Sales Product | 38,029.0 | 36,172.0 | 37,750.0 | 37,254.0 | 35,705.0 | 36,709.0 | 39,005.0 |
| Other Revenue | - | | | | | | |
| **Total Revenue** | **48,607.0** | **47,142.0** | **49,161.0** | **49,247.0** | **48,005.0** | **49,330.0** | **51,904.0** |
| Cost Of Goods Sold | 19,167.0 | 18,718.0 | 19,451.0 | 18,363.0 | 17,781.0 | 18,597.0 | 19,238.0 |
| - Allowance for Inventory | 114.0 | 67.0 $ | - $ | - $ | - $ | - $ | - $ |
| + Products | 15,541.0 | 15,641.0 | 15,377.0 | 14,161.0 | 13,699.0 | 14,427.0 | 14,863.0 |
| - SBC (Cost of Revenues) | 114.0 | 67.0 | 157.0 | 142.0 | 85.0 | 94.0 | 90.0 |
| - Restructuring Charges | - | | (5.0) | - | - | - | - |
| - Legal Settlement | - | (655.0) | 164.0 | - | - | (127.0) | - |
| - SBC (Cost of Revenues) | 40.0 | | (188.0) | 2.0 | - | - | - |
| - Non-Operating (Income) Expenses | - | 45.0 | 50.0 | 74.0 | - | - | - |
| - SBC (Cost of Revenues) | 0 | 0 | 0 | 70.0 | 134.0 | 133.0 | 130.0 |
| - SBC (Cost of Revenues) | 138.0 | 150.0 | - | - | - | - | - |
| + Services | 3,626.0 | 3,732.0 | 4,103.0 | 4,126.0 | 4,082.0 | 4,297.0 | 4,375.0 |
| + SBC (Cost of Revenues) | 138.0 | 150.0 | 157.0 | 70.0 | 85.0 | 94.0 | 90.0 |
| + SBC (Cost of Revenues) | 40.0 | - | - | | | | |
| + SBC (Cost of Revenues) | - | 45.0 | 50.0 | - | - | - | - |
| + SBC (Cost of Revenues) | - | - | - | 142.0 | 134.0 | 133.0 | 130.0 |
| **Gross Profit** | **29,440.0** | **28,424.0** | **29,710.0** | **30,884.0** | **30,224.0** | **30,733.0** | **32,666.0** |
| HM_Prod_COGS_Total_Test | 15,719.0 | 15,181.0 | 15,555.0 | 14,449.0 | 13,918.0 | 14,527.0 | 15,083.0 |
| HM_Serv_COGS_Total_Test | 3,448.0 | 3,537.0 | 3,896.0 | 3,914.0 | 3,863.0 | 4,070.0 | 4,155.0 |
| HM_COGS_Total_Test | 19,167.0 | 18,718.0 | 19,451.0 | 18,363.0 | 17,781.0 | 18,597.0 | 19,238.0 |
| Difference | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| HM_Prod_GP_Total_Test | 22,310.0 | 20,991.0 | 22,195.0 | 22,805.0 | 21,787.0 | 22,182.0 | 23,922.0 |
| HM_Serv_GP_Total_Test | 7,130.0 | 7,433.0 | 7,515.0 | 8,079.0 | 8,437.0 | 8,551.0 | 8,744.0 |
| HM_GP_Total_Test (Calc) | 29,440.0 | 28,424.0 | 29,710.0 | 30,884.0 | 30,224.0 | 30,733.0 | 32,666.0 |
| HM_GP_Total_Test (Direct) | 29,440.0 | 28,424.0 | 29,710.0 | 30,884.0 | 30,224.0 | 30,733.0 | 32,666.0 |
| From 10-K | | | | | | | |
| Product Gross Profit | 22,488.0 | 20,531.0 | 22,373.0 | 23,093.0 | 22,006.0 | 22,282.0 | 24,142.0 |
| Service Gross Profit | 6,952.0 | 7,238.0 | 7,308.0 | 7,867.0 | 8,218.0 | 8,324.0 | 8,524.0 |
| Total Gross Profit | 29,440.0 | 27,769.0 | 29,681.0 | 30,960.0 | 30,224.0 | 30,606.0 | 32,666.0 |
| Source | 2015 AR at 51 | 2015 AR at 51 | 2015 AR at 51 | 2018 AR at 44 | 2018 AR at 44 | 2018 AR at 44 | 2018 AR at 41 |
| Difference | 0.0% | 2.3% | 0.1% | -0.2% | 0.0% | 0.4% | 0.0% |
| Product Gross Profit % | 58.7% | 58.0% | 58.8% | 61.2% | 61.0% | 60.4% | 61.3% |

**EXHIBIT  F**

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 1

1          UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA - OAKLAND DIVISION

3

4    CISCO SYSTEMS, INC., a          )
     California corporation,         )
5    et al.,                         )
                                     )
6                  Plaintiffs,       )  CASE NO.
                                     )  4:18-CV-07602 YGR
7          VS.                       )
                                     )
8    ZAHID "DONNY" HASSAN SHEIKH,    )
     an individual, et al.,          (
9                                    (
                   Defendants.       (
10   _____(
     ADVANCED DIGITAL SOLUTIONS,     (
11   INTERNATIONAL, INC., a          (
     California corporation,         (
12                                   (
          Third-Party Plaintiff,     (
13                                   )
          vs.                        )
14                                   )
     RAHI SYSTEMS, INC., a           )
15   California Corporation,         )
     et al.,                         )
16                                   )
          Third-Party Defendants.    )
17   _____)

18

19

20        CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
                   REMOTE VIDEOCONFERENCE
21        DEPOSITION OF SAMEER KUMAR GUPTA
                  Costa Mesa, California
22                Monday, May 11, 2020

23

24   Job No. 179817
     Reported by:  NIKKI ROY
25                 CSR No. 3052

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 35

1          A.   Yes, for the transceivers I'm familiar with

2     several of the names.

3          Q.   And what are the names?

4          A.   Some of the biggies would be Finisar, Avago,

5     and Broadcom.  F-i-n-i-s-a-r.  A-v-a-g-o.  They're

6     also called Broadcom at times due to some investment

7     branding-related stuff.  Another common one is called

8     Methode, M-e-t-h-o-d-e.  And there are a great many

9     others.  Those are the biggies for the transceiver

10    supply base.

11              There's a little dynamic that's large, 20

12    plus suppliers, 25 plus over the years.  Some come

13    and go, some stay, but the ones that I've mentioned

14    are definitely long-term suppliers for Cisco in that

15    space.

16         Q.   In the last five years, how many different

17    suppliers have there been for Cisco transceivers,

18    ballpark?

19         A.   I'd say they've probably added on the order

20    of 15.

21         Q.   And geographically, are these suppliers in

22    Asia?  Are they in multiple different regions?

23         A.   Largely Asia.  However, there's been some

24    even in the United States.

25         Q.   How about for switches?  Do you -- you

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 64

1  Methode would have something like that, all the

2  places where we've pushed that, and we've tried to

3  scale that program would have a similar database.

4      Q.   And these databases have information along

5  the lines of "Finisar, we manufactured a Cisco

6  transceiver and issued the serial number for it, and

7  we have a database, and you can find that serial

8  number and that transceiver in our database."  Did I

9  get that right?

10     A.   Yes.  It's like that.  Typically we would go

11  to them and we would say "Hey, Finisar, what" -- I

12  have this product serial number.  Can you tell me the

13  label serial number associated with it?"  That might

14  be a way to ask the question.  Or we might say "I

15  have this pairing of data, 1D and 2D data.  Does this

16  match your record?  Yes or no."

17     Q.   Sure.  So for Finisar, have you ever

18  accessed Finisar's database for this kind of

19  information?

20          MR. NELSON:  Objection.

21          THE WITNESS:  I have not accessed it -- yes,

22  I have not accessed it directly.  This is part of

23  what the team would do.  They would contact Finisar,

24  you know, and ask them, you know, they would ask them

25  the question I posed earlier about this pairing of

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 65

1   data "Is this legit?"  Or "Hey, what's the 2D barcode

2   associated with the label, the label serial number

3   associated with this product serial number?"

4   BY MR. ATKINSON:

5        Q.   And so when you talk about the team, these

6   are your investigators, people like David Dao,

7   others; am I right?

8        A.   Yes.  So when I talk about "the team," I was

9   specifically referring to the brand protection

10   engineers.  They would then reach out to an

11   individual such as David Dao who works at Finisar for

12   that information.

13        Q.   I see.  I see.  And the brand protection

14   engineers are within Cisco, right, that you're

15   talking about?

16        A.   That's correct, yes.  They are Cisco

17   employees.

18        Q.   Do these Cisco employees have direct access

19   to the Finisar database to your knowledge?

20        A.   I don't believe so.  I believe we contact

21   the OEM and they process the request for it.

22             In the past we've tried to build that

23   database, but it's very expensive, and given the

24   supplier proliferation it's a neverending task, but

25   for now -- the ultimate goal would be to bring it

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 97

1          Do you see that sentence?

2     A.    Yes, I do.

3     Q.    How does Cisco define a used product?

4          MR. NELSON:  Objection; calls for

5     speculation, lacks foundation, vague.

6          THE WITNESS:  I don't know if there's a

7     uniform standard that I would say is advertised on

8     what we consider "used."  However, what I will say is

9     counterfeiters typically market their products as

10    new.  The reason for that is that a new product will

11    fetch more money on the open market than anything

12    used.

13    BY MR. ATKINSON:

14         Q.  Is it your understanding that the ADSI

15    defendants in this case held out the products at

16    issue as new?

17         A.  I'm not really sure I can answer that as

18    typically I don't know which products are associated

19    with which case.  You know, here I've been given

20    stuff to review.  I would assume that most that the

21    intent was to sell those as new.  I mean, that's

22    typically what -- that's typically the material we

23    look at.

24         Q.  Okay.  But sitting here at this deposition,

25    you can't point to anything specific for the

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1  proposition that the products that were being -- that

2  are at issue here were held out as new?  That's

3  beyond what you have knowledge of, correct?

4      A.  Yes, that's a fair statement.  That's

5  correct.

6      Q.  So there is a page which I can mark, but

7  because of the technical issues I'm just wondering if

8  there's a quicker way to do this.  I found a web page

9  entitled "Cisco Hardware Inspection and Software

10 Re-Licensing Program," and it's on the Cisco website,

11 and there's a frequently -- I think it's a Frequently

12 Asked Questions section.  And I'll just read the

13 portion to you.  You can tell me if it sounds

14 generally correct in your understanding, and if

15 necessary I can send it to you, and we can get a

16 little more into the details.

17         But the question on the website is:  "How

18 does Cisco define 'used' and 'secondary market

19 equipment' that qualifies for this program?

20         "Answer:  Cisco defines used equipment as

21 previously owned equipment that is now owned by a

22 party other than the original customer."

23         And then it goes on to talk about secondary

24 market equipment.

25         Does that understanding of "used," does that

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 215

 1   STATE OF CALIFORNIA      )
                             ) ss.
 2   COUNTY OF LOS ANGELES    )

 3

 4        I, NIKKI ROY, Certified Shorthand Reporter,

 5   certificate number 3052, for the State of

 6   California, hereby certify:

 7        The foregoing proceedings were taken remotely

 8   by me at the time and place therein set forth, at

 9   which time the deponent was placed under oath by me;

10        The testimony of the deponent and all

11   objections at the time of the examination were

12   recorded stenographically by me and were thereafter

13   transcribed;

14        The foregoing transcript is a true and correct

15   transcript of my shorthand notes so taken;

16        I further certify that I am neither counsel for

17   nor related to any party to said action nor in any

18   way interested in the outcome thereof.

19        In witness whereof I have hereunto subscribed

20   my name this 21st day of May, 2020.

21

22        _____

23             NIKKI ROY

24

25

# EXHIBIT  G

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CISCO SYSTEMS, INC. and CISCO TECHNOLOGY INC., | Case No. 4:18-cv-07602 YGR |
| Plaintiffs, | |
| v. | |
| ZAHID HASSAN SHEIKH, IT DEVICES ONLINE, INC., ADVANCED DIGITAL SOLUTIONS INTERNATIONAL, PUREFUTURETECH LLC, K & F ASSOCIATES, LLC, SHAHID SHEIKH, KAMRAN SHEIKH, FARHAAD SHEIKH, IMRAN HUSAIN, and JESSICA LITTLE aka JESSICA MCINTOSH and dba MCINTOSH NETWORKS, | |
| Defendants. | |
| ADVANCED DIGITAL SOLUTIONS INTERNATIONAL, INC., | |
| Third-Party Plaintiff, | |
| v. | |
| RAHI SYSTEMS, INC., | |
| Third-Party Defendants. | |

## EXPERT REBUTTAL REPORT OF RUSSELL W. MANGUM III, PH.D.

CONFIDENTIAL

1

## Table of Contents

I.   Introduction ........................................................................................................... 3

   A.   Assignment ........................................................................................................ 3

II.   Summary of Levy Report ..................................................................................... 4

III.   Preliminary Rebuttal to Levy Report ................................................................. 6

   A.   Levy's Failure to Provide Opinions Regarding the Underlying Criteria and Weights in Cisco's Model ....................................................................................................... 7

   B.   Levy's Inability to Verify the Underlying Criteria in Cisco's Model ............................ 9

   C.   Levy's Lack of Explanation Regarding Logit Regressions and Results ...................... 10

   D.   Levy's Logit Regressions and Analysis Provide Illogical Results ............................... 13

      1.   Cisco's Model Performed on Transceivers in the Broker Dataset and Out-Of-Sample Dataset .................................................................................................... 13

      2.   Logit Regression Coefficients and Omitted Variables ............................................ 15

IV.   Summary of Regan Report .................................................................................. 17

   A.   Lost Profits ....................................................................................................... 17

   B.   Disgorgement (Unjust Enrichment) ....................................................................... 18

V.   Preliminary Rebuttal to Regan Report ............................................................. 19

   A.   Regan's Failure to Prove Cisco Would Make Defendants' Infringing Sales in But-For World ................................................................................................................. 19

      1.   Pricing and Law of Demand ................................................................................ 19

      2.   Cases Regarding Pricing and Demand and Proving Lost Sales ............................... 22

      3.   Competitors and Alternative Purchasing Routes .................................................... 24

   B.   Regan's Failure to Identify Defendants' Infringing Sales and Reliance on Cisco and Vendors to Provide Information ............................................................................ 25

   C.   Regan's Reliance on Dr. Levy's Purported Validation of Cisco's Model ................... 27

   D.   Lost Profits ....................................................................................................... 28

      1.   Applies Probabilistic Average Rates for Non-Authentic Sales ................................ 28

      2.   Assumes Infringing Sales Made Directly by Cisco ................................................ 28

      3.   Assumes All Cisco Product Sales Are Infringing Sales ......................................... 29

   E.   Disgorgement (Unjust Enrichment) ....................................................................... 29

      1.   Assumes All Cisco Product Sales Are Infringing Sales ......................................... 30

   F.   Adjustments to Disgorgement Analysis ................................................................. 30

CONFIDENTIAL

## I.    <u>Introduction</u>

### A.    **Assignment**

1.    On April 17, 2020, I submitted an expert report regarding the proper economic methodology for analyzing and calculating damages claimed by Plaintiffs' as a result of Defendants' alleged actions ("Mangum Initial Report"). Throughout this report I utilize the same definitions and understanding as I did in the Mangum Initial Report.[1]

2.    I understand Plaintiffs allege Defendants have sold, offered to sell, distributed, and advertised Infringing Products and earned revenues from alleged Infringing Products ("Infringing Sales"). On April 17, 2020, Plaintiffs filed two expert reports in relation to this allegation. Daniel S. Levy filed a report ("Levy Report") related to reviewing Cisco's Model; Greg J. Regan filed a report ("Regan Report") related to damages issues.[2] I have been asked to evaluate, analyze, and respond to the Levy Report and Regan Report.

3.    I conduct my analysis through an evaluation of evidence relevant to the facts of the case available at the time of submitting this report. If additional information becomes available, I will update my analysis and opinions appropriately. I assume that Defendants will be found liable with regards to Plaintiffs' allegations, though I understand that Defendants disputes liability. I conduct my analysis and I prepare this report given this assumption.

---

[1] Expert Report of Russell W. Mangum III, Ph.D., April 17, 2020 ("Mangum Initial Report").

[2] Expert Report of Daniel S. Levy, Ph.D., April 17, 2020 ("Levy Report"); Expert Report of Greg J. Regan ("Regan Report").

## II.   Summary of Levy Report

4.   Cisco created a counterfeit detection risk-scoring metric ("Cisco's Model") to determine the likelihood that a product is counterfeit and Dr. Levy was retained to review the performance and validity of Cisco's Model.[3]  Dr. Levy concludes that Cisco's Model has a high probability of identifying verified counterfeit units as High Risk of being counterfeit ("True Positives") and a low probability of identifying authentic units as High Risk of being counterfeit ("False Positives") for switches and transceivers. Dr. Levy supports his conclusion by running logit regressions on transceivers and switches in one dataset, and applying those results to transceivers and switches in the same dataset and a separate dataset against Cisco's Model.

5.   Cisco's Model was created based on data Cisco received from a broker of their products, which Cisco evaluated to determine whether they were authentic or counterfeit ("Broker dataset"). Based on the information in the Broker dataset and Cisco's own understanding of their products and characteristics that indicate a counterfeit product, Cisco concluded that eight criteria can identify such products.[4] I understand the Broker dataset and Cisco's Model is contained within file "Combined Risk Score Results for Expert (4.15.20).xlsx".

6.   I also understand there is a second dataset that is included in file "Combined Risk Score Results for Expert (4.15.20).xlsx" that was not used in creating Cisco's Model ("Out-of-Sample").[5] The Out-of-Sample data is indicated in the file as "Observed", "Warehouse", and "ADSI".[6]

---

[3] Levy Report, p. 2.
[4] Levy Report, p. 5.
[5] *Ibid.*
[6] *Ibid.*

CONFIDENTIAL

7.  Dr. Levy asserts that Cisco's Model performs well and he comes to these conclusions by taking the following steps:

- Testing for calculation errors in Cisco's Model by adding up columns/rows in the "Combined Risk Score Results for Expert (4.15.20).xlsx" file and verifying that they match to the values shown in the file;[7]

- Verifying the criteria in Cisco's Model are appropriately assigned points comparing the score value in the "Combined Risk Score Results for Expert (4.15.20).xlsx" file to underlying records;[8]

- Testing Cisco's Model against his own model of logit regressions to determine which criteria from Cisco's Model are predictive of counterfeit products and the strength each characteristic provides to the prediction;[9]

- Applying the probabilities from his own model (logit regressions) to the Broker dataset and Out-of-Sample dataset to test the probability that Cisco's Model identifies True Positives and False Positives.[10]

8.  Based on his review of the computation in Cisco's Model and the creation of his own model to test the accuracy of Cisco's Model, Dr. Levy concludes that Cisco's Model has a high probability of identifying True Positives and a low probability of identifying False Positives.

---

[7] Levy Report, p. 7.
[8] Levy Report, footnote 17.
[9] Levy Report, p. 10.
[10] Levy Report, pp. 12, 14, 16-19.

CONFIDENTIAL

### III.   Preliminary Rebuttal to Levy Report[11]

9.   The Levy Report and appended materials do not provide the entire bases for his opinions. Dr. Levy does not fully explain the bases behind his analyses, nor has he provided backup files (files communicating the computations, formulas, and program code) or many documents that he relied upon. Given the gaps in the bases for Dr. Levy's opinions, it is not possible to replicate, validate, or even interpret his results, much less sufficiently understand his methods or opinions. However, certain portions of the Levy Report and appended materials highlight approaches and methods that appear, based on the limited available evidence, to be inappropriate, incomplete, or erroneous. I address these issues below.

10.   Dr. Levy attempts to validate Cisco's Model through checking the accuracy of the calculation in Cisco's Model and running logit regressions to compare the results against the data that was used in creating Cisco's Model. Regardless of the method Dr. Levy chooses to authenticate Cisco's Model, the flaw in his attempts is the fact that his conclusions are predicated on the accuracy of the data that is provided to him by Cisco. It is my understanding with regards to the Broker dataset, that Cisco was able to review data and photographs of products to categorize a product as counterfeit or authentic. The question that arises is how Cisco is able to determine with certainty through data and photographs that the product is counterfeit or not? What are the photographic evidence even of? Do they only show the Cisco mark on the outside or do the photos also include what the interior looks like to have a stronger bases in forming their opinion? Regarding the data records, what information was included in there and how

---

[11] Dr. Levy does not provide backup documents used to create his analysis or the files that he relies upon in his report. My opinions are based on information available at the time of submitting this report. If additional information becomes available, I will update my analysis and opinions appropriately.

CONFIDENTIAL

does Cisco know that what they received is accurate? How can Cisco be certain that a product is counterfeit or authentic without physically running tests on the products? This is a critical issue as the foundation of Dr. Levy's analysis relies on the accuracy of this information.

11. In addition, Dr. Levy states that Cisco's Model was developed for and is only to be performed on new products.[12] With regards to Defendants' alleged Infringing Products, Cisco or Dr. Levy may not know whether Defendants' Infringing Products are new products. Dr. Levy has not indicated an awareness of this issue, nor has he claimed to investigate or respond accordingly. Newer versus older products have different price characteristics, unrelated to any counterfeit or infringing status. This is an issue that should have been explained, investigated, and accounted before prior to making any statements about validity or appropriateness.

### A. Levy's Failure to Provide Opinions Regarding the Underlying Criteria and Weights in Cisco's Model

12. Dr. Levy claims to have validated the performance of Cisco's Model by "reviewing the logic and the accuracy of the criteria and weights that Cisco developed to determine whether an individual device had a high, medium, or low risk of being counterfeit."[13] However, Dr. Levy provides no indication that he examined the logic behind Cisco's Model as he suggests.

13. Dr. Levy does not detail any steps he took to understand why or how the eight underlying criteria in Cisco's Model were chosen. With a single exception (discussed below), Dr. Levy similarly fails to even define the eight underlying

---

[12] Levy Report, footnote, 11, p. 7.
[13] Levy Report, p. 2.

CONFIDENTIAL

criteria beyond simply listing them.[14] In his summary of opinions, Dr. Levy claims to have validated the "weights" assigned to Cisco's Model, but he provides no further discussion or evidence that he investigated this topic.[15]

14. As illustrated by his discussion of the one criteria he does explain █████ ████████████████████████████████████, the weights Cisco applies have an enormous influence on the overall risk-scoring assessment.[16] Specifically, Dr. Levy notes that products scoring between 6 and 15 points (aggregating across the eight criteria) are "Medium Risk" of being counterfeit, and products scoring above 15 points will be deemed "High Risk." Thus, meeting the single ████ ████ alone (just one out of the eight criteria) categorizes a product as "Medium Risk" of counterfeit, and ████ of the points necessary to be deemed "High Risk" of counterfeit (i.e., 13 out of 16 points).[17] Dr. Levy fails to evaluate or discuss the legitimacy of Cisco's assignment of such a substantial weight to this factor. Dr. Levy does not question the logic behind Cisco's assignment of 13 points to the ████, or any other criteria in Cisco's Model.

15. Dr. Levy also states that he verified the accuracy of Cisco's Model. This appears incorrect, or at least misleading. Dr. Levy's only review of accuracy of Cisco's Model is checking that the "overall risk-score was the sum of the underlying eight measures and the risk category assigned accordingly was correct."[18] That is, it appears he verified the math. This is <u>far short</u> of a verification of the accuracy of Cisco's Model.

---

[14] Levy Report, footnote 15.

[15] Levy Report, p. 2.

[16] Levy Report, pp. 5-6.

[17] Cisco determines a product's likelihood of being a counterfeit as "High Risk" if a product has a score of over fifteen points, "Medium Risk" if a product has a score of six to fifteen points, and "Low Risk" if a product has a score of five or below. (See Levy Report, p. 6).

[18] Levy Report, pp. 6-7.

8

### B.   Levy's Inability to Verify the Underlying Criteria in Cisco's Model

16.  Dr. Levy mentions the eight underlying criteria for Cisco's Model and then seems to refer to related "test" numbers. In other words, it seems that the eight criteria are the same as the eight tests, but Dr. Levy is not specific about this. He notes that the tests are described in "Risk Scoring for Secondary Market product.docx" but he has not provided that evidence to support this conclusion. Given the lack of bases for his opinions, I am unable to evaluate, verify, or rebut his conclusions.[19] In my review of "CISCO2190 - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER.xlsx", which I understand to be Cisco analysis performed on data related to IT Devices Online, there are eight columns with numbers preceding the criteria and I presume these line up with the evidence Dr. Levy has reviewed.[20]

17.  Out of the eight underlying criteria in Cisco's Model, Dr. Levy only claims to have evaluated five criteria. And, of those five, two were verified using "fuzzy matching technique."[21] Dr. Levy has not provided the results to the fuzzy matching technique performed on Test 7 and Test 8, thus I am unable to evaluate the accuracy of the fuzzy matching technique performed. Dr. Levy was unable to evaluate, in any way (clear or fuzzy), Test 2, Test 3, and Test 6, which, assuming Test/criteria 2, 3, and 6, align with the information in "CISCO2190 - CONFIDENTIAL PURSUANT TO PROTECTIVE

---

[19] Levy Report, footnote 17.

[20] Based on my review of "CISCO2190 - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER.xlsx", tab: "ITD Risk Score (In Scope)", I understand Cisco's Model consists of eight criteria: ██████████████████████████████████████████████████████████████ (See Levy Report, footnotes 15, 17).

[21] Levy Report, footnote 17; pp. 6-7; https://www.techopedia.com/definition/24183/fuzzy-matching.

CONFIDENTIAL

ORDER.xlsx", they are assigned six, three, and six points, respectively.[22] Importantly, the points associated with the three criteria Dr. Levy was unable to verify sum, by themselves, to 15 points, far more than that needed for Cisco to deem a product Medium Risk and only one point shy of High Risk.[23] It appears Dr. Levy has done little of anything to critically evaluate or challenge the method Cisco has developed to assign level of counterfeit risk. It is misleading to consider Dr. Levy's apparent analysis of Cisco's decisions and methods a verification or validation.

### C.    Levy's Lack of Explanation Regarding Logit Regressions and Results

18. Based on the limited information I have about Dr. Levy's analysis, it appears Dr. Levy performed only a limited set of regressions, controlling for a limited sets of variables. Table 1 below shows the criteria (variables) in Cisco's Model,



**Table 1**

| Variables | Cisco's Model Criteria | Levy Logit Regression Broker Dataset | | | Levy Logit Regression Out-of-Sample Dataset | | |
|---|---|---|---|---|---|---|---|
| | | Switches | Transceivers | Modules | Switches | Transceivers | Modules |
| | | | | | | | |
| 9  Unknown Add'l Levy Var. | | √  √ | √  √ | | | | |
| Source: Levy Report | Footnote 15 | Table IV | Table VII | | | | |

√ = Included
Not Included
Not Performed

---

[22] "CISCO2190 - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER.xlsx", tab: "ITD Risk Score (In Scope)", columns AA – AI.

[23] Cisco determines a product's likelihood of being a counterfeit as "High Risk" if a product has a score of over fifteen points, "Medium Risk" if a product has a score of six to fifteen points, and "Low Risk" if a product has a score of five or below. See Levy Report, p. 6.

10

and the set of regressions it seems Dr. Levy could have run based on (a) the different data sets (Broker and Out-of-Sample)[24] and (b) the three different products categories (switches, transceivers, and modules). As shown, Dr. Levy changed the model specifications for the two types of regressions he ran (switches and transceivers in Broker dataset) so that Cisco's Model's variables were not all used, and he added an unknown, unexplained variable to his regressions. No regressions were reported for modules, or using the Out-of-Sample dataset.

19.  The Levy Report and appended materials do not provide the complete set of bases for his opinions regarding his logit regression analyses. Dr. Levy's conclusions and opinions rely in data and methods, but he has not provided information on the data and methods he purportedly employed. Given the gaps in his opinions, it is not possible to fully understand his bases surrounding the logit regressions, much less evaluate, critique, or rebut his opinions. However, the information that has been included in his report allows at least a preliminary commentary on his work, and identification of apparent errors and misplace and/or mistaken methods.

20.  Dr. Levy presents two separate logit regressions to purportedly determine which of the eight underlying criteria in Cisco's Model is predictive of counterfeit products and to determine the strength of each criteria.[25] The first logit regression is performed on switches in the Broker dataset while the second is purportedly performed on transceivers in the Broker dataset (switches and

---

[24] The Broker dataset was created based on data Cisco received from a broker of their products, which was used by Cisco to create Cisco's Model. This data is contained within file "Combined Risk Score Results for Expert (4.15.20).xlsx". The Out-of-Sample dataset is additional data in the same file and indicated by terms "Observed", "Warehouse", and "ADSI" that was *not* used in developing Cisco's Model. (See Levy Report, p. 5).

[25] Levy Report, p. 10.

11

transceivers are the main products at issue in this matter).[26] I am unable to verify Dr. Levy's logic, methodology, inputs, or results, as he has does not provide the data, calculations, or formulas related to the regression results (e.g., by including these materials in his expert report). Once he presents the logit regression results, Dr. Levy does not show how he applied these results to the corresponding tables.[27]

21. Once Dr. Levy presents the tables that utilize the logit regression results to estimate predicted values for switches and transceivers in the Broker dataset, he arbitrarily chooses a cutoff point within the tables to split the products evaluated between counterfeit and authentic.[28] Dr. Levy does not provide a bases for why he chose to cutoff Table V at 0.664 and Table VIII at 0.610.[29] Any adjustments to the cutoff points would affect the results of Tables VI, IX, XI, and XIII. Dr. Levy claims that the statistical model based on the criteria in Cisco's Model "separates counterfeit transceivers from genuine transceivers with _high probability_"[30] (emphasis added). He makes this claim without defining an accepted threshold for "high probability". Table IX shows the split between counterfeit and authentic transceivers, showing a 15% probability that an authentic transceiver is categorized as High Risk.[31] This is unscientific and

---

[26] Table VII is titled "Logit Regression for Switches in Transceiver Dataset." The text directly above states "I perform the same logit model for transceivers from the Broker data. The results are presented in Table VII." Table VII's title and the text above it contradict each other and I am unable to verify whether Table VII presents results from the logit regression performed on switches in a transceiver dataset or it presents results from the logit regression performed on transceivers in the Broker dataset. (See Levy Report, Tables VII, VIII, pp. 11, 15).

[27] E.g., Levy Report, Tables IV to V and Tables VII to VIII.

[28] Levy Report, Tables V, VIII.

[29] Levy Report, pp. 13, 16.

[30] Dr. Levy claims "this statistical model based on the underlying components of the Cisco risk-scoring metric separates counterfeit transceivers from genuine transceivers with high probability." (See Levy Report, p. 16).

[31] For example, this is well above the generally accepted standard probability of less than or equal to 5% for rejecting null hypotheses in regression analysis (B.S. Everitt & A. Skrondal, _The Cambridge Dictionary of Statistics_ (4th ed. 2010), definition for "Significance Level").

CONFIDENTIAL

*ad hoc*. Essentially, Dr. Levy concludes in this instance that being wrong 15 percent of the time is OK with him, but provides no basis for this conclusion, either analytically or based on accepted methods in the economics, finance, or statistics.

22. Dr. Levy's statistical inference is inappropriate as he includes an additional variable without explanation and uses arbitrary cutoff points to support his findings.

### D.   Levy's Logit Regressions and Analysis Provide Illogical Results

#### 1.   Cisco's Model Performed on Transceivers in the Broker Dataset and Out-Of-Sample Dataset

23. In the context of Cisco's Model, the *ideal* scenario is one in which the Broker dataset, the underlying dataset which Cisco's Model is built upon, has a large enough sample of data to create a "perfect" risk-scoring metric. This "perfect" risk-scoring metric would always categorize a *counterfeit* product as High Risk and never categorize an *authentic* product as High Risk of counterfeit.[32] To further test the scoring metric's accuracy, running the metric on another dataset, one which has no relationship to the data used in building the perfect risk-scoring metric, would provide the same results. It would always categorize a *counterfeit* product as High Risk and never categorize an *authentic* product as High Risk.[33]

24. One of the main products at issue in this matter are transceivers and the probability to accurately categorize a transceiver as being counterfeit or

---

[32] More generally, this "perfect" metric would give accurate outcomes when applied to Medium and Low Risk products as well. E.g., it would never categorize a *counterfeit* product as Low Risk and always categorize an *authentic* product as Low Risk.

[33] The same would apply for Medium and Low Risk products, as well.

CONFIDENTIAL

authentic has significant repercussions.[34] Thus, extra attention should be given to how Cisco's Model behaves with respect to transceivers. As discussed below, Cisco's Model performs abysmally with respect to transceivers in the Broker dataset and Out-of-Sample dataset, both of which Dr. Levy focuses on.

25. I understand Table I of Dr. Levy's report is a summary of all products determined as High Risk in the Broker dataset that has been photographically determined to be counterfeit or authentic. The results of this table, along with Tables II, III, VI, XI-XIII, report the probability of Cisco's Model in identifying the two important distinctions that Dr. Levy attempts to validate, counterfeit products that are accurately identified as High Risk of being counterfeit (True Positives) and authentic products that are incorrectly identified as High Risk of being counterfeit (False Positives).[35] It has been noted that it is important to Cisco that they minimize the number of False Positives.[36] The results of these tables provide an insight into the reliability of Cisco's Model.

26. The glaring issue with this analysis is that these tables reveal Cisco's Model does a very poor job at correctly identifying a product as counterfeit or authentic. Dr. Levy's Appendix Table IV and Appendix Table VI reveal just how poorly Cisco's Model predicts the "truth" when it matters most – for transceivers, which are the driving force behind damages in this case.[37] Dr. Levy's Appendix Table IV shows that Cisco's Model incorrectly identifies

---

[34] Based on Plaintiffs' claims, transceivers and switches are the products at issue. (See Levy Report, pp. 8-9; Regan Report, footnote 125).

[35] Levy Report, p. 6.

[36] Ibid.

[37] As discussed above, the "truth" about whether a product is genuine or counterfeit, although a critical issue, is not actually described by Dr. Levy, but rather asserted as he conducts his analyses. Although I am commenting on the portion of his work contained in his report, I am by no means adopting his claims regarding what the known truth is about whether any products at issue in this matter are counterfeit or authentic.

14

authentic transceivers in the Broker dataset as High Risk of counterfeit 39% of the time (False Positives). His Appendix Table VI shows that Cisco's Model only identifies authentic transceivers as Low Risk of counterfeit 50% of the time ("False Negative"). Flipping a coin would give 50% / 50% results. Thus, for transceivers, which make up at least 72 percent of lost profits damages and 44 percent of disgorgement damages in this matter,[38] Cisco's Model is no better than flipping a coin regarding False Negatives, and hardly better for False Positives (39% / 61%) in accurately transceivers as counterfeit or authentic.

27. This is a critical flaw in Dr. Levy's approach and opinions and cannot be glossed over by simply finding another model (his logistic regression) that purportedly arrives at similar results as Cisco's Model.

## 2.   Logit Regression Coefficients and Omitted Variables

28. Dr. Levy provides no explanation for the motivation behind the structure of his regressions. He does not explain the support (aside from Plaintiffs' decisions) for variables he chose, why some are potentially omitted, the expected sign or magnitude of each variable's hypothetical influence, and ultimately testing those results against his theoretical expectations. Further, a cursory review of his regression results show that the coefficients of his variables are inconsistent with that presumed by Cisco's Model, and suggests his models may suffer from sample size and omitted variable bias. Since Dr. Levy has not provided the complete bases for his opinions (including computations, formulas, program

---

[38] At least 72 percent of the lost profits damages ($4.776 / $6.659 = 72%) and 44 percent of the disgorgement damages ($0.798 / $1.8 = 44%) in this matter are related to the "Defendants' Transceivers" category. It seems transceivers are also found in some of the other categories (e.g. Link US) but lack of substantiation in the Levy Report and Regan Report precludes full accounting for the portion of damages related to transceivers. (See Regan Report, ¶3, Schedules 2b, 2d.

CONFIDENTIAL

code, and data used underlying his results and conclusions), I am unable to fully understand, evaluate, critique, or rebut his analysis and conclusions.

29. In his logit regressions, Dr. Levy indicates that he used the eight underlying criteria in Cisco's Model as variables.[39] The results of his regression provide estimated "coefficients", which, as Dr. Levy explains "reflects how each of the eight criteria impact the likelihood that a device was counterfeit.[40] A natural and informative evaluation of Cisco's Model via a logit regression model would be to see if the estimated coefficients of the variables have the same sign and have similar relative magnitudes to the criteria in Cisco's Model. This does not hold true in Dr. Levy's logit regressions and he   that a product is counterfeit.[41] The opposite holds true as well where criteria in Cisco's Model that have low point values show high coefficients.[42] One coefficient is even negative in Dr. Levy's logit regression when the criteria has positive value in Cisco's Model.[43]

30. From the text of his report, it would appear that Dr. Levy's logit regression is defined solely in terms of the eight criteria Cisco gave to him. This does not appear to be the case. Dr. Levy inexplicably includes a ninth variable "Adj_POS".[44] The "Adj_POS" variable shows substantial relative explanatory power. He does not explain the bases for this variable, which renders his logistic regression meaningfully different from Cisco's Model. Another issue of Dr. Levy's logit regression is that several of the criteria in Cisco's Model are

---

[39] Levy Report, Table VI and Table VII.
[40] *Ibid.*
[41] *Ibid.*
[42] *Ibid.*
[43] *Ibid.*
[44] Levy Report, pp. 11, 15.

CONFIDENTIAL

not included and seemingly omitted, which further renders Levy's logit regression model meaningfully different than Cisco's Model.

31. The results of Dr. Levy's logit regression models, based on the partial provision of the bases of his opinions, indicates the weakness of the logit regression models to validate Cisco's Model and to accurately identify counterfeit or authentic products. Dr. Levy's attempts are crucial because they provide a necessary bases for Mr. Regan's damages estimates.

## IV.   **Summary of Regan Report**

32. Mr. Regan evaluates the issue of damages related to Plaintiffs' claims in this matter. He concludes that Cisco was harmed due to Defendants' sales of alleged Infringing Products. This flows from his conclusion that Cisco was selling concurrently with Defendants, and Defendants would not have been selling the accused products in a but-for world (i.e., absent the alleged acts), Cisco would have made those sales.[45] Mr. Regan only presents damages for ADSI and K&F. He does not provided any opinions or damage calculations for individual defendants or other defendants in this matter, nor does he provide any methodology to applying his analysis to these defendants. Mr. Regan has quantified damages in two forms: (1) Lost Profits and (2) Unjust Enrichment.[46]

### A.   **Lost Profits**

33. Mr. Regan splits his lost profits damages into five categories: (1) Sales of Infringing Products by Defendants sourced from Link US ("Link Sales to Defendants"), (2) Sales of Infringing Products by Defendants sourced from Vodanet ("Vodanet Sales to Defendants"), (3) Sales of Infringing Products by

---

[45] Regan Report, ¶¶ 63-67.
[46] Regan Report, ¶¶ 68-72.

CONFIDENTIAL

Defendants tested by Cisco ("Cisco Tested Products"), (4) Sales of "apparent non-authentic" transceivers by Defendants ("Defendants' Transceivers"), (5) Sales of Cisco products with no vendor identified by Defendants ("No Vendor Identified"). His methodology for lost profits for all five categories follow the general steps laid out below:

- Identify Cisco product sales through Cisco and Vendor documents provided to him and Defendants' documents

- Assume Cisco would have made Defendants' Cisco unit sales but-for Defendants' alleged acts

- Apply a discounted Cisco's Global List Price (Only applies to (1) and (2))

- Apply Cisco's Model to Cisco products to compute average probabilistic percentages that products are likely counterfeit, which results in estimated Infringing Sales (Only applies to (1) and (2))

- Deduct incremental Cisco COGS from estimated Infringing Sales

- Deduct Cisco Sales, General, & Administrative expenses

- Compute Pre-Judgement Interest

**B.    Disgorgement (Unjust Enrichment)**

34.   Mr. Regan splits his disgorgement damages into five categories: (1) Link Sales to Defendants, (2) Vodanet Sales to Defendants, (3) Cisco Tested Products, (4) Defendants' Transceivers, (5) No Vendor Identified. His methodology for disgorgement for all five categories follow the general steps laid out below:

- Identify Defendants' sales of Cisco products

- Deduct incremental COGS from sales of Cisco products

- Deduct Defendants' commissions

18

CONFIDENTIAL

- Apply Cisco's Model to Cisco products to compute average probabilistic percentages that products are likely counterfeit, which results in estimated infringing profits from Infringing Sales (Only applies to (1) and (2))

- Compute Pre-Judgement Interest

## V.   Preliminary Rebuttal to Regan Report[47]

35. I am unable to fully replicate, verify, critique, or rebut Mr. Regan's analysis as he did not provide the complete bases of his opinions, including the data he used, programs applied, or the calculations and formulas he employs. However, certain portions of the Regan Report and appended materials highlight approaches and methods that appear inappropriate, incomplete, or erroneous. I address these issues below. Since Mr. Regan relies on certain of Dr. Levy's opinions, I incorporate again here my comments and critiques on Dr. Levy listed above. In addition, all of my opinions in the Mangum Initial Report apply here, including, but not limited to the proper economic methodology for analyzing and calculating damages in the form of lost profits and disgorgement (unjust enrichment) claimed by Plaintiffs in this matter.

### A.   Regan's Failure to Prove Cisco Would Make Defendants' Infringing Sales in But-For World

#### 1.   Pricing and Law of Demand

36. An important question to ask regarding whether Defendants' customers would purchase from Cisco in a but-for world is if there is a large price difference between Cisco's prices and Defendants' prices. Based on the evidence available to me, this appears to be the case. Cisco sells products at very high premiums

---

[47] Mr. Regan does not provide backup documents used to create his analysis or the files that he relies upon in his report. My opinions are based on information available at the time of submitting this report. If additional information becomes available, I will update my analysis and opinions appropriately.

compared to Defendants' sales prices. This would mean that for Defendants' customers to switch over to purchasing from Cisco, they would be paying up to 820% premium in some instances. For example, in Mr. Regan's Link Sales to Defendants, transceiver GLC-LH-SMD is sold at an 821% premium ($1,026 / $125) when compared to Cisco's Global List Price and at a 476% ($595 / $125) premium when compared to a 42% discounted price. Another transceiver GLC-SX-MMD, is sold at a 725% premium ($518 / $71) when compared to Cisco's Global List Price and at a 420% ($300 / $71) premium when compared to a 42% discounted price.[48]

37. One of the fundamental principles of economics is the Law of Demand. It states that the quantity demanded of a product increases with a decrease in price and decreases with an increase in price.[49] Mr. Regan seems unaware of the Law of Demand, as he assumes all customers that bought Defendants' products at substantially lower prices would somehow purchase the identical quantities of Cisco products at much, much higher prices.[50] Mr. Regan relies on a discussion with Charles Williams on April 17, 2020, and the assertion that there is "significant evidence that Cisco is able to sell products at prevailing prices".[51] But that is not the question. The fact that Cisco has sold its products at higher prices to its customers says nothing about purchasers that paid much less to other suppliers. The issue of consumer sensitivity is well known and studied in economics, and is referred to as price elasticity of demand. It reflects known relationship between price and quantity that when price rises, some customers will still pay the higher price, but others will not.

---

[48] Regan Report, Schedule 2b, 2d, Transceiver product "GLC-LH-SMD" and "GLC-SX-MMD".

[49] Marshall, Alfred, 1890. *Principles of Economics*, *8th ed*ition. Macmillan and Co. Book III, Chapter III.

[50] Regan Report, ¶¶ 65, 67.

[51] Regan Report, ¶ 67.

CONFIDENTIAL

38. The concept of price elasticity of demand was created to measure the percentage change in quantity purchased given a percentage change in the price. Mr. Regan has inexplicably assumed complete non-responsiveness of the Defendants' consumers – a position that is untenable economically and logically, and certainly unsupported by Mr. Regan. Without assessing the consumer response of lower quantity when faced with higher prices, any claimed quantity of lost sales is unsupported speculation.

39. Interestingly Dr. Levy and Mr. Regan reference other evidence in this matter that highlights the unreasonable position Mr. Regan is taking regarding price differences and consumer response. In Cisco's Model, one of the primary criteria is referred to as the Commercial Reasonable Test.[52] According to Cisco's Model, ███████████████████████████████ ████████████████████████████████████████████ ████████████████████████████ more than enough to deem the product of Medium Risk of being counterfeit, and nearly ████████████████ necessary to be of High Risk.[53] Importantly, this Commercial Reasonable Test criteria is only one out of eight where ███████████████████████.[54] The fact that Cisco sees a price difference of ██████████████████████ reveals the untenable, and unsupported, position that Regan maintains regarding consumer responsiveness.

---

[52] Levy Report, pp. 5-6.
[53] *Ibid*.
[54] Levy Report, pp. 5-6; "CISCO2190 - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER.xlsx".

CONFIDENTIAL

40. Mr. Regan points out an example in which IT Devices Online, one of the Defendants in this matter, allegedly interfered with Cisco's efforts to sell the same products.[55] The email chain between Cisco employees appears to be a situation where a colleague needs assistance in preventing a prospective customer from purchasing from IT Devices Online, an unauthorized reseller.[56] Despite efforts to warn the customer that they are about to purchase from an unauthorized seller and exclude themselves from being eligible for Cisco's warranty and having a valid software license, the customer decides to purchase from IT Devices Online regardless.[57] The same Cisco employee who requested assistance seems to be experiencing the same problem with "two bigger one's", where customers are purchasing from grey markets instead of directly from Cisco.[58] Defendants' customers are aware they are purchasing products from an unauthorized seller and are also aware of the benefits that come with purchasing an authentic Cisco product, yet they choose to purchase from Defendants at a significantly discounted price.

 2. Cases Regarding Pricing and Demand and Proving Lost Sales

41. Identifying quantitatively the price responsiveness of Defendants' customers (i.e., through determinations of price elasticity of demand) is a required step to assess consumer responsiveness in the face of a price increase. This is particularly true for the very large price increase that would apply between the Defendants' prices and Cisco's prices. Mr. Regan has not attempted to evaluate,

---

[55] Regan Report, ¶ 64, CISCO00000763.
[56] CISCO00000769-772.
[57] CISCO00000767-769.
[58] CISCO00000768.

22

or even shown an awareness of, consumer response and price elasticity in computing lost profits damages to Cisco.[59] The court has acknowledged the importance to evaluate and account for price differences and consumer response, when contemplating lost profits damages. In Crystal Semiconductor Corp. v. TriTech, the court acknowledged that one cannot argue for higher prices that are disconnected from the effect of that higher price on demand for the product.[60] In BIC Leisure Products v. Windsurfing Int'l, the court acknowledged the speculative nature of lost profits claims in the face of substantially different prices.[61]

42. Further, in Brighton Collectibles, Inc. v. RK Texas Leather Mfg., the court addressed the issue of the lack in providing proof that a defendant's sale equals a lost sale.[62] Plaintiffs' cannot assume that a sale was lost without providing sufficient evidence, even when the customer is a shared customer, especially when faced with price differences. In the matter of Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Mgmt., Inc., since evidence of declining sales were not provided, it was necessary to provide another bases to prove lost sales such as testimony from customers who stopped purchasing authentic products to purchase counterfeit products or proving that defendant's customers ever purchased from plaintiffs before.[63] The court recognized that if a customer was

---

[59] This critical role of price elasticity has been noted by the Court in the case *Crystal Semiconductor Corp. v. TriTech*, 246 F.3d 1336 (Fed. Cir. 2001). "In a credible economic analysis... the patentee must also present evidence of the (presumably reduced) amount of products the patentee would have sold at the higher price."

[60] *Crystal Semiconductor Corp. v. TriTech*, 246 F.3d 1336 (Fed. Cir. 2001) ("In a competitive market, sales quantity reacts to price changes.")

[61] There must be causal relation between the infringement and its lost profits and the patent owner must show that but-for the infringement, it would have made infringer's sales. An award of lost profits may not be speculative and if two similar products compete in the same market, prices must not be significantly higher. These points have been noted by the Court in the case *Bic Leisure Products v. Windsurfing Int'l.*, 1 F.3d 1214 (Fed. Cir. 1993).

[62] *Brighton Collectibles, Inc. v. RK Texas Leather Mfg.*, 923 F. Supp. 2d 1245, 1255 (S.D. Cal. 2013).

[63] *Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Mgmt., Inc.*, 628 F. Supp. 2d 312, 320–21 (E.D.N.Y. 2009).

CONFIDENTIAL

willing to pay a lower price for a counterfeit product, it is reasonable to assume they may choose not to purchase an authentic product at a higher price. Furthermore if the defendant's product was not available, the customer may have instead opted to purchase a similarly less expensive product.

43. These cases highlight the economic logic behind a sound evaluation of claimed lost profits when prices differ meaningfully. Mr. Regan's failure to address this known economic reality renders his opinions on lost profits speculative. To avoid speculation, he would have to evaluate the change in demand for Cisco products as sales react to price changes and according to basic economic theory, when price increases, sales quantity decreases.[64] Without any reliable means of testing Defendants' customers' willingness to pay substantially higher prices, lost profits are speculative and improperly biased in favor of Plaintiffs[65], and therefore an inappropriate measure of damages.

### 3.   Competitors and Alternative Purchasing Routes

44. One reason consumers react to higher prices is because they have options. Mr. Regan does not account for, or even acknowledge, the reality of consumer options and alternatives. In reality, many options were available to Defendants' customers. In a but-for world where Defendants' customers who purchased alleged Infringing Products could not purchase the same exact product from Defendants, they would still be faced with myriad of options including, but not limited to the options in Table 2 below:

---

[64] *Crystal Semiconductor Corp. v. TriTech*, 246 F.3d 1336 (Fed. Cir. 2001) ("According to basic tenets of economics, because Crystal is in a competitive market, if Crystal raised prices, Crystal's sales would have fallen.").

[65] That is, each and every reduction in sales due to a Defendants' customer's unwillingness to pay Cisco's higher prices reduces Cisco's potential damages, while each and every failure to identify such reductions benefits increases potential damages and benefits Cisco. In other words, given a starting point where all sales are accused, no analysis of customers' sensitivity to price can increase damages; it can only stay constant (if all customers are found to be price-insensitive) or decline (if some or all customers are found to be price-sensitive).

CONFIDENTIAL

**Table 2**

| | | Product | | | |
|---|---|---|---|---|---|
| | Infringing | Inexpensive Product Similar to Infringing | Authentic Cisco | Authentic Mfg. Competitor | Existing Equipment |
| Defendants | x | √ | √ | √ | √ |
| Unapproved Cisco Seller | x | √ | √ | √ | √ |
| Cisco Mfg. Competitor | x | √ | | √ | √ |
| Cisco | x | √ | $ | | √ |
| Cisco Authorized Partner | x | √ | $ | √ | √ |

*Seller* (row label on left side)

√ = Possible
x = Not Possible
$ = Necessary
N/A

45.  Without substantiation, Mr. Regan excludes the possibility that in a but-for world, at least some of Defendants' customers who purchased alleged Infringing Products would have a multitude of options, as demonstrated in the table above. He unreasonably presumes that Cisco would have made every single unit sale despite the options available, including the option to buy nothing and continue using the existing equipment. With respect to the table above, Mr. Regan asserts that when infringement is not possible (his but for world), all of the Defendants' customers must reject the many check marked options in the table, and will necessarily chose one of just two options that earns money for Cisco.

### B.   Regan's Failure to Identify Defendants' Infringing Sales and Reliance on Cisco and Vendors to Provide Information

46.  Mr. Regan does not identify Defendants' allegedly Infringing Sales on his own and instead relies on Cisco's Model to identify probabilistic averages of

25

Defendants' profits flowing from Infringing Sales.[66] In Mr. Regan's lost profits and disgorgement calculation for Defendants' sales of Cisco Tested Products, he relies solely on Cisco to provide that data. In his lost profits and disgorgement calculation for Link Sales to Defendants, he relies on data provided to him by Link and Cisco.[67] Similarly, in his lost profits and disgorgement calculation for Vodanet Sales to Defendants, he relies on data provided to him by Vodanet.[68] Link and Vodanet's data are incorrect to rely on as they are both shipments into inventory (e.g. Link sells to Defendants and Defendants have yet to sell product, thus remaining in inventory) as opposed to Defendants' actual sales. This may be evidence of inventory accumulation, instead of actual sales.[69]

47. Mr. Regan mentions making adjustments to sales related to Defendants' Cisco products that were acquired from Link and Vodanet as he sees differences in the sales files between these vendors and Defendants.[70] Making adjustments to Defendants' sales based on Link and Vodanet's sales are potentially incorrect as Defendants' may not have made the sale of the product they acquired from Link or Vodanet and might be inventory accumulation.

---

[66] Regan Report, ¶¶ 74, 85.

[67] Regan Report, footnote 124, ¶¶ 69, 73, 80.

[68] Regan Report, footnote 124, ¶¶ 69, 84, 87.

[69] I have opined that it may be appropriate for Plaintiffs' to identify sales based on a large, random sample of Defendants' customers who purchased the alleged Infringing Products, but Plaintiffs' have not taken a large sample, nor provided a reliable statistical inference to rely on such database. (See Mangum Initial Report, ¶ 29).

[70] Regan Report, ¶¶ 75, 84.

CONFIDENTIAL

48. In some instances, Mr. Regan seemingly makes no attempt to separate Defendants' sales of Cisco products from alleged Infringing Products and assumes all sales are derived from Infringing Products.[71] For example, in Mr. Regan's damages calculation of lost profits and disgorgement for No Vendor Identified, it appears he includes sales of Cisco phones.[72] This contradicts his analysis in Link Sales to Defendants in which he excludes "Phone" among other product types.[73] Mr. Regan did not provide many backup files or documents that he relies upon, thus I cannot fully verify his calculations nor the products that are included in his analysis. Mr. Regan fails to satisfy one of the major burdens of Plaintiffs by not identifying Defendants' Infringing Sales.[74]

49. In all of these instances, Mr. Regan does not identify Defendants' Infringing Sales. Instead, he applies a percentage multiplier to a broader group of sales, without actually saying whether any particular sale is infringing or not. This gap in the process alleging wrong doing interferes with the Defendants' ability to see the infringing sale, and consider the costs related to that sale.

### C.    Regan's Reliance on Dr. Levy's Purported Validation of Cisco's Model

50. Mr. Regan relies on Cisco's Model in his lost profits and disgorgement damages calculations. Mr. Regan opines that Cisco's Model appear to be reasonable and he also expects Dr. Levy to opine on Cisco's methodology and find Cisco's Model to be reliable."[75] Mr. Regan's dependence on Cisco's Model is predicated on his own review and Dr. Levy's attempts to validate the metric.

---

[71] Mr. Regan has not identified or defined what a "counterfeit" or infringing product is. (See Regan Report).
[72] Regan Report, Schedules 6a, 6b, 6c; ADSI00334-7, column "item": "CP-6921-C-K9".
[73] Regan Report, Schedule 2b.
[74] Mangum Initial Report, ¶ 25.
[75] Regan Report, footnote 127, ¶ 70.

27

Mr. Regan opines that Cisco's criteria are reasonable and Cisco's conclusions appear to be reasonable, but provides no bases for his conclusion.[76] All of my preliminary rebuttal opinions of Dr. Levy's failings are laid out above.[77]

### D. Lost Profits

#### 1. Applies Probabilistic Average Rates for Non-Authentic Sales

51. In a lost profits calculation, it is Plaintiffs' burden to identify Infringing Sales. As explained above, Mr. Regan does not identify Infringing Sales and instead identifies Defendants' sales of Cisco products which could potentially be infringing, then applies percentages from Cisco's Model in attempts to identify Defendants' Infringing Sales.

#### 2. Assumes Infringing Sales Made Directly by Cisco

52. I understand Cisco sells products directly and through a variety of channels partners including distributors.[78] I also understand Cisco sells a substantial portion of their products through channel partners ("Partners"), while the remainder is sold through direct sales and Partners typically purchase Cisco products from distributors at a 38-42% discount.[79] In Mr. Regan's lost profits calculation of Infringing Sales for Link Sales to Defendants and Vodanet Sales to Defendants, he applies a 42% discount off the GLP.[80] In his lost profits calculation of Infringing Sales for Cisco Tested Products, Defendants' Transceivers, and No Vendor Identified, Mr. Regan assumes that Cisco would

---

[76] Regan Report, ¶ 70.

[77] See Section III of this report.

[78] Cisco 2019 Annual Report, p. 5.

[79] "Distributors typically hold inventory and sell to systems integrators, service providers, and other resellers." (See Cisco 2019 Annual Report, p. 5); Regan Report, ¶ 18.

[80] Regan Report, ¶¶ 77, 85.

28

have made these sales directly, thus applies no discount.[81] He assumes Cisco would have made these sales despite the fact Cisco sells a substantial portion of their products through Partners.[82] Partners if similar to Link and Vodanet, would offer a 42% discount. Mr. Regan's assumption directly conflicts with his position that "defendants' sales of non-genuine "Cisco" products displaced sales otherwise available to Cisco through its authorized distribution network."[83]

### 3.  Assumes All Cisco Product Sales Are Infringing Sales

53. In Mr. Regan's lost profits calculation of Infringing Sales for Link Sales to Defendants and Vodanet Sales to Defendants, he applies a percentage in attempts to compute probabilistic estimates of Infringing Sales.[84] In his calculation of Infringing Sales for Defendants' Transceivers and No Vendor Identified, Mr. Regan simply assumes that all Cisco product sales are Infringing Sales without verifying each sale to determine whether they are authentic or an Infringing Product.[85]

### E.  Disgorgement (Unjust Enrichment)

54. With regards to damages for disgorgement of Defendants' profits, I understand it is the Plaintiffs' burden to identify the sales attributable to the alleged wrongdoing. Mr. Regan has not taken this step. Mr. Regan avoids identifying Infringing Sales and instead choses to identify Defendants' sales of Cisco products, deduct costs, then apply percentages from Cisco's Model in attempts to identify Infringing Sales. This method does not identify actual Infringing

---

[81] Regan Report, ¶¶ 88, 91, 95.
[82] Cisco 2019 Annual Report, p. 5.
[83] Regan Report, ¶ 63.
[84] Regan Report, ¶¶ 74, 85.
[85] Regan Report, ¶¶ 91, 95.

Sales and only estimates a probability of Defendants' sales that are alleged Infringing Sales.

### 1.   Assumes All Cisco Product Sales Are Infringing Sales

55. Instead of identifying Infringing Sales, Mr. Regan applies a probabilistic percentage in attempts to compute estimates of Infringing Sales.[86] He applies these probabilistic percentages from Cisco's Model to the Link Sales to Defendants and Vodanet Sales to Defendants analysis but not to the Defendants' Transceivers or No Vendor Identification analysis.[87] He assumes all sales of Defendants' Transceivers and No Vendor Identification are Infringing Sales.

### F.   Adjustments to Disgorgement Analysis

56. Mr. Regan has not provided the full set of bases for his opinions. He has not provided information, data, formulas, or calculations that are integral parts of his analysis. Without the complete set of bases for his opinions, I cannot fully replicate, evaluate, critique, or rebut fully Mr. Regan's opinions. However, I understand that it is Defendants' burden to respond to Plaintiffs' identification of allegedly Infringing Sales with support for appropriate deductions to those sales, and any apportionment of those sales to factors other than the alleged wrongdoing. Since Mr. Regan has not provided all the bases for his opinions, and has not identified the particular sales that are allegedly infringing, I am unable to identify particular cost deductions to those sales. If additional information becomes available I will update my analysis appropriately.

57. I am able, however, to generally address certain levels of costs that are appropriate for deduction in the calculation of disgorgement damages. I have

---

[86] Regan Report, ¶¶ 82, 87.
[87] Regan Report, ¶¶ 93, 97.

CONFIDENTIAL

reviewed the financial statements of the Defendants' and talked with a representative of the Defendants to understand the costs that were incurred in connection with the sales and marketing of Cisco products.[88] Exhibits to identify these cost deduction categories, as well as a representation of the cost deductions as a percentage of sales are in Exhibit 1 and 1a.

58. Without agreeing on the amounts of sales identified by Mr. Regan, I have taken those sales and deducted the costs I have identified as being incurred in connection with Cisco products. As discussed above, Mr. Regan has made presumptions about the extent of Infringing Products sold by the Defendants. With regard to sales he connects Link Sales to Defendants and Vodanet Sales to Defendants, Mr. Regan presumes a certain percentage of those sales were infringing. But, with respect to Defendants' Transceivers and No Vendor Identified, Mr. Regan assumes (without explanation) that all products are infringing. Given the partial understanding I have of Mr. Regan's analysis, this 100% presumption seems inappropriate, as opposed to the percentage from Link or Vodanet. I have prepared alternative calculations to Mr. Regan's disgorgement analysis to reflect these other infringing percentage applications to the Defendants' Transceivers and No Vendor Identified categories. These alternative analyses are found in Exhibits 2, 3, 4, 5, 5a, 5b, 5c, 6, 6a, 6b, and 6c.[89] A summary of adjustments to Mr. Regan's disgorgement calculations are presented below.

59. I understand that as part of determining damages for disgorgement of unjust enrichment, a Defendant is able to provide evidence of apportionment of its profits to factors other than the alleged wrongdoing. However, since Mr. Regan

---

[88] Discussion with Roya Sadaghiani (CFO of ADSI), April 28, 2020.

[89] The infringing percentage issue here also applies to Mr. Regan's lost profits damages calculation.

CONFIDENTIAL

has (1) not communicated or provided the complete set of bases for his opinions, and (2) not actually identified whether Defendant's sales are infringing, I am thus far hindered from addressing apportionment of profits. Mr. Regan has only identified profits of an aggregated set of Defendants' sales (allegedly infringing and non-infringing). Mr. Regan's application of a percent to this larger grouping does not identify which profits are from allegedly infringing versus non-infringing products. Distinguishing between profits from allegedly infringing products and non- infringing products is part of how apportionment is evaluated. Mr. Regan's choices in his analysis and report submission preclude this evaluation. If additional information becomes available, I will update my analysis appropriately.

## Summary of Damages Disgorgement

| Category | Disgorgement | Source |
|---|---|---|
| Link US Sales to Defendants | $22,704 | Exhibit 2 |
| Vodanet Sales to Defendants | $4,279 | Exhibit 3 |
| Cisco Tested Products | $3,279 | Exhibit 4 |
| Defendants' Transceivers (Weighted 41%) | $68,761 | Exhibit 5 |
| No Vendor Identified (Weighted 41%) | $57,693 | Exhibit 6 |
| **Total** | **$156,716** | |

May 1, 2020

*Russell A. Mangum*

Russell W. Mangum

32

APPENDIX A

# RUSSELL W. MANGUM III



3 Park Plaza          T (949) 955 9025
Suite 790              rmangum@nathaninc.com
Irvine, CA 92614

## CURRENT POSITIONS

Sr. Vice President, Nathan Associates Inc., 2007 to present
Associate Professor, Concordia Univ. Irvine, School of Business and
Economics, 2013 to present

## EDUCATION

Ph.D., economics, University of Southern California, 1995
M.A., economics, University of Southern California, 1992
B.A., economics, with honors, Calif. State University, Fullerton, 1988

## SPECIALIZED EXPERIENCE, RESEARCH, OR INTEREST

Antitrust; Commercial Disputes; Intellectual Property; Statistics and Econometrics, Valuation

## PAST POSITIONS

| | | |
|---|---|---|
| 2002–2012 | Associate Adjunct Professor, USC, Dept. of Economics | Los Angeles, CA |
| 2001–2007 | Vice President, Analysis Group, Inc. | Los Angeles, CA |
| 2001 | Manager, PricewaterhouseCoopers, Financial Advisory Svcs. | Los Angeles, CA |
| 1998–2001 | Managing Associate, Nathan Associates Inc. | Arlington, VA |
| 1998–2000 | Adjunct Professor, John Hopkins University, Krieger School | Washington, DC |
| 1995–1998 | Economist, U.S. Federal Trade Commission | Washington, DC |

## COURSES TAUGHT

- Principles of Microeconomics/Macroeconomics, Intermediate
  Microeconomics/Macroeconomics, Managerial Economics, Statistics and Econometrics, Finance,
  Money and Financial Markets, Economics of Sin, Environmental Economics, Business
  Information Technology, Advanced Topics in Economics

## EXPERIENCE SUMMARY

Dr. Mangum has over 25 years of experience in economic analysis, research, and teaching. His
consulting practice centers on economic analysis and damages quantification in mattes related to
intellectual property and technology, antitrust, class certification, statistical analysis, and complex
commercial disputes. Dr. Mangum's experience as an economic expert is extensive, with testimony
in over 100 matters before local, state, and federal courts. Dr. Mangum has taught graduate and
undergraduate courses in economics, statistics, finance, and econometrics. He is currently an
Associate Professor of Economics in the School of Business and Economics at Concordia
University Irvine, and has previously taught at Johns Hopkins University, The University of
Southern California, and Pepperdine University. Dr. Mangum previously worked at
PricewaterhouseCoopers and The United States Federal Trade Commission, Bureau of Economics.

## PROFESSIONAL EXPERIENCE

### *Intellectual Property*

Dr. Mangum has substantial experience in the area of intellectual property damages, including claims related to infringement of patents; FRAND licensing commitments; patent pools; copyrights; and trademarks; as well as theft of trade secrets; false designation of origin; and false advertising. The case contexts in which Dr. Mangum has performed these analyses include:

- Patent infringement related to:
  - Computer, electronics, and telecommunication industry:
    - Cellular communication technology;
    - Modem communication devices;
    - Wireless communication devices (routers, cards, including under FRAND licensing committments);
    - Handheld device navigation applications;
    - NIC hardware and chipsets;
    - Semiconductors;
    - Webswitching and IP router hardware;
    - Wired and wireless portable electronic temperature sensor devices;
    - Electronic eReader devices;
    - Digital TV Tuners under FRAND licensing commitments;
    - Automated lipsinc animation used in video games;
    - Data encryption devices.
    - VoIP telephony services.
  - Medical devices:
    - Artificial vertebral disc implants;
    - Trocar seals for laparoscopic surgery;
    - Spinal fusion implants;
    - Breast biopsy devices;
    - Remote medical information monitoring technology.
  - Energy
    - Specialized valves used in oil refining;
    - Electric utility management systems;
    - Wide-area real time phasor measurement and monitoring.
  - Food and agriculture:
    - Additive-infused candy;
    - Nutritional supplements;
    - New variety of late ripening white grapes;
    - Structures and methods utilized in the growing of grapes and raisins.

- Business software
  - eProcurement;
  - Business intelligence;
  - Design and simulation;
  - Call routing software;
  - Computer tracking;
  - Program and application management;
- Clothing and clothing design
  - Padded athletic shirits/pants;
  - Shoes;
  - Headwear;
  - Accessories;
- Miscellaneous
  - Electronic nicotine delivery systems (NDS)
  - Personal watercraft devices and accessories
  - Consumer advertising design via use of digital media
  - Automated stapling machines used in bed manufacturing
  - Specialized hardware and control systems used in high-rise elevators
  - Electronic exchange systems for trading of commodities futures contracts
  - Electronic data management system used in public transportation projects
  - Document and print inspection systems
- <u>Trademark, trade dress, or copyright infringement related to:</u>
  - Sponsorship with motorsports, automotive repair tools and devices, beverages and snacks, and apparel;
  - Real estate property aquizition services;
  - Online dining reservation and payment services;
  - Internet search engine terms related to retail sales of food and arranged food products;
  - Enterprise Resource Plannning (ERP) software;
  - Veterinary Teleradiology (online/internet) Services;
  - Devices and software for online mobile device data extraction;
  - Clothing, shoes, and jewelry;
  - Advertising and marketing through wireless mobile communications;
  - Motion picture trademarks in the manufacture of clothing;
  - Furniture products (mechanized and non-mechanized);
  - Portable combustion engines;
  - Infant care products;

- Homeopathic products;
- Postal measuring products;
- Scented candle products;
- Children's toys and art;
- Design plans for a theme amusement park.

- Theft of trade secrets related to:
  - Electronic mechanisms for payment processing;
  - Techical documents, Product features, customer data, and marketing methods/models related to Systems for General Floor Hospital Monitiring of patient vital statistics;
  - Training methods, pricing models, and customer status databases related to Enterprise Resourve Plannning (ERP) software;
  - Customer data and information, and pricing models related to employee pension and benefits insurance brokerage services;
  - Government contracted research into laser vibrometry;
  - Devices and software for mobile device data extraction;
  - IT system design and implementation for the US defense industry;
  - Electronic engineering and CAD packages used in US naval warcraft architecture;
  - Methods for mathematical simulations for the pricing of mortgage backed securities;
  - Soy coffee alternative products;
  - Design, development, marketing, and manufacturing of toys;
  - Computer game accessories.

- False advertising, false designation of orgin, or unauthorized use of likeness related to:
  - Chemical dependence treatment services;
  - Real estate property aquizition services;
  - Security monitoring systems and services;
  - Consumer appliances;
  - High Availability Disaster Recovery (HA/DR) business software;
  - Medical data printer systems;
  - Furniture products;
  - Composed music and lyrics used in television commercials;
  - Restaurant meals and shopping services;
  - Internet advertising services via advertorial placement on publishers' websites;
  - Nutritional supplements and beverages.

- Inventorship disputes related to:
  - Spinal fusion implant systems;
  - Interarterial guidewire and embolic filter devices.

### *Competition/Antitrust*

Dr. Mangum has substantial experience in the area of competition and antitrust, including analyses of relevant product and geographic markets, market power, monopolization, and likelihood of monopolization from impending events. These analyses usually include statistical and econometric analysis of market data to identify the extent of competition, and the magnitude of competition. The case contexts in which Dr. Mangum has performed these analyses include:

- Evaluated common impact and estimated damages, for direct and indirect purchasers, from price fixing and other conspiracies in the markets for commercial tissue paper, bulk vitamins, high-end automobiles, ready mix concrete, consumer apparel, Korean noodles, packaged seafood, interior molded doors, airline travel, and pharmaceuticals.

- Evaluation of alleged competitive forclosure in the market for sleep apnea products, including relevant markets, market power, and lost profits damages.

- Evaluation of alleged price discrimination across dealers of hardscape building materials.

- Evaluation of antitrust claims and affirmative defenses of patent misuse related to required terms in patent license programs for flash memory semiconductors and systems.

- Evaluation of market segments, market channels, and cost pass-through in the market for DRAM-containing products and NFL brand apparel.

- Estimation of damages related to:

    - A conspiracy to boycott developments in DRAM packaging;

    - Foreclosure of competition in market for footware insoles and inserts.

- Evaluation of competitive effects of exclusive dealing clause in a franchise agreement.

- Evaluated the competitive effects of exclusive dealing policies regarding:

    - Acute care hospital and physician services;

    - Customer purchase data exchange related to direct mail advertising and sales;

    - Free standing insert advertising (coupon) services;

    - Replacement parts for 3-piece body welder systems;

    - Interconnect agreements between internet backbone communication services;

    - Supply of biological inputs used in creating generic biologic therapeutic treatments;

    - Professional sports branded athletic apparel;

    - Durable medical equipment;

    - Pharmaceuticals.

- Analyzed the competitive effects from wrongful patent application and issuance (fraud on the patent office) related to processes and mechanisms for food preparation and processing.

- Analyzed the likely competitive effects of proposed mergers in various industries, including hospital services, physician services, pharmaceuticals, medical insurance, construction aggregates, supermarkets, auto parts, cable systems and programming, industrial refractories, and computer game software.

### *Commercial Disputes*

- Estimated damages in the form of lost profits from breach of contract in a services joint venture involving use of indexes and associated data for creation and analysis of international financial securitied and derivatives.

- Estimated damages in the form of disgorgement and lost company value related to brokerage services involving employee pension and benefit programs.

- Evaluated claims of replacement cost and lost profits damages related to alleged interference in the market for femtocell wireless communication products.

- Evaluated claims of damages in the form of lost profits and disgorgement of compensation and benefit from alleged unauthorized use of confidential materials in the market for government contracts for research into laser vibrometry.

- Estimated damages from employee theft of HDD computer memory products from s research/testing facility. Calculated value based on historical in-channel market price and on historical costs of manufacturing and sales.

- Evaluated claims of lost profits damages arising from alleged professional malpractice related to commercial development and land use.

- Provided statistical and data analysis of invoices for disaster recovery and construction services. Estimated lost profits related to alleged fraud, breach of contract, and tortious interference.

- Estimated damages related to alleged breaches of contract, including:

  - Contract involving the development and sale of solar power generation projects;

  - Contract involving the supply of active incredients in nutriceuticals;

  - Non-solicitation agreement between government defense contracting companies;

  - Contract for concession services at amusement parks;

  - Contract for creation and promotion of credit reporting services;

  - Contract for supply of MLB jerseys used in creation of sports memorabilia;

  - Contract for blending and supply contracts for specialized non-dairy beverages;

  - Non-compete clauses (restaurant lease, franchising, structural steel fabrication);

  - Contract for earning and redeeming of frequent flyer miles;

  - Contract for purchase of television airtime on a local over-the-air station;

  - Contract for representation and sale of television programming;

  - Royalty contract regarding design and functionality elements use in toys;

  - Contract for technology and support from software conference bridge systems;

  - Contract for conference calling services and long distance calls connection services.

- Estimated damages from defamation related to the launch of a clinic for medical disorders.

- Evaluated claims by the CA Coastal Commission related to lost recreational value from proposed coastal bluff seawall construction.

- Evaluated concepts and methods for calculating proceeds from from a Qi Tam suit related to improper medical lab billing practices.

- Estimated damages related to Quantum Meruit claims involving use of software to manage viewing and storage of electronic medical images.

### *Employment and Labor*

- Estimated damages related to lost profits; lost company value, employee training and hiring expense, and/or disgorgement of defendant's profits in multiple cases related to the alleged breach of non-solicitation agreements and unauthorized use of confidential information by departing employees the insurance and MLM health and wellness industries.

- Estimated lost profits damages and/or disgorgement of defendant's profits in multiple cases related to the alleged breach of non-solicitation agreements and unauthorized use of confidential information involving government defense contracting companies.

- Estimated plaintiff's lost profits and disgorgement of defendant's profits related to the theft of trade secrets by departing employees in the automated emergency/disaster response industry.

- Estimated disgorgement of defendant's profits related to the theft of trade secrets by departing employees in the naval engineering industry.

- Provided statistical analysis of employee time card and pay data to estimate instances of underpayment or missed breaks.

- Estimated lost earnings and compensation damages related to an alleged wrongful termination of an employee; evaluated lost wages/earnings, lost retirement benefits, and lost compensation through stock options.

- Estimated damages to an employee/inventor related to exclusion as an inventor from PCT applications following termination from a start-up medical devices company; evaluated the plaintiff's claims of lost share of proceeds from technology share.


### *Statistical and Econometric Analysis*

- Performed regression analysis to evaluate class-wide damages related to class certification in the context of alleged conspiracy on the prices of interior molded doors.

- Performed regression analysis to evaluate class-wide damages related to class certification in the context of alleged conspiracy on the prices of packaged seafood.

- Performed regression analysis to evaluate class-wide damages related to class certification in the context of alleged conspiracy on the prices of transatlantic air travel.

- Performed regression analysis to evaluate class-wide damages related to class certification in the context of alleged conspiracy on the prices of Korean noodle products.

- Evaluated regression and statistical analysis offered in support of damages related to an alleged breach of non-solicitation agreements and unauthorized use of confidential information by departing employees the insurance and MLM health and wellness industries.

- Evaluated regression and statistical analysis offered in support of damages and common impact in an indirect purchaser class action related to alleged false advertising for nutritional supplement beverages.

- Performed regression analysis to evaluate class-wide damages related to class certification in the context of alleged conspiracy and exclusive agreement between professional sports teams and an apparel manufacture.

- Performed regression analysis to estimate class-wide damages related to class certification in the context of alleged price fixing in markets for ready mix concrete.

- Performed regression analysis to estimate pass-through of anticompetitive price increases in the manufacturing and sale of DRAM and DRAM containing devices.

- Provided statistical analysis of employee time card and pay data to estimate instances of underpayment or missed breaks.

- Provided sampling techniques and statistical analysis of customer service database to estimate the extent of use of an allegedly infringing feature in a commercial router.

- Evaluated sampling techniques and extrapolation estimates related to allegedly improper medical billing practices and in the context of damages related to construction defects.

- Provided statistical and econometric analysis of survivorship related to consumer membership attrition in credit reporting programs.

- Provided statistical and econometric analysis of the correlation between purchase of infringing products and consequential purchase of related services.

- Provided statiscal analysis and estimate of medical product sales in the absence of data from third party sales force.

- Provided statiscal and econometric analysis of conference calling minutes related to alleged intentional interference and unfair competition.

- Conducted statistical analysis of incremental costs in support of lost profits calculations.


## EXPERT WITNESS EXPERIENCE (SINCE 2015)

- *Cisco Systems Inc. et al. v. Zahid Hassan Sheikh et al.*, United States District Court, Northern District of California (2020). Submitted an expert report behalf of certain defendants related to damages from alleged counterfeit sales and trademark infringement involving transceiver and switching IT equipment.

- *San Diego Country Credit Union v. Citizens Equity First Credit Union*, United States District Court, Southern District of California (2020). Provided deposition testimony on behalf of plaintiff related to damages flowing from fraudulent declaration in the registration of a trademark involving credit unions.

- *Sprint Communications Company LP v. Atlantic Broadband Finance LLC, et al.*, United States District Court, Southern District of Delaware (2020). Submitted an expert report behalf of plaintiff related to lost profits royalty damages from alleged patent infringement involving VoIP telephany services.

- *Sprint Communications Company LP v. Charter Communications Inc. et al.*, United States District Court, Southern District of Delaware (2020). Submitted an expert report behalf of plaintiff related to lost profits and royalty damages from alleged patent infringement involving VoIP telephany services.

- *Sprint Communications Company LP v. Mediacom Communications Corp.*, United States District Court, Southern District of Delaware (2020). Submitted an expert report behalf of plaintiff related to lost profits and royalty damages from alleged patent infringement involving VoIP telephany services.

- *Sprint Communications Company LP v. TPC Global LLC et al.*, United States District Court, Southern District of Delaware (2020). Submitted an expert report behalf of plaintiff related to lost profits and royalty damages from alleged patent infringement involving VoIP telephany services.

- *Sprint Communications Company LP v. Wideopenwest Inc. et al.*, United States District Court, Southern District of Delaware (2020). Submitted an expert report behalf of plaintiff related to lost profits and royalty damages from alleged patent infringement involving VoIP telephany services.

- *In Re: Molded Doors Indirect Purchaser Antitrust Litigation*, United States District Court, Eastern District of Virginia, Richmond Division (2020). Provided deposition testimony related to class certification and the merits phase of an antitrust case on behalf of an indirect purchaser plaintiff class related to the evaluation of common impact, pass-through, and class wide damages involving alleged collusion on the prices for interior molded doors.

- *S&P Dow Jones Indices LLC and SPDJ Singapore Pte Ltd. v. BSE Ltd.,* United States District Court, Northern District of California (2020). Testified in a tribunal trial on behalf of claimants rconcerning damages from breach of contract in a service joint venture related to the use of indexes and associated data for creation and analysis of international financial securitied and derivatives.

- *Citcon USA LLC v. Riverpay Inc. et al.,* United States District Court, Northern District of California (2019). Testified in trial on behalf of defendant/counterplaintiff concerning damages from alleged tortious intereference and breach of contract involving electronic payment processing services.

- *3G Licensing, et al., v. Lenovo Group Ltd., et al.,* United States District Court, District of Delaware (2019). Submitted an expert report on behalf of defendants Lenovo and Motorola Mobility related to reasonable royalty damages for patent infringement involving cellular phone technologies.

- *Martifer-Silverado Fund I, LLC and Silverado Power LLC v. Talesun Solar USA, Ltd.,* Superior Court of California, San Francisco County (2019). Provided deposition testimony on behalf of Defendant, related to alleged breach of contract involving solar energy projects.

- *Inteliquent, Inc. v. Free Conferencing Corporation, et al.,* United States District Court, Northern District of Illinois, Eastern Division (2019). Provided deposition testimony on behalf of Counterclaim Plaintiffs, related to alleged breach of contract, intentional interference, and unfair competition involving conference calling services and long distance calls connection services.

- *In Re Domestic Airline Travel Antitrust Litigation,* United States District Court, District of Columbia (2019). Submitted expert report related to the economic effects of an alleged conspiracy to constrain capacity in the domestic airline travel industry.

- *In Re: Packaged Seafood Products Litigation*, United States District Court, Southern District of California (2019). Provided deposition testimony related to the merits phase of the case and also testfied at a bench trial (evidentiary hearing) on behalf of direct purchaser plaintiff class related to class certification and estimation of class wide damages in an antitrust case involving alleged collusion on the prices for packaged seafood. Also issued initial and reply reports regarding class certification and initial and reply reports related to antitrust effects and damages.

- *T.R.P. Company, Inc., v. Similasan AG and Similasan Corporation,* United States District Court, District of Nevada (2019). Provided deposition testimony on behalf of plaintiff/counter-defendant involving unjust enrichment and lost profits related to trademark infringement of certain homeopathic products.

- *Advanced Digital Solutions International, Inc., v. Rahi Systems, Inc., et al.,* Superior Court for the State of California, County of Alameda (2019). Provided deposition testimony on behalf of plaintiff concerning disgorgement damages related to trade secret misappropriation involving the theft of customer lists.

- *ADT LLC and ADT* US *Holdings v. Alder Holdings LLC, et al.,* United States District Court, Southern District of Florida, Palm Beach Division (2019). Provided trial testimony on behalf of plaintiff involving unjust enrichment and royalty damages related to alleged false advertising and unfair competition, and contempt of injunction related to security monitoring systems and services.

- *ADT LLC v. Security Networks LLC et al.,* United States District Court, Southern District of Florida, Palm Beach Division (2019). Submitted an expert report on behalf of plaintiff involving unjust enrichment and royalty damages related to alleged false advertising and unfair competition, and contempt of injunction related to security monitoring systems and services.

- *ADT LLC & ADT US Holdings, Inc. v. Northstart Alarm Services LLC et al.,* United States District Court, Southern District of Florida (2019). Submitted an expert report on behalf of plaintiff involving unjust enrichment and royalty damages related to alleged false advertising and unfair competition, and contempt of injunction related to security monitoring systems and services.

- *Grasshopper House LLC. V. Clean & Sober Medua LLC., et al.*, and *Cliffside Malibu, et al. v. Grasshopper House LLC, et al.* United States District Court, Central District of California, Western Division (2019). Testified in trial on behalf of counterclaim plaintiffs involving damages from alledged false advertising related to treatment services for chemical dependence.

- *In Re Korean Ramen Antitrust Litigation,* United States District Court, Northern District of California, San Francisco Division (2018). Provided trial testimony on behalf of a class of purchasers of Korean Noodles related to damages from an alledged antitrust price fixing conspiracy.

- *Monster Energy Company v. Integradted Supply Network LLC,* United States District Court, Central District of California (2018). Provided trial testimony on behalf of plaintiff related to damages from alleged trademark and trade dress infringement involving beverages and snacks, tools, and clothing, motorsports and sponsorship and promotion.

- *Soteria Encryption LLC v. Apricorn Inc., et al.,* United States District Court, Central District of California, Western Division (2018). Submitted an expert report on behalf of defendants Apricorn and Lenovo related to reasonable royalty damages for patent infringement involving data encryption devices.

- *McRO Inc. v. Bandai Nameco Games America Inc., et al.*, United States District Court, Central District of California, Western Division (2018). Provided deposition testimony on behalf of certain defendants related to damages from alleged patent infringement involving automated lipsinc animation used in video games.

- *In Re: Transpacific Passenger Air Transportation Antitrust Litigation*, United States District Court, Northern District of California San Francisco Division (2018). Provided deposition testimony on behalf of direct purchaser plaintiff class related to class certification and estimation of class wide damages in an antitrust case involving alleged collusion on the prices for transatlantic air travel.

- *Express Homebuyers USA, LLC, v. WBH Marketing Inc.*, United States District Court, Eastern District of Virgina, Alexandria Division (2018). Provided deposition testimony on behalf of defendant/counterplaintiff related to damages from alleged trademark infringement and trade libel involving real estate propery acquisition services.

- *Schneider* et *al. v. Chipotle Mexican Grill, Inc.*, United States District Court, Northern District of California, San Francisco Division (2017). Provided deposition testimony on behalf of defendant related to class certification and price premium damages involving alleged false statements about food product ingredients.

- *Microsoft Corporation v. A&S Electronic Inc.* United States District Court, Northern District of California (2017). Submitted an expert report on behalf of defendant related to damages from alleged trademark and copyright infringement involving business productivity software packages.

- *Personal Watercraft Product SAS v. Flydive, Inc., et al.,* United States District Court, Central District of California, Southern Division (2017). Submitted an expert declaration on behalf of plaintiff related to irreparable harm from alleged patent infringement in the personal watercraft industry.

- *ADT LLC and ADT US Holdings v. Vivint Inc.,* United States District Court, Southern District of Florida, Palm Beach Division (2017). Provided deposition testimony on behalf of plaintiff involving unjust enrichment and royalty damages related to alleged false advertising and unfair competition related to security monitoring systems and services.

- *Profoot Inc. v. Bayer Healthcare LLC,* United States District Court, Easterm District of New Jersey (2017). Provided deposition testimony on behalf of plaintiff Profoot, involving lost profits damages related to alleged anticompetitive actions in the market for footware insoles and inserts.

- *In re: Sotera Wireless, Inc., Debtor,* United States Bankruptcy Court, Southern District of California (2017). Provide trial testimony on behalf of creditor Masimo Corporation, involving lost profits, unjust enrichment, and royalty damages related to alleged theft of trade secrets in the market for systems used in general floor hospital patent monitoring.

- *Globeride Inc., v. Pure Fishing, Inc.,* United States District Court, Central District of California (2017). Provided deposition testimony on behalf of plaintiff concerning reasonable royalty damages related to alleged patent infringement involving fishing reels.

- *ADT LLC and ADT US Holdings v. Capital Connect Inc., et al.,* United States District Court, Northern District of Texas, Dallas Division (2016). Submitted an expert report on behalf of plaintiff involving unjust enrichment and royaty damages related to alleged false advertising and unfair competition related to security monitoring systems and services.

- *3B Medical Inc. v. ResMed et al.,* United States District Court, Middle District of Florida, Tampa Division (2016). Provided deposition testimony on behalf of plaintiff related to alleged competitive foreclosure in the market for sleep apnea products.

• *ADT LLC and ADT* US *Holdings v. Alarm Protection LLC, et al.,* United States District Court, Southern District of Florida, Palm Beach Division (2016). Provided deposition testimony on behalf of plaintiff involving unjust enrichment and royalty damages related to alleged false advertising and unfair competition related to security monitoring systems and services.

• *Reserve Media Inc. v. Efficient Frontiers Inc. et al.,* United States District Court, Central District of California (2016). Provided deposition testimony on behalf of counterdefendant concerning damages related to alleged trademark infringement involving restaurant reservation services.

• *Adel Tawfilis, DDS d/b/a Carmel Valley Center for Oral and Maxillofacial Surgery and Hamid A. Towhidian, M.D., et al. v. Allergan, Inc.,* United States District Court, Central District of California, Southern Division (2016). Provided deposition testimony on behalf of a class of purchasers of Botox cosmetic products related to the certification of a class alledging an anticompetitive exclusive supply agreement.

• *Homeland Housewares, LLC. and Nutribullet, LLC v. Shark Ninja Operating LLC,* United States District Court, Central District of California, Western Division (2016). Provided deposition testimony on behalf of defendant concerning damages related to false advertising involving consumer appliances.

• *Evolv LLC v. Joyetech USA, LLC, Joyetech (Changzhou) Electronics Co., Ltd., and Wismec Industry Co., Ltd.,* United States District Court, Central District of California, Southern Division (2016). Submitted an expert declaration on behalf of plaintiff concerning irreparable harm from patent infringement involving electronic nicotine delivery system (ENDS) technology and products.

• *Edible Arrangements v. Provide Commerce Inc.,* United States District Court, Central District of Connecticut (2016). Submitted an expert report on behalf of defendant concerning claimed trademark disgorgement damages and lost royalty damages involving internet search engine terms related to retail sales of food and arranged food products.

## RESEARCH PAPERS AND PUBLICATIONS

- "FRAND Commitments and Royalties for Standard Essential Patents", with S. Bosworth and E. Matolo, in <u>Complications and Quandaries in the ICT Sector</u>, Bharadwaj, Gupta, and Devaiah eds., Ch. 2, Springer Open, ISBN 978-981-10-449570, 2018.

- "Corrective Advertising in Lanham Act Damages: The Use and Misuse of Past Advertising Expenditures" with S. Bosworth and E. Matolo, *The Trademark Reporter*, May-June Volume, 2017.

- "The Case for Admitting Settlement License Agreements in a Reasonable Royalty Analysis," with S. Conroy and R. Knudsen, 2011, *Les Nouvelles,* Volume XLVI No. 4, 2012.

- "Cost Analysis," with J. Kinrich and A. Meister, in *Intellectual Property Damages, Guidelines and Analysis*, 2004 supplement, M. Glick, L. Reymann, and R. Hoffman, eds., Chapter 14a, Wiley: New York.

- "Analysis and Measurement of Damages in Patent Infringement Actions," with J. Kinrich, 2003, proceedings of Practicing Law Institute.


## PAST OR PRESENT AWARDS, PROFESSIONAL MEMBERSHIPS

Outstanding Antitrust Litigation Achievement in Economics, American Antitrust Institute, 2019

American Antitrust Institute, advisory board member
American Bar Association, member
American Economic Association, member
Licensing Executives Society, member, chapter chair
Los Angeles County Bar Association, member
Los Angeles Intellectual Property Law Association, member
Orange County Bar Association, member
Orange County Patent Law Association, member

# Appendix B
## Documents Received

**Bates Range**

| Stamp | Beginning | Ending |
|---|---|---|
| - ASDI | 00001 | 00098 |
| - ASDI | 00099A | 00099A |
| - ASDI | 00099 | 00333 |
| - ASDI | 00334 | 00334 |
| - ASDI | 00335 | 00335 |
| - ASDI | 00336 | 00336 |
| - ASDI | 00337 | 00337 |
| - ASDI | 00338 | 00338 |
| - ASDI | 00339 | 00339 |
| - ADSI | 00340 | 01518 |
| - CCO | 000001 | 001676 |
| - CISCO | 2190 | 2190 |
| - CISCO | 2191 | 2191 |
| - CISCO | 00000001 | 00002189 |
| - CISCO | 00002190 | 00002783 |
| - CISCO | 00002783 | 00003961 |
| - CISCO | 00003962 | 00004158 |
| - CISCO | 00004159 | 00008025 |
| - CISCO | 00008028 | 00008099 |
| - CISCO | 00008100 | 00008106 |
| - CISCO_ABARAM | 000001 | 000360 |
| - CISCO_ABARAM | 000361 | 000361 |
| - KFA | 00001 | 00001 |
| - KFA | 00002 | 00002 |
| - KFA | 00003 | 00003 |
| - KFA | 00004 | 00004 |
| - KFA | 00005 | 00005 |
| - KFA | 00006 | 00006 |
| - PFT | 00001 | 00044 |
| - VTA | 001 | 005 |

**Documents**

- Deposition of Shahid Sheikh, Sep. 10, 2019 and Ex. 15
- K&F P&L 2015
- K&F P&L 2016
- K&F P&L 2017
- K&F P&L 2018
- K&F P&L 2019
- K&F Balance Sheet 2015
- K&F Balance Sheet 2016
- K&F Balance Sheet 2017
- K&F Balance Sheet 2018
- K&F Balance Sheet 2019

Cisco Systems Inc., et al v. Zahid Hassan Sheikh., et al.

# Appendix B
## Documents Received

### Court Documents

- Complaint for Damages and Injunctive Relief , December 18, 2018
- ADSI Supplement to Cisco Mediation Brief, December 11, 2019
- Cisco's Second Amended Complaint for Damages & Injunctive Relief, December 04, 2019
- Defendants Advanced Digital Solutions International, Inc., PureFutureTech, LLC, Kamran Sheikh, and Farhaad Sheikh's Answer to Plaintiff's Second Amended Complaint, December 18, 2019
- Joint Case Management Statement & [Proposed] Order , December 19, 2018
- Plaintiffs' Corporate Disclosure Statement , December 19, 2018
- Plaintiffs' Disclosure of No Non-Party Interested Entities or Persons, December 19, 2018
- Defendants Shahid Sheikh, Roya Sadaghiani, Advanced Digital Solutions International, Inc., Kamran Sheikh, PureFutureTech, LLC, And Jessica Little's Rule 26 Initial Disclosures
- Certification of Interested Entities or Persons By Defendants IT Devices Online, Inc. and Zahid "Donny" Hassan Sheikh, January 31, 2019
- Defendants Shahid Sheikh, Roya Sadaghiani, Advanced Digital Solutions International, Inc., Kamran Sheikh, PureFutureTech, LLC, And Jessica Little's Answer to Plaintiffs' Complaint, February 25, 2019
- Defendants Advanced Digital Solutions International, LLC., and PureFutureTech, LLC's Corporate Disclosure Statement, February 25, 2019
- Defendants' Disclosure of Non-Party Interested Entities or Persons, February 25, 2019
- Declaration of Parkhurst in Support of Plaintiff's and Cross-Defendants' MSA of the Cross-Complaint of Masood Minhas and Pure Future Technology, March 01, 2019
- Exhibits C, D, E, H, I, and J to Declaration of Parkhurst Iso Plaintiff's and Cross-Defendants' MSA of the Cross-Complaint of Minhas and Pure Future Technology, March 01, 2019
- MPA ISO Plaintiff's and Cross-Defendants' MSA of the Cross-Complaint of Masood Minhas and Pure Future Technology, March 01, 2019
- Notice of Lodging Records Designated by Mike Mihas as Confidential Under the Protective Order, March 01, 2019
- Notion of Motion for Plaintiff's and Cross-Defendants' MSA of the Cross-Complaint of Masood Minhas and Pure Future Technology, March 01, 2019
- [Proposed] Order Granting Plaintiff's and Cross-Defendants' MSA of the Cross-Complaint of Masood Minhas and Pure Future Technology, March 01, 2019
- Separate Statement in Support of Plaintiff's and Cross-Defendants' MSA of the Cross-Complaint of Masood Minhas and Pure Future Technology, March 01, 2019
- Joint Case Management Conference Statement, March 11, 2019
- Defendant Advanced Digital Solutions International, Inc.'s Third-Party Complaint Against Rahi Systems, Inc., Pure Future Technology, Inc., Masood Minhas A.K.A. Mike Minhas, Nauman Karmat A.K.A. Norman Karmat, Nabia Udin, Karoline Banzon, and Kaelyn Nguyen, March 11, 2019
- First Amended Complaint for Damages and Injunctive Relief, March 19, 2019
- Defendants Advanced Digital Solutions International, Inc., PureFutureTech, LLC, and Jessica Little's Answer to Plaintiffs' First Amended Complaint, March 29, 2019
- IT Devices Online, Inc. and Zahid "Donny" Hassan Sheikh's Answer to Plaintiffs' First Amended Complaint, April 01, 2019
- IT Devices Online, Inc. and Zahid "Donny" Hassan Sheikh's Answer to Plaintiffs' First Amended Complaint, April 02, 2019
- Stipulation RE: Response to Third Party Complaint of Advanced Digital Solutions, Inc., April 30, 2019
- Motion to Dismiss and Motion to Strike Third Party Complaint, May 06, 2019
- Notice of Pendency of Other Action or Proceeding Pursuant to Civil Local Rule 3-13, May 06, 2019
- Third Party Defendants Rahi Systems, Inc. Federal Rule of Civil Procedure 7.1 Disclosure, May 06, 2019
- Third Party Defendants Pure Future Technologies, Inc. Federal Rule of Civil Procedure 7.1 Disclosure, May 06, 2019

Cisco Systems Inc., et al v. Zahid Hassan Sheikh., et al.

# Appendix B
## Documents Received

**Court Documents**

- Third Party Defendants' Certification of Interested Entities or Persons Pursuant to Local Rule 3-15, May 06, 2019
- Third Party Defendants' Demand for Jury Trial, May 06, 2019
- Third Party Plaintiff Advanced Digital Solutions International, Inc.'s Opposition to Motion to Dismiss and Motion to Strike Third-Party Complaint, May 20, 2019
- Reply in Support of Motion to Dismiss and Motion to Strike Third-Party Complaint Filed By Defendant and Third-Party Plaintiff Advance Digital Solutions, Inc., May 28, 2019
- Order Re: Motion to Dismiss Third Party Complaint and Strike Motion for Attorney's Fees, June 14, 2019
- Stipulation and [Proposed] Order to Extend Mediation Deadline, June 19, 2019
- Order to Extend Mediation Deadline, June 20, 2019
- Answer to Third-Party Complaint Filed by Defendant and Third-Party Plaintiff Advanced Digital Solutions, Inc., June 29, 2019
- Statement to the Court Concerning July 8, 2019 Status Conference, June 29, 2019
- Statement of Defendant and Third-Party Plaintiff, Advanced Digital Solutions International, Inc., Concerning the July 8, 2019 Status Conference, July 01, 2019
- Plaintiff's and Defendants Zahid "Donny" Hassan Sheikh and IT Devices Online, Inc.'s Joint Statement RE July 8, 2019 Case Management Conference, July 03, 2019
- Order Vacating Case Management Conference, July 03, 2019
- Joint Status Report for Compliance Hearing, August 14, 2019
- Stipulated Protective Order Re: Confidential Information, September 06, 2019
- Stipulation and Proposed Order to Extend Mediation Deadline, September 10, 2019
- Stipulated Protective Order Re: Confidential Information, September 10, 2019
- Order to Extend Mediation Deadline, September 13, 2019
- Stipulation and [Proposed] Order to Extend Mediation Deadline, October 31, 2019
- Order Granting Stipulation to Extend Mediation Deadline, November 01, 2019
- Plaintiffs Cisco Systems Inc. and Cisco Technology, Inc. Motion for Leave to File Second Amended Complaint, November 12, 2019
- Declaration of Anna P. Chang in Support of Plaintiffs Cisco Systems, Inc. and Cisco Technology, Inc.'s Motion for Leave to File Second Amended Complaint, November 12, 2019
- Order Granting Motion for Plaintiffs Cisco Systems, Inc. and Cisco Technology, Inc.'s Leave to File Second Amended Complaint, November 12, 2019
- Statement of Non-Opposition to Plaintiffs Cisco Systems, Inc. and Cisco Technology, Inc.'s Motion for Leave to File Second Amended Complaint, November 15, 2019
- Statement of Non-Opposition to Plaintiff's Motion for Leave to File Second Amended Complaint, November 26, 2019
- Declaration of Andrew Parkhurst in Support of  Defendants' Statement of Non-Opposition to Plaintiff's Motion for Leave to File Second Amended Complaint, November 26, 2019
- Amended Declaration of Andrew Parkhurst in Support of  Defendants' Statement of Non-Opposition to Plaintiff's Motion for Leave to File Second Amended Complaint, November 26, 2019
- Order Granting Cisco Systems, Inc. and Cisco Technology, Inc. Motion for Leave to File Second Amended Complaint, December 03, 2019
- Response of ADSI Parties to Joint Administrative Motion
- Declaration of Richard Nelson in support of Joint Administrative Motion for Order Setting Emergency Case Management Conference, January 09, 2020
- Joint Administrative Motion for Order Setting Emergency Case Management Conference, January 09, 2020
- Order Granting Joint Administrative Motion for Order Setting Emergency Case Management Conference, January 09, 2020
- Plaintiffs' Rule 26(A) Expert Witness Disclosure

# Appendix B
## Documents Received

---

### Court Documents

---

- (Dkt 87) Order Granting Joint Administrative Motion for Order Setting Emergency Case Management Conference, January 10, 2020
- (Dkt 88) Response to ADSI Parties to Joint Administrative Motion, January 10, 2010
- (Dkt 93) Defendant Imran Husain's Answer to Plaintiff's Second Amended Complaint, January 31, 2020
- (Dkt. 100) Joint Case Management Statement, February 14, 2020
- (Dkt. 106) Case Management and Pretrial Order, February 27, 2020
- (Dkt 108) Notice of Motion and Motion by Defendants to Stay Civil Proceedings Until Expiration of Statue of Limitations; Memorandum of Points and Authorities, March 16, 2020
- (Dkt 108-1) Declaration of Andrew Parkhurst in Support of Motion by Defendants to Stay Civil Proceedings Until Expiration of Statue of Limitations, March 16, 2020
- (Dkt 108-2) [Proposed] Order of Motion by Defendants to Stay Civil Proceedings Until Expiration of Statue of Limitations, March 16, 2020
- (Dkt 113) Administrative Motion to Permit Plaintiffs to Complete Certain Third Party Discovery After the Fact Discovery Cutoff, March 20, 2030
- (Dkt 113-1) [Proposed] Order Granting Plaintiffs' Administrative Motion to Permit Plaintiffs to Complete Certain Third Party Discovery After the Fact Discovery Cutoff, March 20, 2020
- (Dkt 113-2) Declaration of Angela M. He in Support of Plaintiffs' Administrative Motion to Permit Plaintiffs to Finish Certain Third Party Discovery After the Fact Discovery Cutoff, March 20, 2030
- (Dkt 113-3) Declaration of Richard J. Nelson in Support of Plaintiffs' Administrative Motion to Permit Plaintiffs to Finish Certain Third Party Discovery After the Fact Discovery Cutoff, March 20, 2020
- (Dkt 115) Defendants' Opposition to Administrative Motion to Permit Plaintiffs to Continue Third Party Discovery After the Fact Discovery Cutoff , March 24, 2020
- (Dkt 115-1) Declaration of Andrew Parkhurst in Support of Defendants' Opposition to Administrative Motion to Permit Plaintiffs to Continue Discovery After the Fact Discovery Cutoff, March 24, 2020
- (Dkt 115-2) [Proposed] Order on Defendants' Opposition to Administrative Motion to Permit Plaintiffs to Continue Third Party Discovery After Fact Discovery Cutoff, March 24, 2020
- (Dkt 116) Statement of Non-Opposition to Administrative Motion to Permit Plaintiffs to Continue Third Party Discovery After Fact Discovery Cutoff, March 24, 2020
- (Dkt 118) Defendant Jessica Little's Notice of Non-Opposition and Joinder in Motion by Defendants to Stay Civil Proceedings Until Expiration of Statue of Limitations, March 30, 2020
- (Dkt 119) Imran Husain's Joinder in Motion by Defendants to Stay Civil Proceedings Until Expiration of Statue of Limitations, March 30, 2020
- (Dkt 121) Opposition to Defendants' Opposition to Motion to Stay Civil Proceedings Until Expiration of Statue of Limitations, March 30, 2020
- (Dkt 121-1) Declaration of Kathleen B. Friend in Support of Opposition to Defendants' Motion to Stay Civil Proceedings Until Expiration of Statue of Limitations, March 30, 2020
- (Dkt 122) Plaintiffs' Opposition to Motion by Defendants to Stay Civil Proceedings Until Expiration of Statue of Limitations, March 30, 2020
- (Dkt 122-1) Declaration of Richard J. Nelson in Support of Plaintiffs' Opposition to Motion by Defendants to Stay Civil Proceedings Until Expiration of Statue of Limitations, March 30, 2020

---

### Opposing Expert's Report

---

- Expert Report of Daniel Levy, April 17, 2020
- Expert Report of Greg Regan, April 17, 2020

---

Cisco Systems Inc., et al v. Zahid Hassan Sheikh., et al.

## Summary of Damages
## Disgorgement

| Category | Disgorgement | Source |
|---|---|---|
| Link US Sales to Defendants | $22,704 | Exhibit 2 |
| Vodanet Sales to Defendants | $4,279 | Exhibit 3 |
| Cisco Tested Products | $3,279 | Exhibit 4 |
| Defendants' Transceivers (Weighted 41%) | $68,761 | Exhibit 5 |
| No Vendor Identified (Weighted 41%) | $57,693 | Exhibit 6 |
| **Total** | **$156,716** | |

## Summary of Damages (Alt. A)
## Disgorgement

| Category | Disgorgement | Source |
|---|---|---|
| Link US Sales to Defendants | $22,704 | Exhibit 2 |
| Vodanet Sales to Defendants | $4,279 | Exhibit 3 |
| Cisco Tested Products | $3,279 | Exhibit 4 |
| Defendants' Transceivers (Vodanet 21%) | $34,636 | Exhibit 5a |
| No Vendor Identified (Vodanet 21%) | $29,061 | Exhibit 6a |
| **Total** | **$93,959** | |

## Summary of Damages (Alt. B)
## Disgorgement

| Category | Disgorgement | Source |
|---|---|---|
| Link US Sales to Defendants | $22,704 | Exhibit 2 |
| Vodanet Sales to Defendants | $4,279 | Exhibit 3 |
| Cisco Tested Products | $3,279 | Exhibit 4 |
| Defendants' Transceivers (Link 73%) | $121,294 | Exhibit 5b |
| No Vendor Identified (Link 73%) | $101,771 | Exhibit 6b |
| **Total** | **$253,328** | |

## Summary of Damages (Alt. C)
## Disgorgement

| Category | Disgorgement | Source |
|---|---|---|
| Link US Sales to Defendants | $22,704 | Exhibit 2 |
| Vodanet Sales to Defendants | $4,279 | Exhibit 3 |
| Cisco Tested Products | $3,279 | Exhibit 4 |
| Defendants' Transceivers (100%) | $166,058 | Exhibit 5c |
| No Vendor Identified (100%) | $139,330 | Exhibit 6c |
| **Total** | **$335,651** | |

Cisco Systems Inc., et al v. Zahid Hassan Sheikh., et al.

## K&F Associates
## Profit & Loss

| | 2015 | | 2016 | | 2017 | | 2018 | | 2019 | | Total | | Weighted Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 41000 · Product Income | | | | | | | | | | | | | |
| 41120 · Cisco Products | $1,122,735 | 28.4% | $790,533 | 25.0% | $812,264 | 25.8% | $782,508 | 31.8% | $119,850 | 7.8% | $3,627,890 | | 25.4% |
| Total Net Income | $3,954,066 | 100.0% | $3,157,705 | 100.0% | $3,142,418 | 100.0% | $2,460,478 | 100.0% | $1,544,398 | 100.0% | $14,259,064 | | 100.0% |
| | | | | | | | | | | | | | |
| Cost of Goods Sold | | | | | | | | | | | | | |
| 50000 · Cost of Goods Sold | | | | | | | | | | | | | |
| 51120 · Cisco Products | $758,767 | 19.2% | $552,075 | 17.5% | $639,987 | 20.4% | $614,558 | 25.0% | $85,061 | 5.5% | $2,650,448 | | 18.6% |
| Total COGS | $2,948,669 | 74.6% | $2,556,161 | 80.9% | $2,480,866 | 78.9% | $1,991,681 | 80.9% | $1,213,330 | 78.6% | $11,190,707 | | 78.5% |
| **Gross Profit** | **$1,005,397** | 25.4% | **$601,544** | 19.1% | **$661,552** | 21.1% | **$468,796** | 19.1% | **$331,068** | 21.4% | | | 0.0% |
| | | | | | | | | | | | | | |
| *Cisco Products COGS as % of Cisco Products Income* | | 67.6% | | 69.8% | | 78.8% | | 78.5% | | 71.0% | | | 73.1% |
| | | | | | | | | | | | | | |
| Expense | | | | | | | | | | | | | |
| 61000 · Bad Debts Expense | | 0.0% | $1,513 | 0.0% | | 0.0% | | 0.0% | $17,095 | 1.1% | $18,608 | | 0.1% |
| 66900 · Reconciliation Discrepancies | | 0.0% | | 0.0% | | 0.0% | | 0.0% | -$94,714 | -6.1% | -$94,714 | | -0.7% |
| 69800 · Uncategorized Expenses | | 0.0% | | 0.0% | | 0.0% | | 0.0% | $34 | 0.0% | $34 | | 0.0% |
| 70000 · Admin | | 0.0% | | 0.0% | | 0.0% | | 0.0% | | 0.0% | $0 | | 0.0% |
| 70100 · PayPal Fees | $12,673 | 0.3% | $15,840 | 0.5% | $14,359 | 0.5% | $14,858 | 0.6% | $7,728 | 0.5% | $65,457 | | 0.5% |
| 70300 · Rakuten Fees | $2,421 | 0.1% | $316 | 0.0% | | 0.0% | | 0.0% | | 0.0% | $2,737 | | 0.0% |
| 70400 · Dues & Subscriptions | $740 | 0.0% | $740 | 0.0% | $740 | 0.0% | $740 | 0.0% | | 0.0% | $2,960 | | 0.0% |
| 70500 · Bank Fee | $1,013 | 0.0% | $600 | 0.0% | $600 | 0.0% | $439 | 0.0% | $33,132 | 2.1% | $35,654 | | 0.3% |
| 70600 · Credit Card Fees | $88,978 | 2.3% | $73,405 | 2.3% | $67,971 | 2.2% | $47,630 | 1.9% | -$17 | 0.0% | $277,967 | | 1.9% |
| 70700 · eBay Fees | $7,963 | 0.2% | $11,530 | 0.4% | $11,523 | 0.4% | $8,559 | 0.3% | $340 | 0.0% | $39,916 | | 0.3% |
| 70710 · Amazon Fees | $312 | 0.0% | $942 | 0.0% | $2,749 | 0.1% | $53 | 0.0% | $6,016 | 0.4% | $10,073 | | 0.1% |
| 70800 · Office Expenses | $158 | 0.0% | | 0.0% | | 0.0% | | 0.0% | | 0.0% | $158 | | 0.0% |
| 70900 · Miscellaneous Fees | -$565 | 0.0% | | 0.0% | | 0.0% | | 0.0% | | 0.0% | -$565 | | 0.0% |
| Total 70000 · Admin | $113,693 | 2.9% | $103,373 | 3.3% | $97,812 | 3.1% | $72,279 | 2.9% | $47,199 | 3.1% | $434,357 | | 3.0% |
| 72000 · Insurance Expense | $1,082 | 0.0% | | 0.0% | | 0.0% | | 0.0% | | 0.0% | $1,082 | | 0.0% |
| 73000 · Professional Fees | | | | | | | | | | | | | |
| 73100 · Fees - Website DEV | $191,700 | 4.8% | $392,400 | 12.4% | $554,400 | 17.6% | $840,000 | 34.1% | $231,600 | 15.0% | $2,210,100 | | 15.5% |
| 73300 · K & F | $30,000 | 0.8% | $30,000 | 1.0% | $30,000 | 1.0% | $30,000 | 1.2% | $28,750 | 1.9% | $148,750 | | 1.0% |
| 73500 · Outside Services | $5,040 | 0.1% | | 0.0% | | 0.0% | | 0.0% | | 0.0% | $5,040 | | 0.0% |
| 73600 · Legal Fees | | 0.0% | $175 | 0.0% | | 0.0% | | 0.0% | | 0.0% | $175 | | 0.0% |
| 73650 · Accounting Fee | | 0.0% | | 0.0% | | 0.0% | $2,650 | 0.1% | | 0.0% | $2,650 | | 0.0% |
| 73000 · Professional Fees - Other | $1,475 | 0.0% | $130 | 0.0% | | 0.0% | | 0.0% | | 0.0% | $1,605 | | 0.0% |
| Total 73000 · Professional Fees | $228,215 | 5.8% | $422,705 | 13.4% | $584,400 | 18.6% | $872,650 | 35.5% | $260,350 | 16.9% | $2,368,320 | | 16.6% |
| 73700 · Telephone & Internet Exp. | $3,690 | 0.1% | $3,750 | 0.1% | $3,750 | 0.1% | $3,750 | 0.2% | $5,618 | 0.4% | $20,557 | | 0.1% |
| 75000 · Marketing/Advertising Expense | $127,194 | 3.2% | $141,681 | 4.5% | $64,406 | 2.0% | $69,351 | 2.8% | $38,841 | 2.5% | $441,472 | | 3.1% |
| 76000 · Business License Fee | | 0.0% | | 0.0% | $948 | 0.0% | $140 | 0.0% | $178 | 0.0% | $1,266 | | 0.0% |
| 95700 · FTB - State Tax | | 0.0% | $6,000 | 0.2% | $7,032 | 0.2% | $8,534 | 0.3% | $6,800 | 0.4% | $28,366 | | 0.2% |
| 98000 · Suspense Account | | 0.0% | | 0.0% | | 0.0% | $9,850 | 0.4% | -$9,850 | -0.6% | $0 | | 0.0% |
| Total Expense | $473,874 | 12.0% | $679,022 | 21.5% | $758,348 | 24.1% | $1,036,554 | 42.1% | $271,550 | 17.6% | $3,219,347 | | 22.6% |
| | | | | | | | | | | | | | |
| **Costs Incurred in Connection with Alleged Infringing Sales as % of Total Net Income** | | 12.0% | | 21.5% | | 24.1% | | 42.1% | | 16.5% | | | 22.4% |

Notes: Expenses are computed as Percentage of Total Net Income.

Sources: K&F, P&L 2015 - 2019; Discussion with Roya Sadaghiani (CFO of ADSI), April 28, 2020.

Cisco Systems Inc., et al v. Zahid Hassan Sheikh., et al.

## Exhibit 1a
## ADSI Inc.
## Profit & Loss

| | 2015 | | 2016 | | 2017 | | 2018 | | Apr. 2019 | | Total | Weighted Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Net Income | $25,597,750 | | $22,968,660 | | $22,042,611 | | $16,442,441 | | $3,162,743 | | $90,214,205 | |
| | | | | | | | | | | | | |
| Expense | | | | | | | | | | | | |
| Salaries - Others | $927,784 | 3.6% | $725,127 | 3.2% | $629,764 | 2.9% | $538,287 | 3.3% | $121,562 | 3.8% | $2,942,525 | 3.3% |
| Salaries - Officers | $322,500 | 1.3% | $300,000 | 1.3% | $450,000 | 2.0% | $275,000 | 1.7% | $70,000 | 2.2% | $1,417,500 | 1.6% |
| Employee Bonus | $315,428 | 1.2% | | 0.0% | | 0.0% | | 0.0% | | 0.0% | $315,428 | 0.3% |
| Commission | $916,449 | 3.6% | $458,787 | 2.0% | $339,559 | 1.5% | $59,738 | 0.4% | | 0.0% | $1,774,534 | 2.0% |
| Compensation - Form 1099 | | 0.0% | | 0.0% | | 0.0% | | 0.0% | $7,500 | 0.2% | $7,500 | 0.0% |
| Employee Benefits-Med/Den | $94,334 | 0.4% | $91,631 | 0.4% | $73,151 | 0.3% | $48,262 | 0.3% | $6,181 | 0.2% | $313,560 | 0.3% |
| Workers Compensation | $26,129 | 0.1% | $14,301 | 0.1% | $13,982 | 0.1% | $5,722 | 0.0% | $2,561 | 0.1% | $62,695 | 0.1% |
| Payroll Taxes | $155,424 | 0.6% | $113,230 | 0.5% | $103,020 | 0.5% | $70,131 | 0.4% | $18,258 | 0.6% | $460,064 | 0.5% |
| Advertising Expenses | $1,660 | 0.0% | $2,355 | 0.0% | | 0.0% | | 0.0% | | 0.0% | $4,016 | 0.0% |
| Alarm & Security | $1,927 | 0.0% | $2,134 | 0.0% | $1,603 | 0.0% | $1,614 | 0.0% | $808 | 0.0% | $8,086 | 0.0% |
| Lease / Auto / Copy Machine | $4,116 | 0.0% | $3,749 | 0.0% | $568 | 0.0% | $567 | 0.0% | $174 | 0.0% | $9,174 | 0.0% |
| Automotive | $16,267 | 0.1% | $33,481 | 0.1% | $21,234 | 0.1% | $35,576 | 0.2% | $16,914 | 0.5% | $123,473 | 0.1% |
| Bad Debt Expense | $18,539 | 0.1% | $24,250 | 0.1% | | 0.0% | | 0.0% | | 0.0% | $42,789 | 0.0% |
| Bank Service Charge | $6,665 | 0.0% | $8,108 | 0.0% | $9,483 | 0.0% | $7,333 | 0.0% | $4,288 | 0.1% | $35,877 | 0.0% |
| Cash Over/Short/Register | | 0.0% | $9,480 | 0.0% | | 0.0% | | 0.0% | | 0.0% | $9,480 | 0.0% |
| Consulting - Others | $285,380 | 1.1% | $735,068 | 3.2% | $292,705 | 1.3% | $33,874 | 0.2% | $14,689 | 0.5% | $1,361,717 | 1.5% |
| Employee Benefits-Bonus | | 0.0% | | 0.0% | $156,500 | 0.7% | | 0.0% | | 0.0% | $156,500 | 0.2% |
| Depreciation Expense | $16,743 | 0.1% | | 0.0% | | 0.0% | | 0.0% | | 0.0% | $16,743 | 0.0% |
| Donations | $1,300 | 0.0% | $259 | 0.0% | $2,142 | 0.0% | | 0.0% | | 0.0% | $3,701 | 0.0% |
| Dues & Subscriptions | $34,131 | 0.1% | $20,861 | 0.1% | $976 | 0.0% | $478 | 0.0% | $301 | 0.0% | $56,746 | 0.1% |
| Franchise Tax Expense | | 0.0% | $45,297 | 0.2% | $0 | 0.0% | $800 | 0.0% | $800 | 0.0% | $46,897 | 0.1% |
| Heat/Electricity/Water/Other | $17,354 | 0.1% | $17,729 | 0.1% | $17,940 | 0.1% | $15,683 | 0.1% | $3,306 | 0.1% | $72,012 | 0.1% |
| Sales/Marketing Expense | $101,188 | 0.4% | $66,288 | 0.3% | $51,281 | 0.2% | $38,931 | 0.2% | $4,483 | 0.1% | $262,171 | 0.3% |
| Insurance Auto | $27,715 | 0.1% | $17,030 | 0.1% | $12,674 | 0.1% | $19,662 | 0.1% | $6,587 | 0.2% | $83,667 | 0.1% |
| Insurance Employee H/L, D | | 0.0% | | 0.0% | $18,900 | 0.1% | $23,024 | 0.1% | $996 | 0.0% | $42,920 | 0.0% |
| Insurance General | $11,760 | 0.0% | $32,587 | 0.1% | $10,536 | 0.0% | $9,300 | 0.1% | $324 | 0.0% | $64,508 | 0.1% |
| Insurance Worker's Comp | | 0.0% | $488 | 0.0% | | 0.0% | $82,497 | 0.5% | | 0.0% | $82,986 | 0.1% |
| Interest Expense | $57,818 | 0.2% | $93,387 | 0.4% | $90,572 | 0.4% | | 0.0% | $24,543 | 0.8% | $266,319 | 0.3% |
| Licenses | $5,737 | 0.0% | $1,018 | 0.0% | | 0.0% | | 0.0% | | 0.0% | $6,755 | 0.0% |
| Maintenance & Repairs | $7,253 | 0.0% | | 0.0% | $4,596 | 0.0% | $4,656 | 0.0% | $1,401 | 0.0% | $26,180 | 0.0% |
| Meals & Entertainment | $27,314 | 0.1% | $53,795 | 0.2% | $27,299 | 0.1% | $28,773 | 0.2% | $7,347 | 0.2% | $144,527 | 0.2% |
| Miscellaneous Expense | $120 | 0.0% | $2,550 | 0.0% | | 0.0% | | 0.0% | | 0.0% | $2,670 | 0.0% |
| Office Supplies & Expense | $77,086 | 0.3% | $74,441 | 0.3% | $73,868 | 0.3% | $41,619 | 0.3% | $16,207 | 0.5% | $283,221 | 0.3% |
| Personal Property Taxes | $31,442 | 0.1% | $31,565 | 0.1% | $34,477 | 0.2% | $36,776 | 0.2% | $18,144 | 0.6% | $152,404 | 0.2% |
| Penalties | $63 | 0.0% | $677 | 0.0% | | 0.0% | | 0.0% | | 0.0% | $740 | 0.0% |
| Postage | $200 | 0.0% | $251 | 0.0% | $168 | 0.0% | $50 | 0.0% | $100 | 0.0% | $769 | 0.0% |
| Professional Fees / Account | $12,000 | 0.0% | $14,560 | 0.1% | $14,984 | 0.1% | $24,778 | 0.2% | | 0.0% | $66,322 | 0.1% |
| Professional Fees / Legal | $210,307 | 0.8% | -$25,000 | -0.1% | $148,680 | 0.7% | $247,856 | 1.5% | -$47,642 | -1.5% | $534,201 | 0.6% |
| Professional Fees / Other | $23,448 | 0.1% | $2,613 | 0.0% | $7,933 | 0.0% | $1,150 | 0.0% | $30 | 0.0% | $35,174 | 0.0% |
| Promotion | | 0.0% | $9,442 | 0.0% | $1,203 | 0.0% | | 0.0% | | 0.0% | $10,645 | 0.0% |
| Rent | $300,000 | 1.2% | $300,000 | 1.3% | $300,000 | 1.4% | $275,000 | 1.7% | $36,000 | 1.1% | $1,211,000 | 1.3% |
| Supplies/Stationary/Shipping | $428 | 0.0% | $0 | 0.0% | | 0.0% | | 0.0% | $23 | 0.0% | $451 | 0.0% |
| Telephone & Internet | $18,777 | 0.1% | $30,420 | 0.1% | $24,989 | 0.1% | $21,522 | 0.1% | $12,233 | 0.4% | $107,941 | 0.1% |
| Taxes & Licenses | $18,783 | 0.1% | $6,849 | 0.0% | $95 | 0.0% | | 0.0% | | 0.0% | $25,727 | 0.0% |
| Travel Expenses/Convent | $23,022 | 0.1% | $25,299 | 0.1% | $41,615 | 0.2% | $34,683 | 0.2% | $15,046 | 0.5% | $139,666 | 0.2% |
| Travel/Other | $1,116 | 0.0% | $7,285 | 0.0% | $7,034 | 0.0% | $4,351 | 0.0% | $134 | 0.0% | $19,920 | 0.0% |
| Website Development & Maint. | $59,347 | 0.2% | $13,580 | 0.1% | $3,757 | 0.0% | $3,154 | 0.0% | $6,280 | 0.2% | $86,118 | 0.1% |
| Janitorial Expense | $16,012 | 0.1% | $16,297 | 0.1% | $17,970 | 0.1% | $15,549 | 0.1% | $5,225 | 0.2% | $71,053 | 0.1% |
| IT Expenses | | 0.0% | | 0.0% | $39,545 | 0.2% | $58,009 | 0.4% | $25,801 | 0.8% | $123,354 | 0.1% |
| Sales Tax Expense | $19 | 0.0% | | 0.0% | | 0.0% | | 0.0% | | 0.0% | $19 | 0.0% |
| Total Expenses | $4,193,086 | 16.4% | $3,389,544 | 14.8% | $3,044,802 | 13.8% | $2,064,406 | 12.6% | $400,606 | 12.7% | $13,092,444 | 14.5% |
| | | | | | | | | | | | | |
| **Costs Incurred in Connection with Alleged Infringing Sales As a % of Total Net Income** | | 16.3% | | 14.7% | | 13.8% | | 12.6% | | 12.7% | | 14.5% |

Notes: Expenses are computed as Percentage of Total Net Income.

Source: Advanced Digital Solutions Inc., P&L 2015 - Apr. 2019; Discussion with Roya Sadaghiani (CFO of ADSI), April 28, 2020.

Cisco Systems Inc., et al v. Zahid Hassan Sheikh., et al.

### Exhibit 2
### Adjustment to Regan's Schedule 2c
### Defendants' Profits  - Link Sales to Defendants

**Sales**

| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|
| K&F | [1] | $4,951 | $1,051 | $2,798 | $14,167 | $3,462 | $26,429 |
| ADSI | [1] | $15,944 | $13,343 | $27,772 | $8,205 | $0 | $65,264 |
| Total | | $20,895 | $14,394 | $30,570 | $22,372 | $3,462 | $91,693 |

**Costs of Goods Sold**

| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|
| K&F | [2] | $3,346 | $734 | $2,205 | $11,126 | $2,457 | $19,868 |
| ADSI | [1] | $5,277 | $6,221 | $11,068 | $3,610 | $0 | $26,176 |
| Total | | $8,623 | $6,955 | $13,273 | $14,736 | $2,457 | $46,044 |

**Gross Profits**

| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|
| K&F | [3] | $1,605 | $317 | $593 | $3,041 | $1,005 | $6,561 |
| ADSI | [3] | $10,667 | $7,122 | $16,704 | $4,595 | $0 | $39,088 |
| Total | | $12,272 | $7,439 | $17,297 | $7,636 | $1,005 | $45,649 |

**Costs Incurred in Connection with Alleged Infringing Sales**

| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|
| K&F | [4] | $593 | $225 | $675 | $5,968 | $570 | $8,033 |
| ADSI | [5] | $2,601 | $1,047 | $2,307 | $577 | $0 | $6,533 |
| Total | | $3,195 | $1,273 | $2,983 | $6,545 | $570 | $14,565 |

| Probabilistic Counterfeit [1] | 73% |
|---|---|

**Estimated Net Profits**

| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|
| K&F | [6] | $739 | $67 | ($60) | ($2,138) | $317 | ($1,075) |
| ADSI | [6] | $5,892 | $4,437 | $10,516 | $2,935 | $0 | $23,779 |
| **Total** | | **$6,630** | **$4,504** | **$10,456** | **$797** | **$317** | **$22,704** |

**Notes & Sources:**
[1] See Regan Report, Schedule 2c.
[2] = Sales x Cisco Products COGS as % of Cisco Products Income. See Exhibit 1.
[3] = Sales - COGS
[4] = Sales x Costs Incurred in Connection with Alleged Infringing Sales as % of Total Net Income. See Exhibit 1.
[5] = Sales x Costs Incurred in Connection with Alleged Infringing Sales as % of Total Net Income. See Exhibit 1a.
[6] = (Gross Profits - Costs Incurred in Connection with Alleged Infringing Sales) x Probabilistic Counterfeit %.

Cisco Systems Inc., et al v. Zahid Hassan Sheikh., et al.

**Exhibit 3**
**Adjustment to Regan's Schedule 3c**
**Defendants' Profits  - Vodanet Sales to Defendants**

**Sales**

| Company | | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|
| K&F | [1] | $14,035 | $66,559 | $101,482 | $688 | $182,764 |
| ADSI | [1] | $180,360 | $46,307 | $18,458 | $0 | $245,125 |
| Total | | $194,395 | $112,866 | $119,940 | $688 | $427,889 |

**Costs of Goods Sold**

| Company | | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|
| K&F | [2] | $9,801 | $52,442 | $79,701 | $488 | $142,433 |
| ADSI | [1] | $141,008 | $36,410 | $18,425 | $0 | $195,843 |
| Total | | $150,809 | $88,852 | $98,126 | $488 | $338,276 |

**Gross Profits**

| Company | | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|
| K&F | [3] | $4,234 | $14,117 | $21,781 | $200 | $40,331 |
| ADSI | [3] | $39,352 | $9,897 | $33 | $0 | $49,282 |
| Total | | $43,586 | $24,014 | $21,814 | $200 | $89,613 |

**Costs Incurred in Connection with Alleged Infringing Sales**

| Company | | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|
| K&F | [4] | $3,011 | $16,062 | $42,752 | $113 | $61,940 |
| ADSI | [5] | $5,787 | $1,367 | $4 | $0 | $7,158 |
| Total | | $8,798 | $17,430 | $42,757 | $113 | $69,097 |

| Probabilistic Counterfeit [1] | 21% |
|---|---|

**Estimated Net Profits**

| Company | | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|
| K&F | [6] | $255 | ($406) | ($4,374) | $18 | ($4,507) |
| ADSI | [6] | $7,001 | $1,779 | $6 | $0 | $8,786 |
| **Total** | | **$7,256** | **$1,373** | **($4,368)** | **$18** | **$4,279** |

**Notes & Sources:**
[1] See Regan Report, Schedule 3c.
[2] = Sales x Cisco Products COGS as % of Cisco Products Income. See Exhibit 1.
[3] = Sales - COGS
[4] = Sales x Costs Incurred in Connection with Alleged Infringing Sales as % of Total Net Income.
See Exhibit 1.
[5] = Sales x Costs Incurred in Connection with Alleged Infringing Sales as % of Total Net Income.
See Exhibit 1a.
[6] = (Gross Profits - Costs Incurred in Connection with Alleged Infringing Sales) x Probabilistic
Counterfeit %.

Cisco Systems Inc., et al v. Zahid Hassan Sheikh., et al.

**Exhibit 4**
**Adjustment to Regan's Schedule 4c**
**Defendants' Profits - Cisco Tested Products**

**Sales**

| Company | | Tested by Cisco Non-Genuine | Tested By Cisco 80% Non-Genuine | Tested By Cisco 50% Non-Genuine | Total |
|---|---|---|---|---|---|
| K&F | [1] | $25,780 | $7,700 | $3,090 | $36,570 |
| ADSI | [1] | $2,260 | $0 | $0 | $2,260 |
| Total | | $28,040 | $7,700 | $3,090 | $38,830 |

**Costs of Goods Sold**

| Company | | Tested by Cisco Non-Genuine | Tested By Cisco 80% Non-Genuine | Tested By Cisco 50% Non-Genuine | Total |
|---|---|---|---|---|---|
| K&F | [2] | $18,834 | $5,625 | $2,257 | $26,717 |
| ADSI | [1] | $348 | $0 | $0 | $348 |
| Total | | $19,182 | $5,625 | $2,257 | $27,065 |

**Gross Profits**

| Company | | Tested by Cisco Non-Genuine | Tested By Cisco 80% Non-Genuine | Tested By Cisco 50% Non-Genuine | Total |
|---|---|---|---|---|---|
| K&F | [3] | $6,946 | $2,075 | $833 | $9,853 |
| ADSI | [3] | $1,912 | $0 | $0 | $1,912 |
| Total | | $8,858 | $2,075 | $833 | $11,765 |

**Costs Incurred in Connection with Alleged Infringing Sales**

| Company | | Tested by Cisco Non-Genuine | Tested By Cisco 80% Non-Genuine | Tested By Cisco 50% Non-Genuine | Total |
|---|---|---|---|---|---|
| K&F | [4] | $5,787 | $1,728 | $694 | $8,209 |
| ADSI | [5] | $277 | $0 | $0 | $277 |
| Total | | $6,064 | $1,728 | $694 | $8,486 |

**Estimated Net Profits**

| Company | | Tested by Cisco Non-Genuine | Tested By Cisco 80% Non-Genuine | Tested By Cisco 50% Non-Genuine | Total |
|---|---|---|---|---|---|
| K&F | [6] | $1,159 | $346 | $139 | $1,644 |
| ADSI | [6] | $1,635 | $0 | $0 | $1,635 |
| **Total** | | **$2,794** | **$346** | **$139** | **$3,279** |

**Notes & Sources:**
[1] See Regan Report, Schedule 4c.
[2] = Sales x Cisco Products COGS as % of Cisco Products Income (Weighted Average). See Exhibit 1.
[3] = Sales - COGS
[4] = Sales x Costs Incurred in Connection with Alleged Infringing Sales as % of Total Net Income (Weighted Average). See Exhibit 1.
[5] = Sales x Costs Incurred in Connection with Alleged Infringing Sales as % of Total Net Income (Weighted Average). See Exhibit 1a.
[6] = Gross Profits - Costs Incurred in Connection with Alleged Infringing Sales.

Cisco Systems Inc., et al v. Zahid Hassan Sheikh., et al.

**Exhibit 5**
**Adjustment to Regan's Schedule 5c (Weighted Avg)**
**Defendants' Profits - Defendants' Transceivers**

| Sales | | | | | | | |
|---|---|---|---|---|---|---|---|
| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
| K&F | [1] | $710,203 | $448,633 | $243,396 | $189,914 | $9,476 | $1,601,622 |
| ADSI | [1] | $18,430 | $59,823 | $20,736 | $40,807 | $0 | $139,796 |
| Total | | $728,633 | $508,456 | $264,132 | $230,721 | $9,476 | $1,741,418 |

| Costs of Goods Sold | | | | | | | |
|---|---|---|---|---|---|---|---|
| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
| K&F | [2] | $479,970 | $313,306 | $191,773 | $149,153 | $6,725 | $1,140,927 |
| ADSI | [1] | $14,962 | $39,925 | $23,681 | $26,917 | $0 | $105,485 |
| Total | | $494,932 | $353,231 | $215,454 | $176,070 | $6,725 | $1,246,412 |

| Gross Profits | | | | | | | |
|---|---|---|---|---|---|---|---|
| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
| K&F | [3] | $230,233 | $135,327 | $51,623 | $40,761 | $2,751 | $460,695 |
| ADSI | [3] | $3,468 | $19,898 | ($2,945) | $13,890 | $0 | $34,311 |
| Total | | $233,701 | $155,225 | $48,678 | $54,651 | $2,751 | $495,006 |

| Costs Incurred in Connection with Alleged Infringing Sales | | | | | | | |
|---|---|---|---|---|---|---|---|
| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
| K&F | [4] | $85,114 | $96,258 | $58,738 | $80,007 | $1,561 | $321,678 |
| ADSI | [5] | $3,007 | $2,926 | ($407) | $1,744 | $0 | $7,270 |
| Total | | $88,121 | $99,184 | $58,331 | $81,751 | $1,561 | $328,948 |

| Probabilistic Counterfeit [6] | 41% |
|---|---|

| Estimated Net Profits | | | | | | | |
|---|---|---|---|---|---|---|---|
| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
| K&F | [7] | $60,090 | $16,178 | ($2,946) | ($16,251) | $493 | $57,564 |
| ADSI | [7] | $191 | $7,028 | ($1,051) | $5,029 | $0 | $11,197 |
| Total | | $60,281 | $23,205 | ($3,997) | ($11,221) | $493 | $68,761 |

**Notes & Sources:**
[1] See Regan Report, Schedule 5c.
[2] = Sales x Cisco Products COGS as % of Cisco Products Income. See Exhibit 1.
[3] = Sales - COGS
[4] = Sales x Costs Incurred in Connection with Alleged Infringing Sales as % of Total Net Income. See Exhibit 1.
[5] = Sales x Costs Incurred in Connection with Alleged Infringing Sales as % of Total Net Income. See Exhibit 1a.
[6] = Weighted Average Probabilistic Counterfeit % of Link US and Vodanet (See Regan Report, Schedules 2b, 3b).
[7] = (Gross Profits - Costs Incurred in Connection with Alleged Infringing Sales) x Probabilistic Counterfeit %.

**Exhibit 5a**
**Adjustment to Regan's Schedule 5c (Using Vodanet %)**
**Defendants' Profits  - Defendants' Transceivers**

| Sales | | | | | | |
|---|---|---|---|---|---|---|
| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
| K&F | [1] | $710,203 | $448,633 | $243,396 | $189,914 | $9,476 | $1,601,622 |
| ADSI | [1] | $18,430 | $59,823 | $20,736 | $40,807 | $0 | $139,796 |
| Total | | $728,633 | $508,456 | $264,132 | $230,721 | $9,476 | $1,741,418 |

| Costs of Goods Sold | | | | | | |
|---|---|---|---|---|---|---|
| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
| K&F | [2] | $479,970 | $313,306 | $191,773 | $149,153 | $6,725 | $1,140,927 |
| ADSI | [1] | $14,962 | $39,925 | $23,681 | $26,917 | $0 | $105,485 |
| Total | | $494,932 | $353,231 | $215,454 | $176,070 | $6,725 | $1,246,412 |

| Gross Profits | | | | | | |
|---|---|---|---|---|---|---|
| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
| K&F | [3] | $230,233 | $135,327 | $51,623 | $40,761 | $2,751 | $460,695 |
| ADSI | [3] | $3,468 | $19,898 | ($2,945) | $13,890 | $0 | $34,311 |
| Total | | $233,701 | $155,225 | $48,678 | $54,651 | $2,751 | $495,006 |

| Costs Incurred in Connection with Alleged Infringing Sales | | | | | | |
|---|---|---|---|---|---|---|
| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
| K&F | [4] | $85,114 | $96,258 | $58,738 | $80,007 | $1,561 | $321,678 |
| ADSI | [5] | $3,007 | $2,926 | ($407) | $1,744 | $0 | $7,270 |
| Total | | $88,121 | $99,184 | $58,331 | $81,751 | $1,561 | $328,948 |

| Probabilistic Counterfeit [6] | 21% |
|---|---|

| Estimated Net Profits | | | | | | |
|---|---|---|---|---|---|---|
| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
| K&F | [7] | $30,268 | $8,149 | ($1,484) | ($8,186) | $248 | $28,995 |
| ADSI | [7] | $96 | $3,540 | ($529) | $2,533 | $0 | $5,640 |
| Total | | $30,364 | $11,689 | ($2,013) | ($5,652) | $248 | $34,636 |

**Notes & Sources:**
[1] See Regan Report, Schedule 5c.
[2] = Sales x Cisco Products COGS as % of Cisco Products Income. See Exhibit 1.
[3] = Sales - COGS
[4] = Sales x Costs Incurred in Connection with Alleged Infringing Sales as % of Total Net Income. See Exhibit 1.
[5] = Sales x Costs Incurred in Connection with Alleged Infringing Sales as % of Total Net Income. See Exhibit 1a.
[6] = Probabilistic Counterfeit % of Vodanet (See Regan Report, Schedule 3b).
[7] = (Gross Profits - Costs Incurred in Connection with Alleged Infringing Sales) x Probabilistic Counterfeit %.

**Exhibit 5b**
**Adjustment to Regan's Schedule 5c (Using Link US %)**
**Defendants' Profits  - Defendants' Transceivers**

| Sales | | | | | | | |
|---|---|---|---|---|---|---|---|
| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
| K&F | [1] | $710,203 | $448,633 | $243,396 | $189,914 | $9,476 | $1,601,622 |
| ADSI | [1] | $18,430 | $59,823 | $20,736 | $40,807 | $0 | $139,796 |
| Total | | $728,633 | $508,456 | $264,132 | $230,721 | $9,476 | $1,741,418 |

| Costs of Goods Sold | | | | | | | |
|---|---|---|---|---|---|---|---|
| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
| K&F | [2] | $479,970 | $313,306 | $191,773 | $149,153 | $6,725 | $1,140,927 |
| ADSI | [1] | $14,962 | $39,925 | $23,681 | $26,917 | $0 | $105,485 |
| Total | | $494,932 | $353,231 | $215,454 | $176,070 | $6,725 | $1,246,412 |

| Gross Profits | | | | | | | |
|---|---|---|---|---|---|---|---|
| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
| K&F | [3] | $230,233 | $135,327 | $51,623 | $40,761 | $2,751 | $460,695 |
| ADSI | [3] | $3,468 | $19,898 | ($2,945) | $13,890 | $0 | $34,311 |
| Total | | $233,701 | $155,225 | $48,678 | $54,651 | $2,751 | $495,006 |

| Costs Incurred in Connection with Alleged Infringing Sales | | | | | | | |
|---|---|---|---|---|---|---|---|
| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
| K&F | [4] | $85,114 | $96,258 | $58,738 | $80,007 | $1,561 | $321,678 |
| ADSI | [5] | $3,007 | $2,926 | ($407) | $1,744 | $0 | $7,270 |
| Total | | $88,121 | $99,184 | $58,331 | $81,751 | $1,561 | $328,948 |

| Probabilistic Counterfeit [6] | 73% |
|---|---|

| Estimated Net Profits | | | | | | | |
|---|---|---|---|---|---|---|---|
| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
| K&F | [7] | $106,000 | $28,537 | ($5,197) | ($28,666) | $869 | $101,543 |
| ADSI | [7] | $337 | $12,397 | ($1,854) | $8,872 | $0 | $19,752 |
| Total | | $106,337 | $40,934 | ($7,051) | ($19,795) | $869 | $121,294 |

**Notes & Sources:**
[1] See Regan Report, Schedule 5c.
[2] = Sales x Cisco Products COGS as % of Cisco Products Income. See Exhibit 1.
[3] = Sales - COGS
[4] = Sales x Costs Incurred in Connection with Alleged Infringing Sales as % of Total Net Income. See Exhibit 1.
[5] = Sales x Costs Incurred in Connection with Alleged Infringing Sales as % of Total Net Income. See Exhibit 1a.
[6] = Probabilistic Counterfeit % of Link US (See Regan Report, Schedule 2b).
[7] = (Gross Profits - Costs Incurred in Connection with Alleged Infringing Sales) x Probabilistic Counterfeit %.

**Exhibit 5c**
**Adjustment to Regan's Schedule 5c (Using 100%)**
**Defendants' Profits  - Defendants' Transceivers**

**Sales**

| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|
| K&F | [1] | $710,203 | $448,633 | $243,396 | $189,914 | $9,476 | $1,601,622 |
| ADSI | [1] | $18,430 | $59,823 | $20,736 | $40,807 | $0 | $139,796 |
| Total | | $728,633 | $508,456 | $264,132 | $230,721 | $9,476 | $1,741,418 |

**Costs of Goods Sold**

| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|
| K&F | [2] | $479,970 | $313,306 | $191,773 | $149,153 | $6,725 | $1,140,927 |
| ADSI | [1] | $14,962 | $39,925 | $23,681 | $26,917 | $0 | $105,485 |
| Total | | $494,932 | $353,231 | $215,454 | $176,070 | $6,725 | $1,246,412 |

**Gross Profits**

| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|
| K&F | [3] | $230,233 | $135,327 | $51,623 | $40,761 | $2,751 | $460,695 |
| ADSI | [3] | $3,468 | $19,898 | ($2,945) | $13,890 | $0 | $34,311 |
| Total | | $233,701 | $155,225 | $48,678 | $54,651 | $2,751 | $495,006 |

**Costs Incurred in Connection with Alleged Infringing Sales**

| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|
| K&F | [4] | $85,114 | $96,258 | $58,738 | $80,007 | $1,561 | $321,678 |
| ADSI | [5] | $3,007 | $2,926 | ($407) | $1,744 | $0 | $7,270 |
| Total | | $88,121 | $99,184 | $58,331 | $81,751 | $1,561 | $328,948 |

| Probabilistic Counterfeit [6] | 100% |
|---|---|

**Estimated Net Profits**

| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|
| K&F | [7] | $145,119 | $39,069 | ($7,115) | ($39,246) | $1,190 | $139,017 |
| ADSI | [7] | $461 | $16,972 | ($2,538) | $12,146 | $0 | $27,041 |
| Total | | $145,580 | $56,041 | ($9,653) | ($27,100) | $1,190 | $166,058 |

**Notes & Sources:**
[1] See Regan Report, Schedule 5c.
[2] = Sales x Cisco Products COGS as % of Cisco Products Income. See Exhibit 1.
[3] = Sales - COGS
[4] = Sales x Costs Incurred in Connection with Alleged Infringing Sales as % of Total Net Income. See Exhibit 1.
[5] = Sales x Costs Incurred in Connection with Alleged Infringing Sales as % of Total Net Income. See Exhibit 1a.
[6] = Probabilistic Counterfeit % of 100% (See Regan Report, Schedule 5c).
[7] = (Gross Profits - Costs Incurred in Connection with Alleged Infringing Sales) x Probabilistic Counterfeit %.

**Exhibit 6**
**Adjustment to Regan's Schedule 6c (Weighted Avg)**
**Defendants' Profits  - No Vendor Identified**

### Sales

| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|
| K&F | [1] | $402,124 | $139,821 | $495,070 | $485,124 | $39,822 | $1,561,961 |
| ADSI | [1] | $66,298 | $316,949 | $117,204 | ($21,962) | $0 | $478,489 |
| Total | | $468,422 | $456,770 | $612,274 | $463,162 | $39,822 | $2,040,450 |

### Costs of Goods Sold

| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|
| K&F | [2] | $271,764 | $97,645 | $390,068 | $381,001 | $28,263 | $1,168,741 |
| ADSI | [1] | $62,379 | $179,650 | $60,562 | ($17,021) | $0 | $285,570 |
| Total | | $334,143 | $277,295 | $450,630 | $363,980 | $28,263 | $1,454,311 |

### Gross Profits

| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|
| K&F | [3] | $130,360 | $42,176 | $105,002 | $104,123 | $11,559 | $393,220 |
| ADSI | [3] | $3,919 | $137,299 | $56,642 | ($4,941) | $0 | $192,919 |
| Total | | $134,279 | $179,475 | $161,644 | $99,182 | $11,559 | $586,139 |

### Costs Incurred in Connection with Alleged Infringing Sales

| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|
| K&F | [4] | $48,192 | $30,000 | $119,473 | $204,374 | $6,560 | $408,600 |
| ADSI | [5] | $10,816 | $20,190 | $7,824 | ($620) | $0 | $38,210 |
| Total | | $59,009 | $50,189 | $127,298 | $203,753 | $6,560 | $446,809 |

| Probabilistic Counterfeit [6] | 41% |
|---|---|

### Estimated Net Profits

| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|
| K&F | [7] | $34,024 | $5,042 | ($5,992) | ($41,511) | $2,070 | ($6,368) |
| ADSI | [7] | ($2,856) | $48,492 | $20,214 | ($1,789) | $0 | $64,061 |
| Total | | $31,168 | $53,534 | $14,222 | ($43,301) | $2,070 | $57,693 |

**Notes & Sources:**
[1] See Regan Report, Schedule 6c.
[2] = Sales x Cisco Products COGS as % of Cisco Products Income. See Exhibit 1.
[3] = Sales - COGS
[4] = Sales x Costs Incurred in Connection with Alleged Infringing Sales as % of Total Net Income. See Exhibit 1.
[5] = Sales x Costs Incurred in Connection with Alleged Infringing Sales as % of Total Net Income. See Exhibit 1a.
[6] = Weighted Average Probabilistic Counterfeit % of Link US and Vodanet (See Regan Report, Schedules 2b, 3b).
[7] = (Gross Profits - Costs Incurred in Connection with Alleged Infringing Sales) x Probabilistic Counterfeit %.

Cisco Systems Inc., et al v. Zahid Hassan Sheikh., et al.

**Exhibit 6a**
**Adjustment to Regan's Schedule 6c (Using Vodanet %)**
**Defendants' Profits  - No Vendor Identified**

| Sales | | | | | | | |
|-------|-----|-----|-----|-----|-----|-----|-----|
| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
| K&F | [1] | $402,124 | $139,821 | $495,070 | $485,124 | $39,822 | $1,561,961 |
| ADSI | [1] | $66,298 | $316,949 | $117,204 | ($21,962) | $0 | $478,489 |
| Total | | $468,422 | $456,770 | $612,274 | $463,162 | $39,822 | $2,040,450 |

| Costs of Goods Sold | | | | | | | |
|-------|-----|-----|-----|-----|-----|-----|-----|
| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
| K&F | [2] | $271,764 | $97,645 | $390,068 | $381,001 | $28,263 | $1,168,741 |
| ADSI | [1] | $62,379 | $179,650 | $60,562 | ($17,021) | $0 | $285,570 |
| Total | | $334,143 | $277,295 | $450,630 | $363,980 | $28,263 | $1,454,311 |

| Gross Profits | | | | | | | |
|-------|-----|-----|-----|-----|-----|-----|-----|
| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
| K&F | [3] | $130,360 | $42,176 | $105,002 | $104,123 | $11,559 | $393,220 |
| ADSI | [3] | $3,919 | $137,299 | $56,642 | ($4,941) | $0 | $192,919 |
| Total | | $134,279 | $179,475 | $161,644 | $99,182 | $11,559 | $586,139 |

| Costs Incurred in Connection with Alleged Infringing Sales | | | | | | | |
|-------|-----|-----|-----|-----|-----|-----|-----|
| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
| K&F | [4] | $48,192 | $30,000 | $119,473 | $204,374 | $6,560 | $408,600 |
| ADSI | [5] | $10,816 | $20,190 | $7,824 | ($620) | $0 | $38,210 |
| Total | | $59,009 | $50,189 | $127,298 | $203,753 | $6,560 | $446,809 |

| Probabilistic Counterfeit [6] | 21% |
|-------------------------------|-----|

| Estimated Net Profits | | | | | | | |
|-------|-----|-----|-----|-----|-----|-----|-----|
| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
| K&F | [7] | $17,138 | $2,540 | ($3,018) | ($20,910) | $1,043 | ($3,208) |
| ADSI | [7] | ($1,439) | $24,426 | $10,182 | ($901) | $0 | $32,268 |
| Total | | $15,700 | $26,966 | $7,164 | ($21,811) | $1,043 | $29,061 |

**Notes & Sources:**
[1] See Regan Report, Schedule 6c.
[2] = Sales x Cisco Products COGS as % of Cisco Products Income. See Exhibit 1.
[3] = Sales - COGS
[4] = Sales x Costs Incurred in Connection with Alleged Infringing Sales as % of Total Net Income. See Exhibit 1.
[5] = Sales x Costs Incurred in Connection with Alleged Infringing Sales as % of Total Net Income. See Exhibit 1a.
[6] = Probabilistic Counterfeit % of Vodanet (See Regan Report, Schedule 3b).
[7] = (Gross Profits - Costs Incurred in Connection with Alleged Infringing Sales) x Probabilistic Counterfeit %.

## Exhibit 6b
## Adjustment to Regan's Schedule 6c (Using Link US %)
## Defendants' Profits - No Vendor Identified

### Sales

| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|
| K&F | [1] | $402,124 | $139,821 | $495,070 | $485,124 | $39,822 | $1,561,961 |
| ADSI | [1] | $66,298 | $316,949 | $117,204 | ($21,962) | $0 | $478,489 |
| Total | | $468,422 | $456,770 | $612,274 | $463,162 | $39,822 | $2,040,450 |

### Costs of Goods Sold

| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|
| K&F | [2] | $271,764 | $97,645 | $390,068 | $381,001 | $28,263 | $1,168,741 |
| ADSI | [1] | $62,379 | $179,650 | $60,562 | ($17,021) | $0 | $285,570 |
| Total | | $334,143 | $277,295 | $450,630 | $363,980 | $28,263 | $1,454,311 |

### Gross Profits

| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|
| K&F | [3] | $130,360 | $42,176 | $105,002 | $104,123 | $11,559 | $393,220 |
| ADSI | [3] | $3,919 | $137,299 | $56,642 | ($4,941) | $0 | $192,919 |
| Total | | $134,279 | $179,475 | $161,644 | $99,182 | $11,559 | $586,139 |

### Costs Incurred in Connection with Alleged Infringing Sales

| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|
| K&F | [4] | $48,192 | $30,000 | $119,473 | $204,374 | $6,560 | $408,600 |
| ADSI | [5] | $10,816 | $20,190 | $7,824 | ($620) | $0 | $38,210 |
| Total | | $59,009 | $50,189 | $127,298 | $203,753 | $6,560 | $446,809 |

| Probabilistic Counterfeit [6] | 73% |
|---|---|

### Estimated Net Profits

| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|
| K&F | [7] | $60,018 | $8,894 | ($10,570) | ($73,227) | $3,651 | ($11,234) |
| ADSI | [7] | ($5,038) | $85,541 | $35,658 | ($3,156) | $0 | $113,005 |
| Total | | $54,980 | $94,434 | $25,088 | ($76,383) | $3,651 | $101,771 |

**Notes & Sources:**
[1] See Regan Report, Schedule 6c.
[2] = Sales x Cisco Products COGS as % of Cisco Products Income. See Exhibit 1.
[3] = Sales - COGS
[4] = Sales x Costs Incurred in Connection with Alleged Infringing Sales as % of Total Net Income. See Exhibit 1.
[5] = Sales x Costs Incurred in Connection with Alleged Infringing Sales as % of Total Net Income. See Exhibit 1a.
[6] = Probabilistic Counterfeit % of Link US (See Regan Report, Schedule 2b).
[7] = (Gross Profits - Costs Incurred in Connection with Alleged Infringing Sales) x Probabilistic Counterfeit %.

Cisco Systems Inc., et al v. Zahid Hassan Sheikh., et al.

## Exhibit 6c
## Adjustment to Regan's Schedule 6c (Using 100%)
## Defendants' Profits - No Vendor Identified

**Sales**

| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|
| K&F | [1] | $402,124 | $139,821 | $495,070 | $485,124 | $39,822 | $1,561,961 |
| ADSI | [1] | $66,298 | $316,949 | $117,204 | ($21,962) | $0 | $478,489 |
| Total | | $468,422 | $456,770 | $612,274 | $463,162 | $39,822 | $2,040,450 |

**Costs of Goods Sold**

| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|
| K&F | [2] | $271,764 | $97,645 | $390,068 | $381,001 | $28,263 | $1,168,741 |
| ADSI | [1] | $62,379 | $179,650 | $60,562 | ($17,021) | $0 | $285,570 |
| Total | | $334,143 | $277,295 | $450,630 | $363,980 | $28,263 | $1,454,311 |

**Gross Profits**

| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|
| K&F | [3] | $130,360 | $42,176 | $105,002 | $104,123 | $11,559 | $393,220 |
| ADSI | [3] | $3,919 | $137,299 | $56,642 | ($4,941) | $0 | $192,919 |
| Total | | $134,279 | $179,475 | $161,644 | $99,182 | $11,559 | $586,139 |

**Costs Incurred in Connection with Alleged Infringing Sales**

| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|
| K&F | [4] | $48,192 | $30,000 | $119,473 | $204,374 | $6,560 | $408,600 |
| ADSI | [5] | $10,816 | $20,190 | $7,824 | ($620) | $0 | $38,210 |
| Total | | $59,009 | $50,189 | $127,298 | $203,753 | $6,560 | $446,809 |

| Probabilistic Counterfeit [6] | 100% |
|---|---|

**Estimated Net Profits**

| Company | | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|
| K&F | [7] | $82,168 | $12,176 | ($14,471) | ($100,251) | $4,999 | ($15,379) |
| ADSI | [7] | ($6,897) | $117,109 | $48,818 | ($4,321) | $0 | $154,709 |
| **Total** | | **$75,271** | **$129,286** | **$34,346** | **($104,572)** | **$4,999** | **$139,330** |

**Notes & Sources:**
[1] See Regan Report, Schedule 6c.
[2] = Sales x Cisco Products COGS as % of Cisco Products Income. See Exhibit 1.
[3] = Sales - COGS
[4] = Sales x Costs Incurred in Connection with Alleged Infringing Sales as % of Total Net Income. See Exhibit 1.
[5] = Sales x Costs Incurred in Connection with Alleged Infringing Sales as % of Total Net Income. See Exhibit 1a.
[6] = Probabilistic Counterfeit % of 100% (See Regan Report, Schedule 6c).
[7] = (Gross Profits - Costs Incurred in Connection with Alleged Infringing Sales) x Probabilistic Counterfeit %.

1  JAMES McMANIS (40958)
   TYLER ATKINSON (257997)
2  ANDREW PARKHURST (324173)
   McMANIS FAULKNER
3  A Professional Corporation
   50 West San Fernando Street, 10th Floor
4  San Jose, California 95113
   Telephone:    (408) 279-8700
5  Facsimile:    (408) 279-3244
   Email:        aparkhurst@mcmanislaw.com
6
   Attorneys for Defendant and Third Party Plaintiff
7  Advanced Digital Solutions International, Inc., and
   Defendants PureFutureTech, LLC, K&F Associates, LLC,
8  Shahid Sheikh, Kamran Sheikh and Farhaad Sheikh

9              **UNITED STATES DISTRICT COURT**

10           **NORTHERN DISTRICT OF CALIFORNIA**

11                   **OAKLAND DIVISION**

12 | CISCO SYSTEMS, INC., a California corporation, and CISCO TECHNOLOGY, | Case No. 4:18-CV-07602-YGR |
13 | INC., a California corporation, | **PROOF OF SERVICE** |
14 |            Plaintiffs, | |
15 |        v. | |
16 | ZAHID "DONNY" HASSAN SHEIKH, an individual; et al., | |
17 |            Defendants. | |
18 | | |
19 | ADVANCED DIGITAL SOLUTIONS | |
20 | INTERNATIONAL, INC., a California corporation, | |
21 |        Third-Party Plaintiff, | |
22 |        v. | |
23 | RAHI SYSTEMS, INC., a California corporation; et al., | |
24 | | |
25 |        Third-Party Defendants. | |
26
27
28

PROOF OF SERVICE, Case No. 4:18-CV-07602-YGR

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF SANTA CLARA**

I am employed in the County of Santa Clara, State of California. I am over the age of 18 and not a party to the within action; my business address is 50 West San Fernando Street, 10th Floor, San Jose, California 95113.  My email address is: aparkhurst@mcmanislaw.com.

On May 1, 2020, I served true copies of the following document(s) described as:

EXPERT REBUTTAL REPORT OF RUSSELL W. MANGUM III, PH.D.

on the interested parties in this action as follows:

| | |
|---|---|
| Richard J. Nelson, Esq.<br>Ian K. Boyd, Esq.<br>Anna P. Chang, Esq.<br>Sideman & Bancroft LLP<br>One Embarcadero Center, 22nd Floor<br>San Francisco, CA  94111-3711<br>T:  (415) 392-1960<br>F:  (415) 392-0827<br>E:  rnelson@sideman.com<br>    iboyd@sideman.com<br>    achang@sideman.com | *Attorneys for Plaintiff*<br>CISCO SYSTEMS, INC. and CISCO TECHNOLOGY, INC. |
| Michael C. Robinson, Esq.<br>John Bradley Stuckey, Esq.<br>ROBINSON DiLANDO<br>801 S. Grand Ave., #500<br>Los Angeles, CA  90017<br>T:  (213) 229-0100<br>F:  (213) 229-0114<br>E:  mrobinson@rdwlaw.com<br>    bstuckey@rdwlaw.com | *Attorneys for Defendant*<br>ZAHID HASSAN SHEIKH and IT DEVICES ONLINE, INC. |
| John C. Kirke, Esq.<br>Jesse B. McKeithen, Esq<br>Kathleen Friend, Esq..<br>DONAHUE FITZGERALD, LLP.<br>1999 Harrison Street, 26th Floor<br>Oakland, CA 94612<br>T:  (510) 451-0544 / F:  (510) 832-1486<br>E:  jkirke@donahue.com<br>    kfriend@donahue.com | *Attorneys for Third Party Defendants*<br><br>RAHI SYSTEMS, INC., PURE FUTURE TECHNOLOGY, INC., MIKE MINHAS, NORMAN KARAMAT, NABIA UDDIN, KAROLINE BANZON and KAELYN NGUYEN |
| Matthew A. Crosby, Esq.<br>Michael C. Crosby, Esq.<br>Crosby & Crosby<br>1570 The Alameda, #200<br>San Jose, CA  95126<br>T:  (408) 370-7500 / Fax:  (408) 984-5063 | *Attorneys for Defendant*<br>JESSICA LITTLE |

PROOF OF SERVICE, Case No. 4:18-CV-07602-YGR

E:  matt@crosbyplc.com
    mike@crosbyplc.com

James Giacchetti, Esq.                    *Attorneys for Defendant*
Attorney at Law                          IMRAN HUSAIN
45 E. Julian Street
San Jose, CA  95112
T:  (669) 226-8605
E:  jamesgiacchetti@gmail.com

☒       **(ELECTRONIC MAIL)**
         Based on a court order or an agreement of the parties to accept service by email or
         electronic transmission, I caused the documents to be sent to the persons at the e-mail
         addresses listed on the above service list.

☒       **(FEDERAL)**
         I declare under penalty of perjury under the laws of the United States of America that
         the above is true and correct.

         Executed on May 1, 2020, at San Jose, California.

                                              */s/ Andrew Parkhurst*
                                              Andrew Parkhurst

# EXHIBIT  H

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                   OAKLAND DIVISION

 4   CISCO SYSTEMS, INC., a        )
     California corporation, and   )
 5   CISCO TECHNOLOGY, INC., a     )
     California corporation,       )
 6                                 )
                  Plaintiffs,      )
 7                                 )
          -vs-                     )
 8                                 )
     ZAHID "DONNY" HASSAN SHEIKH,  )
 9   an individual, et al.,        )
                                   )
10               Defendants.       )
     _____ )  Case No:
11   ADVANCED DIGITAL SOLUTIONS    )
     INTERNATIONAL, INC., a        )  4:18-CV-07602-YGR
12   California corporation,       )
                                   )
13        Third-Party Plaintiff,   )
                                   )
14        -vs-                     )
                                   )
15   RAHI SYSTEMS, INC., a         )
     California corporation,       )
16   et al.,                       )
                                   )
17        Third-Party Defendants.  )
     _____ )

18

19        REMOTE DEPOSITION OF GREG J. REGAN, CPA

20                    CONFIDENTIAL

21                   May 7, 2020

22

23   Reported by:

24   ANNE M. TORREANO, RPR, CCRR, CLR, CSR No. 10520

25   JOB NO. 179816
```

1        A.   It's common for a risk matrix to stratify

2   risk into subgroupings.

3        Q.   And in the past when you've looked at those

4   risk scoring models' outputs, like the one we see

5   here in 2f, you typically see that the high risk

6   percentage is greater than the medium risk

7   percentage; is that correct?

8        A.   I think that that's a common outcome.

9        Q.   And so when you look at this schedule here,

10  2f, and you saw, for transceivers, that the high

11  risk was higher than the medium risk, what was your

12  first thought?

13            ATTORNEY NELSON:   Objection.   Misstates.

14            THE WITNESS:   I could be incorrect, but I

15  think you stated that backwards.

16  BY ATTORNEY PARKHURST:

17       Q.   Okay.   So my understanding is, if you look

18  at column 2, if you go from transceivers and trace

19  to the right, it says high risk is 73.7, medium risk

20  is 95.3; is that correct?

21       A.   Yes.

22       Q.   So then if you go to the column that states

23  "Applied Non-Genuine," you adjusted the medium risk

24  to say 73.7 instead of 95.3; is that correct?

25       A.   That's right.

1      Q.   And we've been talking about why you made

2   that adjustment just now; is that correct?

3      A.   Yes.

4      Q.   And so when you took the 95.3 and made it

5   73.7, what prompted you to make that decision?

6      A.   I think I've already answered this

7   question.

8           So this to me exhibited some uncertainty

9   with respect to the medium-risk population, that in

10  my view and experience that I would expect it to be

11  at or equal -- excuse me, at or below the high-risk

12  population.  And I look to the next greatest

13  population of products, for example, the switches,

14  where there is a decreasing percentage of the

15  population that are non-genuine where the product is

16  categorized as medium risk, and I made an adjustment

17  so that the amount of damages was decreased to

18  reflect a similar trend in expectation.

19      Q.   Okay.  So when you first saw the

20  transceivers and it says 73.7 for high risk, 95.3

21  for medium risk, that gave you cause for concern.

22  Is that fair to say?

23           ATTORNEY NELSON:  Objection.  Outside the

24  scope.

25           THE WITNESS:  What I described it as is

Confidential

Page 163

1               REPORTER'S CERTIFICATE

2          I, Anne Torreano, Certified Shorthand

3    Reporter licensed in the State of California,

4    License No. 10520, hereby certify that the deponent

5    was by me first duly sworn, and the foregoing

6    transcript is a true and correct record of the

7    testimony given; that said testimony was taken by me

8    stenographically and thereafter reduced to

9    typewriting under my direction; and that reading and

10   signing was [ ] requested [X] not requested.

11          I further certify that I am not a relative

12   or employee of a party or an employee of an attorney

13   or agent of a party, or interested, directly or

14   indirectly, in the proceeding either as counsel,

15   attorney, agent, or otherwise.

16          The dismantling, unsealing, or unbinding

17   of the original transcript will render the

18   reporter's certificates null and void.

19          In witness whereof, I have subscribed my

20   name this 19th day of May, 2020.

21

22

23

24                    _Anne Torreano_

25                 ANNE M. TORREANO, CSR No. 10520

# EXHIBIT  I

**To:** Kenny Carter (kenncart)[kenncart@cisco.com]; Tim Casto (tcasto)[tcasto@cisco.com]; Reggie Harris (regharri)[regharri@cisco.com]; Kara Kaiser (kakaiser)[kakaiser@cisco.com]
**Cc:** Shelly Wight (swight)[swight@cisco.com]
**From:** Steve O'Bryan (stobryan)
**Sent:** 2016-10-21T10:52:28-04:00
**Importance:** Normal
**Subject:** RE: IT Devices Online
**Received:** 2016-10-21T10:52:30-04:00

I don't think they are.....

I did send a nicely articulated "concern email" to the customer this morning. He responded with a little back tracking as to why they were talking with them, so I think we might be over the hump on this one. Really appreciate your data and email verbiage in a timely fashion.


Thanks.....
Steve



Steve OBryan
ACCOUNT MANAGER
stobryan@cisco.com
Phone: 513-697-2221  SNR

Think before you print.

This email may contain confidential and privileged material for the sole use of the intended recipient. Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of this message.
For more corporate legal information go to:
http://www.cisco.com/web/about/doing_business/legal/cri/index.html


**From:** Kenny Carter (kenncart)
**Sent:** Friday, October 21, 2016 9:37 AM
**To:** Tim Casto (tcasto); Steve O'Bryan (stobryan); Reggie Harris (regharri); Kara Kaiser (kakaiser)
**Cc:** Shelly Wight (swight)
**Subject:** RE: IT Devices Online

Hi Tim:



CISCO00000758

Thank you the assistance on this one.

Hi Steve:

Your assumption is correct.  IT Devices Online (aka Enterprise Technology Solutions) is not an authorized reseller of Cisco.  Let me know if IT Devices Online is telling the customer that they an authorized source.

Regards,

Kenny

**From:** Tim Casto (tcasto)
**Sent:** Thursday, October 20, 2016 6:48 PM
**To:** Steve O'Bryan (stobryan) <stobryan@cisco.com>; Reggie Harris (regharri) <regharri@cisco.com>; Kara Kaiser (kakaiser) <kakaiser@cisco.com>; Kenny Carter (kenncart) <kenncart@cisco.com>
**Cc:** Shelly Wight (swight) <swight@cisco.com>
**Subject:** Re: IT Devices Online

Glad to help! Let us know if there is anything else we can do to help.

Tim Casto
Cisco Brand Protection
tcasto@cisco.com
Tel: +1 408 527 5827

**From:** "Steve O'Bryan (stobryan)" <stobryan@cisco.com>
**Date:** Thursday, October 20, 2016 at 3:37 PM
**To:** Tim Casto <tcasto@cisco.com>, "Reggie Harris (regharri)" <regharri@cisco.com>, "Kara Kaiser (kakaiser)" <kakaiser@cisco.com>, "Kenny Carter (kenncart)" <kenncart@cisco.com>
**Cc:** "Shelly Wight (swight)" <swight@cisco.com>
**Subject:** RE: IT Devices Online

Perfect, thank you.  I have some of this stuff already in a letter I send out when confronted with this, but you have given me some newer verbiage.  Mostly I needed confirmation on this company in specific and you have answered that question..... they are a grey marketer.  I couldn't find them in the partner locator, but wanted confirmation before I sent something to the customer that might be inaccurate.

Thanks.....
Steve

CONFIDENTIAL



Steve OBryan
ACCOUNT MANAGER
stobryan@cisco.com
Phone. 513-697-2221  SNR

 Think before you print.

This email may contain confidential and privileged material for the sole use of
the intended recipient. Any review, use, distribution or disclosure by others is
strictly prohibited. If you are not the intended recipient (or authorized to receive
for the recipient), please contact the sender by reply email and delete all copies
of this message.
For corporate legal information go to
http://www.cisco.com/web/about/doing_business/legal/cri/index.html

**From:** Tim Casto (tcasto)
**Sent:** Thursday, October 20, 2016 6:32 PM
**To:** Steve O'Bryan (stobryan); Reggie Harris (regharri); Kara Kaiser (kakaiser); Kenny Carter (kenncart)
**Cc:** Shelly Wight (swight)
**Subject:** Re: IT Devices Online

Hi Steve,

Please feel free to share the below language with your customer regarding IT Devices Online.

Let us know if you have any questions.

Best regards,

Tim

Regardless of what IT Devices Online claims, and regardless of whether their Cisco product is used or is in new sealed boxes, ANY Cisco product they supply is considered unauthorized.

1.      Unauthorized product is not eligible for any Cisco OEM warranty
2.      Unauthorized product is not automatically eligible for SMARTnet
3.      Unauthorized product does not have a valid software license.

IT Devices Online is NOT a member of the Cisco Authorized Reseller Program.

For a detailed list of authorized Cisco Channel Partners, please refer

CONFIDENTIAL

to http://www.cisco.com/go/partnerlocator.

The following policy statement applies, whether the product is used or is in new, unopened and sealed boxes.

When products are not sold through Cisco's authorized sales channels, Cisco can offer no assurance as to the provenance and quality of those products. Additionally, when resellers resell Cisco products that have been sourced from outside of Cisco's authorized sales channels, those products do not come with a valid software license or hardware warranty and are not automatically eligible for a Cisco service support contract (such as SMARTnet maintenance).

With regard to used Cisco products, Cisco Refresh equipment (formerly CCRE) is the only used Cisco product offering that is authorized and supported by Cisco (without additional inspection, fees, or relicensing). Cisco Refresh equipment is sold with a full Cisco warranty and software license, and with the same Cisco service support options that new products have. Cisco Refresh is sold only through Cisco authorized partners.

An overview of Cisco's policy on this subject is as follows:

**Licensing**. When Cisco sells its products, software licenses (such as for Cisco IOS) are granted to the initial purchasers of those products. Cisco's policy is that software may not be transferred to any other purchaser of the product unless specifically authorized by Cisco. To the extent that Cisco believes a customer is not an initial purchaser—or if a customer expresses concern that it is not an initial purchaser—such issues will be promptly addressed and Cisco is committed to resolving all licensing issues that arise. In full, this policy is set forth on Cisco's website: http://www.cisco.com/en/US/prod/cisco_software_transfer_relicensing_policy.html.

**Support Plans**. Cisco products that are not purchased through Cisco's authorized sales channels are not automatically eligible for a Cisco service support contract. For Cisco products purchased outside Cisco's authorized sales channels that are genuine Cisco product, Cisco must still evaluate the product's eligibility to receive support services (i.e., to ensure that no changes have been made to the genuine Cisco hardware or software, and to confirm that the product still functions according to Cisco's specifications and customer expectations) and Cisco's policy is to charge an inspection fee for this evaluation. In full, this policy is set forth on Cisco's website: http://www.cisco.com/en/US/prod/hw_sw_relicensing_program.html.

**Warranty**. Cisco products are sold with warranties that inhere to the benefit of the initial purchaser. Cisco's policy is that warranties may not be transferred to any other purchaser of the product unless specifically authorized by Cisco. To the extent that Cisco believes a customer is not an initial purchaser—or if a customer expresses concern that it is not an initial purchaser— such issues will be promptly addressed and Cisco is committed to resolving all warranty issues that arise. In full, this policy is set forth on Cisco's website:http://www.cisco.com/en/US/products/prod_warranties_listing.html.

Cisco's policy on Third-Party Components is openly available. It is posted at:http://www.cisco.com/en/US/products/prod_warranties_item09186a00800b5594.html.

Doing business with Cisco

CONFIDENTIAL

link: http://www.cisco.com/web/about/doing_business/authorized_sourcing.html

Tim Casto
Cisco Brand Protection
tcasto@cisco.com
Tel: +1 408 527 5827

**From:** "Steve O'Bryan (stobryan)" <stobryan@cisco.com>
**Date:** Thursday, October 20, 2016 at 3:27 PM
**To:** Tim Casto <tcasto@cisco.com>, "Reggie Harris (regharri)" <regharri@cisco.com>, "Kara Kaiser
(kakaiser)" <kakaiser@cisco.com>, "Kenny Carter (kenncart)" <kenncart@cisco.com>
**Cc:** "Shelly Wight (swight)" <swight@cisco.com>
**Subject:** RE: IT Devices Online

Kenny:

Would love to get whatever data you have on these guys. I need to get some messaging to my
customer tomorrow to ensure they don't pull the trigger on ordering from this company.


Thanks.....
Steve



Steve OBryan
ACCOUNT MANAGER
stobryan@cisco.com
Phone: 513-697-2221  SNR


Think before you print.

This email may contain confidential and privileged material for the sole use of
the intended recipient. Any review, use, distribution or disclosure by others is
strictly prohibited. If you are not the intended recipient (or authorized to receive
for the recipient), please contact the sender by reply email and delete all copies
of this message.
For corporate legal information go to:
http://www.cisco.com/web/about/doing_business/legal/cri/index.html


**From:** Tim Casto (tcasto)
**Sent:** Thursday, October 20, 2016 6:12 PM

CISCO00000762

**To:** Reggie Harris (regharri); Kara Kaiser (kakaiser); Kenny Carter (kenncart)
**Cc:** Steve O'Bryan (stobryan)
**Subject:** Re: IT Devices Online

Hi Reggie,

We are indeed aware of IT Devices Online. Adding our colleague Kenny Carter to this thread as he is the most knowledgeable about this company.

Just in terms of coverage (in the event one or two of us happen to be out of the office at the same time), it wouldn't hurt to send these types of requests to our mailer brandprotection-americas@cisco.com .

Thanks,

Tim


Tim Casto
Cisco Brand Protection
tcasto@cisco.com
Tel: +1 408 527 5827


**From:** "Reggie Harris (regharri)" <regharri@cisco.com>
**Date:** Thursday, October 20, 2016 at 3:00 PM
**To:** "Kara Kaiser (kakaiser)" <kakaiser@cisco.com>, Tim Casto <tcasto@cisco.com>
**Cc:** "Steve O'Bryan (stobryan)" <stobryan@cisco.com>
**Subject:** FW: IT Devices Online

Kara and Tim,
Sorry to forward this over this way.  Is there someone I should be sending these types of requests to normally?

One of our reps (Steve O'Bryan, who is copied on this message), is running into a grey market situation we believe.  Do we have any intel on IT Devices Online?  Their website link is below.
Thanks,
Reggie


*Reggie Harris* .:|:.:|:. **CISCO** | Partner Account Manager | USPO | regharri@cisco.com | SNR: +1.513.697.2299 |


**From:** Steve O'Bryan <stobryan@cisco.com>
**Date:** Thursday, October 20, 2016 at 5:53 PM
**To:** "group.swight(mailer list)" <group.swight@cisco.com>
**Cc:** Reggie Harris <regharri@cisco.com>, Danielle Curran <dacurran@cisco.com>
**Subject:** IT Devices Online

Does anyone know anything about this company?  They are some kind of grey marketer, but I haven't seen them before.  They are smoking us on a deal right now.


CONFIDENTIAL

# EXHIBIT  J

```
 1           UNITED STATES DISTRICT COURT

 2        NORTHERN DISTRICT OF CALIFORNIA

 3               OAKLAND DIVISION

 4    ----------------------------

 5  CISCO SYSTEMS, INC., a          Case No:
    California corporation, et al.,  4:18-cv-07602
 6                                    YGR
                   Plaintiffs
 7  vs.

 8  ZAHID "DONNY" HASSAN SHEIKH,
    an individual, et al.,
 9
                   Defendants.
10  ----------------------------
    ADVANCED DIGITAL SOLUTIONS
11  INTERNATIONAL, INC.,  a
    California corporation,
12
             Third-Party Plaintiff,
13
    vs.
14
    RAHI SYSTEMS, INC.,  a
15  California corporation, et al.,

16           Third-Party Defendants.
    ----------------------------
17

18   TELECONFERENCE DEPOSITION OF ANITA SMITH

19               May 12, 2020

20

21

22

23

24  Reported by:  Susan S. Klinger, RMR-CRR, CSR

25  Job No. 179868
```

1      A.     I don't know.

2      Q.     So for these three switches, who was

3  the vendor that was utilized to purchase them

4  from?

5      A.     Dexon.

6      Q.     Was that the first time you

7  purchased products from Dexon?

8      A.     No, I purchased equipment from them

9  in the past.

10     Q.     Do you know when you first purchased

11  equipment from them?

12     A.     I do not know.

13     Q.     Was it in the last five years?

14     A.     It was within the five years.

15     Q.     Could you estimate how regularly you

16  purchased products from them?

17     A.     Well, we really don't buy a lot of

18  stuff all the time, so I do other vendors.  He

19  is not the only vendor.  I mean, based off of

20  what he has available and based on price, so

21  I'm not sure as far as how often I purchase

22  from him.  I would have to go look at that

23  information.

24     Q.     And do you have a list of approved

25  vendors that you buy from?

1            C E R T I F I C A T E

2

3        I, SUSAN S. KLINGER, a certified shorthand

4    reporter within and for the State of Texas, do

5    hereby certify:

6        That ANITA SMITH, the witness whose

7    deposition is hereinbefore set forth, was duly

8    sworn by me and that such deposition is a true

9    record of the testimony given by such witness.

10       I further certify that I am not related to

11   any of the parties to this action by blood or

12   marriage; and that I am in no way interested in

13   the outcome of this matter.

14       IN WITNESS WHEREOF, I have hereunto set my

15   hand this 22nd of May, 2020.

16

17   _____

18                    Susan S. Klinger,

19                    RMR-CRR, CSR

20                    Texas CSR# 6531

21

22

23

24

25

# EXHIBIT  K

Page 1

1           ROUGH DRAFT TRANSCRIPT

2    VIDEOCONFERENCE DEPOSITION OF PAUL C. RICCOBENE

3               MAY 20, 2020

4        A realtime rough draft is unedited and

5    uncertified and may contain untranslated stenographic

6    symbols, incorrectly translated words, misspelled

7    proper names, nonsensical word combinations and an

8    occasional reporter's note.  Any inaccuracies will be

9    corrected in the final certified transcript of

10   proceedings.

11       By acceptance of a rough draft of proceedings,

12   any party or counsel representing any party to the

13   action understands and agrees that the text of a rough

14   draft may not be quoted or cited in any subsequent

15   court or discovery proceeding, may not be used for

16   impeachment purposes and may not be distributed in any

17   form to any other person or entity.

18       Further, by acceptance of a rough draft of

19   proceedings, any party or counsel representing any

20   party to the action agrees to indemnify and hold

21   harmless the individual court reporter should the

22   final transcript differ in form or content from the

23   rough draft of the proceedings.

24                   - - -

25

1      Q.    And when you -- so how does that process

2    typically work.  Do you tell them certain specific

3    circumstances that you need to meet or do you

4    provide them specific products that you're looking

5    for?  Scan you describe how that process works?

6      A.    I will typically, when we are looking

7    for a specific product, I will contact -- usually

8    I will contact CDW.  And if I'm not particularly

9    happy with the pricing that they give us, I will

10    look elsewhere sometimes.

11      Q.    Why do you typically go to CDW first?

12      A.    We probably purchase the vast majority

13    of our networking gear from them.  We have used

14    them because we know their sales staff really well

15    and their pre-sales engineering staff, so we've

16    worked with them sometimes on specific solutions,

17    so we typically use them.

18      Q.    So in this process, do you do any online

19    research to try and look at what the price of the

20    product you're looking for, that is out there?

21      A.    Yes.

22      Q.    And so what factors play into your

23    decision if CDW comes back with a quote and you

24    don't like the price you're getting, how do you

25    decide that price is too high and you want to look

1  elsewhere?

2      A.    A lot of times its from experience, to

3  see what they've offered in the past, and if it's

4  increased, then we will typically look someplace

5  else.

6      Q.    So you base it primarily on previous

7  quotes that they've given you for similar

8  products, is that fair to say?

9      A.    Yes, that and just knowledge of knowing

10  what the average price of what a switch would be.

11      Q.    And does Scripps have any process for

12  rejecting quotes if the price is too high?

13      A.    Can you explain what you mean by

14  rejection of the quote.

15      Q.    Yeah, maybe a little more clear, if you

16  were to get a quote from a VAR for a switch, for

17  example, and submit that to your purchasing

18  department, do they ever send it back and say this

19  is a too high price for that switch, please look

20  elsewhere.

21      A.    I've personally never seen that.

22      Q.    So in an instance where CDW is not

23  offering the price that you want, what do you

24  typically -- what factors do you go look for when

25  trying to by the a similar product from a

1   different VAR.  Typically it would be price.  We

2   would look at a similar or possibly an order model

3   Cisco switch and look for something will that's,

4   you know, lower price, that would meet a similar

5   level of performance that we like.

6        Q.    When you say an older product, what

7   would constitute an older product?

8        A.    That would be anything before the

9   Catalyst 9300 series, 92, 93, 9400 series.

10       Q.    So there's instances where you're

11  looking for devices and the job that you need the

12  device to provide could be done by an older, not

13  new product, is that fair to say?

14       A.    That's fair to say.

15       Q.    Do you ever order a used product,

16  products that have been used before?

17       A.    We typically call them refurbished, but,

18  yes.

19       Q.    And how do you know that their

20  refurbished?

21       A.    We'll specifically ask for a refurbished

22  switch.

23       Q.    Okay.  So there are times when you're

24  looking for replacement switches, where Scripps is

25  willing to use refurbished switches as opposed to

 1   new switches, is that correct?

 2       A.    That's correct.

 3       Q.    What percentage would you say of the

 4   switches that you've ordered have been refurbished

 5   versus brand new?

 6       A.    I don't know if I could give you an

 7   exact number.  I mean, it could probably be -- it

 8   would probably be right around 50 percent.

 9       Q.    What factors go into the consideration

10   of whether or not you need a new switch versus

11   whether a refurbished switch will do?

12       A.    It can typically be does it match the

13   existing infrastructure that's already on site.

14   So if they already have like a previous generation

15   version of switches, we'll try to continue to

16   match that up, and sometimes, if they need to

17   expand something, it needs to be an identical

18   model.

19       Q.    So does price play a consideration in

20   deciding whether or not to order a refurbished

21   switch versus a new switch?

22       A.    Yes, the -- that is a part of it, for me

23   it is a part of it.

24       Q.    And when you say for you, what do you

25   mean by for you?