# Depo 1

1                    UNITED STATES DISTRICT COURT
2                  NORTHERN DISTRICT OF CALIFORNIA
3                        OAKLAND DIVISION
4
     CISCO SYSTEMS, INC., a
5    California corporation;
     et al.,
6
                        Plaintiffs,
7
     vs.                                  No. 4:18-cv-07602 YGR
8
     ZAHID "DONNY" HASSAN SHEIKH,
9    an individual; et al.,
10                      Defendants.
     _____/
11
     ADVANCED DIGITAL SOLUTIONS
12   INTERNATIONAL, INC., A
     California corporation,
13
          Third-party Plaintiff,
14
     vs.
15
     RAHI SYSTEMS, INC., a
16   California corporation,
     et al.
17
          Third-party Defendants.
18   _____/
19                    DEPOSITION OF THERESA LAU
20   DATE:            December 16, 2019
21   TIME:            12:53 p.m.
22   LOCATION:        San Francisco, California
23   REPORTED BY:     BENJAMIN GERALD, CSR
                       California CSR No. 14203
24                     Washington CSR No. 3468
25   JOB NO.:         172510

Page 103

BY MS. HE:

Q.   So is 6172 Corte Padre a residential address?

A.   Yes.

Q.   And does it belong to Kamran?

MR. BASTIDA:   Calls for speculation.

THE WITNESS:   Yes, it does.

BY MS. HE:

Q.   And Kamran owns Pure Future Tech?

A.   Yes.

Q.   Under the section that says "email address," do you see that?

A.   Yes.

Q.   What email address did you list?

A.   cs@purefuturetechnology.com.

Q.   Who's email address is this?

A.   This is a shared -- shared mailbox.

Q.   Who has access to this mailbox?

A.   Sam.   That's all I can remember.

Q.   Do you recall if multiple people had access to this email address?

A.   Yes.

Q.   Do you recall if Kamran has access to this email address?

A.   He does, yes.

Q.   Did you have access to this email address while

1   BY MS. HE:

2        Q.   Who else?

3        A.   Freddy's credit card, as well.  That's all I

4   can remember.

5        Q.   And when you refer to Freddy's credit card, is

6   that a business card?

7        A.   Yes.

8        Q.   Have you ever used his personal card?

9        A.   No.

10       Q.   Have you ever used Kamran's personal card?

11       A.   Yes.

12       Q.   For what kind of matters?

13       A.   For Kamran's personal bills.

14       Q.   Did you ever use Kamran's personal number for

15   work-related matters?

16       A.   No.

17       Q.   So do you know why Pure Future Tech opened up a

18   UPS box in Portland?

19       A.   I don't know.

20       Q.   Do you have any connections, any family members

21   in Portland?

22       A.   I don't.

23       Q.   Do you have any friends in Portland?

24       A.   I do not.

25       Q.   Do you -- does ADSI -- excuse me -- does Pure

Page 109

Future Tech have any customers in Portland?

        MR. BASTIDA:   Objection.   Calls for speculation.

        THE WITNESS:   I don't know.

BY MS. HE:

    Q.   Why did you fill out this mailbox service agreement?

        MR. BASTIDA:   Asked and answered.

        THE WITNESS:   Kamran asked me to.

BY MS. HE:

    Q.   Do you know if someone instructed Kamran to complete this form?

    A.   I don't know.

    Q.   Did Kamran tell you why you were filling out this form?

    A.   He did not.

    Q.   How did Kamran assign you to fill out this agreement?

        MR. BASTIDA:   Objection.   Vague.

        THE WITNESS:   He asked me to find a UPS box in Portland, Oregon and to open an account.

BY MS. HE:

    Q.   How did you find a UPS box in Portland, Oregon?

    A.   I went on to -- I went to the UPS site and looked at their locations in -- located in Portland,

Page 110

1    Oregon.

2         Q.   How did you choose a particular UPS location in

3    Portland, Oregon?

4         A.   I looked at their Yelp reviews and just picked

5    one that seemed to have pretty good reviews.

6         Q.   And did you talk to anybody at ADSI regarding

7    this UPS box in Portland, Oregon?

8              MR. BASTIDA:  Objection.  Vague.

9              THE WITNESS:  I know Kamran.

10   BY MS. HE:

11        Q.   So you didn't talk to anybody else at ADSI

12   regarding this UPS box in Portland, Oregon?

13        A.   I've probably -- I've discussed shipments with

14   Jessica and Sam, about shipments that arrived here.

15        Q.   What did you discuss with Jessica regarding

16   shipments that arrived at the UPS box in Portland,

17   Oregon?

18        A.   The current statuses, whether they've been

19   forwarded to our Fremont UPS box or not.

20        Q.   And did Jessica know when you asked her these

21   kinds of questions?

22             MR. BASTIDA:  Objection.  Vague.  Calls for

23   speculation.

24             THE WITNESS:  I only asked -- well, yes.  I

25   guess.

1     A.  Sam.

2     Q.  Did Jessica have access to the cs@ email

3 address?

4        MR. BASTIDA:  Objection.  Calls for

5 speculation.

6        THE WITNESS:  I'm not sure.

7 BY MS. HE:

8     Q.  Did Pure Future Tech have any employees?

9     A.  No.

10       MR. BASTIDA:  Calls for speculation.

11       THE WITNESS:  No.

12 BY MS. HE:

13    Q.  Why did Pure Future Tech send shipments to the

14 UPS store instead of its mailing address?

15       MR. BASTIDA:  Objection.  Foundation.  Calls

16 for speculation.

17       THE WITNESS:  I don't know.

18 BY MS. HE:

19    Q.  Who -- how did Pure Future Tech retrieve

20 shipments from the UPS store in Portland, Oregon?

21       MR. BASTIDA:  Same objection.

22       THE WITNESS:  The shipments were forwarded to

23 the Fremont UPS store and then picked up from there.

24 BY MS. HE:

25    Q.  Who instructed the UPS in Portland, Oregon to

1   ship it to the Fremont location?

2        A.   I did.

3        Q.   And who told you to instruct the UPS store to

4   do that?

5        A.   Kamran.

6        Q.   Did anyone instruct Kamran to do that?

7        MR. BASTIDA:  Calls for speculation.

8        THE WITNESS:  I don't know.

9   BY MS. HE:

10       Q.   When Kamran instructed you to instruct the UPS

11  store to ship packages to the Fremont UPS location, did

12  he say anything else?

13       A.   No.

14       Q.   Who picked up the shipment at the Fremont UPS

15  box?

16       MR. BASTIDA:  Objection.  Compound.  Calls for

17  speculation.

18       THE WITNESS:  The Fremont box, right?

19  BY MS. HE:

20       Q.   Yes.

21       A.   Imran or any of our warehouse workers.

22       Q.   And what would they do with it after they

23  picked it up?

24       MR. BASTIDA:  Same objections.

25       THE WITNESS:  I don't know.

1          MS. HE:   Okay.   This is going to be Exhibit 29.

2          (Exhibit 29 was marked for identification.)

3     BY MS. HE:

4          Q.   Ms. Lau, can you please take a look through

5     these documents, and let me know when you're done.

6          A.   I'm finished.

7          Q.   Okay.   You are a quick reader.

8          Do you recognize this document?

9          A.   Yes.

10         Q.   What is it?

11         A.   It's the UPS application -- UPS store

12    application to open a mailbox.

13         Q.   Did you complete this -- this form?

14         A.   Yes, I did.

15         Q.   Can you look at the box number 16.

16         Is that your signature?

17         A.   Yes.

18         Q.   And is the rest of this, Section 5, for

19    example; and A, regarding driver's license; B, passport;

20    is that your writing?

21         A.   Yes.

22         Q.   And what company is listed in box number two?

23         A.   Pure Future Tech.

24         Q.   Were you an employee of Pure Future Tech when

25    you completed this form?

1        A.   No.

2        Q.   Why did you put Pure Future Tech as the company

3    under Box 2?

4        A.   I was told to put Pure Future Tech as the

5    company name.

6        Q.   Who instructed you to put Pure Future Tech as

7    the company name?

8        A.   Kamran did.

9        Q.   Did Kamran explain why he wanted you to put

10   Pure Future Tech as the company name?

11       A.   No, he did not.

12       Q.   And during this time, were you an employee at

13   ADSI?

14       A.   Yes.

15       Q.   Did you ask him why you were performing this

16   task on behalf of Pure Future Tech and not ADSI?

17       A.   No, I did not.

18       Q.   Did you ever question that?  Did you ever

19   wonder why?

20       A.   Yes, I did.

21       Q.   Did you investigate into this?

22            MR. BASTIDA:  Objection.  Vague.

23            THE WITNESS:  No, I did not.

24   BY MS. HE:

25       Q.   Did you ask anyone else at ADSI why you were

Page 129

1      A.  I don't know.

2          MR. BASTIDA:  Objection.  Calls for

3  speculation.

4  BY MS. HE:

5      Q.  Do you know who Nabia Uddin is?

6      A.  Yes.

7      Q.  Who is she?

8      A.  She was the purchaser for ADSI while I was at

9  ADSI.

10     Q.  Have you heard of Uddin Networks?

11     A.  No.

12     Q.  Okay.  Are you aware that ADSI imported goods

13  that Customs seized?

14     A.  Yes.

15     Q.  And how did you learn about this?

16     A.  They would -- Customs would send mail to the

17  UPS boxes that would eventually make their way to ADSI.

18     Q.  And what was this mail that Customs would send

19  to the UPS boxes?

20     A.  Thick envelopes.  I don't know what was inside.

21     Q.  So you don't know what was inside, but you do

22  know that the letters were from CBP -- or the packages

23  were from CBP?

24     A.  It would say "US Customs" on the envelope.

25     Q.  Got it.  Did these UPS box receive any other

1  types of mail, other than packages and shipments?

2           MR. BASTIDA:  Calls for speculation.

3           THE WITNESS:  Not that I know of.

4  BY MS. HE:

5       Q.  Okay.  Are you aware that Customs sent ADSI a

6  seizure notice regarding seized goods?

7       A.  Yes.

8       Q.  How did you become aware of these notices?

9       A.  I believe they were one of the Customs

10  envelopes that they sent.  When I first saw them, I

11  opened one or two to see what they were, and one of them

12  was, like, a seizure.  I would pass them on to Kamran.

13      Q.  So what kind of envelopes did you open when --

14  when you received them from the UPS box?

15          MR. BASTIDA:  Objection.  Vague.  Compound.

16          THE WITNESS:  They were white envelopes, pretty

17  thick.  Normal letter-sized envelopes.

18  BY MS. HE:

19      Q.  Who delivered these white envelopes to you?

20          MR. BASTIDA:  Objection.  Mischaracterizes

21  witness' testimony.  Calls for speculation.  Vague.

22          THE WITNESS:  The warehouse -- whoever in the

23  warehouse would pick up the packages from the UPS box.

24  BY MS. HE:

25      Q.  So when did you -- so when warehouse -- excuse

1  me -- when the warehouse delivered these UPS packages to

2  you, how did you decide to open them?

3     A.  Back then, I opened all the mail for ADSI, so I

4  only opened them to see what I should be doing with the

5  mail I got.

6     Q.  So when you said "back then," do you know the

7  timeline that you're referring to?

8     A.  I would say before late 2018.

9     Q.  Before late 2018.

10     So before late 2018, you would open all of the

11  packages or envelopes that the warehouse would deliver

12  to you from the UPS box; is that correct?

13     A.  No, I stopped opening the Customs envelopes

14  after a while.

15     Q.  But before late 2018, did you continue to open

16  up these envelopes?

17     A.  No.

18     Q.  When did you start opening up these envelopes?

19     A.  I don't remember.

20     Q.  Did you open up any packages?

21     A.  No, I didn't.

22     Q.  Did you ever open up a package delivered from

23  the warehouse from the UPS store?

24     A.  No, I didn't.

25     Q.  You testified earlier that back then, you

1  opened all the mail for ADSI.

2        What did you mean by "all the mail"?

3     A.  The mail that came from the USPS post office,

4  except for packages.

5     Q.  So you opened up all the mail for ADSI that

6  came from the USPS.

7        Did you open up all the mail from the UPS box

8  that the warehouse would deliver to you?

9     A.  No, I did not.

10    Q.  So did CBP -- sorry.

11        Did Customs ever send seizure notices via

12  US mail?

13        MR. BASTIDA:  Objection.  Calls for

14  speculation.

15        THE WITNESS:  I don't know.

16  BY MS. HE:

17    Q.  Did the seizure notices that you saw come from

18  the UPS box?

19    A.  Yes.

20    Q.  Which one?

21    A.  I don't know.

22    Q.  Do you know if any of the seizure notices from

23  Customs came from the Portland, Oregon UPS box?

24    A.  I don't know.

25    Q.  Do you know if any of the Customs notices came

Page 133

1  from the Reno, Nevada UPS box?

2      A.  Yes.

3      Q.  Did you read through the notices?

4      A.  No.

5      Q.  Did you read it enough to determine that it was

6  a seizure notice?

7      A.  Well, yeah.  Yeah.  Just enough to do that.

8      Q.  And what did you do when you realized it was a

9  seizure notice from Customs?

10     A.  I brought it to Kamran.

11     Q.  Did Kamran say anything when you brought these

12 notices to him?

13     A.  Only to continue bringing him these notices.

14     Q.  Okay.  Do you know who else had knowledge of

15 these seizures?

16     A.  I don't.

17     Q.  Do you know if Shahid had knowledge of these

18 seizures?

19     A.  I don't know.

20     Q.  What about Roya?

21     A.  I don't know.

22     Q.  What about Kamran?

23     A.  Yes.

24     Q.  And what about Farhaad, or Freddy?

25     A.  I don't know.

1                              CERTIFICATE

2          I, BENJAMIN GERALD, Certified Shorthand Reporter,

3    Certificate No. 14203, for the State of California do

4    hereby certify:

5          That prior to being examined, the witness named in

6    the foregoing deposition was by me duly sworn to testify

7    to the truth, the whole truth, and nothing but the truth

8    in the within-entitled cause;

9          That said deposition was taken shorthand at the

10   time and place herein named;

11         That the deposition is a true record of the

12   witness's testimony as reported to the best of my

13   ability by me, and was thereafter transcribed to

14   typewriting by computer under my direction;

15         I further certify that I am not interested in

16   the outcome of said action, nor am I connected with, nor

17   related to any of the parties in said action, nor to

18   their respective counsel.

19         Witness my hand this 27th day of December, 2019.

20

21         _____

22         BENJAMIN GERALD, CSR No. 14203

           STATE OF CALIFORNIA

23

24

25

# Depo 2

Page 1

1                  UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF CALIFORNIA

3                        OAKLAND DIVISION

4                          ---oOo---

5    CISCO SYSTEMS, INC., a
     California corporation,
6    et al.,

7                   Plaintiffs,

8    vs.                                No. 4:18-cv-07602 YGR

9    ZAHID "DONNY" HASSAN SHEIKH,
     an individual, et al.,

10

                    Defendants.
11   _____/

12   ADVANCED DIGITAL SOLUTIONS
     INTERNATIONAL, INC., a
13   California corporation,

14        Third-Party Plaintiff,

15   vs.

16   RAHI SYSTEMS, INC., a California
     corporation, et al.,

17

     Third-Party Defendants.
18   _____/

19               DEPOSITION OF JESSICA LITTLE

20                SAN FRANCISCO, CALIFORNIA

21                FRIDAY, OCTOBER 11, 2019

22   Reported by:

23   ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR

24   California CSR No. 9830

25   Job No. 169011

Page 26

1  myself on the advisement of my counsel.

2      Q   Did you confess to your employer that you

3  were committing crimes at ADSI?

4      A   I respectfully decline to answer your

5  question on the grounds that I might incriminate

6  myself on the advisement of my counsel.

7      Q   Did you confess to your employer that you

8  were conducting counterfeiting at ADSI?

9      A   I respectfully decline to answer your

10 question on the grounds that I might incriminate

11 myself on the advisement of my counsel.

12     Q   Did you conduct counterfeiting operations at

13 ADSI?

14     A   I respectfully decline to answer your

15 questions on the grounds that I might incriminate

16 myself and on the advisement of counsel.

17     Q   Is it a fact that you did conduct

18 counterfeiting operations at ADSI?

19     A   I respectfully decline to answer your

20 question on the grounds that I might incriminate

21 myself and on the advisement of counsel.

22     Q   How did you come to be employed at ADSI?

23     A   I respectfully decline to answer your

24 question on the grounds that I might incriminate

25 myself and on the advisement of counsel.

1        Q    I'm asking you to put Exhibit 20 in front of

2   you, which is the one-page verification.

3            MR. POLVERINO:   This one.

4            MR. NELSON:   Q.   Is that your signature on

5   Exhibit 20?

6        A    Yes.

7        Q    Okay.   And then, going back to Little 4, next

8   to the signature of Jessica Little, it has the date,

9   and it says 4/29/16.

10           Did you write that?

11       A    I respectfully decline to answer your

12   question on the grounds that I might incriminate

13   myself and on the advisement of counsel.

14       Q    Isn't it a fact that, in April of 2016, you

15   arranged for a UPS mailbox in Reno, Nevada, for a

16   company by the name of McIntosh Networks?

17       A    I respectfully decline to answer your

18   question on the grounds I might incriminate myself and

19   on the advisement of counsel.

20       Q    Let's go to the next page, which is Little 5.

21   The date on the top is 4/26/16, which is actually

22   three days before the date on Little 4, but it's in

23   the same ballpark.   It shows here, if you look in the

24   middle of the document, for the name on which -- to

25   which applicant's mail will be received, it says

1      MR. NELSON:   Q.   And you're asserting your

2  Fifth Amendment as to that question?

3      A   Yes.

4      Q   That leads me to believe that there's a

5  possibility that you might have been observing him do

6  counterfeiting activities while you yourself were

7  doing counterfeiting activities; is that a fair

8  statement?

9      MR. POLVERINO:   Objection; compound;

10  argumentative; and it's an assumption, counsel's

11  assumption.

12      MR. NELSON:   Q.   You can answer.

13      A   I respectfully decline to answer your

14  question on the grounds that I might incriminate

15  myself and on the advisement of counsel.

16      Q   But we've established that you -- that you

17  know a person named Imran Hussein; correct?

18      A   Yes.

19      Q   Have you ever discussed Cisco products with

20  him?

21      A   I respectfully decline to answer your

22  question on the grounds that I might incriminate

23  myself and on the advisement of counsel.

24      Q   Have you ever seen him print Cisco labels?

25      A   I respectfully decline to answer your

Page 69

1   question on the grounds that I might incriminate

2   myself and on the advisement of counsel.

3       Q   Did you see him print Cisco labels without

4   having anything yourself to do with it?

5       A   I respectfully decline to answer your

6   question on the grounds that I might incriminate

7   myself and on the advisement of counsel.

8       Q   And the reason it may incriminate you is

9   because you worked with him to make Cisco labels and

10  to apply them to products; isn't that true?

11      A   I respectfully decline to answer your

12  question on the grounds that I might incriminate

13  myself and on the advisement of counsel.

14      Q   Are you denying that you applied counterfeit

15  Cisco labels to products?

16      A   I respectfully decline to answer your

17  question on the grounds that I might incriminate

18  myself and on the advisement of counsel.

19      Q   Let's break that question up into pieces.

20          Do you know what a Cisco product is?

21          MR. POLVERINO:  Vague and uncertain.

22          MR. NELSON:  Okay.

23      Q   Do you believe -- is there something about

24  that question that -- that you think, Ms. Little, is

25  vague?  I'll try to clarify it for you.

1   of, to obtain a UPS box in Reno, Nevada, to receive

2   products for ADSI?

3        A   I respectfully decline to answer your

4   question on the grounds that I might incriminate

5   myself and on the advisement of counsel.

6        Q   I'll represent to you that Zahid Sheikh --

7   let me ask you a question.   Zahid Sheikh is owner of

8   ADSI; correct?

9        A   Yes.

10        Q   I'll represent to you that Zahid Sheikh knew

11   of no reason to receive products in Reno, Nevada.

12   There's no salespeople there.   There's no customers

13   there.

14             Can you think of any reason why ADSI would

15   need to receive products in Reno, Nevada?

16        A   I respectfully decline to answer your

17   question on the grounds that I might incriminate

18   myself and on the advisement of counsel.

19        Q   Let me just rephrase that.

20             Can you think of any lawful reason for ADSI

21   to receive products in Reno, Nevada?

22        A   I respectfully decline to answer your

23   question on the grounds that I might incriminate

24   myself and on the advisement of counsel.

25        Q   And just to be fair, I'm giving you a chance

1   to provide a lawful reason.   Not an unlawful reason.

2   So the answer would -- would actually not incriminate

3   you.

4           Is there any reason that you can think of,

5   lawful reason, noncriminal reason, to receive products

6   in Reno and have them brought down to Fremont,

7   California?

8       A    I respectfully decline to answer your

9   question on the grounds that I might incriminate

10  myself and on the advisement of counsel.

11      Q    Do you know how Nabia Uddin identified

12  vendors to sell Cisco products to ADSI?

13          He's pointing at your paper again, ma'am.

14      A    I respectfully decline to answer your

15  question on the grounds that I might incriminate

16  myself and on the advisement of counsel.

17      Q    Did you ever have any discussions with Nabia

18  Uddin requesting that she not get you involved in

19  anything illegal?

20      A    I respectfully decline to answer your

21  question on the grounds that I might incriminate

22  myself and on the advisement of counsel.

23      Q    Did you ever express any concern to Nabia

24  Uddin that she was doing something illegal?

25      A    I respectfully decline to answer your

1  to answer your question on the grounds that I might

2  incriminate myself and on the advisement of counsel.

3        MR. NELSON:  Q.  And I don't want you to

4  speculate.

5        MR. POLVERINO:  Excuse me, Counsel.  I would

6  also object to that last question on a foundational

7  basis.

8        MR. NELSON:  Okay.  Sure.  Let's unpack it.

9     Q   I mean, so as you see in this paragraph, a

10  former colleague of yours has claimed that you were

11  involved in a counterfeit operation using a PO Box, a

12  UPS box in Reno.

13        My question to you is:  Do you deny it?

14     A   I respectfully decline to answer your

15  question on the grounds that I might incriminate

16  myself and on the advisement of counsel.

17     Q   Is there any reason you can think of that

18  Ms. Uddin would provide false information about you?

19     A   I respectfully decline to answer your

20  question on the grounds that I might incriminate

21  myself and on the advisement of counsel.

22        MR. POLVERINO:  Additionally, it calls for --

23        MR. NELSON:  Wait, no.  You can object.

24        MR. POLVERINO:  Okay.

25        MR. NELSON:  You can object to the form of

1       A    I will take my attorney's instruction.

2            Sorry.   I respectfully decline to answer your

3    question on the grounds that I might incriminate

4    myself and on the advisement of counsel.

5       Q    I'm actually not encouraging you.   It's just

6    your attorney was pointing to the paper, so I wanted

7    to --

8       A    Yes.

9       Q    Okay.

10           (Document marked Exhibit 24

11            for identification.)

12           MR. NELSON:   Okay.   You've been handed what's

13   been marked as 24.   And it's a letter dated

14   August 15th, which is four days after the Federal

15   Express letter.   And it reads -- and it's going to

16   Sideman Bancroft, the law firm that sent you the

17   letter, on August 11th.   It reads:

18           "To whom it may concern:   Hello, this is a

19   residential address.   I don't know this company,

20   quote, 'McIntosh Networks.'   I have not received

21   anything from China vendor at this address, that I

22   know of.   I did receive two letters from U.S. Customs

23   and Borders a while ago, but didn't know what to make

24   of them.   Sincerely yours, Jessica Little."

25       Q    Did you send this letter?

1    A    I respectfully decline to answer your
2  question on the grounds that I might incriminate
3  myself and on the advisement of counsel.
4    Q    Is that your signature on this letter?
5    A    I respectfully decline to answer your
6  question on the grounds that I might incriminate
7  myself and on the advisement of counsel.
8    Q    Did anybody encourage you to deny knowing a
9  company by the name of McIntosh Networks?
10    A    I respectfully decline to answer your
11  question on the grounds that I might incriminate
12  myself and on the advisement of counsel.
13    Q    Ma'am, look back at Exhibit 21, and pages 3
14  and 4.   And I'll represent that this appears to be a
15  rental agreement which was signed under penalty of
16  perjury, which was then notarized, which appears to be
17  a request to UPS Store for a UPS box by Jessica Little
18  for McIntosh Networks in April of 2016, a mere
19  four months before the letter which is Exhibit 24.
20        Is there any honest, innocent explanation for
21  why you said to Sideman Bancroft, in August of 2016,
22  that you didn't know the company by the name of
23  McIntosh Networks?
24        MR. POLVERINO:  The form of the question
25  assumes facts not in evidence.

1          THE WITNESS:  I again respectfully decline to

2     answer your question on the grounds that I might

3     incriminate myself and on the advisement of counsel.

4          MR. NELSON:  Q.  Isn't it a fact that, on

5     August 15, 2016, when you sent a letter in response to

6     receiving the C&D, that you knew that you were telling

7     a lie by representing that you didn't know a company

8     by the name of McIntosh Networks?

9          A   I respectfully decline to answer your

10    question on the grounds that I might incriminate

11    myself and on the advisement of counsel.

12         Q   Because on August 15, 2016, isn't it true

13    that you very well knew of a company by the name of

14    McIntosh Networks?

15         A   I respectfully decline to answer your

16    question on the grounds that I might incriminate

17    myself and on the advisement of counsel.

18         Q   And isn't it true that only four months prior

19    to this, you arranged for a UPS box in the name of

20    McIntosh Networks?

21         A   I respectfully decline to answer your

22    question on the grounds that I might incriminate

23    myself and on the advisement of counsel.

24         Q   Isn't it true that you sent this letter in

25    response to a cease and desist informing you to stop

1  that your company was buying and selling counterfeit

2  Cisco products?

3      A    I respectfully decline to answer your

4  question on the grounds that I might incriminate

5  myself and on the advisement of counsel.

6      Q    And the reason you're not telling us that is

7  because you, in fact, knew that you and others were

8  buying and selling counterfeit Cisco products?

9          MR. POLVERINO:   Lacks foundation; assumes

10  facts not in evidence; calling for the witness to

11  speculate, and it's argumentative.

12          THE WITNESS:   I again respectfully decline to

13  answer your question on the grounds that I might

14  incriminate myself and on the advisement of counsel.

15          MR. NELSON:   Q.   Who paid for the McIntosh

16  Networks UPS box?

17      A    I respectfully decline to answer your

18  question on the grounds that I might incriminate

19  myself and on the advisement of counsel.

20      Q    Put -- please put Exhibit 21 back in front of

21  yourself.

22          MR. POLVERINO:   That's this one here.

23          THE WITNESS:   Oh.

24          MR. POLVERINO:   You might have it.   Yeah,

25  he's pointing to it.   We can use this one.

Page 147

CERTIFICATE OF REPORTER

1
2

3          I, ANDREA M. IGNACIO, hereby certify that the

4   witness in the foregoing deposition was by me duly

5   sworn to tell the truth, the whole truth, and nothing

6   but the truth in the within-entitled cause;

7          That said deposition was taken in shorthand

8   by me, a disinterested person, at the time and place

9   therein stated, and that the testimony of the said

10  witness was thereafter reduced to typewriting, by

11  computer, under my direction and supervision;

12         That before completion of the deposition,

13  review of the transcript [ ] was [x] was not

14  requested.  If requested, any changes made by the

15  deponent (and provided to the reporter) during the

16  period allowed are appended hereto.

17         I further certify that I am not of counsel or

18  attorney for either or any of the parties to the said

19  deposition, nor in any way interested in the event of

20  this cause, and that I am not related to any of the

21  parties thereto.

22  Dated: 10-23-2019

23  _____

24   ANDREA M. IGNACIO, RPR, CRR, CCRR, CLR, CSR No. 9830

25

# Depo 3

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3                  OAKLAND DIVISION

 4   CISCO SYSTEMS, INC, a        )
     California corporation, et   )
 5   al.,                         )
                                  )  Case No.:
 6              Plaintiff,        )  4:18-CV-07602 YGR
                                  )
 7         vs.                    )
                                  )
 8   ZAHID "DONNY" HASSAN         )
     SHEIKH, an individual, et    )
 9   al.,                         )
                                  )
10              Defendants.       )
     _____  )
11                                )
                                  )
12   ADVANCED DIGITAL SOLUTIONS   )  Case No.:
     INTERNATIONAL, INC., a       )  4:18-CV-07602 YGR
13   California corporation,      )
                                  )
14        Third-Party Plaintiff,  )
                                  )
15   vs.                          )
                                  )
16   RAHI SYSTEMS, INC., a        )
     California Corporation, et   )
17   al.                          )
                                  )
18     Third-Party Defendants.    )

19                   CONFIDENTIAL
       VIDEO-RECORDED DEPOSITION OF FARHAAD SHEIKH
20                 February 21, 2020
              San Francisco, California
21

22

23   REPORTED BY:

24   Tammy Moon, CSR No. 13184, CRR, RPR

25   JOB NO. 176342
```

```
 1    one on Deer Oaks in Pleasanton, are those the only

 2    two houses that you have lived at since 2008?

 3    A.        Yes.

 4    Q.        Okay.   Are you currently employed?

 5    A.        Yes.

 6    Q.        And in what capacity?   How are you

 7    employed?

 8              MR. PARKHURST:   I'm instructing my client

 9    not to answer that question pursuant to his Fifth

10    Amendment privilege.

11              MR. NELSON:

12    Q.        Do you have a LinkedIn profile?

13              MR. PARKHURST:   I'm instructing my client

14    not to answer that question pursuant to his Fifth

15    Amendment privilege.

16              MR. NELSON:

17    Q.        Does your LinkedIn profile state that --

18    your current job?

19              MR. PARKHURST:   I'm instructing my client

20    not to answer that question pursuant to his Fifth

21    Amendment privilege.

22              MR. NELSON:

23    Q.        Your father testified that you are

24    currently the CEO of the defendant in this case,

25    ADSI.  Is that true?
```

Confidential

Page 16

1           MR. PARKHURST:  I'm instructing my client

2   not to answer that question pursuant to his Fifth

3   Amendment privilege.

4           MR. NELSON:

5   Q.      Are you employed anywhere else but ADSI

6   currently?

7           MR. PARKHURST:  I'm instructing my client

8   not to answer that question pursuant to his Fifth

9   Amendment privilege.

10           MR. NELSON:

11   Q.      When did you start working at ADSI?

12           MR. PARKHURST:  I'm instructing my client

13   not to answer that question pursuant to his Fifth

14   Amendment privilege.

15           MR. NELSON:

16   Q.      Now you remember giving a deposition in the

17   civil case that your company Advanced Digital

18   Solutions International brought against Rahi

19   Systems, don't you?

20           MR. PARKHURST:  I'm instructing my client

21   not to answer that question pursuant to his Fifth

22   Amendment privilege.

23           MR. NELSON:  So, Counsel, whether he has a

24   memory of giving a deposition in the civil case of

25   Advanced Digital Solutions International versus Rahi

1    as -- as an entity called U.S. Customs?

2              MR. PARKHURST:  I'm instructing my client

3    not to answer that question pursuant to his Fifth

4    Amendment privilege.

5              MR. NELSON:

6    Q.        Do you understand that one of the roles of

7    U.S. Customs is to prevent counterfeit or dangerous

8    items to come into the United States?

9              MR. PARKHURST:  I'm instructing my client

10   not to answer that question pursuant to his Fifth

11   Amendment privilege.

12             MR. NELSON:

13   Q.        And you are going to follow that

14   instruction?

15   A.        I'm going to follow the instructions.

16   Q.        Okay.  You were aware that -- that products

17   coming to your company were being seized as being

18   counterfeit, correct?

19             MR. PARKHURST:  I'm instructing my client

20   not to answer that question pursuant to his Fifth

21   Amendment privilege.

22             MR. NELSON:

23   Q.        You're following that instruction?

24   A.        Yes.

25   Q.        Now there are times in which Customs

```
 1   detains a product, seizes it, and then the importer

 2   disputes the seizure.  They say, "No.  The" -- "that

 3   product is not counterfeit."  Do you -- do you

 4   understand that concept of disputing a seizure?

 5          MR. PARKHURST:  I'm instructing my client

 6   not to answer that question pursuant to his Fifth

 7   Amendment privilege.

 8          MR. NELSON:  The idea that --

 9   Q.      Were you aware that -- that Customs allows

10   people to dispute seizures?

11          MR. PARKHURST:  I'm instructing my client

12   not to answer that question pursuant to his Fifth

13   Amendment privilege.

14          MR. NELSON:

15   Q.      And are you following the instructions?

16   A.      Yes.

17   Q.      Okay.  And that's -- in the -- in the --

18   the disputing of a seizure is done when the importer

19   is -- believes that the products are, in fact,

20   genuine and that there's been a mistake.  Do you

21   understand that?

22          MR. PARKHURST:  I'm instructing my client

23   not to answer that question pursuant to his Fifth

24   Amendment privilege.

25              ///
```

Confidential

1                MR. NELSON:

2    Q.        And I -- I'll ask you whether or not you're

3    going to follow that instruction.  I'm also going to

4    ask whether we can have a stipulation that you're

5    going to be following your counsel's instruction

6    every time that he instructs you not to -- not to

7    answer based on your Fifth Amendment rights.

8                So I guess the first question is are you

9    going to follow this particular instruction?

10   A.        Yes.

11   Q.        Do you intend to continue to follow the

12   instruction as given by your counsel?

13   A.        Yes.

14              MR. NELSON:  And then, Counsel, can we have

15   a stipulation that instead of my confirming with him

16   that he's following your instruction, that he, in

17   fact, will follow your instruction and I don't need

18   to have him confirm that?

19              MR. PARKHURST:  Yes.

20              MR. NELSON:

21   Q.        Okay.  If at any point you decide you don't

22   want to follow your counsel's instruction, we can

23   take a break and you can talk to your counsel about

24   it.

25              But otherwise, when he instructs you not to

Confidential

Page 51

1    answer, I'm just going to move on to the next

2    question, assuming that you, in fact, are

3    volitionally choosing not to answer the question

4    based on your attorney's instruction to you.  Is

5    that fair?

6    A.        Can you repeat your question.

7              MR. NELSON:  Can it be read back, please.

8              (Record read.)

9    A.        What does "volition" mean?

10   Q.        That's why I actually then immediately gave

11   you a definition.  So it's "choosing."  So

12   "volitional" is an act of choosing.

13             MR. PARKHURST:  Think voluntary.

14             THE WITNESS:  Okay.

15             MR. NELSON:

16   Q.        Are you okay with that?

17   A.        Yes.

18   Q.        Okay.  Do you know whether an answer was

19   filed on your behalf with regard to this complaint?

20   A.        I don't know.

21             (Exhibit 77 was marked for identification.)

22   Q.        So I've handed you what we've marked as

23   Exhibit 77.  I'll represent it to you to be what's

24   titled "Defendants Advanced Digital Solutions

25   International, Inc., Pure Future Tech, LLC, Kamran

Confidential

1                    (Exhibit 34-C was marked for

2                     identification.)

3                    MR. NELSON:

4    Q.        I'm handing you what was marked as 34-C,

5    and on the bottom it says "K&F Sales to Customers

6    [2017] KFA00005."  Do you recognize the information

7    in this document?

8                    MR. PARKHURST:  I'm instructing my client

9    not to answer that question pursuant to his Fifth

10   Amendment privilege.

11                   (Exhibit 34-D was marked for

12                    identification.)

13                   MR. NELSON:

14   Q.        Handing you 34-D, which on the bottom right

15   says "K&F Sales to Customers [2018] KFA00006."  Do

16   you recognize the information in this document?

17                   MR. PARKHURST:  I'm instructing my client

18   not to answer that question pursuant to his Fifth

19   Amendment privilege.

20                   MR. NELSON:

21   Q.        Does this document correctly reflect

22   transactions that occurred at KF -- K&F Associates?

23                   MR. PARKHURST:  I'm instructing my client

24   not to answer that question pursuant to his Fifth

25   Amendment privilege.

1  you know what Vodanet is?

2          MR. PARKHURST:  I'm instructing my client

3  not to answer that question pursuant to his Fifth

4  Amendment privilege.

5          MR. NELSON:

6  Q.      And there's a reference at the bottom of

7  this page to Link-US.  Link-US is a company that

8  sold K&F Associates Cisco transceivers, correct?

9          MR. PARKHURST:  I'm instructing my client

10 not to answer the question pursuant to his Fifth

11 Amendment privilege.

12          (Exhibit 36-B was marked for

13           identification.)

14          MR. NELSON:

15 Q.      I'm handing you what's been marked as 36-B.

16 I'll just tell you it's out of -- out of order.

17 36-A, we marked as an exhibit yesterday, but 36-B

18 says at the bottom right "2018 Cisco Sales ADSI_KF

19 ADSI00339."  It's got similar information, including

20 a column for the item.  The first row says GLCLHSMD,

21 for example.  Cost, price, quantity, ship, et

22 cetera.

23          Have you seen this kind of information

24 before?

25          MR. PARKHURST:  I'm instructing my client

 1    not to answer that question pursuant to his Fifth

 2    Amendment privilege.

 3              MR. NELSON:

 4    Q.        Is this a true and accurate copy of -- of

 5    information that exists at the data systems by ADSI?

 6              MR. PARKHURST:  I'm instructing my client

 7    not to answer that question pursuant to his Fifth

 8    Amendment privilege.

 9              MR. NELSON:

10    Q.        Did you assist your counsel in compiling

11    information to respond to document requests by Cisco

12    in this case?

13              MR. PARKHURST:  I'm instructing my client

14    not to answer that question pursuant to his Fifth

15    Amendment privilege.

16              MR. NELSON:  Let me repeat, Counsel.  My

17    question was did he assist in the -- in the

18    gathering of documents that were produced by you in

19    this case.  And you have -- you've asserted that he

20    has a Fifth Amendment privilege with regard to

21    assisting and gathering documents.  Are you -- are

22    you asserting that?

23              MR. PARKHURST:  Yes.

24              MR. NELSON:

25    Q.        Which, I guess, begs the question:  Did you

```
 1    doctor any of the documents, sir?

 2              MR. PARKHURST:  I'm instructing my client

 3    not to answer that question pursuant to his Fifth

 4    Amendment privilege.

 5              MR. NELSON:

 6    Q.        Did you provide fake or false documents to

 7    your counsel?

 8              MR. PARKHURST:  I'm instructing my client

 9    not to answer that question pursuant to his Fifth

10    Amendment privilege.

11              MR. NELSON:

12    Q.        Can you think of any way that Cisco or the

13    Court could have confidence that the documents

14    provided are true and accurate?

15              MR. PARKHURST:  I'm instructing my client

16    not to answer that question pursuant to his Fifth

17    Amendment privilege.

18              MR. NELSON:

19    Q.        Is there a possibility, sir, that the

20    documents that were provided by your attorneys are

21    fake?

22              MR. PARKHURST:  I'm instructing my client

23    not to answer that question pursuant to his Fifth

24    Amendment privilege.

25              (Exhibit 37 was marked for identification.)
```

Confidential

```
 1                  MR. NELSON:

 2    Q.       Handing you Exhibit 37.  It says on the

 3    bottom "Cisco 2015 ADSI00334."  Is this a true and

 4    accurate copy of information that exists in the ADSI

 5    computer system?

 6                  MR. PARKHURST:  I'm instructing my client

 7    not to answer that question pursuant to his Fifth

 8    Amendment privilege.

 9                  MR. NELSON:

10    Q.       Is this a fake document, sir?

11                  MR. PARKHURST:  I'm instructing my client

12    not to answer that question pursuant to his Fifth

13    Amendment privilege.

14                  (Exhibit 38-A was marked for

15                   identification.)

16                  MR. NELSON:

17    Q.       Handing you what has been marked as 38-A.

18    It says on the bottom "Cisco 2016 ADSI00335."  Is

19    this a true and accurate copy of information that

20    exists on the ADSI computer system?

21                  MR. PARKHURST:  I'm instructing my client

22    not to answer that question pursuant to his Fifth

23    Amendment privilege.

24                  MR. NELSON:

25    Q.       Is this information fake?
```

```
1              MR. PARKHURST:  I'm instructing my client

2    not to answer that question pursuant to his Fifth

3    Amendment privilege.

4              MR. NELSON:

5    Q.      I just want to call your attention on Row

6    2, under Column Y, which says "our vend."  It says

7    ING100, I-N-G 100.  Does that -- does that suggest

8    that that particular product was purchased from

9    Ingram Micro?

10              MR. PARKHURST:  I'm instructing my client

11    not to answer that question pursuant to his Fifth

12    Amendment privilege.

13              MR. NELSON:

14    Q.      Did you -- did your company, in fact,

15    purchase that product from Ingram Micro?

16              MR. PARKHURST:  I'm instructing my client

17    not to answer that question pursuant to his Fifth

18    Amendment privilege.

19              MR. NELSON:

20    Q.      Did your company buy any Cisco transceivers

21    from Ingram Micro?

22              MR. PARKHURST:  I'm instructing my client

23    not to answer that question pursuant to his Fifth

24    Amendment privilege.

25              ///
```

Confidential

1              MR. NELSON:

2    Q.       Did your company provide false information

3    to the government suggesting that you purchased

4    products from Ingram Micro when, in fact, you did

5    not?

6              MR. PARKHURST:  I'm instructing my client

7    not to answer that question pursuant to his Fifth

8    Amendment privilege.

9              (Exhibit 38-B was marked for

10              identification.)

11             MR. NELSON:

12   Q.       You've been handed what is Exhibit --

13   titled Exhibit 38-B, "Cisco 2017 ADSI00336."  Is

14   this true and accurate information obtained from the

15   ADSI computer system?

16             MR. PARKHURST:  I'm instructing my client

17   not to answer that question pursuant to his Fifth

18   Amendment privilege.

19             MR. NELSON:

20   Q.       Did you participate in the faking of

21   information to provide to your attorneys?

22             MR. PARKHURST:  I'm instructing my client

23   not to answer that question pursuant to his Fifth

24   Amendment privilege.

25             (Exhibit 38-C was marked for

1                    identification.)

2                    MR. NELSON:

3        Q.          Handing you what has been marked as 38-C,

4        designated "Cisco 2018 ADSI00337."   Is this

5        information true and accurate as it exists on the

6        company's computer system?

7                    MR. PARKHURST:   I'm instructing my client

8        not to answer that question pursuant to his Fifth

9        Amendment privilege.

10                   MR. NELSON:

11       Q.          Is this information fake?

12                   MR. PARKHURST:   I'm instructing my client

13       not to answer that question pursuant to his Fifth

14       Amendment privilege.

15                   (Exhibit 39-A was marked for

16                   identification.)

17                   MR. NELSON:

18       Q.          Handing you what's been marked 39-A, which

19       is titled at the bottom "KF-Cisco purchases from

20       ADSI/2017 KFA00001."   Is this information true and

21       accurate?

22                   MR. PARKHURST:   I'm instructing my client

23       not to answer that question pursuant to his Fifth

24       Amendment privilege.

25                   ///

1                MR. NELSON:

2    Q.        Is this information fake?

3                MR. PARKHURST:  I'm instructing my client

4    not to answer that question pursuant to his Fifth

5    Amendment privilege.

6                (Exhibit 39-B was marked for

7                identification.)

8                MR. NELSON:

9    Q.        Handing you what has been marked as 39-B,

10   which states at the bottom "KF-Cisco purchases from

11   ADSI/2018 KFA00001."  Is this information true and

12   accurate?

13                MR. PARKHURST:  I'm instructing my client

14   not to answer that question pursuant to his Fifth

15   Amendment privilege.

16                MR. NELSON:

17   Q.        Is this information fraudulent?

18                MR. PARKHURST:  I'm instructing my client

19   not to answer that question pursuant to his Fifth

20   Amendment privilege.

21                (Exhibit 40 was marked for identification.)

22                MR. NELSON:

23   Q.        I'm handing you what's been marked as

24   Exhibit 40.  It states at the bottom "KF-Cisco sales

25   12-01-2015 to 07-24-2019 KFA00002."  Is this

Confidential

```
 1    information true and accurate?

 2              MR. PARKHURST:  I'm instructing my client

 3    not to answer that question pursuant to his Fifth

 4    Amendment privilege.

 5              MR. NELSON:

 6    Q.        Is any of the information on this

 7    fraudulent?

 8              MR. PARKHURST:  I'm instructing my client

 9    not to answer that question pursuant to his Fifth

10    Amendment privilege.

11              MR. NELSON:  We've gone for a little while.

12    Why don't we take a morning break for about ten

13    minutes.

14              THE VIDEOGRAPHER:  This marks the end of

15    Volume 1, Media No. 3.  Our time now is 10:48 a.m.

16    and we're going off record.

17              (Break taken.)

18              THE VIDEOGRAPHER:  This marks the beginning

19    of Volume 1, Media No. 4.  Our time now is

20    11:06 a.m. and we're on record.

21              MR. NELSON:

22    Q.        Mr. Sheikh, you were involved in sales at

23    Advanced Digital Solutions International, Inc.,

24    correct?

25              MR. PARKHURST:  I'm instructing my client
```

Confidential

 1          MR. PARKHURST:  I'm instructing my client

 2    not to answer that question pursuant to his Fifth

 3    Amendment privilege.

 4          MR. NELSON:

 5    Q.        Are you aware of products being seized by

 6    U.S. Customs coming to ADSI?

 7          MR. PARKHURST:  I'm instructing my client

 8    not to answer that question pursuant to his Fifth

 9    Amendment privilege.

10          MR. NELSON:

11    Q.        Are you aware of efforts taken by your

12    family to avoid detection by Customs for products

13    coming to -- to Fremont?

14          MR. PARKHURST:  I'm instructing my client

15    not to answer that question pursuant to his Fifth

16    Amendment privilege.

17          MR. NELSON:

18    Q.        Were you ever involved personally in

19    arranging for receiving points for products to be

20    imported from -- from China?

21          MR. PARKHURST:  I'm instructing my client

22    not to answer that question pursuant to his Fifth

23    Amendment privilege.

24          MR. NELSON:

25    Q.        Is there any innocent explanation that you

1    have for getting UPS boxes in Reno and Portland and

2    Bakersfield to obtain products?

3              MR. PARKHURST:  I'm instructing my client

4    not to answer that question pursuant to his Fifth

5    Amendment privilege.

6              MR. NELSON:

7    Q.        At trial, Cisco will contend that ADSI

8    obtained these far-flung locations in order to avoid

9    detection from Customs.  Do you have any explanation

10   that's innocent about getting UPS boxes in these

11   other states and cities?

12             MR. PARKHURST:  I'm instructing my client

13   not to answer that question pursuant to his Fifth

14   Amendment privilege.

15             MR. NELSON:

16   Q.        And if Cisco were to file a motion with the

17   Court to preclude any testimony from ADSI as to an

18   innocent explanation of -- for -- for this practice,

19   Cisco would be prejudiced because now we have an

20   opportunity -- we're sitting with the CEO of the

21   company.

22             We have the opportunity to hear from you as

23   to why this was done that would explain away the

24   curiosity of getting these receiving points hundreds

25   of miles away.  Now's the chance for us to hear this

Confidential

1    so we can address it before any kind of motion.  Do

2    you want to provide any information that would shed

3    light on this?

4              MR. PARKHURST:  I'm instructing my client

5    not to answer that question pursuant to his Fifth

6    Amendment privilege.

7              MR. NELSON:

8    Q.        Do you admit that the reason why your

9    brother and your company got these other locations

10   to receive products is to evade detection from

11   Customs?

12             MR. PARKHURST:  I'm instructing my client

13   not to answer that question pursuant to his Fifth

14   Amendment privilege.

15             MR. NELSON:

16   Q.        Do you admit that you knew that the

17   products that were being imported from China were

18   counterfeit?

19             MR. PARKHURST:  I'm instructing my client

20   not to answer that question pursuant to his Fifth

21   Amendment privilege.

22             MR. NELSON:

23   Q.        And that a way to get these products into

24   the United States so you can sell them to the U.S.

25   government and others was to hide your activity from

1   Customs?  Do you admit that?

2            MR. PARKHURST:  I'm instructing my client

3   not to answer that question pursuant to his Fifth

4   Amendment privilege.

5            MR. NELSON:

6   Q.        Do you intend at any point to dispute the

7   fact that you knowingly imported counterfeit Cisco

8   products?

9            MR. PARKHURST:  I'm instructing my client

10  not to answer that question pursuant to his Fifth

11  Amendment privilege.

12            MR. NELSON:

13  Q.        As CEO of ADSI, do you admit that ADSI

14  knowingly imported counterfeit Cisco products?

15            MR. PARKHURST:  I'm instructing my client

16  not to answer that question pursuant to his Fifth

17  Amendment privilege.

18            MR. NELSON:

19  Q.        At any point in time, do you intend, as CEO

20  of the company, to contend otherwise that ADSI did

21  not know these products were -- were counterfeit?

22            MR. PARKHURST:  I'm instructing my client

23  not to answer that question pursuant to his Fifth

24  Amendment privilege.

25            ///

Confidential

1    Q.        Okay.  So turn to page 13, please.  The

2    first affirmative defense that you asserted was that

3    ADSI claim -- that ADSI asserts the claims made in

4    the second amended complaint are barred in whole or

5    in part by abandonment of any marks at issue.

6              Do you have any evidence that Cisco

7    abandoned any of these marks?

8              MR. PARKHURST:  I'm instructing my client

9    not to answer that question pursuant to his Fifth

10   Amendment privilege.

11             MR. NELSON:

12   Q.        Are you going to -- are you, ADSI, going to

13   assert a defense that Cisco abandoned its

14   trademarks?

15             MR. PARKHURST:  I'm instructing my client

16   not to answer that question pursuant to his Fifth

17   Amendment privilege.

18             MR. NELSON:

19   Q.        Does ADSI have any evidence to support a

20   defense that Cisco abandoned the trademarks?

21             MR. PARKHURST:  I'm instructing my client

22   not to answer that question pursuant to his Fifth

23   Amendment privilege.

24             MR. NELSON:

25   Q.        Let's look at the second affirmative

Confidential

 1    defense:  acquiescence.  "The ADSI defendants," that

 2    includes you, personally as well as ADSI, company

 3    that you're a CEO of, "assert that the claims made

 4    by Cisco are barred by the equitable doctrine of

 5    acquiescence."  Do you have any evidence that Cisco

 6    acquiesced, agreed to the activity that -- that ADSI

 7    was conducting?

 8              MR. PARKHURST:  I'm instructing my client

 9    not to answer that question pursuant to his Fifth

10    Amendment privilege.

11              MR. NELSON:

12    Q.        Do you intend to assert any defense with

13    regard to the equitable doctrine of acquiescence?

14              MR. PARKHURST:  I'm instructing my client

15    not to answer that question pursuant to his Fifth

16    Amendment privilege.

17              MR. NELSON:

18    Q.        The third affirmative defense reads that

19    "ADSI defendants assert that the alleged injury or

20    damage suffered by plaintiffs, if any, would be

21    adequately compensated by damages."  Do you contend

22    that Cisco can be adequately compensated by damages

23    received from ADSI?

24              MR. PARKHURST:  I'm instructing my client

25    not to answer that question pursuant to his Fifth

 1    Amendment privilege.

 2              MR. NELSON:

 3    Q.        Let's go to the sixth affirmative defense,

 4    which is on page 14.  It reads that "ADSI defendants

 5    assert that Cisco's claims are barred in whole or in

 6    part because the injuries and/or damages alleged in

 7    the SAC, second amended complaint, were actually

 8    and/or proximately caused by the acts or omissions

 9    committed by third parties."

10              Do you contend, as the CEO of ADSI, that

11    the acts -- the injuries were caused by actions of

12    third parties?

13              MR. PARKHURST:  I'm instructing my client

14    not to answer that question pursuant to his Fifth

15    Amendment privilege.

16              MR. NELSON:

17    Q.        It's a fact that all of the damages were

18    caused by acts of ADSI and its affiliated companies,

19    true?

20              MR. PARKHURST:  I'm instructing my client

21    not to answer that question pursuant to his Fifth

22    Amendment privilege.

23              MR. NELSON:

24    Q.        Let's look at the eighth affirmative

25    defense.  It reads that "The ADSI defendants assert

1    that Cisco's claims are barred in whole or in part

2    because Cisco failed to take all reasonable,

3    necessary, and appropriate action to mitigate and

4    purported damages resulting from the alleged matters

5    set forth in the second amended complaint."

6              What facts do you have that Cisco failed to

7    take all reasonable, necessary, and appropriate

8    actions?

9              MR. PARKHURST:  I'm instructing my client

10   not to answer that question pursuant to his Fifth

11   Amendment privilege.

12             MR. NELSON:

13   Q.        Now you're aware, aren't you, that Cisco

14   sent cease and desist letters to your company

15   telling your company to stop -- stop trafficking

16   counterfeit products, right?

17             MR. PARKHURST:  I'm instructing my client

18   not to answer that question pursuant to his Fifth

19   Amendment privilege.

20             MR. NELSON:

21   Q.        And you're aware that Cisco sent a cease

22   and desist letter to your employee Jessica Little to

23   tell her to stop importing counterfeit products,

24   correct?

25             MR. PARKHURST:  I'm instructing my client

 1    not to answer that question pursuant to his Fifth

 2    Amendment privilege.

 3              MR. NELSON:

 4    Q.       Can you think of anything else that Cisco

 5    should have done to mitigate the damages that ADSI

 6    and the associated companies were causing?

 7              MR. PARKHURST:  I'm instructing my client

 8    not to answer that question pursuant to his Fifth

 9    Amendment privilege.

10              MR. NELSON:

11    Q.       Let's look at the 12th affirmative defense,

12    which is on page 15.  Now this -- this asserts that

13    "ADSI defendants assert that plaintiffs' trademark

14    registrations were improperly issued by the U.S.

15    Patent and Trademark Office."  What evidence do you

16    have that -- that these trademarks were improperly

17    issued?

18              MR. PARKHURST:  I'm instructing my client

19    not to answer that question pursuant to his Fifth

20    Amendment privilege.

21              MR. NELSON:

22    Q.       Do you have any evidence whatsoever that

23    these trademarks were improperly issued?

24              MR. PARKHURST:  I'm instructing my client

25    not to answer that question pursuant to his Fifth

Confidential

1   Amendment privilege.

2           MR. NELSON:

3   Q.      Do you withdraw this affirmative defense as

4   -- as baseless?

5           MR. PARKHURST:  I'm instructing my client

6   not to answer that question pursuant to his Fifth

7   Amendment privilege.

8           MR. NELSON:

9   Q.      Oh, let's look at the 14th affirmative

10  defense.  It's on paragraph 14.  It says "ADSI

11  defendants assert that plaintiffs' claims are barred

12  because there has been no infringement of

13  plaintiffs' marks."  Do you contend that ADSI has

14  not sold counterfeit Cisco products?

15          MR. PARKHURST:  I'm instructing my client

16  not to answer that question pursuant to his Fifth

17  Amendment privilege.

18          MR. NELSON:

19  Q.      In fact, you've looked at -- you've seen

20  some engineering reports today.  Isn't it true that

21  ADSI, in fact, sold counterfeit Cisco products?

22          MR. PARKHURST:  I'm instructing my client

23  not to answer that question pursuant to his Fifth

24  Amendment privilege.

25          ///

1                MR. NELSON:

2    Q.         Every time you sold counterfeit Cisco

3    products, your company ADSI infringed plaintiffs'

4    trademarks, correct?

5                MR. PARKHURST:   I'm instructing my client

6    not to answer that question pursuant to his Fifth

7    Amendment privilege.

8                MR. NELSON:

9    Q.         Let's look at the 15th affirmative defense.

10   It's on page 16.  It says "ADSI defendants assert

11   that plaintiffs' claims are barred in whole or in

12   part because any infringement, if any, was innocent

13   and in spite of ADSI's" -- "defendants' attempts to

14   act in the utmost good faith."

15               Isn't it a fact that the infringement that

16   took place, the selling of counterfeit products, was

17   done knowingly, not innocently?

18               MR. PARKHURST:   I'm instructing my client

19   not to answer that question pursuant to his Fifth

20   Amendment privilege.

21               MR. NELSON:

22   Q.         You talk here about ADSI -- "defendants'

23   attempts to act in utmost good faith."  Can you list

24   to me one effort to act in good faith?

25               MR. PARKHURST:   I'm instructing my client

Confidential

1    not to answer that question pursuant to his Fifth

2    Amendment privilege.

3              MR. NELSON:

4    Q.       And, in fact, is that -- that ADSI acted in

5    utmost bad faith in selling products that it knew

6    were counterfeit, true?

7              MR. PARKHURST:  I'm instructing my client

8    not to answer that question pursuant to his Fifth

9    Amendment privilege.

10             MR. NELSON:

11   Q.       Let's look at the 23rd affirmative defense.

12   It's on page 17.  It states that "ADSI defendants

13   assert that plaintiffs' claims are" --

14             (Reporter clarification.)

15   Q.       "ADSI defendants assert that plaintiffs'

16   claims are barred by the doctrine of unclean hands."

17   Can you think of one thing that Cisco did here in

18   respect to ADSI that was unfair?

19             MR. PARKHURST:  I'm instructing my client

20   not to answer that question pursuant to his Fifth

21   Amendment privilege.

22             MR. NELSON:

23   Q.       Cisco sued ADSI and asked that ADSI pay

24   damages for selling counterfeit Cisco products,

25   correct?

Confidential

Page 177

```
 1              MR. PARKHURST:  I'm instructing my client

 2    not to answer that question pursuant to his Fifth

 3    Amendment privilege.

 4              MR. NELSON:

 5    Q.        That lawsuit is not barred by any bad acts

 6    by Cisco, correct?

 7              MR. PARKHURST:  I'm instructing my client

 8    not to answer that question pursuant to his Fifth

 9    Amendment privilege.

10              MR. NELSON:

11    Q.        Is there any acts of unclean hands that you

12    can identify so that we could be prepared to address

13    this at trial?

14              MR. PARKHURST:  I'm instructing my client

15    not to answer that question pursuant to his Fifth

16    Amendment privilege.

17              MR. NELSON:

18    Q.        Let's look at the 24th affirmative defense.

19    It's on page 17.  "ADSI defendants assert that

20    Cisco's claims are barred in whole or in part

21    because Cisco, by their own conduct, waived any

22    claims as to the matters of which plaintiffs now

23    complain."

24              Mr. Sheikh, as -- as CEO of defendant ADSI

25    and as one of the named defendants yourself, can you
```

Confidential

Page 178

1    think of any acts by Cisco that show that Cisco

2    doesn't care about stopping the counterfeiting of

3    Cisco products?

4              MR. PARKHURST:  I'm instructing my client

5    not to answer that question pursuant to his Fifth

6    Amendment privilege.

7              MR. NELSON:

8    Q.        Can you think of any acts by Cisco in which

9    Cisco essentially said it wasn't going to pursue any

10   claims about counterfeit products?

11             MR. PARKHURST:  I'm instructing my client

12   not to answer that question pursuant to his Fifth

13   Amendment privilege.

14             MR. NELSON:

15   Q.         Isn't it a fact that at no time Cisco

16   encouraged ADSI to sell counterfeit Cisco products?

17             MR. PARKHURST:  I'm instructing my client

18   not to answer that question pursuant to his Fifth

19   Amendment privilege.

20             MR. NELSON:

21   Q.        And as CEO of ADSI, do you admit that an

22   award of damages in excess of $6 million would be

23   fair and equitable?

24             MR. PARKHURST:  I'm instructing my client

25   not to answer that question pursuant to his Fifth

1          MR. NELSON:

2   Q.       Every time you sold counterfeit Cisco

3   products, your company ADSI infringed plaintiffs'

4   trademarks, correct?

5          MR. PARKHURST:  I'm instructing my client

6   not to answer that question pursuant to his Fifth

7   Amendment privilege.

8          MR. NELSON:

9   Q.       Let's look at the 15th affirmative defense.

10  It's on page 16.  It says "ADSI defendants assert

11  that plaintiffs' claims are barred in whole or in

12  part because any infringement, if any, was innocent

13  and in spite of ADSI's" -- "defendants' attempts to

14  act in the utmost good faith."

15          Isn't it a fact that the infringement that

16  took place, the selling of counterfeit products, was

17  done knowingly, not innocently?

18          MR. PARKHURST:  I'm instructing my client

19  not to answer that question pursuant to his Fifth

20  Amendment privilege.

21          MR. NELSON:

22  Q.       You talk here about ADSI -- "defendants'

23  attempts to act in utmost good faith."  Can you list

24  to me one effort to act in good faith?

25          MR. PARKHURST:  I'm instructing my client

1    not to answer that question pursuant to his Fifth

2    Amendment privilege.

3              MR. NELSON:

4    Q.        And, in fact, is that -- that ADSI acted in

5    utmost bad faith in selling products that it knew

6    were counterfeit, true?

7              MR. PARKHURST:  I'm instructing my client

8    not to answer that question pursuant to his Fifth

9    Amendment privilege.

10             MR. NELSON:

11   Q.        Let's look at the 23rd affirmative defense.

12   It's on page 17.  It states that "ADSI defendants

13   assert that plaintiffs' claims are" --

14             (Reporter clarification.)

15   Q.        "ADSI defendants assert that plaintiffs'

16   claims are barred by the doctrine of unclean hands."

17   Can you think of one thing that Cisco did here in

18   respect to ADSI that was unfair?

19             MR. PARKHURST:  I'm instructing my client

20   not to answer that question pursuant to his Fifth

21   Amendment privilege.

22             MR. NELSON:

23   Q.        Cisco sued ADSI and asked that ADSI pay

24   damages for selling counterfeit Cisco products,

25   correct?

1    Customs?  Do you admit that?

2           MR. PARKHURST:  I'm instructing my client

3    not to answer that question pursuant to his Fifth

4    Amendment privilege.

5           MR. NELSON:

6    Q.       Do you intend at any point to dispute the

7    fact that you knowingly imported counterfeit Cisco

8    products?

9           MR. PARKHURST:  I'm instructing my client

10   not to answer that question pursuant to his Fifth

11   Amendment privilege.

12          MR. NELSON:

13   Q.       As CEO of ADSI, do you admit that ADSI

14   knowingly imported counterfeit Cisco products?

15          MR. PARKHURST:  I'm instructing my client

16   not to answer that question pursuant to his Fifth

17   Amendment privilege.

18          MR. NELSON:

19   Q.       At any point in time, do you intend, as CEO

20   of the company, to contend otherwise that ADSI did

21   not know these products were -- were counterfeit?

22          MR. PARKHURST:  I'm instructing my client

23   not to answer that question pursuant to his Fifth

24   Amendment privilege.

25          ///

1                    C E R T I F I C A T E

2    STATE OF CALIFORNIA        )
                                ) ss:
3    COUNTY OF SACRAMENTO       )

4            I, TAMMY MOON, CSR No. 13184, Certified

5    Shorthand Reporter, do hereby certify:

6            That FARHAAD SHEIKH, the witness whose

7    deposition is hereinbefore set forth, was duly sworn

8    by me and that such deposition is a true record of

9    the testimony given by such witness.

10           I further certify that I am not related to

11   any of the parties to this action by blood or

12   marriage; and that I am in no way interested in the

13   outcome of this matter.

14           IN WITNESS WHEREOF, I have hereunto set my

15   hand this 4th of March, 2020.

16

17   *Tammy Moon*

18   _____

19           Tammy Moon, CSR No. 13184, CRR, RPR

20

21

22

23

24

25

# Depo 4

CONFIDENTIAL

1               UNITED STATES DISTRICT COURT

2                      FOR THE

3             NORTHERN DISTRICT OF CALIFORNIA

4    _____

5    CISCO SYSTEMS, INC., et al.,        )
                                         )
6                                        )
                                         )
7              Plaintiff,                )
                                         )
8                 vs.                    )
                                         )  Civil Actio
9                                        )  4:18-CV-07602 YGR
     ZAHID "DONNY" HASSAN                )
10   SHEIKH, et al.,                     )
                                         )
11                                       )
                                         )
12             Defendant.                )
     _____)

13

14                   CONFIDENTIAL

15            VIDEOTAPED DEPOSITION OF

16             SHAHID HUSSAIN SHEIKH

17            San Francisco, California

18           Tuesday, September 10, 2019

19                   Volume I

20

21

22

23   Reported by Stenographer
     MARY J. GOFF
24   CSR No. 13427
     Job No. 167861
25   PAGES 1-269

CONFIDENTIAL

Page 30

1        Q      Gotcha.   Do you have any -- any business

2    facility in Reno?

3        A      No.

4        Q      Do you have a vacation house in Reno?

5        A      No.

6        Q      Do you have family in Reno?

7        A      No.

8        Q      Is there a reason for anybody from ADSII

9    to send time in Reno, other than vacation?

10        A      No.

11        Q      Would you agree with me that -- that Reno

12    is a lot farther from Fremont than, say, Fremont?

13        A      Yes.

14        Q      And if you have a business in Fremont, you

15    would agree with me that it's more convenient to

16    receive products in Fremont as opposed to receive

17    them in Reno, which would require someone to get

18    into a car and drive three, sometimes five hours to

19    Reno to pick them up?

20                ATTORNEY PARKHURST:   Objection to form of

21    the question.

22        A      So the question?   I mean, it's --

23        Q      (BY ATTORNEY NELSON) You --

24        A      -- a phrase -- I mean, you're --

25        Q      -- you would agree with me that it is

CONFIDENTIAL

Page 31

1   simpler and more efficient to import products to the

2   same city where your business is located as opposed

3   to getting a UPS box in Reno, for example?

4            ATTORNEY PARKHURST:   Objection to form of

5   the question.

6        Q    (BY ATTORNEY NELSON) Would you agree with

7   that?

8        A    Yes.

9        Q    Is there -- is there any reason from a

10  business perspective to import products to a UPS

11  Box 200 miles away as opposed to an im -- a UPS box

12  close to your office?

13       A    I don't know.

14       Q    Similarly, is there a reason to import

15  products into Oregon to then have them brought down

16  to California?  Is there a business reason for that?

17       A    I don't know.

18       Q    The reason for doing that was to avoid

19  scrutiny by U.S. Customs, correct?

20            ATTORNEY PARKHURST:   Objection to form of

21  the question.

22       A    I don't know.

23       Q    (BY ATTORNEY NELSON) And you don't know

24  because you weren't aware that these UPS boxes had

25  been obtained?

1   did this?

2        A    Okay.  Let me -- just for clarification

3   regarding this, I spoke to Jessica myself also.

4   There's -- my son is not involved in that.  I'm --

5   when this case came up, okay, we all said:  What's

6   happening?

7            And Jessica said:  There's an allegation

8   against you.

9            THE COURT REPORTER:  And Jessica said

10  there's an allegation against you?

11       A    No.  No.  I asked her -- this is your

12  allegation.  This is -- what do you have to say?

13           THE COURT REPORTER:  I need you to slow

14  down and enunciate for me, please.

15       Q    (BY ATTORNEY NELSON) And what did she say

16  to you?

17       A    She denied it.

18       Q    How did she deny it?

19       A    She said, "No."  I mean, just -- that's

20  the way that -- she said, "No, never."

21       Q    Did you ask her whether she had a P.O. Box

22  in Reno, Nevada?

23       A    Yes.

24       Q    What did she say?

25       A    She was advised by Nabia, the previous

CONFIDENTIAL

1    company's buyer, to do that.

2         Q    And what did she use that box for?

3         A    They were bringing in -- importing or

4    bringing in parts.  Not just Cisco.  Maybe other

5    parts also.

6         Q    Why did -- why did they do that?

7         A    What I was informed now to -- this thing

8    happened.  Because I was not -- as the CEO, I was

9    not involved 100 percent in the business.  I was

10   pretty much out.  So I asked this question:  What

11   was going on?

12             Seems like Nabia was ordering these things

13   first at ADSII.

14             THE COURT REPORTER:  Ordering these things

15   first?

16        A    I mean these products.  Okay.  Then she

17   had this Uddin Network.  She had some -- a UPS store

18   under that.

19             When she was ordering there, maybe two

20   times or three.  I don't know how many.  I don't

21   know the details, because she's not my employee

22   anymore.  And she is the one who is complaining,

23   putting this.

24             Her products got -- what do you call the

25   right word -- customs stopped it.  Then she asked --

Page 62

1    see -- Jessica, Hey, can -- I need your help.  Can

2    you open the store?

3             And she did that.  That's what I

4    understood from Jessica.

5        Q    Did Jessica tell you that she would drive

6    to Reno to pick up packages?

7        A    No.

8        Q    Who would pick up packages that were

9    delivered to Reno?

10       A    I checked with her on that.  Nobody drove.

11   As she was advised from Nabia, they forward -- they

12   forwarded it to Nab -- the Uddin address.

13       Q    Let me understand.  So what Jessica Little

14   told you was when the packages arrived in Reno, they

15   would in -- somebody would instruct the Reno UPS

16   store to forward those packages to --

17       A    Uddin Networks.

18       Q    -- to Uddin Networks --

19       A    Yes.

20       Q    -- in Fremont?

21       A    I think she was -- yeah.  In Fremont, yes.

22            THE COURT REPORTER:  One at a time,

23   please.

24       A    Oh, I'm sorry.

25       Q    (BY ATTORNEY NELSON) Did Jessica Little

1        Q        And -- and she left the company recently,

2    correct?

3        A        Yes.

4        Q        A couple of weeks ago?

5        A        Yes.

6        Q        Now, she rented a UPS box up in Portland,

7    Oregon, using the Fremont address as -- as -- as a

8    place that's associated with that box.  Were you

9    aware of that?

10       A        No.

11       Q        Do you know whether Ms. Lau requested

12   reimbursement for expenses related to that UPS box?

13       A        I don't know.

14       Q        Do you know if -- have you talked to your

15   son, Kamran Sheikh, about opening up that UPS box?

16       A        No.

17       Q        Are you aware whether Kamran Sheikh used

18   his credit card to pay for the opening of that UPS

19   box in Portland, Oregon?

20       A        I don't know.

21       Q        Can you think of any legitimate business

22   reason for Kamran to have Teresa Lau open a box -- a

23   UPS box in Portland, Oregon?

24                ATTORNEY PARKHURST:  Objection to the form

25   of the question.

CONFIDENTIAL

Page 69

1          A     No.

2          Q     (BY ATTORNEY NELSON) Do you have employees

3     in Portland?

4          A     No.

5          Q     Do you have a significant customer in

6     Portland?

7                ATTORNEY PARKHURST:   Objection to the form

8     of the question.

9          A     No.

10         Q     (BY ATTORNEY NELSON) Do you -- do you

11    recognize that Portland is a far distance away from

12    Fremont, California?

13               ATTORNEY PARKHURST:   Objection to the form

14    of the question.

15         A     Okay.   Yes.

16         Q     (BY ATTORNEY NELSON) And -- and your

17    counsel may be concerned about "far distance."   Do

18    you -- do you -- would you -- if you got into a car

19    today to drive to Portland, how long do you think it

20    would take you?

21         A     I don't know.   I -- it depends what speed

22    limit you're driving, but --

23         Q     Let's assume --

24         A     -- I don't --

25         Q     -- let's assume you're following the law

CONFIDENTIAL

Page 70

1    and not -- and not exceeding the speed limit.   Would

2    it take you more than 10 hours to get to Portland?

3          A     Yes.

4          Q     Okay.   Can you think of -- given that

5    distance, can you think of any legitimate business

6    reason for Kamran Sheikh to get a UPS box in

7    Portland, Oregon?

8              ATTORNEY PARKHURST:   Objection to the form

9    of the question.

10         A     No.

11         Q     (BY ATTORNEY NELSON) Okay.   Can you think

12   of any legitimate reason for Jessica Little to get a

13   P.O. -- P.O. Box in Reno?

14             ATTORNEY PARKHURST:   Objection to the form

15   of the question.

16         A     I explained that, I think, already.

17         Q     (BY ATTORNEY NELSON) Well --

18         A     From her conversation that -- with Uddin.

19         Q     What you explained is that -- is that

20   Nabia Uddin asked her to -- to rent a box in

21   Uddin -- in Reno, right?

22         A     Yes.

23         Q     And that there had been some seizures by

24   customs of counterfeit products going to Uddin

25   Networks' box in California?

CONFIDENTIAL

Page 71

1          A       Products.   I wouldn't call them

2     counterfeit.    They were products.

3          Q       And they were seized by customs -- what

4     was your understanding of why they were seized by

5     customs?

6          A       I did not know about them until all these

7     things has come up, so I'm -- I'm still looking into

8     that.

9          Q       So when Jessica Little told you that Nabia

10    Uddin had asked her to open this box and that

11    customs had seized products going to Uddin Networks

12    in California, your testimony now is that you did

13    not understand when she told you that, that the

14    seizures were related to the fact that the products

15    were counterfeit?

16              ATTORNEY PARKHURST:    Objection to the form

17    of the question.

18          A       They were not counterfeit as far as I

19    understand --

20          Q       (BY ATTORNEY NELSON) What was your --

21          A       -- according to these people.

22          Q       What was your understanding of why customs

23    had seized those products?

24          A       My understanding now is they seized the

25    products because they don't like -- or Cisco doesn't

CONFIDENTIAL

Page 72

1  like cheaper products coming from overseas.

2      Q    Who told you that the reason why customs

3  seized these products was because the products were

4  cheaper?

5      A    Nabia --

6      Q    Did Nabia --

7      A    -- and -- sorry.

8      Q    Go ahead.  Sorry.

9      A    -- yeah, Nabia and Mike.

10      Q    My "Mike," you mean Mike Minhas?

11      A    Minhas.

12      Q    Can you spell his last name for our

13  reporter?

14      A    M I N H A S.

15      Q    Did Nabia Uddin state to you that the

16  products that were seized by customs were not

17  counterfeit?

18      A    Were not counterfeit, yes.

19      Q    That's what she said to you?

20      A    Yes.

21      Q    When did she tell you that?

22      A    I don't remember the date now.  Three

23  years ago.

24      Q    It was while she was still employed by

25  ADSII?

CONFIDENTIAL

Page 73

1        A     Yes.

2        Q     Where were you when you had this

3   conversation with her?

4        A     Probably in the office.

5        Q     Did you ask her to challenge the seizure

6   of these products?

7              ATTORNEY PARKHURST:   Objection to the form

8   of the question.

9        A     Okay.  She was -- according to her, she

10  was taking care of it.

11       Q     (BY ATTORNEY NELSON) What did you

12  understand that to mean?

13       A     Mean that these are all after the facts

14  now that there were some letters that came from

15  customs.

16             She would take care of -- she would take

17  them because she was the office manager, purchase of

18  everything.  And mail would get to her physical

19  mail.

20             And then she said, "Okay.  I'll -- I'll

21  handle it from here."

22       Q     Did she show you any copies of these

23  letters from customs?

24       A     No.

25       Q     Did you ask her to show you these copies?

CONFIDENTIAL

Page 86

1              Are you aware whether the reason for the

2    P.O. Box in Reno was to avoid scrutiny by customs?

3              ATTORNEY PARKHURST:   Objection to the form

4    of the question.

5       A    I'm not -- I'm not sure.

6       Q    (BY ATTORNEY NELSON) Can you think of a

7    reason why somebody would get a P.O. Box in Reno and

8    incur the extra charge of having the products then,

9    once they arrive in Reno, to then be shipped down at

10   a cost to Fremont?

11      A    I'm going to make the same assumption you

12   made earlier.

13      Q    I'm making no assumptions.   I'm asking

14   questions.

15             ATTORNEY PARKHURST:   Hold on.   Don't

16   assume.

17      A    Okay.   I don't know.

18      Q    (BY ATTORNEY NELSON) Can you -- my

19   question is:   Can you think of a reason other than

20   avoiding scrutiny by customs?

21      A    No.

22      Q    And if your son -- does your son have any

23   ties to the Reno, Nevada area?

24      A    So --

25             ATTORNEY PARKHURST:   Objection.   Counsel,

CONFIDENTIAL

Page 87

1    can you clarify which son?

2         Q    (BY ATTORNEY NELSON) Does Kamran -- Kamran

3    have ties to the Reno, Nevada area?

4         A    No.

5         Q    Does he have a vacation house up there?

6         A    No.

7         Q    Is he married?

8         A    No.

9         Q    Does he have friends in the Reno area, to

10   your knowledge?

11        A    I don't know.

12        Q    Can you think of a reason why your son

13   would arrange for a UPS box in Reno?

14        A    I don't know.

15        Q    Can you think of a reason for your son to

16   arrange for a UPS box in Portland, Oregon?

17        A    No.

18        Q    Who is Imran Hussain?

19        A    He is one of our employees.

20        Q    How long has he been an employee?

21        A    Approximately 12, 14 years.

22        Q    Is he currently an employee of ADSII?

23        A    Yes.

24        Q    Where is he today, as far as you know?

25        A    Meaning?

CONFIDENTIAL

Page 99

1    Why don't we take our lunch break.  We can go off

2    the record.

3              THE VIDEOGRAPHER:  We're off the record at

4    12:12 p.m.

5              (A break was taken from 12:12 p.m. to

6    1:18 p.m.)

7              THE VIDEOGRAPHER:  This is beginning of

8    Media No. 3.  We're back on the record at 1:18 p.m.

9    You may proceed.

10             ATTORNEY NELSON:  Great.  Thank you.

11        Q    (BY ATTORNEY NELSON) How many people are

12   employed by ADSII now in September of 2019?

13        A    There's approximately four in the U.S.

14        Q    And who are they?

15        A    There's, of course, Shahid, Rosie, Imran,

16   and Farhad.  And I guess you can add Roya also,

17   because she takes, you know...

18        Q    What is Farhad's job title?

19        A    Recently we have made him the CEO.

20        Q    When did he become CEO?

21        A    At the beginning of the year or so, I

22   would say.

23        Q    Beginning of 20 --

24        A    Yeah.

25        Q    -- 19?

CONFIDENTIAL

1      A      Yeah.

2      Q      What was he before that?

3      A      He was just, I mean, like an office boy.

4      Q      What is your job title now?

5      A      I don't like titles.  But you know, as --

6  for just -- for the namesake, I'm the president.

7      Q      Do you have any other title with ADSII?

8      A      No.

9      Q      Prior to Farhad becoming CEO, were you the

10 CEO?

11     A      Yes.

12     Q      Okay.  How many employees does ADSII have

13 in Pakistan?

14     A      Approximately about 25 right now.

15     Q      How many offices do you have in Pakistan?

16     A      You mean physical?  One.

17     Q      One.  Where is that located?

18     A      City called Lahore.

19     Q      And in September of 2018 -- so 12 months

20 ago --

21     A      Okay.

22     Q      -- how many employees do you think you had

23 in Pakistan?

24     A      I would say maybe 50, 60.  It fluctuates.

25 I mean, I...

CONFIDENTIAL

Page 141

1    or Synnex so they could show that quote to the U.S.

2    government, but instead purchased a Cisco product

3    from Pretty Technology or Hong Kong Sellsi or some

4    other Chinese-based company?  Do you know of that

5    situation happening?

6              ATTORNEY PARKHURST:  Objection to the form

7    of the question.

8         A    No.

9         Q    (BY ATTORNEY NELSON) Did you ever know of

10   that situation happening in 2017 or any other year?

11             ATTORNEY PARKHURST:  Same objection.

12        A    No.

13        Q    (BY ATTORNEY NELSON) Are -- are records of

14   purchases by ADSII kept electronically?

15        A    Yes.

16        Q    And where are they kept?  In what -- in

17   what kind of system?

18        A    In the accounting software.

19        Q    And what is that referred to?

20        A    Meaning the name of the -- SBT.

21        Q    Is -- do you have any other electronic

22   records regarding purchases of Cisco products

23   anywhere else other than in the SBT system?

24        A    No.  No.

25        Q    Are you familiar with what information is

CONFIDENTIAL

Page 142

1   captured about the purchase in the SBT system?

2          A    Meaning?  What details do you want?

3   Like --

4          Q    Meaning what details?  That's -- that's --

5   are you -- are you familiar with the details that

6   are captured in the SBT system about a purchase of a

7   Cisco --

8          A    Yes.

9          Q    -- product?

10         A    Yes.

11         Q    What details are captured?

12         A    Vendor name, of course our name, date,

13   P.O. number, and the products, and the...

14         Q    What about the price?

15         A    Yes, and the price.

16         Q    What about the serial number of the

17   products?

18         A    If they are available at that time, but

19   they're usually available after the fact, I would

20   say.

21         Q    So once you have -- fair point.

22              Once you have ordered the products, you

23   receive the products from the vendor?

24         A    Um-hum.

25         Q    Do you -- does ADSII record the serial

CONFIDENTIAL

Page 143

1   numbers of the products they received?

2          A     They should.   That was the rule.

3          Q     How -- how do you know that that was the

4   rule?

5          A     Well, I -- I had enforced it many times.

6   But knowing my team, the sales team, as soon as the

7   product came, they wanted to just rush and deliver,

8   especially Mike.

9                And that's when -- sometimes the serial

10  numbers, you don't get time to write them down, but

11  I think in most cases we had them.

12         Q     And what was -- what was -- what was the

13  reason why you wanted the -- the serial numbers to

14  be captured?

15         A     It's generally for RMA return.

16         Q     So if a customer had a problem with a

17  product and came to you and said:   You sold me X,

18  and it's not working, then you would be able to

19  confirm that, in fact:   Yeah, that serial number,

20  that's right, we did sell that to you as opposed to:

21  We don't what you are talking about; we didn't sell

22  that product to you?

23               Is that the idea of the RMA?

24         A     Yes.

25         Q     Because RMA stands for Return Material

Page 144

1    Authorization --

2         A    Yes.

3         Q    -- is that right?  Yeah.  So it's for --

4    it's for returns?

5         A    Yes.

6         Q    Yeah.  And so the -- the serial number

7    then -- you wanted the serial numbers captured in

8    the SBT system to assist in that process?  That's at

9    least one reason for it?

10        A    Yes.

11        Q    So is there a -- is there a field in the

12   SBT system that says serial number or what is --

13   what is the heading of the field?

14        A    It's -- yeah, it is called "serial

15   number," yes.

16             ATTORNEY NELSON:  I'm about ready to

17   switch to another topic, and I see we're -- it's

18   been about an hour, so why don't we take a 10-minute

19   break.  Is -- is that good?

20             ATTORNEY PARKHURST:  Um-hum.

21             THE VIDEOGRAPHER:  Okay.  We're off the

22   record at 2:14 p.m.

23             (A break was taken from 2:14 p.m. to 2:34

24   p.m.)

25             THE VIDEOGRAPHER:  This is the beginning

CONFIDENTIAL

Page 200

1            ATTORNEY PARKHURST:   Objection to the form

2   of the question.

3        A    I cannot answer that.   It's not...

4        Q    (BY ATTORNEY NELSON) It's not okay, is it?

5        A    Yeah.

6        Q    Yeah.   And to -- to arrange for shipping

7   addresses outside the State of California in order

8   to import products that are counterfeit, that would

9   be a problem, wouldn't it?

10            ATTORNEY PARKHURST:   Objection to the form

11   of the question.

12        A    I don't know.

13        Q    (BY ATTORNEY NELSON) What -- what -- what

14   is the lawful business reason to justify setting up

15   a shipping point in Portland, Oregon, to receive

16   products after there has been seizure, a seizure, a

17   seizure of products going to Fremont?   What is the

18   lawful reason to do that?

19            ATTORNEY PARKHURST:   Objection to the form

20   of the question.

21        A    I don't know.

22        Q    (BY ATTORNEY NELSON) When there are no

23   customers in Portland, Oregon; there's no

24   salespeople in Portland, Oregon; there's nothing in

25   Portland, Oregon, other than 400 miles away from

CONFIDENTIAL

Page 201

1    Fremont, California.

2              So isn't that a -- evidence -- a reason

3    for people to believe that your son, Kamran Sheikh,

4    was trying to avoid the scrutiny of customs in

5    the -- in this activity, of bringing in Cisco

6    products?

7              ATTORNEY PARKHURST:  Objection to the form

8    of the question.

9         A    No.

10        Q    (BY ATTORNEY NELSON) What is -- what is

11   the innocent explanation for that activity?

12        A    I don't know.

13        Q    That's a difficult question.  I mean, this

14   is your son I'm talking about, so I know it's

15   difficult.

16             But if he was importing legitimate

17   products and selling them from Fremont -- you import

18   them to Fremont or you import them to Milpitas or

19   you import them to San Jose; you import them

20   someplace close -- is there -- is there any innocent

21   explanation for arranging for UPS stores in Reno and

22   in Portland?

23             ATTORNEY PARKHURST:  Objection to the form

24   of the question.

25        A    I don't know.

CONFIDENTIAL

Page 268

1        I, MARY J. GOFF, CSR No. 13427, Certified

2   Shorthand Reporter of the State of California,

3   certify;

4        That the foregoing proceedings were taken

5   before me at the time and place herein set forth, at

6   which time the witness declared under penalty of

7   perjury; that the testimony of the witness and all

8   objections made at the time of the examination were

9   recorded stenographically by me and were thereafter

10  transcribed under my direction and supervision; that

11  the foregoing is a full, true, and correct

12  transcript of my shorthand notes so taken and of the

13  testimony so given;

14       That before completion of the deposition,

15  review of the transcript (XX) was ( ) was not

16  requested:   ( ) that the witness has failed or

17  refused to approve the transcript.

18       I further certify that I am not financially

19  interested in the action, and I am not a relative or

20  employee of any attorney of the parties, nor of any

21  of the parties.

22       I declare under penalty of perjury under the

23  laws of California that the foregoing is true and

24  correct, dated this 23rd day of September, 2019.

        *Mary J. Goff* _____

25          MARY J. GOFF

# Depo 5

Page 1

1                  UNITED STATES DISTRICT COURT
2                  NORTHERN DISTRICT OF CALIFORNIA
3                       OAKLAND DIVISION
4

   CISCO SYSTEMS, INC., a California
5  corporation, et al.,
6              Plaintiffs,            Case No.
                                      4:18-cv-07602 YGR
7     vs.
8  ZAHID "DONNY" HASSAN SHEIKH, an
   individual, et al.,
9
               Defendants.
10 ——————————————————————————————————————

   ADVANCED DIGITAL SOLUTIONS
11 INTERNATIONAL, INC., a California
   corporation,
12
               Third-Party Plaintiff,
13    vs.
14 RAHI SYSTEMS, INC., a California
   corporation, et al.,
15
               Third-Party Defendants.
16 ——————————————————————————————————————
17
18
19
20      VIDEO-RECORDED DEPOSITION OF NABIA UDDIN
21              San Jose, California
22              Friday, March 6, 2020
23
24 REPORTED BY:
   CYNTHIA MANNING, CSR No. 7645, CLR, CCRR
25 JOB NO. 177154

1      Q.   When did you open a post office box?

2      A.   Approximately 2016.

3      Q.   And you mentioned that there were two post

4  office boxes that you shipped to.  The 2016 post

5  office box, is that one of them?

6      A.   Correct.

7      Q.   And then do you know who opened the other

8  post office box that you would ship to?

9      A.   Yes.  Jessica Little.

10     Q.   Do you -- do you know when Ms. Little

11 opened the post office box?

12     A.   No, I do not.

13     Q.   Were you present when she opened a post

14 office box?

15     A.   No, I was not.

16     Q.   How did you come to hear that Ms. Little

17 opened a post office box?

18     A.   When I was asked to ship product there.

19     Q.   So when you were asked to ship product

20 there, what were you told in this regard?

21     A.   I was given an address and instructed to

22 have product that was ordered from either Hong Kong,

23 Ltd. or Shenzhen -- to have those orders shipped to

24 Ms. Little's box in Reno, Nevada.

25     Q.   And who said this to you?

1      A.   Jessica and Shahid Sheikh.

2      Q.   And they said that they opened that box?

3      A.   I don't know who opened the box.

4      Q.   Okay.   In 2016 you opened a post office

5  box.   Was that with UPS?

6      A.   Correct.

7      Q.   And what was the location of the post

8  office box that you opened?

9      A.   I don't have the exact street address, but

10  it's on Washington Boulevard in Fremont.

11      Q.   And why did you open the 2016 Washington

12  Boulevard post office box?

13      A.   I was instructed to do so by Shahid.

14      Q.   And how did he communicate this

15  instruction?

16      A.   Verbally.

17      Q.   Verbally?

18      A.   Correct.

19      Q.   And when you say "verbally," do you mean in

20  person?

21      A.   Correct.

22      Q.   And so I just want to know what you recall

23  of that conversation that you had where he

24  instructed you to open a post office box?   What do

25  you remember of that conversation?

1    Q.  And how did Ms. Little instruct you to do

2  this?  How did she communicate that instruction?

3    A.  Via e-mail.

4    Q.  Was this every time you did it?

5    A.  By e-mail and phone.

6    Q.  Ever in person?

7    A.  If she was in the office.

8    Q.  And what would she tell you exactly?

9    A.  Basically what quantity to purchase, where

10 to purchase it from, how to have it shipped in.

11   Q.  And did she tell you this is counterfeit?

12   A.  No.

13   Q.  How did you come to learn that this was

14 allegedly counterfeit?

15   A.  When product and the labels that go on the

16 product would be shipped and arrive separately.

17   Q.  And you said that Ms. Little instructed you

18 to do this?

19   A.  Ms. Little and Shahid.

20   Q.  And Shahid Sheikh?

21   A.  Correct.

22   Q.  And how often did Mr. Sheikh tell you to do

23 this?

24   A.  I mean, it was mostly either him or Jessica

25 that would dictate where to get this product from.

Page 123

1        Q.   And they would tell you -- they would

2   communicate this request by e-mail or in phone or in

3   person; is that the case?

4        A.   Correct.

5        Q.   And did they do that for each of the 50 to

6   100 times.

7             MS. FRIEND:   Misstates testimony.

8             THE WITNESS:   Yes.

9   BY MR. ATKINSON:

10       Q.   And when did you first learn that there

11  were products and labels being shipped out and

12  arrive separately?

13       A.   When they would arrive to my PO box.

14       Q.   Did you ever go personally?

15       A.   Yes.

16       Q.   Was that PO box a Uddin Networks PO box?

17       A.   Yes.

18       Q.   When was the first time that the labels

19  arrived at your PO box?

20       A.   I don't remember the exact date.

21       Q.   Do you recall the year?

22       A.   It was within a few months of opening the

23  Uddin Networks LLC.

24       Q.   Within a few months of opening the company

25  PO box, you went to the post office box and found

Page 124

1    labels were shipped; is that right?

2         A.   I didn't make all the pickups at Uddin

3    Networks, but I did know that when we would get the

4    tracking from the supplier it would just -- some of

5    the tracking would be strictly for the labels and

6    the other tracking would be for the product itself.

7         Q.   And you personally went down there from

8    time to time?

9         A.   From time to time, but I wasn't the primary

10   person that did the pickups.

11        Q.   Did you personally observe labels coming

12   into your post office box?

13        A.   No.

14        Q.   Okay.   When did you first learn that labels

15   were being shipped to your post office box?

16        A.   Again, it would just show on the tracking

17   based on the weight and the product that would get

18   picked up and brought back to the office.   I have

19   seldomly went to the PO box to make any pickups.

20        Q.   So you're assuming, based on the weight,

21   that these were labels shipped to your PO box?

22        A.   I'm not assuming.   When the product would

23   get picked up from the PO box and come to the

24   Fremont office, and that's when you would get the

25   packing slip, go look at the material, that's what

1   it would be; it would be labels.

2       Q.   Okay.   So you were aware that labels and

3   product were being shipped to your PO box within a

4   few months of setting it up; right?

5       A.   Yes.

6       Q.   And that's when you became aware that,

7   according to you, there was counterfeit products;

8   right?

9       A.   Correct.

10      Q.   This is a few years before you left ADSI;

11  right?

12           MS. FRIEND:   Misstates testimony.

13  BY MR. ATKINSON:

14      Q.   It was more than a year before you left

15  ADSI; right?

16      A.   It was in the last five years.

17      Q.   Okay.   Other than what you've just

18  described, have you ever been involved in the

19  purchase of counterfeit products?

20           MS. FRIEND:   Vague and ambiguous.

21           THE WITNESS:   What we just went over.

22  BY MR. ATKINSON:

23      Q.   Other than that, any other involvement?

24           MS. FRIEND:   Vague and ambiguous.

25           THE WITNESS:   No.

1         A.   Yes.

2         Q.   Did you ever witness someone putting a
3    label on a product?

4         A.   Yes.

5         Q.   And who did you witness putting a label on
6    a product?

7         A.   Jessica Little, Imran Husain.

8         Q.   And when did you witness that?

9         A.   What do you mean when did I witness it?

10        Q.   Did you witness it more than one time?

11        A.   Yes.

12        Q.   When was the first time you witnessed
13   either Ms. Little or Mr. Husain putting a label on a
14   product?

15        A.   I don't remember the exact timeframe, but
16   it was after the product started coming into the PO
17   box and then being picked up and brought back to the
18   Fremont office.

19        Q.   Within a few months of opening the PO box?

20        A.   Correct.

21        Q.   Okay.  Did you ask them what they were
22   doing?

23        A.   No.

24        Q.   Where were they when you saw them doing
25   this?

1          A.   In Imran's office.

2          Q.   Did Imran have his own office with a door?

3          A.   Yes.

4          Q.   Did it have a window?  Could you see into

5     office?

6          A.   Yes.

7          Q.   Was Imran's door open or closed when you

8     say you saw him putting labels on the product?

9          A.   I don't recall if it was open or closed.

10          Q.   And how big a window is on his office?

11               And before I go any further, let me

12     clarify.

13               I'm only interested in a window that you

14     would be able to see into so that you could see

15     activity in the office.

16               Does he have such a window?

17          A.   Yes.

18          Q.   Could you approximate the size of the

19     window that you could see through?

20          A.   The size of that window (indicating).  Like

21     the width and the depth between.  It wasn't that

22     big, but like where that shade is, that approximate

23     rectangular size.  I don't know what size that would

24     be.

25          Q.   Would you say that's about 15 feet across?

1     Q.  More than five?

2     A.  Yes.

3     Q.  More than 10?

4     A.  Yes.

5     Q.  More than 20?

6     A.  Approximately.

7     Q.  Approximately 20?

8     A.  Yes.

9     Q.  Okay.  On approximately 20 occasions you

10 saw Imran Husain putting labels on products; is that

11 right?

12    A.  Correct.

13    Q.  And we're talking 20 different instances of

14 that; right?

15    A.  Correct.

16    Q.  Okay.  And approximately how many times did

17 you see Ms. Little putting labels on product?

18    A.  Probably 10, 15, approximately.

19    Q.  And was that also in Mr. Husain's office?

20    A.  Yes.

21    Q.  And was there a particular time of day they

22 would do that?

23    A.  No particular time of the day.

24    Q.  Did they appear to take any efforts to hide

25 what they were doing?

1     A.   Yes.

2     Q.   Did Mr. Husain have a key to box 315?

3     A.   The second key that I had to the box I had

4  given to -- per Shahid Sheikh, I had given to Kamran

5  Sheikh.   Now, if Kamran then forwarded to Imran, I

6  do not know.   But Kamran and Imran were the ones

7  that did the majority of the pickups from the PO

8  box.

9     Q.   And did you have any discussions, do you

10  recall, with Kamran Sheikh about seizure notices

11  from CBP for products going to Uddin Networks?

12     A.   No, sir.

13     Q.   So in 2016, did you have any idea that

14  customs was seizing counterfeit products --

15  counterfeit Cisco products going to Uddin Networks?

16     A.   No, I was not aware.

17     Q.   Let's go back to the e-mail that you sent

18  to Mr. Colosi in 2017.   It's dated November 28th.

19          So the next sentence:

20          "Cisco had blacklisted them about seven

21          years ago, but they are importing these

22          parts from China."

23          Who is "them" and "they"?

24     A.   I know that we could not buy from

25  distribution, such as Ingram Micro or TechData,

Page 209

1    A.   It was just a gut feeling that this is

2  wrong.   There is something not right about the way

3  that they are conducting business, and I wanted to

4  bring light to it eventually.   And when I got fired

5  is what when I reached out because I was no longer

6  threatened to lose my job.   And I mean it was wrong.

7  I didn't feel good doing it, but I was following

8  instructions to perform my job in order to keep my

9  job.

10    Q.   Do you believe that Shahid Sheikh knew

11  about these counterfeit activities?

12    A.   Yes.

13    Q.   Why do you believe that?

14    A.   He is the one that would find these

15  suppliers, have the meetings with them, go out and

16  meet with them in China.   So I think that he knew

17  what he was getting himself into.   He is the one

18  that would come back from a business meeting and

19  then instruct the team on how and where to purchase

20  product from.

21    Q.   Who signed your checks?

22    A.   Shahid and Roya.

23    Q.   Why didn't you speak up to Shahid?

24       Is he the kind of man you could say, "Hold

25  on.   I think this is bad what we're doing"?

1    conversation with Peter, but that is all the

2    information that I have regarding this Cisco

3    counterfeit product.

4         Q.   Let's focus on the labeling of products in

5    Fremont at the ADSI offices.

6              You had testified earlier that Imran Husain

7    and Jessica Little were both involved in the actual

8    labeling, and that I think it was Miguel --

9         A.   Correct.

10        Q.   -- at least observed at least one of these

11   labeling sessions.

12             Is -- I don't have Miguel's last name, I

13   apologize, but is he still located locally?

14        A.   I don't know.

15        Q.   When was the last time that you spoke with

16   him?

17        A.   When I was employed at ADSI.

18        Q.   So back at the end of 2017 would have been

19   the last time you spoke with him?

20        A.   September 2017.

21        Q.   Do you know if Shahid Sheikh is aware that

22   the products are labeled -- were being labeled in

23   Fremont?

24        A.   Is he aware of that?

25        Q.   Right.

Page 216

1          A.   Yes.

2          Q.   Why?   How do you know that?

3          A.   He has seen Imran do it in the office and a

4    lot of instructions were given by Shahid himself.

5          Q.   Including instructions to label the

6    products?

7          A.   Correct.

8          Q.   How about also the orders, did you see

9    orders that went from ADSI to Pretty Technology that

10   specified the number of labels that they were

11   buying?

12         A.   Sometimes it was spelled out on the POs and

13   other times Jessica would just communicate that with

14   Summer or whoever the supplier contact was.

15         Q.   And how did Jessica Little communicate that

16   to Pretty Technology?

17         A.   Via e-mail.

18         Q.   So there would be e-mails between Jessica

19   Little and Summer in which Jessica Little requested

20   Cisco labels?

21         A.   Correct.

22         Q.   Do you know for a fact that there are

23   e-mails like that?

24         A.   I haven't seen them, but the way the

25   product will come in, the way that -- it would only

Page 219

1      A.  Within a five-minute drive.

2      Q.  Was -- were products being sent to ADSI on

3  the Business Center Drive?

4      A.  Yes.

5      Q.  So if ADSI was ordering products, let's say

6  HP products, those products would be delivered to

7  4255 or whatever the address is of Business Center

8  Drive in Fremont?

9      A.  Correct.

10      Q.  It's a lot easier to have the products

11  delivered right to the office.  You get them right

12  away and you don't have to send somebody to -- five

13  minutes away a to a UPS Store; correct?

14      A.  Correct.

15      Q.  What products were being sent to the UPS

16  Store in Fremont?

17      A.  Cisco product.

18      Q.  Was it only Cisco products going to the UPS

19  Store in Fremont?

20      A.  Yes.

21      Q.  No HP products?

22      A.  Not to the best of my knowledge.

23      Q.  The products that you knew were being

24  picked up at the Fremont UPS Store were 100 percent

25  Cisco products and labels?

Page 220

1        A.   To the best of my knowledge, yes.

2        Q.   Now, again, it would be a lot easier to

3   have those products sent directly to Business Center

4   Drive, then you get them right away and you don't

5   have to send somebody down with a key to a UPS box.

6            Did anybody explain to you why it was that

7   for those products, those had to go to UPS box,

8   whereas the HP products and everything else could go

9   to the ADSI office?

10       A.   No.

11       Q.   Did that seem odd to you?

12       A.   Very.

13       Q.   At some point did you figure out why it was

14  that the Cisco products were being sent to the UPS

15  box and everything else was going to the ADSI

16  office?

17       A.   Yes.

18       Q.   What did you figure out?

19       A.   That it's being imported in from China

20  and/or Hong Kong and then being sent to Jessica

21  Little's PO box in Reno and then being shipped to my

22  PO box.  So it was -- the whole process seemed very

23  odd to me.

24       Q.   So let's dive into the Reno box for a

25  moment because you mentioned that.

1      A.   Yes.

2      Q.   So do you know what products were being

3  imported into the Reno box?

4      A.   Besides the transceivers and some switches?

5      Q.   Yeah.

6      A.   Those are the ones that I'm aware of.

7      Q.   Were you aware of anything that wasn't a

8  Cisco product that was being imported by ADSI into

9  the United States to the Reno UPS box?

10     A.   No, I was not.

11     Q.   And in that situation, you didn't have

12  somebody drive up to Reno to pick up the boxes and

13  then drive them back to Fremont, did you?

14     A.   No.

15     Q.   How did you get the products, the Cisco

16  products, from the Reno UPS box down to the ADSI

17  office on Business Center Drive in Fremont?

18     A.   So Jessica had given instructions to the

19  UPS store where she opened up the UPS box that

20  whenever something came in to then forward it to my

21  box.  That communication was handled with Jessica,

22  by her, and she instructed the UPS Store on how to

23  do that.  So I don't know what was said or who was

24  managing that.

25     Q.   Did that seem inefficient to you?

1        A.   Very.

2        Q.   Because let's peel back the inefficiencies.

3            Let's assume that the most efficient thing

4   is you order something and you have it delivered to

5   your address.

6        A.   Correct.

7        Q.   So you add one level of inefficiency.  You

8   say:  Instead of sending it to my address in

9   Fremont, I want you to send this to Reno and then it

10  will come down to my address in Fremont.  That would

11  be inefficient; right?

12       A.   Correct.

13       Q.   Let's add a second level of inefficiency.

14  I want you to send it first to an UPS box in Reno

15  and then have that go down to a UPS box in Fremont

16  and then you have somebody on Business Center Drive

17  get in their car and drive five minutes to pick it

18  up from the UPS box in Fremont.  That's pretty

19  inefficient too, isn't it?

20       A.   Correct.

21       Q.   Can you think of any reason why Shahid

22  Sheikh and his sons were setting up the receiving of

23  products in this way?

24       A.   I don't know why they chose to do it this

25  way.

1   confusing than that -- is, I'll represent to you, a

2   letter from U.S. Customs to Kenney Carter,

3   referencing a seizure of 650 transceiver labels on

4   June 2nd, 2018.  This was actually going to

5   PureFuture Tech on 47000 Warm Spring Boulevard,

6   Number 122 in Fremont.

7           First question to you is:  June 7th, 2018,

8   you were no longer with ADSI; correct?

9       A.   Correct.

10      Q.   And this did not go to the Uddin Networks

11  UPS box, did it?

12      A.   No.

13      Q.   This one went to a PureFuture Tech address?

14      A.   Correct.

15      Q.   Have you ever heard of a company called

16  PureFuture Tech?

17      A.   Yes.

18      Q.   And what do you know it to be?

19      A.   It's just an online company that -- Kamran

20  is the owner of this company.

21      Q.   And did Kamran ever talk to you while you

22  were colleagues at ADSI about buying transceiver

23  labels in China?

24      A.   I don't recall.  For PureFuture Tech?

25      Q.   For PureFuture.

Page 246

1          A.   No.

2               MR. NELSON:   Just to complete the picture,

3     let's take a look at Exhibit 74.

4               (Deposition Exhibit 74, previously marked

5               for identification, was referenced herein)

6     BY MR. NELSON:

7          Q.   So I'll represent to you that Exhibit 74 is

8     the photographs that Customs sent to Cisco for

9     authentication for the products that were coming in

10    in order to get Cisco to say whether or not this was

11    genuine Cisco merchandise.

12              The first page you can see an is RoHS

13    Hazardous Substance Table; right?

14         A.   Yes.

15         Q.   The second page is the bigger label that

16    goes on the outside of a transceiver antistatic bag?

17         A.   Yes.

18         Q.   The third page, we now have what appears to

19    be a roll of labels, and Customs later identified

20    the number as 650 of these.

21              But those -- what do you recognize the

22    labels on the right, the ones that have the Cisco

23    trademark, to be?

24         A.   Probably the smaller label that goes on top

25    of the transceivers.

1    Q.   Yeah.

2         And in your experience, dealing with buying

3    and selling Cisco products for many, many years at

4    ADSI, can you think of any legitimate reason for

5    Cisco to produce and distribute labels so that

6    people can put them on various pieces of metal to

7    sell as Cisco transceivers?

8    A.   No.

9    Q.   Are you familiar with BrokerBin?

10   A.   Yes.

11   Q.   And Tradeloop?

12   A.   No.

13   Q.   But on BrokerBin, BrokerBin is a B2B

14   marketplace?

15   A.   Correct.

16   Q.   So a seller sells products to another

17   seller.  It's a forum for sellers to sell to each

18   other; correct?

19   A.   Correct.

20   Q.   And people sell all sorts of things on

21   BrokerBin, including Cisco products; correct?

22   A.   Correct.

23   Q.   Because Cisco products can be bought and

24   sold just like widgets?  I mean, they are things

25   that can be bought and sold; right?

Page 248

1       A.   Correct.

2       Q.   Have you ever seen someone offer for sale

3   on BrokerBin Cisco labels?

4       A.   No.

5       Q.   Would it surprise you if somebody offered

6   Cisco labels on BrokerBin?

7       A.   Yes.

8       Q.   Why?

9       A.   Because Cisco-authorized product does not

10  sell labels separately.

11      Q.   Right.

12           I want to go back to the labeling operation

13  that took place at ADSI.   And you described how

14  Jessica Little and Imran Husain would do it.   How

15  close would you get to them?

16           What is the closest you ever got to them

17  while they were doing their labeling operation?

18      A.   Besides just seeing what they were doing in

19  the office, that's about it.   I never stood behind

20  them to see exactly what they were doing.

21      Q.   Could you estimate for us approximately how

22  far away you were?   Are we talking about 10 feet,

23  100 feet, a football field?

24      A.   Like from here to the end of the table

25  would be his office and then the window would be

Page 249

1  right there.   So what is that, about 5 feet or so?

2       Q.   Oh, that's a lot longer than 5 feet, but

3  it's probably -- and I'll ask counsel to confirm,

4  but maybe around 12 to 15 feet?

5       A.   Yeah, from here to there.

6            MR. NELSON:   Is that fair?

7            MS. FRIEND:   I agree with that.

8            MR. ATKINSON:   Sure.

9  BY MR. NELSON:

10       Q.   So how do you know that they were putting

11  labels on Cisco products as opposed to just doing

12  crossword puzzles?

13       A.   They were sitting there with transceivers

14  and they were sitting applying labels to them, which

15  was very clear and apparent through the window,

16  which is how I know that they were applying labels

17  to counterfeit Cisco product.

18       Q.   And we saw the color pictures of labels on

19  sort of a peel-off backing.

20            Did you ever see like the remnant of the

21  peel-off backing?   So once -- all the labels have

22  been taken off but now you have that glossy paper?

23       A.   Shiny paper, yes.

24       Q.   And you saw that in the office?

25       A.   Yes.

1    Q.   Do you have any doubt that they were
2    putting labels on counterfeit Cisco transceivers?
3    A.   Do I have doubt that they were?
4    Q.   Do you have any doubt?
5    A.   No doubt.
6    Q.   I think you had talked about the UPS box
7    when counsel showed you the information of you
8    acquiring the UPS box in Fremont and using your
9    credit card.
10   A.   Correct.
11   Q.   I think he asked you whether or not you had
12   been reimbursed for the expense of the UPS box.
13        Were you reimbursed?
14   A.   Yes.
15   Q.   Who reimbursed you?
16   A.   Shahid.
17   Q.   And how did he reimburse you, in cash or
18   check or how?
19   A.   Check.
20   Q.   And was it a company check or personal
21   check?
22   A.   Company check.
23   Q.   Do you have a copy of that check?
24   A.   Yes.
25   Q.   You have a copy of it at your home or --

Page 273

REPORTER'S CERTIFICATE

1

2          I, CYNTHIA MANNING, a Certified Shorthand

3  Reporter of the State of California, do hereby

4  certify:

5          That the foregoing proceedings were taken

6  before me at the time and place herein set forth;

7  that any witnesses in the foregoing proceedings,

8  prior to testifying, were placed under oath; that a

9  verbatim record of the proceedings was made by me

10  using machine shorthand which was thereafter

11  transcribed under my direction; further, that the

12  foregoing is an accurate transcription thereof.

13          I further certify that I am neither

14  financially interested in the action, nor a relative

15  or employee of any attorney of any of the parties.

16          Before completion of the deposition, review

17  of the transcript [ ] was [X] was not requested.  If

18  requested, any changes made by the deponent during

19  the period allowed are appended hereto.

20          In witness whereof, I have subscribed my

21  name this 18th day of March 2020.

22

23  _____

24  CYNTHIA MANNING, CSR No. 7645, CCRR, CLR

25

# Depo 6

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                   OAKLAND DIVISION
 4                     ---oOo---
 5    CISCO SYSTEMS, INC., a
      California corporation,
 6    et al.,
 7                 Plaintiffs,
 8    vs.                          No. 4:18-CV-07602 YGR
 9    ZAHID "DONNY" HASSAN SHEIKH,
      an individual, et al.,
10
                  Defendants.
11    _____/
12    ADVANCED DIGITAL SOLUTIONS,
      INTERNATIONAL, INC., a
13    California corporation,
14      Third-Party Plaintiff,
15    vs.
16    RAHI SYSTEMS, INC., a
      California corporation,
17    et al.,
18     Third-Party Defendants.
      _____/
19    Job No: 177108
20       CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
21        VIDEOTAPED DEPOSITION OF SHAHID SHEIKH
22              SAN FRANCISCO, CALIFORNIA
23              FRIDAY, FEBRUARY 28, 2020
24    Stenographically Reported by:
      ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR
25    California CSR No. 9830
```

Confidential - Pursuant to Protective Order

Page 11

1   to answer that question pursuant to his Fifth

2   Amendment privilege.

3         MR. NELSON:  Q.  Do you have any question in

4   your mind that -- that the information here is, in

5   fact, true and accurate?

6         MR. PARKHURST:  I'm instructing my client not

7   to answer that question pursuant to his Fifth

8   Amendment privilege.

9         MR. NELSON:  Okay.

10    Q   We actually did not look at the spreadsheets

11  at your deposition, so you have not testified in this

12  case under oath yet with regard to the spreadsheets.

13        So your counsel has instructed you not to

14  answer pursuant to your Fifth Amendment privilege.

15  Are you going to follow that instruction?

16    A   Yes.

17        MR. PARKHURST:  And, Counsel, can we

18  stipulate from here on out that he'll follow the

19  instruction as given?

20        MR. NELSON:  So what your counsel has

21  proposed is:  Instead of my asking you each time, "Are

22  you going to follow this instruction that your counsel

23  has provided," that I can forego that.  And we're

24  assuming, we're stipulating, that you're going to

25  follow his instruction not to answer questions based

Confidential - Pursuant to Protective Order

1  on your Fifth Amendment privilege when he asserts

2  that.

3       Q    Is that -- do you understand that?  Is that

4  fair?

5       A    No, I didn't understand that.

6       Q    So the idea -- so generally attorneys are

7  allowed to make objections, make instructions during a

8  deposition.  But the witness is to answer the

9  question.  Typically that is what would happen.

10           So an attorney -- this happened last time

11  where an attorney may object because the question,

12  they think, is vague, ambiguous, or unclear with time,

13  et cetera.

14           When they -- when an attorney -- when an

15  attorney asserts those kinds of objections, it is --

16  it is mostly for the record so that when a trier of

17  fact or the judge looks at that down at trial time, he

18  or she, in this case she, would make a decision about

19  whether or not the question is questionable.

20           So counsel makes an objection for the record.

21  So it's preserved for the judge some months from now

22  to take a look at.  The witness can answer, and this

23  happened at your first deposition where Mr. Parkhurst

24  would make a deposition, but that didn't relieve --

25  relieve you of your obligation to answer.  You still

Confidential - Pursuant to Protective Order

1    had to go ahead and answer.

2           Do you remember?  Well, whether you remember

3    or not, that -- that's what happened.

4           This is a little special, because

5    Mr. Parkhurst is objecting to the question because of

6    your Fifth Amendment right not to provide testimony

7    against yourself.  It's a constitutional right.  And

8    so, he's flagging the issue for the record and for

9    you, and he's -- he's instructing you, he's advising

10   you not to answer the question, and to assert your

11   Fifth Amendment rights.

12          The Fifth Amendment rights are yours to -- to

13   assert or not to assert.  Now, you're here with

14   counsel, so presumably you've got Mr. Parkhurst at

15   your side for a reason to give you good advice.  But

16   nevertheless, it is your -- it is your -- your -- your

17   right to assert.

18          I want to caution you -- not caution you --

19   but I just want to alert you that in federal court,

20   that a witness who asserts the Fifth Amendment, that a

21   court can and a jury can draw what's called an adverse

22   inference from the assertion of the Fifth Amendment.

23   That -- that, in fact, the person asserted the Fifth

24   Amendment because the answer to the question would be

25   bad for them.

Confidential - Pursuant to Protective Order

1    So that's an instruction that can be given to

2  the jury so the jury will know that you asserted the

3  Fifth Amendment.  They can just read -- read it

4  against you.  And say, Okay.  The reason he did is

5  because the information is bad.

6    Now, Mr. Parkhurst will make arguments at

7  that time as to why the jury should not do that.  But

8  nevertheless, the law says that -- that that is -- is

9  something that will likely happen.

10    Because of that, the lawyers have to ask you

11  whether you're going to follow your counsel's

12  instruction.  So, in this case, Mr. Parkhurst had

13  placed on the record very clearly his advice to you to

14  assert your Fifth Amendment right.

15    You have the right to overrule essentially

16  your counsel and go ahead and answer it.  Most people

17  don't.  I'll just tell you that right now, but

18  nevertheless you have that right.

19    So what attorneys have to do in my shoes,

20  they will then have to follow-up from the witness and

21  say, Okay.  You heard from your counsel.  He's

22  advising you to assert the Fifth Amendment right.  Are

23  you going to do that?  And then the person will say

24  either "yes" or "no."

25    So the day gets long if after every single

Confidential - Pursuant to Protective Order

Page 15

1    time I turn to you and say "Are you going to follow
2    the advice of your counsel?"   So that's the general
3    issue.
4           Now, the idea of the stipulation is the
5    assumption -- the assumption that Mr. Parkhurst says
6    is that -- that you're going to follow his
7    instruction.   He's telling you that he's advising you
8    not to answer pursuant to the Fifth Amendment, and so
9    he's expecting you're going to follow it.
10          And so what I'm -- so we're asking for a
11   stipulation now is that I don't have to ask you each
12   and every time "Are you going to follow your counsel's
13   instruction?"
14          We can -- we will stipulate that you, in
15   fact, are following your counsel's instruction, and
16   you've been advised about the adverse inference, and
17   you understand the consequences, and you're going to
18   follow your counsel's instruction.
19          Does that make sense?   Is that -- the idea of
20   the stipulation and the consequences make sense to
21   you?
22      A   Yes.
23      Q   Okay.   Do you want to confer with
24   Mr. Parkhurst before we proceed?
25      A   I'm okay.

Confidential - Pursuant to Protective Order

Page 16

1    Q    You're okay.

2    A    Yes.

3    Q    You're okay to go forward?

4         And do -- do you agree that -- is that

5    stipulation, the stipulation of the idea that -- that

6    I don't have to ask you whether you're going to follow

7    your counsel's instruction that, in fact, if he -- if

8    he -- if he advises you not to answer based on your

9    Fifth Amendment rights, that you, in fact, will not

10   answer; is that -- is that stipulation okay with you?

11   A    Yes.

12        MR. NELSON:  That's okay with you,

13   Mr. Parkhurst?

14        MR. PARKHURST:  Yes.

15        MR. NELSON: Okay.  Okay.  All right.

16   Q    If I can have the -- those exhibits back

17   again.  Thank you.  You can keep your glasses.

18   A    Okay.  Yeah.

19   Q    Thanks.

20        So when we ended the day on September 10th, I

21   had provided to you a copy of a solicitation contract

22   order for commercial items, and I am going to have

23   this marked as Exhibit 80.

24        (Document marked Exhibit 80

25          for identification.)

Confidential - Pursuant to Protective Order

Page 21

```
 1    bottom right.  Right above the first page.  It --

 2              MR. PARKHURST:  Back to the first page.

 3              MR. NELSON:  Back to the first page.  Oh,

 4    sorry.  Yes.

 5        Q    Do you see where it says 05-JUL-2017 and my

 6    question right now is:  Do you see that, the date

 7    there?

 8        A    Yes.

 9        Q    As of July 2017, your company had already

10    received numerous notices from customs that your

11    suppliers in China were supplying you counterfeit

12    Cisco products; correct?

13              MR. PARKHURST:  I'm instructing my client not

14    to answer that question pursuant to his Fifth

15    Amendment privilege.

16              MR. NELSON:  Q.  Despite those notices, ADSI

17    continued to purchase from these Chinese counterfeit

18    sellers; isn't that correct?

19              MR. PARKHURST:  I'm instructing my client not

20    to answer that question pursuant to his Fifth

21    Amendment privilege.

22              MR. NELSON:  Q.  And with full knowledge that

23    the products that you were importing from China were

24    counterfeit, you, as CEO of ADSI at this time,

25    July 2017, allowed Cisco products imported from China
```

Confidential - Pursuant to Protective Order

Page 22

1    to be sold to the Defense Health Agency; correct?

2          MR. PARKHURST:   I'm instructing my client not

3    to answer that question pursuant to his Fifth

4    Amendment privilege.

5          MR. NELSON:   Okay.  Let's put 80 aside for

6    now.

7          (Document marked Exhibit 81

8           for identification.)

9          MR. NELSON:   Handing you what's been marked

10   as 81, and I'll represent it from the Bates Nos.

11   ADSI '180 through '194.  You'll see that in Box 15

12   that these products were to be delivered to Strategic

13   Systems Programs, individual named Daniel Kostka,

14   K-O-S-T-K-A, in Washington, D.C.

15      Q   Do you recognize this document?

16         MR. PARKHURST:  I'm instructing not to answer

17   that question pursuant to his Fifth Amendment

18   privilege.

19         MR. NELSON:  Let's go to page 3 of this which

20   is marked as '182.  You'll see that item one is a

21   Cisco router.  It's a 3925/K9 for $3,000.

22      Q   Do you know what a Cisco 3925/K9 router is?

23         MR. PARKHURST:  I'm instructing my client not

24   to answer that question pursuant to his Fifth

25   Amendment privilege.

Confidential - Pursuant to Protective Order

Page 33

1      MR. NELSON:  Q.  But neither you nor anyone

2  else at ADSI alerted the U.S. Navy that the switches

3  that you were selling to the Navy were potentially

4  counterfeit?

5      MR. PARKHURST:  I'm instructing my client not

6  to answer that question pursuant to his Fifth

7  Amendment privilege.

8      MR. NELSON:  Let's look at item three.  It's

9  on the next page, and these are ten transceivers, and

10 the manufacture part number is GLC-SX-MMD.  And your

11 company, ADSI, sold these for $250 each.

12    Q   These transceivers were counterfeit; weren't

13 they?

14      MR. PARKHURST:  I'm instructing my client not

15 to answer that question pursuant to his Fifth

16 Amendment privilege.

17      MR. NELSON:  Q.  Now, the counterfeit

18 transceivers were easy because you were actually

19 making them in Fremont; weren't you?

20      MR. PARKHURST:  I'm instructing my client not

21 to answer that question pursuant to his Fifth

22 Amendment privilege.

23      MR. NELSON:  Q.  You had employees in Fremont

24 who were -- who were printing labels and putting those

25 labels on the metal casings of things that then look

Confidential - Pursuant to Protective Order

Page 34

1   like Cisco transceivers; isn't that correct?

2         MR. PARKHURST:   I'm instructing my client not

3   to answer that question pursuant to his Fifth

4   Amendment privilege.

5         MR. NELSON:  And we went over, at your

6   deposition in September, all of the various seizures

7   by customs, but -- and I'm not going to do that again

8   with you.

9      Q   But do you recall seizure after seizure after

10  seizure of counterfeit transceivers being imported

11  from ADSI from China?

12        MR. PARKHURST:  I'm instructing my client not

13  to answer that question pursuant to his Fifth

14  Amendment privilege.

15        MR. NELSON:  Now, let's go to the very end of

16  this ADSI '217, and you'll see here that the accepter

17  is Kelly Duane with an e-mail out -- address of

18  duane.kelly@me.navy.mil.  Also, Vivian Wilson, and

19  Vivian Wilson also has @me.navy.mil e-mail address.

20     Q   There is no question in your mind that these

21  products that you were obtaining were being going to

22  the U.S. Navy; correct?

23        MR. PARKHURST:  I'm instructing my client not

24  to answer that question pursuant to his Fifth

25  Amendment privilege.

Confidential - Pursuant to Protective Order

Page 35

1       MR. NELSON:  Q.  And yet you nevertheless

2   ordered them from China?

3       MR. PARKHURST:  I'm instructing my client not

4   to answer that question pursuant to his Fifth

5   Amendment privilege.

6       MR. NELSON:  Q.  And you ignored the risk

7   that these Chinese products were counterfeit even

8   though there had been dozens of custom seizures of

9   products from your Chinese suppliers coming to your

10  company, ADSI?

11      MR. PARKHURST:  I'm instructing my client not

12  to answer that question pursuant to his Fifth

13  Amendment privilege.

14      MR. NELSON:  Q.  And your response to the

15  dozens of custom seizures was not to stop doing

16  business with these Chinese sources.  Rather, your

17  response was finding different locations in the

18  United States to receive the products so that customs

19  wouldn't stop them; isn't that true?

20      MR. PARKHURST:  I'm instructing my client not

21  to answer that question pursuant to his Fifth

22  Amendment privilege.

23      MR. NELSON:  Q.  And once some of the

24  products came under custom's review -- strike that.

25      Once products were not detained by customs,

Confidential - Pursuant to Protective Order

Page 107

1           CERTIFICATE OF REPORTER

2

3        I, ANDREA M. IGNACIO, hereby certify that the

4   witness in the foregoing deposition was by me duly

5   sworn to tell the truth, the whole truth, and nothing

6   but the truth in the within-entitled cause;

7        That said deposition was taken in shorthand

8   by me, a disinterested person, at the time and place

9   therein stated, and that the testimony of the said

10  witness was thereafter reduced to typewriting, by

11  computer, under my direction and supervision;

12       That before completion of the deposition,

13  review of the transcript [ ] was [x] was not

14  requested.  If requested, any changes made by the

15  deponent (and provided to the reporter) during the

16  period allowed are appended hereto.

17       I further certify that I am not of counsel or

18  attorney for either or any of the parties to the said

19  deposition, nor in any way interested in the event of

20  this cause, and that I am not related to any of the

21  parties thereto.

22  Dated:3-12-2020

23  _____

24   ANDREA M. IGNACIO, RPR, CRR, CCRR, CLR, CSR No. 9830

25

# Depo 7

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3                   OAKLAND DIVISION

 4  CISCO SYSTEMS, INC, a      )
    California corporation, et )
 5  al.,                       )
                               )  Case No.:
 6              Plaintiff,     )  4:18-CV-07602 YGR
                               )
 7          vs.                )
                               )
 8  ZAHID "DONNY" HASSAN       )
    SHEIKH, an individual, et  )
 9  al.,                       )
                               )
10              Defendant.     )
    _____  )
11  ADVANCED DIGITAL SOLUTIONS )
    INTERNATIONAL, INC., a     )
12  California corporation,    )
                               )
13       Third-Party Plaintiff,)
                               )
14  vs.                        )
                               )
15  RAHI SYSTEMS, INC., a      )
    California Corporation, et )
16  al.                        )
                               )
17    Third-Party Defendants.  )

18                   CONFIDENTIAL
19      VIDEO-RECORDED DEPOSITION OF KAMRAN SHEIKH
                  February 20, 2020
20             San Francisco, California

21

22

23  REPORTED BY:

24  Tammy Moon, CSR No. 13184, CRR, RPR

25  JOB NO. 176341
```

Confidential

```
 1                MR. NELSON:

 2    Q.         Is it true, Mr. Sheikh, that you knowingly

 3    were engaged in counterfeiting activities involving

 4    Cisco products?

 5                MR. PARKHURST:  I'm instructing my client

 6    not to answer that question pursuant to his Fifth

 7    Amendment privilege.

 8                MR. NELSON:

 9    Q.         Now I'm just going to alert you, Mr.

10    Sheikh, that the issue of knowledge of -- of

11    counterfeiting activities in the civil context is

12    important, because there are particular legal

13    consequences to knowingly trafficking counterfeit

14    products.  There's enhanced damages.  For example,

15    attorneys' fees become available pursuant to the

16    statute.

17                So one thing that Cisco is asking for in

18    this lawsuit is for all damages related to the

19    counterfeit trafficking that occurred at ADSI and

20    the companies related to ADSI.

21                At trial, we'll be arguing that -- that you

22    and others at the company knew that this counterfeit

23    activity was occurring.  Is -- is that true?  Did

24    you know it?

25                MR. PARKHURST:  I'm instructing my client
```

```
 1    not to answer that question pursuant to his Fifth

 2    Amendment privilege.

 3              MR. NELSON:

 4    Q.        I'm alerting you, sir, that -- that in

 5    federal court, that the assertion of the Fifth

 6    Amendment can be used at trial and to support the

 7    inference that the reason that you're asserting your

 8    Fifth Amendment privilege is because the answer is

 9    exactly what is being proposed; that, in fact, in

10    this situation, that you knew that ADSI was selling

11    counterfeit Cisco products that would then subject

12    you to the enhanced damages under the Lanham Act.

13              If you don't answer the question today,

14    then -- then your failure to answer the question can

15    be used in the civil case.  With that understanding,

16    are you willing to answer that question?

17              MR. PARKHURST:  I'm instructing my client

18    not to answer that question pursuant to his Fifth

19    Amendment privilege.

20              MR. NELSON:

21    Q.        Is there any evidence that you'd like to

22    provide to explain that you did not know that the

23    companies that you were associated with were

24    trafficking in counterfeit Cisco products?

25              MR. PARKHURST:  I'm instructing my client
```

```
 1   Amendment privilege.

 2              MR. NELSON:

 3   Q.        Have you been to the ADSI facility in

 4   Pakistan?

 5              MR. PARKHURST:  I'm instructing my client

 6   not to answer that question pursuant to his Fifth

 7   Amendment privilege.

 8              MR. NELSON:

 9   Q.        Do you know a company called Pure Future

10   Tech?

11              MR. PARKHURST:  I'm instructing my client

12   not to answer that question pursuant to his Fifth

13   Amendment privilege.

14              MR. NELSON:

15   Q.        Were you responsible for establishing with

16   the California state -- Secretary of State a company

17   called Pure Future Tech LLC?

18              MR. PARKHURST:  I'm instructing my client

19   not to answer that question pursuant to his Fifth

20   Amendment privilege.

21              MR. NELSON:

22   Q.        Your father testified that -- that he asked

23   you to -- to set up this company; Pure Future Tech

24   LLC.  Is that true?

25              MR. PARKHURST:  I'm instructing my client
```

Confidential

 1    not to answer that question pursuant to his Fifth

 2    Amendment privilege.

 3            MR. NELSON:

 4    Q.      Do you know the e-mail address

 5    CS@purefuturetechnology.com?

 6            MR. PARKHURST:  I'm instructing my client

 7    not to answer that question pursuant to his Fifth

 8    Amendment privilege.

 9            MR. NELSON:

10    Q.      It is true that you have access to that

11    particular e-mail alias to -- in order to look at

12    those e-mails, correct?

13            MR. PARKHURST:  I'm instructing my client

14    not to answer that question pursuant to his Fifth

15    Amendment privilege.

16            MR. NELSON:

17    Q.      Do you know a woman by the name of Theresa

18    Lau?

19            MR. PARKHURST:  I'm instructing my client

20    not to answer that question pursuant to his Fifth

21    Amendment privilege.

22            MR. NELSON:

23    Q.      Did you used to work with Theresa Lau?

24            MR. PARKHURST:  I'm instructing my client

25    not to answer that question pursuant to his Fifth

Confidential

Page 39

1    filed with the California Secretary of State?

2              MR. PARKHURST:  I'm instructing my client

3    not to answer that question pursuant to his Fifth

4    Amendment privilege.

5              MR. NELSON:

6    Q.         I'll draw your attention -- now the address

7    has changed for your address at service of process.

8    It's now listed at 4255 Business Center Drive in

9    Fremont.  Do you recognize that address?

10             MR. PARKHURST:  I'm instructing my client

11   not to answer that question pursuant to his Fifth

12   Amendment privilege.

13             MR. NELSON:

14   Q.         That's the address for ADSI, isn't it?

15             MR. PARKHURST:  I'm instructing my client

16   not to answer that question pursuant to his Fifth

17   Amendment privilege.

18             MR. NELSON:

19   Q.         There is a building located at 4255

20   Business Center Drive; is there not?

21             MR. PARKHURST:  I'm instructing my client

22   not to answer that question pursuant to his Fifth

23   Amendment privilege.

24             MR. NELSON:

25   Q.         The building located at 4255 Business

Confidential

1    Center Drive is a building that you would go to work

2    at day after day after day up until December of

3    2018, correct?

4                MR. PARKHURST:  I'm instructing my client

5    not to answer that question pursuant to his Fifth

6    Amendment privilege.

7                MR. NELSON:

8    Q.        You were very familiar with the building at

9    4255 Business Center Drive, weren't you?

10               MR. PARKHURST:  I'm instructing my client

11   not to answer that question pursuant to his Fifth

12   Amendment privilege.

13               MR. NELSON:

14   Q.        Was only legitimate business transpiring at

15   4255 Business Center Drive?

16               MR. PARKHURST:  I'm instructing my client

17   not to answer that question pursuant to his Fifth

18   Amendment privilege.

19               MR. NELSON:

20   Q.        Is it a fact that -- that the business

21   being conducted at 4255 Business Center Drive was

22   trafficking in counterfeit products in violation of

23   the Lanham Act?

24               MR. PARKHURST:  I'm instructing my client

25   not to answer that question pursuant to his Fifth

1    Amendment privilege.

2            MR. NELSON:

3    Q.        Were there any other improper activities

4    occurring at 4255 Business Center Drive?

5            MR. PARKHURST:  I'm instructing my client

6    not to answer that question pursuant to his Fifth

7    Amendment privilege.

8            MR. NELSON:

9    Q.        In addition to any unlawful activities,

10   were any lawful activities being done at 4255

11   Business Center Drive?

12           MR. PARKHURST:  I'm instructing my client

13   not to answer that question pursuant to his fifth --

14   to his Fifth Amendment privilege.

15           MR. NELSON:

16   Q.        And I'm sorry.  I may have asked this, but

17   are you familiar with a building located at 4255

18   Business Center Drive.

19           Regardless of what was going on in that

20   building, are you familiar that there was a building

21   -- is a building in Fremont at 4255 Business Center

22   Drive?

23           MR. PARKHURST:  I'm instructing my client

24   not to answer that question pursuant to his Fifth

25   Amendment privilege.

Page 45

1    not to answer that question pursuant to his Fifth

2    Amendment privilege.

3              MR. NELSON:

4    Q.        Do the Giants play baseball in San

5    Francisco?

6    A.        Yes.

7              MR. PARKHURST:  I'm going to object.  This

8    line of questioning is irrelevant, harassing,

9    pointless.

10             MR. NELSON:

11   Q.        Did you go to college at Northern Arizona

12   University?

13             MR. PARKHURST:  Objection.  Asked and

14   answered.

15             MR. NELSON:

16   Q.        You can answer.

17   A.        Yes.

18   Q.        Have you ever heard of a company called

19   ADSI?

20             MR. PARKHURST:  I'm instructing my client

21   not to answer that question pursuant to his Fifth

22   Amendment privilege.

23             MR. NELSON:

24   Q.        All right.  Let me show you Exhibit 5.

25   This was also -- thank you -- at your mother's

Confidential

Page 46

```
 1    deposition.

 2             (Document handed.)

 3    Q.       I'll identify it as a document filed with

 4    the California Secretary of State that -- that's

 5    date stamped December 5, 2018.

 6             And here I'll draw your attention again to

 7    paragraph nine.  Appears on the bottom of the

 8    document, dated February 5, 2018, with your name

 9    typed there.  That -- that is your name, correct?

10    A.       Yes.

11    Q.       Okay.  And the title says "Manager."  Do

12    you see that?

13    A.       Yes.

14    Q.       Were you the manager of Pure Future Tech as

15    of December 5, 2018?

16             MR. PARKHURST:  I'm instructing my client

17    not to answer that question pursuant to his Fifth

18    Amendment privilege.

19             MR. NELSON:

20    Q.       This was a document that was filed with the

21    California Secretary of State's office asserting

22    that it is true and correct that you were the

23    manager of Pure Future Tech.  Was that false?

24             MR. PARKHURST:  I'm instructing my client

25    not to answer that question pursuant to his Fifth
```

 1    Amendment privilege.

 2         MR. NELSON:

 3    Q.       Handing you what was marked as Exhibit 7 to

 4    your mother's deposition.  And I'll represent it to

 5    be a document filed with the Secretary of State's

 6    office, California, on or about November 22, 2017.

 7             This one -- look under the -- Box 1.  It

 8    says "K&F Associates."  Do you see that?

 9    A.       Yes.

10    Q.       It has a business address for K&F

11    Associates at 6172 Corte Padre in Pleasanton.

12    That's a home that you own, correct?

13    A.       Yes.

14    Q.       And it shows the manager as Zahid Sheikh.

15    That's your father, correct?

16    A.       Yes.

17    Q.       And it shows his address at 6172 Corte

18    Padre, Pleasanton.  Did your father live at -- in

19    the Pleasanton address in November of 2017?

20             MR. PARKHURST:  I'm instructing my client

21    not to answer that question pursuant to his Fifth

22    Amendment privilege.

23             MR. NELSON:

24    Q.       Now you previously testified that you're

25    renting that house in Pleasanton, and you receive

Confidential

```
 1   rental payments.  Are you renting it to your father?

 2            MR. PARKHURST:  I'm instructing my client

 3   not to answer that question pursuant to his Fifth

 4   Amendment privilege.

 5            MR. NELSON:

 6   Q.       Have you met the people that are living in

 7   your house in Pleasanton?

 8            MR. PARKHURST:  I'm instructing my client

 9   not to answer that question pursuant to his Fifth

10   Amendment privilege.

11            MR. NELSON:

12   Q.       Do you know the people who are living in

13   your house in Pleasanton?

14            MR. PARKHURST:  I'm instructing my client

15   not to answer that question pursuant to his Fifth

16   Amendment privilege.

17            MR. NELSON:  Counsel, you have a good faith

18   basis to assert -- assert and -- and instruct him

19   about the people that are living in his house?

20            MR. PARKHURST:  We do, counsel.

21            MR. NELSON:

22   Q.       Are they doing anything wrong in your house

23   in Pleasanton?

24            MR. PARKHURST:  I'm instructing my client

25   not to answer that question pursuant to his Fifth
```

1    Amendment privilege.

2              MR. NELSON:

3    Q.        Go down to paragraph nine that was filed

4    with the Secretary of State's office on November 22,

5    2017.  This shows that date, the name of the person

6    completing the form, has your name typed in there.

7    That's your name, correct?

8    A.        Yes.

9    Q.        And the title it says "Manager."  That's

10   what it says, doesn't it?

11   A.        Yes.

12   Q.        And this was allegedly true and correct

13   according to what paragraph nine says, correct?

14             MR. PARKHURST:  I'm instructing my client

15   not to answer that question pursuant to his Fifth

16   Amendment privilege.

17             MR. NELSON:

18   Q.        Well, you -- you can read with me,

19   paragraph nine says "The information contained

20   herein including any attachments is true and

21   correct."  Can -- can you read that?

22   A.        Yes.

23   Q.        Okay.  Was this true and correct?

24             MR. PARKHURST:  I'm instructing my client

25   not to answer that question pursuant to his Fifth

Confidential

1    Amendment privilege.

2               MR. NELSON:

3    Q.        Let's actually look to the second page of

4    this document, which has the additional managers.

5    You're the second one here, Kamran Sheikh, out of

6    your Pleasanton address at 6172 Corte Padre,

7    correct?

8               MR. PARKHURST:  I'm instructing my client

9    not to answer that question pursuant to his Fifth

10   Amendment privilege.

11              MR. NELSON:

12   Q.        Well, actually, I'm just -- I'm just

13   reading this.  This -- is that -- is that your name

14   under the "First name: Kamran"?  Is that your name?

15   A.        Yes.

16   Q.        And the second where it says "Last name:

17   Sheikh," that's your -- that's your last name,

18   correct?

19   A.        Yes.

20   Q.        Okay.  The address listed here is -- is the

21   Corte Padre, Pleasanton, address, which is the house

22   you own, correct?

23   A.        Yes.

24   Q.        Okay.  Now for Roya, it provides her last

25   name as Sheikh, but she actually also has her -- her

Confidential

Page 54

1    not to answer that question pursuant to his Fifth

2    Amendment privilege.

3           MR. NELSON:

4    Q.       Were you involved in making purchases of

5    Cisco products from China on behalf of Pure Future

6    Technology LLC?

7           MR. PARKHURST:  I'm instructing my client

8    not to answer that question pursuant to his Fifth

9    Amendment privilege.

10          MR. NELSON:

11   Q.       Did you arrange for products to be

12   delivered to Pure Future Technology at addresses

13   other than in Fremont, California?

14          MR. PARKHURST:  I'm instructing my client

15   not to answer that question pursuant to his Fifth

16   Amendment privilege.

17          MR. NELSON:

18   Q.       What is the company Pretty Technology?

19          MR. PARKHURST:  I'm instructing my client

20   not to answer that question pursuant to his Fifth

21   Amendment privilege.

22          MR. NELSON:

23   Q.       What is the company HongKong Sellsi?

24   A.       I'm instructing my client not to answer

25   that question pursuant to his Fifth Amendment

1    privilege.

2            MR. NELSON:

3    Q.       You know that both of those companies sell

4    counterfeit Cisco products, right?

5            MR. PARKHURST:  I'm instructing my client

6    not to answer that question pursuant to his Fifth

7    Amendment privilege.

8            MR. NELSON:

9    Q.       Did you know that they were counterfeit

10   before Pure Future Technology bought them?

11           MR. PARKHURST:  I'm instructing my client

12   not to answer that question pursuant to his Fifth

13   Amendment privilege.

14           MR. NELSON:

15   Q.       All right.  I'll ask the question:  Isn't

16   it a fact you did know that they were counterfeit

17   before you bought them?

18           MR. PARKHURST:  I'm instructing my client

19   not to answer that question pursuant to his Fifth

20   Amendment privilege.

21           MR. NELSON:

22   Q.       This wasn't an innocent mistake, was it?

23           MR. PARKHURST:  I'm instructing my client

24   not to answer that question pursuant to his Fifth

25   Amendment privilege.

Confidential

Page 58

1    products?

2            MR. PARKHURST:   I'm instructing my client

3    not to answer that question pursuant to his Fifth

4    Amendment privilege.

5            MR. NELSON:

6    Q.        You arranged for pick-up locations of Cisco

7    products outside of Fremont, California, correct?

8            MR. PARKHURST:   I'm instructing my client

9    not to answer that question pursuant to his Fifth

10   Amendment privilege.

11           MR. NELSON:

12   Q.        And the reason you did that was because

13   products that were coming to Fremont were being

14   seized by customs as being counterfeit?

15           MR. PARKHURST:   I'm instructing my client

16   not to answer that question pursuant to his Fifth

17   Amendment privilege.

18           MR. NELSON:

19   Q.        And you wanted to hide these sales from

20   customs, didn't you?

21           MR. PARKHURST:   I'm instructing my client

22   not to answer that question pursuant to his Fifth

23   Amendment privilege.

24           MR. NELSON:

25   Q.        So what you did was you arranged for a UPS

Page 59

1    store in Reno to receive products from China,

2    correct?

3              MR. PARKHURST:  I'm instructing my client

4    not to answer that question pursuant to his Fifth

5    Amendment privilege.

6              MR. NELSON:

7    Q.        And what happened is these products went to

8    Reno and then the word was then given to your people

9    in Fremont that products were waiting to be picked

10   up, correct?

11             MR. PARKHURST:  I'm instructing my client

12   not to answer that question pursuant to his Fifth

13   Amendment privilege.

14             MR. NELSON:

15   Q.        And then you would instruct Jessica Little

16   or some other employee to contact the Reno UPS and

17   have them send those products to Fremont?

18             MR. PARKHURST:  I'm instructing my client

19   not to answer that question pursuant to his Fifth

20   Amendment privilege.

21             MR. NELSON:

22   Q.        And you would arrange to pay for the Reno

23   UPS office to send those products to Fremont?

24             MR. PARKHURST:  I'm instructing my client

25   not to answer that question pursuant to his Fifth

1    Amendment privilege.

2              MR. NELSON:

3    Q.        Now this doesn't make any sense

4    financially, does it?

5              MR. PARKHURST:  I'm instructing my client

6    not to answer that question pursuant to his Fifth

7    Amendment privilege.

8              MR. NELSON:

9    Q.        Whatever amount you paid to -- to bring

10   these products in from China, they could have as

11   easily been delivered directly to Fremont as opposed

12   to going to Reno, correct?

13             MR. PARKHURST:  I'm instructing my client

14   not to answer that question pursuant to his Fifth

15   Amendment privilege.

16             MR. NELSON:

17   Q.        So when you paid the UPS store in -- in

18   Reno to reship these products, that's money you

19   could have saved if you had merely arranged for them

20   to be shipped directly from China to Fremont,

21   correct?

22             MR. PARKHURST:  I'm instructing my client

23   not to answer that question pursuant to his Fifth

24   Amendment privilege.

25             ///

Confidential

Page 61

1              MR. NELSON:

2   Q.        And the reason you paid that money was

3   because you wanted to be able to receive these

4   products so that Cisco and customs wouldn't know

5   that these products were coming to ADSI.  Isn't that

6   correct?

7              MR. PARKHURST:  I'm instructing my client

8   not to answer that question pursuant to his Fifth

9   Amendment privilege.

10             MR. NELSON:

11  Q.        Now sometimes people say that they have

12  products delivered elsewhere because it may make it

13  -- make it easier to receive these products for

14  customs.  Was that the reason?

15             MR. PARKHURST:  I'm instructing my client

16  not to answer that question pursuant to his Fifth

17  Amendment privilege.

18             MR. NELSON:

19  Q.        There may be other reasons why you -- you

20  had these products delivered in Reno rather than in

21  Fremont.  Can you tell us today what those other

22  reasons were?

23             MR. PARKHURST:  I'm instructing my client

24  not to answer that question pursuant to his Fifth

25  Amendment privilege.

Confidential

```
 1              MR. NELSON:

 2   Q.       Now there could be some answers which may

 3   implicate your Fifth Amendment, and you may want to

 4   kind of hold those back.  There may be other answers

 5   which are innocent, in which you would say there are

 6   five different reasons.  I'm going to tell you about

 7   three of them.

 8              Will you tell me about any reason that you

 9   had to have products delivered to Reno that were

10   innocent?

11              MR. PARKHURST:  I'm instructing my client

12   not to answer that question pursuant to his Fifth

13   Amendment privilege.

14              MR. NELSON:

15   Q.       And that's because there were no other

16   innocent explanations, were there?

17              MR. PARKHURST:  I'm instructing my client

18   not to answer that question pursuant to his Fifth

19   Amendment privilege.

20              MR. NELSON:

21   Q.       But that didn't work, did it, because

22   products were seized by customs going to Reno?

23              MR. PARKHURST:  Is that a question?

24              MR. NELSON:  That is a question.

25              MR. PARKHURST:  I'm instructing my client
```

1   Q.        Yeah.  And it was after customs was seizing

2   products going to Keystone Avenue in Reno that you

3   arranged with Theresa Lau to scout a -- a different

4   alternative location in Portland, Oregon, correct?

5             MR. PARKHURST:  I'm instructing my client

6   not to answer that question pursuant to his Fifth

7   Amendment privilege.

8             MR. NELSON:

9   Q.        Did you tell Theresa Lau to find a location

10  -- a UPS location in Portland, Oregon?

11            MR. PARKHURST:  I'm instructing my client

12  not to answer that question pursuant to his Fifth

13  Amendment privilege.

14            MR. NELSON:

15  Q.        Did you receive the seizure notices?

16            MR. PARKHURST:  I'm instructing my client

17  not to answer that question pursuant to his Fifth

18  Amendment privilege.

19            MR. NELSON:

20  Q.        Did you instruct Ms. Lau to bring you the

21  seizure notices?

22            MR. PARKHURST:  I'm instructing my client

23  not to answer that question pursuant to his Fifth

24  Amendment privilege.

25            ///

Confidential

1  Amendment privilege.

2            MR. NELSON:

3  Q.       I used the word "hinky."  I probably

4  shouldn't have.  Would you think there was something

5  wrong with selling a product and having the customer

6  put the label on it?

7            MR. PARKHURST:  I'm instructing my client

8  not to answer that question pursuant to his Fifth

9  Amendment privilege.

10           MR. NELSON:

11 Q.       So you're not going to contend in this case

12 that -- that you did not understand that buying

13 labels separately and putting them on products

14 wasn't wrong?

15           MR. PARKHURST:  I'm instructing my client

16 not to answer that question pursuant to his Fifth

17 Amendment privilege.

18           MR. NELSON:

19 Q.       You knew that that's what was going on at

20 ADSI's facility in Fremont, didn't you?

21           MR. PARKHURST:  I'm instructing my client

22 not to answer that question pursuant to his Fifth

23 Amendment privilege.

24           MR. NELSON:

25 Q.       You knew that Imran Hussein was printing

1    labels in Fremont and putting them on products,

2    didn't you?

3              MR. PARKHURST:  I'm instructing my client

4    not to answer that question pursuant to his Fifth

5    Amendment privilege.

6              MR. NELSON:

7    Q.        You knew that Imran Hussein was getting

8    labels printed in China as well and then having --

9    putting those printed labels on products in Fremont,

10   didn't you?

11             MR. PARKHURST:  I'm instructing my client

12   not to answer that question pursuant to his Fifth

13   Amendment privilege.

14             MR. NELSON:

15   Q.        And at no time are you going to claim that

16   -- that you believe that that was okay?

17             MR. PARKHURST:  I'm instructing my client

18   not to answer that question pursuant to his Fifth

19   Amendment privilege.

20             MR. NELSON:  All right.  Why don't we take

21   a ten-minute break?

22             THE VIDEOGRAPHER:  This marks the end of

23   media file labeled number two.  Off the record at

24   10:25 a.m.

25             (Break taken.)

1   not to answer that question pursuant to his Fifth

2   Amendment privilege.

3          MR. NELSON:

4   Q.      Okay.  Let's go to the next page, page

5   five.  Here, again, are some signatures on at least

6   three different parts of this page.

7          One about halfway down the page; and then

8   two signatures side by side, about three quarters of

9   the way.

10         Those are Jessica Little's signatures,

11  correct?

12         MR. PARKHURST:  I'm instructing my client

13  not to answer that question pursuant to his Fifth

14  Amendment privilege.

15         MR. NELSON:

16  Q.      Let's go back to page one of Exhibit 21.

17  Jessica wrote to -- apparently to the mailbox store.

18  The address is store0949@Yahoo.com.  And she says:

19         "Hello there.  Attached is my filled out

20  mailbox agreement.  I'm going to use my boss's card

21  to pay.  Please let me know" -- I'm sorry -- "please

22  let me now what the next step is.  Thank you,

23  Jessica."

24         Were you Jessica Little's boss back in May

25  of 2016?

```
 1              MR. PARKHURST:  I'm instructing my client
 2    not to answer that question pursuant to his Fifth
 3    Amendment privilege.
 4              MR. NELSON:
 5    Q.        Did you authorize Jessica Little to use
 6    your credit card to pay for this UPS box?
 7              MR. PARKHURST:  I'm instructing my client
 8    not to answer that question pursuant to his Fifth
 9    Amendment privilege.
10              MR. NELSON:
11    Q.        When you authorized Jessica Little to use
12    your credit card to open this UPS box, you did it
13    because you knew that she was going to then import
14    counterfeit Cisco products into the United States at
15    a location other than Fremont, California, right?
16              MR. PARKHURST:  I'm instructing my client
17    not to answer that question pursuant to his Fifth
18    Amendment privilege.
19              MR. NELSON:
20    Q.        Looking back at Exhibit 21, did you ask
21    Jessica Little to contact the Reno UPS store in or
22    about January of 2018?
23              MR. PARKHURST:  I'm instructing my client
24    not to answer that question pursuant to his Fifth
25    Amendment privilege.
```

Confidential

1   A.        No.

2   Q.        There's a -- there's a civil case going on

3   involving ADSI and the -- the employees that left.

4   Are -- are you -- are you a plaintiff in that case?

5   A.        What's that -- plaintiff.

6           MR. PARKHURST:  Counsel, no, he's not.

7           MR. NELSON:  Okay.  Okay.

8   Q.        But so at the end of 2017, various

9   employees left ADSI, including Nabia Uddin.  Isn't

10  that correct?

11          MR. PARKHURST:  I'm instructing my client

12  not to answer that question pursuant to his Fifth

13  Amendment privilege.

14          MR. NELSON:

15  Q.        Did the fact that those employees left

16  cause you to ask Jessica Little to get information

17  about the Reno UPS box?

18          MR. PARKHURST:  I'm instructing my client

19  not to answer that question pursuant to his Fifth

20  Amendment privilege.

21          MR. NELSON:

22  Q.        You asked Theresa Lau to set up a UPS box

23  in Portland, Oregon, correct?

24          MR. PARKHURST:  I'm instructing my client

25  not to answer that question pursuant to his Fifth

 1    Amendment privilege.

 2            MR. NELSON:

 3    Q.        Are you aware that Theresa Lau was deposed

 4    in this case?

 5            MR. PARKHURST:  I'm instructing my client

 6    not to answer that question pursuant to his Fifth

 7    Amendment privilege.

 8            MR. NELSON:

 9    Q.        Ms. Lau talked to you before her

10    deposition, didn't she?

11            MR. PARKHURST:  I'm instructing my client

12    not to answer that question pursuant to his Fifth

13    Amendment privilege.

14            MR. NELSON:

15    Q.        Did you talk to Ms. Lau after her

16    deposition?

17            MR. PARKHURST:  I'm instructing my client

18    not to answer that question pursuant to his Fifth

19    Amendment privilege.

20            MR. NELSON:

21    Q.        I'm handing you what is marked as

22    Exhibit 28 and Ms. Lau's deposition.  On the first

23    page of this, it shows an address for Pure Future

24    Tech at 6172 Corte Padre, Pleasanton.  That's the

25    home that you -- that you own, correct?

Confidential

Page 86

1    A.        Yes.

2    Q.        There's a phone number here of

3    (408)610-3400.  Do you know whose phone number that

4    is?

5            MR. PARKHURST:  I'm instructing my client

6    not to answer that question pursuant to his Fifth

7    Amendment privilege.

8            MR. NELSON:

9    Q.        Is that one of your phone numbers?

10           MR. PARKHURST:  I'm instructing my client

11   not to answer that question pursuant to his Fifth

12   Amendment privilege.

13           MR. NELSON:

14   Q.        Go to page four of this document, the last

15   page.  Under 18, paragraph 18, there's something

16   that says "optional automatic renewal."  It's

17   authorizing UPS store to charge, quote, "my credit

18   card," end quote, for rental charges.

19                And then the name on card that's typed in

20   here says "Kamran Sheikh," your name, correct?

21                MR. PARKHURST:  You're asking if he sees --

22                MR. NELSON:

23   Q.        That's your name?

24   A.        Yes.

25   Q.        And you see that what is -- what is checked

1    is`-- is Amex.  Do you see the check by Amex?

2    A.      Yes.

3    Q.      Do you know Amex to mean American Express?

4    A.      Yes.

5    Q.      There is a card number here.  Is that your

6    credit card?

7            MR. PARKHURST:  I'm instructing my client

8    not to answer that question based on his Fifth

9    Amendment privilege.

10           MR. NELSON:

11   Q.      Do you have your wallet?

12   A.      Yes.

13   Q.      Now?  Do you have an American Express

14   credit card in your wallet right now?

15           MR. PARKHURST:  I'm instructing my client

16   not to answer that question pursuant to his Fifth

17   Amendment privilege.

18           MR. NELSON:

19   Q.      Do you -- as you sit here right now, do you

20   have an American Express card with you that ends in

21   1024?

22           MR. PARKHURST:  I'm instructing my client

23   not to answer that question pursuant to his Fifth

24   Amendment privilege.

25           ///

Confidential

1          MR. NELSON:

2    Q.          Did you use that -- that credit card in

3    order to authorize the rental of this UPS box?

4          MR. PARKHURST:   I'm instructing my client

5    not to answer that question pursuant to his Fifth

6    Amendment privilege.

7          MR. NELSON:

8    Q.          You've used that credit card in order to

9    authorize rentals of other UPS boxes in order to

10   avoid customs, correct?

11          MR. PARKHURST:   I'm instructing my client

12   not to answer that question pursuant to his Fifth

13   Amendment privilege.

14          MR. NELSON:

15   Q.          You've used that credit card in order to

16   pay for receiving locations in cities outside of

17   Fremont, California, correct?

18          MR. PARKHURST:   I'm instructing my client

19   not to answer that question pursuant to his Fifth

20   Amendment privilege.

21          MR. NELSON:

22   Q.          And what we know about are the locations in

23   Reno and in Portland.  Are there other locations

24   that you've arranged and paid for with your credit

25   card?

1          MR. PARKHURST:  I'm instructing my client

2   not to answer that question pursuant to his Fifth

3   Amendment privilege.

4          MR. NELSON:

5   Q.        And the fact is that you have arranged for

6   other locations in addition to Reno and -- and

7   Portland, correct?

8          MR. PARKHURST:  I'm instructing my client

9   not to answer that question pursuant to his Fifth

10  Amendment privilege.

11         MR. NELSON:

12  Q.        Did you arrange for a -- a location in

13  Bakersfield, California?

14         MR. PARKHURST:  I'm instructing my client

15  not to answer that question pursuant to his Fifth

16  Amendment privilege.

17         MR. NELSON:

18  Q.        If we had your credit card details, we

19  would see all the different locations that you have

20  rented in order to avoid customs, wouldn't we?

21         MR. PARKHURST:  I'm instructing my client

22  not to answer that question pursuant to his Fifth

23  Amendment privilege.

24         MR. NELSON:

25  Q.        Are you aware that Cisco has subpoenaed

Confidential

1    not to answer that question pursuant to his Fifth

2    Amendment privilege.

3            MR. NELSON:

4    Q.        Let's go back to Ms. Lau.  Starting at

5    page 112, line 25:

6            "Who instructed the UPS in Portland,

7    Oregon, to ship it to the Fremont location?

8            "Answer:  I did.

9            "Question:  And who told you to instruct

10   the UPS store to do that?

11           "Answer."

12           You know what she said, don't you?

13           "Kamran."

14           MR. PARKHURST:  Is that a question,

15   counsel?

16           MR. NELSON:  It was, but it was -- I'll

17   withdraw the question.

18   Q.        And let me just -- let me just reread that.

19           "And who told you to instruct the UPS to do

20   that?

21           "Answer:  Kamran."

22           Ms. Lau testified truthfully that you're

23   the one that told her to bring the products down

24   from Portland down to -- to Fremont, true?

25           MR. PARKHURST:  I'm instructing my client

 1    not to answer that question pursuant to his Fifth

 2    Amendment privilege.

 3            MR. NELSON:

 4    Q.       All right.  The custom seizures that we

 5    looked at previously were ones that went to Reno and

 6    to Portland.  Actually, did I show you the one that

 7    went to Portland?  Maybe I did not.

 8            (Brief pause.)

 9    Q.       Pardon me, one second.

10            (Brief pause.)

11            I did not.  Handing you what was marked as

12    Exhibit 32, and this is -- at Theresa Lau's

13    deposition.

14            And I am reading from this.  It's a little

15    faint, but the date of importation of August -- I'm

16    sorry, October 29, 2018, was "five Cisco network

17    switches going to ADSII at 1819 SW Fifth Avenue,

18    Suite 302, Portland, Oregon."

19            Did I read that correctly?

20    A.       Yes.

21    Q.       Have you seen this seizure notice before?

22            MR. PARKHURST:  I'm instructing my client

23    not to answer that question pursuant to his Fifth

24    Amendment privilege.

25            ///

Confidential

1                MR. NELSON:

2    Q.        Have you seen the seizure notices we looked

3    at earlier from Reno before?

4                MR. PARKHURST:  I'm instructing my client

5    not to answer that question pursuant to his Fifth

6    Amendment privilege.

7                MR. NELSON:

8    Q.        Isn't it a fact that Theresa Lau, when she

9    received these, gave them to you?

10               MR. PARKHURST:  I'm instructing my client

11   not to answer that question pursuant to his Fifth

12   Amendment privilege.

13               MR. NELSON:

14   Q.        All right.  Let's -- let's look at her

15   testimony.  Page 130, line five:

16               "Okay.  Are you aware that customs sent

17   ADSI a seizure notice regarding seized goods?

18               "Yes.

19               "Question:  How did you become aware of

20   these notices?

21               "Answer:  I believe they were one of the

22   customs envelopes that they sent.  When I first saw

23   them, I opened one or two to see what they were and

24   one of them was like a seizure.  I would pass them

25   on to Kamran."

Confidential

1            MR. NELSON:

2    Q.        Now when you got these notices, you might

3    have been confused about why customs was seizing

4    these products as counterfeit.  Were you confused?

5            MR. PARKHURST:  I'm instructing my client

6    not to answer that question pursuant to his Fifth

7    Amendment privilege.

8            MR. NELSON:

9    Q.        You might have also been upset that customs

10   was seizing these products because they weren't

11   counterfeit, and then you would have contested with

12   customs the seizure.  Did you ever contest the

13   seizure?

14           MR. PARKHURST:  I'm instructing my client

15   not to answer that question pursuant to his Fifth

16   Amendment privilege.

17           MR. NELSON:

18   Q.        The fact is, sir, you never contested the

19   seizure, did you?

20           MR. PARKHURST:  I'm instructing my client

21   not to answer that question pursuant to his Fifth

22   Amendment privilege.

23           MR. NELSON:

24   Q.        Because you knew they were counterfeit.

25           MR. PARKHURST:  I'm instructing my client

Confidential

```
 1   not to -- is that a question counsel?

 2             MR. NELSON:

 3   Q.        Because you knew they were counterfeit,

 4   question mark?

 5             MR. PARKHURST:  I'm instructing my client

 6   not to answer that question pursuant to his Fifth

 7   Amendment privilege.

 8             MR. NELSON:

 9   Q.        Or was there any other reason you didn't --

10   you didn't challenge any of the seizures?

11             MR. PARKHURST:  I'm instructing my client

12   not to answer that question pursuant to his Fifth

13   Amendment privilege.

14             MR. NELSON:

15   Q.        At no time in this litigation are you ever

16   going to contest -- contend that you had other

17   reasons for not contesting these seizures, correct?

18             MR. PARKHURST:  I'm instructing my client

19   not to answer that question pursuant to his Fifth

20   Amendment privilege.

21             MR. NELSON:

22   Q.        If you had any other reasons, I want to

23   hear it so we can talk about it.  Are there any

24   other reasons?

25             MR. PARKHURST:  I'm instructing my client
```

```
1   not to answer that question pursuant to his Fifth

2   Amendment privilege.

3           MR. NELSON:

4   Q.      All right.  Let's go back to Ms. Lau.  She

5   claims that she talked to you about these.  Let me

6   read from page 133, line five:

7               "Did you read it enough to determine that

8   it was a seizure notice?

9               "Answer:  Well, yeah.  Yeah.  Just enough

10  to do that.

11              "Question:  And what did you do when you

12  realized it was a seizure notice from customs?

13              "Answer:  I brought it to Kamran.

14              "Question:  Did Kamran say anything when

15  you brought these notices to him?

16              "Answer:  Only to continue bringing him

17  these notices."

18              Was Ms. Lau testifying truthfully when she

19  testified about this?

20              MR. PARKHURST:  I'm instructing my client

21  not to answer that question pursuant to his Fifth

22  Amendment privilege.

23              MR. NELSON:

24  Q.      There has been dozens of seizure notices

25  directed to Pure Future Tech, to ADSI, to Macintosh
```

1  Networks, Uddin Networks, all these various

2  companies associated with ADSI.  Did you see all of

3  them?

4          MR. PARKHURST:  I'm instructing my client

5  not to answer that question pursuant to his Fifth

6  Amendment privilege.

7          MR. NELSON:

8  Q.       As a matter of fact, you did, because you

9  told your people to get them to you right away,

10  didn't you?

11          MR. PARKHURST:  I'm instructing my client

12  not to answer that question pursuant to his Fifth

13  Amendment privilege.

14          MR. NELSON:

15  Q.       You told your staff to give the notices to

16  you personally, didn't you?

17          MR. PARKHURST:  I'm instructing my client

18  not to answer that question pursuant to his Fifth

19  Amendment privilege.

20          MR. NELSON:

21  Q.       And you didn't stop ordering products from

22  China, even though they were being seized as

23  counterfeit, did you?

24          MR. PARKHURST:  I'm instructing my client

25  not to answer that question pursuant to his Fifth

1    Amendment privilege.

2              MR. NELSON:

3    Q.        What did you do?

4              MR. PARKHURST:  I'm instructing my client

5    not to answer that question pursuant to his Fifth

6    Amendment privilege.

7              MR. NELSON:

8    Q.        In fact, what you did was you found new

9    places to -- to import the products, hoping that CBP

10   customs wouldn't detect it.  Isn't that right?

11             MR. PARKHURST:  I'm instructing my client

12   not to answer that question pursuant to his Fifth

13   Amendment privilege.

14             MR. NELSON:

15   Q.        That's why you got the PO box -- the UPS

16   box in Portland, correct?

17             MR. PARKHURST:  I'm instructing my client

18   not to answer that question pursuant to his Fifth

19   Amendment privilege.

20             MR. NELSON:

21   Q.        If you thought these products were genuine,

22   you would have challenged the seizure, wouldn't you?

23             MR. PARKHURST:  I'm instructing my client

24   not to answer that question pursuant to his Fifth

25   Amendment privilege.

Confidential

```
 1              MR. NELSON:

 2   Q.         But you never did, did you?

 3              MR. PARKHURST:  I'm instructing my client

 4   not to answer that question pursuant to his Fifth

 5   Amendment privilege.

 6              MR. NELSON:

 7   Q.         If you thought these were genuine, you

 8   could have contacted Cisco to ask why they were

 9   calling these counterfeit, couldn't you have?

10              MR. PARKHURST:  I'm instructing my client

11   not to answer that question pursuant to his Fifth

12   Amendment privilege.

13              MR. NELSON:

14   Q.         But you never did, did you?

15              MR. PARKHURST:  I'm instructing my client

16   not to answer that question pursuant to his Fifth

17   Amendment privilege.

18              MR. NELSON:

19   Q.         You could have stopped buying from these

20   sources in China, knowing what they were doing was

21   selling you counterfeit, couldn't you have?

22              MR. PARKHURST:  I'm instructing my client

23   not to answer that question pursuant to his Fifth

24   Amendment privilege.

25              ///
```

```
 1              MR. NELSON:

 2    Q.        But you didn't stop, did you?

 3              MR. PARKHURST:  I'm instructing my client

 4    not to answer that question pursuant to his Fifth

 5    Amendment privilege.

 6              MR. NELSON:

 7    Q.        You continued to buy and import counterfeit

 8    Cisco products, didn't you?

 9              MR. PARKHURST:  I'm instructing my client

10    not to answer that question pursuant to his Fifth

11    Amendment privilege.

12              MR. NELSON:

13    Q.        But the one thing you did do was try to

14    find new ways to bring those products into the

15    United States; isn't that right?

16              MR. PARKHURST:  I'm instructing my client

17    not to answer that question pursuant to his Fifth

18    Amendment privilege.

19              MR. NELSON:

20    Q.        You got a location in Reno to import the

21    products, didn't you?

22              MR. PARKHURST:  I'm instructing my client

23    not to answer that question pursuant to his Fifth

24    Amendment privilege.

25              ///
```

1   ending in 1024.  Do you see that?

2   A.        Yes.

3   Q.        And your American Express card ends with

4   one -- 1024, doesn't it?

5             MR. PARKHURST:  I'm instructing my client

6   not to answer that question pursuant to his Fifth

7   Amendment privilege.

8             MR. NELSON:

9   Q.        Just if you can put the mailbox service

10  agreement, Exhibit 28, back in front of you.  So the

11  signature on page four that's next to -- it's dated

12  next to what appears to be Theresa Lau, which she

13  testified was her signature.  It was dated July 25,

14  2018.  Do you see that?

15  A.        Talking number 19?

16  Q.        Yeah.  Yeah.  Exactly.

17  A.        Yes.

18  Q.        Okay.  And the reason why this UPS box was

19  obtained in Portland in July of 2018 was because of

20  the flurry of customs seizures that were occurring

21  in Reno, correct?

22            MR. PARKHURST:  I'm instructing my client

23  not to answer that question pursuant to his Fifth

24  Amendment privilege.

25            ///

1              MR. NELSON:

2    Q.        And -- and we looked through those earlier,

3    and we don't need to look at them again.  But it was

4    clear to you that -- that CBP was on to you with

5    regard to using a Reno address to import counterfeit

6    Cisco products, correct?

7              MR. PARKHURST:  I'm instructing my client

8    not to answer that question pursuant to his Fifth

9    Amendment privilege.

10             MR. NELSON:

11   Q.        So to stop the intrusion of customs seizing

12   counterfeit Cisco products, you moved your

13   operations -- at least the receiving part of the

14   operations to Portland; isn't that true?

15             MR. PARKHURST:  I'm instructing my client

16   not to answer that question pursuant to his Fifth

17   Amendment privilege.

18             MR. NELSON:

19   Q.        Now ADSI was importing products on a

20   regular basis from China all throughout the time

21   period we're talking about:  2016, 2017, 2018.

22   Correct?

23             MR. PARKHURST:  I'm instructing my client

24   not to answer that question pursuant to his Fifth

25   Amendment privilege.

Confidential

1          MR. NELSON:

2     Q.          Not everything got detained by customs, did

3     it?

4               MR. PARKHURST:  I'm instructing my client

5     not to answer that question pursuant to his Fifth

6     Amendment privilege.

7               MR. NELSON:

8     Q.          For all of the seizures that took place,

9     there were hundreds and hundreds of shipments that

10    made it through, was -- weren't there?

11              MR. PARKHURST:  I'm instructing my client

12    not to answer that question pursuant to his Fifth

13    Amendment privilege.

14              MR. NELSON:

15    Q.          And once they made it through and got down

16    to Fremont, ADSI then sold them to various customers

17    in the United States, correct?

18              MR. PARKHURST:  I'm instructing my client

19    not to answer that question pursuant to his Fifth

20    Amendment privilege.

21              MR. NELSON:

22    Q.          And those customers included the federal

23    government, correct?

24              MR. PARKHURST:  I'm instructing my client

25    not to answer that question pursuant to his Fifth

Confidential

```
 1    Amendment privilege.

 2              MR. NELSON:

 3    Q.        Included the U.S. Army?

 4              MR. PARKHURST:  I'm instructing my client

 5    not to answer that question pursuant to his Fifth

 6    Amendment privilege.

 7              MR. NELSON:

 8    Q.        Included the U.S. Navy.  You know that?

 9              MR. PARKHURST:  I'm instructing my client

10    not to answer that question pursuant to his Fifth

11    Amendment privilege.

12              MR. NELSON:

13    Q.        Included the USDA; the U.S. Department of

14    Agriculture.  Included them too, didn't it?

15              MR. PARKHURST:  I'm instructing my client

16    not to answer that question pursuant to his Fifth

17    Amendment privilege.

18              MR. NELSON:

19    Q.        And you know that -- that Cisco has

20    obtained from these end customers information about

21    their -- their products.  You know that, right?

22              MR. PARKHURST:  I'm instructing my client

23    not to answer that question pursuant to his Fifth

24    Amendment privilege.

25              ///
```

1    wouldn't you?

2          MR. PARKHURST:  I'm instructing my client

3    not to answer that question pursuant to his Fifth

4    Amendment privilege.

5          MR. NELSON:

6    Q.       Did you care when this was happening?

7          MR. PARKHURST:  I'm instructing my client

8    not to answer that question pursuant to his Fifth

9    Amendment privilege.

10         MR. NELSON:

11   Q.       You saw -- you saw seizure notice after

12   seizure notice showing that customs was seizing

13   these products coming in from China to your company

14   over and over and over again, didn't you?

15         MR. PARKHURST:  I'm instructing my client

16   not to answer that question pursuant to his Fifth

17   Amendment privilege.

18         MR. NELSON:

19   Q.       And yet you persisted, didn't you?

20         MR. PARKHURST:  I'm instructing my client

21   not to answer that question pursuant to his Fifth

22   Amendment privilege.

23         MR. NELSON:

24   Q.       Did you ever think about alerting the

25   customers that the products may be counterfeit?

1              C E R T I F I C A T E

2    STATE OF CALIFORNIA        )
                                ) ss:
3    COUNTY OF SACRAMENTO       )

4         I, TAMMY MOON, CSR No. 13184, Certified

5    Shorthand Reporter, do hereby certify:

6         That KAMRAN SHEIKH, the witness whose

7    deposition is hereinbefore set forth, was duly sworn

8    by me and that such deposition is a true record of

9    the testimony given by such witness.

10        I further certify that I am not related to

11   any of the parties to this action by blood or

12   marriage; and that I am in no way interested in the

13   outcome of this matter.

14        IN WITNESS WHEREOF, I have hereunto set my

15   hand this 3rd of March, 2020.

16

17

18            *Tammy Moon*

19            Tammy Moon, CSR No. 13184, CRR, RPR

20

21

22

23

24

25