Pages 1 – 113

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

CISCO SYSTEMS, INC., ET AL.,)
                           )
        Plaintiffs,     )   **NO. C-18-7602 YGR**
                           )
  VS.                 )   FRIDAY, OCTOBER 16, 2020
                           )
SHAHID H. SHEIKH, ET AL.,  )   OAKLAND, CALIFORNIA
                           )
                           )   PRETRIAL CONFERENCE
        Defendants.     )
_____)
ADVANCED DIGITAL SOLUTIONS  )
INTERNATIONAL, INC.,      )
                           )
  Third-Party Plaintiff,  )
                           )
  VS.                 )
                           )
RAHI SYSTEMS, INC., ET AL., )
                           )
                           )
  Third-Party Defendants.  )
_____)

**REPORTER'S TRANSCRIPT OF ZOOM PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:        Sideman & Bancroft LLP
                    One Embarcadero Center, 22nd Floor
                    San Francisco, California 94111
         **BY:  RICHARD J. NELSON, ESQUIRE**
              **IAN K. BOYD, ESQUIRE**
              **ANGELA M. HE, ESQUIRE**

(Appearances Continued)

Reported By:         Diane E. Skillman, CSR 4909, RPR, FCRR
                    Official Court Reporter
      TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

```
 1

 2    For Defendants:          McManis Faulkner
                               50 West San Fernando Street
 3                             10th Floor
                               San Jose, California 95113
 4                    BY:  RICHARD T. ATKINSON, ESQUIRE
                          ANDREW K. PARKHURST, ESQUIRE
 5

 6    For Defendant            Crosby & Crosby
      Jessica Little           1570 The Alameda, Suite 200
 7    and Imran Husain:        San Jose, California 95126
                      BY:  MICHAEL CROSBY, ESQUIRE
 8

 9

10    For Third-Party          Donahue Fitzgerald LLP
      Defendant Nabia          1999 Harrison Street, 26th Floor
11    Uddin:                   Oakland, California  94612
                      BY:  JOHN C. KIRKE, ESQUIRE
12                        KATHLEEN B. FRIEND, ESQUIRE

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | <u>Friday, October 16, 2020</u>                                      <u>1:00 p.m.</u> |
| 2 | P R O C E E D I N G S |
| 3 | o0o |
| 4 | **THE COURT:**  Okay.  Good afternoon, everyone.  Let's |
| 5 | go ahead and call their case. |
| 6 | **THE CLERK:**  Calling Civil Action 18-7602 Cisco |
| 7 | Systems, Inc. versus Sheikh, et al. |
| 8 | Counsel, please state your appearances. |
| 9 | **MR. NELSON:**  Good afternoon, Your Honor.  Richard |
| 10 | Nelson for the plaintiffs Cisco Systems and Cisco Technology. |
| 11 | I am accompanied by Ian Boyd and Angela He. |
| 12 | **THE COURT:**  Okay.  Good afternoon. |
| 13 | **MR. ATKINSON:**  Good afternoon, Your Honor.  Tyler |
| 14 | Atkinson with McManis Faulkner on behalf of the defendant, |
| 15 | third-party plaintiff ADSI, and defendants PureFutureTech, K&F |
| 16 | Associates, Shahid Sheikh, Kamran Sheikh, and Farhaad Sheikh. |
| 17 | With me also is my colleague, Andrew Parkhurst. |
| 18 | **THE COURT:**  Okay.  Good afternoon. |
| 19 | **MR. CROSBY:**  Good afternoon, Your Honor.  Michael |
| 20 | Crosby on behalf of defendants Jessica Little and Imran |
| 21 | Husain. |
| 22 | **THE COURT:**  Okay.  Good afternoon. |
| 23 | **MR. KIRKE:**  Good afternoon, Your Honor.  John Kirke |
| 24 | with Kathleen Friend for the third-party defendant Nabia |
| 25 | Uddin. |

1          **THE COURT:**  Okay.  Good afternoon.

2      All right.  We have a lot of things to do today.  So let's

3  get started.

4      Given my order on summary judgment, I suspect a number of

5  things have changed in terms of your trial prep.  I'll let you

6  know right off the bat I'm still trying to get you out.  You

7  are trailing a criminal action so the November 2nd trial date

8  is continued one week to November 9th.

9      There will be two points in time that I will know whether

10  or not I can get you out on the 9th.  The first is

11  October 27th.  Sometime on October 27th, I will find out --

12  that is our weekly check-in with respect to COVID issues.  I

13  will find out whether a jury pool is coming in or not.  If it

14  is not, then it will be continued.  If it is, then you trail.

15      The case in front of you is a criminal case.  It is

16  supposed to go out November 6, Friday.  If it does not go out

17  November 6, you will go out Monday, November 9th.  So you

18  won't know until that Friday.  If I cannot get you out on

19  November 9th, the case is continued for jury selection on

20  January 7th, 2021.

21      Okay?  If I can't get you out January 7th, who knows.

22      All right.  We're going to go through -- I have your

23  filings, but I also have your binders.  We are going to do

24  this in the sequence of the binder.

25      The proposed order regarding stipulations is in order, and

1   that order will be entered at Docket 235.

2       With respect to your witness list, Docket 236, in light of

3   the summary judgment order, are there any updates to 236?

4           **MR. ATKINSON:**  Not for defendants, Your Honor.

5           **MR. NELSON:**  Richard Nelson for the plaintiffs.

6       There is no change due to third-party defendants.

7           **THE COURT:**  Mr. Kirke?

8           **MR. KIRKE:**  Yes, Your Honor.

9       And part of our witness list also depends on the rulings

10  with respect to the Fifth Amendment issues, but we are only

11  calling for the third-party defendants Nabia Uddin and

12  possibly Karoline Banzon.  But I note that other previous

13  third-party defendants remain on the defendants' witness list.

14          **THE COURT:**  Who is the second person you said?

15          **MR. KIRKE:**  Karoline Banzon.

16          **THE COURT:**  Okay.

17          **MR. KIRKE:**  She remains on the witness list, but I --

18  at least as far as what the third-party defendant would put

19  on, our estimate is -- is probably no more than a half hour

20  for her.

21          **THE COURT:**  Okay.  So you're withdrawing then from --

22  from your affirmative case, Theresa Lau, Danny Dass, Shahid

23  Sheikh?

24          **MR. KIRKE:**  No, Your Honor.  We were -- I'm sorry I

25  wasn't clear.

```
 1        We are withdrawing our third party -- the other -- the

 2   previous third-party defendants who we previously had on our

 3   witness list with the exception of Ms. Banzon and Ms. Uddin.

 4        THE COURT:  Okay.

 5        MR. KIRKE:  If it please the court, we could

 6   circulate, and update, and submit that to the Court --

 7        THE COURT:  I just want to strike them from my list.

 8   Do you have Docket 236?  Yours begin at page 9?

 9        MR. KIRKE:  Yes, Your Honor, I have that.

10        As of right now, the witnesses we will be withdrawing, I

11   believe, start on page 10 at the bottom, Mr. Minhas.  And

12   going on to the next page, Mr. Karamat, Ms. Nguyen, and

13   Mr. Raisoni.

14        However, those, with the exception of Ms. Nguyen, remain

15   on the defendants' witness list.

16        THE COURT:  I understand.  I look at the time

17   estimates as part of my calculation.  All right.

18        So Minhas is withdrawn, affirmatively, Karamat withdrawn,

19   Nguyen is withdrawn, and Raisoni is withdrawn, right?

20        MR. KIRKE:  Yes.  Thank you, Your Honor.

21        THE COURT:  Any other changes to the witness list?

22                    (No response.)

23        Hearing none --

24        MR. CROSBY:  Excuse me, Your Honor, one moment.  I

25   have to plug in my computer, but please keep proceeding.  I
```

1    apologize.

2          **THE COURT:**  All right, Mr. Crosby.

3      So you were limited to calling the witnesses on this list

4    as currently amended.  That's Docket 236.  You cannot call any

5    other witnesses unless the Court so orders and upon a showing

6    of good cause.  And that doesn't relate to experts, just

7    percipient.  Okay.

8      237, experts.  Any changes I should know about?  I know we

9    have a couple of motions with respect to the experts.

10         **MR. NELSON:**  Your Honor, this is Richard Nelson for

11   the plaintiffs.

12     I have just been informed that one of my experts, Sam

13   Gupta, who is a nonretained expert, may be leaving Cisco.  I

14   haven't had a chance to talk with him.  But initially I knew

15   that that was a possibility just last week, and he confirmed

16   that he would still testify even if he was no longer at Cisco.

17     So the plan would be, if we go forward on the November

18   date, I suspect that Sam Gupta will be our witness.  If it

19   gets pushed to January, we may need to substitute that he be a

20   witness.  Of course I would give the defendants and the

21   third-party defendant an opportunity to depose that new expert

22   witness if I have to replace him.

23         **THE COURT:**  Okay.  Why don't we go ahead, since we

24   are on experts, and talk about the motions with respect to the

25   experts.

1     First, with respect to the motion with respect to

2   Mr. Russell Mangum, and as I understand it, it is only his

3   opening report that is being challenged, correct?

4          **MR. BOYD:**  This is Ian Boyd for Cisco.

5       That's correct, Your Honor.

6          **THE COURT:**  All right.

7       I am inclined to grant the motion.  I've read the report.

8   It's, in many ways, just a hypothetical opening.  It doesn't

9   really address anything specific about the case, it just

10  hypothesizes.  And because of that I don't know that if I

11  strike it there's any prejudice whatsoever given that all of

12  his real opinions are in his Rebuttal Report.

13      Response.

14         **MR. ATKINSON:**  Your Honor, this is Tyler Atkinson for

15  the defendants.

16      We don't necessarily agree with the Court on that.  Our

17  view, in the sense it's mooted --

18         **THE COURT:**  Pull it up, 132-2, and tell me what it is

19  that you want from this report.

20         **MR. ATKINSON:**  Your Honor, just to be clear, I'm

21  saying we don't necessarily disagree with the Court.  In other

22  words, I'm not saying --

23         **THE COURT:**  Your double negative is you agree with

24  me?

25         **MR. ATKINSON:**  Your Honor, we didn't bring the motion

1    and we are not the Court, so we are kind of in an awkward

2    position there.

3        Our view is, the issues that we want to bring to the

4    jury's attention are embraced by the Rebuttal Report.  And so

5    in that sense, we thought the motion was just moot because of

6    the fact that we don't intend to call Mr. Mangum without him

7    responding to the testimony of the experts.

8        And I am sorry, Your Honor, I don't mean to consume the

9    Court's time on this point.

10       **THE COURT:**  Okay.  Well, you didn't withdraw it, so

11   anyhow, the motion is granted.

12       The opinions expressed in the opening report are stricken

13   and cannot be used at trial.  If there are identical opinions

14   in the Rebuttal Report, which was not challenged, then those

15   are fine.  But if it comes just from the opening -- and I

16   haven't -- the reason I say that is I have not read the

17   rebuttal because that wasn't part of the motion.  I only read

18   the opening and found nothing of real substance for purposes

19   of the trial.

20       So do I need to be more clear given that I haven't read

21   the rebuttal?  Are there any questions that you may have?

22       **MR. ATKINSON:**  And Your Honor, this is Tyler Atkinson

23   for the defendants again.

24       This is where my concern comes because I understand the

25   Court saying, okay, Mr. Expert, you are barred from testifying

1   to X, Y, and Z, which is found in the initial report.  Where

2   this could become arguably problematic is, if it is in the

3   Rebuttal Report, I'm concerned we are going to end up with

4   sort of a pitched battle about, well, the judge said this

5   can't come in, and then we have to show, no, it is all in the

6   Rebuttal Report.

7       I don't know if it would help the Court to review the

8   Rebuttal Report.  I believe we included it with our opposition

9   to the motion.  I would have to check on that.

10          **THE COURT:**  Well, is -- that's why I'm asking,

11   Mr. Atkinson.

12       What -- I am not striking the opinions that are in the

13   Rebuttal Report.  All right.  Do we really have to spend a lot

14   of time on this, folks?  Is there any confusion whatsoever

15   about what's happening?

16       Mr. Boyd?

17          **MR. BOYD:**  No, Your Honor, no confusion.  We don't

18   need to spend any more time on this from Cisco's perspective.

19          **THE COURT:**  All right.  Hopefully we won't be wasting

20   time in the trial.  If it's in the Rebuttal Report, he can

21   talk about it.

22          **MR. ATKINSON:**  Thank you, Your Honor.

23          **THE COURT:**  The next one is with respect to Mr. Levy

24   and Mr. Regan.

25       With respect to those, I am inclined to deny the motion.

```
1    You know, I didn't see in the motions that there was really a

2    challenge that comes within the confines of *Daubert*.  It's

3    more of an objection to the substance of the opinions, and

4    that goes to weight not admissibility.

5        So does anyone want to argue?  If not, that's the ruling.

6                          (No response.)

7        Hearing none, I'll deem it submitted and those motions are

8    overruled.

9        Okay.  The next tab in your binder -- and, actually, it

10   wasn't in the binder.  I have this humongous stack of

11   discovery excerpts.  But am I right, are there no -- you all

12   figured this out and there's nothing for me to resolve?

13       I didn't see any motions.  I didn't see any disputes over

14   designations.

15           **MR. NELSON:**  Thank you, Your Honor.  This is Richard

16   Nelson for the plaintiffs.

17       There is no motion with regard to the Exhibit List.  The

18   Exhibit List is Document 238.  It was filed.

19       Your Honor, I -- what I would like to bring to the Court's

20   attention, the Court's standing order advised the parties to

21   meet and confer in good faith to try to resolve admissibility

22   issues.

23           **THE COURT:**  Yes.

24           **MR. NELSON:**  Specifically -- so the stipulation to

25   admit certain documents or at the very least to stipulate to
```

1    the authenticity of the documents.

2            **THE COURT:**  Right.

3            **MR. NELSON:**  What the plaintiffs did, and actually

4    the third-party defendants as well, we very carefully went

5    through every document.  And I haven't counted them up, Your

6    Honor, but probably 95, 97 percent of defendants' documents we

7    have agreed that they are not only foundationally authentic,

8    but that we stipulate to the admissibility.

9        So we were very careful -- there's a few that we don't

10   stipulate to admissibility, but the vast majority we have done

11   that.

12       For each and every one of plaintiffs' exhibits, and I

13   think third-party defendants' exhibits, defendants have

14   refused to either agree to the authenticity or to stipulate to

15   admissibility.

16       And I think, Your Honor, it's really abusive in the

17   sense --

18            **THE COURT:**  Let me find out about that.

19       Mr. Atkinson, I see that and then I noted it as I was

20   preparing.  Why is that?

21            **MR. ATKINSON:**  Your Honor, I believe this is

22   something Mr. Parkhurst was going to address with the court.

23            **THE COURT:**  All right.  Mr. Parkhurst, why is that?

24            **MR. PARKHURST:**  Yes, Your Honor.

25       I mean, a few things.  We also carefully looked at these

```
 1    exhibits that our opposing parties have put on the list.

 2              THE COURT:  Let's take a look at Exhibit 1.

 3         What is that exhibit?

 4              MR. NELSON:  Trademark -- I'm sorry.

 5              COURT REPORTER:  I'm sorry.  I didn't understand

 6    that.

 7              MR. NELSON:  I apologize, Madame Court Reporter.

 8    This is Rick Nelson.

 9         I was actually answering the question, but then I stopped

10    myself because I think the Court was addressing it to

11    Mr. Parkhurst.

12              THE COURT:  So it says description TM 1,542,339.

13         What is that?

14              MR. NELSON:  This is Richard Nelson.  I guess I will

15    answer that, Your Honor.

16         It's the trademark at issue.  So this is the copy from the

17    PTO which has been certified.

18              THE COURT:  All right.  What's the problem with that

19    document, Mr. Parkhurst?

20              MR. PARKHURST:  So, yeah, Your Honor, I think the --

21    the issue that we raise -- we certainly understand that this

22    is a document produced by the Trademark Office.  However, our

23    position is, given the potential for criminal liability in

24    this case, given all --

25              THE COURT:  What does criminal liability have to do
```

1    with admissibility?  What rule of evidence does not allow for

2    the admissibility of this document?

3        Mr. Parkhurst?

4              **MR. PARKHURST:**  Your Honor --

5              **THE COURT:**  Give me rule number.

6              **MR. PARKHURST:**  Your Honor, it's about creating a

7    record, Your Honor.  We believe we owe a duty to our client.

8    Given the potential for criminal liability, we can't be

9    creating a record of stipulations and admissibility and

10   things --

11             **THE COURT:**  I need an evidentiary basis for your

12   objection.

13             **MR. PARKHURST:**  Your Honor, our position simply is,

14   we won't stipulate to the admissibility.  Foundation and

15   authenticity are the objection as well as hearsay, the

16   document is hearsay.  We certainly understand that the Court

17   may find that those objections are overruled and that the

18   document is admissible --

19             **THE COURT:**  Okay.  This is what we are going to do,

20   Mr. Parkhurst, to make it easier for you and your client.

21       You are going to make those objections at trial, and all

22   of those objections are going to count against your time.

23             **MR. PARKHURST:**  Understood, Your Honor.

24             **THE COURT:**  So you understand that?  That means you

25   are going to waste three to four hours of a limited clock to

 1    these objections.

 2              **MR. PARKHURST:**   Understand, Your Honor.

 3              **THE COURT:**   Are you sure you want to do that?

 4              **MR. PARKHURST:**   Your Honor, I would just return,

 5    again, to our position about stipulating and establishing that

 6    record of stipulating to documents, to their authenticity, to

 7    their foundation.   I think that that is our position on that.

 8              **MR. ATKINSON:**   Your Honor, this is Tyler Atkinson.

 9              **THE COURT:**   What's the problem with the foundation?

10    This is a certified document.

11              **MR. PARKHURST:**   Understood, Your Honor.   This may be

12    a situation where the Court certainly finds that this is an

13    admissible --

14              **THE COURT:**   Mr. Parkhurst, you have a Rule 11

15    obligation.   Shall I sanction you for making objections that

16    don't have foundation?

17              **MR. ATKINSON:**   Your Honor, we have heard the Court.

18    I'm going to speak with my colleagues here.   We'll check in

19    with Mr. Nelson.   The Court has clearly given us direction.

20        If we may, we would ask to return to this issue with

21    Mr. Nelson.

22              **THE COURT:**   I think that is a smart move,

23    Mr. Atkinson.   We don't have time to waste, gentlemen.

24        If you want to indicate that you are preserving some kind

25    of objection, preserve it.   But don't waste my time.   Don't

1    waste jurors' time.  It's already a difficult situation to

2    have a trial during these times.  You didn't want to have a

3    virtual trial.  You are demanding a jury trial, which I will

4    give you.  But do not... do not abuse the process by making

5    objections that really have no basis in the code.  We are

6    trying to streamline this so that the real issues can come in

7    front of the jury.

8         Are there any real issues you want to talk about in terms

9    of the evidence?

10             **MR. PARKHURST:**  Your Honor, I would like to point out

11   that Your Honor did focus on Exhibit 1 for the first part

12   of -- for this discussion.  However, there are numerous

13   exhibits beyond Exhibit 1 that relate to custom seizures, that

14   relate to documents, produce the executive summaries by Cisco,

15   overwhelming majority of these documents have not been

16   verified, have not been established a foundation, have not

17   established authenticity.  They contain communications between

18   persons that are not parties to this case, persons that have

19   not come up in depositions.

20        It is just a huge amount of documents.  I think by my

21   count --

22             **THE COURT:**  So the first -- the trademark documents

23   are 1 through 5.

24        Next page.

25             **MR. PARKHURST:**  Yes, Your Honor.

1    Starting at Exhibit 7 all the way through Exhibit, I

2    believe it is 73, these are all documents that are Customs and

3    Border seizures -- that relate to custom and border seisures

4    of allegedly counterfeit products.

5    These documents not only haven't been subject and put

6    forth, at least a majority of them, haven't been put forth in

7    a deposition.  I think almost all of them haven't been put

8    forth in a deposition and established any foundation or

9    authenticity related to them.  They contain communications

10   between none of the defendants, none of the third-party

11   defendants.

12            THE COURT:  All right.  So I'm looking at 7 through

13   39.  All have the title CBP Seizure Notice.

14   What are these?

15            MR. NELSON:  Your Honor, this is Richard Nelson for

16   the plaintiffs.

17   These are government documents.  After the government

18   seized counterfeit products going to various of the

19   defendants' addresses, they then sent a notice to Cisco as a

20   trademark owner as well as the defendants alerting them to the

21   seizure.  These are the formal seizure documents.

22   And we assert that they are admissible pursuant to

23   803(8)(A)(i) as a public record.  Also they're kept in Cisco

24   in the ordinary course of business under 803(6).

25            THE COURT:  Response.

1              MR. PARKHURST:  Your Honor, Cisco's counsel,

2    Mr. Nelson, just described 803 being the hearsay exception

3    that would make them admissible.  However, the foundation and

4    authenticity we take issue with, specifically -- we are not

5    admitting there is a hearsay exception that would apply,

6    however, I don't think the foundation and authenticity of

7    these documents has ever been established.

8         Not to mention, Your Honor, just also the relevance and

9    probative value of these documents because they're not -- it's

10   my understanding, Your Honor -- part of Cisco's damages

11   calculation.  These products were never actually sold to my

12   knowledge.

13             MR. NELSON:  Your Honor, if I may?

14             THE COURT:  Who is Kenny Carter?

15             MR. NELSON:  Kenny Carter is the Cisco witness.  He

16   was deposed and he was actually asked about some of these

17   documents.

18        He is the individual at Cisco who receives these custom

19   seizures.  He also communicates via email with customs.  Those

20   are the exhibits coming up.

21        So he testified in his deposition with regard to the

22   process about receiving the customs notices.  I think

23   specifically was shown various of these and the process then

24   of sending cease and desists to the importers, which happened

25   here.  Cease and desists were sent to defendants, and people

1    working with the defendants, for some of these seizures.

2        So with regard to authenticating these exhibits,

3    F.R.E. 901, I think, shows that these are sufficiently

4    supported as government seizure notices are on CBP letterhead.

5    They're sent to the trademark owner in the ordinary course.

6    They connect to the --

7            **THE COURT:**  Mr. Nelson.

8            **MR. NELSON:**  Yes.  I'm sorry.

9            **THE COURT:**  Just hold on a second.

10                   (Pause in the proceedings.)

11       I don't think I have your exhibits yet; is that right?

12           **MR. NELSON:**  You don't have all of the exhibits, Your

13   Honor.  We did, though, because many, many, many of these were

14   mentioned in the motions in limine and per the Court's order,

15   we had to submit those.  So there were -- a lot of the

16   exhibits were actually submitted in connection with that.

17       But the actual exhibits, I think those are to be delivered

18   to the Court a week before.  I'll have to check your order.  I

19   think it is sometime before the trial.

20           **THE COURT:**  So I have a box with respect to motion in

21   limine number 2.  Is it in there?

22           **MR. NELSON:**  It could be, Your Honor.  If it is a

23   box, it is probably a big box.

24                   (Pause in the proceedings.)

25           **THE COURT:**  Okay.  Great.

1          So I'm looking at 34.  Do I take it that numbers -- let me

2     go back to Number 7.  Okay.  So 7 through 39 are all basically

3     the same?

4               **MR. NELSON:**  They are the same kind of document, Your

5     Honor.  Yes.

6               **THE COURT:**  These are all from U.S. Border -- U.S.

7     Custom and Border Protection to Kenny Carter.

8               **MR. NELSON:**  That's correct, Your Honor.

9               **THE COURT:**  And he kept these in the regular course

10    of his business?

11              **MR. NELSON:**  He did, Your Honor.

12              **THE COURT:**  For what purpose?

13              **MR. NELSON:**  Well, Cisco has recorded its trademarks

14    with Customs and has provided information to Customs about

15    screening products coming into the United States.

16         So Cisco cooperates quite extensively with Customs to stop

17    counterfeits coming into the United States.  Kenny Carter is

18    the employee who is interacting with Customs with regard to

19    questions they have about particular products.  He then

20    supplies the information to Customs and then they make their

21    own expert determination about whether the product is

22    counterfeit or not.

23         If they seize it, then they provide the seizure notice to

24    Mr. Carter.  He tracks it.  This particular one, Exhibit 7,

25    Your Honor, shows who the exporter was in China and that it

1     was going to Uddin Networks in Fremont.

2         He provides that to counsel, and then we typically send

3     cease and desist letters to the importers telling them that

4     they are violating the law, they're potentially -- Cisco

5     potential customers and asking them to stop it.

6             **THE COURT:**  Let me ask you this:  You gave -- you

7     said 803(6).  And what else did you note?

8             **MR. NELSON:**  I noted 803(8)(A)(i), which is the

9     public record exception to the hearsay rule with regard to

10    this.

11        So I think this particular document, Your Honor, you know,

12    it's kept in the -- it's received by Cisco pursuant to its

13    interactions with Customs.  It's kept by Cisco pursuant to

14    803(6) I think is probably the only exception we would need

15    for this one.

16            **THE COURT:**  But are you -- I have a couple of

17    questions.  Under 803(6)(A), you don't actually have evidence

18    of when it was made.

19            **MR. NELSON:**  Well, we do, I suppose.  The actual

20    seizure notice has the government stamp on the top, the

21    June 1st, 2016.  So I would think this is the date in which

22    this letter, this notice was created and sent out.

23            **THE COURT:**  Yes, but Mr. Carter didn't make it.  He

24    received it.

25            **MR. NELSON:**  That's correct, Your Honor.

22

1          **THE COURT:**  So it's not a Cisco business record in

2     that sense.

3          I guess my question is:  For what purpose is it being

4     offered?  When Mr. Carter did something -- I mean, Mr. Carter

5     receives these documents.  I understand he did that in his

6     ordinary course.

7          When he receives it, he actually does something with it.

8     So is it even being offered for its truth or is it being

9     offered for purposes of explaining what Mr. Carter did every

10    time he received one of these things?  If so, then it's not

11    actually hearsay because it's not being offered for that

12    purpose.  But I don't know.

13         **MR. NELSON:**  Certainly, Your Honor.  With regard

14    to -- there will be -- Mr. Carter will testify that he

15    received certain notices.  This was the very first seizure

16    notice going to Fremont and the defendants' operation.

17         We did not know -- well, when he received this, he did

18    arrange for a cease and desist letter to be sent to Uddin

19    Networks.  That was sent and that is another exhibit here.

20         **THE COURT:**  That's the difference, Mr. Nelson.

21    Mr. Carter doesn't know if somehow the Customs and Border

22    Patrol, for instance, got the description of the merchandise

23    wrong.  He doesn't know how they put these things together.

24    Were those people deposed?  Is that even relevant?

25         The question is, why does the jury have to see this other

1    than to know what Mr. Carter did in response?

2         **MR. NELSON:**  Thank you, Your Honor.

3        I think -- I basically agree with Your Honor.  I think

4    that in this case -- this is an unusual case because there are

5    so many seizure notices.  And so part of the issue for the

6    jury is enhanced damages with regard to the Lanham Act

7    violation.

8        So if the defendant is acting recklessly, in a very

9    egregious fashion, then the jury can award enhanced damages.

10       There's two things that happen when the seizure notices

11   occur.  A letter goes to the trademark owner, in this case

12   Mr. Carter for Cisco.  And also a seizure notice goes to the

13   importer, in this case it was Uddin Networks.  There's others

14   for ADSI, itself, and PureFutureTech.

15       Those seizure notices are received by the importer, here

16   the defendants.  And when we asked the defendants about the

17   seizure notices, they asserted the Fifth with regard to Mr. --

18   two of the Sheikhs.  Shahid Sheikh at his first deposition, I

19   think he claimed not to have seen these.

20       But nevertheless, this is evidence of -- that shows that

21   they would have received notice too.  And we don't have their

22   particular seizure notices that came from the government.  We

23   do know that when the government sends a notice like this to

24   the trademark owner, they also give notice to the importer.

25       We know that happened.  There's evidence that Ms. Uddin --

1          **THE COURT:**  Mr. Nelson --

2          **MR. NELSON:**  Sorry.

3          **THE COURT:**  Who has personal knowledge who's going to

4     testify at trial to that process?

5          **MR. NELSON:**  Kenny Carter would have personal

6     knowledge about that process and then --

7          **THE COURT:**  Kenny Carter can't testify as to what the

8     Border folks are doing.

9          **MR. NELSON:**  Well, actually -- Your Honor, this is

10    statutory.  So there are statutory regulations that control

11    this whole process.  And per statute, Customs is required to

12    send this notice to the trademark owner.

13         **THE COURT:**  Mr. Nelson, how many times are there

14    requirements in a statute?  That doesn't mean things happen.

15    That doesn't mean things happen in the way they say they are

16    going to happen.

17       Do you know how often Federal Judges have to force

18    government officials to do what's in a statute?

19         **MR. NELSON:**  I understand, Your Honor.  There may be

20    other seizures that occurred that they did not follow the

21    statutory regulations.  But in these situations, these 32

22    situations, they actually did comply with the statute.

23         **THE COURT:**  I take it -- for purposes of our

24    discussion here, I have no reason to believe you.  I mean,

25    that is, no reason not to believe you.  But at trial, you

```
1    can't testify.  And that's what -- that's why trials are what

2    they are.  We have to actually bring in the people who are

3    doing it.

4        And so far I haven't heard that Mr. Carter can do that

5    because he doesn't actually know.  I mean, he may assume, but

6    he doesn't have personal knowledge because he didn't do it.

7            MR. NELSON:  Your Honor, the other side of this is

8    really important, which is, in addition to Cisco receiving

9    notice, the defendants received notice.  And there is

10   testimony about that.

11       Ms. Uddin testified that she received these notices from

12   Customs, and she talked about it with the defendants.  And

13   Ms. Lau, Theresa Lau received notices of the ones that were

14   being seized going to the Portland UPS office, and she

15   presented it and gave it to Kamran Sheikh.

16       So there is testimony that -- not from the defendants

17   themselves, they asserted the Fifth Amendment, but from

18   witnesses -- other witnesses who worked with the defendants

19   that these notices were received by the defendants and were

20   presented --

21           COURT REPORTER:  I'm sorry.  Excuse me, Your Honor.

22       Mr. Nelson, I did not hear the last part of your comment.

23           MR. NELSON:  There will be testimony that these --

24   the notices that went to the defendants were actually received

25   by them, by Ms. Uddin and Ms. Lau.  And as they testified at
```

1    their depositions, they then presented those seizure notices

2    to the defendants.

3              **THE COURT:**  Okay.

4              **MR. PARKHURST:**  Your Honor, if I can have an

5    opportunity to respond.

6              **THE COURT:**  You may.

7              **MR. PARKHURST:**  Yeah, Your Honor.

8         So I think that it's important to point out that no matter

9    who received the documents, Your Honor's point is correct that

10   there's nobody with personal knowledge, nobody from Customs

11   and Border has been deposed in this case.

12        And to the point about the documents being admitted for

13   not -- for a nonhearsay purpose, if that were the case, if the

14   Court were to rule that they were admitted for that purpose,

15   not for the truth of the matter, we would request a limiting

16   instruction be given to establish that these records don't

17   establish for the truth of the matter that any counterfeiting

18   occurred, but simply for the limited purpose that Your Honor

19   described.

20             **MR. NELSON:**  Just to respond quickly to that.

21        Part of what we are having to show -- what we do have to

22   show for knowledge, we don't have to show knowledge in the

23   civil case for counterfeit.  They're liable for the

24   counterfeit activity even if they didn't know it was

25   counterfeit.

1          But if we can show that they knew it was counterfeit, then

2     we do get enhanced damages.  So this is important for that

3     purpose; that they were continuing to purchase products from

4     the same sources in China even though they received, you know,

5     seizure after seizure after seizure after seizure.  They moved

6     their operation to Reno.  They moved it to Portland.  They

7     continued to do the same thing.

8          So the argument that we are going to make to the jury is,

9     that these people knew exactly what they were doing.  They

10    were getting told by the government, getting told by Cisco,

11    and they continued to do it, which would then justify, in our

12    argument, the enhanced damages.

13              **THE COURT:**  All right.  So --

14              **MR. PARKHURST:**  Your Honor, I would just --

15              **THE COURT:**  Hold on.  I mean, it sounds like I'm

16    going to have to hear the evidence.

17         It sounds like, tentatively speaking, these documents come

18    in for a nonhearsay purpose.  And then they may come in

19    additionally for notice.  That's what I'm hearing so far.

20    Without -- but it all may depend on what the witnesses say.

21         All right.  All right.  Issues beginning at Document 40.

22              **MR. PARKHURST:**  Yes, Your Honor.

23         This is -- these documents, again, relate to the Customs

24    and Border seizure notices.  However these are specific emails

25    and communications between Cisco and what appears to be

1    members of Customs and Border.

2        We would, again, raise similar objections here.  These

3    communications have not been raised in deposition.  They are

4    hearsay.  They are communications between Cisco employees and

5    members of Custom and Border.  There's no defendants on any of

6    these communications or other parties.

7        And as well, again, the relevance issue, Your Honor.

8    Again, it is our understanding that these products cannot be

9    part of the damages calculation for individual products sold.

10           **MR. NELSON:**  Your Honor, Richard Nelson for the

11   plaintiffs.

12           **THE COURT:**  Mr. Nelson, I am keeping my notes.

13       So I've got emails beginning at 40 through about 72 all

14   with Mr. Carter.  So I'm assuming the issues are similar?

15           **MR. NELSON:**  They are, Your Honor.

16           **THE COURT:**  Okay.  Go ahead.

17           **MR. NELSON:**  Your Honor, my first comment has to do

18   with there was never any deposition testimony about this.  I'm

19   surprised by that.

20       The defendants had these documents before Kenny Carter's

21   deposition.  They deposed him.  They asked him questions about

22   some of them.  They certainly didn't ask him thorough

23   questions about all of them.  But they had them.  They had the

24   ability to ask the witness the question --

25           **THE COURT:**  Let me say to both of you, whether or not

1    there's deposition testimony isn't dispositive of anything.

2    So --

3          **MR. NELSON:**  I agree, Your Honor.

4       So the documents, from our perspective, so these emails

5    are kept in the ordinary course of business by Cisco.  So

6    803(6).

7       They are -- and I take the Court's point with regard to

8    whether or not they are hearsay or whether or not they are

9    being offered not for the truth of the matter asserted.

10   Effectively that is correct.

11      This is the chain of -- this explains the chain.  So,

12   initially the government, CBP in this situation, contacts

13   Cisco.  They have products that they have stopped.  They ask

14   Cisco to review them.  They do that --

15         **THE COURT:**  Mr. Nelson?

16         **MR. NELSON:**  Sorry.

17         **THE COURT:**  At Document 40, the document is addressed

18   to Cisco IPR.

19      What is that?

20         **MR. NELSON:**  Kenny Carter testified about that.  And

21   he would testify at trial that that is a -- an alias, an email

22   alias at Cisco.  He is on that email alias.  He monitors that

23   email.

24         **THE COURT:**  Okay.  So he is the one that is

25   responding to these things and/or receiving them?

1          MR. NELSON:  Yes, Your Honor.  He receives the

2     emails.  Also on the email alias are engineers within Cisco.

3          And so making reference to Exhibit 40, there is then a

4     series of photographs that Customs sent to Cisco for

5     authentication, pictures of products that were being imported.

6          This is a switch.  And you can see on page, I think it is

7     page 3 of this exhibit, Bates Number 2605.  It's the side of

8     the switch that has the identifying information for the

9     switch.

10         Cisco is able to use this information and make an

11    authenticity determination, whether it's counterfeit or

12    genuine.

13         THE COURT:  Now these exhibits have been -- obviously

14    have been separated.  Do I take it that all of them -- that

15    there was a litany of all of these produced emails done in the

16    ordinary course?

17         MR. NELSON:  Yes, Your Honor.  All these were

18    produced, and each one of these then ties to a seizure notice.

19         These particular group of exhibits of emails then are --

20    are -- are counterfeit products that were ultimately seized.

21    And those were the seizure notices that Your Honor reviewed

22    just prior to these.

23         THE COURT:  All right.  So why doesn't this fall

24    within 803(6)?

25         MR. NELSON:  If that is addressed to me, Your Honor,

1      it does.

2              **THE COURT:**  I'm talking to Mr. Parkhurst.

3              **MR. PARKHURST:**  Yes, your honor.

4         I think that the -- these wouldn't qualify as a business

5      record as email communications between Customs and Border.

6      This isn't a typical record like a 10K or some sort of

7      financial document or some sort of sales report.  These are

8      live communications between Cisco -- persons at Cisco and

9      persons at Customs and Border Patrol.  It's not --

10             **THE COURT:**  Is he going to testify that this was his

11     job?

12             **MR. NELSON:**  He is, Your Honor.

13             **THE COURT:**  If it's his job and this is the manner in

14     which he does his job and it was done at the time or near the

15     date of the event, kept in the ordinary course, was a regular

16     practice, how does that not fit within 803(6)?

17             **MR. PARKHURST:**  I think, Your Honor, I would go back

18     to it's -- it's a communication between the two --

19             **THE COURT:**  I understand what it is.  That wasn't my

20     question.

21             **MR. PARKHURST:**  Given Your Honor's description, I --

22     right now it's not -- not seeing part of the statute that

23     803(6) if it's kept --

24             **THE COURT:**  Tentatively these things come in

25     assuming, Mr. Nelson, you can, in fact, lay the foundation

1      that it's a business record.  Not all emails are business

2      records.  And I've got -- I've had many litigators who have

3      not been able to get emails in at trial.  Part of it is

4      because they don't think about the evidence code.

5          So, you have to set the foundation that it comes within

6      the confines of 803(6), but it sounds to me, from your

7      proffer, like it would.  But you still have to set the

8      foundation.

9              **MR. PARKHURST:**  Your Honor, I also just would like to

10     point out, and apologies for not mentioning earlier, 803(6)

11     would apply for the actual fact it is a business record, but

12     the content of the email would still be hearsay.

13             **THE COURT:**  These are this -- is information upon

14     which people rely to do their job.  Unlike the California Code

15     of Evidence, the Federal Code of Evidence provides more

16     leeway.  And the question is, whether or not these are

17     trustworthy documents.  The manner in which we figure out

18     whether something is trustworthy is by looking at the purpose

19     for which they are being used.

20         It sounds to me that this was his job.  And so -- and if

21     it's his job -- you will have a chance to cross-examine him

22     and then I can make the determination then.

23         I'm giving you, given these kinds of objections on this

24     list, my preliminary sense of what the issue is.

25             **MR. PARKHURST:**  Understood, Your Honor.

1    And that's -- it's just our -- the position is that the

2    statements themselves would be statements made by Cisco.  It's

3    not a party admission.  It's not -- it's by Cisco and by

4    Customs and Border Protections.  This would be statements made

5    among themselves even though --

6    **THE COURT:**  Mr. Parkhurst, it says absolutely nothing

7    to do with an admission.  The question is, is whether it is a

8    business record under 803(6).  They are two entirely separate

9    portions of the Code of Evidence.

10    **MR. PARKHURST:**  Understood, Your Honor.

11    That's the -- the objection is based on the content of the

12    email.  The record -- the email may be a business record under

13    803(6), but it's the content, the statements within --

14    **THE COURT:**  There is no difference.  You are trying

15    to make a distinction where one doesn't exist.

16    **MR. PARKHURST:**  Understood, Your Honor.

17    **THE COURT:**  I mean, that's like saying, okay, we have

18    a general ledger.  The general ledger is a business record but

19    none of the numbers therein are business records.

20    That's the analogy you are trying to make.

21    **MR. PARKHURST:**  Yes, Your Honor.  That would go back

22    to your trustworthiness point.  A ledger just records numbers.

23    It records the data, the output of a sale.  These are

24    communications.  These are actual statements, written

25    communications --

1           **THE COURT:**  Well, you will have an opportunity to

2    object.

3           **MR. PARKHURST:**  Thank you, Your Honor.

4           **THE COURT:**  All right.

5       73.

6           **MR. NELSON:**  73, Your Honor, is a portion --

7           **THE COURT:**  Hold on.

8           **MR. NELSON:**  It's a deposition, Your Honor.

9           **THE COURT:**  73 is not in my binder.

10          **MR. NELSON:**  Yes, Your Honor.  It's a videotape, Your

11   Honor.

12       It's a videotape of a portion of a deposition of Shahid

13   Sheikh.  Depending upon the Court's ruling with regard to the

14   Fifth Amendment issues, if Shahid Sheikh testifies, then we

15   will use this, if it's appropriate, to cross-examine him.

16          **THE COURT:**  Okay.

17          **MR. NELSON:**  If he doesn't testify, then we may have

18   to address it separately.

19          **THE COURT:**  74?

20          **MR. NELSON:**  74 is under the C & D letters I

21   described, Your Honor.  So this is a C & D letter actually

22   sent by my firm to Uddin Networks at Kenny Carter's direction.

23          **THE COURT:**  Well, if necessary, I will allow

24   Mr. Colosi to testify for five minutes that he sent it.

25          **MR. NELSON:**  Mr. Colosi is on the witness list by the

1    defendants, Your Honor, and he would be able to testify to

2    that effect.

3        Ms. Uddin received the letter.  I believe in her

4    deposition, Your Honor, she didn't recall the actual document.

5    Mr. Colosi would be able to testify about this.

6            **THE COURT:**  75.  I mean there are a series of these

7    same things or what is --

8            **MR. NELSON:**  They are, Your Honor.  So 75 is the same

9    thing.  It's a C & D that went to McIntosh Networks.  Jessica

10   Little asserted the Fifth Amendment with regard to whether she

11   received this document.  It was sent to her address in

12   Berkeley in her madame name -- mother's madame name, I

13   guess --

14           **THE COURT:**  76.

15           **MR. NELSON:**  76.  So Ms. Little responded to a

16   discovery request -- oh, I apologize, Your honor.

17       76 is a letter that Ms. Little sent.  And she sent it to

18   my firm in response to the C & D denying that she had any

19   knowledge of McIntosh Networks, a company that she had

20   established the UPS box three months earlier.  But in the

21   letter she says she had no idea what McIntosh Networks is.  It

22   was received by my firm.  I asked her about it at the

23   deposition; she asserted the Fifth Amendment.

24           **THE COURT:**  All right.

25       And, Mr. Crosby, you're objecting to this letter, or not?

1       You are on mute, Mr. Crosby.

2           **MR. CROSBY:**  Yes, Your Honor.  Only in the sense that

3    my client has asserted her Fifth Amendment right.  Should

4    plaintiff attempt to introduce this to the jury at trial, that

5    can be addressed at that time.

6           **THE COURT:**  Well, it certainly could be a party

7    admission.  How does that play out, Mr. Crosby, if it's a

8    party admission?

9           **MR. CROSBY:**  If it's a party admission and Your Honor

10   finds that way, then it would be an admissible document.

11          **THE COURT:**  All right.

12      77?  Same issues all with Ms. Little.

13          **MR. NELSON:**  This is a little bit different, Your

14   Honor.  This (sic) is the documents that she produced in this

15   case.  And there are many documents coming up, which are

16   produced by the defendants, and they are not agreeing to the

17   admissibility or the foundation for those documents that they

18   produced in discovery.

19      This would be a party admission, Your Honor.  I don't know

20   if we have to go that far.  These were documents produced by

21   Ms. Little in the -- in this litigation.

22          **THE COURT:**  When the production was made, did someone

23   certify it?

24          **MR. NELSON:**  I would have to double-check that,

25   whether there's a certification.  I confronted Ms. Little with

1  these documents at her deposition, and she asserted the Fifth

2  Amendment.

3          **THE COURT:**  That's through what, Mr. Nelson?

4          **MR. NELSON:**  That is for 77.

5     For 78, Your Honor, those are records which we subpoenaed

6  from a third party.  And so this is the production from -- in

7  this case, it's UPS in Reno.  And we have the Custodian of

8  Record's declaration pursuant to the subpoena.

9     That's the case for the ones coming up through 84.

10         **THE COURT:**  All right.  So those look like business

11 records under 803(6)?

12         **MR. NELSON:**  Yes, Your Honor.

13         **THE COURT:**  And they are certified with the subpoena?

14         **MR. NELSON:**  Yes, Your Honor.

15         **THE COURT:**  And you have the certification?

16    All right.  Any comments on that?  Objections seem

17 unfounded.

18                  (No response.)

19    How about at 87 then?

20         **MR. NELSON:**  87, Your Honor, or 85?

21         **THE COURT:**  85.

22         **MR. NELSON:**  85, this is 803(6).  It's a business

23 record.  So this is a letter that Cisco sent to ADSI with

24 regard to ADSI's partnership status.  ADSI was an authorized

25 Cisco partner until 2015.

```
 1              THE COURT:  I don't have 85.  My binder jumps from 83

 2    to 88.

 3              MR. NELSON:  The reason for that, Your Honor, is this

 4    is not cited in our motion in limine.  So I apologize for

 5    that.

 6         Our plan is to get you the entire 1 through the end per

 7    the Court's order, I think it's a week before trial.  But the

 8    other ones were cited in the motions in limine.

 9              THE COURT:  I see.  Okay.

10         So, again, who drafted the letter?

11              MR. NELSON:  Let me just grab the letter, Your Honor.

12                        (Pause in the proceedings.)

13         So the letter was actually sent by -- just going down, I'm

14    sorry -- Jennifer Louie, who is one of Kenny Carter's

15    colleagues.  He, Kenny Carter, was involved in this letter

16    because it was part of his group.  And so he has personal

17    knowledge of this letter.

18         And it's kept in the ordinary course of Cisco's business.

19    Okay.

20              MR. PARKHURST:  Your Honor, we would --

21              THE COURT:  I know, you are objecting to everything.

22         With respect to all of these, Mr. Nelson, you're going to

23    have to set the foundation that these things are business

24    records.  If they are business records as we have gone

25    through, they will be admitted.
```

1          **MR. NELSON:**  Thank you, Your Honor.  I understand.

2          **THE COURT:**  So 85 through 87 are all letters?

3          **MR. NELSON:**  That's correct, Your Honor.  And they

4     are all -- so they would fall under the business record

5     exception that we will make out in trial.

6          Beginning on 88, Your Honor, all the way through 103,

7     these are all defendants' records and produced by the

8     defendants, Bates numbered by the defendants.

9          Some of them I confronted the defendants with, and either

10    they asserted the Fifth Amendment or testified.  It would

11    depend.  But they are all defendants' documents.  I can't for

12    the life of me imagine why they are not agreeing to the

13    foundation of their own documents.

14         **MR. PARKHURST:**  Your Honor, just -- Andrew Parkhurst

15    for the defendants.

16         I think it goes back to our position we raised earlier

17    about not wanting to create a record of stipulating to

18    evidence.  However, given the Court's earlier statements about

19    other records, we certainly, with respect to these through --

20    it looks like it's through Exhibit 103, I'd like to take

21    another opportunity to discuss with Mr. Nelson about these.

22         **THE COURT:**  Okay.

23         Well, it looks like they go beyond 103.  The next set are

24    business records of PureFutureTech.

25         **MR. NELSON:**  103, Your Honor, you will see from the

1    Bates Number CCO -- so this was produced, I believe that was

2    the Bates number methodology used by the third-party

3    defendants.

4        And this is just the corporate documents that were filed

5    by ADSI with the California state authorities.  So part of

6    these documents, Your Honor, I confronted the witnesses during

7    their depositions.  Shahid Sheikh, in the first part of his

8    deposition, testified about the documents.  Roya, his wife,

9    the mother to Imran and Kamran testified to these documents as

10   well.

11       So, I don't believe that the defendants are going to

12   dispute these publicly-filed documents, and we can probably

13   resolve that with Mr. Parkhurst.

14           **THE COURT:**  Okay.  That takes us through 107.

15       108?

16           **MR. NELSON:**  So this is a -- these are the government

17   contracts which involves Cisco products sold by the

18   defendants.

19       Actually, then I showed this list, I believe, to Shahid

20   Sheikh.  He didn't acknowledge the various sales to the

21   government.  Chuck Williams -- Charles Williams is cited as a

22   sponsoring witness.  He's familiar -- works with the GSA a

23   lot.  He's familiar with GSA contracting.  And this document

24   shows the various products that the defendants have sold to

25   the government over the years.

1        If this were a normal case, Your Honor, of course in trial

2    I would show this to the owners of ADSI and have them confirm

3    that they made all these sales to the government.

4    Unfortunately, I don't have that opportunity.

5        So they are thwarting the submission of evidence to the

6    jury.  The -- we will get to it, I think, in the motions in

7    limine, but there is evidence that they have sold to the

8    federal government.  We have several government entities that

9    have testified in depositions, et cetera.  There are numerous

10   invoices from ADSI to government entities.

11       And Shahid Sheikh, in the first part of his deposition,

12   before he started asserting the Fifth Amendment, confirmed

13   these sales.  He wasn't personally involved in them.

14   Individuals in Pakistan were conducting those sales, but he

15   was aware of the sales and he confirmed the document.

16       In a normal trial, I would be able to show these

17   particular transactions to the defendant and have them confirm

18   that.  I think we are at an unusual impasse, Your Honor.

19            **THE COURT:**  Response?

20            **MR. PARKHURST:**  Your Honor, as Mr. Nelson said, these

21   records have not been authenticated.  There's no foundation

22   laid for these.  They are documents printed off a government

23   website.  It appears -- those are our objections.

24            **THE COURT:**  I'm not sure what the foundation is going

25   to be, Mr. Nelson.

1          **MR. NELSON:**  I understand, Your Honor.  Actually, as

2    I marked it on the exhibit list, Your Honor, we are not going

3    to be seeking to admit these into evidence.  They are being

4    marked for identification only.

5          **THE COURT:**  Okay.

6       The next, 110?

7          **MR. NELSON:**  110 -- so ADSI is a government supplier.

8    They are on the GSA portal.  And the Exhibit 110 is their

9    registration with the GSA.

10      I believe -- I don't have it in front of me.  I believe I

11   showed this to Shahid Sheikh when he was answering questions,

12   and he did confirm multiple times that ADSI did sell products

13   through the GSA portal.

14      At this point, Your Honor, I'm not sure that I need this

15   document to be admitted to the jury.  It will depend upon Your

16   Honor's ruling on the adverse inference motion in limine.

17      The fact of the matter is, ADSI sold their counterfeit

18   Cisco products to the federal government.  That is an

19   important aspect of the case.  It does -- we are using it to

20   have the jury consider that, about the appropriateness of

21   enhancing the damages.

22      The -- so I think the fact that they sold to the federal

23   government and they were on the GSA -- I don't think the

24   defendants are disputing.

25          **THE COURT:**  Okay.  Hold on just a minute.

1          (Pause in the proceedings.)

2          **THE COURT:**  Okay.  Part of my reason for going

3     through with some measure of detail was for me to get a sense

4     of how I think about evidence.  So the question is, are there

5     other things in here for which you might need some guidance?

6          **MR. NELSON:**  Rick Nelson for the plaintiffs, Your

7     Honor.

8          No, Your Honor, I understand the Court's directions.

9          **MR. PARKHURST:**  Andrew Parkhurst for the defendants.

10     Your Honor, I also understand the Court's position from

11     earlier.

12          **MS. FRIEND:**  Your Honor, Kate Friend for other

13     third-party defendants.

14          I did want to raise -- there are some issues that we

15     raised in the meet and confer with the defendants about some

16     documents on their portion of the exhibit list that relate to

17     various of the third-party defendants who have now been

18     granted summary judgment and that we believe should actually

19     be removed from their exhibit list.  They are no longer of any

20     relevance to the case.

21          **THE COURT:**  Exhibit numbers?

22          **MS. FRIEND:**  Sure.  Those documents would include

23     Number 318, Your Honor.

24          **THE COURT:**  All right.  So let's -- I thought I had

25     in my standing order a notation that these exhibit lists were

1   supposed to be annotated to show where you're doing things for

2   identification only or where it was not a primary document to

3   help manage irrelevant objections.  And maybe that wasn't

4   clear, but let me be clear on some of these things.

5       Deposition transcripts do not come into evidence.  And it

6   looks like who's ever put excerpts in here indicated that it

7   was for identification only, so I don't know why there are

8   objections.

9       Expert reports do not come into evidence.  Same issue.

10      So let's go to, you said, 30 --

11          **MS. FRIEND:**  There are approximately 10 of them, Your

12   Honor.  The first one would be 311.

13          **THE COURT:**  So this is an exhibit?

14          **MS. FRIEND:**  These are exhibits, Your Honor.  Some of

15   these are documents that were exhibits used in conjunction

16   with the summary judgment motion.  They include things like

17   Rahi Systems' responses to request for production.

18          **THE COURT:**  All right.  Let's talk about those.  Are

19   those actually -- well, those don't come into evidence either.

20          **MS. FRIEND:**  Correct.

21          **THE COURT:**  That doesn't mean that information from

22   certified documents such as that can't come in, but the

23   document doesn't come in.

24      So what is it that you -- what do you all want from 311?

25   What is the point?

1          **MR. PARKHURST:**  Your Honor, we put that on -- sorry.

2    This is Andrew Parkhurst for defendants.

3       We put this on the exhibit list to show Rahi's lack of

4    response, that Rahi refused to turn over the records of their

5    Cisco sales as part of discovery, which we believe was part of

6    our case for bringing the indemnity claim against Rahi, but

7    now the Court has ruled on the summary judgment motion.

8       To Ms. Friend's -- in a meet and confer, she did raise the

9    possibility, at that time there was no ruling on the motion

10   for summary judgment, we couldn't agree to anything then.  She

11   has emailed last night, around 4:00 p.m., about the

12   possibility of removing those.

13      We haven't had a chance to make a determination about

14   whether or not those exhibits would be something that could

15   still have relevance and something we would need to use with

16   the remaining third-party defendant, Ms. Uddin, but that's

17   where that stands on these documents.

18          **THE COURT:**  All right.  Meet and confer on that.

19   311, 312, what else?

20          **MS. FRIEND:**  I assume we will meet and confer

21   further, Your Honor, with Mr. Parkhurst.  I don't want to take

22   up -- I don't want to belabor this if we are able to meet and

23   confer about it.

24          **THE COURT:**  Okay.  What else do you want to talk

25   about in terms of exhibits?

 1          MR. NELSON:  From the plaintiffs, Your Honor, there

 2   is nothing additional.

 3          MR. PARKHURST:  Nothing, I think, from defendants,

 4   Your Honor.

 5          THE COURT:  All right.  I'm going to need an updated

 6   exhibit list.

 7       How much time do you want to meet and confer?

 8          MR. PARKHURST:  Your Honor, I guess it all depends --

 9   I guess we don't know --

10          THE COURT:  Mr. Parkhurst, you need to be ready to go

11   to trial.  This case is going to get all wrapped up with a bow

12   on top, and as soon as I can take you out, you are going to go

13   out.

14          MR. PARKHURST:  Understood, Your Honor.  I defer --

15   if there's a good time for plaintiff to meet.  Maybe a week?

16          MR. NELSON:  Your Honor, we are available to meet

17   over the weekend.

18          MR. KIRKE:  As is third-party defendant Nabia Uddin.

19          THE COURT:  I just need it at some point.  You can

20   get it to me by next Friday.

21       Okay.  So these -- all of these excerpts, and I don't

22   recall seeing any objections lodged.  Is there nothing to do

23   on that front?

24          MR. NELSON:  I apologize, Your Honor.  I missed the

25   first part of Your Honor's question.  The excerpts, are we on

```
 1    to the next one?
 2           THE COURT:  This is my (indicating) -- my gift from
 3    you all.
 4           MR. NELSON:  Sorry, I apologize for the gift as well.
 5       We are on to the list of proposed discovery excerpts,
 6    audios, and videos.  There's nothing that the plaintiffs need
 7    to address with the Court.
 8           THE COURT:  Anybody else?
 9           MR. PARKHURST:  Your Honor, Andrew Parkhurst for
10    defendants.
11       We included in ECF-247 the objections that we have for
12    certain portions of the deposition transcript --
13           THE COURT:  Did you put it in a binder?
14           MR. PARKHURST:  This was submitted by third-party
15    defendants' binder, Your Honor.  I assume they have it in
16    their --
17           THE COURT:  I don't remember seeing it.  Hold on.
18           MR. PARKHURST:  We submitted a joint binder.
19           THE COURT:  I have lots of binders from all of you.
20    I don't remember seeing one on that issue.
21                   (Pause in the proceedings.)
22           MS. FRIEND:  Your Honor, I believe it is Docket 247
23    is the order.
24           MR. NELSON:  Kate, this is the one that you delivered
25    to the Court?
```

1           **MS. FRIEND:**  Yes.

2           **MR. NELSON:**  Was it in a binder when it was

3    delivered?

4           **MS. FRIEND:**  I believe so.

5           **MR. KIRKE:**  Yes -- yes, it was.  And I believe we

6    received confirmation that it was -- that it was delivered.

7           **THE COURT:**  So walk me through how you set this up.

8    I now have -- I'm looking at 247.  So where are these -- is

9    that where Exhibit Tab A is?  Tab 1 here?

10          **MR. NELSON:**  Document 247, Your Honor, is the

11   document -- the list of proposed discovery excerpts.  That was

12   done after the other ones were done.  So we, the plaintiffs,

13   provided the Court with a binder with eight of the components.

14   This fifth component was delivered by third-party defendants.

15   I'm not quite sure of their numbering within the binder.

16      247 shows the designations of particular portions of

17   depositions that were being offered by the parties, and then

18   if there was any dispute about that, that was indicated in

19   that column.

20      I could give the Court an overview, at least of the ones

21   the plaintiff put in.

22          **THE COURT:**  So I'm trying -- this huge document that

23   I have, called a Proposed Discovery Excerpts Audios and Videos

24   that were sent -- Mr. Kirke, that I have from you, it's a --

25   it has an index that's a two-page chart, and then it has 28

1    exhibits, but there is no -- there is no ECF number.

2        So what is that, Mr. Kirke?

3        **MR. KIRKE:**  Your Honor, those contain the excerpts

4    of, including deposition designations and objections that my

5    office gathered and then put together and submitted.

6        **THE COURT:**  Does that correlate to this document,

7    Docket 247?

8        **MR. KIRKE:**  It does, Your Honor.

9        And in all candor, the -- I believe the Court's order is

10   that there should be, I think, no more than six pages of

11   excerpts for the Court to review and rule on objections.

12   There are well more than six pages.

13       So I don't know if we should include this as part of the

14   meet-and-confer process, and my office can confirm what we

15   thought was sent over, what we received confirmation of a

16   binder being delivered to the Court.

17       **THE COURT:**  Let's just look at Number 1 as an

18   example.

19       So this is the deposition of Mr. Love?

20       **MR. NELSON:**  Yes, Your Honor.  So Mr. Love is the IT

21   person in charge of the U.S. Army National -- I'm sorry.  He's

22   with the U.S. Army, Your Honor.  And we deposed -- Shahid

23   deposed him with regard to their purchase of counterfeit

24   products from ADSI.

25       So this -- these excerpts that we have from his deposition

1    were his authorization of the various documents that show that

2    the products ADSI sold to the Army were counterfeit.

3          THE COURT:  So the first objection is at page 31,

4    lines 16 and 17?

5       Why is this on this list?  That is, that 16 and 17 is the

6    objection.

7          MR. PARKHURST:  Yes, Your Honor.  Andrew Parkhurst

8    for the defendants.

9       The deposition transcript that they have submitted for

10   Mr. Love, we're identifying where we interposed objections to

11   that testimony.

12         THE COURT:  You want me to strike the objection or

13   are you seeking to have more of this stricken than you've

14   identified?

15         MR. PARKHURST:  Well, Your Honor, the portion in

16   dispute, we're identifying where we disputed to testimony

17   given by Mr. Love.

18      And this may be an oversight.  We may have done this

19   wrong.  This may be something that needs to be part of the

20   meet and confer.

21         MR. NELSON:  This is Richard Nelson for the

22   plaintiffs.

23      A meet and confer might be helpful, Your Honor.  These --

24   the depositions took place of third parties.  This deponent is

25   back in Maryland; obviously can't be present for trial.  He

1    was deposed so that he could give testimony about the

2    documents that the government had.

3        I don't really suspect that Mr. Parkhurst or Mr. Atkinson

4    are going to challenge that testimony.  They asserted

5    particular objections during the testimony, but the -- I mean,

6    I imagine that upon reflection, they may accept the fact that

7    this testimony is out there.  They can argue with regard to

8    the force of the testimony, but this is -- this is litigation

9    101, Your Honor.

10       We had an out-of-state witness, we deposed them.  We asked

11   questions particularly to authenticate documents.  And those

12   documents, we presume, would be admitted and not without

13   objection.  They could argue that somehow these counterfeit

14   products are not -- they can argue whatever they decide to

15   argue, but I don't think that they are really going to argue

16   that the questions and answers at the deposition were

17   improper.

18              THE COURT:  Okay.  This is -- a couple of things.

19       One is, just because someone makes an objection at the

20   deposition or a deposition, doesn't mean that it's a good

21   objection.  In terms of presentation of evidence through

22   deposition testimony, whether you're reading it or doing it by

23   video, all objections should be stricken from the recitation

24   unless -- you know, I've done this on the fly, in which case

25   someone makes the objection and I rule on the bench, and the

1    answer is read or not read, but that is not this case.

2         So, Mr. Parkhurst, you need to go back and decide whether

3    you want to stand on that objection.  But what you're asking

4    me to strike is the testimony that follows, not your

5    objection.

6         The way I do this, so that you know, is I want a proposed

7    order that tracks what it is you want me to do.  I'm going to

8    sit down -- I want a binder in one hand with all of these

9    documents and I want my proposed order in the other.  And I

10   want to be able to -- there should be a column or a line or

11   something where I check a box.  Is it -- you know, is the

12   objection sustained or overruled.

13        And then -- and I'm not going to type it up.  I am going

14   to use a pen.  I'm going to strike it and I'm going to file

15   it, and you all are going to comply.

16        That means that every single line item has to have its own

17   space.  The reason -- and litigators, you know, you're not

18   always judicious with what it is you present.

19        The reason I limit you to six pages is because you

20   apparently will take as many pages as I give you.  So if I

21   said 10, I would have 10 pages of objections.  I give you six.

22   You get to divide them equally if there is a dispute.  And

23   that's all I'm going to do.  You are just going to have to

24   deal.

25        So you figure out what is the most important because I

1    have a limited amount of time, and that's what you get.

2         Sometimes -- you know, sometimes it's hard for me to make

3    a ruling if I don't have enough context.  So frequently I'll

4    get page 5, and then page 52, and then page 101.  And you want

5    me to strike something on each of those pages, but you don't

6    give me the pages before or after that explain so I can read

7    and figure out what the context of the examination was.

8         And so sometimes you will get back a lot of blanks because

9    I don't know because you haven't given it to me.  And it is

10   incumbent on you to give it to me.  Okay?

11        I also need to know who these people are.  So, if you've

12   identified them on your witness list, then I can go back and I

13   can cross-reference so I can understand who they are.

14   Sometimes you don't give that to me.  You have to give it to

15   me if you want a ruling.  Okay?

16        So why don't you all work on that.  And it looks like I'm

17   going to need it back again.

18        Do you need any more guidance on that topic?

19             **MR. PARKHURST:**  Not from defendants, Your Honor.

20             **MR. NELSON:**  Not from plaintiffs.

21        There are a number of deposition excerpts that we have

22   beginning at Number 7, 8, 9, 10 -- 7, 8, 9 in particular,

23   which have to do with the motions in limine.  So these are the

24   assertions of the Fifth Amendment.

25        So presumably, depending on the Court's ruling, there --

```
 1      it would just be -- they would just be eliminated.  I don't
 2      think there's anything to discuss at this point, but that is
 3      the reason why some of these are listed.
 4              THE COURT:  Okay.
 5          We are going to pass on jury instructions, I think, for
 6      now unless there is something that -- let me ask this:  The
 7      Fifth Amendment one I understand.
 8          Supplemental instruction -- the special instruction P1-1,
 9      page 56 of 81, to where the disputes begin, is this an
10      objection?
11          Because you don't think that the evidence will be there or
12      is it -- is there something else going on?  I mean, what I
13      don't have are counterpositions with respect to each of these.
14          Special instruction P1 is proffered, I take it, from the
15      plaintiffs, and the defendants object, but I don't see any
16      argument.
17              MR. NELSON:  Your Honor, from the plaintiffs'
18      standpoint, so this was suggested by us.
19              THE COURT:  I assumed because it says you agree and
20      you gave me your authorities.
21              MR. NELSON:  Yep.
22              THE COURT:  What I don't have is the basis for the
23      objection.
24              MR. ATKINSON:  Your Honor, this is Tyler Atkinson for
25      the defendants.
```

1          The basis for the objection is simply that we did not

2     believe that these particular instructions needed to be

3     provided.  They seem to be surplusage with the instructions,

4     the model instruction.  That said, if the Court believes this

5     will aid the jury, then that's the Court's prerogative

6     obviously.

7          **THE COURT:**  But, Mr. Atkinson, sometimes jury

8     instructions are proffered that people actually believe are

9     wrong on the law and/or where there is specific objections to

10    language, and that's fine.  That's what I didn't know.

11         So, if your argument -- if there's nothing wrong in here

12    as a matter of law and your argument is that it's just not

13    necessary, that's fine.  I just didn't know one way or the

14    other.

15         **MR. ATKINSON:**  I believe the statements of law are

16    correct.  So, yes, Your Honor, I appreciate that.  Our

17    objection is limited to we don't believe it is necessary.

18         **THE COURT:**  Okay.

19         What about -- there was one before that.  Page 53 of 81,

20    the adverse inference.  That's the Fifth Amendment, but --

21    let's not do that one right now.

22         All right.  The one after that then is 5.5.  This is a

23    model instruction.  You just think it's not necessary?

24         **MR. ATKINSON:**  Sorry, Your Honor, 5.5?

25         **THE COURT:**  Right.  You disagree.

```
 1              MR. ATKINSON:  I just have -- I am looking at the

 2    ECF-248, Document 248?

 3              THE COURT:  No.  Docket 240 are the jury

 4    instructions.

 5              MR. ATKINSON:  There were omitted instructions.

 6              THE COURT:  Okay.

 7                   (Simultaneous colloquy.)

 8              MR. ATKINSON:  Sorry, Your Honor.

 9              THE COURT:  I went through the binder.  So --

10              MR. ATKINSON:  Your Honor, I will pull up the former

11    instructions just so I have apples to apples.

12                   (Pause in the proceedings.)

13              THE COURT:  So I'm pulling up your now -- the new

14    one.

15         All right.  So 5.5 you still -- still you disagree?

16              MR. ATKINSON:  I'm sorry, Your Honor, I'm not seeing

17    it in the table.  Can you give me a page reference?

18              THE COURT:  On which document?

19              MR. ATKINSON:  On Document 248, if you pulled that

20    up.

21              THE COURT:  Well, I'm looking at the chart on 248.

22    On 240, which has 5.5, it's page 58 of 81.

23              MR. ATKINSON:  This may have been an instruction that

24    was withdrawn by one of the parties.

25              THE COURT:  That's why I picked up 248.  It is
```

1  showing on 248.

2       **MR. NELSON:**  I'm wondering, we don't have a 5.5.  We

3  have a 15.5 and there's some dispute on 15.5.

4       **THE COURT:**  I'm sorry.  You're right, 15.5.  I'm

5  sorry.

6              (Pause in the proceedings.)

7       **MR. NELSON:**  The plaintiffs have no objection to

8  15.5, Your Honor.  I believe the objection was by the

9  defendants.

10      **THE COURT:**  I understand that, Mr. Nelson.  I am

11 waiting for the defense.

12      **MR. NELSON:**  Okay.

13             (Pause in the proceedings.)

14      **MR. ATKINSON:**  I believe our objection to this may

15 have been based on language that was omitted.  This may have

16 been a -- there was a choice not to include some bracketed

17 language.

18    But I believe it's possible that during meet and confer

19 with the plaintiffs, we were satisfied that plaintiff said

20 they were not seeking future liability, and so that

21 clarification mooted the dispute.  I apologize, Your Honor, we

22 should have made sure that's clear to the Court.

23    Mr. Nelson, correct me if I'm wrong, I think that was the

24 issue and I think we were satisfied that the bracketed

25 language didn't need to be included with the clarification

1    that the plaintiffs were not looking for forward liability.

2           **MR. NELSON:**  I believe, Your Honor, that there is

3    bracketed language after 1 and 2, which is on the pattern

4    model jury instruction that has to do with -- it has to do

5    perhaps with steps that the defendants may have to take in the

6    future to correct the counterfeit issues, and we are not

7    seeking that.

8           **THE COURT:**  So in Docket 248, there's no objection at

9    this point?

10          **MR. ATKINSON:**  There is none, Your Honor.  Yes, Your

11   Honor, there is none.

12          **THE COURT:**  15.6.  What is the objection there from

13   the defense?

14               (Pause in the proceedings.)

15          **MR. ATKINSON:**  I'm sorry, Your Honor.  I don't see

16   why we objected to this.  This is a model instruction.  It

17   looks like it would be appropriate to give this.

18          **THE COURT:**  All right.  So noted.  The objection at

19   15.6 is withdrawn.

20      The next one I see, Special Instruction P-2.

21          **MR. NELSON:**  Do you want to hear their objection?

22          **MR. ATKINSON:**  On this one, I don't believe we had an

23   issue with the statement of law, the necessity of giving this

24   instruction.

25          **THE COURT:**  Objection to Special Instruction P-3?

1          MR. ATKINSON:  The objection had to do with the

2     necessity of giving this instruction.

3          THE COURT:  P -- let's see.  The next one I see then

4     is plaintiffs' objection to 15.29 or is it just we have

5     competing --

6          MR. ATKINSON:  We have competing, Your Honor.  We

7     offered the model instruction and as I understand it,

8     plaintiffs added language to account for 2020 Supreme Court

9     case, and I can speak to that if the Court would like to hear

10    me.

11         THE COURT:  All right.  Go ahead.

12         MR. ATKINSON:  Your Honor, I think -- and counsel can

13    speak for himself, but I think counsel's position, as we have

14    met and conferred on this, is that the Supreme Court in the

15    *Romag* case articulated that a showing of willfulness is not

16    required to obtain a trademark infringer's profits.

17         We don't -- we think the model is properly drafted by the

18    Ninth Circuit.  We don't believe that additional sentence is

19    necessary.  In fact, the case, which the court has the

20    citation, it's -- I'll spare the court reporter reciting it

21    because I know it's in front of the Court.  In the *Romag* case,

22    the Court said at page 1497, and I'm just going to quote this

23    language.  I am sure the court will review the case itself.

24         Quote:  "Given these traditional principles, we do not

25    doubt that a trademark defendant's mental state is a highly

1    important consideration in determining whether an award of

2    profits is appropriate" period.  "But acknowledging that much

3    is a far cry from insisting on the inflexible precondition to

4    recovery Fossil advantage," unquote.

5        So while the Supreme Court very clearly thinks you do not

6    need a showing of willingness -- excuse me, willfulness to

7    obtain the infringer's profits, it does not go so far as to

8    denounce that consideration by a fact finder.

9        And for that reason, we think it calls attention to

10   something that really a jury shouldn't be necessarily thinking

11   about on the question of profits.  The Court says you don't

12   need to get into willfulness on the question of profits.

13       So we think the Ninth Circuit instruction is not wrong.

14   It's not really missing anything.  It actually adds -- it

15   attracts attention to an issue if we start saying a showing of

16   willfulness is not required.  The instruction, as drafted,

17   doesn't suggest willfulness is required.

18           **THE COURT:**  Okay.

19           **MR. NELSON:**  Really briefly, Your Honor.

20       The model instruction, obviously, was drafted and put

21   together before the Supreme Court ruled on the *Romag* case just

22   a few months ago.  So that particular issue of willfulness was

23   hotly disputed.  That is what -- that is why the Court took up

24   the case because there was a conflict.

25       The Supreme Court now has ruled on that.  We just added

1    that sentence in the first paragraph.  This is a -- this is

2    the added sentence is -- is -- reflects a holding from the

3    Supreme Court that settled this issue.  We think it would be

4    appropriate to instruct the jury with regard to the current

5    state of the law.

6         **THE COURT:**  Okay.  I understand the issue.

7         The next objection I see is to -- well, this is the

8    equitable indemnity.  There's -- defendants object.

9         **MR. ATKINSON:**  Yes, Your Honor.

10        I -- part of this comes down to, we wanted to address with

11   the Court how this case is going to be tried in terms of the

12   sequence and in terms of the defendants' complaint against the

13   third-party defendant Nabia Uddin.

14        We think, to the extent equitable indemnity needs to be

15   discussed with the Court, briefed to the Court, that would

16   properly be done outside of the jury instruction process.

17        **MS. FRIEND:**  Your Honor, I'm not sure that I

18   understand counsel's objection in this case.

19        **THE COURT:**  Is equitable indemnity a jury question?

20        **MS. FRIEND:**  Your Honor, there is a jury instruction

21   for equitable indemnity within the CACI instructions so that's

22   why we included this.

23        The underlying issue is that the only remaining cause of

24   action in this case that involves our client --

25        **THE COURT:**  Hold on.

1           **MS. FRIEND:**  I'm sorry.

2           **THE COURT:**  I don't see a cite to the CACI

3    instruction.

4           **MS. FRIEND:**  It is -- it might be somewhat buried in

5    there.  It's 3800, Your Honor.  And it's at line 6, page 75.

6           **THE COURT:**  I see it.  Thanks.

7        All right.  Go ahead.

8           **MS. FRIEND:**  So the only remaining claim against our

9    client really arises out of the UCL, Your Honor.  And since

10   the Court ruled at the beginning of this case that the Lanham

11   Act claims were dismissed, and that's really the basis for the

12   unlawfulness component of the UCL claim brought by the

13   plaintiffs, what's left is really the fraudulent or unfair

14   components.

15       And there's a recent case that came out of the California

16   Supreme Court earlier this summer where the Court clarified

17   that the UCL claim is an equitable claim that is an issue of

18   law that should be decided by the Court.  However, the

19   indemnity claim remains a jury question, of course.

20          **THE COURT:**  Okay.  So what is the objection to the

21   instruction itself?

22       Mr. Atkinson, you're muted.

23          **MR. ATKINSON:**  Sorry.  I had a good streak there of

24   not doing that by accident.

25       To the extent the instruction tracks with CACI 3800, and

```
 1      it would need to be updated to reflect Ms. Uddin, we don't

 2      necessarily have an issue with that other than the larger

 3      question for the Court of how the Court wants to proceed on

 4      our third-party complaint.

 5              THE COURT:  Okay.  Let's keep going.  There is an

 6      objection to special instruction -- or to TPD Number 3.

 7          What's the objection here?

 8              MR. ATKINSON:  I believe, if it tracks CACI 4030, the

 9      only -- the only question is, again, how the Court wants to

10      proceed with our third-party complaint.

11              THE COURT:  Okay.  TP Number 5?  Well, 4.  Is it the

12      same for 4 and 5?

13                      (Pause in the proceedings.)

14              MS. FRIEND:  Your Honor, I will just jump in quickly

15      on Number 5.

16          Given the Court's ruling on the summary judgment motion, I

17      don't know that 5 is necessary any longer.

18              THE COURT:  Withdrawn?

19              MS. FRIEND:  Yes, Your Honor.

20              THE COURT:  All right.  4?

21              MR. ATKINSON:  With respect to 4, if the Court is

22      inclined to give an instruction regarding liability for

23      indemnity, we may have a -- we may want to offer a competing

24      instruction.

25          I think the only reason we did it had to do with these
```

1    instructions coming out when they did, and the question of how

2    the Court wants to handle this case.

3        So we may -- if the Court doesn't mind, we may have a

4    competing instruction on this to go with the other one.

5            **THE COURT:**  Okay.  Let's talk about the Fifth

6    Amendment issues.

7        I laid out my position in the order for summary judgment.

8    It was obviously issued after you filed your motions in

9    limine.  I do think that, to the extent that someone testified

10   during a deposition, I can't exclude their testimony on those

11   topics at trial if they didn't assert the Fifth.

12       What you have done in terms of your motions, though, is to

13   paint everything broad brush, and I can't really address it in

14   that way.

15       So, how do you want to proceed in terms of making this

16   accessible to you in order to prepare for trial?

17           **MR. NELSON:**  Thank you, Your Honor.

18       So we would like guidance from the Court on these

19   particular issues.

20       And the one Your Honor just mentioned pertains to only one

21   of the defendants, Shahid Sheikh.  He testified at his

22   deposition.  The deposition did not finish.  And when we

23   returned, which was several months later, he then asserted the

24   Fifth and wouldn't answer any more questions.

25       So I guess there's two ways to approach this.  One is, as

1    Your Honor mentions, if he testified in the deposition, then

2    he would be allowed to testify at trial.  The problem we have

3    with that -- the first problem is that a deposition is not

4    completed until it is completed.  And we went back to some of

5    the areas, as we had intended to do, when he did set up his

6    completion, and refused to answer.  So we really weren't able

7    to finish the deposition.

8         But putting that issue aside, I don't know if I would be

9    that unhappy with the thought of him testifying at trial.  If

10   he's willing to testify at trial, then I'm willing at this

11   point to do that.  I mean, what we said in our papers, Your

12   Honor, is true; that it prejudices the plaintiff because we

13   weren't able to find out in February what he's going to

14   testify in November.  I can deal with that.

15        And so if he testifies, and is available for

16   cross-examination -- actually, if he testifies, I'm going to

17   put him on in my case-in-chief.  If he's willing to now answer

18   those questions, then -- then I remove my objection with

19   regard to the Fifth Amendment and will welcome his testimony.

20             **THE COURT:**  All right.

21        Response.

22             **MR. ATKINSON:**  Well, Your Honor, just to be clear --

23   and it doesn't sound like it's necessarily as germane as it

24   might have been, but he testified on September 10, 2019, from

25   10:07 a.m. to 6:10 p.m., and he testified for more than five

1    hours.

2        And I do think it -- to the extent -- maybe I'm the only

3    person who thinks it's relevant at this point, the defendant

4    sought a stay --

5             **THE COURT:**  Mr. Atkinson, does he intend to testify

6    in your case-in-chief?

7             **MR. ATKINSON:**  Yes.

8             **THE COURT:**  Okay.

9             **MR. ATKINSON:**  Yes.

10             **THE COURT:**  Well, then --

11             **MR. ATKINSON:**  So --

12             **THE COURT:**  Hold on.

13        Given that he tends to -- intends to testify in your

14    case-in-chief, he's ordered to testify in plaintiffs'

15    case-in-chief.

16        And as I hear Mr. Nelson, he is withdrawing his

17    objections.

18             **MR. NELSON:**  I am, Your Honor.

19             **MS. FRIEND:**  Your Honor, Kate Friend for the

20    third-party defendants.

21        I just want to raise a collateral issue, which is, the

22    fact that -- and I think this was addressed to some extent

23    when the Court discussed in our summary judgment order

24    Mr. Sheikh's supplemental declaration that the Court sustained

25    our objections to that declaration in part on the Fifth

1   Amendment grounds.

2       And I think the Court recognized that in that case it's

3   somewhat different.  Because in the case of the third-party

4   defendants, you are dealing with an affirmative claim that is

5   being brought and then we have this other issue of having

6   withheld the information as to the third-party claim.

7       For that reason, we actually -- we object to Mr. Sheikh

8   testifying and we also certainly object to his deposition

9   testimony being read by the defendants.

10      It's not admissible for that purpose.  He's available.

11          **THE COURT:**  Well --

12          **MR. ATKINSON:**  So, Your Honor --

13          **THE COURT:**  Ms. Friend, the whole thing is admissible

14  as a party admission.  They could read the entire deposition

15  if they wanted to under the Code of Evidence.

16          **MS. FRIEND:**  Your Honor, Mr. Sheikh's counsel, I

17  don't believe, could read his --

18          **THE COURT:**  But Mr. Nelson could.

19          **MS. FRIEND:**  Mr. Nelson could.  I think the proposal

20  from the defendants is that they intend to read Mr. Sheikh's

21  testimony.

22          **THE COURT:**  They can't do that.

23      Let me be clear.  If, Mr. Atkinson, if you thought you

24  were going to do that, the answer is, no, you cannot do that.

25  That's not allowed.

1          Mr. Nelson can --

2               **MR. ATKINSON:**  Right.

3               **THE COURT:**  -- you can't.

4               **MR. ATKINSON:**  Right.  No, I understand, Your Honor.

5          With regard to the third-party defendants, the issue we

6     would have there with their arguments is, the third-party

7     defendants never noticed Shahid Sheikh's deposition.  Shahid

8     Sheikh, in fact, did sit for seven hours for a deposition,

9     more than five hours of which he provided substantive

10    responses.  And then in the last -- less than two hours, he

11    started asserting the Fifth Amendment.

12         So there was no additional time, absent leave of court,

13    for the third-party defendants to be asking questions.  And

14    I'm not going to second-guess how that went down, but the fact

15    of the matter is, the third-party defendants actually are not

16    in the same shoes as the plaintiff.

17         And so we tried to cite in our brief all of the

18    substantive questions.  And it's only common sense.  Cisco, in

19    the first more than five hours of Mr. Sheikh's deposition,

20    asked the critical questions of the case.

21         So, in terms of looking at this from a high level, we

22    agree, we should not be able to elicit information that he

23    refused to respond to.  We can't ask him the questions that he

24    refused to answer on day two, but we do believe it would be

25    proper to stick to the substantive -- the subject areas that

1    were covered during his first five hours of deposition.

2          THE COURT:  I guess the question is, didn't you

3    withhold documents on the basis of Fifth Amendment?

4          MR. ATKINSON:  I don't believe so.  Mr. Parkhurst can

5    speak to that further because that's an area that he was

6    working on.

7          THE COURT:  So to the extent that you withheld

8    discovery, responses to interrogatories, anything like that on

9    the basis of the Fifth Amendment, then your argument doesn't

10   hold water.

11         MR. ATKINSON:  Mr. Parkhurst?

12         MR. PARKHURST:  Your Honor, we -- no documents were

13   withheld on the basis of the Fifth Amendment.  The Fifth

14   Amendment assertions were in responses to interrogatories from

15   third-party defendants.

16         THE COURT:  All right.  So it would be another guide.

17     If those objections were made in response to questions

18   from the third-party defendants, you cannot affirmatively

19   solicit that information.

20         MR. PARKHURST:  The deposition testimony in September

21   of 2019 that Mr. Sheikh gave was several months before

22   third-party defendants sent their interrogatories, which I

23   believe was springtime, March of 2020.

24         THE COURT:  I don't know how that timing matters.

25   How does that matter?  Your responses are what controls.

1          **MR. PARKHURST:**  Understood, Your Honor.

2      I guess where the direction from the Court -- if he

3  testified in September of 2019 to a topic that then was

4  covered in third-party defendants' special interrogatories

5  that they sent in March, when the Fifth Amendment was

6  asserted, is his testimony from September 2019 now --

7          **THE COURT:**  Well, you would have to show me an

8  example.

9      So he affirmatively testified to something and then said,

10  no, I refuse to say the same thing again?  Admission once is

11  an admission period.

12          **MS. FRIEND:**  As an example, Your Honor, there were

13  questions like the standard:  State all facts that support

14  your claim against Ms. Uddin.  But also things like state all

15  facts that support your claim that Ms. Uddin is responsible

16  for directing the counterfeiting activities.

17      And that is a question that, you know, at that point we

18  had not had an opportunity to cross-examine Mr. Sheikh and in

19  some ways that written discovery serves as the

20  cross-examination.  And so -- and they refused to answer those

21  questions.

22      That's why we think that the Court should exclude that

23  testimony on the same rationale that the Court excluded

24  Mr. Sheikh's supplemental declaration.

25          **THE COURT:**  And I can't do that without detail.  That

1    is, I understand the issue, but you have not -- but you have

2    not proffered it to me in a sufficient detail for me to make

3    those calls.

4        I mean, I will.  You understand the principle.

5            **MS. FRIEND:**  Sure.

6            **THE COURT:**  And that's, you know, that's part of the

7    reason to have a pretrial conference, right, so you can

8    understand the principle.

9        And now I'll put it back on your plate to figure out what

10   is the most efficient way for you all to, you know, slice the

11   issue so that you know what you are going to trial on.

12           **MS. FRIEND:**  Your Honor, would you like us to submit

13   a supplemental briefing on the issue?

14           **THE COURT:**  I am not -- I never encourage more

15   briefs.  What you all need to do -- look, and it costs money

16   to put this stuff together.  Right?

17       So what you need to figure out is, now that you have this

18   direction, is there a way that in light of the Court's

19   direction and, you know, the defendants can make any -- can

20   throw in whatever footnotes they want about maintaining their

21   objections, but in light of the Court's direction on this

22   topic, the parties agree that this is the way -- this is what

23   we are going to do.

24       Let's say there are 25 topics.  We agree that, based on

25   the Court's direction, these 20 are out and these five are

1    available, or whatever.

2         If you want to go the more expensive route, you can do

3    that.  But I can't -- you know, I'm just the judge.  I'm not

4    the lawyers.  You know this case better than I do.  You know

5    the documents better than I do.  You know the testimony.  I

6    can't do it for you without something much more specific in

7    front of me.

8                   MS. FRIEND:  Thank you, Your Honor.

9                   MR. NELSON:  Your Honor, with regard to the topics,

10   what I understood is that the defendants were going to allow

11   Mr. Sheikh to testify with regard to questions having to do

12   with the counterfeit operation that was occurring at ADSI and

13   the assorted companies in Fremont.

14        I would intend to ask some questions about exactly that,

15   about counterfeit products being purchased, about counterfeit

16   labels being placed on products in Fremont, and all of the --

17   and all of those details.

18        I want to make certain that we are not stepping into an

19   additional problem at trial because those are the exact kind

20   of questions that he refused to testify to in February.  So if

21   he's going to testify about the activities of ADSI and their

22   sales of products, where they are procuring their products and

23   the directions to the employees, that's great and I'm happy to

24   have him testify.

25        But it is not going to be a repeat of September 2019.  I

1    mean, I am not constrained to just ask the very same questions

2    I asked in 2019.  The topics are whether or not the defendants

3    committed the Lanham Act violations, you know, during the time

4    in question.  That is the case in chief.  So I would expect to

5    be able to ask questions that would cover all of that.

6         **THE COURT:**  Mr. Atkinson?

7         **MR. ATKINSON:**  I think, Your Honor, we will meet and

8    confer with our opposing counsel.  I actually don't think

9    there's a lot of disagreement, at least as to plaintiffs and

10   defendants here.  And it is mostly a matter of setting guard

11   rails so that in front of the jury we don't have problems.

12        **MR. NELSON:**  The guard rail is really important, Your

13   Honor.  That's what strikes me as odd as where the turn that

14   we are going here.  Because the defendants --

15        **THE COURT:**  Mr. Nelson, it is odd to me too.

16        **MR. NELSON:**  Okay.

17        **THE COURT:**  But I'm not, you know, I'm not going to

18   resolve it today.  And if -- I'm happy to issue orders based

19   upon agreement.  I'm happy to issue orders when something more

20   specific is proffered, and I think guard rails are important

21   for everybody.  But it's still a little premature for me to be

22   doing something more specific.

23        So that deals with motion in limine 1, right, and 4,

24   right?

25        **MR. ATKINSON:**  Your Honor, I think of 1 and 9 as

1    being related and 2 and 4 as being related.  2 and 4 really

2    have to do with the adverse inference instruction and what the

3    Court will allow and not allow in that regard.

4              **THE COURT:**  All right.  Argument on 2.

5              **MR. NELSON:**  On 2, Your Honor?

6              **THE COURT:**  Yes.

7              **MR. NELSON:**  So we are moving party here.  So our

8    motion in limine Number 2 involves the instruction that the

9    Court should give with regard to the adverse inference that

10   the jury may take on the assertion of the Fifth Amendment by

11   the various defendants.

12       The -- there is an argument, their motion Number 4, which

13   is that no adverse inference should be given.  We argued in

14   our opposition there that they are misreading the law; that,

15   in fact, in federal court, in federal question cases, the

16   adverse inference is allowed.  So we believe that they are

17   just wrong with regard to federal law.

18       The biggest question on Number 2 -- so with Number 2, Your

19   Honor, as you might have seen, we took great care in

20   identifying the various adverse inferences that we believe

21   should be provided.

22       So there's a variety of questions that were asked of the

23   defendants, and we have identified by the defendant, and the

24   question that was asked of the defendant and their assertion

25   of the Fifth Amendment.  And then pursuant to Ninth Circuit

```
1    authority, we understand that we have the burden to show that

2    there's substantial evidence that supports that that, in fact,

3    is true.

4        And so what we've provided in the table that accompanied

5    motion in limine Number 2, it is the exact issues that an

6    adverse inference, we argue, is appropriate, their assertion

7    of the adverse inference, and then the evidence that supports

8    the veracity of the underlying fact.

9        And so that -- the first issue is, should an adverse

10   inference be provided?  And plaintiffs argue that, yes.  I

11   don't think the defendants actually are disputing that fact.

12       The second issue is when should the adverse inference

13   instruction be provided.  And our argument on that, Your

14   Honor, is this is an essential part of this case in the fact

15   that the defendants, other than Mr. Sheikh, that we just

16   learned ten minutes ago may testify, the defendants are not

17   testifying.  And these essential facts are not going to be in

18   front of the jury.

19       We think the jury needs to be instructed early that the

20   witnesses have chosen not to testify and -- just so that it's

21   not prejudicial to the plaintiffs.  The jury may be wondering

22   why haven't we called Kamran Sheikh, or why haven't we called

23   Jessica Little as a witness.

24       And the fact is, we would love to call Jessica Little and

25   Imran Husain, et cetera as witnesses and cannot because of the
```

1    Fifth Amendment.  So there is a balance jury instruction that

2    we provided that we are asking the Court to alert the Court

3    (sic) to that.

4        Then we believe that the case law supports, and we cited

5    the cases, but there is a paucity of authority in this area.

6    I was surprised.  We couldn't find great authority that says

7    when it was that the Court should give the adverse inference

8    instruction.

9        And so our solution that we proposed to the Court was that

10   when the plaintiffs establish the underlying fact, then at

11   that point we propose that we would then turn to the Court and

12   say, for example, once underlying fact Number 8 was

13   established, which is on page 11 of 28 of Document 194, we

14   would ask the Court to then provide the jury with the adverse

15   inference that Kamran Sheikh knowingly engaged in counterfeit

16   activities involving Cisco products, a fact that he refused to

17   testify about.

18       So once there is sufficient evidence in front of the jury

19   about that, we would think it would be appropriate at that

20   point to then instruct the jury.

21       I think the defendants' option is to wait until the very

22   end of the case and then have that instruction be provided as

23   part of the closing instructions.

24       This is just too big of an issue in this case with regard

25   to -- it's the ability for the plaintiff to prove its case to

1    the jury.  And the Court acknowledges that the defendant has a

2    Constitutional right to refuse to testify.

3        That comes with consequences.  That comes with an

4    acknowledgment that the plaintiff, in this context, is

5    prejudiced because this is key evidence that we're not able to

6    provide to the jury.

7        I don't think it's appropriate on day seven of the trial,

8    if it goes seven days, for the very first time for the jury to

9    hear, oh, that explains why the plaintiff never brought

10   forward that evidence.  I get it that the defendants asserted

11   the Fifth.

12       At that point, I believe, it's too late, Your Honor.  Or

13   not too late, but people -- people get set in their ways and

14   they are now -- they are sniffing in the wrong direction and

15   they don't have the right guidance from the Court about the

16   strange circumstance here.  The strange circumstance being

17   that the plaintiffs were unable to establish certain facts

18   during the course of the case, and it would only be at the

19   conclusion of the case that everything would be made clear.

20       We think that's too late.

21           **THE COURT:**  Response.

22           **MR. ATKINSON:**  Thank you, Your Honor.

23       In response to those points, there is no confusion over

24   the fact that an official Court can give an adverse inference

25   instruction.  There is no disputing that.

1    However, I think all parties agree that that is a

2    discretionary call of the Court whether or not to give that

3    instruction.

4    And just with this notion of prejudice, we are not

5    confusing state court with federal court, but we know that

6    Your Honor had plenty of experience doing state court trials.

7    And as the court well knows, in state court, plaintiffs are

8    regularly confronted with the exclusion of Evidence Code

9    Section 913, and that state law is in play in other cases, and

10   plaintiffs move on with their case.

11   So this is not going to bring the case to a screeching

12   halt.  In the first instance, we believe the Court should

13   exercise its discretion, not give the adverse inference

14   instruction, and we do believe that it should weigh into the

15   Court's thinking about this, the fact that there are

16   substantive state law issues, and state law privilege Evidence

17   Code Section 913 would not allow any of this.

18   So, that's why we believe the Court should not exercise

19   its discretion in giving the inference instruction.  However,

20   in the alternative, if the Court believes there is prejudice

21   to plaintiff that needs to be offset, it's a matter of not

22   unduly prejudicing the defendants, and the plaintiffs'

23   presentation, as I read it, would have the Court instructing

24   the jury possibly as many as 52 times.

25   At least there are 52 issues set out in the exhibit

1    accompanying the motion.  That would be wildly overwhelming to

2    the jury.  It would really be putting the thumb on the scale

3    for the outcome to have the Court repeatedly remind the jury

4    that these people exercised their Fifth Amendment privilege

5    and did not answer these questions.

6        We're not married to the idea of a closing instruction or

7    to an introductory instruction, and we would definitely, if

8    the Court is inclined to instruct the jury, we would work with

9    the Court and counsel about what exactly that language should

10   look like.  But it should not overwhelm the jury and it should

11   not overshadow the facts.

12       Cisco makes out in its motion that it has all this

13   independent evidence.  It can put on its case.  It does not

14   need to hammer this issue more than necessary.

15           **THE COURT:**  Okay.  Any other thoughts?

16           **MR. NELSON:**  Your Honor, we did provide to the Court

17   in the proposed order the instruction that we suggest with

18   regard to the invocation of the Fifth Amendment right, which I

19   think is balanced and it's based on the case law.

20       With regard to discretion, the federal courts are very

21   clear that the assertion of the Fifth by a party can cause

22   significant harm to the other party.  And the way to remedy

23   that is by giving this instruction.

24       It's a choice, and a choice that they can take for obvious

25   reasons and, nevertheless, it does prejudice the plaintiffs in

1    this case.

2        So we believe that the Ninth Circuit clearly authorizes

3    the Court to give the instruction.  It's appropriate.  The

4    witness apparently -- well, two of the defendants refused to

5    answer any questions, including their job title.  Whether

6    they, in fact, were CEO of ADSI; refused to answer that

7    question.

8        So for us to be able to meet our burden to the jury to

9    establish not only that this is counterfeit, we don't need

10   their words for that, we have our own independent evidence of

11   that, but particularly whether they knew that it was

12   counterfeit, that these CBP notices were being provided, et

13   cetera, that, I think -- that is our burden to establish to

14   the jury that they did this willfully and knowingly.

15       And in order to prove willfulness and knowledge without

16   the actual testimony of the person who is allegedly willful or

17   knowing is extremely difficult and hard for the jury to piece

18   together without the instruction.

19           **MR. ATKINSON:**  Your Honor, if I may?

20           **THE COURT:**  Go ahead, briefly.

21           **MR. ATKINSON:**  Your Honor, keeping it brief, my only

22   response to that, Your Honor, is we did move to stay this case

23   which would have alleviated, I think, a lot of the claim of

24   prejudice that the plaintiff is making out.  Plaintiff opposed

25   our motion to stay the case while it was holding the -- while

1    the threat of criminal exposure persisted.

2        So, I mean, we can't replay how that went down and what

3    discovery would have developed if we had not had to assert

4    the --

5            **THE COURT:**  What is the statute of limitations on

6    that?

7            **MR. ATKINSON:**  I would have to go back and look, Your

8    Honor.  Granted, it would have been a long --

9            **THE COURT:**  I went and looked at your motion, and I

10   didn't see the actual years identified.

11       Do you not know?

12           **MR. ATKINSON:**  Not off the top of my head.  I

13   apologize, Your Honor.

14           **THE COURT:**  Does anybody know?

15           **MR. NELSON:**  It's a five-year statute, Your Honor.

16       And, Your Honor, one reason why the Court did not grant

17   the stay was -- it was at that point moot, discovery was over.

18   The assertions of the Fifth took place.

19       Usually a defendant asks for the stay before they have to

20   assert the Fifth because they don't want to assert the Fifth.

21   They already asserted the Fifth, and discovery at that point

22   was over.

23       So, if -- the motion should have been -- if the motion

24   could have been made, it should have been made earlier when it

25   would have been actually meaningful in the case.  And we

1    opposed it on that basis; the fact that it was a meaningless

2    motion because discovery had completed.

3         **MR. ATKINSON:**  Your Honor, plaintiff opened

4    discovery, reopened discovery, and continued discovery

5    multiple times in this case.  We believe the Court would have

6    favorably heard a motion by the defendants to reopen and

7    answer the questions once a Fifth Amendment was not an issue.

8         So, I mean, these are all hypotheticals, Your Honor.

9         **MR. NELSON:**  The Fifth Amendment would not be an

10   issue in 2024, Your Honor.  Cisco would not consent to holding

11   this case in abeyance until 2024.  I don't think it's good for

12   the Court's docket to have it there.

13        **THE COURT:**  Okay.  I'll have to think about what's

14   fair.  So I'm not prepared to rule on those.  And I'll have to

15   think about it some more.

16        I mean, I suspect, tentatively, I'll let you know, I'm

17   going to give some kind of instruction because I think

18   jurors -- I don't want them speculating.  And it is -- while I

19   work hard to create a rapport with my jurors so they listen

20   and do what I tell them to do, I don't -- if I don't have to,

21   I don't make my job harder.

22        And I think that there are ways to do it that makes it

23   fair to all sides.  I've just got to figure out how to get

24   that done.

25        **MR. ATKINSON:**  Thank you.

1          **THE COURT:**  So --

2          **MR. NELSON:**  I'm sorry, Your Honor.

3      With regard to that, in the *Nationwide* case, the Ninth

4   Circuit case, the Court allowed the playing of deposition in

5   which the defendant asserted the Fifth.  So the jury saw the

6   assertion of the Fifth, and the Court then gave the

7   ameliorative instruction to alert the jury that they may but

8   don't necessarily need to draw an adverse inference by that.

9      In this case, we do -- and we have included them on the

10   excerpts and videotapes that we talked about earlier today,

11   the assertions of the Fifth by Mr. Kamran Sheikh and

12   Mr. Farhaad Sheikh.

13          **THE COURT:**  I don't think I'm going to have the jury

14   sit there for four hours and listen to someone taking the

15   Fifth for four hours.

16          **MR. NELSON:**  It is an excerpt, Your Honor.  We

17   certainly didn't include the entire deposition.  That would

18   bore me too.

19      I guess that would be the question, is whether the Court

20   would allow -- how the Court is going to handle this.  Because

21   if the Court is going to allow some of the assertions -- there

22   are some particularly important assertions of the Fifth that

23   if the Court were to say that we could play five minutes of

24   each one of these deponents, and then the Court giving the

25   instruction to the jury, then we would, before the trial of

1    course, make the proper selection, show it to defense counsel,

2    just so that the jury can see both the assertion and the

3    Court's --

4              **MR. ATKINSON:**   Your Honor, I don't know when the

5    Court wants to hear from us on that.  We won't belabor the

6    point today.  We would object and we will address it when the

7    Court wants to hear from us.

8              **THE COURT:**  Okay.

9         Number 3 is the only motion that I have -- well, this one

10   is on bifurcation.  I tend not to bifurcate cases.  I have

11   bifurcated cases when I have complicated burden-shifting

12   evidence.

13        So I did a *McDonnell-Douglas* class action.  I think it's

14   very difficult for jurors to understand burden of proof and

15   who bears the burden.  And so I will bifurcate so that the

16   jury clearly knows whose burden it is on phase 1.  Then they

17   hear a bit more evidence and then they are told now you have

18   to -- you think differently, now the defendant has the burden,

19   and then they have to think about that piece.

20        So I've done it in circumstances where there's prejudicial

21   evidence in the second half that is totally irrelevant to the

22   first, and so I try to get a jury decision in the first phase

23   before bringing in the prejudicial evidence in the next phase.

24        But, you know, run-of-the-mill cases, right, there are

25   elements:  Liability, damages, causation.  You know, it all

```
 1   gets done at the same time.  I just don't see why I would

 2   bifurcate.

 3       Mr. Atkinson.

 4           MR. ATKINSON:  Thank you, Your Honor.

 5       So, I would say, and I don't think the Court's comments to

 6   say this is just a run-of-the-mill case.  We believe it is

 7   actually a fairly complex case.  The allegations by Cisco is

 8   massive counterfeiting, damages of north of $6 million.

 9           THE COURT:  For everybody, your case is an important

10   case.

11           MR. ATKINSON:  Right.

12           THE COURT:  My only point is this is not -- there is

13   no burden shifting.  You know, we do patent cases.  We never

14   bifurcate in patent cases.  Those are very complex cases.

15       The only case that gave me a headache during trial over

16   the architecture of a semiconductor chip where I was ruling on

17   objections as we went.  That one gave me a headache.

18       Yes, this is a lot of money.  It is not --

19           MR. ATKINSON:  Here is where it gets complicated,

20   Your Honor.

21       There is a liability aspect to this where Cisco is

22   alleging a massive counterfeiting.  And they have only

23   analyzed or examined a tiny fraction of those devices.  And so

24   they are going to extrapolate for the jury using, among other

25   information, pricing data.  They are going to be extrapolating
```

1    and trying to convince a jury what I have been calling the

2    liability phase.

3        From whatever the jury concludes in terms of liability,

4    how many devices were counterfeit, then the jury is going to

5    move to what I consider to be a very discrete phase, which is

6    tallying up the damages.  And in this case, Cisco is going to

7    make an argument -- they can correct me if I'm wrong -- I

8    believe they are going to make an argument that all of those

9    sales would have enured to the benefit of Cisco if they

10   weren't allegedly counterfeit.

11       My point is, that liability phase, it's not only discrete,

12   it does bring in pricing data.  It does bring in a lot of the

13   market information --

14           **THE COURT:**  So let's -- okay.  Keep going.  I'm

15   not -- so far I'm not convinced.  Because here's the other

16   thing.

17           **MR. ATKINSON:**  Yes.

18           **THE COURT:**  You know, I have to instruct these

19   jurors.  There's -- there are economies when they can roll

20   from one topic into the next, when it is all part and parcel

21   of the whole thing.

22       To have them come out and then hear more evidence -- are

23   they going to have to hear it from the same witnesses?

24           **MR. ATKINSON:**  Well, I'll give you an example, Your

25   Honor.

 1          One of the critical witnesses here, I believe, for Cisco

 2     is going to be their damages expert.  And Cisco has stipulated

 3     that the damages expert will testify only as to damages.

 4          So, for Cisco's damages -- if we were to have a damages

 5     phase, that person would only -- I mean, by stipulation, that

 6     person is speaking to damages.  The -- and it appears in

 7     Mr. Regan's Footnote 1 of his expert report.  He'll assume --

 8     the jury has made whatever liability finding it does.  We

 9     believe -- in order for the jury to make a coherent and

10     reasoned decision in this case, especially given the novelty

11     of this forecasting model that Cisco intends to put in front

12     of the jury, we believe it would help the jury first to

13     conclude, well, what is the liability in this case?  What

14     products or how many widgets were counterfeited, and then move

15     on.

16          It doesn't need to be a huge production.  It doesn't need

17     to be a new jury impaneled.  Then the jury just goes back and

18     hears a little bit more evidence about damages, which would be

19     based on the jury's liability finding.  Here's that evidence

20     about damages, and then goes back and makes the next

21     determination.

22          And, Your Honor, I would not even foreclose the

23     possibility that the parties in a trial might be able to come

24     to some resolution over this case if we had some idea of where

25     a jury came down on the question of liability.  Because right

```
 1    now we have a very large damages number based on a very large
 2    liability finding.
 3              THE COURT:  Okay.  Any response?
 4              MS. HE:  Your Honor, Angela He on behalf of Cisco
 5    here.
 6       I don't -- I'll keep this short because I don't want to
 7    change your position here.  But here, you know, there's
 8    overlapping evidence for both liability and damages.  And
 9    bifurcation is the exception to the rule.
10       So, here in trademark cases such as this one, evidence
11    that goes to wrongful intent to proving willfulness, for
12    example, will also be necessary to show damages and Cisco's
13    entitlement to defendants' profits.
14       So it will be burdensome for Cisco to provide
15    substantially duplicative evidence in two separate --
16              THE COURT:  As I understood it, and I'm looking at
17    the witness list now, assuming I bifurcated, everybody comes
18    in except for Regan, right?
19       Who other than Regan would testify at the damages phase?
20              MS. HE:  We would also like to present evidence and
21    deposition testimony from third-party witnesses, such as the
22    U.S. Army in Virginia.  And that would go to show both the
23    willful infringement aspect and damages.  Because they
24    purchased these products --
25              COURT REPORTER:  I'm sorry --
```

1          **THE COURT:**  Is that evidence in the liability phase

2    too?

3          **MS. HE:**  Yes, Your Honor.

4          **THE COURT:**  Who else is in both?

5          **MS. HE:**  It would be other deposition deponents, such

6    as the deponent for West U.S.A. Realty.

7          **THE COURT:**  Who else?

8          **MS. HE:**  That's all that comes to mind currently,

9    Your Honor, but there's also other evidence that we would like

10   to show such as other evidence showing wrongful intent.

11       The seizure notices that the defendants received, the C &

12   D letters, that's all evidence that we would have to show for

13   a second trial, specially to a second jury --

14         **THE COURT:**  No, no, no.  There's no second jury.  And

15   Mr. Atkinson kind of -- he threw something in.  Maybe that

16   confused you.  You never have a second jury for bifurcation.

17       You have one jury.  They go, they make a decision with

18   respect to phase 1, they come back, they hear more evidence,

19   then they go back and make a decision as to phase 2.  You

20   would never have a second jury.  The same jury has to hear it

21   all.

22       What I am trying to understand is which of the witnesses

23   would only be for liability, which would only be for damages,

24   and which would have to testify as to both?

25         **MS. HE:**  Your Honor, we would present deposition

1   testimony of the third-party witnesses of Mr. Richard Love and

2   the deponent for West U.S.A. Realty --

3          **COURT REPORTER:**  Excuse me.  I didn't understand

4   that.

5          **THE COURT:**  Who?  I didn't either.

6          **MS. HE:**  Mr. Love from the U.S. Army as well as

7   deponent for West U.S.A. Realty was another third party who

8   purchased counterfeit products from defendant.

9          **THE COURT:**  And then Regan.

10          **MS. HE:**  And Regan.  Sorry, what was that, Your

11   Honor?

12          **THE COURT:**  Isn't your expert Regan?

13          **MR. BOYDEU:**  Regan would testify to the damages.

14          **THE COURT:**  Do the defendants have any witnesses in

15   the damages phase or just cross-examination?

16          **MR. ATKINSON:**  Your Honor, our only expert would be

17   the damages expert coming in in the damages phase.  So, two

18   experts.  One on each side on the damages phase.

19      And it sounds like because you are denying our *Daubert*

20   motion, their expert Levy -- or Levy would come in the

21   liability phase.

22      I would point out, if there is a finding of unavailability

23   for these third parties that's scattered around the country,

24   if it's going to be deposition testimony, that would be the

25   ideal circumstance where you can have the testimony that you

1    want to use on liability, and the liability -- in other words,

2    you are not calling out people to fly out here for phase 1 and

3    then recalling them for phase 2.  It would be a lot more

4    straightforward if the Court is going to allow their

5    deposition testimony to come in.  That's the most streamline

6    way it would have been done anyway.

7         **THE COURT:**  Okay.  Tentatively it is denied.

8         I really don't -- it is just not how I try cases.  And I

9    don't see huge economies of scale.  And there is no -- just so

10   that you know, Mr. Atkinson, it's not surprising, most

11   defendants want me to bifurcate.  That's the way it is.  So, I

12   suspect if I --

13        **MR. ATKINSON:**  Understood, Your Honor.

14        **THE COURT:**  -- if I have Cisco as a defendant,

15   they're going to come in some day and they're going to ask me

16   to bifurcate.  It's very common for defendants to ask.

17        All right.  The next is evidence regarding other

18   litigation.

19        **MR. PARKHURST:**  Yes, Your Honor.  Andrew Parkhurst

20   for defendants.

21        This is our motion MIL 5.  We are seeking to exclude --

22   there's another case that's been filed in the Northern

23   District, *Hewlett-Packard versus ADSI*.  And we want to exclude

24   reference to that case.  Plaintiffs have stipulated to not

25   discussing that case.

```
1        The third-party defendants oppose --

2             THE COURT:  So there's a nonopposition.  Why isn't

3   this coming in as a stipulation as opposed to spending time on

4   it?

5             MR. PARKHURST:  Your Honor, I think it's not -- our

6   argument is that it shouldn't come in because it's not

7   relevant to this case.  It is prejudicial.  It's character

8   evidence --

9             THE COURT:  I'm looking at Docket 205.  It says, a

10  notice of nonopposition to motion in limine Number 5.

11       What's the issue?

12            MS. FRIEND:  Your Honor, this is Kate Friend for

13  third-party defendant Nabia Uddin.

14       We filed an opposition not to -- I think we were somewhat

15  confused because the motion that we were expecting to see

16  after meet and confer was actually somewhat different than the

17  motion that was filed.  And the original version of the motion

18  that came through is different than what was ultimately filed.

19       We have no intention of discussing the other Northern

20  District litigation, but as the Court is aware, there is the

21  state litigation that is going on.  And I think our position

22  is really that if the Court is going to allow the State

23  litigation to come in, that we should be allowed to respond to

24  the state litigation issue --

25            THE COURT:  So, let me tell you, generally speaking,
```

1    I never let evidence of other cases in.

2        So, who is asking that I admit evidence of the state court

3    case?

4            **MR. PARKHURST:**  Your Honor, if I can put -- lay out

5    this topic a little more plainly.

6        So we -- originally, in what we sent to the other parties

7    in the email exchange of the initial drafts of the MIL, had a

8    slightly more broad motion that covered more topics.  We

9    subsequently narrowed it down to the *HPE* litigation for

10   exclusion and didn't talk about the state court case.

11       The state court case is between the defendants who have

12   sued the third-party defendants in Superior Court in Alameda

13   County.  This has to do with the trade secret misappropriation

14   and other claims along that line.

15       The reason that that would potentially come up is, the way

16   this all got started here in this case was -- at least

17   supposedly a whistleblower report from third-party defendant

18   Nabia Uddin made to -- in a call with Peter Colosi, Sideman &

19   Bancroft, Cisco's attorney.

20       That whistleblower allegation that she made to them, and

21   she's, of course, a key part of the evidence here, was made

22   after Ms. Uddin had been sued in the Superior Court case in

23   Alameda.

24       So, a part of our case is to undermine her credibility and

25   establish her bias in waiting or not making any allegations

```
1   against the defendants in this case until after she was sued

2   in Superior Court.

3       So to the extent --

4           THE COURT:  It sounds -- okay.  I have it.  It sounds

5   like an appropriate topic on bias.

6           MS. FRIEND:  So, Your Honor, I would say this is --

7   what I'm hearing now is actually a far more narrow version of

8   what the proposed evidence is than what we heard in meet and

9   confer.  We heard a much broader proposition for what would be

10  presented.

11      And I think that there's not an issue necessarily with

12  saying, you know, that there is litigation for the purpose of

13  acknowledging that Ms. Uddin had been sued along with the

14  other third-party defendants in the case.

15      The problem is that my understanding is what they really

16  want to produce is a lot of evidence about, you know, exactly

17  what the claims are in the state court litigation.

18          THE COURT:  I think it's appropriate to question on

19  issues of bias.  I, you know, I would -- I don't see any other

20  relevant purpose for purposes of this case.

21      You know, after a couple of questions, the point is made

22  and 403 objections should be made at trial after that.

23          MS. FRIEND:  Okay.

24          THE COURT:  Okay?

25          MR. KIRKE:  Your Honor, this is John Kirke.  Sorry.
```

1    During the meet-and-confer process, it was ADSI's counsel,

2    if I understood him correctly, and you can correct me if I'm

3    wrong, said that they wanted to elicit evidence regarding the

4    manner in which the third-party defendants, now just talking

5    about Ms. Uddin, left ADSI.  And I think that's a different --

6    as Ms. Friend just noted, that's a different subject than just

7    going to bias that she got sued and then called Cisco,

8    according to ADSI.

9        What we don't want --

10        **THE COURT:**  Are you saying that she was terminated

11   because she -- precisely because she was sued?

12        **MR. KIRKE:**  No, Your Honor -- no.

13        Your Honor, what I'm saying is, is that in this trade

14   secrets case in the state court, there are all sorts of issues

15   regarding the manner in which Ms. Uddin, third-party

16   defendants, left the company in terms of going from one

17   company to another.  And I just want to make -- I want to make

18   certain we are not getting into that in this case; that we are

19   only just talking about this limited issue about getting a

20   lawsuit and then supposedly notifying Cisco as a result of

21   that lawsuit.

22        **MR. PARKHURST:**  So, Your Honor, I think the -- if

23   there was confusion during meet and confer, I think it's a

24   little more limited than Mr. Kirke is -- it's for the purpose

25   of establishing bias and then to the extent -- we have to

1    establish she's been sued, the circumstances she left, she was

2    terminated for a reason, and that's another indication of bias

3    that she was terminated from her employer, a place she worked

4    at for many years and then, you know, was subsequently sued.

5        Just to the limited extent that we are discussing the

6    cause, the reason that she was terminated for cause, the

7    reasons that she was sued, we certainly don't intend to put on

8    our state case during this trial.  But it is for that limited

9    purpose of establishing where she fits into this litigation

10   and where her potential bias and credibility issues arise.

11       **THE COURT:**  This is what I'm going to have you do.

12   There are a number of things that you have to meet and confer

13   on.

14       And just given what's on my docket trying to get

15   everything ready in case we are going to be in trial, after we

16   are done here, which I hope is pretty soon, you are going to

17   go back and you're going to meet and confer.

18       And I want you to provide me with a proposed form of order

19   on all of these motions in limine in light of what I have told

20   you and given some of the articulation that needs to happen in

21   terms of creating those guard rails, as I think Mr. Nelson or

22   Mr. Atkinson referred to them.

23       If you don't agree, that's good for me to know.  Then give

24   me your proposals as to what you think I said and, you know, I

25   guess what I -- and make sure it's in editable form.

1        And then I can have another meeting with you and I can try

2    to make sure that we are all on the same page.  That's what

3    motions in limine are about.  They are about all being on the

4    same page so we don't have issues come up in the midst of

5    trial.

6        So you don't have to agree with what I've decided, but

7    what's most important is that we are all on the same page and

8    that some of this stuff gets more finely articulated between

9    you all so that we know where those guard rails are and I know

10   where they are so I can enforce those agreements when we are

11   in the midst of trial.

12       Okay?

13       **MR. ATKINSON:**  Thank you, Your Honor.

14       My only question in that regard is, it seems like the

15   adverse inference issue is just a little still unsettled and I

16   think the Court was going to think about what it wanted to do.

17       So I would just ask with respect to adverse inference, if

18   we can avoid getting into the weeds on that one if the parties

19   are so far apart on what they think should be done.

20       **THE COURT:**  I think on that one, part of my concern

21   is that I still don't know and have from you -- well, let's

22   leave that one alone.  I mean, I need to think --

23       **MR. ATKINSON:**  Thank you.

24       **THE COURT:**  I think I need to think about some of

25   what you've said.

1          I can tell you on that, Mr. Nelson, I am concerned with

2     this notion of instructing the jury 52 times.  At a certain

3     point it does become prejudicial, an instruction by the Court.

4          One of the things I was thinking is that perhaps there's

5     an instruction at the end of every other day, or something,

6     where I can just say, you know, as the evidence has come in,

7     you should know that these are the various topics that have

8     been covered and there's -- you know, and then give the

9     adverse instruction.  That way I'm instructing four times,

10    three times, not 52 times.  And it's at the end of the day

11    and, you know, they can understand it.

12         Mr. Atkinson, I am concerned about waiting until the very

13    end because it's not instructive.

14         One of the things that I do -- any time -- any time I have

15    a trial where I have to give a limiting instruction, I give it

16    at the time.  Because if I don't give it at the time, the jury

17    doesn't really understand it.  And so, you know, those things

18    I always do in the course of the trial so that I can explain

19    it.

20         This, to me, is a little bit more like that circumstance.

21    But I take your point that 52 times is too many.  I tried a

22    four-month criminal VICAR case, multiple defendants.  The head

23    of the Nuestra Familia federal prison gang.  I had one lawyer

24    who had not had a lot of trial experience, and this lawyer

25    refused to not object because the lawyer was afraid for

1      appellate purposes that it wouldn't be preserved.  That lawyer

2      said "objection, 702" so many times through the course of the

3      trial, that when I went to talk to the jurors afterwards,

4      their first question was, what's evidence code section 702?

5      And then I explained it to them.

6          But, you know, it gets very distracting and it's not

7      instructive.  So what I'm thinking about is some hybrid in

8      terms of how to do it.  You know, you both made valid points.

9      I just have to figure out how to structure it.

10                 MR. NELSON:  Your Honor, if I may --

11                 MR. ATKINSON:  And what --

12                      (Simultaneous colloquy.)

13                 MR. NELSON:  Sorry, Tyler.

14         That sounds sensible.  I certainly was not anticipating

15     the Court instructing 52 times.  So the -- that idea that the

16     Court has suggested, I think, does make sense.  I would be

17     happy to meet and confer with Tyler and Andrew on that.

18                 MR. ATKINSON:  Your Honor, we will meet and confer.

19     I do think there is one piece of this that may inform the

20     Court's approach.  You have four witnesses -- at its essence,

21     you have four witnesses who are not going to testify on the

22     grounds of Fifth Amendment.  And so it's not like somebody --

23                 THE COURT:  And that's not -- those aren't the ones

24     I'm concerned about.  Those I can easily say at the front end,

25     these --

1          **MR. ATKINSON:**  Right.

2          **THE COURT:**  -- you know, these witnesses, you know,

3    instruct on those ones.  It's really the other where we are

4    trying to parse between testimony that you might say, if he

5    is, in fact, going to testify versus what he is not.

6      And that's important for them to understand because I let

7    jurors ask questions.  What I don't want is for them to ask

8    the question, you know?  Ask him this.  Well, he has already

9    taken the Fifth on that, so he doesn't have to answer.

10          **MR. NELSON:**  Your Honor, while on this topic, what we

11   would want to reserve is a discussion about what the adverse

12   inference is.

13     So, it's more than just the witness in general asserted

14   the Fifth, but what the Court said is, the fact he asserted

15   the Fifth as to a particular question and there is evidence

16   that that question is, in fact, true, that the jury can weigh

17   that in deciding whether to believe that fact.

18     So it is more than their decision not to testify.  It's a

19   decision not to testify as to a particular fact, and the jury

20   can use that in order to favor the other side as to that

21   particular fact.

22     We can address it more fully later.

23          **THE COURT:**  And that's also what closing argument is

24   about.  I mean, you have -- you know, you can -- that's the

25   time where you put all of that independent evidence together.

1    And there's -- even if there's a generic inference, then you

2    can say one plus one is two, or whatever you want to argue.

3           MR. NELSON:  Something to think about for us, but

4    is -- in closing argument, if I was allowed to say to the jury

5    that in a deposition defendant Farhaad Sheikh was asked about

6    the setting up of these remote locations to receive products

7    and refused to answer, and as you've heard from the Court

8    there's -- you can draw an adverse inference from his refusal

9    to answer that he knew that these remote locations were being

10   established, I mean, I think that's satisfactory.

11       I think that's the point I want to be able to make is to

12   draw the line between A and B; the fact that there is this

13   fact out there, they know these remote locations were being

14   established, the fact that he refused to testify about that,

15   that's what we think the Court just said the jury can draw an

16   adverse inference and refused to testify about a topic.

17          THE COURT:  The other way to deal with that, which

18   might be a good compromise for both of you, is that you --

19   because you can't argue something that's not in evidence.

20   Right?

21       And one of the things you can do, rather than me giving,

22   Mr. Atkinson, multiple instructions, which would be

23   appropriate, is if the parties stipulated to all the responses

24   that were not given on the basis of a Fifth Amendment, and

25   that stipulation with -- you could even attach the deposition

1    transcripts -- was entered into evidence as part of the trial,

2    that stipulation doesn't have to be read to the jury.  It

3    certainly doesn't have to be read word by word.  We've

4    already -- we already addressed the stipulation, but as part

5    of the trial record.  If it's part of the trial record, then

6    it can, in fact, be argued.

7        So, you know, that would be another way to do it.  Because

8    then you could say, well, we asked him this in deposition, and

9    he took the Fifth, in your argument, even though during the

10   course of trial they are not listening to that back and forth,

11   back and forth for five hours.

12       So that would be another approach.

13           **MR. NELSON:**  Understood.

14           **THE COURT:**  It's a lot to think about.  It may just

15   be better if you all chew on it and talk about it, and then we

16   can reconvene.

17       Gupta and Casto?

18           **MR. PARKHURST:**  Yes, Your Honor.  Andrew Parkhurst

19   for defendants.

20       Our motion is to exclude Mr. Casto and Mr. Gupta for not

21   being included in the initial disclosures.  That's Rule 27 --

22   sorry, 37.

23       And then only disclosing -- the first time we became aware

24   of Mr. Casto and Mr. Gupta was in the expert witness

25   disclosures that Cisco served after the discovery cutoff had

1    already expired.

2        Mr. Casto has been withdrawn from the witness list.

3    However, our argument remains with him that he's the main

4    architect, person worthy -- that has the information about the

5    Risk Scoring Model.  He authored a memorandum about the Risk

6    Scoring Model that was also sent to us after the discovery

7    cutoff.  He was described by Mr. Williams in his deposition as

8    the lead point person on development of the Risk Scoring

9    Model.

10        So the fact that he was not disclosed to us in the time

11    period that allowed us to take his deposition and gather

12    information from him and then do follow-on further discovery,

13    had he been disclosed to us before the cutoff, we would have

14    been able to do so.  That warrants his preclusion from being

15    able to offer evidence in this trial.

16        Mr. Gupta is a little different.  He has not been

17    withdrawn as a witness.  He is actually listed as an expert

18    witness for Cisco.  Mr. Gupta's deposition was taken as an

19    expert.  However, the position remains that he was not

20    disclosed until after the discovery cutoff.  The disclosure --

21    expert witness disclosure states that he intends to testify

22    primarily on his percipient knowledge and factual knowledge.

23    So he is certainly somebody that we believe should have been

24    disclosed earlier in the case so we could have gathered

25    percipient testimony from him and fact testimony, and had an

1    opportunity to conduct further discovery based on that, but we

2    were not aware of him until after the fact discovery cutoff.

3         **THE COURT:**  I require parties to disclose experts,

4    any nonretained person who is in-house.  And I do that, and I

5    do that at the same time that the disclosures are required so

6    that I don't have problems with lawyers trying to backdoor

7    rulings with respect to their experts who are retained.

8         Where is the prejudice if you deposed him?

9         **MR. PARKHURST:**  The prejudice for Mr. Casto, Your

10   Honor, is that we haven't taken his deposition and he was

11   disclosed after the fact discovery cutoff.

12        For Mr. Gupta, we did take his deposition --

13        **THE COURT:**  But Casto isn't going to testify so there

14   is no prejudice because you can't -- you can't impeach

15   Mr. Gupta with Mr. Casto's testimony.

16        **MR. PARKHURST:**  Your Honor, for Mr. Casto, he is

17   reserved as a rebuttal witness.  Cisco has expressed numerous

18   times that they reserve the right to call him as a rebuttal

19   witness.

20        Our argument is that by not disclosing him, they should be

21   precluded from offering any evidence because this is somebody

22   who clearly -- he has been a Cisco employee for, I believe,

23   over a decade, correct me if I'm wrong, and --

24        **THE COURT:**  I already ordered that no one who is not

25   on this list, 236, cannot testify.

1          **MR. PARKHURST:**  I'm sorry, you cut out for the first

2     part --

3          **THE COURT:**  I said, I already ordered at the

4     beginning of this hearing that anybody who is not on Docket

5     236 cannot testify.  And if Mr. Casto is not on the list, then

6     per that order, he can't testify unless they come back and

7     make some kind of showing.

8          **MR. PARKHURST:**  Understood, Your Honor.  Then that --

9     do I understand Your Honor to mean that they can't call him as

10    a rebuttal as well?

11         **THE COURT:**  Not without a motion.

12         **MR. PARKHURST:**  Okay.  Understood, Your Honor.  Then

13    that --

14         **THE COURT:**  Not only not without a motion, but with

15    time remaining.

16       You are not going to get all the time you asked for.  So

17    you are going to have to be efficient.  Then with respect to

18    Mr. Gupta, I don't see the prejudice.

19         **MR. PARKHURST:**  Sorry, Your Honor.

20       The argument is that we did take his deposition as an

21    expert in his expert capacity.  But he was disclosed -- he has

22    been a Cisco employee since 1999, I believe.  He is a major

23    program director over there.

24         **THE COURT:**  But so what, Mr. Parkhurst?  That's my

25    point.

1        My point always is, if they are going to bring someone

2   from in-house, they have to identify him.  That's what they

3   have done; so that there are no surprises, so that you did get

4   his deposition, so that there is no prejudice.

5        **MR. PARKHURST:**  Your Honor, they identified him in

6   their expert witness disclosure, not in their initial

7   disclosure.  That's where the prejudice -- in the expert

8   witness disclosure it states --

9        **THE COURT:**  Okay.  I get it, but I still -- I

10  understand the timing, but what you still haven't told me is

11  why it matters.

12       **MR. PARKHURST:**  Your Honor, our argument is, because

13  he was disclosed after the fact discovery cutoff, he is

14  somebody that should have been disclosed in the initial

15  disclosures so we were denied the opportunity to take his fact

16  deposition and to follow-on discovery before the cutoff that

17  could have stemmed from --

18       **THE COURT:**  But he is not testifying as a percipient

19  witness, is he?

20       **MR. NELSON:**  He's not, Your Honor.  He is not.

21       **THE COURT:**  So -- okay.  He's not.  It's denied.

22     Next.  Personal conduct, Number 7.

23       **MR. PARKHURST:**  Yes, Your Honor.

24     So this has to do specifically with certain questions that

25  were elicited during deposition testimony and --

```
1                        (Simultaneous colloquy.)

2             THE COURT:  There's a nonopposition, Docket 206.  So

3       tell me what the issue is.

4             MR. PARKHURST:  Your Honor, there is a nonopposition

5       from plaintiff.  Third-party defendants have opposed.

6             THE COURT:  All right.  Tell me what the issue is.

7             MR. PARKHURST:  Yes, Your Honor.

8          The issue is, during deposition in this matter,

9       specifically the deposition of Roya Sadaghiani and Theresa

10      Lau, there were questions that were given to the deponents

11      along the lines about drug use, about other issues that are

12      just not pertinent or relevant to this case.

13         And so third-party defendants make the point that this is

14      a relatively open-ended motion.  It doesn't cite to specific

15      evidence to exclude, and that's for the reason that --

16            THE COURT:  Ms. Friend, what are you trying to get

17      in?

18            MS. FRIEND:  Your Honor, we are not trying to get in

19      the drug use issue.  We have already told defense counsel --

20                      (Simultaneous colloquy.)

21            MS. FRIEND:  -- testifying about that or eliciting

22      testimony about that.

23            THE COURT:  Granted as to drug use.

24         What next?  What else are you talking about?

25            MS. FRIEND:  The other issue is that there are these
```

1    references in here, you know, it's not really clear exactly

2    what they want to exclude, but there's some references to some

3    of this underlying -- well, we think, some of the underlying

4    state litigation issues, like the harassment issues and the

5    Labor Code violations.

6        The reason we have a concern about this is because, you

7    know, as the Court has noted earlier, we still have on --

8    despite the Court's ruling on summary judgment, we still have

9    most of the third-party defendants listed on the defendant's

10   witness list.  They are apparently intending to call them.

11       The only conceivable reason that we can think of that they

12   would want to call them is going back to this issue that we

13   discussed in the last MIL, which is this idea that they want

14   to talk about how the defendants all left.

15       And we think that is irrelevant.  But if the Court is

16   going to allow that in, we think that it's fair that we then

17   be permitted to discuss things like why they left.

18            **MR. PARKHURST:**  Your Honor, I would -- the pushback

19   there is that the reason for filing this motion and the reason

20   that it is relatively open-ended is to try and capture -- you

21   know, the drug use questions are one thing, but there's also

22   just the possibility of opening this up into a very open-ended

23   discussion of harassment and Labor Code violations, and things

24   that have nothing to do with this case, and we are trying to

25   keep out --

1          **THE COURT:**  Well, Mr. Parkhurst, I wouldn't open the

2    door.  That's the issue.  The question is, does the door get

3    opened?

4          **MR. PARKHURST:**  Understood, Your Honor --

5          **THE COURT:**  If you ask a question about, well, why

6    did you leave, and the response -- the honest response to that

7    question is, well, they're jerks and they violated, you know,

8    the -- they wouldn't pay me and they wouldn't do this and

9    wouldn't do that, that's fair game.  It is fair game.

10       You can't open a door for one side and not let the other

11   side come through.

12         **MR. PARKHURST:**  Yes, Your Honor.

13       I think that there is a slight distinction.  I don't think

14   we would ask the question of why did you leave.  The question

15   may be, did you misappropriate or take customers with you at

16   the time you left.  And if the response was, well, they were

17   harassers and didn't pay me appropriately, I'm not so sure

18   that that's opening the door.  That's -- making --

19                    (Simultaneous colloquy.)

20         **THE COURT:**  Maybe not, but you can't have -- I mean,

21   the whole point of motions in limine is to be precise for

22   specific things.  You want your cake and eat it too.  You want

23   to make a nice wide motion that you can cite back to the

24   parties later.

25       So, drug use, that's specific.  Motion is granted.

1      If it there's something -- if there's something specific,

2   I can deal with specificity.  But everybody tread cautiously

3   because if someone opens the door, I let the others come

4   through.  And that's the way it works.

5      Now, don't violate my orders.  If you have any inkling

6   that you might do that, we have 30 minutes every morning to

7   talk about it, and you better raise it then.

8          **MR. PARKHURST:**  Understood, Your Honor.  I think that

9   that's how we will have to address that, beyond the drug use.

10          **THE COURT:**  So, I mean -- in terms of criminal

11   conduct, it has to be a crime of moral turpitude in order for

12   it to come in for purposes of being a basis for impeaching.

13   So you can't ask somebody just anything.

14      Again, if there's some criminal act out there in terms of

15   personal conduct that you know about, that you have certified

16   copies of their conviction, even with something like that, I

17   need to look at it in advance because certain crimes are

18   allowed for purposes of impeachment, other crimes are not.

19   It's not just any crime.  It has to be a crime of moral

20   turpitude.

21      Okay.  Two more.  Diane, how are you doing?  We have been

22   on since 1:00.

23          **COURT REPORTER:**  I can do two more.  I'm more than

24   happy to take a break as well, Your Honor.

25          **THE COURT:**  Let me ask this:  We have two more

```
 1    motions.  What else do you -- what else do we need to do
 2    today?
 3            MR. PARKHURST:  Your Honor, I would say that for
 4    motion in limine 9, I believe that's wrapped up in the
 5    discussion that was had earlier about what to do about
 6    Mr. Sheikh's testimony.
 7        I think 9 has to do -- this is third-party defendants'
 8    motion so they can obviously speak for it, it is more of a
 9    narrow subset of motion in limine 1.
10            THE COURT:  All right.  Number 8?
11            MR. PARKHURST:  Your Honor, there is no Number 8.
12    That was -- there was an 8, and then through the
13    meet-and-confer process, we resolved that with plaintiff and
14    reached --
15            THE COURT:  Then there's a 10.
16            MR. PARKHURST:  Yes.
17            MS. FRIEND:  Number 10, Your Honor, it addresses an
18    issue that you actually ruled on in the summary judgment
19    ruling, which is that double hearsay testimony.  And I think
20    that's actually the Court's ruling would apply there at this
21    point.
22            THE COURT:  Is there anything else that we need to
23    talk about other than a date to come back?
24            MR. PARKHURST:  Your Honor, if I could, about
25    Number 10, if there's time for more argument.
```

1          **THE COURT:**  I have to tell you, I didn't have a hard

2    copy of 10, so I didn't look at it.  Isn't -- this is to

3    exclude hearsay regarding Uddin.

4      I did -- didn't I rule on that in the summary judgment?  I

5    thought I did.

6          **MS. FRIEND:**  You did, Your Honor.

7          **MR. PARKHURST:**  Yes, there was a ruling, Your Honor.

8    Actually -- I'll reserve on that, Your Honor.  No argument is

9    necessary.

10         **THE COURT:**  All right.

11     Do you want to see how much you can accomplish on your own

12   and then send me an update next Friday and let me know whether

13   there is a need to meet again?

14         **MR. NELSON:**  Yes, Your Honor.  I think that's a good

15   idea.  From the plaintiffs, we agree.

16         **MR. ATKINSON:**  We agree.

17         **THE COURT:**  All right.  Thumbs up everybody?

18     I see a bunch of thumbs up.  Mr. Kirke?

19         **MR. KIRKE:**  Thank you, Your Honor.

20         **THE COURT:**  My court reporters, they love me and they

21   hate me, I think.  I try to be good to them, but I do keep

22   going.

23     All right.  Everybody stay safe.  We will get an order out

24   on our part.  I'll expect to see things back from you all

25   within one week, on the 23rd.

1          MR. NELSON:  Thank you, Your Honor.

2          THE COURT:  All right.  We are adjourned.  Thank you.

3          MR. ATKINSON:  Thank you.

4          MR. BOYD:  Thank you.

5          MR. KIRKE:  Thank you.

6              (Proceedings concluded at 4:18 p.m.)

7

8                    **CERTIFICATE OF REPORTER**

9          I, Diane E. Skillman, Official Reporter for the

10  United States Court, Northern District of California, hereby

11  certify that the foregoing is a correct transcript from the

12  record of proceedings in the above-entitled matter.

13

14

15          DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

16              Wednesday, October 21, 2020

17

18

19

20

21

22

23

24

25

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC**