Pages 1 - 58

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

CISCO SYSTEMS, INC.,           )
                               )
          Plaintiff,           )
                               )
  VS.                          )      **NO. CV 18-07602-YGR**
                               )
SHAHID H. SHEIKH, ET AL.,      )
                               )
          Defendants.          )
_____)

                           Oakland, California
                           Friday, November 6, 2020

                  **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

                    SIDEMAN & BANCROFT LLP
                    One Embarcadero Center
                    Twenty-Second Floor
                    San Francisco, CA 94111
               BY:  **RICHARD J. NELSON, ESQUIRE**
                    **IAN K. BOYD, ESQUIRE**

For Defendant Advanced Digital Solutions International, Inc.:
                    MCMANIS FAULKNER
                    50 West San Fernando Street, 10th Floor
                    San Jose, CA 95113
               BY:  **RICHARD T. ATKINSON, ESQUIRE**
                    **ANDREW K. PARKHURST, ESQUIRE**

For Third-Party Defendant Nabia Uddin:
                    DONAHUE FITZGERALD LLP
                    1999 Harrison Street, 26th Floor
                    Oakland, CA 94612
               BY:  **JOHN C. KIRKE, ESQUIRE**

Reported By:       Pamela Batalo-Hebel, CSR No. 3593, RMR, FCRR
                   Official Reporter

<u>**Friday - November 6, 2020**</u>                              **10:00 a.m.**

## P R O C E E D I N G S

### ---oOo---

**THE CLERK:**  Calling Civil Action 18-7602, Cisco Systems, Inc., et al. vs. Sheikh, et al.

Counsel, please state your appearances.

**MR. NELSON:**  Good morning, Your Honor.  Richard Nelson and Ian Boyd for Plaintiffs.

**THE COURT:**  Good morning.

**MR. ATKINSON:**  Good morning, Your Honor.  Tyler Atkinson, and with me also is my colleague, Andrew Parkhurst, for the ADSI defendant.

**MR. KIRKE:**  Good morning, Your Honor.  John Kirke with Kathleen Friend for the Third-Party Defendant, Nabia Uddin.

**THE COURT:**  Okay.  Good morning.

Mr. Crosby?

**MR. ATKINSON:**  I believe Mr. Crosby -- sorry, Ms. Stone.

**THE CLERK:**  I received an email that he was not available and other counsel can fill in if they know more information.

**THE COURT:**  Okay.  And no one else from his office then was going to hop on?

**THE CLERK:**  This is the clerk --

**MR. ATKINSON:**  That is my understanding, Your Honor.

1           **THE CLERK:**  This is the clerk.  He had referred that

2      the ADSI defendants would keep him informed, I think was what

3      the email -- unless counsel says something else that they know.

4           **THE COURT:**  Okay.  Good enough.

5           So let's -- I want to start with jury instructions today,

6      and I want to start there because part of the analysis with

7      respect to relevance relates to what it is you actually have to

8      prove.  And one of the reasons why many of us have people focus

9      on jury instructions early rather than as an afterthought is so

10     everybody is on the same page.  And as I looked at your

11     submissions, it is not at all clear to me that you're on the

12     same page, so we will be, hopefully, by the end of our meeting

13     today.

14          Mr. Nelson, make sure you all are taking good notes

15     because I am going to ask you to send us a set of revised

16     instructions at the end of all this.

17          Just one kind of introductory remark with them.  When you

18     send them back, I would like to see two sets.  The first set is

19     the set that will be read to the jury in advance of evidence; a

20     second set then to be read to the jury at the close of

21     evidence.  And I say that because the introductory ones,

22     typically those are going to be the (Zoom froze.)

23          **THE COURT REPORTER:**  Your Honor, I'm sorry, you froze.

24          **THE COURT:**  Okay.

25          **THE COURT REPORTER:**  "The introductory ones, typically

1    those are going to be the..."

2          **THE COURT:**  -- Chapter 1 instructions from the Ninth

3    Circuit, so on your Table of Contents -- and I'm operating off

4    of Docket 248.  That's starting at 1.2 through 1.21, plus any

5    stipulations of fact.  That's 2.2.  Pretty much that's it.

6          Now, the instructions at the end of the trial, I repeat

7    that same set of introductory instructions because by the end

8    of the trial, it's going to make a lot more sense to them.  And

9    with respect to the end, you should know I give them their own

10   copy in their own binder so they have them, and I also file

11   those as part of the docket.  I don't do the introductory ones

12   as part of my docket entries.  And so if you could prepare

13   those.

14         Obviously the ones being read in advance are all -- the

15   tense about the evidence "you will hear," and the ones at the

16   end, the tense is all past, "you have heard."  So literally, if

17   you all will sit there when you're putting these together and

18   make the necessary options or choose the appropriate options

19   given the timing of the instruction.

20         I don't see, even though you've added it here -- I don't

21   see a basis for giving a "clear and convincing evidence"

22   instruction.  Where is that standard relevant?  I've only seen

23   on your submissions "preponderance."

24         **MR. NELSON:**  Your Honor, this is Richard Nelson for

25   the Plaintiffs.

1        I would have to take a look at that, Your Honor.  I

2    apologize.

3        **THE COURT:**  Okay.  Well, we're going to go through --

4    I don't see -- nobody is really jumping up here, so to the

5    extent there is no clear and convincing standard at issue, I

6    don't include it.  Okay?

7        Just so that you know, 2.4, "Deposition in lieu of live

8    testimony," I give that at the time the deposition is read.

9        2.14 and 2.15, I have not looked at your exhibit list that

10   closely.  Are there going to be charts or summaries, or are

11   there any identified on your list?

12       **MR. NELSON:**  Your Honor, this is Richard Nelson.

13       Yes.  I think for Plaintiffs, there will be a summary

14   chart, Rule 1006.  I think the one I'm thinking of right now is

15   just a chart showing all the custom seizures, but that chart is

16   not currently prepared.  I mean, it's in the Complaint, but

17   it's not currently prepared, but we will, of course, share it

18   with other counsel before using it.

19       **THE COURT:**  Okay.

20       **MR. KIRKE:**  Your Honor, the Third-Party Defendant will

21   have a chart or two which also, of course, will be shared with

22   all the parties per the Court's pretrial order.

23       **THE COURT:**  Okay.

24       So after 2.15, then what I tend to do is I shift to the

25   actual claims before the section -- the 3 section or -- the

1   instructions under Section 3.  All of those go at the very,

2   very end.  So let's just go through these.

3       After the Chapter 1 instructions to which there are no

4   objections, it seems to me that I would hop over to Instruction

5   4.2.  Well, I can include 4.1, but 4.2 says, "Under the law,

6   corporate" -- well, maybe that's why -- 4.1 may be repetitive

7   of 4.2.  Let me just see.

8       No.  So 4.1 is fine, and then we go to 4.2, and 4.2 says,

9   "Under the law, a corporation is considered to be a person.  It

10  can only act through its employees, agents, directors, and

11  officers.  Therefore a corporation is responsible for the acts

12  of its employees, agents, directors, and officers performed

13  within the scope of authority."

14      Then I would explain to the jury who that is.  So Cisco

15  Systems, Inc.; Cisco Technology, Inc.; Advanced Digital

16  Solutions International, Inc.; PureTech -- well, certainly

17  those are corporations.

18      It seems to me PureTech or PureFutureTech LLC and KF &

19  Associates LLC both fall under this instruction as corporations

20  because they're limited liability corporations as opposed to

21  partnerships, which is -- partnerships is discussed in 4.3.  Am

22  I right about that?

23          **MR. ATKINSON:**  That's my understanding, Your Honor.

24          **THE COURT:**  Okay.  So as I look at the list of who is

25  left in this case, there is no 4.3 -- I don't see why I would

1    give 4.3, which is only related to partnerships.

2              **MR. NELSON:**  This is Rick Nelson for the Plaintiffs.

3        I agree, Your Honor.

4              **THE COURT:**  So does everybody agree that should not be

5    given or it's withdrawn?

6              **MR. KIRKE:**  Yes, Your Honor.

7              **MR. ATKINSON:**  This is Tyler Atkinson.

8        It's agreed.

9              **THE COURT:**  Okay.

10       And then after explaining to them that all of these

11   parties are corporations, the next thing to explain is at 4.4,

12   so 4.4, 4.5, 4.7, and 4.8 all explain to the jury about this

13   issue with an agent and what the difference is between the

14   principal and the agent and what "scope of authority" means and

15   "ratification."  All of that flows from this discussion that

16   we've got these parties who are corporations.  Okay?  So all of

17   those should be given.

18       Now, the question is -- and I asked for this, and I

19   don't -- I was busy this morning.  Did you file something,

20   Mr. Atkinson, with respect to 4.11 and 4.12?

21             **MR. ATKINSON:**  Your Honor, the parties have circulated

22   a draft.  I think all parties, other than possibly the

23   Third-Party Defendants, have agreed to the second amended jury

24   instructions that have circulated, Your Honor.

25       I do have the language that we propose for 4.12 and --

1    excuse me -- and for 4.11, which we've provided to all parties.

2    I don't know if the Court would like to --

3         **THE COURT:**  I would like to see it.

4         So I'm going to let you share -- can he share his screen,

5    Ms. Stone?

6         **THE CLERK:**  Yes.  If he just hits that "share screen"

7    on his control.

8         **MR. ATKINSON:**  I can do that.

9         Your Honor, I apologize for the delay.  I'm pulling up the

10   language here.  In fact, I'll take the draft that is

11   circulating --

12        **THE COURT:**  While he is doing that, maybe someone can

13   send me those two instructions.  So -- all right.  Here we go.

14   Okay.

15        (The Court reviews the document shared on the screen,

16   Instruction 4.11.)

17        **THE COURT:**  Okay.  So this, though, relates -- so that

18   is 4.11.

19        Let me see 4.12.

20        (The Court reviews the document shared on the screen,

21   Instruction 4.12.)

22        **THE COURT:**  Okay.  You can take that down.  If someone

23   could send that to me, I'd appreciate it.

24        You have an affirmative claim against Uddin for equitable

25   indemnity, but you've offered no instruction for that claim,

1  and you've disputed the instruction offered by Uddin.

2           **MR. ATKINSON:**  Your Honor, we've -- I apologize.

3  We've reviewed the instruction.  It appears to be generally

4  correct; however --

5           **THE COURT:**  Which instruction?

6           **MR. ATKINSON:**  This would be "Special Instruction

7  Third-Party Defendant-2."

8           **THE COURT:**  Okay.

9           **MR. ATKINSON:**  The issue at this point is it begins by

10 saying, "The Court has found that ADSI engaged in unfair,"

11 etc., etc. and --

12          **THE COURT:**  Okay.  So you're no longer disputing the

13 entirety of that instruction?

14          **MR. ATKINSON:**  That's correct, Your Honor.  And I --

15 there were certain instructions the last time we reviewed this

16 with the Court where we said, "We dispute.  Here is why we

17 dispute."  This is one that we wanted to look at because it was

18 offered shortly before that hearing.

19          **THE COURT:**  All right.  So let me just keep going

20 then, now that I have a general understanding.

21     So you've got 4.1 -- I mean, 4.11 and 4.12, and then it

22 would be my intention at this point to actually jump to the

23 claims.

24     So, Mr. Nelson, I would say something to the effect of,

25 "I'll now instruct you on the specific claims in this matter."

1    I always have some kind of transition.  You should all know all

2    these numbers I don't -- none of that ultimately makes it into

3    the final; right?  The jury doesn't have to see that stuff.

4    It's confusing.

5        The next one is 15.5, and Defendants disagree, but I don't

6    know why.  And this is a Ninth Circuit Model Instruction 15.5.

7        **MR. ATKINSON:**  Your Honor, I believe our only issue

8    with this instruction was the -- we didn't believe it to be

9    necessary to instruct.  I understand it's a model instruction.

10   We understand if the Court wants to give it, but that was our

11   position, I believe.

12       **THE COURT:**  Okay.  So for now, we'll keep that in,

13   Mr. Nelson.

14       Then 15.6.  Again, this is a standard instruction.

15   Defendant disagrees.  These are the elements of a trademark

16   infringement claim.  I don't understand why you disagree.

17       **MR. ATKINSON:**  Your Honor, I believe this may be the

18   one that we withdraw our objection to at the last hearing.  I

19   believe there was an instruction where we realized that it was

20   tracking the code, and -- excuse me -- the model, and obviously

21   the elements need to be provided to the jury.

22       **THE COURT:**  Okay.  So noted.  So I'll do 15.6.

23       Mr. Nelson, just make a note.  You're to have your plurals

24   consistent in this instruction.  You have both singular and

25   plural for plaintiff, so it's plural.

1      And I don't think that there's a dispute that with respect
2   to the second -- these are -- it's conjunctive, so it should be
3   1, 2, and 3; right?  So they have to prove all three things.

4      Then I would move to 15.8.  My intention is to strike the
5   first -- the first sentence and to start with the preface "With
6   respect to the first element."  So the way I instruct a jury,
7   everything I do tracks the burden of proof.  So I tell them,
8   "Here are the Elements 1, 2 and 3.  I'm going to explain the
9   first element.  So with respect to the first element, a valid
10  trademark," is blah-blah-blah-blah.  There doesn't seem to be
11  any other objection -- or doesn't seem to be any objection to
12  15.8.

13     Then it makes sense to move to 15.18, but, again, the
14  preface would be, "With respect to the third element, you
15  should use the following factors to determine whether the
16  Defendants' use of the trademark is likely to cause confusion."

17     Second paragraph, I'd strike that first sentence and just
18  say, "The presence or absence of any particular factor should
19  not necessarily resolve."  If you're not getting all these tiny
20  things, Mr. Nelson, I'll fix it.  But, again, one of the things
21  that I want to do when I'm explaining these things to the jury
22  is say, "You've got to prove 1, 2, 3.  With respect to No. 1,
23  I'm going to give you some more instructions.  I don't have any
24  extra instructions for No. 2, but with respect to No. 3, here
25  are some more instructions."  That way the jury -- and they

will have a physical copy in front of them -- understands and
can go back and forth to figure out how they're supposed to
answer the questions.

15.19, standard instruction, very long.  I've had to give
these before, but, you know, nothing to do about it.  You have
to give it.

Then I'm being asked to give Special Instruction P-2.  My
question for the Plaintiffs is does the word "presumption" come
up in either of those cases cited?  If not, then I won't give
it, period.

**MR. NELSON:**  I understand, Your Honor.  I don't have
the cases in front of me.  When we prepare the next draft or
the next version of the instructions to give to the Court, I'll
address it, and so if "presumption" does not appear in those
cases, then I'll remove it.  If "presumption" does, I will, of
course, talk to Mr. Atkinson and Mr. Kirke, and we will just
confirm that it does.

**THE COURT:**  If it's there, then I'll consider it.  I'm
not saying I'll give it.

**MR. NELSON:**  Understood.

**THE COURT:**  But if that word doesn't exist, then the
answer is absolutely no.

Okay.  So then I am thinking about not addressing willful
infringement at that point but rather moving straight to the
damages section, and it seems to me when I look at 15.26 and

15.27 together, it would be better to start 15.26 by saying,
"If you find in favor of Plaintiff on the claim for trademark
infringement, Plaintiff may be entitled to damages.  In order
for Plaintiff to recover damages, the Plaintiff must first
prove by a preponderance of the evidence that the Defendant had
notice," and then explain that.

Then the next piece on 15.27, then I would say, "If you
find that Plaintiffs have proven notice, then you can determine
actual damages."  That seems to me logically to be their
decision-making tree.  Am I missing something?

MR. NELSON:  I don't think you're missing anything,
Your Honor.  That sounds right to me, too.

THE COURT:  So I would just modify those to make
that -- it's kind of taking out just a few words here and
there, but that's how I would explain it to them.

So then they talk about -- they figure out actual damages
if it's appropriate, and I have two different instructions,
15.29.  The only difference is the addition of one sentence, so
what I'd like to have back from you, Mr. Nelson, is one
instruction with that one sentence in red, and we can talk
about whether or not the model instruction should be changed.

At this point, though, I haven't even given them an
instruction on willfulness yet, so I'm not sure that I would
give it; that is, I would keep 15.29.  And then after 15.29,
then I would give Special Instruction P-3.

1      Again, it seems like Defendant objects here.  I don't know

2  why.  This -- I don't know why.

3          **MR. ATKINSON:**  Your Honor, I think our objection was

4  only along the lines that it -- we didn't believe a

5  "substantial factor" instruction needs to be given.

6          **THE COURT:**  I don't understand that comment.  I'm

7  talking about P-3.

8          **MR. ATKINSON:**  Excuse me.  I was looking at PPD-3.

9          (Pause in proceedings.)

10         **THE COURT:**  Mr. Atkinson, I'm waiting for you.  Sorry.

11 You've got an objection --

12         **MR. ATKINSON:**  Well, Your Honor --

13         **THE COURT:**  You've got an objection to P-3.

14         **MR. ATKINSON:**  Your Honor, I believe it was because we

15 thought that the instruction was found elsewhere in the model

16 instructions, and --

17         **THE COURT:**  And what instruction is that?

18         **MR. ATKINSON:**  And that's what I'm looking for now,

19 Your Honor.  I apologize.

20         **THE COURT:**  Because you didn't offer an alternative

21 instruction.

22         **MR. ATKINSON:**  May we come back to this particular

23 one, P-3?

24         **THE COURT:**  Okay.  So what I'm currently inclined to

25 do is just tell them that if they've found Defendants

1  infringed, they have to decide whether they did so willfully.

2  That's the first sentence.  And then go straight to what the

3  proof is.  So I would eliminate the second paragraph and say,

4  "Defendants willfully infringed Plaintiffs' trademark if," one,

5  two, three, and Plaintiffs bear the burden.

6      By the way, the way we find their answer to that question

7  is we have to add a special interrogatory to the verdict form,

8  which is not there.  I looked at the verdict forms.  Unless I'm

9  missing something, Mr. Nelson, I don't see any interrogatory on

10  willfulness, and there is a standard interrogatory affiliated

11  with the Ninth Circuit at 15.27.  We'll get to that later, but

12  we need an interrogatory, it seems to me, on willfulness;

13  right?  Because the point is if they find willfulness, then you

14  may be entitled to treble damages, but that's not a jury

15  decision.  Am I right?

16      **MR. NELSON:**  Well, yeah -- well, Your Honor, with

17  regard to willfulness, so in the proposed verdict form that

18  Plaintiffs and Third-Party Defendant provided, number six is

19  asking about intentional conduct, effectively willfulness.

20      **THE COURT:**  So --

21      **MR. NELSON:**  It probably should be changed to

22  "willful" instead of "intentionally" -- "willfully" instead of

23  "intentionally."

24      **THE COURT:**  Yes.  All right.  That's fine.  I see what

25  you've done.

1      So, again, remember, jurors need to be coached along, and

2  the instructions need to match the verdict form exactly.  They

3  should be able to track one with the other.  And also by the --

4  just so that you know, they'll have their own personal copy of

5  the verdict form in their binder.  Again, I think that helps

6  them work through their decision-making process.  But that

7  should be changed to "willfully," not "intentionally."

8      Okay.  We move then from willful infringement.  So that's

9  the end.  And then we've got -- then I have to explain to them

10  what the elements are for equitable indemnity.

11      And on this, Ms. Friend, I'm going to need more

12  information because it just doesn't make -- I am looking at

13  Third-Party Defendant's Special Instruction 2.  Certainly the

14  first paragraph -- I can't read the first paragraph to them

15  because I've not found anything.

16      **MS. FRIEND:**  I think, Your Honor -- Mr. Kirke, and I

17  talked about that after I sent the email yesterday, and I think

18  that we agree that the first paragraph should certainly come

19  out of that instruction.

20      **THE COURT:**  Okay.  So then the next paragraph that

21  you're offering, which Defendants disagree with or maybe

22  they've changed their mind, I don't know, but it would read,

23  "ADSI claims" -- well, they'd only go here if they found

24  against ADSI --

25      **MS. FRIEND:**  Correct.

1       **THE COURT:**  -- correct?

2       **MS. FRIEND:**  Correct.

3       **THE COURT:**  Mr. Atkinson?

4       **MR. ATKINSON:**  Correct, Your Honor.

5       **THE COURT:**  And not even -- let's say -- okay.  So

6   then I'd need a transition that says, "If you've found against

7   ADSI on trademark infringement, then you must determine whether

8   a claim for equitable indemnity has been proven," or something

9   to that effect; right?  "ADSI claims its liability under" --

10  and we've never talked to them about the UCL, so I don't

11  know -- I can't --

12      **MR. ATKINSON:**  Your Honor --

13      **THE COURT:**  Yes?

14      **MR. ATKINSON:**  -- if I may share my screen, I have the

15  CACI 3800 on which the -- I think the essence of this was

16  supposed to be based on CACI 3800 -- and I should have known

17  the Court has its own copy.

18      **THE COURT:**  I live with CACI.  CACI is great.  In

19  fact, I even deal with motions to dismiss with CACI.  We've got

20  the elements.  Are they there or not?

21      3800.  My law clerk may not have it.  Why don't you share

22  your screen.

23      Okay.  So you would want this to read, "ADSI claims" --

24  why don't you read it.

25      **MR. ATKINSON:**  Yes, Your Honor.

1      "ADSI claims that it was required to pay," and then this

2  is where we have whatever the jury has found, or it is required

3  to pay the damages that the jury awarded and --

4      **THE COURT:**  Remember that this has got to be formatted

5  in a way where we don't know the answer.  So it would -- you'd

6  have to preface it by saying, "If you found in favor of

7  Plaintiffs and against ADSI, then ADSI claims it is required to

8  pay" -- or "that Uddin is required to pay ADSI based on Uddin's

9  share of responsibility."  I mean, is that what you're

10  talking --

11      **MR. ATKINSON:**  Yes.  And we agree with the Court's

12  language, and I copied it, and I can send it to Mr. Nelson.

13      **MS. FRIEND:**  Your Honor, the only thing I would say is

14  I know that when the Court was kind of originally reading out

15  its instruction, you know, its idea on the instruction, you

16  mentioned -- you know, you said, "If you found against ADSI on

17  trademark infringement," and the issue is that the trademark

18  infringement, the Court has already found that ADSI -- if

19  it's -- if it's found liable on trademark infringement, that

20  does not create liability for Ms. Uddin.  It would only be if

21  there is a UCL finding.

22      **THE COURT:**  Let's take that off, Mr. Atkinson.

23      **MR. ATKINSON:**  Your Honor, if the Court is asking me

24  what our position is, we do agree there is a threshold

25  requirement there to the extent we're pinning the indemnity on

1    the state claim.  I suppose we can try to work out some

2    language here along the lines of what the Third-Party

3    Defendants had proposed.

4         **MS. FRIEND:**  Your Honor, I think I mentioned yesterday

5    that as we read particularly that most recent case that came

6    out of the California Supreme Court over the summer, the UCL

7    claim issue is actually an issue for the Court to make a

8    preliminary determination on.  The Court decides that issue

9    because it's an equitable issue.

10        **THE COURT:**  It's not preliminary; it's ultimately.  It

11   is the Court's role to decide UCL claims, and so the question

12   is -- and typically, I haven't had lawyers somehow try to -- I

13   mean, it sounds like what you're asking for again is perhaps

14   some -- you're trying to parse out one of the elements -- how

15   do you want to deal with this?  Because you're not going to get

16   a decision from me on the UCL before we have a jury verdict.

17        **MS. FRIEND:**  I --

18        **MR. ATKINSON:**  Well, Your Honor --

19        **MS. FRIEND:**  Go ahead, Mr. Atkinson.

20        **MR. ATKINSON:**  Thank you.

21        Your Honor, what I think we could propose is we don't flag

22   that issue to the jury.  It would just be confusing.  The jury

23   makes its finding, and then the judge can -- Your Honor can go

24   back and make a determination either way.  And in the event

25   that Your Honor makes one determination, then the jury's

1  finding will be mooted.

2          **MS. FRIEND:**  I think actually -- I think we would see

3  this going the other way, Your Honor.  That perhaps the jury

4  would decide this after the verdicts are rendered on the other

5  questions.

6          **THE COURT:**  What question do you want the jury to

7  answer?

8          **MS. FRIEND:**  I think it's really is there -- is there

9  indemnity.

10          **MR. ATKINSON:**  Your Honor, I think this is where 3800

11  comes into play.

12          **THE COURT:**  But it's not -- what are the elements of

13  your UCL claim which don't go to the jury?

14          **MR. ATKINSON:**  I'm going to ask my colleague,

15  Mr. Parkhurst, who is on top of that one.

16          **MR. PARKHURST:**  Yes, Your Honor.

17      The UCL claim is -- I could look up the specific elements,

18  but it's pretty simple.  It's just that the Defendant engaged

19  in unfair, fraudulent, or illegal conduct that has, you know,

20  an unfair -- to grant an unfair competitive advantage.  I'm

21  sorry, Your Honor.  I have to look up the actual elements for a

22  UCL claim.

23          **MS. FRIEND:**  Your Honor, I have an idea about this,

24  and I would just comment on it.

25      So of course the elements of the 17200 claim are unlawful,

1   unfair, and fraudulent activity, and in this case, the Court

2   has already ruled that the alleged unlawful activity, which is

3   the Lanham Act activity, is outside the scope of the UCL claim.

4   So we're really left with in this case either fraudulent or

5   unfair activity, and there is some authority for the Court, and

6   I think it's actually cited in our original version of the jury

7   instruction, that describes what is an unfair or unlawful

8   business practice -- excuse me -- unfair or fraudulent business

9   practice, and we have included that language, that an unfair

10   business act or practice is when you have a practice that

11   offends an established public policy or it's an activity that

12   is immoral, or a fraudulent practice is conduct that is likely

13   to confuse or deceive members of the public.

14          **THE COURT:**  This is more and more looking like a

15   bifurcated case.  Seriously.  I don't --

16          **MR. ATKINSON:**  Well, Your Honor --

17          **THE COURT:**  I don't know how you do this.

18          **MR. ATKINSON:**  Your Honor --

19          **THE COURT:**  The finding on the primary case is not --

20   it sounds like is not relevant to the equitable indemnity.  And

21   you aren't going to have a finding on the other two components.

22   So how can you get a finding on indemnity when you don't have a

23   finding on the underlying basis for the indemnity claim?

24          **MS. FRIEND:**  Your Honor, I think it would maybe make

25   sense for us to confer with ADSI's counsel about how to best

1  address this and see if we can work out a way to avoid a need

2  for bifurcation.

3      **THE COURT:** I'm looking at one more thing. I mean,

4  that's fine. You can all talk -- you can talk about it and

5  then get back to me, but I want to -- all right. We can move

6  on. I will -- I'll come back to it. I want you to think about

7  one other thing. Okay. All of these -- all of these remaining

8  instructions really deal with that.

9      So after I give -- again, just so you understand how this

10 works in my courtroom, after I give all of these substantive

11 instructions, there will be a note in the binder that says --

12 it's a blank page, and it says "stop here" because at that

13 point, I'm going to invite you to make your closing arguments.

14 Once you make your closing arguments, then the subsequent pages

15 are the Chapter 3 instructions, so the duty to deliberate, pick

16 a foreperson, all of that. Those are kind of my final words to

17 them before they go into the jury room.

18     I will not be giving a jury instruction -- a jury form for

19 every defendant. I will use the format that is being offered

20 by the Plaintiffs, which is one comprehensive form. So I like

21 things to be nice and logical and simple. That will obviously

22 have to be revised, depending on what happens here with this

23 equitable indemnity stuff because it doesn't -- it doesn't

24 flow.

25     So for purposes of a working document, we'll work off of

1    Docket No. 234.

2         So then now moving to your other outstanding issues, with

3    respect to Defendants' Motion in Limine No. 11, the Court notes

4    that Defendants have withdrawn 311, 312, 315, 317, 318, and 319

5    from the documents.  The remaining ones we need to talk about,

6    but they -- it is better, in my view, to talk about them in the

7    context -- and maybe we have to wait until this issue is

8    resolved with respect to what's actually being proved and

9    whether or not this case is going to be bifurcated.

10        As I look at your opposition, Mr. Atkinson, depending on

11   how questions are answered and -- or how -- how questions are

12   asked, some of this is probably not appropriate.  So we are not

13   going to litigate in this claim -- in this case your -- what's

14   effectively your UCL claim against Rahi Systems.  We're not

15   doing that here.  It is entirely not relevant to Cisco's

16   affirmative claims, and I have no elements showing that it is

17   probative of anything else.

18        So if I look at your opposition, page 3, line -- beginning

19   at line 10, you talk about how these -- you know, the sequence

20   that she didn't claim counterfeiting until after she was

21   terminated for cause and sued by ADSI.  That's -- that's fine.

22   That's appropriate.  I've said that before.

23        Raisoni's testimony about the circumstances leading up to

24   her counterfeiting allegations, I don't know that that comes

25   in.  That's a collateral matter.  I don't know that she is

1  going to deny what you've said, but that's where you begin to

2  go down this rabbit trail that's really the state court action.

3       Emails are -- they're out-of-court statements.  I don't

4  know -- people can use documents for purposes of their

5  examination, but that doesn't mean that they come into

6  evidence.  And then you talk about how these exhibits, quote,

7  "highlight other unscrupulous efforts by Raisoni to upend

8  ADSI," close quotes.  So what?  It's not relevant to this case.

9  That's relevant to the state court case.  So that stuff is

10  collateral, and it doesn't come in.

11       "Raisoni's other communications demonstrate a concerted

12  effort to secretly transfer ADSI salespersons and clients."

13  That's the state court case.  That is not this case.  That is

14  not relevant to bias.  It doesn't come in.

15       His coordination, quote, "shows a pattern of Raisoni

16  attempting to ruin ADSI through unfair and dubious tactics."

17  Totally relevant to your state court case, not relevant here.

18       So that's the line that, you know -- that I thought I said

19  I was drawing, and you're on notice not to violate the Court's

20  order about trying to litigate the state court case here.  It

21  concerns me when you say things like this that you don't

22  understand where the line is.

23       **MR. ATKINSON:**  Well, Your Honor, I believe the Court

24  invited the Third-Party Defendants to specifically set out what

25  it is that the Defendants would be prohibited from asking

1    because -- the Court has acknowledged the circumstances of

2    Ms. Uddin's departure from ADSI.  To some extent it's fair

3    game.  The circumstances of her reporting ADSI, it's fair game,

4    as the Court has said.

5        I certainly do not want to -- I'm not going to violate a

6    court order.  I will do everything -- as long as I

7    understand -- and the Court has helped explain its thinking

8    about these things.  It would be helpful if there were -- if

9    there was a stated parameter in terms of what the Court does

10   not want us to get into.  I would just -- so at least my

11   position is on the table.

12       We would contend that it does go to bias, prejudice, and

13   credibility when you have a competitor who -- the intention of

14   the competitor is to sink ADSI and --

15           **THE COURT:**  I don't disagree with that, and that's why

16   I -- you can get into that in a small measure, but what you

17   want to do is litigate -- and perhaps it's an issue of

18   proportion.  Do you want me to say you get five minutes on a

19   topic?  I mean, I don't know what kind of boundaries you want.

20   You cannot, once you have -- you cannot litigate all of the

21   specifics of what's happened in that -- in that case here.  And

22   we -- when you have all of these invoices and everything else,

23   no, that is not going to be allowed.

24           **MR. ATKINSON:**  And, Your Honor, we understand the

25   Court's desire to limit this, and it is not our intention to

1    litigate the state action in your court.  I think where we left

2    off was because this is a prohibition being placed on the

3    Defendants, the invitation was -- and this is at the request of

4    the Third-Party Defendant.  The invitation was for the

5    Third-Party Defendant to specify what it is that we're not to

6    get into.

7         All of that aside, we certainly understand the Court's

8    position, and it's very much a matter of 403 and fairness, and

9    we -- it may be a matter of we just need to -- some kind of

10   time limit, but even that, it's not our intention to then use

11   that time to get into irrelevant matters.  We simply want to

12   put out the bias, prejudice, credibility for the jury to

13   understand and to see our point of view.

14        **MR. KIRKE:**  Your Honor, if I may, I appreciate the

15   Court noting on page 3 of the opposition items which disturbed

16   and concerned us.  I also want to point out on page 2 of the

17   opposition and -- page 2, line 17, as a potential area of

18   inquiry, the Defendants -- and I quote -- "including the

19   circumstances of her departure from ADSI," close quote, that

20   also is inconsistent with the Court's order which was issued on

21   Tuesday of this week, Tuesday, November 3rd, and that is Docket

22   284.

23        The Court, as I said, already issued an order -- as the

24   Court said earlier, already issued an order.  And with respect

25   to Ms. Uddin's termination, the Court ordered that Defendants

1   only could delve into, with respect to the termination, the

2   fact that Ms. Uddin was terminated by the Defendants and any

3   basis which was communicated directly to her.  And then the

4   Court lists other items there and then says, quote, "no other

5   issues may be examined without the express approval of the

6   Court," end quote.  And that is again Docket 284 at page 6,

7   line 12.

8        And yet now we get an opposition that is -- that is

9   apparently proffering -- intending to proffer testimony that is

10  inconsistent with something the Court already ordered and goes

11  into -- takes us into the rabbit hole of the state court

12  litigation.

13       **THE COURT:**  Well, I will say that both of these

14  documents, the opposition and my order, were issued on the same

15  day.  One is Docket 284; one is Docket 285.  I haven't checked

16  the timestamp.

17       So I can tell you the reason why I included that

18  additional language regarding her termination was in fact to be

19  explicit that the scope isn't supposed to bring in all

20  the other theories that were never communicated to her.  Again,

21  that's the -- it seems to me that this long-standing dispute

22  between Rahi Systems and ADSI will ultimately get resolved, but

23  it's going to get resolved by the state court.  It's not going

24  to get resolved here.

25       And so if they told her, you know, that they were

1   terminating her because she was conspiring with Rahi, then, you

2   know -- then they can say that.  I don't know what they told

3   her.  I have no idea exactly what they told her.

4        So, again, what I'm trying to do is cabin this in terms

5   of -- in terms of the bias issues.

6        I will also say that I went back, and with respect to

7   Exhibits 31, 33, and 34, all of those were referenced in my

8   summary judgment order which is at Docket 246, pages 12 to 13.

9   The documents -- Exhibit 27 was also referenced in that order

10  at page 12, and Exhibit 35 was also referenced in that order at

11  page 11.  And the Court's views on the relevance of those

12  documents is set forth therein.

13       Again, I don't think that they have any relevance to the

14  counterfeiting, and they seem to me to go beyond the parameters

15  of bias by trying to litigate more of the state court action by

16  reference/cross-reference to them than I will allow in this

17  case.

18       So in light of that, you know, I'll see if I can fashion

19  something to make it more clear for you all.

20       **MR. KIRKE:**  Your Honor, again, if I may -- and maybe

21  this is helpful.  There are some aspects that -- there are a

22  couple of items in here, in the opposition, with respect to

23  contemplated testimony that Third-Party Defendant Nabia Uddin

24  would stipulate to.  I don't know if you would prefer that I

25  confer with Mr. Atkinson on that or share what we would

1   stipulate to because some of what's in here as proffered

2   testimony frankly is true.  There is no reason to bring in

3   Mr. Raisoni to testimony to it, especially when we will

4   stipulate to some of these.

5        Specifically we would stipulate to what's on page 3, the

6   facts going from line 8 to 18, and Ms. Friend will jump in and

7   correct me if I'm misstating or overstating, but I believe

8   that's correct.

9        **THE COURT:**  I'm not going to stop him from questioning

10  her.  That's why you have -- that's why you have

11  cross-examination.

12       **MR. KIRKE:**  Oh, oh, I mean -- "her" -- I mean

13  Ms. Uddin would be on the stand.  I was talking about

14  Mr. Raisoni.  I mean --

15       **THE COURT:**  You can't -- I mean, look.  In order to

16  bring in a person for purposes of impeachment, you have to have

17  something that you're impeaching.  If she agrees that she was

18  terminated, if she agrees that -- with your timeline, you can

19  argue what it means, but you can't bring in someone to impeach

20  if she agrees.  She may not agree with, you know, the argument,

21  but it's not impeachment.  It's kind of the foundation for

22  impeachment if she disagrees or she lies or something.  So

23  without a foundation, you can't bring in someone else to

24  impeach.

25       **MR. ATKINSON:**  Your Honor, I take the Court's point.

1  I suppose there is -- there are elements of what Mr. Raisoni

2  would testify to that are relevant to the action and not

3  necessarily for impeachment purposes, but to put together -- to

4  explain to the jury what actually happened here because you

5  have a former employee making very serious accusations against

6  her former employer, ADSI.  She engaged in -- she made the

7  admissions that she made at deposition about what her own

8  conduct was.  She goes -- she is terminated.  She goes to work

9  for the competitor, and she's told, while working for the

10  competitor, go over to the Plaintiff and report the Plaintiff

11  for counterfeiting, which Mr. Raisoni, as someone in the

12  business, also would know the effect that would have on his

13  competition.

14      So, Your Honor, I would just --

15      **THE COURT:**  Hold on just a minute.  You haven't

16  deposed him; right?

17      **MR. ATKINSON:**  We have not.

18      **THE COURT:**  So you want to put him on the stand and

19  ask him whether he told her to go and -- and report to Cisco

20  that ADSI was counterfeiting?  That's what you want to ask him

21  on the stand?

22      **MR. ATKINSON:**  Among other things, yes, Your Honor.

23  But that -- I don't think that's the total extent of it.

24      **THE COURT:**  And you expect him to say "yes" to that

25  question?

1     **MR. ATKINSON:**  Well, if he says "no," that's

2  impeachable.  I mean -- and, Your Honor, I'm also --

3     **THE COURT:**  You understand what's going on here.

4  You're trying -- what you're trying to do is bring in a

5  third-party witness to prove bias with respect to someone else,

6  and you're actually not even going to prove it because the

7  answers to your questions aren't consistent with what your

8  theory is.  And you, as the lawyer, asking a question is not

9  evidence.

10     **MR. ATKINSON:**  Your Honor --

11     **THE COURT:**  So first you would -- who is going to

12  testify that this happened?  Who is going to testify that that

13  happened?

14     **MR. ATKINSON:**  Among others, I think Ms. Uddin will

15  testify to it, and I expect Mr. Raisoni in your courtroom will

16  tell the truth.

17     **THE COURT:**  So how is that impeachable?  How is he

18  impeaching if she's affirmatively saying that that's true?

19  Then you can't use him to impeach?

20     **MR. ATKINSON:**  Your Honor, I think this idea about

21  impeachment -- I'm talking about affirmative evidence here not

22  just impeachment.

23     **THE COURT:**  It's not affirmative evidence being

24  probative of any element of any claim.  That's the problem.

25  So, Mr. Atkinson, to the extent that you're offering evidence,

1   it has to be probative of an element of a claim.

2          **MR. ATKINSON:**  And, Your Honor, we would submit to the

3   Court that it is probative because it shows that -- it shows

4   what actually happened here.  It shows that this case is a

5   result of a competitor.

6          **THE COURT:**  Mr. Atkinson, we can agree to disagree on

7   this one, and you need to go back and think about it.  I'll

8   tell you how I think about it:  The evidence that is relevant

9   and probative of an element of a claim.  You've not identified

10  any element of a claim to which this testimony is relevant.

11  What you've identified it as is relevant and probative of the

12  bias of someone else's testimony.  That particular piece is --

13  she's going to agree.

14       So let's just say it this way.  He doesn't come in without

15  a proffer after I've heard her testimony.  I just am not

16  hearing you say anything which would suggest that it's anything

17  other than collateral information.  Totally relevant to your

18  other lawsuit, but not really relevant here.

19         **MR. ATKINSON:**  Your Honor, I -- I think the Court said

20  it best.  I think we agree to disagree.  I will revisit this.

21       In terms of elements, I -- this is the element of whether

22  or not counterfeiting happened, and so in terms of showing the

23  jury a complete picture and allowing the jury to come to its

24  own conclusions about what happened here, we think -- and maybe

25  it's a matter also of looking at it in totality.  You have a

1   former employee hopping over to the competitor and then making

2   all of these accusations against the former employer.

3        **THE COURT:**  Well, that's all going to be in front of

4   the jury.  It's all in front of the jury.  They're going to

5   hear that.

6        **MR. ATKINSON:**  And Mr. Raisoni would know what kind of

7   damage that would cause.

8        **THE COURT:**  Well, what does that have to do with --

9   what does that have to do with anything?  It's, again, relevant

10  to your state court claim.  How is it relevant here?

11       **MR. ATKINSON:**  Your Honor, I -- I mean, I would like

12  to give this a little more thought before I make my

13  presentation to the Court, but I would put it this way.  The

14  Court is familiar with the concept of *res ipsa loquitur*.

15  Normally former employees don't go along and, in the ordinary

16  course, turn on their former employer.  Something happened

17  here, and for Ms. Uddin to go to Cisco and say, "Hey, I,

18  Ms. Uddin, committed a bunch of crimes at ADSI," to put it

19  bluntly, "but you really should give a hard look at ADSI" --

20  for her to do that at the urging of her employer and boss and

21  the person, Mr. Raisoni, who would know the ripple effect that

22  this would have, there is at least a scintilla of relevance

23  there.  And I know my burden is more than just a scintilla, but

24  we think it gets over whatever 403 would have against us.

25       So I would like to make my presentation to the Court and

possibly flag particular elements to the Court.  That's why we

think the jury should have an opportunity at least to have this

information.

And I should also footnote, Your Honor, we are not -- we

have been given an allotted amount of time.  It is not in our

interests, among other reasons -- and we don't want to attract

the ire of the Court.  It is not in our interest to go down, as

the Court called it, rabbit holes.  Our intention here is to

put on a focused defense, but it's just a matter of giving the

jury a complete picture of what we think happened, minding, of

course, the Court's admonitions and orders.

**THE COURT:**  As you know, I am trying to -- I am trying

to slice this case in a way that deals with lots of complicated

issues.  Back to my point of bifurcation.  So you're welcome to

make a presentation on that later.  I've given you my

preliminary indication, and I've told you what the basis of it

is.  So I think it is important that you, you know, figure out

the basis for the proffer.

Okay.  Back on the claim against Uddin.  A reminder in

general, conduct is unfair when a practice offends an

established public policy.  So it has to be tethered -- the

unfair prong of the UCL claim has to be tethered to some

legislative-declared policy.  Where is the UCL claim tethered

under the unfair prong given that the Lanham Act doesn't serve

as that basis?

1          **MR. ATKINSON:**  I'm going to defer to my colleague,

2     Mr. Parkhurst, on this question.

3          **MR. PARKHURST:**  Yeah, Your Honor.  The

4     legislative-declared purpose is not committing trademark

5     infringement.  I understand that those claims are dismissed,

6     but the UCL is based on the underlying conduct.  So if the

7     underlying conduct is the accusation that Ms. Uddin, outside

8     the scope of her employment, acted on her own to commit

9     trademark infringement, then that's illegal, unfair, against

10    legislative policy conduct.

11         **THE COURT:**  The fraudulent prong requires a showing

12    that members of the public are likely to be deceived as well as

13    proof of actual reliance.  Will there be evidence of that to

14    support the fraudulent prong?

15         **MR. PARKHURST:**  Evidence of actual reliance,

16    Your Honor?

17         **THE COURT:**  That's what the law requires.

18         **MR. PARKHURST:**  That I'd -- I'd have to get back to

19    the Court, if that's something -- evidence of actual reliance.

20    Certainly the first part of that prong -- I mean, that is the

21    nature of trademark infringement, is to fraudulently induce

22    reliance on somebody to believe there is an association or some

23    sort of likelihood of confusion or something like that, but to

24    show actual reliance, I'd have to get back to the Court,

25    Your Honor.

1    **THE COURT:**  So, again, the reason that I'm asking

2    these questions is to go back to the beginning and the elements

3    of these claims.  If you require a finding by the jury on some

4    factual issue upon which you want me to rely when I decide the

5    UCL claim, you actually have to know what the legal basis is

6    upon which you are proceeding, and I need that clear.

7    So I'm going to need a clear articulation of your theory

8    and the evidence that you think is going to support the UCL

9    claim.  That way we can figure out what we're asking the jury

10   to decide in terms of equitable indemnity.

11   **MR. PARKHURST:**  Understood, Your Honor.

12   **THE COURT:**  Okay.

13   Deposition designations are long overdue so I'm assuming I

14   have nothing to do; right?

15   **MR. NELSON:**  Your Honor, this is Richard Nelson.

16   Unfortunately, Your Honor, you have nothing to do right

17   now.  We do have -- I circulated yesterday or the day before a

18   draft of revised designations to counsel, so we should be able

19   to have that to you shortly.

20   **THE COURT:**  Folks, I'm closing down very soon in terms

21   of your case.  We were already supposed to be in trial, right,

22   on Monday?  This is the amount of time that I reserved for

23   focusing on your case.  I go into trial in another case in

24   about three weeks, and that's going to last into December, and

25   I'm not -- and then I'm going to take, I don't know, maybe a

1   week off before I have to try your case.

2       So we are done.  I mean, this is all wrapped up and it's

3   got a present and I am going to put it on the shelf and I'm not

4   going to look at it.  So we are -- we are at, you know, short

5   strokes here.  That's why we're doing all of this.  As I said,

6   we were supposed to be done already.  So you can send it.  I

7   don't know when or if I'll get it back to you, given that it's

8   at least a month late.

9       Mr. Nelson, I'm still looking for a revised list of the

10  depositions transcripts.

11          **MR. NELSON:**  The index, Your Honor?

12          **THE COURT:**  Right.  I mentioned to you that it wasn't

13  consistent with what you sent me.

14          **MR. NELSON:**  Yeah.  I believe that was corrected

15  earlier this week.

16          **THE COURT:**  It is on the docket?

17          **MR. NELSON:**  I don't know if they actually filed it on

18  the docket or if it was -- if it was just sent to the Court.  I

19  don't know if the index -- I believe the index was corrected,

20  Your Honor, and it was sent to chambers.  I don't believe it

21  was --

22          **THE COURT:**  I'll look for it again.  If I don't have

23  it, then we'll send you a note.

24          **MR. NELSON:**  Please.  Thank you.

25          **THE COURT:**  Mr. Parkhurst, how much time do you want

1    before I get that -- well, I guess what I'm looking for from

2    you all are I need the elements of those UCL claims and I will

3    need these revised instructions.  Can I get them on -- by next

4    Tuesday?  Wednesday is a holiday, which means I can work on

5    your case.

6            **MR. NELSON:**  Your Honor, I will have the revised

7    instructions drafted and circulated today to counsel, so

8    hopefully we would be able to work out any issues either over

9    the weekend and get it filed on Monday or Tuesday.

10           **MR. KIRKE:**  And the Third-Party Defendant, Nabia

11   Uddin, will have any comments to Mr. Nelson and the rest of

12   counsel by tomorrow.

13           **MR. ATKINSON:**  It does not sound like Your Honor's

14   timeline will be a problem.

15           **THE COURT:**  Okay.

16           **MR. BOYD:**   Your Honor, just briefly, Ian Boyd.

17       The index was emailed to the Court on Wednesday at about

18   10:54 a.m., but we are certainly happy to resubmit or file,

19   however the Court wishes.

20           **THE COURT:**  Okay.  I'm sure if it was there, it's

21   there.  So I will ask my -- I'll ask my staff to take a look

22   for it.  I did that myself, so it may not have been on their

23   radar.

24       Okay.  What else do you want to do today?

25           **MR. ATKINSON:**  Your Honor, this is Tyler Atkinson.

1       On the Court's order, Document 284, this is the second

2   pretrial order, the Court made a ruling on the Motion in Limine

3   No. 2 and 4.  I'm looking at page 3.  This has to do with the

4   adverse inferences.

5              **THE COURT:**  You mean on page -- on page 3 and 4?

6              **MR. ATKINSON:**  Yes, Your Honor.  Starting on page 3.

7              **THE COURT:**  Yes.

8              **MR. ATKINSON:**  And, Your Honor, I guess I would start

9   by saying obviously we ask for no adverse instruction, that it

10  not be given.  The Court has given this due consideration.  The

11  Court has exercised some care, I can tell, in terms of limiting

12  the number of times a jury will hear the adverse inference

13  instruction.

14      All of that said, I did, just for purposes of letting the

15  Court know our authorities -- and, frankly, for the record, we

16  believe an instruction at the outset of the case to tell the

17  jury when it's getting, as the Court knows, very few

18  instructions at the very beginning relative to all the

19  instructions the jury is going to be hearing -- to hear about

20  the Fifth Amendment at that stage we think is unduly

21  prejudicial to the Defendants and that the Court can fulfill

22  its desire to strike a balance without starting off the case

23  with such an instruction.  That's all I have to say about it.

24             **THE COURT:**  I think it's a valid point, now that I've

25  worked through the instructions, which I hadn't done before.  I

1   might do something shorter, or you could all stipulate that

2   it's part of your stipulations, and that might be the

3   appropriate place for me to say it.

4       I don't have -- do I have any stipulations from you all in

5   terms of being -- that as part of the instructions I think is

6   2. -- yeah 2.2.  So typically I would read any stipulations to

7   the jury.  I can't remember whether I have some from you.

8       If I do, Mr. Nelson, you would put those in there.

9       **MR. NELSON:**  Your Honor, with regard to stipulations,

10  so Document 235 are the two stipulations that the parties were

11  able to accomplish earlier.  Stipulation No. 1 has to do with

12  expert testimony.  I'm not sure if that is being contemplated

13  as being read to the jury.  And No. 2 is just that we're not

14  going to be discussing illegal drug problems that any of the

15  defendants may have.  Again, I don't think that is put in front

16  of the jury.

17      There are a number of other stipulations that the

18  Plaintiffs requested, but those were not stipulations.

19      One thing, Your Honor, there was -- Plaintiffs did request

20  an instruction from the Court with regard to the fact that

21  certain witnesses are not going to be testifying; that they

22  have exercised their Fifth Amendment right and have chosen not

23  to testify and that the jury should not hold that against

24  Plaintiffs for not calling those particular witnesses.  I think

25  that the Court addressed that separately.

1          **THE COURT:**  So where in the instructions is that?

2          **MR. NELSON:**  It's not in the actual instructions,

3    Your Honor.  That was -- I think it was part of our Motion in

4    Limine No. 1, too.  Hold on one second.

5          **MR. KIRKE:**  Pardon me for interrupting, but I believe

6    it was in the proposed statement of the case as well.

7          **THE COURT:**  So the statement of the case I don't read

8    as part of the instructions.  I use your statement of the

9    case -- I see.  All right.

10         There are two times when I use the statement of the case.

11   One is when I address the venire, and then, two, I think it's

12   in one of these earlier instructions, but you all agreed to it

13   so I haven't spent any time thinking about it.

14         **MR. ATKINSON:**  Your Honor, this is an issue with a

15   handful of submissions that the parties have made to the Court.

16   We have, generally speaking, offered the Court at times joint

17   submissions where we've attempted to carve out some subset if

18   the parties want something else in front of the Court.  In this

19   case, the reference to a joint submission, the preliminary

20   statement of the case that the parties have agreed to does not

21   get into the Fifth Amendment.  In fact, this gets into the

22   concern I was inarticulately trying to address to the Court,

23   which is to talk about the Fifth Amendment.

24         When the jury is just hearing about this case and getting

25   its initial instructions, we have a concern that that is going

1  to cause the jury to -- it will have a tendency to overshadow

2  whatever else the jury is going to hear about the case.  So

3  that's --

4  **THE COURT:**  Okay.  Again, I take your point, and I

5  will think about it once I have -- once I have all of the

6  instructions in front of me and the manner in which I'm going

7  to give them.

8  I assume -- and it is fair game -- that Plaintiff in his

9  opening statement is going to mention the Fifth Amendment.  The

10  cat is not going to be in the bag very long, Mr. Atkinson.  But

11  I take your point that coming from the lawyers and coming from

12  me are probably two different things so I will think about it.

13  **MR. ATKINSON:**  Thank you, Your Honor.

14  **THE COURT:**  Okay.  Anything else you want to talk

15  about?

16  **MR. NELSON:**  Your Honor, Rick Nelson for the

17  Plaintiffs.

18  There was an issue that the Court discussed at length in

19  the last pretrial conference, and that had to do with the

20  adverse inference with regard to a testifying witness, Shahid

21  Sheikh.  The Court -- it proposed the possibility of

22  bifurcating the case in that regard because Plaintiffs withdrew

23  our demand that -- or our request that the Court not allow

24  Mr. Sheikh to testify since he had asserted the Fifth Amendment

25  during his deposition.

1    During the conference, Defendants asserted that he in fact

2  would testify, and Plaintiffs withdrew our request with regard

3  to Mr. Sheikh.

4    What I didn't fully appreciate as that was happening was

5  the fact that Third-Party Defendant Uddin clearly has a

6  different view on that and that she is prejudiced with regard

7  to him now testifying at the trial, unringing his assertion of

8  the Fifth Amendment.

9    And the Court had proposed one way to solve that --

10       **THE COURT:**  Hold on just a minute, Mr. Nelson.

11       (Pause in proceedings.)

12       **THE COURT:**  Okay.

13    Ms. Stone, I saw that you popped off, and so we stopped.

14       **THE CLERK:**  Okay.  It's saying my internet is

15  unstable.  I don't know what to do.  Okay.

16       **THE COURT:**  That's okay.  You didn't miss anything.  I

17  had Mr. Nelson stop.

18    Go ahead, Mr. Nelson.

19       **MR. NELSON:**  And so trying to accommodate Ms. Uddin's

20  concerns with regard to the Fifth Amendment and her inability

21  to get this evidence and properly prepare for trial, with the

22  assertion of the Fifth during discovery and Plaintiffs'

23  position that we now would not object to Mr. Sheikh testifying,

24  and so the Court had proposed a possibility of a bifurcation in

25  which Mr. Sheikh testifies during the first proceeding, jury

then renders its verdict, and then the jury comes back, same

jury comes back and then is told in the sort of second or the

follow-up proceeding that in fact Mr. Sheikh asserted the Fifth

Amendment during his deposition and in the written discovery

that Ms. Uddin had proffered and then provide the adverse

inference instruction at that point and have the jury then

decide the issue presumably with regard to Ms. Uddin.

We did -- the Court asked us to meet and confer about

that, and all counsel did meet and confer about that, and I --

the way that I view it, Your Honor, is that there are three

options:  That being one option, that Mr. Sheikh testifies,

there is a bifurcation, and then the jury is then instructed

with regard to the adverse inference and to ignore everything

they heard from Mr. Sheikh during the first part of the

proceeding.

The second possibility is I take -- I suggest that he

testify in the first proceeding and is instructed with regard

to the adverse inference, that he refused to answer Ms. Uddin's

questions in the written discovery and the additional

deposition questions, and the jury can take whatever inference

it wants to take from that.

And the third, frankly, is that he not be allowed to

testify; that because of his using the Fifth Amendment as a

shield during the discovery, that he shouldn't be allowed to

testify at trial.

1    I think the issue, as I view it, Your Honor, is

2    predominantly one of Ms. Uddin.  I think from the Plaintiffs'

3    perspective, we are willing to have him testify.  We're -- we

4    accept the fact that he took the Fifth Amendment during his

5    deposition, and we're willing to proceed with him testifying

6    and examining him.  That's our view.  I think that Ms. Uddin

7    has a different view of that, and so I think it is -- it's

8    something that is complicated and we probably need to resolve.

9         **MR. ATKINSON:**  Your Honor, this is Tyler Atkinson.

10        **THE COURT:**  It sounds like you all don't agree on an

11   approach.  I mean -- go ahead, Mr. Atkinson.

12        **MR. ATKINSON:**  I apologize, Your Honor.  That's the

13   piece that I want to clarify for the Court.

14        We did meet and confer, and I think all parties agreed

15   that -- at least it was my understanding that bifurcation was

16   not economical, and that for various reasons, different parties

17   did not want bifurcation.  So to the extent bifurcation is a

18   subject here, I think we can put that aside.  I think the

19   question --

20        **THE COURT:**  I haven't put it aside.  I mean, so it's

21   not going to cost you -- in my view, it won't cost you any more

22   because you still have the same number of hours.  So it's just

23   a question of when testimony gets cut off or how it gets

24   presented, but the time is the same, unless I do -- you know,

25   unless I do a separate trial, and, frankly, I still need to

1   hear from Mr. Parkhurst about the claim, in any event.

2          But go ahead.

3          **MR. ATKINSON:**  Well, I think, Your Honor, maybe that's

4   where we should pause it and get more information to you about

5   the instruction and the claim, but this is actually a subject

6   that the Court has heard some argument about already in terms

7   of our position that Mr. Sheikh gave more than five hours of

8   deposition testimony, Ms. Uddin never noticed his deposition.

9   Her counsel was present for his deposition.  The subject

10  interrogatories that Ms. Uddin propounded on Mr. Sheikh were

11  propounded at the very end, literally at the close of

12  discovery, and our view is that the requests were duplicative

13  with information that had already come out in this case,

14  including at the deposition, the five-hour-plus deposition that

15  Mr. Sheikh gave in which Ms. Uddin's counsel was present.  And

16  there, you know, was a joint interest, at least to some extent,

17  with the Plaintiffs.

18         So I think maybe we need to get more information to the

19  Court in terms of what we propose needs to be proven to the

20  jury.  I think the Court previously, when the Court addressed

21  bifurcation -- the Court may have discussed having two separate

22  trials rather than just two phases, which obviously would be a

23  lot more streamlined, but it's something I think we need to

24  talk with our other counsel about because I actually thought

25  bifurcation had been, at least as far as the parties were

1    concerned, put to rest.

2         THE COURT:  Anybody else want to chime in?

3         MR. KIRKE:  Yes.  Thank you, Your Honor.

4    Your Honor, at our hearing a week ago, counsel made the

5    same argument on the adverse inference, and the Court shared

6    its thoughts or actually shared its order that Ms. Uddin

7    would -- that this was a winning argument for her, and that

8    Ms. Uddin would --

9         THE COURT:  I thought I said it was -- that I still

10   had this under submission, didn't I?

11        MR. KIRKE:  I'm talking about with respect to the

12   adverse inference.  I thought -- I mean, I was just thumbing

13   through the transcript from last week, and the Court already

14   ruled on summary judgment with respect to Ms. Uddin's

15   entitlement on the adverse inference.

16        The reason -- one reason that Ms. Uddin is opposed to

17   bifurcation is that she's going to -- she would have to testify

18   in -- in both phases -- I mean, I think it would be inefficient

19   for a couple of reasons and also, frankly, unfair to Ms. Uddin

20   because she would have to get up there and testify in Cisco's

21   case in chief; then be subjected to cross-examination by ADSI.

22   That phase is done.  Then she's got to come back and do that

23   again in her phase.  And also, I mean, we're going to have some

24   of the same witnesses in our case.

25        THE COURT:  Mr. Kirke, I don't even know the elements

1    of your claim, and no one has articulated them, so -- at this

2    point, so I don't know that I agree with you.  And maybe the

3    only person -- well, I don't know.  I mean, that's -- I need to

4    see what -- what's -- I need to know the elements of the claim,

5    and we're at the time of trial, and I don't have elements.  So

6    I need -- I need the elements.  Do you know what they are,

7    Mr. Kirke?

8         **MR. KIRKE:**  The elements of the -- of the claim -- the

9    claim against us for which ADSI didn't offer an instruction?

10        **THE COURT:**  Yes.  That one.

11        **MR. KIRKE:**  Off the top of my head, I do not,

12   Your Honor.  We tried -- we tried to offer -- we did offer an

13   instruction on indemnity, but...

14        **THE COURT:**  But even that wasn't, you know -- wasn't

15   entirely -- didn't entirely work because it involved me making

16   decisions that I hadn't decided and that I wasn't going to

17   decide.  I mean -- so...

18       I think I understand your various perspectives.  I just

19   need to have a better understanding myself of what the elements

20   are so that I know what it is you are all going to try to prove

21   and how much -- you know, whether there is -- whether there is

22   a way to -- you know, to slice it so that everybody is

23   protected.

24        **MR. NELSON:**  And, Your Honor, if I may, Richard

25   Nelson.

1      I think one concern that we have is that the issues for

2  the indemnification are closely intertwined with the underlying

3  issue of the case, which is whether or not ADSI was selling

4  counterfeit Cisco products.  They want to say that Ms. Uddin

5  was intricately involved in that and was doing it without their

6  knowledge, but that is their -- that is part of their defense

7  on the Lanham Act, is they had a rogue employee who was doing

8  this without the company's knowledge.

9      Part of the way, I think, they are going to try to

10  establish that is through the testimony of Shahid Sheikh, which

11  gets us to the crux of the problem in that from at least

12  Uddin's perspective, they weren't allowed to fully explore

13  those issues with Shahid Sheikh during discovery, and it would

14  be unfair for him to then testify about that.

15      So the bifurcation -- I mean, a bifurcation I could

16  imagine in -- in some cases would work if the issues are

17  discrete and there's some separation.

18          THE COURT:  So, Mr. Nelson, one of the reasons why I'm

19  pushing on the parties is because I don't know, frankly, that

20  there is an appropriate affirmative claim against Ms. Uddin

21  other than in the sense of what -- other than the actual

22  defense of the primary claim.  You know --

23          MR. NELSON:  I understand.

24          THE COURT:  -- if I look at the instructions that you

25  have all given me, with respect to agency, if you can't win on

1   the agency defense per the instruction, you have no -- it's not

2   clear to me that you have a claim at all.  At all.  And you

3   certainly didn't offer one.  That's why I'm pushing.  I mean,

4   you know -- and judges can only rule on things that are brought

5   to us.  But, frankly, I'm sitting here wondering whether there

6   is any claim whatsoever.

7        **MR. NELSON:**  And, Your Honor, just so I'm clear, the

8   claim that you're wondering about right now is the claim by

9   ADSI against Uddin, or is it the --

10       **THE COURT:**  Yes.

11       **MR. NELSON:**  Yeah.  Because Cisco will present a lot

12  of evidence with regard to the counterfeit products that were

13  being sold by ADSI.  That's our focus.  And the various

14  individuals at ADSI, which will include Jessica Little and the

15  Sheikhs, etc., that were involved in that, they're defendants

16  in the case.  That's the focus of our evidence.

17      And so as part of that, if during the -- during that phase

18  if it is -- if there are two phases, that phase, then there

19  would be testimony by Shahid Sheikh about his involvement in

20  this, and I believe that part of what he may say is that --

21  that he was relying on or that there were things that Ms. Uddin

22  sent to him about what was happening.  And so --

23       **THE COURT:**  So here's the thing.  As I read that

24  instruction, the Defense says, "It wasn't us; it was Uddin,"

25  and the jury is being instructed to determine that if it was

1  Uddin and she was acting on her own, then there is no -- they

2  must find in favor of the Defendant.  So if they find in favor

3  of the Defendant because it was Uddin, that's it.  There is no

4  other claim.  I don't know that you can have -- so that's what

5  I'm trying to unpack here.

6        **MR. NELSON:**  Yeah.  No.  I appreciate that,

7  Your Honor.

8        And so we have revised Instruction 4.12 to make clear

9  that -- 4.11 and 4.12 that the issue with regard to Uddin is

10 that while she was there at ADSI and acting as a -- we claim as

11 an agent for ADSI, she was doing that within the scope of her

12 duties, and everything she did was for the benefit of ADSI.

13       We may or may not win on that, and as part of that

14 instruction, it says well, if the jury decides that she was

15 acting outside her scope, then as to those -- that activity,

16 then there is no liability for ADSI.

17       But chronologically, Your Honor, it's important to note

18 that she left in September of 2017.  The activity continued

19 through the middle of 2019.  So there's going to be -- there's

20 going to be much, much evidence about activity at ADSI long

21 after Ms. Uddin left.  So they may be able to pare off some of

22 the damage and some of the activity if they can establish that

23 Ms. Uddin was acting as a rogue employee, but that won't --

24 that won't provide complete comfort for them because of the

25 evidence of what was happening around them that had nothing to

1    do with Ms. Uddin when she was an employee and then obviously

2    when she was no longer there, and that activity can't be pinned

3    on Ms. Uddin either.

4         **THE COURT:**  Well, it may be -- and what is the time

5    period for which there is evidence of her potential rogue

6    actions?  Mr. Atkinson?

7         **MR. PARKHURST:**  Your Honor, I can -- it's up until she

8    left, so that's September, I believe, 22, 2017, was when she

9    was terminated from ADSI.

10        **THE COURT:**  And when did it start?  What's the

11   beginning date?

12        **MR. PARKHURST:**  She worked there for -- I can't

13   remember.  It's more than a decade.  The time period would be

14   the period of her employment -- it would be up until the

15   point -- because it's an indemnity claim, it would be up until

16   the point that Cisco is seeking relief, Your Honor.

17        **THE COURT:**  Well, when is there evidence -- when do

18   you have evidence --

19        **MR. NELSON:**  Your Honor, I can answer the question.

20   So what -- the evidence of counterfeit trafficking that we have

21   commences in April of 2015 and it goes from April 2015 until

22   the summer of 2019.

23        **THE COURT:**  And she was in the exact same role for

24   those two years or two and a half years?  Was her -- the

25   actions that she or her job or whatever, you know, where there

1  is this argument about whether or not she was acting within the

2  scope of her employment -- was that always the same for that

3  two and a half years?

4      MR. PARKHURST:  My understanding, Your Honor, during

5  that time period, she was ADSI's buyer, yes, so she was...

6      MR. NELSON:  Your Honor, I -- and not that it matters

7  for this point.  The question is was it static, and I think --

8  I think the answer is yes.  There were -- there were more

9  buyers.  She wasn't the only buyer, but I don't believe -- I'll

10  let Mr. Kirke or Ms. Friend provide that guidance, but I don't

11  know of a change in her employment status.

12      MS. FRIEND:  Although, Your Honor, I would say the

13  evidence relating to the -- the shell company that Ms. Uddin

14  was asked to create, that was created in early 2016, and that's

15  really when the allegations of her involvement begin.

16      THE COURT:  All right.  Is there any scenario under

17  which you could maintain an indemnity claim against Ms. Uddin

18  if the jury found that she was acting within the scope of her

19  employment for the entire period?

20      MR. PARKHURST:  I mean, I don't want to -- I mean, my

21  initial impression is no.  If there's a finding that every

22  action that Ms. Uddin took during the course of her employment

23  was not the subject of rogue action, outside-the-scope

24  action -- if they determine that she was acting as ADSI's agent

25  for that period, then I think -- yeah.  I think Your Honor is

1    correct.

2           MR. ATKINSON:  Your Honor, I agree.  I think I agree

3    with my colleague, but it is something we would like to look

4    into to make sure we're correct on that point.

5           THE COURT:  And --

6           MR. PARKHURST:  And I would just point out,

7    Your Honor, that if the Court were inclined to make a finding

8    on Ms. Uddin's agency in the first phase -- we've been talking

9    about bifurcation -- I mean, if that finding was in the first

10   period, I mean, that goes directly to the indemnity claim,

11   and -- I'm sorry.  Maybe I'm not explaining it correctly

12   because I'm thinking out loud, but that would cut against

13   bifurcation, I would think.

14          THE COURT:  Except that I would never have to give the

15   jury an instruction unless they found that she was acting

16   outside the scope of her authority.  So they could deliberate.

17   I could give an instruction, including an admonishment, if

18   necessary, with respect to the Fifth Amendment and tell them

19   that they couldn't consider certain things so -- I don't know.

20   But I would never have to cross that bridge if they do not find

21   affirmatively that she was acting outside the scope of her

22   employment.  It makes for fewer appellate arguments.  I'm

23   always in favor of fewer appellate arguments to protect the

24   jury's verdict.

25          MR. NELSON:  Your Honor, this is Richard Nelson.

1       This is -- this is, as I mentioned before, less of our

2   concern, and our argument --

3           **THE COURT:**  I agree.

4           **MR. NELSON:**  However, it seems to me very difficult

5   for the jury to hear from Shahid Sheikh and for Shahid Sheikh

6   to describe how this was rogue conduct and was not, you know --

7   was not sanctioned by the company when Ms. Uddin is asking for

8   Mr. Sheikh not to be permitted to testify because of his

9   assertion of the Fifth Amendment during discovery.

10          **THE COURT:**  Well, I get it, Mr. Nelson.

11          **MR. NELSON:**  Okay.

12          **THE COURT:**  As the Defendant said, there is no way to

13   accommodate everybody.

14       All right.  I don't know that you can help me at this

15   point given that you're not going to agree.  I'm just going to

16   have to ultimately decide.  And I may make a tentative decision

17   and then have to revise later once I hear all the evidence.

18       Settlement.  Have you agreed to go back to a mediator?

19          **MR. NELSON:**  Your Honor, Plaintiffs are still ready

20   and willing to do that.

21          **THE COURT:**  I thought you were going to talk about it,

22   Mr. Atkinson.  Did you talk about it?

23          **MR. ATKINSON:**  Your Honor, we did meet and confer.

24   This is not a particular issue that we met and conferred on.

25       We respect to the Court's desire for us to go to

1  mediation, if that's what we're ordered to do, we absolutely

2  will do what we're told to do.

3          **THE COURT:**  So ordered.

4          **MR. ATKINSON:**  And we'll work it out.

5          **THE COURT:**  You are ordered --

6          **MR. ATKINSON:**  I'm sorry?

7          **THE COURT:**  I said "so ordered."

8          **MR. ATKINSON:**  Understood.

9          **MR. KIRKE:**  Your Honor, I appreciate the strains

10  placed upon the Court, and I know the Court gave its indication

11  last time regarding the use of -- of a magistrate judge.  Is

12  that -- is it possible at all for us to go to a magistrate -- a

13  magistrate judge who would have some level of authority -- of

14  perceived authority?

15          **THE COURT:**  I really don't think there is anyone

16  available.

17      So, again, by Tuesday see if you can find someone

18  privately to do it.  I will ask if someone is available and let

19  you know, but you should assume no.

20          **MR. ATKINSON:**  Your Honor, I don't -- I apologize.  I

21  don't think it will be difficult for at least the Plaintiff and

22  the Defendants to agree on someone.  If it's possible to do it

23  virtually, I -- I -- a colleague of mine actually wrote a whole

24  blog on virtual mediations.  I think to the extent we can spare

25  crowding people into a room unnecessarily --

1          **THE COURT:**  I think it's the only way people are doing

2     them these days.  It's certainly the only way our magistrate

3     judges are doing them.  No one is meeting in person, so it's

4     all virtual, and that's fine.

5          So by next Tuesday -- Tuesday is the deadline -- let me

6     know who you have picked and when your date is for --

7          **MR. ATKINSON:**  Thank you, Your Honor.

8          **THE COURT:**  As soon as possible.  There are so many

9     mediators out there.  I am told that retired judges shouldn't

10    think that they are going to become billionaires because the

11    market is so saturated.  I'm sure you can find someone.

12         **MR. NELSON:**  We will, Your Honor.  So by Tuesday,

13    would you like us to send an email to chambers just announcing

14    who we have selected and the date that we're looking at?

15         **THE COURT:**  You have -- that's fine.  You have lots of

16    things to get me by Tuesday.

17         All right.  Anything else?  And I don't think I'll decide

18    on this bifurcation or how I will deal with the adverse

19    inferences.  You know, until I get more information from you,

20    including the cleaned-up jury instructions, the elements, I

21    really am not sure I can take this much further for you.  Okay?

22         All right.  Anything else?  I'll figure out when I can

23    talk to you again, but I'm not going to put anything on the

24    calendar right now.

25         **MR. NELSON:**  Nothing further from the Plaintiffs,

1    Your Honor.

2              **MR. ATKINSON:**  Nothing from the Defendants.  Thank

3    you, Your Honor.

4              **MR. KIRKE:**  Thank you, Your Honor.

5              **THE COURT:**  Okay.

6              **MR. PARKHURST:**  Thank you, Your Honor.

7              **MR. BOYD:**  Thank you, Your Honor.

8              **THE COURT:**  Okay.  Everyone stay safe.  We're

9    adjourned.

10                    (Proceedings adjourned at 12:00 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    <u>CERTIFICATE OF REPORTER</u>

4          I certify that the foregoing is a correct transcript

5   from the record of proceedings in the above-entitled matter.

6

7   DATE:    Tuesday, November 10, 2020

8

9   *Pamela Batalo Hebel*

10  _____
    Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
11  U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25